**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- X
                                  :

| | |
|---|---|
| STUDENTS AGAINST ANTISEMITISM, INC., STANDWITHUS CENTER FOR LEGAL JUSTICE, MILES RUBIN, DANIELLA SYMONDS, ERIN MCNULTY, NOAH MILLER, and VALERIE GERSTEIN, | Case No. **COMPLAINT** Jury Trial Demanded |
| Plaintiffs, | |
| -against- | |
| THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, and TRUSTEES OF BARNARD COLLEGE, | |
| Defendants. | |

-------------------------------------------------------- X

Plaintiffs Students Against Antisemitism, Inc. ("SAA"), StandWithUs Center for Legal Justice ("SCLJ"), Miles Rubin ("Rubin"), Daniella Symonds ("Symonds"), Erin McNulty ("McNulty"), Noah Miller, ("Miller"), and Valerie Gerstein ("Gerstein," and collectively with Rubin, Symonds, McNulty, and Miller, the "Individual Plaintiffs"), for their complaint against defendants The Trustees of Columbia University in the City of New York ("Columbia University") and Trustees of Barnard College ("Barnard," and together with Columbia University, "Columbia"), allege as follows:

**PRELIMINARY STATEMENT**

1.      Columbia, one of America's leading universities, has for decades been one of the worst centers of academic antisemitism in the United States.  Since October 7, 2023, when Hamas terrorists invaded Israel and slaughtered, tortured, raped, burned, and mutilated 1,200

people—including infants, children, and the elderly—antisemitism at Columbia has been particularly severe and pervasive.  Columbia faculty and students have openly lauded Hamas's October 7 atrocities as "astounding," "awesome," and "great feats."  Mobs of pro-Hamas students and faculty have marched by the hundreds through Columbia's campus, shouting vile antisemitic slogans, including calls for genocide, such as: "Jews will not defeat us"; "there is only one solution, Intifada revolution"; "we will honor our martyrs"; "resistance is justified"; "by any means necessary"; and, in Arabic, "from water to water, Palestine will be Arab."  Those mobs have occupied buildings, promoted violence against Jews, and harassed and assaulted Jews on campus.  Jewish and Israeli students have been spat at, physically assaulted, threatened, and targeted on campus and social media with epithets such as "fuck the Jews," and "death to Jews."  Columbia faculty have promulgated antisemitism in their courses and dismissed and intimidated students who object.  What is most striking about all of this is Columbia's abject failure and deliberate refusal to lift a finger to stop and deter this outrageous antisemitic conduct and discipline the students and faculty who perpetrate it.

2.     Columbia's antisemitism manifests itself in a double standard invidious to Jews and Israelis.  Columbia selectively enforces its policies to avoid protecting Jewish and Israeli students from harassment, hires professors who support anti-Jewish violence and spread antisemitic propaganda, and ignores Jewish and Israeli students' pleas for protection.  Those professors teach and advocate through a binary oppressor-oppressed lens, through which Jews, one of history's most persecuted peoples, are typically designated "oppressor," and therefore unworthy of support or sympathy.  Columbia permits students and faculty to advocate, without consequence, for the murder of Jews and the destruction of Israel, the only Jewish country in the world.

3.     The Individual Plaintiffs, SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and numerous others have explicitly and repeatedly warned Columbia that its severe and pervasive hostile environment harms Jewish and Israeli students.  In fact, Columbia has been aware of its antisemitism problem for years, but its response has been, to say the least, utterly ineffective and clearly unreasonable in not just tolerating, but enabling antisemitism. Columbia has abjectly failed to enforce its policies and discipline those responsible for turning Columbia's campus into a severely hostile environment for its Jewish and Israeli students, including the Individual Plaintiffs and other SAA and SCLJ members.  When, in clear violation of Columbia's policies, a mob of students took over a campus building to further their antisemitic agenda, Columbia's response was not to remove and discipline them, but to enable them to conceal their identities by supplying them with umbrellas and asking bystanders not to film them.

4.     Columbia's longtime practice when it comes to antisemitism—of refusing to enforce its own policies against discrimination and harassment—ensured that Hamas's October 7 terrorist attack would enormously intensify the anti-Jewish abuse on campus.  Shockingly, numerous students and faculty members at Columbia have openly endorsed Hamas and the horrific October 7 massacre it perpetrated even though: Hamas, since its founding in 1987, has perpetrated numerous suicide bombings and other terrorist attacks against civilians; Hamas vows to kill and destroy Jews and Israel; the U.S. State Department has designated Hamas as a Foreign Terrorist Organization; and Hamas repeatedly proclaims its determination to repeat the October 7 atrocities until its genocidal aims are achieved.  Many of Columbia's students and faculty support Hamas and condemn Israel for defending itself against Hamas's attacks—but they are never heard to condemn, let alone rally against, Syria and Yemen, which have killed hundreds of

thousands of Arab civilians, or Pakistan, which is currently expelling almost two million Afghan Muslims, or China, which has imprisoned its Muslims in reeducation camps, or countries like Somalia and Nigeria, where Christians are regularly murdered.

5.      Subjected to intense anti-Jewish vitriol, including from their own professors and Columbia administrators, the Individual Plaintiffs and other Jewish and Israeli students, including SAA's and SCLJ's Jewish and/or Israeli Columbia student members, have been deprived of the ability and opportunity to fully participate in Columbia's educational and other programs and have been placed at severe emotional and physical risk.

6.      In short, Columbia has permitted endemic antisemitism to exclude Jewish and Israeli students from full and equal participation in, and to deprive them of the full and equal benefits of, their educational experience at Columbia, and has invidiously discriminated against them by, among other things, failing to protect them in the same way Columbia has protected other groups—all based on their race, ethnicity, religion, citizenship, and/or national origin.  That Columbia has done so for many years and continues to do so to this day further confirms that it has responded to antisemitism with at best deliberate indifference, that Columbia cannot be left to its own devices, and that its response has been clearly ineffective and clearly unreasonable.

7.      As alleged herein, Columbia's actions, including its deliberate indifference to, and indeed enabling of, antisemitism on its campus, constitute an egregious violation of Title VI of the Civil Rights Act of 1964.  Columbia must now be compelled to implement institutional, far-reaching, and concrete remedial measures.  Columbia must also pay damages to plaintiffs—who have been robbed of their college and graduate school experience—to compensate them for the hostility they have been forced to endure as a consequence of Columbia's unlawful conduct.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq.*).  This Court has supplemental jurisdiction over plaintiffs' related state-law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as plaintiffs' federal claim.

9.      This Court has personal jurisdiction over Columbia University because it is based and operates in New York.

10.      This Court has personal jurisdiction over Barnard because it is based and operates in New York.

11.      Venue in the Southern District of New York is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to plaintiffs' claims occurred and where Columbia University and Barnard are located.

## PARTIES

12.      Plaintiff Students Against Antisemitism, Inc. is a not-for-profit corporation organized under the laws of the State of Delaware, formed to defend human and civil rights, including the right of individuals to equal protection and to be free from antisemitism in higher education.  SAA is composed of voluntary members, including students at higher education institutions, who support SAA's mission and who have been personally aggrieved or otherwise impacted by antisemitism and discrimination in higher education.  SAA's members include current Jewish and Israeli Columbia students experiencing a severe and pervasive hostile educational environment, which causes them to lose the full benefits of Columbia's educational and extracurricular opportunities.

13.     Plaintiff StandWithUs Center for Legal Justice is a tax-exempt membership organization organized under the laws of California, and that partners with StandWithUs, a nonprofit education organization dedicated to supporting Israel and combating antisemitism. Composed of students, professors, and community members, SCLJ enhances StandWithUs's mission through impact litigation and other legal actions.  SCLJ's Jewish and/or Israeli Columbia student members include current Jewish and Israeli Columbia students, who are experiencing a pervasively hostile campus climate and loss of attendant educational and extracurricular opportunities.  SCLJ members also include Columbia alumni.

14.     Plaintiff Miles Rubin is a Jewish student at Columbia University and has attended Columbia University's School of General Studies since fall 2019.  Rubin holds American and Israeli citizenship.  He is also a member of SAA and SCLJ.

15.     Plaintiff Daniella Symonds is a Jewish student at Columbia University and has attended Columbia University's School of General Studies since fall 2023.  She is also a member of SAA and SCLJ.

16.     Plaintiff Erin McNulty is a Jewish student at Columbia University and has attended Columbia University's School of General Studies since fall 2021.  She is also a member of SAA and SCLJ.

17.     Plaintiff Noah Miller is a Jewish student in his second year at Columbia University's Graduate School of Architecture, Planning and Preservation.  He is also a member of SAA and SCLJ.

18.     Plaintiff Valerie Gerstein is a Jewish student at Columbia University and has attended since fall 2022.  Gerstein is a second-year Masters student in Columbia University's School of Professional Studies.  She is also a member of SAA and SCLJ.

19.     SCLJ Member #1 is a Jewish student at Columbia University, enrolled at Columbia University's School of Social Work.

20.     SCLJ Member #2 is a Jewish student at Columbia University, enrolled at Columbia University's School of Social Work.

21.     SCLJ Member #3 is a Jewish student at Columbia University, enrolled at Columbia University's School of Social Work.

22.     SCLJ Member #4 is a Jewish Israeli Ph.D. candidate at Columbia University.

23.     SCLJ Member #5 is a Jewish Israeli Ph.D. candidate enrolled at Columbia University's Irving Medical Center ("CUIMC").

24.     SCLJ Member #6 is a Jewish student enrolled at Columbia University's School of Nursing.

25.     SCLJ Member #7 is a Jewish student enrolled at Columbia University's School of the Arts.

26.     SCLJ Member #8 is a Jewish student at Barnard.

27.     SCLJ Member #9 is a Jewish student at Barnard and holds American and Israeli citizenship.

28.     SCLJ Member #10 is a Jewish student enrolled at Columbia University's Mailman School of Public Health.

29.     Defendant The Trustees of Columbia University in the City of New York is the legal name of Columbia University, a private not-for-profit university based in New York, New York.  Columbia University is composed of various graduate and undergraduate constituent schools, including the School of General Studies ("GS"), the School of Social Work ("CSSW"), the Graduate School of Architecture, Planning and Preservation ("GSAPP"), the School of

Nursing, the School of Professional Studies ("SPS"), the School of Engineering and Applied Science, the School of the Arts, and the Mailman School of Public Health.

30.     As of October 2023, Columbia University's endowment fund was valued at $13.6 billion.  Columbia University accepts substantial direct financial assistance from the federal government through, among other things, grants and contracts; it received at least $1.2 billion in fiscal year 2023 and will receive substantial direct federal financial assistance in fiscal year 2024.  Columbia University also receives substantial indirect federal financial assistance through, among other things, tuition paid with federal financial aid.  At all times relevant to this complaint, Columbia University was and continues to be subject to Title VI.  Columbia University is also an "educational institution" and place of "public accommodation" under the New York State Human Rights Law and the New York City Human Rights Law.

31.     Defendant Barnard is a private not-for-profit women's liberal arts college in New York, New York.  Barnard is an official undergraduate college of Columbia University.

32.     While Columbia University and Barnard are separate institutions, Barnard students are deeply integrated in the Columbia University campus and community.  Barnard and Columbia University students can cross register for courses, and Barnard students receive a diploma with seals from both schools and signatures by the presidents of both.  Barnard students can also join student clubs at both Barnard and Columbia University.  Barnard has about 80 student clubs, and Barnard students may also join any of the 500 clubs at Columbia University.  Barnard students compete in Columbia University's NCAA Division I athletic programs and have "full access to Columbia[] [University's] libraries and library resources."  Columbia University students can access the Barnard College Library, and students at each school can access each other's dining halls.

33.     As of January 2023, Barnard's endowment fund was valued at $459.8 million. Barnard, like Columbia University, accepts financial assistance from the federal government through grants and contracts, including $9,888,000 in the fiscal year 2022.  Barnard also receives indirect federal financial assistance through federal financial aid.  At all times relevant to this complaint, Barnard was and continues to be subject to Title VI.  Barnard is an "educational institution" and place of "public accommodation" under the New York State Human Rights Law and the New York City Human Rights Law.

## FACTS

### A.     Title VI Protects Jewish Students Against Antisemitism

34.     Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives federal funding or other federal financial assistance, and protects all students, including Jewish and Israeli students, in such programs or activities.

35.     Since at least September 2004, it has been the policy of the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") to investigate Title VI complaints against universities related to antisemitism.  In an October 26, 2010 letter to federally funded schools, OCR confirmed that such schools are "responsible for addressing harassment incidents about which [they] know[] or reasonably should have known," and must address "anti-Semitic harassment," stating that such harassment violates Title VI when it creates a "hostile environment" based on "actual or perceived shared ancestry or ethnic identity as Jews," in which "the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school," or when the "harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees."

36.     The Obama, Trump, and Biden administrations have confirmed the urgent need to combat antisemitism in educational institutions.  In June 2010, President Barack Obama's State Department adopted a working definition of antisemitism developed by the European Monitoring Center on Racism and Xenophobia.  The State Department also adopted contemporary examples of antisemitism, which include ways that antisemitism manifests itself with regard to the State of Israel:

- "Using the symbols and imagines associated with classic anti-Semitism to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis";

- "Blaming Israel for all inter-religious or political tensions";

- "Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation"; and

- "Denying the Jewish people their right to self-determination, and denying Israel the right to exist."

37.     In December 2019, President Donald Trump issued Executive Order 13899 on "Combating Anti-Semitism," directing the executive branch to enforce Title VI against discrimination "rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI," and in doing so, to consider the definition of antisemitism promulgated by the International Holocaust Remembrance Alliance ("IHRA"), an intergovernmental organization comprised of thirty-five member countries.

38.     The IHRA definition of antisemitism provides, among other things, the following "contemporary examples of antisemitism":

- "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion";

- "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor";

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation";

- "Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis"; and

- "Holding Jews collectively responsible for actions of the state of Israel."

39.     On January 4, 2023, DOE, citing the "rise in reports of anti-Semitic incidents," released a fact sheet, "Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics," which reiterated that Title VI protects "students who experience discrimination, including harassment, based on their . . . (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity."

40.     In May 2023, President Joseph Biden released the U.S. National Strategy to Counter Antisemitism, described as the "most ambitious and comprehensive U.S. government-led effort to fight antisemitism in American history," and DOE launched its Antisemitism Awareness Campaign.

41.     As the historical birthplace of the Jewish people, the land of Israel is at the core of Jewish identity, ancestral tradition, religion, and culture.  The movement for the reestablishment, development, and protection of the Jewish nation in the land of Israel, known as Zionism, arises from Jews' ethnic and historic roots in that land and their right to self-determination.  Zionism is central to the Individual Plaintiffs', SAA members', and SCLJ members' Jewish identities, and many are descendants of survivors of the Nazis, with family and friends in Israel.

42.    Anti-Zionism is not merely a political movement—although many try to disguise it as such—but is a direct attack against Israel as a Jewish collectivity.  Nearly half of the Jews in the world live in Israel.  Anti-Zionism is discriminatory and antisemitic when expressed in terms of, for example: applying double standards not applicable to other countries or peoples in assessing Israel's legitimacy and conduct; denying the Jewish people's right to self-determination or the right of the State of Israel to exist; denying that Israel has the right to self-defense against terrorism, invasion, or the murder, rape, and kidnapping of its citizens; accusing Israel of being inherently racist or comparable to the Nazis; or invoking classic antisemitic canards against Israel and its people.  "When people criticize Zionists," Dr. Martin Luther King, Jr. explained, "they mean Jews.  You're talking anti-Semitism."

43.    The widespread anti-Jewish hate that has gripped Columbia and other universities since October 7, 2023 confirms that in nearly all instances, anti-Zionism is rarely anything more than thinly veiled antisemitism.  At rallies and events across the country, and especially at Columbia, Jewish students have been maligned as "murderers," "colonizers," "racists," "genocidal," and, "Zionists."

44.    On February 12, 2024, the Committee on Education and the Workforce of the U.S. House of Representatives opened an investigation into Columbia's "response to antisemitism and its failure to protect Jewish students," citing "grave concerns regarding the inadequacy of Columbia's response."

**B.    Columbia University and Barnard Fail to Enforce Their Own Policies to Protect Jewish Students**

**i.    Columbia University's Policies**

45.    Columbia University has issued at least seven applicable policies ostensibly to protect students from discrimination, harassment, and intimidation: (i) Equal Opportunity and

Affirmative Action Policies & Procedures; (ii) Rules of University Conduct; (iii) Non-Discrimination Statement and Policy; (iv) Standards & Discipline Policy; (v) University Events Policy; (vi) Student Group Event Policy and Procedure; and (vii) Faculty Handbook.  Columbia University's clearly unreasonable response to antisemitic discrimination and harassment, and its selective enforcement of its own rules, however, reflect a shameful double standard in its failure and refusal to apply these policies in a nondiscriminatory manner to protect Jewish students and prevent antisemitism on campus, deeming Jewish students unworthy of the protections Columbia University readily affords non-Jewish students.

**a.  Equal Opportunity and Affirmative Action Policies & Procedures**

46.    Columbia University's Office of Equal Opportunity and Affirmative Action ("EOAA") is supposed "to prevent and respond to discrimination and harassment by developing and implementing policies and procedures [("EOAA Policies & Procedures")] that address discrimination [and] harassment."  The EOAA Policies & Procedures prohibit discrimination and harassment on the basis of, among other protected characteristics, creed, national origin, race, or religion.

47.    Under the EOAA Policies & Procedures, proscribed discrimination includes: "[t]reating members of a protected class less favorably because of their membership in that class."  Harassment, "which is a form of discrimination," involves "[s]ubjecting an individual to unwelcome conduct, whether verbal or physical, that creates an intimidating, hostile, or abusive working, learning or campus living environment; that alters the conditions of employment or education; or unreasonably interferes with an individual's work or academic performance on the basis of the individual's membership in a protected class. . . ."[1]

---

[1] Harassment can include: "verbal abuse; epithets or slurs; negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; insulting or obscene comments or gestures; and the display or circulation of written or

**b.   Rules of University Conduct**

48.     Columbia's Rules of University Conduct provide that "[t]he University has an

obligation to assure members of its community that they can continue in their academic pursuits

without fear for their personal security or other serious intrusions on their ability to teach and to

study," and the "University may restrict expression that constitutes a genuine threat of

harassment" at "any demonstration, including a rally or picketing, that takes place on or at a

University facility or at any University sponsored activity."  Barnard students, "as members of

the Columbia University community," are also required to comply with the Rules of University

Conduct.

**c.   Non-Discrimination Statement and Policy**

49.     Columbia University's Non-Discrimination Statement and Policy prohibits

discrimination against any person on the basis of citizenship status, creed, national origin, race,

religion, or "any other applicable, legally protected status" in the administration of Columbia

University's educational policies, programs and functions.

**d.   Standards and Discipline Policy**

50.     Columbia University's Standards and Discipline Policy prohibits misconduct such

as disruptive behavior, harassment, vandalism or damage to property, and violation of Columbia

University policies and law.  It provides that students who interfere with "the ability of others to

take advantage of the full complement of University life" will be subject to discipline and

recognizes that "[c]alls, texts, e-mails, and social media usage by students can contribute to a

hostile work, learning, or living environment, even if they occur away from the University

premises."

---

graphic material (including in hard copy, by email or text, or through social media) that denigrates or shows hostility
or aversion toward an individual or group members of a protected class."

### e.   University Events Policy

51.   Columbia University's Events Policy ("Events Policy"), which governs on- and off-campus events held by student groups and non-affiliated organizations sponsored by a recognized Columbia University group, organization, or student activities adviser, provides that, among other things:

> Consistent with the Rules of University Conduct, the University may regulate the time, place and manner of certain forms of public expression.  This includes restricting certain activities when the University believes there is a genuine threat of harassment and/or the potential for an unmanageable safety concern.

52.   On December 7, 2023—two days after the presidents of Harvard University, University of Pennsylvania, and Massachusetts Institute of Technology were widely criticized for refusing, in their testimony before Congress, to affirm that calling for the genocide of Jews violates their universities' policies—Columbia University revised its Events Policy and Campus Resources FAQ to include the question "what is Columbia's reaction to calls for genocide against Jews?"  Its response:

> The University has an obligation to assure members of its community that they can continue in their academic pursuits without fear for their personal security or other serious intrusions on their ability to teach and to study.  Columbia supports free speech and expression, but our rules of conduct do not allow or condone language that promotes or supports violence in any manner.  Calls for genocide against the Jewish community or any other group are abhorrent, inconsistent with our values and against our rules. Incitement to violence against members of our community will not be tolerated.

### f.   Student Group Event Policy and Procedure

53.   Columbia University's Student Group Event Policy and Procedure, which governs the process for recognized student groups to host events and is "intended to promote safe and responsible social events for Columbia University's recognized student organizations," provides,

among other things, that the "conduct of all guests is bound by University Rules and the student group may be held responsible for the behavior of their invited guests."

54.     On October 24, 2023, Columbia University amended its Student Group Event Policy and Procedure to permit sanctions for failure to obtain required event approval or abide by the terms of an approved event.

### g. Faculty Handbook

55.     Columbia University's Faculty Handbook incorporates the EOAA Policies and Procedures and the Non-Discrimination Statement and Policy and, among other things, directs that faculty should "confine their classes to the subject matter covered by their courses and not use them to advocate any political or social cause."

### ii. Barnard's Policies

56.     Barnard has issued policies ostensibly to protect students from harassment and intimidation, including: (i) Policy Against Discrimination and Harassment; (ii) Rules for Maintenance of Public Order; and (iii) Student Code of Conduct.

### a. Policy Against Discrimination and Harassment

57.     Barnard's Policy Against Discrimination and Harassment ("Barnard's Discrimination Policy") provides that Barnard "does not tolerate and specifically prohibits" discrimination and harassment "on the basis of race, color, religion, creed, national or ethnic origin . . . in the administration of any of its educational programs and activities," and that Barnard will take "prompt and appropriate action to address such misconduct, end a hostile environment if one has been created, and prevent the recurrence of a hostile environment."

58.     Barnard's Discrimination Policy defines "discriminatory harassment" as "harassment by any member or group of the community on the basis of actual or perceived membership in a class protected by policy or law," and a "hostile environment" as "one that

16

unreasonably interferes with, limits, or effectively denies an individual's educational or employment access, benefits, or opportunities."  Barnard's Discrimination Policy proscribes "online manifestations of any of the behaviors prohibited [by Barnard's Discrimination Policy], when those behaviors occur in or have an effect on the College's education program and activities or use College networks, technology, or equipment."

### b.  Rules for Maintenance of Public Order

59.     Barnard's Rules for Maintenance of Public Order, which state that "Barnard College is committed to defend the right of each member of the Barnard community to carry out his or her assigned duties and responsibilities without interference," including the ability of "students to attend classes," prohibit: "Use or threat of force or violence against any person, or the damaging of property"; "Prevention of the normal use or occupancy of any building owned or rented by the College or disruption of any normal College function through use of force or threat of force, physical obstruction, or noise"; and "Physical obstruction of or the use of threat of force or violence to interfere with the passage of any person about the College campus or through the entrance or exits of any College building or facility or the corridors thereof."

### c.  Student Code of Conduct

60.     Barnard's Student Code of Conduct prohibits, among other things, "discrimination, harassment and retaliation," "[d]isorderly [c]onduct," "[d]isruptive [b]ehavior," "[v]andalism or [d]amage to [p]roperty," "[t]hreatening [b]ehavior," and violations of Barnard policy or federal, state, or local law.

### C.     Columbia's History of Antisemitism and Civil Rights Violations

### i.     Columbia Has Permitted and Fostered Antisemitism for Years

61.     The antisemitism permeating Columbia's campus today has a long history, and antisemitism has long been promulgated in Columbia's classrooms.

17

62.     From 1963 to 2003, Columbia University Professor Edward Said was a pioneer in developing a purported academic theory—a doctrine invoked by Hamas in its founding charter—he called "Orientalism," which, as one scholar has put it, "posits that every interaction between the West and the East is influenced by racism, ignorance, and rapaciousness."  Under that doctrine and related doctrines concerning so-called settler colonialism—doctrines which have become enormously influential at Columbia and other universities—Jews and Israelis are assigned to the West and considered among the oppressor class.  In 2000, Said put his antisemitic doctrine into practice when he was photographed throwing stones across the Lebanon-Israel border at an Israeli guardhouse.  The current Edward Said Professor of Modern Arab Studies, Rashid Khalidi, is known for his work as a spokesperson for the Palestine Liberation Organization when it was a U.S. designated terrorist organization.

### ii.     Columbia's Antisemitism is Exposed in *Columbia Unbecoming*

63.     In 2004, *Columbia Unbecoming*, a film exposing the rampant antisemitism among Columbia's faculty, was released.  Through a series of interviews—including with students who took classes in Columbia University's Middle East and Asian Languages and Cultures Department (now known as the Middle Eastern, South Asian, and African Studies Department or "MESAAS")—the film put Columbia on notice of professors who were intimidating and harassing Jewish students.  Columbia, however, failed to take any meaningful remedial or disciplinary actions.

64.     For example, one student recounted being belittled by longtime Columbia University Professor George Saliba.  During a conversation about who has a claim to the land of Israel—Arabs or the Jews (who had lived in Israel for thousands of years)—Saliba, apparently of the view that only who he views as "pure-bred" Arabs have a claim to the land, told her, "you

have no voice in this debate . . . you have green eyes, you're not a Semite  . . . you have no claim to the land of Israel."

65.     Another central figure in *Columbia Unbecoming* is Professor Joseph Massad, who has taught at Columbia University since 1999.  For years, Massad has spewed antisemitic rhetoric and intimidated students with impunity.  In 2002, for example, while lecturing at Oxford University, Massad claimed: "The Jews are not a nation.  The Jewish state is a racist state that does not have a right to exist."  In 2003, Massad wrote: "The ultimate achievement of Israel: the transformation of the Jew into the anti-Semite and the Palestinian into the Jew."  And at Columbia University, upon learning that a Columbia student was Israeli and had served in the Israel Defense Forces ("IDF"), Massad demanded to know how many Palestinians that student had killed.

66.     The film also exposed Professor Hamid Dabashi who, among other roles, is a founding member of Columbia University's Center for Palestine Studies and Director of Undergraduate Studies at MESAAS.

67.     Rather than remedying the anti-Jewish hatred on campus exposed in *Columbia Unbecoming*, Columbia did the opposite: In December 2004, to whitewash and denounce the film, it assembled an "Ad Hoc Grievance Committee," a group of five professors, including one who previously had ignored student complaints about antisemitism.  After nine months of purported investigation, the committee issued a report which—despite corroborating several of the antisemitic incidents in the film perpetrated by Columbia University faculty members— concluded that "further formal rules or regulations to codify behavior or sanction specific categories of action" were not necessary.  The Ad Hoc Grievance Committee recommended no disciplinary measures against any of the offending professors, including Massad and Saliba.

68.     *Columbia Unbecoming*'s shocking revelations concerning campus antisemitism—and the leading roles played by faculty—helped prompt a November 2005 investigation into antisemitism on college campuses by the U.S. Commission on Civil Rights ("Commission"), a bipartisan, independent commission of the federal government, created by the Civil Rights Act of 1957.

69.     In April 2006, the Commission issued a report cataloging its findings, which included that "anti-Israeli or anti-Zionist propaganda has been disseminated on many campuses that include traditional anti-Semitic elements, including age-old anti-Jewish stereotypes and defamation," and that "[a]nti-Semitic bigotry is no less morally deplorable when camouflaged as anti-Israelism or anti-Zionism."

70.     The Commission also made the following recommendations:

- "OCR should protect college students from anti-Semitic and other discriminatory harassment by vigorously enforcing Title VI against recipients that deny equal educational opportunities to all students";

- "University leadership should ensure that all academic departments, including departments of Middle East studies, maintain academic standards, respect intellectual diversity, and ensure that the rights of all students are fully protected"; and

- "OCR should conduct a public education campaign to inform college students of the rights and protections afforded to them under federal civil rights laws, including the right of Jewish students to be free from anti-Semitic harassment."

71.     Neither *Columbia Unbecoming* nor the Commission's report led Columbia to address and ameliorate the antisemitism pervading its campus.  Three years after the Commission's report, despite his antisemitic conduct, Massad was awarded with tenure.

### iii.     *Columbia Unbecoming* Fails to Inspire Change

72.     Since the film, Columbia's hostile environment has only gotten worse for Jewish and Israeli students.  As alleged herein, swastikas—the Nazi symbol still used to threaten and

intimidate Jews around the world—are drawn on campus; faculty relentlessly spew anti-Jewish rhetoric, inveigh against Zionists, and parrot terrorist propaganda; student groups routinely use the campus for antisemitic rallies and to threaten Jewish and Israeli students; and Columbia's administration consistently ignores the pleas of its Jewish and Israeli students for protection and support, while readily expressing outrage at, and zero tolerance for, abuse and harassment of other, non-Jewish groups.

73.     Along with faculty, certain student groups have been central to perpetuating antisemitism at Columbia.  Students for Justice in Palestine ("SJP") is one of the most vitriolic antisemitic networks on college campuses, including at Columbia.  SJP was founded by the chair and co-founder of American Muslims for Palestine ("AMP"), Hatem Bazian, who, during a 2004 rally in San Francisco, stated: "Are you angry?  Well, we've been watching Intifada in Palestine. . . .  And the question is what are we doing?  How come we don't have an Intifada [a term used for violent Palestinian uprisings against Israel and Jews] in this country? . . .  [I]t's about time that we have an Intifada in this country. . . . "

74.     AMP's leadership overlaps with three organizations that have been shut down by federal authorities, whose assets were frozen by the U.S. Treasury Department, or that have been found civilly liable for providing material support to Hamas, including Holy Land Foundation for Relief and Development.  On October 9, 2023, a Hamas official, Ali Barakeh, declared that one of the goals of the October 7 terrorist attack was to demand the release of the directors of Holy Land Foundation for Relief and Development serving prison sentences in the U.S.  A recent study by the Network Contagious Research Institute found that the presence of SJP on campuses "significantly correlated with antisemitic activity."  And on October 31, 2023, Virginia Attorney General Jason Miyares announced an investigation into AMP for providing material

support to Hamas.  National SJP receives funding and training from AMP as well as from universities.

75.     In 2016, Columbia's chapters of SJP and Jewish Voice for Peace ("JVP")—an anti-Zionist organization whose members include both Jews and non-Jews—launched Columbia University Apartheid Divest ("CUAD"), a coalition of Columbia University and anti-Zionist student organizations, which is not a student organization recognized by Columbia.  Although Columbia University nominally suspended SJP and JVP in November 2023, they continue to operate without consequence through CUAD.

76.     On April 7, 2016, SJP, JVP, and CUAD co-hosted an event titled "Intifada: The Palestinian Uprising" at Columbia's Pupin Hall.  The student groups described the Intifada as "the self determined response of the Palestinian people to the daily horror and atrocities committed by the state of Israel, [which] today is called an act of terrorism . . . a subjective rhetorical strategy used by the powerful to demonize legitimate acts of resistance and to maintain systems of oppression."  In fact, the Intifadas were carried out through a campaign of suicide bombs, many of which included nails dipped in rat poison, targeted at civilians.  During the Second Intifada, from around September 2000 through February 2005, Hamas claimed responsibility for over fifty suicide bombings, including: the August 9, 2001 bombing of a Jerusalem pizzeria, killing seven children; the December 1, 2001 double-suicide bombing in the crowded Ben Yehuda pedestrian mall in Jerusalem, killing eleven; and the March 27, 2002 suicide bombing at a Passover Seder at the Park Hotel in Netanya, killing thirty.

77.     On January 17, 2017, during a Chicago radio interview, Professor Khalidi invoked Nazi-era dehumanization tropes analogizing Jews to vermin, stating that Israel

supporters would "infest the Trump transition team, . . . [and] infest our government as of January 20."

78.     On February 13, 2017, CUAD, SJP, and JVP rallied against a speech in Lerner Hall by the Israeli Ambassador to the United Nations, Danny Danon, sponsored by the student group Students Supporting Israel ("SSI"), accusing Ambassador Danon of "virulent racis[m]." Rallying outside of Lerner Hall, students chanted, "no peace on stolen land," as many attempted to get past security and into the event.  During the event, several attendees had to be removed by security personnel for disruptive outbursts.  Eventually, roughly one hundred students managed to break through the event's security, and marched through Lerner Hall, chanting, "from the River to the Sea, Palestine will be free" and "Israel is a terrorist state."

79.     In April 2017, a Columbia University library book was defaced with text that implied too few Jews were murdered during the Holocaust: "The ovens were too small!  Heil!" A few months later, a swastika was discovered in a Columbia University stairwell.

80.     On April 11, 2018, Holocaust Remembrance Day, SJP held a "Gaza Solidarity Rally" only a few hundred feet away from SSI's Holocaust commemoration booth.  Members of SJP chanted at mourning Jewish students, "from the River to the Sea, Palestine will be free" and "from Gaza to the [Low] plaza, globalize the Intifada!"

81.     On May 8, 2018, Professor Dabashi posted an antisemitic diatribe to Facebook, writing: "Every dirty treacherous ugly and pernicious act happening in the world just wait for a few days and the ugly name of 'Israel' will pup [sic] up as a key actor in the atrocities."  Less than ten days later he posted: "The Israeli flag, the very term 'Israel' are now and forever synonymous with mass murderers… with massacres, with land thieves, with incremental genocide, with war crimes, with crimes against humanity."

82.    On May 29, 2018, the Columbia/Barnard chapter of Alums for Campus Fairness, a nonprofit organization dedicated to organizing alumni to combat campus antisemitism, sent an open letter to Columbia regarding Dabashi's antisemitic statements, requesting that Columbia:

> 1. Issue a formal, public statement unequivocally condemning Professor Hamid Dabashi's anti-Semitic postings as antithetical to Columbia University's liberal values;
>
> 2. State unequivocally that Jewish, Israeli and pro-Israel students, for whom Zionism and the right of Jewish self-determination are core values, are as welcomed at Columbia University as everybody else;
>
> 3. Meet with the representatives of alumni, parents, and selected signatories to discuss how the campus environment can be improved; [and]
>
> 4. Relieve Professor Dabashi of teaching responsibilities until he commits to recognizing and ending his anti-Semitic rhetoric. . . . Dabashi must be prevented from creating a hostile environment on campus for Jewish, Israeli and pro-Israel students who are entitled–like every student–to a safe and welcoming learning environment.

83.    Appended to the letter were comments from Columbia community members, including faculty, alumni, and students. One student explained: "As an Israeli student I feel targeted in this University by professors such as Dabashi. I expect the administration to AT LEAST help me by condemning him when needed." In line with Columbia's reaction to *Columbia Unbecoming*, these statements were ignored.

### iv.    Columbia's Failure to Act Against Antisemitism Emboldens Overt Antisemitism on Campus

84.    On November 29, 2018, two swastikas and an antisemitic slur were spray-painted on the walls of a Jewish professor's office at Columbia University's Teachers College. As media outlets reported, the professor had "written about the Holocaust and ha[d] been a repeated target

of anti-Semitic vitriol while working as a psychology and education professor at the university's Teachers College in Manhattan."

85.     In April 2019, SJP, JVP, and CUAD circulated a flier for "Columbia University Israeli Apartheid Week," depicting an IDF soldier with a disproportionately large nose and horns protruding from his helmet—age-old antisemitic caricatures.  Columbia failed to discipline SJP, JVP, CUAD, or any of their members or faculty advisers.  Had student organizations or anyone else on campus distributed fliers with caricatures of other protected minority groups drawing on racial, ethnic, religious, gender, or sexual orientation stereotypes, or engaged in any of the other conduct alleged herein against other protected groups, there is no question that Columbia would have acted to stop and deter it.

86.     In December 2019, two Columbia University students filed complaints with OCR alleging that Columbia's educational environment was hostile to Jews and Israelis.  In one complaint, an alumna alleged that she received a master's degree from MESAAS but was deterred from pursuing another degree because of rampant antisemitism among faculty in the department including programming in Columbia University's Center for Palestinian Studies and Middle East Institute, which "falsely depicts Jews as foreigners and 'congenital' outsiders in Israel and the Palestinian territories, equates Zionism with racism, demonizes Zionists as establishing an apartheid state in Israel, and advocates for the annihilation of the Jewish state and its replacement with a Palestinian [*sic*] in which Jews do not seek to rule."

87.     In the other complaint, a Jewish Israeli-American student alleged that during Professor Massad's keynote speech at the 2019 Palestine Center Annual Conference, Massad sought to justify "the armed resistance of the Izz al-Din al-Qassam Brigades," the military wing of Hamas, which was responsible for the kidnapping and murder of the student's uncle.  The

student further alleged that while he was standing at a table on campus advertising SSI, "a Columbia professor of Arabic literature  . . .approached the table, interrupted the conversation, pointed at [him] and yelled, 'Don't believe a word he is saying.  He is Mossad [Israel's national intelligence agency].'"  The student also alleged that he was called a "Zionist pig," among other derogatory names, by student members of SJP.  On November 20, 2023, four years after the complaint was filed, the DOE announced an investigation into Columbia University based on these allegations, among numerous others.

88.     Between February and March 2020, there were three reports of swastikas on Columbia University's campus.

89.     In an interview with the *Columbia Spectator*, a Columbia University student stated that in 2022, when she told a professor that her family was Israeli, the professor responded, "So you must know a lot about settler colonialism.  How do you feel about that?" When the student shared her Israeli background with another professor, the professor responded, "It's such a shame that your people survived just in order to perpetuate genocide."

90.     In October 2022, McNulty, while eating in a campus dining hall, heard students espousing antisemitic conspiracy theories promoted by Kanye West as they passed around an image of a swastika.  In or around the same time, McNulty crossed paths with three student athletes on campus on her way to class who were repeatedly using the phrase "Jew someone down" and laughing.  McNulty was taken aback by such open antisemitism on campus.

91.     In 2022, the watchdog group StopAntiSemitism graded twenty-five colleges and universities on whether their campus environments are hostile to Jews based on "surveys to the administration," "hundreds of first-person narratives by students," and other research.  Columbia

received an F.  The report noted that Jewish students "overwhelmingly DO NOT believe the administration considers their safety as a priority."

### v.   Columbia Still Offers and Teaches an Antisemitic Curriculum

92.    During freshman orientation, Columbia students must participate in Diversity, Equity, and Inclusion ("DEI") training focused on identifying and preventing discrimination and biases against a wide variety of groups.  Conspicuously omitted from the training is antisemitism.

93.    During first-year orientation, CSSW students are required to attend "Professional Development and Self Awareness Orientation," an orientation program run by multiple departments including Student Affairs.  CSSW teaches through a lens that focuses on power, race, oppression, and privilege, which not only ignores thousands of years of Jewish persecution and marginalization, but unjustifiably characterizes Jews as "oppressors."  While antisemitism is perfunctorily included in CSSW's DEI glossary of terms, it is not discussed during DEI trainings or other orientation programming.  CSSW's orientation made SCLJ Member #1—whose Jewish heritage is integral to her identity—feel marginalized and excluded.

94.    To fulfill the requirements of his history major, Rubin had to take four classes in the Middle Eastern studies department.  Because his focus is Middle East studies, to graduate, Rubin was required to enroll in a class taught by Khalidi or Massad.  In fall 2020, Rubin enrolled in "History of the Modern Middle East" with Professor Khalidi.  During a class discussion on supposed national origin myths, a student asked Khalidi, "how intentional were the Jews in creating their national origin myth in creating Israel?"  Khalidi responded by stating that Jews have "no claim to [Israel]," thereby delegitimizing a core aspect of Jewish identity and the Jewish people's historical, ethnic, and ancestral claim to the land of Israel.

95.     In November 2022, Gerstein joined Columbia's School of Professional Studies's Diversity Equity Inclusion, and Accessibility ("DEIA") Committee, made up of administrators, faculty, staff, alumni, and students, believing it to be a viable avenue to effect change to Columbia's institutional antisemitism, but Gerstein's efforts, however, were rebuffed.  In January and February 2022, Gerstein proposed a Jewish Identity and Antisemitism workshop, but after submitting the formal proposal, was told the workshop would be postponed without a valid explanation.  When Gerstein contacted SPS Dean Troy J. Eggers to plan the workshop for spring 2024, he emailed: "We have our list of DEIA events set for the spring already and are focusing on those."

96.     In spring 2023, Miller was enrolled in a class with Professor Rosana Elkhatib. During a field trip to the architecture firm where she works, Elkhatib referred to Israel as a "terrorist organization"—equating Israel to terrorists like Hamas—in front of Miller and his peers.

97.     A few months earlier, during Miller's Architecture History course, Professor Felicity Scott referred to a map of Israel as a "military map of illegal conquest."  Scott has signed on to a public letter stating: "We recognise [sic] that architecture and urban planning are both the means and the ends of Israeli settler colonialism and state terror.  As architects and planners, it is our moral and ethical duty to acknowledge that the tools of our profession have been co-opted to violate the legal rights of the Palestinian people."  The letter's signatories also included the Dean of Columbia's Graduate School of Architecture, Andrés Jaque.

98.     Antisemitism is so pervasive that it even permeated the curriculum in an "Introduction to Judaism" class Rubin enrolled in for fall 2023.  During a lecture about the Jewish holidays, Professor Beth A. Berkowitz, while laughing, asserted that Jews perform the

"method act" of celebrating Passover, implying Jews are not oppressed or marginalized. As a result, Rubin dropped the class after two weeks.

### D.      Hamas Terrorists Commit Horrific Atrocities Against Innocent Civilians in Israel

99.      On October 7, 2023, Hamas launched an unprovoked surprise attack on Israel, perpetrating depraved acts of murder, torture, rape, violence, and kidnapping against Israeli citizens. Thousands of armed terrorists invaded southern Israel, while others launched a barrage of rockets toward populated cities. Once inside Israel, the terrorists, acting as well-armed death squads, dispersed into towns shooting, raping, torturing, burning, and mutilating unarmed civilians, including infants, children, and the elderly, taking hundreds of hostages and engaging in mass murder and rape at a music festival near Gaza's border with Israel.

100.      The IDF eventually repelled the terrorists and regained control over the affected area. By that time, Hamas had killed 1,200 people and abducted over 200 more. October 7 was the single deadliest day for Jews since the Holocaust.

101.      Antisemitism is a core tenet of Hamas—an extreme Islamist terrorist group explicitly committed to the destruction of Israel and its Jewish inhabitants, the creation of an Islamic state in Israel's place, and the annihilation of all Jews around the world. Hamas's 1988 charter states: "The Day of Judgment will not come about until Muslims fight the Jews and kill them." In October 1997, the U.S. State Department designated Hamas, which has controlled Gaza since 2007, a Foreign Terrorist Organization.

102.      In keeping with its charter and goals, since its inception, Hamas has carried out numerous indiscriminate terror attacks on Israeli civilians through bombings, rocket barrages, shootings, and stabbings, including during two Intifadas. Since 2002, Hamas killed scores more through similar suicide bombings, public bus attacks, booby traps, shootings, and other acts of

terror.  Since October 7, senior Hamas officials have hailed the slaughter and vowed that it was

"just the first time, and there will be a second, a third, a fourth," promising another "October 7,

October 10, October one-millionth" until the complete annihilation of Israel.

103.    Shockingly, many students and faculty at Columbia celebrate, justify, and excuse

Hamas's mass rape, murder, and kidnapping.  Some have resorted to harassment and even

violence against Jewish students in support of Hamas's attack and in condemnation of Israel's

defensive response.  Columbia's faculty and students falsely accuse Israel of: committing

"genocide" and "ethnic cleansing" (even though the Arab population of Gaza has more than

quadrupled since 1967); creating an "open-air prison" in Gaza (even though Israel completely

removed itself in 2005 from Gaza, which also shares a border with Egypt); and "apartheid" (even

though all citizens in Israel enjoy equal rights).

104.    Further evidencing the antisemitic nature of their activities, these students, and the

faculty who support them, do not condemn, let alone rally against, such countries as Syria and

Yemen, which have killed hundreds of thousands of Arab civilians, and Pakistan, which is now

expelling almost two million Afghan Muslims, or China, which has imprisoned its Muslims in

reeducation camps, or Somalia and Nigeria, where Christians are regularly murdered.

**E.    Columbia's Facially Inadequate Response to October 7 Fans the Flames of Campus Antisemitism**

105.    Columbia's decades of deliberate indifference to anti-Jewish harassment has

created an environment in which antisemitic activity has flourished and which, following

Hamas's October 7 massacre, has enabled yet another intolerable wave of antisemitic abuse on

campus.

### i.   Columbia's Silence Creates a Vacuum Filled by Antisemitism

106.    In the immediate aftermath of the October 7 massacre, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members waited for Columbia University's president, Minouche Shafik, to issue a statement condemning Hamas's mass murder and kidnapping, just as Columbia University presidents had done in the wake of other incidents and events, including Asian violence during the COVID-19 pandemic and George Floyd's murder.  As Columbia's students and faculty began celebrating Hamas's slaughter, President Shafik remained silent.  Two days later, rather than condemn Hamas or those who celebrated their attack, President Shafik urged faculty to bring "clarity and context" to the greatest loss of Jewish life since the Holocaust.

107.    On October 8, Professor Massad published a piece celebrating Hamas's attack in *The Electronic Intifada* titled, "Just another battle or the Palestinian war of liberation?" Expressing his enthusiastic support of Hamas, he labeled the massacre as "an innovative Palestinian resistance," "shocking success," and "stunning victory," and used words such as "astounding" and "awesome" to describe the terrorist attack on Jewish civilians.

108.    On October 13, a Columbia University student started a petition to remove Professor Massad, which within four days had garnered over 50,000 signatures.  On October 15, more than 300 Columbia affiliates, including faculty, signed an open letter expressing "unwavering solidarity" with Massad, defending his October 8 pro-terrorism piece.  MESAAS administrators and a Columbia University spokesperson declined the *Columbia Spectator*'s request for comment on the petition and open letter.

109.    On October 9, several Columbia student groups publicized a joint statement "regarding the recent events in Palestine Israel: Oppression Breeds Resistance," framing the terrorist attacks as a form of resistance, and "remind[ing] Columbia students that the Palestinian

struggle for freedom is rooted in international law, under which occupied peoples have the right to resist the occupation of their land."

110.     The joint statement blamed Israel for Hamas's attack and concluded that "Israel does not have the right to defend its occupation, its apartheid state or its siege of Gaza."  In the days that followed, the joint statement was edited to include more antisemitic rhetoric and additional signatories.  Three weeks later, in defense of the joint statement, nearly 170 Columbia faculty members signed an open letter characterizing the October 7 terrorist attack as a "military response" that could be regarded as an exercise of the "right to resist."  Columbia spokespersons declined the *Columbia Spectator*'s request for comment on the joint statement, and a Columbia University spokesperson subsequently declined to comment on the open letter.

111.     On October 9, SJP and JVP also issued an open letter standing in "full solidarity with Palestinian resistance against over 75 years of Israeli settler-colonialism and apartheid" and characterized Hamas's October 7 attack as "an unprecedented historic moment for the Palestinians of Gaza. . . .  Despite the odds against them, Palestinians launched a counter-offensive against their settler-colonial oppressor."

112.     On the evening of October 9, President Shafik broke her silence by issuing a "Message of Concern for Our Community" in which she claimed to be "devastated by the horrific attack on Israel and the ensuing violence that is affecting so many people."

113.     Around this same time, SJP and JVP reactivated CUAD, which had been dormant since 2020, "in response to the overwhelming support for Palestinian freedom from students on Columbia's campus"—in other words, CUAD was brought back to amplify the surge in student support for Hamas's October 7 atrocities.

114.    On October 18, President Shafik emailed Columbia students about purportedly "Upholding Our Values," stating:

> Our day-to-day duty of care for the security and well-being of our students, faculty, and staff is paramount. . . .We know that the atmosphere on campus is extremely charged, and some of you have expressed concern about your personal security.  Let me reassure you that the University will take all available steps to help you.

Again conspicuously omitted from President Shafik's message was any explicit condemnation of Hamas's terrorism or Columbia faculty and student support for Hamas.

115.    Following Hamas's October 7 attack, the IDF released a 47-minute compilation of footage captured via CCTV, body camera, and cell phone video of the brutal massacre, much of which was recorded by Hamas terrorists.  On two separate occasions, President Shafik and members of Columbia's administration were invited to a screening of the footage; they all declined both invitations.

116.    Columbia's Jewish students are still waiting for the help President Shafik promised.  At a press conference held outside of Columbia's gates on October 30, Jewish students plead for help and spoke of not feeling safe on campus.  One student explained, "Now I get it, I actually understand how the Holocaust happened."  In a media interview two weeks later, a Jewish Israeli Columbia student detailed frequent "antagonization for being Jewish and being Israeli" since October 7, including being told to "go to hell" and that Israeli hostage posters are "fake news," and described reporting the harassment to Columbia administrators, Columbia Public Safety ("Public Safety"), and her resident adviser, none of whom addressed the issue.

117.    On November 2, 2023, the *Columbia Spectator* reported the results of its interviews with over fifty Jewish students at Columbia, some of whom are Israeli:

> Of those interviewed, 34 reported feeling unsafe on campus since Hamas' unexpected attack on Israel on Oct. 7.  Thirteen students

said that they personally experienced incidents where they felt attacked or harassed, either in-person or online.  Ten students reported avoiding or fully staying off campus at some point since Oct. 7.  Twelve students said they tried to hide or veil their Jewish identity when walking around campus.  Seventeen students said they have been negatively affected or offended by Columbia-affiliated online spaces.

118.    A December 2023 study published by Brandeis University, which surveyed students at 51 campuses after October 7, ranked Columbia in its worst category: "highest antisemitic hostility."

### ii.    Columbia Fails to Prevent or Respond to the Student-Organized National Day of Resistance

119.    On or about October 10 and 11, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members learned that SJP chapters across the country—including Columbia's SJP chapter—were holding a "National Day of Resistance" on October 12.

120.    Leading up to the National Day of Resistance, tensions on campus rose and antisemitic rhetoric and acts of violence and intimidation intensified.  For example, on October 10, SCLJ Member #8 was on Columbia's campus when she observed a group of individuals displaying propaganda signs, equating Israel to a terrorist state.  When SCLJ Member #8 sought to engage them in dialogue, one of the individuals screamed at her.  The commotion caused a group of students to begin gathering, which only caused the individuals to become more aggressive.  SCLJ Member #8 attempted to report the aggressive group to Public Safety for harassing students.  Public Safety informed her that they knew the group was a recurring issue and knew they were not supposed to be on campus, and asked the individuals to leave, but did nothing when the group refused.  SCLJ Member #8 saw the group back on campus a few days later and reported them again.  The group continues to harass students on Columbia's campus

without intervention, despite SCLJ Member #8's reports to Public Safety, Vice President and Dean of Barnard Leslie Grinage, and President Shafik's office.

121.    That same day, a group of female students at Barnard's Milstein Center were loudly discussing their plans to never speak to Israelis again.  When SCLJ Member #8's friend told the students that she was Israeli, the students screamed at her, calling her, "disgusting" and "racist," and telling her to "go to hell."  SCLJ Member #8 reported this incident the next day in an email to various administrators and on October 24 when she met with Dean Grinage, but neither SCLJ Member #8 nor her Israeli friend is aware of any subsequent investigation.

122.    On the morning of October 11, a Jewish Israeli student was verbally assaulted outside of Butler Library by someone yelling, "free Palestine" and "fuck the Jews."  The assailant said that he was attacking the student "because you are a Jew," motioning to the student's Star of David necklace.

123.    That same day, McNulty witnessed an individual on campus screaming, "Jews are going to hell" into a microphone.  Instead of disciplining or instructing the individual to leave, a Public Safety officer merely told the individual to turn the microphone volume down.

124.    In the late afternoon, Dennis A. Mitchell, Columbia University Interim Provost, emailed students that they are supposedly "all guided by the University's Rules of Conduct," which he attached "[f]or those who choose to engage in demonstrations or protests."

125.    Shortly after Mitchell's email, five Jewish Israeli Columbia students were assaulted in front of Butler Library.  While exiting the library, the students noticed a fellow Columbia student tearing down hostage posters, which they had hung up earlier that day.  When the students asked for their posters back, the assailant attacked them with a stick, cursed at them, and punched one of the students, who suffered a broken finger and lacerations to his head.  When

the incident was reported to the New York Police Department ("NYPD"), the attacker was arrested and charged with assault. But when the incident was reported to Columbia University, the student-victim was advised by an academic adviser, who is also a Columbia University administrator, to stay off campus in light of the upcoming National Day of Resistance.

126.    When Rubin learned of the assault, he emailed GS Dean Lisa Rosen-Metsch:

> I heard a disturbing story that an Israeli GS student was assaulted on campus today, and there is a lot of fear within the community about the safety of Columbia's jewish community. There is a rumor going around that jewish students should not come to school the next few days. I was wondering if there are efforts to alleviate the worries of the community and to let us know we are safe.

Rubin never received a response from Dean Rosen-Metsch.

127.    That evening, David Greenberg, Executive Vice President of Columbia University Facilities and Operations, emailed students that access to campus the next day would be restricted to valid Columbia University ID ("CUID") holders to "help maintain safety and a sense of community through planned demonstration activities." Barnard and Columbia University students' CUID cards give each the ability to access both campuses.

128.    Fearing that Columbia was intentionally ignoring the red flags and taking little to no steps to thwart the anticipated violence, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members voiced their concerns to the administration. Symonds, for example, emailed President Shafik requesting immediate action, including by banning SJP from campus because of its support for terrorism and condemning any student participation in the National Day of Resistance, which Symonds predicted "will put Jewish and Israeli students on campus at high risk." Symonds never received a response. SCLJ Member #8 also emailed predicting President Shafik that SJP "will glorify and openly support the actions of Hamas," "genocide, terrorism, and the end of the Jewish people," and requested President Shafik

"stand with the Jewish and Israeli students of Columbia against these heinous acts of antisemitism."  SCLJ Member #8 never received a response.

129.    On October 12, Interim Provost Mitchell issued another statement in anticipation of the National Day of Resistance in which he acknowledged that the event "risk[ed] creating an unsafe environment" and promised that "anyone unwilling to identify themselves will be required to leave campus, and "[a]ll violations are subject to discipline under our rules."

130.    Later that afternoon, hundreds of Columbia students swarmed the lawns at the center of campus.  SJP's raucous rally took place on one side while SSI and other students quietly assembled on the other, with Public Safety standing between the two groups.  SJP encouraged Columbia members to chant antisemitic slurs, including: "Jews will not defeat us"; "globalize the Intifada"; "resistance is justified"; "from the River to the Sea"; "Minouche Shafik, open your eyes, please divest from Israel's crimes"; and "Columbia, Columbia, open your eyes, stop defending apartheid."  They also held "glory to the martyrs" signs, praising the October 7 terrorists.  As explained by Columbia University Professor Shai Davidai in a piece published in November 2023, "the differences between the student organizations' chant of 'from the river to the sea' and the Nazi chant of 'Germany for Germans' are mere semantics.  The antisemitic sentiment is the same."

131.    As SJP's rally grew, student leaders from SSI, who were informed that Public Safety could not keep them safe, encouraged the pro-Israel students to disperse.  As one Jewish student left the rally, he had an Israeli flag ripped off his back within direct view of a Public Safety guard booth.

132.    SJP and its supporters roamed campus and spread their hateful messages.  Despite the clear language of the Rules of University Conduct—which prohibits conduct that, among

other things, "endangers property on a University facility," "causes a noise that substantially hinders others in their normal academic activities," "places another in danger of bodily harm," or disrupts university functions—Public Safety looked on as students climbed on the iconic Alma Mater statue and used megaphones to broadcast their threats.

133.    At around 6:00 p.m., the SJP crowd abandoned their supposed "designated area" and began marching around campus.  SCLJ Member #8 was holding a sign with information about the October 7 terrorist attack.  As students marched by, they screamed at her that the terrorist attack was "fake news."  The mob then marched down Broadway toward the Kraft Center for Jewish Student Life, Columbia's Hillel building, which was forced to lock its doors as a security precaution and advise students to shelter inside.  At 7:20 p.m.—three hours after the event began—Public Safety alerted Hillel that students could leave the building.

134.    The next day, Rubin emailed Dean Rosen-Metsch and GS Assistant Dean of Students Mitali Dave that he felt forced to leave campus after viewing the "distressing videos from campus" on the National Day of Resistance and expressed his hesitation to return.  Yet again, Rubin did not receive a response.

135.    In the two weeks following October 7, SCLJ Member #4 was deeply disturbed by the antisemitic rallies as they were forced to traverse through mobs of students with signs on campus stating "by any means necessary" and "resistance is justified" to get to their lab, which often requires them to be onsite.  While worrying about their family in Israel, SCLJ Member #4 was bombarded by signs and chants reminding them of stories they were told by members of their family who witnessed the Nazis rise to power and fled Europe before the Holocaust. Distraught and unable to focus while on campus, SCLJ Member #4 felt they had no choice but to

work remotely until mid-January, necessitating that they forego onsite research.  Consequently, SCLJ Member #4's research was significantly adversely affected.

### iii.   SSI is Prohibited from Holding Events While Other Student Groups Openly Discriminate Against Jewish and Israeli Students With Impunity

136.    On October 17, members of SSI's Executive Board met with Columbia University administrators—including Aaron Gomes, Executive Director of Student Engagement, Noah Mullenix, SSI's assigned adviser, and Assistant Director of Student Engagement, and Sean Trulby, Associate Dean of Student Life—to express their concern that Columbia had canceled an event planned for October 16 due to supposed concerns that Columbia would not be able to ensure safety at the event.  Ironically, the purpose of the event, in part, was to publicize a krav maga (Israeli martial arts) self-defense class in response to Jewish students feeling unsafe on campus.

137.    During the same meeting, SSI was told by the administrators that no clubs on campus could hold events revolving around "buzzwords" like "Israel" or "Palestine."  In a follow up email, SSI asked Mullenix, Gomes, and others why SJP and JVP were allowed to announce an event on October 18 which clearly violated this new "buzzword" protocol, while SSI's peaceful tabling event was prohibited.

138.    Two days later, on October 20, Mullenix asked to schedule another meeting.  At the next meeting, Mullenix failed to provide substantive responses as to why SJP and JVP were allowed to announce an event and instead explained the protocol for scheduling events.  Mullenix followed up with an email providing "shareable resources," including a self-defense class and counseling and psychological services.

139.    Meanwhile, anti-Jewish rhetoric and incidents continued to increase across Columbia.  On October 17, for example, a Jewish student on campus had his kippah ripped off

his head.  Two days later, on October 19, a student yelled, "fuck the Jews" at a Jewish student wearing a kippah inside a Columbia building.

140.    On October 20, 2023, Lizzy George-Griffin, President of the LionLez student club—an "event-based, social club designed for queer and non-binary people"—emailed its members inviting them to movie screenings.  At the bottom of the email, George-Griffin wrote: "It's FREE PALESTINE over here.  Zionists aren't invited."

141.    In response to a student's reply expressing her concerns and disappointment, George-Griffin launched into a vile and ignorant antisemitic tirade:

> [W]hite Jewish people are today and always have been the oppressors of all brown people . . . . I'm gonna touch your hand when I say this, WHEN I SAY THE HOLOCAUST WASN'T SPECIAL, I MEAN THAT. . . . Did you know that only white Jews are allowed to live in "Israel"? . . .  LionLez is run by people of color.  For it to be a safe space for people of color, Zionists (all of whom are white supremacists) are not invited.  Ever.
>
> Hamas only exists because of Zionists' cruelty.  Zionists have taken Palestinians hostages for 75 years, so Hamas took hostages for a prisoner exchange to get their family members back.  They fought back and killed a handful of people after a 75-year ongoing genocide that's killed hundreds of thousands.  This is not a war.  "Israel" is the sole aggressor.  Israelites are the Nazis.

142.    George-Griffin ended the email, "You and your white supremacy are also not invited" and, with bold capital letters, "**STOP THE GENOCIDE!  FREE PALESTINE!  FUCK ISRAEL[.]**"

143.    When another concerned Jewish student messaged LionLez, the club responded with no remorse: "discrimination is against oppressed people.  Zionists are the oppressors.  So nothing is gonna happen to our club."

144.    LionLez was right about one thing—nothing happened to the club; Columbia took no remedial or disciplinary actions.  Columbia learned of George-Griffin's and LionLez's

antisemitic discrimination and harassment and did nothing.  On October 24, a student emailed the Student Governing Board, composed of student groups and formed to protect the rights of students, about LionLez.  On October 25, Symonds also emailed the Student Governing Board to express her concern.  A few days later, Symonds filed an OCR complaint.  McNulty also filed an OCR complaint but was told that the incident had been reported and her complaint would be closed.

145.    Columbia graduated George-Griffin in December 2023 with a "Multicultural Graduation Cord"—an honor bestowed by the Multicultural Affairs group of the Undergraduate Student Life office on graduates who demonstrate "an outstanding commitment to diversity, social justice, and multiculturalism through Multicultural Affairs, campus leadership, community involvement, academic endeavors, and/or personal dedication."

146.    On October 24, Columbia facilities employees tore down posters depicting Israeli hostages.  When a Jewish student questioned why the employees were tearing them down, one responded, "fuck you."  Later that day, SCLJ Member #8 met with Dean Grinage who promised to pass the incident on to the appropriate authorities if she determined it was necessary.

147.    On October 25, SJP and other student groups participated in a national walkout, where they walked out of class and marched around campus.  The day before, Rubin asked various deans and professors to be allowed to attend class via Zoom because he did not feel safe on campus: "Tomorrow there is a large Pro-Palestinian rally on campus, and I cannot take much more of this.  Please help me, I cannot continue to bear witness to all of this."  After Rubin's accommodation request was denied, he was forced to drop the course or risk falling further behind.

148.    Notwithstanding the antisemitism that occurred at SJP's October 12 rally, Columbia permitted the walkout and merely restricted campus access to CUID holders.

149.    During the walkout, Columbia community members chanted, "from the River to the Sea," while holding signs saying "resistance is not terrorism!"  Rubin was shoved by a student wearing a keffiyeh, who Rubin recognized as a School of International and Public Affairs ("SIPA") student.  Rubin reported the student and his concerns for other nearby Jewish students to Public Safety officers at the rally but was told he had to report any concerns to the Public Safety office.  Yet when Rubin filed a formal report, he was told that Public Safety could not do anything in response.

150.    At another point during the rally, Rubin observed a student holding a Palestinian flag aggressively waving it in the faces of three Jewish students, one of whom was only spared from being hit because she ducked out of the way.  Rubin tried to non-violently deescalate the situation but was swarmed by students who falsely accused him of being the aggressor.  Rubin later went to the Public Safety office to report the incident, but found about ten officers standing around ignoring the chaos outside.

151.    That day, for the first time, Dean Rosen-Metsch offered to meet with Rubin later that afternoon.  During their meeting, Rubin reiterated his concerns.  Dean Rosen-Metsch—who herself is Jewish and is now a member of Columbia's supposed "Task Force on Antisemitism"—told Rubin that Columbia is a "historic antisemitic institution, and it has been the whole time I've been here, and there's really nothing I can do about it."

152.    On October 27, a swastika was discovered in a Columbia University building. Yet President Shafik failed to disclose the vandalism to the Columbia community.

153.     On October 31, SSI emailed Assistant Director Mullenix to inform him of a silent, on-campus event SSI scheduled the next day and to request Public Safety's presence in the general area.  Mullenix replied that Columbia needed a "MINIMUM of 10 business days" for student group events, and should SSI move forward, "there likely will be individual and student group accountability."  When SSI asked for an explanation of the disparate treatment of SSI compared to SJP—which organized the October 25 walkout that, by definition, was not pre-approved—Mullenix replied: "There has been, what we might consider, a period of transition with the University event and student group policies this fall.  There was further clarity provided to the rules based on need, including how rules are enforced—so there has been some degree of flexibility the past few weeks."

154.     Fearing discipline, SSI did not move forward with the event.  In the following months, SSI has continued to abide by Columbia's policies, including the lengthy notice requirement, while pro-Palestinian groups, like CUAD and its member organizations, have ignored Columbia's policies and warnings, holding rallies and events near-daily with impunity.

     **iv.     Columbia's Suspension of SJP and JVP Only Emboldens the Groups To Continue to Act Without Consequence**

155.     On November 9, continuing their disregard for Columbia's policies, SJP and JVP organized a "Shut it Down!" walkout, which again attracted hundreds of students.

156.     Earlier in the week, McNulty reported this event to GS Dean of Students Marlyn Delva, asking to cancel or postpone the event given its especially disturbing timing—to be held on the anniversary of Kristallnacht—an unsettling message.  Columbia responded once more by only restricting campus access to CUID holders—a tactic that, as proven by the October 12 and October 25 rallies, was woefully ineffective in ensuring Jewish student safety.  Similar to the SJP and JVP events that preceded it, the "Shut it Down!" rally featured Columbia community

members freely espousing antisemitic and threatening rhetoric, including student and administrative assistant Adrian Gonzalez, who aggressively yelled, "fuck the Jews," "death to Jews," and "fuck Israel," while trying to instigate fights.  SCLJ Member #8 observed students screaming at a rabbi while he was praying with students.

157.    At the event, Mohsen Mahdawi, a student organizer, yelled, "back" and "shame" into a megaphone while instructing other students to physically push a small group of pro-Israel students back as the protestors conducted a "die-in" and shouted, "from the River to the Sea." These incidents were reported to Public Safety both during and after the event.  Gerald Rosberg, Senior Executive Vice President of Columbia University and Chair, Special Committee on Campus Safety, acknowledged after the rally that it was filled with "threatening rhetoric and intimidation."

158.    On November 10, Columbia temporarily suspended SJP and JVP—not for the groups' antisemitic rhetoric, harassment, and calls for violence, but for their violations of campus event policies.  And while Columbia's suspension is conditional—lifting the suspension is contingent on demonstrating a commitment to complying with Columbia's policies and engaging with school officials—other institutions, in contrast, such as Fordham University, State University System of Florida, and Lafayette College, have refused to recognize, banned, or permanently suspended SJP from their campuses.  In fact, in an October 24 letter, Florida's State University System Chancellor instructed Florida's universities to deactivate their SJP chapters citing the group's support for Hamas.

159.    Columbia's SJP and JVP suspensions applied to the groups, not their members. In response to a frequently asked question about Columbia University's event policies, Columbia University published on its Event Policy and Campus Resources FAQ website page that "[n]o

person involved in organizing, promoting, or speaking at the event SJP and JVP staged on November 9, 2023, was subject to any sanction under the Rules of University Conduct or otherwise."  This is despite the litany of Columbia University policies that were broken— including the EOAA Policies & Procedures, which prohibit "epithets or slurs; negative stereotyping; [and] threatening, intimidating or hostile acts"—by readily identifiable students such as Mahdawi and Gonzales.

160.    To circumvent the suspension, SJP and JVP members began using CUAD as their alter ego.  Predictably, because Columbia refused to take measures to effectively address the root problem—antisemitism, and the students and faculty who perpetrate it—its campus environment is no better following the suspension.  The same students who organized and attended SJP and JVP's unauthorized hate-filled events continue facilitating the same on a near-daily basis.

161.    On November 15, Within Our Lifetime-United for Palestine ("WOL")—an extremist, antisemitic group—organized a rally to protest SJP and JVP's suspensions just outside of Columbia's gates where a Public Safety guard booth is located.  SJP advertised the rally on its social media outlets.  WOL's mission, much like its affiliates, is to "defend the Palestinian right to resist Zionist settler violence and support Palestinian resistance in all forms.  By any means necessary.  With no exceptions and no fine print."

162.    A few days before, McNulty emailed Dean Delva the rally's flier, "voicing [her] heaviest concern for the safety for Jewish students once again that is put at risk with events that push harmful hate rhetoric."  In line with her response to McNulty's concerns—which proved to be well founded—about the November 9 rally, Dean Delva said that she would pass the information on to others in Columbia's administration.

163.    During the November 15 WOL rally at Columbia, agitators defaced hostage posters, chanted, "Israel bombs, USA pays, how many kids did you kill today," and held banners that said "by any means necessary" and "resistance until return within our lifetime."  One Columbia Jewish student wearing a kippah was spit at by a WOL agitator, and mocked and harassed by others with threats like, "I hope you guys suffer" and "you guys think it's okay to kill innocent babies and bomb hospitals."  Since the rally was in front of Columbia's main gates, Rubin, an IDF veteran, had to walk through the crowd on his way to class as antisemites flashed signs describing the IDF as "savage."  This was not the first time Rubin felt discriminated against as an IDF veteran at Columbia.  For example, a graduate student, after finding out Rubin was in the IDF, asked him, "how many Palestinians have you killed?"

164.    During the hate-fest, Mahdawi addressed the crowd while standing next to WOL's co-founder and chairperson, Nerdeen Kiswani, who has called for Israel to be "wiped off the map."  During his speech, Mahdawi referred to IDF soldiers as terrorists, claimed Israel is an apartheid state, led a chant of "from the River to the Sea," and thanked the "thousands" of agitators for rallying in support of SJP and JVP.

165.    At the same time as the WOL rally, Columbia faculty organized a walkout and demonstration on campus to likewise protest the suspension.

166.    Symonds, who found herself in the crosshairs of this faculty-led rally while walking through campus, was terrified by the rhetoric school employees were shouting to students using megaphones.  Rubin also observed the same crowd placing stickers around campus such as "Israel is committing genocide," and "Zionism is racism."

167.    On November 16, Symonds attended an event sponsored by a student group, SIPA Palestine Working Group, entitled "New Paradigm Shift in Palestine and Israel."  During

the event, Professor Khalidi lectured for an hour to a room full of supporters, echoing his claims, such as Israel is merely using the war as a pretext to destroy Gaza.

168.    That same day, the student group Columbia Law Coalition for Free Palestine occupied Columbia Law School's lobby.  For nearly three hours, these students violated multiple policies, including by disrupting classes with a megaphone.  After students notified a Columbia University administrator, the students were eventually asked to leave the building but were not removed when they refused to leave.

169.     On November 30, SIPA hosted a panel discussion, "The War in Gaza: Constructive Campus Conversations," in Low Library.  CUAD disrupted the event by locking hands to form a "Hall of Shame" with two parallel rows of students lining the stairs to the building to heckle attendees while entering or exiting.  Using megaphones, CUAD student members shouted antisemitic chants like "from the River to the Sea."  Rather than disperse the crowd, Columbia emailed SCLJ Member #5 and others that they should use a side door (which the mob later blocked as well).

170.    Once the panel started, the CUAD agitators further disrupted the event by loudly banging on the Low Library doors; Public Safety took no steps to stop them.  That day, SCLJ Member #8 passed by the rally while she was on her way to a meeting with Dean Grinage about moving off campus, which she was considering because of the hostile environment she faced while living in Barnard's dormitories.  During the meeting, she reported the rally to Grinage and afterwards, emailed Grinage a picture of the "Hall of Shame" and a social media post proving that SJP and JVP organized the rally.

171.    On December 5, 2023, JVP flouted its suspension by posting on the group's Instagram account, inviting the Columbia community to join JVP and SJP at on-campus events

for each night of Hanukah.  A Columbia University spokesperson told *Jewish Insider* that the university had "communicated with JVP that this is an unsanctioned event by an unsanctioned student group"—yet JVP and SJP were still able to advertise and hold their event without intervention.

172.    That same day, the general body of the Student Governing Board voted "overwhelmingly to declare noncooperation with Columbia's Student Group Event and Procedure policy."

     **v.    Future Social Workers Stage Takeovers in Support of Hamas's Massacre**

173.    In the days after October 7, CSSW students flocked to group chats to justify "armed resistance," writing "I don't believe at all that Hamas has committed any atrocities," and "[t]here is absolutely not a place to humanize the Zionist Jews slaughtering children."  In response, Jewish CSSW students turned to their DEI office for guidance and support.

174.    On October 10, SCLJ Member #3 met with Karma Lowe, CSSW Senior Associate Dean for DEI, Enrollment, and Community Engagement, to report the group chat messages.  SCLJ Member #3 spent the meeting in tears stressing the need for a Jewish affinity group at CSSW to provide safe spaces for Jewish students to grieve and process the trauma of October 7.  Instead, Dean Lowe told SCLJ Member #3 that CSSW would not recognize a Jewish affinity group without a Palestinian affinity group.  Because Lowe could not find a faculty member willing to serve as a facilitator for a Palestinian affinity group, CSSW never formed a Jewish affinity group.

175.    At the same time that Jewish students' pleas for help were being dismissed, CSSW permitted the formation of student groups, like Columbia Social Workers 4 Palestine ("CSSW4P"), which advocate violence.  Soon after its formation, for example, CSSW4P

released a "Statement in Support of Palestinian Resistance," introducing its mission to "[d]efend[] Palestinian resistance," and arguing that "[t]he word terrorism is misappropriated to classify anti-imperial efforts as immoral or barbaric."

176.    On November 1, CSSW Student Life emailed its rules for posting fliers, specifying that fliers need to be pre-approved.  CSSW4P and its members continue to flagrantly ignore those rules without punishment and plaster the school, including classroom chairs, bathroom stalls, balconies, and even the gaps in the benches, with propaganda, including the classic blood libel that Israel commits "murder, mutilation, [and] targeted attacks of civilians." As part of its campaign, CSSW4P members also wrote on classroom chalkboards "CU, stop funding genocide" and "divest from Israel's crimes."

177.    Because Columbia refuses to enforce its own policies, Jewish students, like SCLJ Members #1 and 2, have removed unauthorized posters and erased hateful messages on chalkboards.  SCLJ Members #1 and 2 have also turned such posters over to CSSW's security personnel so that security footage can be reviewed and responsible individuals identified.  SCLJ Members #1 and 2 have also reported ongoing poster campaigns to their deans and DEI office. Their complaints, however, continue to be dismissed.  When SCLJ Member #1 reported unauthorized posters to Lorenzo A. Shaw-Graham, CSSW Assistant Director of DEI, in November, for example, he responded that removing posters or reminding students of the policy was "not [his] job."

178.    After it was formed, CSSW4P also began hosting a series of events framed as "sit-ins" and "teach-ins."  On November 8, for example, CSSW4P staged a sit-in to support "Palestinian resistance movements."  During the takeover, which disrupted classes for over nine hours, CSSW students passed out pamphlets praising the October 7 attack:

- "Al-Aqsa Flood has proven to the world . . . you are not safe to enjoy your ill-gained comforts";

- "All people of an honest heart can relate to" October 7;

- The "capturing hundreds of Israeli settlers . . . sends a clear military message";

- "Israel has once again exposed itself before the world as a vicious dog" and "the question of putting such a dog down is painfully apparent";

- October 7 proved that "despite their facades, reactionaries bleed and die like anyone else";

- "It is harder, and requires more maturity and understanding to support [Hamas]";

- "[T]he Houthi resistance fighters in Yemen have launched long-range missiles at Israel"; and

- "Armed struggle is the sole path of conquering power for the people."

179.    Students also held "from the River to the Sea" signs while they chanted, "globalize the Intifada" and "by any means necessary," pounded drums, floors, and the walls, and blocked entrances and exits to the building.

180.    Rather than remove these disruptive students, CSSW offered to escort Jewish students to and from their classes.  SCLJ Member #1—whose request for a Zoom option that day because of safety concerns was denied—was terrified to walk through the takeover and had to be escorted to and from class.  Moira Curtain, CSSW Assistant Dean and Director of the Advising Department, also escorted students.

181.    SCLJ Member #2 was terrified when she arrived at CSSW for her afternoon class and witnessed the takeover.  She was reminded of the Nazi's "Final Solution" upon hearing her classmates chanting, "there is only one solution, Intifada revolution."  She also observed CSSW4P members following and chanting at Jewish students in an effort to intimidate and harass them.

182.    On November 29, CSSW4P hosted its first "teach-in," during which students falsely proclaimed that: Zionists "suppress[ed] Yiddish and Ashkenazi culture in the region . . . to replace this weak diaspora Jew with a new strong Israeli and Hebrew speaking Jew" because "they wanted to erase the language and history of Jews who had historically lived peacefully with Palestinians"; Israel treats Holocaust survivors poorly because Zionists believe if "violence is enacted upon you, then you're weak and you're a victim, and [Israel] cannot have that in this new culture"; the "founding ideology of Israel" is "necessary revenge" which "shifted from Germans to Arabs"; Jews kill babies that "might present future harm to Jews"; "Zionism is antisemitism"; Zionism is "fanatically racist in nature"; and Jews are "open to killing their own people to maintain power."

183.    On December 3, CSSW4P began advertising its second "teach-in" titled "Significance of the October 7th Palestinian Counteroffensive."  The event, according to CSSW4P, would feature a discussion on "the centrality of revolutionary violence to anti-imperialism."  The flier disseminated before the event depicted an assault rifle, which a CSSW4P member claimed "is associated with revolutionary struggle."

184.    The Individual Plaintiffs, SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and members of the public were shocked to learn about this event and its purpose.  Professor Davidai, for example, posted on Twitter that "[v]ictims of rape should never have to worry that their social worker might view some victims as acceptable targets" and tagged Columbia and CSSW, writing: "THIS IS SCHOOL-FUNDED HATRED" and "IF YOU ALLOW THIS EVENT TO TAKE PLACE, YOU ARE COMPLACENT IN THE HATRED." Dr. Mijal Bitton, a research fellow at the Shalom Hartman Institute of North America, also shared the event flier, tweeting: "Imagine receiving services from a Columbia-educated social

worker who believes burning families, killing babies, and gang-raping women is a 'counteroffensive' and 'revolutionary violence [central] to anti-imperialism.'"

185.    After learning of the planned event, SCLJ Member #3 emailed CSSW Deans Melissa Begg, Moira Curtain, and Karma Lowe, Senior Executive Vice President Rosberg, and CSSW Assistant Dean for Student Services Cheiku Camara, the event's flier and wrote: "CSSW4Palestine must be addressed as a hate group that has infiltrated our campus. . . . They have not formed a proper student group so that they can shirk responsibility for the damage they are causing to our community."  SCLJ Member #5 also emailed their deans, asking them to ensure the event would be shut down and its promoters reprimanded.  The deans assured SCLJ Member #5 that CSSW would not allow the event to proceed.

186.    On December 4, Dean Begg issued a statement about the event:

> We learned late last night of a flier and accompanying text being circulated about a December 6th event at the Columbia School of Social Work (CSSW).  This is not a CSSW-sponsored event.  The students who organized the event did not seek approval for the fliers and text as required by CSSW processes. . . . [L]anguage that promotes violence in any manner [] is antithetical to our values. This event will not go forward at CSSW.

187.    On December 5, CSSW4P posted a flier for the event on its Instagram and stated: "Ain't nothing canceled y'all.  Stay tuned for updates tonight.  If you didn't hear it from us, disregard it."  That day, SCLJ Member #2 emailed several professors and deans, including Dean Begg, to alert them of this post and report her safety concerns.  None of the deans responded.

188.    Contrary to Dean Begg's assurances, the event did go forward.  Rather than stop it, CSSW emailed its students to give them the option to attend their classes remotely if they were afraid to attend in person.

189.    On December 6, starting around 12:00 p.m., Columbia University officials not only stood idly by as students and faculty took over the CSSW lobby, but aided them in their efforts.  Before the event, Assistant Dean Camara ushered the event's organizers into the lobby and then addressed the crowd to provide tips on how to shirk public backlash, including by instructing the crowd not to record the takeover.  During the event, Camara directed a student-employee to retrieve and distribute CSSW branded umbrellas so that students and faculty could create a makeshift barrier to shield the speakers' identities.

190.    When SCLJ Member #1 first heard the commotion and realized it was the "teach-in," she went to Dean Begg's office, but Begg's secretary did not let her into the office.  With no one enforcing the supposed cancelation, one by one, student speakers espoused the kind of pro-violence rhetoric previewed by the event's flier.  One student described Hamas's October 7 terrorist attack as "great feats":

> On October 7, the Palestinian Liberation fighters demonstrated their refusal to be dominated. . . . They showed us that through creativity, determination, and combined strength, the masses can accomplish great feats, a fact that we have seen in every heroic struggle for liberation, from Vietnam to Afghanistan.  As Mao says, "dare to struggle, dare to win."

191.    Another student speaker stated: "It is the blood of the pure martyrs and the heroes . . . that will put an end to [this battle]" and then praised "Hamas, the Popular Front for the Liberation of Palestine, Islamic Jihad, the Democratic Front for the Liberation of Palestine . . . [who] reached united armed struggle in Operation Al Aqsa Flood on October 7."

192.    During these speeches, students jabbed their open umbrellas at SCLJ Members #2 and 3, who were attempting to document the takeover.  On several occasions, when SCLJ Member #2 attempted to reposition herself to see the speakers, the students would adjust their umbrellas so her vision remained blocked.  SCLJ Member #2 was jabbed in the face with these

umbrellas throughout the takeover.  And when she attempted to move closer to listen to a group of students huddled together, she was shoved by a larger student, who was holding a keffiyeh as a barrier to help shield speakers' identities.

193.    Columbia University officials who witnessed this conduct sought themselves not to be filmed.  At one point, an observer asked CSSW's director of security if the event was canceled.  The security officer, while asking not to be filmed, confirmed that the event as planned was canceled, but claimed the university could not prevent the event's attendees from gathering in the lobby.  At another point, a Columbia University official escorted a student out because he refused to stop recording the event, evidencing that Columbia can evict students when it wants.  Only after over roughly an hour of the "teach-in" did Assistant Dean Camara finally ask students and faculty to disperse from the lobby and ushered them into another area of the building.

194.    Shortly after the "teach-in," SCLJ Member #5 emailed President Shafik's office, asking what Jewish students should do to protect themselves, given that Columbia "cannot guarantee [their] safety"—"If you cannot shut down an event that was known in advance and had no authorization, what will you do when someone attacks?"  Twelve days later, President Shafik's office provided a generic response that Columbia is committed to ensuring the safety and well-being of its student and enforcing violations of its policies.

195.    On December 7, a student reported the event and Camara's behavior through Columbia's bias hotline.  SCLJ Member #2 detailed her experiences at the takeover to several of her professors during a meeting in January.  Yet Columbia has not disciplined the students who brazenly flouted Columbia's policies nor the administrators, like Camara, who aided them in doing so.

196.    Columbia's refusal to enforce its policies to protect Jewish CSSW students, despite their persistent pleas for help, is astounding.  Dean Lowe has been on "leave" since December, so Jewish CSSW students are stuck with Assistant Director Shaw-Graham, who continues to dismiss their concerns.  Jewish CSSW students have regularly met with Dean Curtain to detail concerns for their safety and well-being, but on February 2, Curtain began a three-week vacation.  Her automatic email reply refers students to Assistant Dean Camara, the same administrator who enabled incitement of violence and actual violence at the December 6 "teach-in."

197.    On February 8, CSSW's Jewish Caucus organized an "Emergency Antisemitism Roundtable."  The Jewish Caucus invited various CSSW administrators and faculty; Dean Begg, however, did not attend, nor did any representatives of CSSW Student Affairs.  Deans Curtain and Lowe both responded with out-of-office emails, even though they could have attended via Zoom.  One professor was unable to attend because she was purportedly "commuting home" during that time.  Assistant Director Shaw-Graham attended for a portion on behalf of the DEI office and actively dismissed student concerns.  Assistant Dean Camara attended but said nothing, let alone explain his conduct during the December 6 takeover.  During the event, multiple faculty members admitted that CSSW is not safe for Jewish students.

### vi.    SJP and JVP Continue to Organize and Stage Yet Another Rally Despite Their Suspensions

198.    On December 8, in violation of the terms of its suspension, SJP commandeered a table reserved by another student group to distribute pamphlets saying "from the river to the sea, Palestine will be free."

199.    On December 9, SJP and JVP announced a December 11 rally at Barnard to demand that Barnard President Laura Rosenbury publicly call for a permanent ceasefire between

Israel and Hamas.  In anticipation, Sarah Gillman, Senior Vice President Strategic Finance and

Operations at Barnard, and Dean Grinage warned students: "We have been made aware of a

protest planned on the Barnard campus for Monday afternoon.  This protest has not been

authorized. . . . [T]his, and any unauthorized protest or event, is not permitted" and that access to

Barnard's campus would be limited to CUID holders.

200.    Undeterred, on December 11, Columbia students gathered in the Barnard Quad

and on the Milstein Center terrace, then marched to Futter Field on Barnard's campus where they

were joined by more students who had been attending another rally on the Low Library steps.

Throughout the Barnard rally, over one hundred students chanted, "Intifada, Intifada, long live

the Intifada," "from the River to the Sea," and, in Arabic, "from water to water, Palestine is

Arab."  At least one Jewish student was assaulted at the rally.

201.    SCLJ Member #9 first heard the chants from her Barnard dormitory.  Although

she felt unsafe leaving, she had to walk through the rally to attend a class.  While traversing

campus, she was disturbed that faculty participated in genocidal chants.  She was relieved to

identify Dean Grinage at the rally, and asked her if Public Safety would shut it down.  Dean

Grinage responded that Public Safety was instructed to permit the rally, and if SCLJ Member #9

was uncomfortable, she could return to her dormitory.  Fearing for her safety, SCLJ Member #9

returned to her dormitory, where she was unable to escape the terrifying sound of the chants and

rally.

202.    After the rally, SCLJ Member #9 emailed President Rosenbury's office to report

it, provide her firsthand account, and express that Jewish students "feel incredibly unwelcome

and unsafe on our own campus" and are "disappointed in the lack of responsiveness to a planned

unauthorized rally on campus."  President Rosenbury's office replied: "We appreciate your

reaching out to share your thoughts, experience, and feedback. . . . Please know we take your concerns seriously and want to ensure that you have access to Barnard's spaces, support, and resources."  The email incredulously lauded Barnard's efforts to "ensure students' safety" during the rally, even though Dean Grinage admitted that Public Safety could not intervene safely, failed to commit to holding accountable those responsible, and merely referred SCLJ Member #9 to online resources and community programs.

203.    Even though SJP and JVP were suspended and were advocating violence against and the destruction of Israel and its people, Columbia did not shut the rally down.  And despite several Barnard deans passing by and Dean Grinage attending, the rally continued unabated.  No disciplinary actions have been taken against the Columbia University or Barnard students who participated.  SCLJ Member #8 still sees peers on campus who boast about their participation on social media.

### vii.    Violent and Exclusionary Anti-Jewish Rhetoric Escalates in the Spring 2024 Semester

204.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members allowed themselves to hope that when they returned from winter break, Columbia would finally remedy its antisemitic hostile campus environment.  They were disheartened that at one of the first major rallies of the new semester, Columbia, once again, refused to enforce its rules against "language that promotes or supports violence," including "[c]alls for genocide against the Jewish community," among other policies.  As Mahdawi told the *Columbia Spectator*: "The administration has been betting on us calming down and getting busy and forgetting about it. . . . [W]e come stronger every time after a break."

205.    On January 19, 2024, Barnard held a "Day of Dialogue," a town hall style event "designed to address [] challenges, promote respectful dialogue across [] differences, and affirm

[Barnard's] commitment to being an inclusive community." To encourage attendance, Barnard canceled classes and held a raffle. Barnard's administrators invited as a speaker Hatem Bazian—who infamously has stated that "it's about time we had an Intifada in this country," called for the dismantling of Israel, co-founded SJP, and founded and chairs AMP, which is under government investigation for providing material support to Hamas. In defending the invitation, a Barnard spokeswoman praised Bazian as a "renowned scholar" who could help students "examine all viewpoints." During the town hall, CUAD, SJP, and JVP members marched through a Barnard building to disrupt the event.

206.   Later that day, CUAD held a "Divestment Now" rally at Low Library which was promoted by the supposedly suspended SJP and JVP. Around 1:00 p.m., hundreds of Columbia students gathered on the steps of Low Library, where they kicked and knocked over metal barriers surrounding the Alma Mater statue and chanted: "there is only one solution, Intifada revolution"; "we will honor all our martyrs"; "if we don't get no justice, then they don't get no peace"; and, in Arabic, "from water to water, Palestine will be Arab." Students also proclaimed their support for the Houthis—whose slogan is "Death to America, Death to Israel, curse the Jews and victory to Islam" (and who recently executed people they accused of homosexuality)— just two days after the U.S. State Department designated them a global terrorist group, chanting, "Yemen, Yemen, make us proud, turn another ship around."

207.   Several students advanced on the pro-Israel and Jewish students in attendance, blocking them with Palestinian flags. A Public Safety officer had to intervene when Mahdawi— the same organizer who was previously reported for his intimidation of Jewish students on November 9—encroached on and shouted through a megaphone at Jews and other Israel supporters. Although a Columbia University official acknowledged to the *Columbia Spectator*

that "this was an unsanctioned event held by an unrecognized student coalition and that is a violation of university policies and procedures," Columbia did nothing to prevent the rally from occurring, remove attendees, or discipline CUAD's members.  In fact, not only did Columbia tolerate the unsanctioned event, but Columbia faculty actively participated in it, including members of the Faculty and Staff for Justice in Palestine, which was organized in support of SJP and JVP.

208.    A few days later, on January 24, CUAD, SJP, and JVP organized a walkout titled "No Safety Without Divestment."  In anticipation, Columbia restricted campus to CUID holders, despite this proving unsuccessful in maintaining order during the previous semester's rallies.  Over one hundred students walked out of their classes and gathered at the center of campus to chant, among other things: "if we don't get no justice, then they don't get no peace"; "Intifada, Intifada, long live the Intifada"; "from New York to Gaza, globalize the Intifada"; and, in Arabic, "from water to water, Palestine will be Arab."  Students also held signs that said "Yemen, Yemen make us proud, turn another ship around."  The students also chanted, "we don't want no IOF [Israeli Occupation Forces] here" and "IOF off campus now," in reference to Columbia's IDF veterans.  Because of mandatory military service in Israel, this is the equivalent of calling for Israelis not to be permitted on campus.

209.    During the rally, Mahdawi once again espoused violence.  Using a megaphone, he glorified martyrdom, claiming that "there is nothing-nothing more honorable than dying for a noble cause."  As the students marched past administrative and academic buildings, faculty and staff shut the blinds to their offices.  When the mob marched past Butler Library, Gerstein was blocked from entering.  When the rally ended, students promised to continue their efforts, chanting, "we'll be back."

210.     Jewish students and faculty were scared and frustrated by Columbia's continued refusal to protect them.  Professor Davidai tweeted: "Columbia knows *exactly* who are the organizers of these pro-Hamas protests.  Columbia knows *exactly* who are the organizers that repeatedly break the school's rules.  It's not that Columbia can't do anything.  Columbia is *choosing* not [*sic*] to do nothing."

211.     In a *Democracy Now!* interview the next day, Columbia Law Professor Katherine Franke suggested that the mere presence of Israeli students on campus is cause for concern, stating: "Columbia has a program.  It's a graduate relationship with older students from other countries, including Israel.  And it's something that many of us were concerned about, because so many of those Israeli students, who then come to the Columbia campus, are coming right out of their military service."  Franke has previously refused to write reference letters for students seeking jobs or internships in Israel.

212.     A Columbia University spokesperson acknowledged in a statement to *Haaretz* that Professor Franke's statements are "antithetical to Columbia's values and can lead to acts of harassment or violence," but has not disciplined her.

213.     On January 26, CUAD, SJP, and JVP shared a tweet on their Instagram pages: "can we now say that . . . we've matured past the point where we genuinely believe that pacifist and diplomatic efforts to save Palestine will actually work?  revolution and armed resistance is the only thing that'll save Palestine."  Although Columbia's "rules of conduct do not allow or condone language that promotes or supports violence in any manner," like the many before it, the groups' open call for "armed resistance" has gone unpunished.

214.     That same day, SCLJ Member #5 attended President Shafik's "Listening Forum." SCLJ Member #5 was eager for this opportunity, but much to their dismay, President Shafik

misappropriated the Listening Forum to deflect Jewish students' concerns.  During the forum, SCLJ Member #5 told President Shafik that Jewish students feel unsafe on campus and, because of Columbia's inaction, are often forced to avoid class, certain buildings, and campus altogether. President Shafik responded by pointing to Columbia sponsored events, like the November 30 SIPA panel discussion, yet failed to acknowledge that Columbia allowed the panel discussion to be overrun by agitators, causing Jewish students, like SCLJ Member #5, even more distress. Ultimately, President Shafik made the troubling suggestion that Columbia should prepare incoming students to be "more resilient" to the campus environment.

215.    During the Listening Forum, President Shafik also falsely claimed that an alleged incident involving a stink bomb at CUAD's January 19 rally was the only physical attack on campus since October 7.  In reality, several Jewish and Israeli Columbia students have been assaulted on or adjacent to campus at events organized by Columbia students.  Even though the NYPD's investigation is still ongoing, President Shafik also gratuitously referred to the alleged stink bomb incident as a "chemical attack."

216.    On January 31, posters resembling Nazi propaganda were plastered around Columbia's campus.  The posters contained an image of a blue and white skunk with an Israeli flag imprinted in its fur next to the words "Beware!  Skunk on Campus" and "brought to you in collaboration by Columbia University and the IOF" (IOF is an antisemitic term for IDF, meaning "Israel Occupation Forces").

217.    On February 2, WOL returned to Columbia for an "All Out for Palestine at Columbia University" event, which was also organized and promoted by CUAD, SJP, and JVP. A few days earlier, SCLJ Member #5 reported the upcoming event in an email to President Shafik's office, the Task Force on Antisemitism, and Public Safety wherein they detailed WOL's

hateful and violent history and expressed concern for the safety of Jewish students.  SCLJ Member #5 received no substantive response.

218.    Rather than taking measures to deter its students from aiding and participating in the event, Columbia again merely restricted campus access to CUID holders, once again sending a message that the hostile environment at Columbia would be accommodated rather than ameliorated.

219.    Starting around 3:00 p.m., hundreds of agitators, including students and faculty, gathered in front of Columbia's gates.  The mob chanted: "we will honor our martyrs"; "there is only one solution, Intifada revolution"; "globalize the Intifada"; "settlers, settlers go back home, Palestine is ours alone"; and "from the River to the Sea."  Agitators held up signs that said: "expel IOF terrorists from Columbia"; "by any means necessary"; "Israel has managed to turn Jews into Nazis!"; and "victory to the Palestinian resistance."  There were also trucks with billboards claiming that "Israel is the new Nazi Germany," repeating the blood libel that "Israel steals Palestinian organs," and displaying images of Hitler next to President Biden.

220.    At one point, the mob began marching down Broadway in front of a Columbia building where a Jewish student wearing a shirt with an Israeli flag was confronted.  One agitator saw the student's shirt and told the group to spread out and block his path before pushing and pinning the student against the wall of the Columbia building while the rest of the crowd surrounded him.  After the student broke free, the group chased after him yelling, "keep fucking running."

221.    SJP shared to Instagram that Columbia's Faculty and Staff for Justice in Palestine participated in the rally, and Mahdawi vowed to continue organizing these riots, remarking after the rally that "we are not backing down."  And while Columbia did not discipline any of its

community members for their participation, the NYPD arrested several individuals, including at least one Columbia student.

222.     On February 8, CUAD, SJP, and JVP organized yet another walkout.  Columbia again merely restricted campus to CUID holders, permitting approximately fifty students to gather in the center of campus, where they created antisemitic propaganda and obscenity laden signs disguised as "art," such as "Zionists get no bitches," while using amplified sound to chant: "globalize the Intifada"; "there is only one solution, Intifada revolution"; "resistance is justified, when people are occupied"; "Israel is a racist state"; "Israel is a fascist state"; "Israel is a terrorist state"; "from the River to the Sea, Palestine will be free"; "Palestine is our demand, no peace on stolen land"; "Yemen, Yemen, make us proud, turn another ship around"; "it is right to rebel, Israel go to hell"; and, in Arabic, "from water to water, Palestine will be Arab" and "Palestine, free, free, Zionists go out."

223.     Joseph Howley, a Columbia Associate Professor of Classics, spoke into a megaphone purportedly on behalf of the Columbia chapter of Faculty and Staff for Justice in Palestine, espoused antisemitic conspiracy theories that Israel is directly "destroying the culture and reputation" of Columbia; and that Israel destroys Palestinian libraries "because they want to destroy its memory and its past."  Professor Howley also encouraged students to continue ignoring Columbia's policies by "showing up" for the unsanctioned rallies.

224.     Following the Columbia rally, Columbia Professor and Task Force on Antisemitism member Gil Zussman posted on X: "Cat is out of the bag: dozens of Students for Justice in Palestine chant 'From the river to the sea Palestine will be Arab' & other horrible chants about the 'Yahood' (Jews)."

225.     Less than one week later, on February 13, CUAD and SJP led roughly one hundred students in another rally on campus unopposed by Columbia.  During the rally, students dyed red the snow-covered lawns in the center of campus to symbolize blood.  They also chanted, using megaphones: "there is no safe place, death to the Zionist state"; "we don't want two states, we want all of it"; "if we don't get no justice, then they don't get no peace"; "no peace on stolen land"; Israel is a terrorist state"; and, in Arabic, "Jews out."  Students also harassed and intimidated a student holding an Israeli flag, blocking him and blasting sirens in his direction.  The students eventually marched around campus, culminating in a blockade at the entrance of Butler Library, where they broke the glass of a library door and promised to continue their efforts, shouting, "the more you try to silence us, the louder we will be."

226.     In response to the rally, Professor Zussman posted on X: "Another day, another unapproved demonstration with hate speech."  Disturbingly, on an SJP Instagram post bragging about the rally, an individual commented, "Plant a bomb tbh."

227.     Even with advance knowledge of these rallies, which violate numerous provisions of Columbia's policies and are organized by suspended student groups, Columbia refuses to stop them and curtail the pervasively hostile environment for Jewish and Israeli students.

### viii.     Columbia's Digital Spaces Are Infected by Antisemitism

228.     Following October 7, platforms like Instagram, X, Sidechat, and WhatsApp have been bombarded with antisemitic social media posts and messages by Columbia students and employees celebrating Hamas, denigrating Jews and Israelis, and even targeting and calling for violence against individual Jewish students and faculty members.  Though these actions have been reported to Columbia, it has done nothing in response.

229.     In the days immediately following October 7, for example, a WhatsApp chat group moderated by Columbia's School of General Studies students was co-opted by outsiders

invited to join by GS students.  Messages from a phone number associated with Mohammad

Wiese, Assistant Professor of Emergency Medicine at Columbia University Irving Medical

Center, sought to instigate fights with students who supported Israel: "Send location"; "Be a man

and back ur threats"; and "The lack of locations being sent just shows me that your forefathers

were women just as you all are."  In response, a GS student and IDF veteran replied that he

intended to report the individual to GS for incitement of violence, which elicited the response

from the professor, "LMFAOOOO."

230.    Sidechat in particular has become an anti-Jewish echo chamber for Columbia

students posting anonymously.  A valid Columbia University email address domain is required to

sign up for an account on Sidechat.  While other universities have endeavored to identify posters

of antisemitic threats to anonymous message boards, Columbia has not.

231.    When a Jewish Israeli student was assaulted on Columbia's campus by a fellow

student on October 11, 2023, Columbia students took to Sidechat to defend the assailant.  In one

Sidechat post, a Columbia community member expressed their violent fantasies involving

Columbia's IDF veterans, and even went as far as to name a Columbia University student, who

took leave during his junior year to join the IDF: "I sincerely hope any IDF veterans here (and

this includes [specific student], currently 'proudly' serving) die a slow death."  This, and similar

violent messages regarding IDF veterans, have a profoundly negative effect on Rubin and

Symonds who feel threatened, as are were forced to share a campus with individuals who wish

for their deaths.  Their fear was compounded when Columbia did nothing despite receiving

reports of this post.

232.    In a series of Sidechat posts, Columbia students also targeted and effectively

doxed a Jewish Barnard resident assistant because she removed propaganda from a dormitory

bulletin board.  The posts named the resident assistant's specific dormitory and floor, leaving no doubt as to her identity and location, and encouraged students to vandalize her dormitory room, which they eventually did.

233.   SCLJ Member #8 also reported the Sidechat posts to Dean Grinage when they met on October 24.  Grinage falsely responded that it was a Columbia University issue; however, Barnard students can post to Columbia's Sidechat because they have Columbia University email address domains.  Nonetheless, Grinage claimed that she would pass the information on to the appropriate authorities if she determined it necessary.  Following the meeting, SCLJ Member #8 emailed Grinage screenshots of antisemitic messages on Sidechat.  She has not heard of any action taken in connection with her report.

234.   This conduct violates several of Columbia University's policies which prohibit "verbal abuse; epithets or slurs; negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; insulting or obscene comments or gestures; and the display or circulation of written or graphic material . . . that denigrates or shows hostility or aversion toward an individual or group members of a protected class," whether disseminated through "hard copy, by email or text, or through social media."  Columbia University's Standards and Discipline Policy recognizes that "[c]alls, texts, e-mails, and social media usage by students can contribute to a hostile work, learning, or living environment, even if they occur away from the University premises."  Similarly, Barnard's Discrimination Policy states that Barnard "will engage in a variety of means to address and mitigate the effects" of discrimination and harassment over social media.

235.   Columbia nonetheless has made no effort to combat the onslaught of antisemitic harassment and threats on social media by its students and faculty.  With respect to posts made

while the user is on campus, using Columbia's WiFi network, Columbia has refused to disable access to Sidechat on its network or to take any steps to enforce Columbia University's Acceptable Usage of Information Resources Policy—which prohibits using Columbia University's network to "[v]iolate any institutional policies or procedures" or "[i]ntimidate, harass, threaten or otherwise do harm to other Users or internal or external Information Resources including but not limited to: Doxing / Doxxing [and] Cyberbullying." Barnard's Acceptable Use Policy, which similarly applies to "all individuals who access, use, or control College resources," states that Barnard "resources must be used in compliance with all Barnard policies and procedures and applicable local, state, federal, and international laws and regulations," and that users are prohibited from using College resources to "[i]ntimidate, harass, threaten, or otherwise do harm to other users including, but not limited to, doxing/doxxing, cyberbullying, creating deep fakes, cyberstalking, and non-consensual image use or impersonation."

**F.   Columbia's Double Standard in Addressing Antisemitism**

236.   Columbia has deliberately chosen to remain indifferent in response to antisemitism and anti-Jewish harassment—which stands in stark contrast to its swift and decisive actions to address bias-related incidents when the victims are not Jewish and/or Israeli. Columbia's invidious and egregious double standard is reflected in, among other things, its official statements and programs addressing bias or important social issues, disciplinary actions against faculty, and disciplinary actions against students when antisemitism is not involved.

**i.   Columbia Issues Strong Statements to Address Hate, Violence, and Harassment Unless Jews Are the Targets**

237.   Columbia's double standard is readily apparent when comparing its response to attacks against other groups—even those off campus and outside of New York State—to attacks

67

against Jews on its very own campus.  As one Black Jewish Barnard student told the *Times of Israel*: "When I speak about Black and Native American issues, you have people's attention, no one questions what you're saying.  If you say it's racist, then it's racist.  Your word is law.  But now it seems my Jewishness cancels it out for them.  If I say something is antisemitic they don't listen."

238.    In 2020, then Columbia University President Lee C. Bollinger and Columbia University deans released no less than nine separate statements of solidarity in the wake of George Floyd's murder.  Shortly thereafter, Columbia announced robust efforts to address on-campus racism.

239.    In August 2020, Columbia University renamed a dormitory on its Manhattan medical campus because its namesake was a slaveowner, issuing a statement: "We all understand how careful we need to be in shaping the environment, symbolic as well as physical, in which we ask our students to live and to call home."

240.    In 2021, prompted by a rise in anti-Asian incidents during the COVID-19 pandemic, and a shooting spree in Atlanta that targeted Asians, then Columbia University President Bollinger and several Columbia University deans released statements of solidarity. President Bollinger stated, in part: "I cannot adequately express my sense of shared injury and outrage at yet another display of evil and bigotry in this country. . . . To the many thousands in our Columbia University community who are Asian or Asian American, we want you to know that we, too, on your behalf and for all of us, feel the anguish and justifiable fear because of this latest episode of a deep-rooted strain of racism in America."  Then Barnard President Sian Leah Beilock similarly issued a statement unequivocally denouncing xenophobia, which recognized

that the shooting in Atlanta came amidst a rise of anti-Asian violence in New York City, and expressed, "It can be hard to fathom the depth of grief, rage, fear and confusion we are feeling."

241.    In 2022, following the Colorado Springs night club shooting that targeted the LGBTQ+ community, Columbia University released a statement of solidarity: "The violence and harm that took place last night at Club Q must be named as an act of hatred and terror against the LGBTQ+ community, and against the values we aim to uphold at Columbia.  Informed by the values of respect, dignity and the inherent value of every human, we at Columbia condemn this act, and stand in solidarity with the LGBTQ+ community."

242.    At the beginning of the current school year, on August 28, 2023, Columbia University released a statement of solidarity in response to a shooting in Jacksonville, Florida, which targeted the Black community.  The statement claimed that "[o]ne of Columbia's greatest assets is our diverse community [and that Columbia] denounces all forms of racism and bias and will continue working to fulfill its commitment to anti-racism."

243.    In each of the above examples, Columbia decisively issued statements of solidarity with affected students and unequivocally denounced violence.  Yet over four months after the October 7 terrorist attack against Jews, Columbia University has not issued a single statement to its students condemning Hamas or even suggesting that the university would stand with its Jewish and Israeli students, some of whom were directly impacted by Hamas's atrocities.

244.    Columbia's failure to publicly condemn Hamas is part of a deliberate, broader pattern of refusing to acknowledge Jew hatred.  In 2018, when an antisemitic domestic terrorist unleashed a hail of bullets in the Tree of Life Synagogue in Pittsburgh, killing eleven Jews and wounding six others, including Holocaust survivors, Columbia issued a statement conspicuously

omitting any reference to "Jews" or "antisemitism," while also offering solidarity for those affected by the then recent rise in homophobic- and racist–motivated incidents.

### ii.    Columbia Swiftly Provides Resources for Victims of Doxing

245.    On November 1, after campus antisemitism and discrimination reached a fever pitch, Presidents Shafik and Rosenbury announced the creation of a "Task Force on Antisemitism."  Less than three hours later, Presidents Shafik and Rosenbury announced a "Doxing Resource Group" to address "disturbing incidents" in which the "names and photos of Arab, Muslim, and Palestinian students" were publicized.  They added that Columbia was "grateful for the persistence and perseverance of the students, and their families, in the face of this harassment.  We are assembling available resources to support them and the staff and faculty who are by their side."

246.    These two initiatives were meant to address concerns from students on both sides—Jewish students targeted by antisemitism on one side and students who were identified for their possible involvement in these antisemitic incidents.  But comparing these two emails— sent hours apart—highlights Columbia's antisemitic double standard.  For example, the email announcing the Task Force on Antisemitism framed the incidents on campus as "report[s]," while the Doxing Resource Group email left no doubt that Columbia believed "attacks" had occurred.

247.    While the Doxing Resource Group email recounted specific "disturbing incidents," no specifics or details about the antisemitic incidents on Columbia's campus were provided in the Task Force on Antisemitism email.  And while the Doxing Resource Group email detailed concrete measures, including that Columbia had already "retained experts in the field of digital threat investigation and privacy scrubbing," the Task Force has not even begun

making recommendations.  Since the establishment of the Task Force, Jewish students' safety

remains unaddressed at Columbia.

> ### iii. Columbia Does Not Hesitate to Discipline Faculty Members Who Make Racist or Other Controversial Statements, Except When the Statements Are Antisemitic

248.    While Columbia hires, promotes, and protects professors who espouse and teach

antisemitic vitriol, Columbia decisively disciplines professors in matters involving other

minority groups or expressing unpopular ideas.  In 2005, Barnard fired an American History

professor because he taught an unconventional perspective on history that emphasized the role of

debauchery.  In 2022, Columbia University suspended its psychiatry department chair for

tweeting a photo of an African model with the caption: "Whether a work of art or freak of nature

she's a beautiful sight to behold."  That year, Barnard canceled a course on Culture in America,

because the professor had quoted rap lyrics including the N-word.

249.    But Columbia University does nothing to protect Jews in response to complaints

about its faculty, including Rashid Khalidi, Hamid Dabashi, Joseph Massad, and Katherine

Franke, all of whom have been repeatedly exposed for their expression of antisemitic views,

endorsement of violence against Jews, and/or calls for Israel's destruction.  Indeed, just as it

ignored corroborated reports of Professor Massad's antisemitic harassment nearly two decades

ago, Columbia has failed to answer renewed calls to discipline Massad for his abhorrent support

of terrorism against Jews and Israel the day after the depraved terror attacks on October 7.

250.    By ignoring these reports, Columbia has emboldened Massad.  During a webinar

on December 4, Massad promoted the debunked claim that the IDF was engaging in

"indiscriminate strafing of people at the music festival" or those trying to flee the scene.  He also

added that the "claims of mass murders of babies" and "mass rapes of women" were lies

"dispensed to a white supremacist Western world."  On January 11, 2024, Massad claimed in the

*Middle East Eye* that "a majority of Israeli Jews" hold "genocidal views" and "support [] ethnic cleansing of the Palestinian people," and suggested that "Israeli Jews" should move to the U.S. and Europe.

251.    Columbia Law Professor Franke—who bragged on Twitter on November 26, 2023 that she helped shut down and trap people on the Manhattan Bridge to protest the "genocide in Gaza," and more recently called for Columbia to exclude Israeli students from campus—is teaching three courses, including "Reading Group on Modern History of Palestine." The Associate Director of Undergraduate Career Development at Columbia University, Lameess Mehanna, stated, "we can make sure that it is etched in the books of history that 2023 was the beginning of the end for the Zionist entity [Israel]" at a rally in New York City on December 31, 2023.

252.    Columbia's inaction has further emboldened faculty to teach and promote antisemitic rhetoric that creates a hostile environment for Jewish and Israeli students.

> **iv.    Columbia Punishes Students for Policy Violations That Do Not Involve Antisemitism**

253.    Columbia's failure and refusal to discipline students who engage in antisemitic harassment also stands in stark contrast to the discipline Columbia metes out in response to bias-motivated incidents against other minority groups or even the mere use of crude language or other misconduct.

254.    In 2006, for example, Columbia University suspended its men's ice hockey team from preseason competition, placed it on probation for a year, and required its members to participate in trainings because the team's recruitment fliers said, "stop being a pussy."  In 2015, Columbia University terminated a teaching assistant, in part, because he used the word "fucked" in an email to students.

255.    In 2016, Columbia University suspended its men's wrestling team for text messages containing racist, sexist, and homophobic language.  In 2018, Barnard banned a Columbia University student from its campus for harassing Black students.  In November 2020, Columbia University banned seventy MBA students from campus for traveling to Turks and Caicos, in violation of its COVID-19 travel policy.  In 2021, Barnard evicted a low-income student from Barnard housing because she accidentally started a fire.

### G.    Plaintiffs Are Being Denied Equal Access to Columbia's Educational Opportunities

256.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members at Columbia know that, solely because of their Jewish and/or Israeli identities, Columbia views and treats them as second-class citizens, undeserving of the protections that Columbia affords non-Jewish students.  As a result, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have been deprived of the benefits that non-Jewish students enjoy in both academic and student life—all while paying, in addition to tuition, mandatory costly "student life fees," which fund student groups, including SJP, JVP, and the coalition of student groups that constitute CUAD.

257.    In the immediate aftermath of October 7, Rubin and Symonds faced unique challenges as IDF veterans.  Both expected they could be joining their units and contacted various GS deans to inquire what options were available should they need to do so.  On October 8, Rubin asked Dean Rosen-Metsch, who has touted GS as the "premier destination for military veterans seeking an undergraduate degree," to schedule a town hall to clarify how GS would support the Israeli community and those who planned to deploy to the IDF.  No town hall was scheduled.

258.    In the days and weeks that followed, the Individual Plaintiffs continued to reach out to the administration, including Deans Rosen-Metsch and Dave.  On October 16, Rubin sent an email stating that he felt "unsafe" on campus and that the "learning environment [was] truly toxic."  GS Associate Dean of Student Affairs and Wellbeing Amber Griffiths responded by suggesting he connect with Public Safety to get a "better sense" of its presence on campus.  The next day, Rubin emailed Case Manager Bridgette "Judy" Aboal—his assigned point of contact at Columbia Health—stating that he was going through "emotional turmoil" and that Columbia had turned into a "hostile learning environment."  He asked for "immediate assistance in any way" and included "*urgent*" in the subject line.  That afternoon, in response to a different email, Aboal acknowledged how "difficult" it was for Rubin to share his "intimate experiences with the current events," but that she could not consider his request for remote classes—news she could "imagine" was a "disappointment."

259.    On or about October 24, Rubin tried again to attend class.  On his walk to class, including inside an academic building, Rubin was bombarded by signs reading Israel is "committing genocide."  Overwhelmed and unable to concentrate in class, Rubin left and went to the Dean of Students office, where he was told to return later in the day.  In the meantime, Rubin emailed Dean Dave, Dean Griffiths, and his professor, pleading for help, but he received no substantive response.

260.    Faced with no more conventional options, and desperate to receive any meaningful response from the administration, Rubin—joined at times by Symonds and other Jewish students—stood quietly on Columbia University's College Walk for about four hours holding up a sign that read "Columbia doesn't care about the safety and well-being of its Jewish students."  While McNulty was nearby, two students in keffiyehs walked by laughing.  When

Rubin asked why they were laughing, one replied, "you guys bomb hospitals"—referring to a false Hamas report that Israel had bombed the Al-Ahli Arab Hospital in Gaza City, when in reality it was a rocket aimed at Israel that misfired.

261.    Rubin was also approached by several professors.  One MESAAS professor took photos of Rubin and laughed at him.  Another professor stopped to ask Rubin why he felt Columbia does not care about its Jewish students.  Moments later, a female student walked by and yelled at Rubin, "Fuck the Jews.  Fuck Israel."  Rubin looked at the professor and said, "that's why."  One of Rubin's friends who had witnessed the interaction reported it to Public Safety but never heard back.

262.    As a result of Columbia's refusal to address antisemitism both on campus and in the classroom, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have been deprived of Columbia educations.

263.    McNulty dropped multiple classes because professors refused to arrange accommodations for exams or missed in-person classes because she could not physically get to class without risking her safety by walking through antisemitic rallies.  On October 12, in her Chinese class, McNulty's classmate wrote the following notes on an iPad tilted in her direction: "Israeli students do not want to take advantage of their education at Columbia"; "The jewish student who was attacked yesterday was a white student who's [*sic*] goal was to get a black Palestinian arrested"; "The jewish students on campus were trying to recruit 'zionists' who we [*sic*] 'extremely dangerous' and who would make the campus unsafe"; and "The Jewish communities [*sic*] goal is to spread misinformation to gain support."  Distressed by these messages, McNulty immediately left class and sent an email reporting the incident to, among others, Marlyn Delva, GS Dean of Students.  She did not receive a response.  The next week,

McNulty tried returning to class only to find students discussing their participation in SJP rallies, which had no connection to the subject of the course.

264.    Despite her stellar academic record, McNulty completed only one class last semester because that professor accommodated her request for remote learning; even in that situation, however, she was deprived of the educational opportunities offered by in-person learning, including the discussion portion of that class.  Her request to continue a class via Zoom in spring 2024 was recently denied.  McNulty's mental health has also been significantly impacted by Columbia's hostile environment, causing her to lose sleep and have nightmares.  As a result, McNulty's graduation date will likely be extended by a full year.

265.    Symonds has experienced immense stress because of the antisemitic events at Columbia since October 7, causing her to lose sleep and miss countless classes.  Symonds's stress has been exacerbated by the lack of support offered by Columbia.  Symonds has had to avoid taking courses that she otherwise would have taken with certain professors, like Massad and Khalidi, because of their well-documented histories of antisemitic discrimination and harassment.  She was also interested in attending graduate school at SIPA, but is dissuaded because of its rampant antisemitism following October 7, including its academic building being defaced with a swastika on October 27.  Symonds has avoided wearing clothing on campus identifying her as a member of SSI out of fear for her emotional safety, or otherwise felt compelled to cover it up depending on her surroundings fearing retaliation for her Jewish identity.

266.    Rubin has experienced antisemitism in classes, which affected his GPA and forced him to withdraw from a class.  Since October 7, Rubin has found Columbia's campus to be unbearable, affecting his mental health and causing him to flee campus to the safety of his

parents' house and miss countless classes and fall behind on coursework.  On October 25, Rubin

heard amplified chants of "from the River to the Sea" during a midterm exam, and during a

lecture on the Holocaust that day, he could hear similar chants.  Rubin has persistently requested

accommodations, such as remote learning, to no avail, causing him to withdraw from a course.

267.    Gerstein's academic environment has been severely impacted by antisemitism.

She had to drop a required course taught by Erwin de Leon, SPS Chief Diversity Officer and

Lecturer, because of his previous attitude and alleged conduct toward Jews.  Instead, she must

take an independent study, which is mainly online, depriving Gerstein of the full benefits of the

course.  Antisemitism has also impacted other educational activities for Gerstein, including her

ability to fully participate on SPS's DEIA Committee.

268.    Since October 7, Gerstein has had several classes disrupted because of the

antisemitic campus environment.  In the fall, she had a class on the first floor of the SIPA

building with constant disruptions due to a nearby class taught by former U.S. Secretary of State

Hillary Clinton.  That semester, students led a relentless campaign against Clinton, disrupting

academic activities in the SIPA building, including on November 29, when students occupied the

lobby of the SIPA building, chanting, "Hillary, Hillary, you can't hide, you're supporting

genocide."  Gerstein has often avoided campus when antisemitic rallies are planned, including on

February 2 when WOL and Columbia students led a riot adjacent to campus.  When she is forced

to be on campus during rallies, Gerstein has, at times, been physically prevented from accessing

Columbia's facilities.

269.    Since October 7, Miller has continued to experience antisemitism in classes.  For

example, on October 30, Miller attended a "safe space" lecture—which was advertised as an

opportunity to have an open discussion about the Middle East with Dean Jaque of the Graduate

School of Architecture.  During the lecture, Jaque consistently referred to Israel as "Palestine."

Feeling unsafe, Miller felt compelled to leave.

270.    The next day, Miller was paired with a fellow GSAPP student to give a lecture for their Extreme Design class.  While discussing the assignment, Miller's classmate suggested they focus their lecture on October 7.  When Miller told his classmate that it was extremely painful to discuss October 7, the classmate responded by pretending to look for a book around his desk and jokingly told Miller he was trying to find his copy of Mein Kampf.

271.    In November 2023, GSAPP students hosted a series of "teach-ins" as part of an event, "What is Settler Colonialism?"

272.    During a meeting with Dean Jaque in December 2023, Miller asked Jaque to condemn antisemitic bullying on campus.  Jaque refused to do so, claiming he was told to follow President Shafik's lead and would not make an independent statement.  When Miller raised his concerns about the "What is Settler Colonialism?" fliers and event with Jaque, he claimed GSAPP did not endorse the event.  To date, the event remains advertised on GSAPP's website and the poster advertises it as a GSAPP event.

273.    After returning to campus in January 2024, Miller was once again confronted with antisemitism in the classroom.  On his first day of "Spirits and Matter:  Architecture and the Modernization of the Middle East," Miller noticed that not every class involved discussions of architecture.  For instance, according to the syllabus, the lecture planned for March 6 is called "Occupation and Genocide," and required reading includes "Israel's Genocide in Gaza Encapsulates the Entire History of European Colonialism"—Miller, who felt the class would turn into an anti-Israel discussion, was left with no option but to drop the class.

274. Since October 7, Miller has dropped multiple classes and avoided going to campus on at least twenty separate days because of the hostile environment. He has made reports to the administration but has merely received automated replies which include referrals to wellness resources. As a GSAPP student, it is imperative that Miller work in his assigned studio space in Avery Hall; indeed, Columbia only provides the license to certain software on the computers on campus, which he cannot access on his personal computer. Because the studio space does not have air conditioning, the windows are frequently open, making it impossible to ignore the disruptive noise of the rallies right outside. Even with the windows closed, Miller found it impossible to concentrate and was frequently too distracted to stay in the studio—which he reported to the administration.

275. Columbia's antisemitic faculty and curriculum effectively limits the available courses for Jewish and Israeli students. When registering for classes, the Individual Plaintiffs, SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and other Jewish and/or Israeli students at Columbia are forced to check whether the professors have a history of antisemitism. Especially since October 7, Jewish students have had to cross reference their preferred courses against the long list of faculty members that have signed onto statements defending Hamas's atrocities or participated in the pro-terror rallies. They have had to avoid courses taught by professors who have expressed antisemitic views. Jewish students at CSSW, like SCLJ Members #1, 2, and 3, maintain a list of professors classified as "not friends of the Jews," "complicated," "undecided," or "friends of the Jews." The number of professors considered "friends of the Jews" is close to the number of for those that are hostile toward Jews. In other words, Jewish students are deprived of access to Columbia's full course catalog

available to their non-Jewish peers if they want to attempt to avoid antisemitic discrimination or harassment.

276.    SCLJ Member #1 is traumatized by the intimidation and harassment she has endured at CSSW, including at the November 8 takeover where she was forced to be escorted to and from class by a professor for her own safety.  SCLJ Member #1 had a final exam scheduled at the same time as the December 6 takeover.  SCLJ Member #1, driven to tears by the hostile environment created by the takeover, requested an accommodation.  Her request was denied, and she was required to take the final, a group project, with one of the organizers of the pro-terror event while the event was taking place in the building.  The next day, SCLJ Member #1 emailed several universities to ask about transferring but determined that transferring was not a viable option because it would require her graduation date to be extended.

277.    SCLJ Member #1 has had to drop or avoid taking classes because of antisemitic students or professors.  SCLJ Member #1's classes are often derailed by student-led antisemitic diatribes.  In multiple classes, SCLJ Member #1's classmates have made offensive comments about Jews, Zionists, and Israel—which none of her professors have addressed.  She has also made reports to Dean Curtain, as well as at least one formal conduct complaint to Columbia University's Center for Student Success and Intervention.

278.    Before October 7, SCLJ Member #1 took full advantage of CSSW.  She participated in several clubs; now she is only comfortable participating in events hosted by the Jewish Caucus because other clubs have either published or endorsed antisemitic statements, or their leaders have organized antisemitic rallies or made antisemitic posts or messages on social media.  Now she remains on campus only as long as necessary to attend her classes and often flees campus to stay with family outside of New York City.  SCLJ Member #1 was shocked to

learn that her graduation ceremony this year is on a Friday and ends at 6:30 p.m., shortly before the Jewish Sabbath begins.  She and other Jewish CSSW students requested a date or time change to accommodate their Sabbath observance, which was denied.

279.    When on campus, SCLJ Member #2 lives in a constant state of fear.  Because of pro-terror rallies last semester, her classes were moved to Zoom twice.  Another class, on November 9, was effectively canceled when she was the only student who did not participate in an anti-Jewish walkout.  SCLJ Member #2 has had to avoid registering for courses she otherwise would have taken because of antisemitic professors.  This semester, she dropped a course that she planned her entire schedule around when on the second day, a group of roughly half the class came in late after participating in a rally.  SCLJ Member #2 recognized several of these students as having organized and participated in the December 6 takeover where she was shoved and jabbed with umbrellas.  During a meeting with her professors and a follow up email dropping the class, SCLJ Member #2 reported that she did not feel safe being in a class with these students.

280.    SCLJ Member #2 struggles to concentrate in class as there are often distracting posters covering her classrooms, which her professors largely ignore.  Her professors and classmates often make offhand comments about Israel, regardless of whether it is relevant to the discussion.  SCLJ Member #2 avoids campus and common areas in CSSW because of the antisemitic environment.

281.    SCLJ Member #3 has been denied access to Columbia's full academic and extracurricular offerings because of antisemitism.  His request to form a Jewish affinity group at CSSW was denied, even though there are affinity groups for other protected groups.  SCLJ Member #3 has also been prevented from joining CSSW student caucuses that he is interested in

because they have posted statements calling for violent means of resistance.  SCLJ Member #3's academics have also been disrupted because of campus antisemitism.

282.    SCLJ Member #3 foregoes registering for courses taught by antisemitic professors.  Multiple hostile takeovers at CSSW forced his classes during fall 2023 to be held remotely or canceled.  During the November 8 takeover, the professor of his afternoon course facilitated an informal discussion about the takeover and related current events, even though the topic of that class was supposed to be "toddlerhood, early childhood, and infancy," and his evening class that day was canceled because of the takeover.  SCLJ Member #3 has avoided campus when there are rallies because they make him feel unsafe.

283.    SCLJ Member #4 returned to campus in mid-January but stays home on particularly chaotic and violent days.  Since returning in January, students and faculty have called for the exclusion of Israelis from campus.  SCLJ Member #4 now takes a circuitous route to their lab to avoid the rallies and also plans their research around when the rallies occur.  Although they would like to continue their education and pursue their research in person, there are days where they cannot go to campus out of concern for their safety.  In one such instance, on February 2, WOL and student groups rioted around Columbia's perimeter, preventing SCLJ Member #4 from walking to their lab without confronting their fellow students' calls for their removal from the Columbia community.  SCLJ Member #4 has sent at least five emails to President Shafik and the Task Force on Antisemitism to report incidents, like the WOL riot, that have created a hostile environment and impacted their access to the full educational benefits at Columbia.  SCLJ Member #4 has only received generic, ineffective responses.

284.    SCLJ Member #4 also withdrew their membership from their graduate student union because of its rampant antisemitism, including its statement blaming Israel for October 7,

dissemination of weekly emails encouraging attendance at rallies, and vote to divert funding to SJP and JVP which they were not supposed to receive during their suspension. Columbia's hostile environment—in which they are constantly confronted by stickers such as "Zionist donors get your hands off our institution" or posters hung near their lab with pictures of Israeli tanks with phrases such as "is your research fueling the war machine?"—has severely impacted SCLJ Member #4's mental health. In response, SCLJ Member #4 is in a constant state of distress and hypervigilance whenever stepping foot on campus.

285. Since October 7, SCLJ Member #5 is forced primarily to work remotely rather than in their shared Columbia laboratory, which has been overtaken by individuals who use the space to espouse antisemitic conspiracy theories and blood libels. Columbia students have organized multiple rallies at or next to CUIMC's campus, including on November 29 in which they blockaded the entrance to the Hammer Health Sciences Building. SCLJ Member #5 now feels unsafe working on campus and stays home instead.

286. SCLJ Member #5 is also afraid for their safety on campus because of the violent and exclusionary rhetoric espoused freely by students targeting them as an Israeli and Jewish. SCLJ Member #5 is deterred from wearing garb that identifies them as Jewish because of these safety concerns. SCLJ Member #5 returned to Israel over winter break because they did not feel safe on campus and was disheartened that their concerns proved even more well founded upon returning. Before returning, they emailed their deans to ask if the campus environment was likely to be safer when they returned. One of their deans responded that it was not clear.

287. SCLJ Member #5 is significantly less productive at home, and has sacrificed in-person collaboration, networking, and other benefits afforded to their non-Jewish, non-Israeli colleagues. When SCLJ Member #5 is on campus, they struggle to concentrate. Last semester,

for example, there were constant antisemitic postering campaigns at the Hammer Health Sciences Building, which included placing posters containing blood libels on every seat.  There has also been phone banking weekly at the Vagelos Education Center.

288.    SCLJ Member #5, exhausted by all of the energy they expend documenting and reporting antisemitism at Columbia, including their considerable efforts to be heard by Columbia's administration, is considering transferring.  At the very least, their graduation date will likely be extended because of their diminished productivity.

289.    In the days following October 7, the School of Nursing campus became increasingly hostile and charged for Jews.  SCLJ Member #6, who lost family and friends in Hamas's attack, helped organize a small vigil at Columbia's medical campus.  As a result of a photo of SCLJ Member #6 crying and holding an Israeli flag posted to social media, they received hateful, antisemitic messages, calling them a murderer, "filthy Jew," and Nazi, and death threats.

290.    On October 12, SCLJ Member #6 wrote an email to the School of Nursing deans and other administrators, explaining that they did not feel safe on campus, and they found the amount of antisemitism on campus deeply distressing, and asking how Columbia planned to keep its Jewish students safe, but never received a response.  They separately heard from their program director that she would pass their concerns along to the deans of the nursing school.  As antisemitism escalated on campus, they continued emailing their program director, who kept telling them she would pass their concerns along.

291.    SCLJ Member #6 has become anxious and depressed because of the hostile environment on campus and the lack of a response from the administration.  They did not feel safe going to class.  The School of Nursing campus became so unbearable that they left New

York.  When they told their program director they left the state, she merely put them in contact

with the school's social worker.  When SCLJ Member #6 met with the social worker, she was

dismissive of their concerns, by claiming that they were "the only Jewish student who has

complained."  Yet SCLJ Member #6 knows that several of their Jewish classmates have also

complained to the administration.  In fact, multiple Jewish students have been told by various

members of Columbia's administration that they are the only ones feeling unsafe.  When SCLJ

Member #6 reiterated their concerns, she replied, "I'm sorry that's your perception of things, but

we have to support all of our students."  Frustrated, they asked for more clarity.  She reiterated,

"we have to support all students," and stated that the issue "is very complicated and delicate."

When SCLJ Member #6 asked the social worker if she would tolerate people saying they wanted

to lynch African Americans or yelling homophobic slurs, she was quick to respond that she

would not.

292.    Since October 7, SCLJ Member #6 repeatedly emailed Judy Wolfe, School of

Nursing Senior Associate Dean of Student Affairs, expressing their concerns with the campus

environment, but never received a response.  Yet when SCLJ Member #6's friend met with Dean

Wolfe and mentioned SCLJ Member #6 had been struggling to deal with the antisemitism on

campus, Wolfe said to "tell [SCLJ Member #6] to reach out to me, and we can talk."  SCLJ

Member #6 forwarded Wolfe emails they had sent her since October 7, explaining that they

would be happy to meet with her but expressing frustration and confusion by how long it took to

make contact.

293.    On November 28, SCLJ Member #6 finally met with Dean Wolfe but walked

away disappointed and discouraged.  When they reiterated their concerns, Wolfe said, "I'm sorry

this is your experience."  Wolfe told them that she does not handle disciplinary procedures, and

referred them to the bias reporting procedures, which at that time, weeks after announcing a Task Force on Antisemitism, still did not include antisemitism as grounds for making a report.

294.    SCLJ Member #7's experience as a film student at Columbia hinges on their ability to access equipment on campus and work collaboratively with peers.  Following October 7, this has been nearly impossible, significantly affecting their productivity, and they have considered transferring to a different school or taking a leave of absence.  Immediately after October 7, SCLJ Member #7 was attacked by classmates in a group chat for sympathizing with another Jewish student.  Since then, SCLJ Member #7 is a social pariah in their department due to their Jewish identity, and they have been forced to forgeo numerous social events.

295.    On November 2, SCLJ Member #7 met with an administrator in Columbia's film department and expressed concern about certain classmates posting violent rhetoric on social media.  SCLJ Member #7 also expressed concern about professors in the department who had signed onto a letter defending the students who signed the pro-terror joint statement and referring to the October 7 terrorist attack as a "military action" that can be reasonably "recontextualize[d]."  SCLJ Member #7 will now not take classes with these professors even though he likely would have otherwise.  The chair of their department said there is nothing they can do to address the issue, and that SCLJ Member #7 needs to be comfortable working with people they disagree with.  Lechner also told them that the Jewish people "have been through a lot and can get through [this]."

296.    On January 22, SCLJ Member #7 met with School of Arts Assistant Dean of Student Support Herbert Hugh "to highlight the occurrences on campus that have made Columbia a hostile and unsafe environment since Hamas' attack," including frequent calls for violence against Jews.  During this meeting, Hugh told them that he would send multiple

resources to "foster [their] wellness as a Jew on [Columbia's] campus"—a common response to Jewish students who have expressed similar concerns rather than addressing the root cause or disciplining harassers.  Three days later, SCLJ Member #7 emailed Hugh because they had not received any resources.  In response, Hugh claimed he was delayed sending resources—despite promising them within one day—because he wanted to consult with School of the Arts Dean Leila Maher.  In a February 2 meeting, Dean Maher echoed the department chair's response, telling SCLJ Member #7 there was nothing she could do about the antisemitism on campus.

297.   SCLJ Member #7's classes have been disrupted by antisemitic rallies on roughly five occasions.  The School of Arts is near the center of campus, and rallies can be heard from within the building.  On February 2, the rally was so disruptive, SCLJ Member #7 was forced to leave class.  There are also days where rallies are scheduled, and SCLJ Member #7 avoids campus altogether.  When they must go to campus, SCLJ Member #7 takes alternative routes to and from campus to avoid rallies.  When campus access is restricted and certain gates are closed because of rallies, however, SCLJ Member #7 is sometimes forced to traverse threatening rallies to get to the School of Arts.  SCLJ Member #7 recently received an email from a professor inquiring as to why they were absent from a lecture class.  They responded they did not want to come to campus given the previous day's rally where SJP students broke a library door and chanted, "there is no safe place."  The professor responded this was not a valid excused absence.

298.   SCLJ Member #8 moved out of campus housing over fall break due to her former roommate, who posted vile antisemitic statements on social media.  As she explained to Dean Grinage in a November 7 email, she "no longer fe[lt] safe living in the same room" as her former roommate.  At first, SCLJ Member #8 sought to move into different campus housing, but ultimately moved off campus altogether because of the hostile environment—which also drove

her to stop wearing a necklace that has her Hebrew name on it and to no longer carry an Israeli flag.

299.    SCLJ Member #8 avoids campus since October 7 except to attend her classes. She does not go to the libraries or social events outside of those hosted by Hillel.  She has also participated in multiple clubs before October 7, but withdrew from all but Hillel, because of rampant antisemitism in student groups.  For instance, she attended Barnard's annual Midnight Breakfast on the last day of classes every semester in each of her prior years on campus but did not attend this year.  She particularly avoids campus when rallies are scheduled.  She has been selective about picking classes since October 7, and tries to avoid those with professors or students with documented histories of antisemitism.  Her classes have been disrupted because of the antisemitic rallies on campus.  For instance, on October 25, Columbia students caused a campus-wide disruption by walking out of classes.  SCLJ Member #8 is applying for graduate school but is not applying to Columbia because of its institutional antisemitism.

300.    SCLJ Member #9's classes, particularly those on Barnard's campus, have been regularly disrupted by the antisemitic rallies.  For example, a rally on November 15 could be heard during SCLJ Member #9's laboratory.  SCLJ Member #9's classmates congregated at the classroom's windows to watch the rally.  Rather than address the disruption, SCLJ Member #9's professor remarked, "wish we could be there."  Due to incidents like this, SCLJ Member #9 is afraid to share her Jewish identity in her classes.

301.    SCLJ Member #9's campus experiences have also been deeply impacted by Columbia's hostile environment since October 7.  SCLJ Member #9 is disturbed by antisemitic propaganda that is ubiquitous on Columbia's campus.  Due to Columbia's inaction, she reports these posters herself.  In SCLJ Member #9's formerly preferred study location in the Milstein

Center, there is an unauthorized poster that she cannot remove herself and Barnard has not taken down despite her reports.  Consequently, SCLJ Member #9 stopped studying in this location.

302.    SCLJ Member #10's courses have been contaminated by rampant antisemitism before and following October 7.  Last semester, his Foundation of Public Health required course, was taught by Abdul Kayum Ahmed, who, in 2019, told an auditorium full of high school students during a presentation that there is "fluidity between those who are victims becoming perpetrators" as shown by "Jews who suffered in the Holocausts and established the State of Israel . . . perpetuat[ing] violence against Palestinians that [is] unthinkable"; signed the October 30 letter defending the student groups' joint statement that justified the October 7 terrorist attack; and this year, published "A is for Amandla: The ABC Guide for Young Revolutionaries [and their parents]," the cover of which depicts children holding signs that say "no justice no peace" and "decolonize this place" in front of a banner that reads "free Palestine." Professor Ahmed exploited his position as a core curriculum professor to teach impressionable, first-year students a false narrative to justify violence against Jews and Israelis.

303.    On December 10, SCLJ Member #10 shared his concerns about Ahmed's "many biased and unprofessional actions" in an email to Mailman School of Public Health Dean Linda P. Fried, as well as various other administrators.  Dean Fried is also aware of Ahmed's misconduct because during an October 10 session of a speaker series that she hosted, Ahmed redirected a discussion around Indigenous Peoples' Day to broadcast his narrative of Israel as a colonizer.  SCLJ Member #10 walked out of the event.

304.    SCLJ Member #10's required General Public Health program last semester was similarly co-opted by Professor Rachel T. Moresky as a platform to spread propaganda.  For example, Moresky assigned a biased reading ahead of a lecture that blamed Israel for the Al-Ahli

Hospital explosion well after it was proven that a misfired rocket aimed at Israel caused the explosion. SCLJ Member #10 reported his concerns about Moresky's lectures in his December 10 email to Dean Fried and others.

305.    Since October 7, SCLJ Member #10 has taken a back entrance to his school's campus because of frequent rallies that make him feel unsafe. SCLJ Member #10 has avoided campus or missed classes altogether due to safety concerns. SCLJ Member #10 avoids certain courses and has withdrawn from others because he no longer feels safe at the Morningside campus.

306.    Because of Columbia's persistent refusal to comply with its obligations to stop discrimination and harassment against Jewish students, the Individual Plaintiffs, SAA's and SCLJ's Jewish and/or Israeli Columbia student members, , and other Jewish students are deprived of the benefits that non-Jewish students enjoy, including, but not limited to, physical protection; emotional support; a sense of inclusion and belonging; participation in educational, extracurricular and Columbia's-sanctioned social activities; the ability to freely express their Jewish identity in class, written coursework, and on campus; and their right to express their support for and attachment to Israel, their ancestral homeland, where many, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, have friends and family. And because of the hostile environment, plaintiffs have been, and continue to be, deprived of Columbia's full educational opportunities and offerings including use of Columbia's libraries and other educational resources.

307.    As a result of Columbia's actions and inactions alleged herein, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members are made to feel less important than, and are treated differently from, other non-Jewish students. Students,

along with Columbia faculty, are able to taunt, demonize, assault, harass, intimidate, ostracize, and discriminate against the Individual Plaintiffs, SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and other Jews with impunity.

308.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and other Jewish students do not feel physically safe on Columbia's campus or in its classrooms and other facilities and avoid certain areas of campus.

309.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members also justifiably fear the harassment, discrimination, and intimidation they face, on any given day, from professors and Columbia leadership—who are supposed to teach and guide them—and from their fellow students, all of whom are required to treat them with respect and dignity under Columbia's policies.  As a result of Columbia's deliberate indifference to their hostile educational environment, including its clearly unreasonable response—failure to respond at all—to reported incidents, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members are often unable to focus, study, or perform their course work to the best of their ability, thereby inhibiting their ability to maximize their Columbia education. These students have had to spend their time at Columbia fearing for their physical safety, enduring anti-Jewish abuse and harassment, and communicating with Columbia administrators in vain over antisemitism.  They have been unable to focus on their coursework or otherwise enjoy their Columbia experience.

310.    Columbia's unreasonable actions and inactions described above not only deprive the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members of their right to the educational and extracurricular opportunities afforded other students—which

have led and will continue to lead to academic, social, and professional consequences—but also severely impact their health, mental well-being, and sense of security.

## COUNT I
### (Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*)

311.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

312.    Columbia University and Barnard receive financial assistance from the United States Department of Education and are therefore subject to suit under Title VI of the Civil Rights Act of 1964.

313.    Discrimination against Jews and/or Israelis—including based on actual or perceived shared ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI.

314.    The Individual Plaintiffs are and identify as Jewish, and their status and identification as Jews brings them within the scope of Title VI's protections.  The Individual Plaintiffs are currently enrolled as students at Columbia.  SAA's members include Jewish and/or Israeli students at Columbia, who are also within the scope of Title VI's protections.  SCLJ's members include Jewish and/or Israeli students at Columbia, who are also within the scope of Title VI's protections.

315.    Title VI prohibits a recipient of federal funds from intentionally treating any individual worse, even in part because of his or her ancestry, race, ethnic characteristics, or national origin.

316.    The acts and omissions of Columbia and its administrators have subjected, and continue to subject, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli

Columbia student members to discrimination and harassment on the basis of their actual and/or perceived shared Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin.

317. Columbia and its administrators had actual notice that such discrimination and harassment, over which Columbia has substantial control and the authority to remediate, was, and continues to be, so severe, pervasive, and objectively offensive that it created, and continues to create, a hostile environment based on shared Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin that deprives the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members of full access to Columbia's educational programs, activities, and opportunities.

318. Columbia and its administrators intentionally discriminate against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members on the basis of their actual and/or perceived shared Jewish ancestry, race, ethnic characteristics, or national origin, as exhibited by Columbia and its administrators' deliberate indifference to the antisemitic abuse, harassment, and intimidation of the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members in violation of Title VI. Specifically, Columbia and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members and the hostile environment that they and other Jewish and Israeli students are forced to endure at Columbia because of their ancestry, race, ethnic characteristics, or national origin. Additionally, Columbia continues to fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring. Such unlawful deliberate indifference causes the Individual Plaintiffs and SAA's and

SCLJ's Jewish and/or Israeli Columbia student members to be subjected to a hostile educational environment.

319.    The environment at Columbia, which has been rendered hostile for the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members as a result of their Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it deprives the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members of equal access to the educational opportunities and benefits that Columbia provides to non-Jewish and/or non-Israeli students.

320.    Columbia and its administrators actively and intentionally engage in this pattern of severe and pervasive discrimination.

321.    Columbia and its administrators also directly and intentionally discriminate against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, with their actual or perceived shared Jewish and/or Israeli ancestry, race ethnic characteristics, or national origin a substantial or motivating factor in Columbia actions.

322.    Columbia continues to unreasonably fail to act, or to act inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference and/or unjustifiable delay, in applying its policies to known or reported incidents involving antisemitism or where the victim or complainant is a Jewish and/or Israeli student, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members.  As detailed above, Columbia's actions, inactions, and conduct were, and continue to be, intended to treat the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members

differently as Jewish and Israeli students as compared to other similarly situated non-Jewish and/or non-Israeli students.

323.    Columbia's acts and omissions are the actual, direct, and proximate causes of the Individual Plaintiffs' and SAA's and SCLJ's Jewish and/or Israeli Columbia student members' injuries.

324.    As a result of the foregoing, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have suffered, and continue to suffer, substantial damages in amounts to be determined at trial.

325.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have been and will continue to be injured because Columbia have and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and have and will continue to intentionally discriminate against them on the basis of Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin.

326.    Plaintiffs are entitled to injunctive relief under Title VI, because Columbia has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate or remedy at law to prevent Columbia from continuing to discriminate against its students on the basis of Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin in violation of Title VI; and the harm the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members will otherwise continue to suffer is irreparable.

327.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

<u>**COUNT II**</u>
**(New York Executive Law (Human Rights Law) § 296 *et seq.*)**

328.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

329.     Educational institutions like Columbia are prohibited, under New York Executive Law § 296, from discriminating against or permitting the harassment of students, even in part because of their actual or perceived race, religion, national origin (defined to include "ancestry"), citizenship, or immigration status.

330.     The Individual Plaintiffs are and identify as Jewish, and their status and identification as Jews brings them within the scope of Executive Law § 296's protections.  The Individual Plaintiffs are currently enrolled as students at Columbia.  SAA's members include Jewish and/or Israeli students at Columbia, who are also within the scope of Executive Law § 296's protections.  SCLJ's members include Jewish and/or Israeli students at Columbia, who are also within the scope of Executive Law § 296's protections.

331.     The acts and omissions of Columbia and its administrators have subjected, and continue to subject, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members to discrimination and harassment on the basis of their actual and/or perceived Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status.

332.     Columbia and its administrators' had actual notice that such discrimination and harassment, over which Columbia had substantial control and the authority to remediate, was and continues to be severe, pervasive, and objectively offensive that it create, and continues to created, a hostile environment based on shared Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status that deprives the Individual Plaintiffs and SAA's

Jewish and SCLJ's and/or Israeli Columbia student members of full access to Columbia's educational programs, activities, and opportunities.

333.    Columbia and its administrators intentionally discriminate against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members on the basis of their actual and/or perceived shared Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status, as exhibited by Columbia and its administrators' deliberate indifference to the antisemitic abuse, harassment, and intimidation of the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, in violation of Executive Law § 296.  Specifically, Columbia and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members and the hostile environment that they and other Jewish students are forced to endure at Columbia because of their race, religion, national origin, citizenship, or immigration status.  Additionally, Columbia continues to fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring.  Such unlawful deliberate indifference causes the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members to be subjected to a hostile educational environment.

334.    The environment at Columbia, which has been rendered hostile for the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members as a result of their Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status is sufficiently severe, pervasive, persistent, and offensive such that it deprives the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members of equal

access to the educational opportunities and benefits that Columbia provide to non-Jewish and/or non-Israeli students.

335.    Columbia and its administrators actively and intentionally engage in this pattern of severe and/or pervasive discrimination.

336.    Columbia and its administrators also directly and intentionally discriminate against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, with their actual or perceived shared Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status a substantial or motivating factor in Columbia's actions.

337.    Columbia's actions or conduct had, and continue to have, an unjustifiable differential or disparate impact upon the Individual Plaintiffs, SAA's and SCLJ's Jewish and/or Israeli Columbia student members, as Jewish and/or Israeli students.

338.    Columbia continues to unreasonably fail to act, or to act inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving antisemitism or where the victim or complainant is a Jewish and/or Israeli student, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members.  As detailed above, Columbia's actions, inactions, and conduct were, and continue to be, intended to treat the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members differently as Jewish and Israeli students as compared to other similarly situated non-Jewish and/or non-Israeli students.

339.     Columbia's acts and omissions are the actual, direct, and proximate causes of the Individual Plaintiffs', SAA's, and SCLJ's Jewish and/or Israeli Columbia student members' injuries.

340.     As a result of the foregoing, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have suffered, and continue to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

341.     Columbia's actions and omissions toward the Individual Plaintiffs, SAA's and SCLJ's Jewish and/or Israeli Columbia student members amount to willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others.

342.     The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have been and will continue to be injured because Columbia has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and have and will continue to intentionally discriminate against them on the basis of Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status.

343.     Plaintiffs are also entitled to injunctive relief under New York Executive Law § 296, because Columbia had knowledge of, and has been, and continues to be, deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate remedy at law to prevent Columbia from continuing to discriminate against its students on the basis of Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status in violation of Executive Law § 296; and the harm the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members will otherwise continue to suffer is irreparable.

344.     Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y. Exec. Law § 297(10).

## COUNT III
### (New York Civil Rights Law § 40-c)

345.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

346.     New York Human Rights Law § 291 provides that the opportunity to obtain education and use places of public accommodation, such as Columbia, without discrimination because of race, creed, or national origin is a civil right.

347.     New York Civil Rights Law § 40-c ("NYCRL") prohibits Columbia from subjecting Jewish and/or Israeli students to discrimination or harassment—including based on their actual or perceived race, creed, or national origin.

348.     The Individual Plaintiffs are and identify as Jewish, and their status and identification as Jews brings them within the scope of NYCRL's protections.  The Individual Plaintiffs are currently enrolled as students at Columbia.  SAA's members include Jewish and/or Israeli students at Columbia, who are also within the scope of NYCRL's protections.  SCLJ's members include Jewish and/or Israeli students at Columbia, who are also within the scope of NYCRL's protections.

349.     The acts and omissions of Columbia and its administrators have subjected, and continue to subject, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members to discrimination and harassment on the basis of their actual and/or perceived Jewish and/or Israeli race, creed, or national origin.

350.     Columbia and its administrators had actual notice that such discrimination and harassment, over which Columbia had substantial control and the authority to remediate, was and

continues to be so severe, pervasive, and objectively offensive that they created and continue to create a hostile environment based on shared Jewish and/or Israeli race, creed, or national origin that deprives the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members of full access to Columbia's educational programs, activities, and opportunities.

351.    Columbia and its administrators intentionally discriminate against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members on the basis of their actual and/or perceived shared Jewish and/or Israeli race, creed, or national origin, as exhibited by Columbia and its administrators' deliberate indifference to the antisemitic abuse, harassment, and intimidation of the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, in violation of NYCRL.  Specifically, Columbia and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members and the hostile environment that they and other Jewish and Israeli students are forced to endure at Columbia because of their race, creed, or national origin.  Additionally, Columbia continues to fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring.  Such unlawful deliberate indifference causes the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members to be subjected to a hostile educational environment.

352.    The environment at Columbia, which has been rendered hostile for the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members as a result of their Jewish and/or Israeli race, creed, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it deprives the Individual Plaintiffs and SAA's and SCLJ's

Jewish and/or Israeli Columbia student members of equal access to the educational opportunities and benefits that Columbia provides to non-Jewish and/or non-Israeli students.

353.    Columbia and its administrators actively and intentionally engage in this pattern of severe and/or pervasive discrimination.

354.    Columbia and its administrators also directly and intentionally discriminate against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, with their actual or perceived shared Jewish and/or Israeli race, creed, or national origin a substantial or motivating factor in Columbia's actions.

355.    Columbia's actions or conduct had, and continue to have, an unjustifiable differential or disparate impact upon the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, as Jewish and/or Israeli students.

356.    Columbia continues to unreasonably fail to act, or to act inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving antisemitism or where the victim or complainant is a Jewish and/or Israeli student, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members.  As detailed above, Columbia's actions, inactions, and conduct were, and continue to be, intended to treat the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members differently as Jewish and Israeli students as compared to other similarly situated non-Jewish and/or non-Israeli students.

357.    Columbia's acts and omissions are the actual, direct, and proximate causes of the Individual Plaintiffs', SAA's, and SCLJ's Jewish and/or Israeli Columbia student members' injuries.

358.    As a result of the foregoing, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have suffered, and continue to suffer, substantial damages and are entitled to statutory damages of $500 per violation pursuant to NYCRL § 40-d.

359.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have been and will continue to be injured because Columbia has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and have and will continue to intentionally discriminate against them on the basis of Jewish and/or Israeli race, creed, or national origin.

360.    Plaintiffs are also entitled to injunctive relief under NYCRL, because Columbia has knowledge of, and has been, and continues to be, deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate remedy at law to prevent Columbia from continuing to discriminate against its students on the basis of Jewish and/or Israeli race, creed, or national origin; and the harm the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members will otherwise continue to suffer is irreparable.

361.    By this action, plaintiffs seek to vindicate the public interest by enforcing fundamental civil rights protections for students, including students who face discrimination and harassment at school based on race, creed, or national origin.

362.    Plaintiffs have complied with the procedural requirements of NYCRL § 40-d by serving notice of this complaint upon the State Attorney General at or before the commencement of the action.

## COUNT IV
### (New York City Human Rights Law – N.Y.C. Admin. Code § 8-107(4), (17))

363.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs above as though fully set forth herein.

364.    New York City Admin. Code § 8-107(4) prohibits Columbia from subjecting Jewish and/or Israeli students to discrimination or harassment—including based on actual or perceived race, creed, national origin, immigration or citizenship status.

365.    The acts and omissions of Columbia and its administrators and other employees have subjected, and continue to subject, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members to discrimination and harassment on the basis of their actual and/or perceived Jewish and/or Israeli race, creed, national origin, immigration or citizenship status that is severe and pervasive.  Columbia has refused, withheld from, and denied the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members the full and equal enjoyment, on equal terms and conditions, of Columbia's accommodations, advantages, services, facilities or privileges, in violation of N.Y.C. Admin. Code § 8-107(4), including by treating them less favorably than similarly situated non-Jewish and/or non-Israeli students based on their protected characteristics.

366.    Columbia's actions or conduct had, and continue to have, an unjustifiable differential or disparate impact upon the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, as Jewish and/or Israeli students, in violation of N.Y.C. Admin. Code § 8-107(17).

367.    Columbia's acts and omissions are the actual, direct, and proximate causes of the Individual Plaintiffs', SAA's, and SCLJ's Jewish and/or Israeli Columbia student members' injuries.

368.    As a result of the foregoing, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have suffered, and continue to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

369.    Columbia's actions and omissions toward the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members amount to willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others.

370.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have been and will continue to be injured because Columbia has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and has and will continue to intentionally discriminate against them on the basis of Jewish and/or Israeli race, creed, national origin, immigration or citizenship status.

371.    Plaintiffs are also entitled to injunctive relief, because Columbia has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate remedy at law to prevent Columbia from continuing to discriminate against its students on the basis of Jewish and/or Israeli race, creed, national origin, immigration or citizenship status; and the harm the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members will otherwise continue to suffer is irreparable.

372.    By this action, plaintiffs seek to vindicate the public interest by enforcing fundamental state civil rights protections for students, including students who face discrimination and harassment at school based on their actual or perceived race, creed, national origin, immigration or citizenship status.

373.    Plaintiffs have complied with the procedural requirements of N.Y.C. Admin. Code § 8-502 by serving notice of this complaint upon the City Commission on Human Rights and the Corporation Counsel.

374.    Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y.C. Admin. Code § 8-502(g).

## COUNT V
### (Breach of Contract)

375.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

376.    At all relevant times, an implied or express contractual relationship existed between Columbia and the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members by virtue of their enrollment at Columbia and as defined by and through Columbia codes, policies, and procedures governing student conduct, including but not limited to Columbia's (i) EOAA Policies & Procedures; (ii) Rules of University Conduct; (iii) Standards & Discipline Policy; (iv) Non-Discrimination Statement and Policy; (v) University Events Policy; (vi) Student Group Event Policy and Procedure; and (vii) Faculty Handbook. Through the documents and materials it publishes and provides to students, Columbia makes express and implied contractual commitments to its students concerning bias-related abuse, harassment, intimidation, and discrimination.

377.    At all relevant times, an implied or express contractual relationship existed between Barnard SCLJ's Jewish and/or Israeli Barnard student members by virtue of their enrollment at Barnard and as defined by and through Barnard codes, policies, and procedures governing student conduct, including but not limited to Barnard's (i) Policy Against Discrimination and Harassment, (ii) Rules for Maintenance of Public Order, and (iii) Student

Code of Conduct.  Through the documents and materials it publishes and provides to students,

Barnard makes express and implied contractual commitments to its students concerning bias-

related abuse, harassment, intimidation, and discrimination.

378.    New York law recognizes that the relationship between a student and a college is

contractual in nature, and that the terms of student handbooks, university bulletins, regulations,

codes, policies, and procedures become part of that contract.

379.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia

student members complied with their obligations under these contracts.

380.    Columbia University breached its agreements with the Individual Plaintiffs and

SAA's and SCLJ's Jewish and/or Israeli Columbia University student members, and failed to

comply with its obligations under these contracts, throughout the course of their enrollment at

Columbia University, including by, among other things, failing to comply with the following

provisions, among others:

- "Columbia University is committed to providing a learning, living, and working environment free from prohibited discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members."  (EOAA Policies & Procedures);

- "Harassment may include, but is not limited to: verbal abuse; epithets or slurs; negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; insulting or obscene comments or gestures; and the display or circulation of written or graphic material (including in hard copy, by email or text, or through social media) that denigrates or shows hostility or aversion toward an individual or group members of a protected class."  (*Id.*);

- "All employees . . . have an obligation to immediately report harassment [and] discrimination."  (*Id.*);

- Violations of the Rules of University Conduct include, among other things, threatening to or placing another in danger of bodily harm or causing or attempting to cause physical harm; incitement; property damage; interfering with an entrance or exit or physically preventing passage from a University facility; "causing noise that substantially hinders others in their normal academic activities"; "briefly interrupt[ing] a University function"; "disrupt[ing] a University function or

render[ing] its continuation impossible"; "fail[ing] to self-identify when requested to do so by a properly identified [dean or appointed official]"; and "fail[ing] to disperse from an assembly upon order of a properly identified [dean or appointed official]."  (Rules of University Conduct);

- "The University prohibits any form of discrimination against any person on the basis of . . . citizenship status; . . . creed; . . . national origin;. . . race; religion; . . . or any other applicable, legally protected status in the administration of its educational policies, admissions policies, employment, scholarship and loan programs, and athletic and other University-administered programs and functions." (Non-Discrimination Statement and Policy);

- "As members of the Columbia University community, all students are expected to uphold the highest standards of respect, integrity, and civility. . . . Students who violate standards of behavior related to academic or behavioral conduct interfere with their ability, and the ability of others, to take advantage of the full complement of University life, and will thus be subject to Dean's Discipline."  (Standards and Discipline);

- "The University has an obligation to ensure that all members of our community can participate in their academic pursuits without fear for their safety."  (University Event Policy);

- "Attendees at events held without approval as described in this Policy will be required to disperse."  (*Id.*);

- "[R]ules of conduct do not allow or condone language that promotes or supports violence in any manner.  Calls for genocide against the Jewish community or any other group are abhorrent, inconsistent with our values and against our rules. Incitement to violence against members of our community will not be tolerated." (Event Policy and Campus Resources FAQ);

- "The conduct of all guests is bound by University Rules and the student group may be held responsible for the behavior of their invited guests."  (Student Group Event Policy and Procedure.); and

- "Faculty should confine their classes to the subject matter covered by their courses and not use them to advocate any political or social cause . . . Faculty should allow the free expression of opinions within the classroom that may be different from their own and should not permit any such differences to influence their evaluations of their students."  (Faculty Handbook.)

381.    Barnard breached its agreements with SCLJ's Jewish and/or Israeli Barnard student members, and failed to comply with its obligations under these contracts, throughout the

course of their enrollment at Barnard, including by, among other things, failing to comply with the following provisions, among others:

- "The College takes prompt and appropriate action to address misconduct, end a hostile environment if one has been created, and prevent the recurrence of a hostile environment." (Policy Against Discrimination and Harassment.);

- "Although Barnard may not control websites, social media, and other venues in which harassing communications are made, when such communications are reported to the College, it will engage in a variety of means to address and mitigate the effects." (*Id.*);

- "The following activities which infringe upon the rights of individuals shall not be permitted and shall be considered violations of College rules:" "Use or threat of force or violence against any person, or the damaging of property"; "Prevention of the normal use or occupancy of any building . . . or disruption of any normal College function"; "Physical obstruction of or the use of threat of force or violence to interfere with the passage of any person about the College campus or through the entrance or exists of any College building or facility." (Rules for Maintenance of Public Order.)

- Prohibited conduct includes, among other things, "discrimination, harassment and retaliation," "Disorderly Conduct," "Disruptive Behavior," "Failure to Comply," "Vandalism or Damage to Property," "Threatening Behavior," and violations of Barnard policy or federal, state, or local law. (Student Code of Conduct.)

382. Columbia University also has breached the implied covenant of good faith and fair dealing implied in its contracts with students, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia University student members. Among other things, Columbia University selectively applies or enforces its student handbooks, university bulletins, regulations, codes, policies, and procedures in a bad faith and discriminatory way—improperly motivated by shared ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status bias—treating incidents of abuse, harassment, intimidation, or discrimination against Jewish and/or Israeli students, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia University student members, in a more lenient, tolerant, forgiving, and nonchalant manner than it treats similar incidents against other minority groups.

383.    Barnard also has breached the implied covenant of good faith and fair dealing implied in its contracts with students, including SCLJ's Jewish and/or Israeli Barnard student members.  Among other things, Barnard selectively applies or enforces its student handbooks, university bulletins, regulations, codes, policies, and procedures in a bad faith and discriminatory way—improperly motivated by shared ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status bias—treating incidents of abuse, harassment, intimidation, or discrimination against Jewish and/or Israeli students, including SCLJ's Jewish and/or Israeli Barnard student members, in a more lenient, tolerant, forgiving, and nonchalant manner than it treats similar incidents against other minority groups.

384.    As a direct, proximate, and foreseeable consequence of the foregoing breaches, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have been damaged, and continue to sustain substantial damages, in amounts to be determined at trial.

## COUNT VI
### (New York General Business Law §§ 349, 350)

385.    The Individual Plaintiffs repeat and reallege the allegations of the preceding paragraphs above as though fully set forth herein.

386.    Section 349(a) of the General Business Law provides consumer protection by declaring as unlawful "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.  Section 350 similarly prohibits "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.

387.    Columbia University's conduct, statements, and representations described above, were consumer-oriented and were aimed at, and had a broad impact on, a large consumer group,

namely, prospective and current students of Columbia University.  These statements include those reflected, embodied, and set forth in Columbia University's: (i) Equal Opportunity and Affirmative Action Policies & Procedures; (ii) Rules of University Conduct; (iii) Standards & Discipline Policy; (iv) Non-Discrimination Statement and Policy; (v) University Events Policy; (vi) Student Group Event Policy and Procedure; and (vii) Faculty Handbook.

388.    Columbia University has not acted in accordance with, and has not followed through on, its statements against discrimination, abuse, and harassment, and has instead knowingly engaged in the following false acts or practices that are deceptive or misleading in a material way, that were aimed at the consumer public (namely, prospective and current students), and that were likely to mislead a reasonable prospective or current student acting reasonably under the circumstances:

- By falsely leading the Individual Plaintiffs to believe that Columbia University would apply, enforce, and follow the rules and policies, and the commitments contained therein, reflected, embodied and set forth in Columbia University's: (i) Equal Opportunity and Affirmative Action Policies & Procedures; (ii) Rules of University Conduct; (iii) Standards & Discipline Policy; (iv) Non-Discrimination Statement and Policy; (v) University Events Policy; (vi) Student Group Event Policy and Procedure; and (vii) Faculty Handbook; and

- By falsely causing the Individual Plaintiffs to believe that if they paid tuition and fees to Columbia University, then Columbia University would uphold, adhere to, abide by, and comply with its stated rules and policies, and the commitments contained therein, to foster, ensure, maintain, and create an environment free of discrimination, abuse, harassment, and intimidation, and provide an adequate and appropriate setting and environment in which all students, of whatever ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status could freely express their identity and ancestry, could learn and grow, and could participate fully and meaningfully in Columbia University's educational and other programs.

389.    The Individual Plaintiffs saw, heard, and were aware of Columbia University's false and misleading statements and representations described above before they enrolled at Columbia University, and after they were enrolled in Columbia University.

390.    Columbia University's false and misleading statements and practices described above caused the Individual Plaintiffs injury by causing them to enroll at Columbia, and to pay tuition and fees to Columbia University, and to continue to maintain enrollment at Columbia University and continue to pay tuition and fees to Columbia University, based on the reasonable understanding that Columbia University would apply, enforce, and follow through on its codes and policies, and the commitments contained therein, concerning protecting students from harassment, abuse, intimidation and discrimination based on their ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status, would otherwise seek to protect students from such hateful and bigoted conduct, and would take actions and implement measures to adequately, appropriately, and sufficiently address such misconduct to foster, ensure, and maintain a safe educational and campus environment.  Columbia University did not take such actions.

391.    Columbia University's failure, refusal, lack of ability and intention, and lack of commitment to combating, addressing, and ameliorating these deplorable actions, and to making good on and complying with its aforementioned statements, constitute deceptive practices and/or false advertising, and have caused the Individual Plaintiffs to sustain actual damages and not obtain the benefit of their bargain with Columbia University, including the loss of the value of the tuition and fees they have paid Columbia University, extreme emotional distress, loss of educational and extracurricular opportunities, economic injuries, and other direct and consequential damages.

392.    Accordingly, the Individual Plaintiffs are entitled to statutory and/or actual damages in amounts to be determined at trial and to treble damages pursuant to General Business Law § 349(h), based on Columbia University's willful or knowing violations.

393.    Plaintiffs are entitled to attorneys' fees and costs pursuant to General Business

Law § 349(h).

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a jury trial for all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray and request that a judgment be entered in each of their

favor, and against Columbia University and Barnard awarding them:

A.    Injunctive relief enjoining Columbia University and Barnard and their agents

from establishing, implementing, instituting, maintaining, or executing policies,

practices, procedures, or protocols that penalize or discriminate against Jewish

and Israeli students, including the Individual Plaintiffs SAA's, and SCLJ's Jewish

and/or Israeli Columbia student members, in any way, and ordering Columbia

University and Barnard to take all necessary, adequate, and appropriate remedial,

corrective, and preventative measures such as the following: (i) disciplinary

measures, including the termination of deans, administrators, professors, and

other employees responsible for antisemitic discrimination and abuse, whether

because they engage in it or permit it; (ii) disciplinary measures, including

suspension or expulsion, against students who engage in such conduct; (iii)

declining and returning donations, whether from foreign countries or elsewhere,

implicitly or explicitly conditioned on the hiring or promotion of professors who

espouse antisemitism or the inclusion of antisemitic coursework or curricula; (iv)

adding required antisemitism training for Columbia University and Barnard

community members; and (v) appointing a neutral expert monitor to oversee
compliance with this Court's order;

B.      Compensatory, consequential, and punitive damages in amounts to be determined
at trial;

C.      Statutory penalties, including treble damages, for violations of General Business
Law § 349(h) and N.Y. Civ. Rights Law § 40-c, pursuant to N.Y. Civ. Rights Law
§ 40-d;

D.      Reasonable attorneys' fees, the costs of suit, and expenses;

E.      Pre-judgment interest and post-judgment interest at the maximum rate allowable
by the law; and

F.      Such other and further relief as the Court deems just and proper.


Dated:   February 21, 2024
         New York, New York


Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By:   */s/ Marc E. Kasowitz*
       Marc E. Kasowitz
       Daniel R. Benson
       Mark P. Ressler
       Andrew L. Schwartz
       Joshua E. Roberts
       Jillian R. Roffer
       Zachary N. Josephs
       1633 Broadway
       New York, New York 10019
       Tel:  (212) 506-1700

       *Attorneys for Plaintiffs*