# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X
                                                     :

| | |
|---|---|
| STUDENTS AGAINST ANTISEMITISM, INC., STANDWITHUS CENTER FOR LEGAL JUSTICE, MILES RUBIN, DANIELLA SYMONDS, ERIN MCNULTY, NOAH MILLER, VALERIE GERSTEIN, KATIANA ARYEH, LAURA BELLOWS, LEMONY DAVID, JOHN DOE, CHAYA DROZNIK, LEO ELKINS, SAMUEL FRIEDMAN, MAYA GAL, AYELET GLASER, MICHAEL GROSS, JARED HARNICK, GABRIEL KAHANE, TALIA KESSELMAN, ELI MIZRAHI-AKS, OMER NAUER, AMIEL NELSON, GABRIEL NELSON, MOLLY NELSON, MARC NOCK, AVA QUINN, TALIA RABBAN, JANE ROE, SOPHIE RUKEYSER, ALIZA RUTTENBERG, EMILY SANDLER, ANDREW STEIN, JONATHAN SWILL, RAFAEL VANUNO, XAVIER WESTERGAARD, EDEN YADEGAR, and LILY ZUCKERMAN, | : Case No. 1:24-cv-01306-VSB-SN <br><br> : **FIRST AMENDED COMPLAINT** <br><br> : Jury Trial Demanded |

                 Plaintiffs,            :

     -against-                  :

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, and BARNARD COLLEGE,    :

               Defendants.         :

------------------------------------------------------- X

Plaintiffs Students Against Antisemitism, Inc. ("SAA"), StandWithUs Center for Legal

Justice ("SCLJ"), Miles Rubin ("Rubin"), Daniella Symonds ("Symonds"), Erin McNulty

("McNulty"), Noah Miller, ("Miller"), Valerie Gerstein ("Gerstein"), Katiana Aryeh ("Aryeh"),

Laura Bellows ("Bellows"), Lemony David ("David"), John Doe ("Doe"), Chaya Droznik

("Droznik"), Leo Elkins ("Elkins"), Samuel Friedman ("Friedman"), Maya Gal ("Gal"), Ayelet Glaser ("Glaser"), Michael Gross ("Gross"), Jared Harnick ("Harnick"), Gabriel Kahane ("Kahane"), Talia Kesselman ("Kesselman"), Eli Mizrahi-Aks ("Mizrahi-Aks"), Omer Nauer ("Nauer"), Gabriel Nelson ("Gabe"), Molly Nelson ("Molly"), Marc Nock ("Nock"), Ava Quinn ("Quinn"), Talia Rabban ("Rabban"), Jane Roe ("Roe"), Sophie Rukeyser ("Rukeyser"), Aliza Ruttenberg ("Ruttenberg"), Emily Sandler ("Sandler"), Andrew Stein ("Stein"), Jonathan Swill ("Swill"), Rafael Vanuno ("Vanuno"), Xavier Westergaard ("Westergaard"), Eden Yadegar ("Yadegar"), and Lily Zuckerman ("Zuckerman," and together with Rubin, Symonds, McNulty, Miller, Gerstein, Aryeh, Bellows, David, Doe, Droznik, Elkins, Friedman, Gal, Glaser, Gross, Harnick, Kahane, Kesselman, Mizrahi-Aks, Nauer, Gabe, Molly, Nock, Quinn, Rabban, Roe, Rukeyser, Ruttenberg, Sandler, Stein, Swill, Vanuno, Westergaard, and Yadegar, the "Individual Plaintiffs"), for their complaint against defendants The Trustees of Columbia University in the City of New York ("Columbia University") and Barnard College ("Barnard," and together with Columbia University, "Columbia"), allege as follows:

## PRELIMINARY STATEMENT

1.      Columbia, one of America's leading universities, has for decades been one of the worst centers of academic antisemitism in the United States.  Since October 7, 2023, when Hamas terrorists invaded Israel and slaughtered, tortured, raped, burned, and mutilated 1,200 people—including infants, children, and the elderly—and kidnaped hundreds of others, antisemitism at Columbia has become even more severe and pervasive.  Columbia faculty and students have openly lauded Hamas's October 7 atrocities as "astounding," "awesome," and "great feats."  Mobs of pro-Hamas students and faculty have marched by the hundreds through Columbia's campus, shouting vile antisemitic slogans, including calls for genocide, such as "Jews will not defeat us"; "there is only one solution, Intifada revolution"; "we will honor all our

2

martyrs"; "resistance is justified"; "by any means necessary"; "burn Tel Aviv to the ground"; "death to the Zionist state"; "we don't want two states, we want all of it"; and, in Arabic, "from water to water, Palestine will be Arab" and "Jews out."  Those mobs have occupied buildings, promoted violence against Jews, and harassed and assaulted Jews on campus.  Jewish and Israeli students have been spat at, physically assaulted, threatened, and targeted on campus and social media with epithets, such as "fuck the Jews," "death to Jews," "fucking Jew," "kike," "go back to Europe," "go back to Poland," "you guys are inbred," "Zionist pig," and "baby killer." Columbia faculty have promulgated antisemitism in their courses and dismissed and intimidated students who object.  In April 2024, Columbia University Board of Trustees Co-Chair Claire Shipman testified before Congress, "we have a specific problem right now on our campus, so I can speak from what I know, and that is rampant antisemitism."  What is most striking about all of this is Columbia's abject failure and deliberate refusal to lift a finger to stop and deter this outrageous antisemitic conduct and discipline the students and faculty who perpetrate it.

2.     Columbia's antisemitism manifests itself in a double standard invidious to Jews and Israelis.  Columbia selectively enforces its policies to avoid protecting Jewish and Israeli students from harassment, hires professors who support anti-Jewish violence and spread antisemitic propaganda, and ignores Jewish and Israeli students' pleas for protection.  Those professors teach and advocate through a binary oppressor-oppressed lens, through which Jews, one of history's most persecuted peoples, are typically designated "oppressor," and therefore unworthy of support or sympathy.  Columbia permits students and faculty to advocate, without consequence, the murder of Jews and the destruction of Israel, the only Jewish country in the world.

3.     The Individual Plaintiffs, SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and numerous others have explicitly and repeatedly warned Columbia that its severe and pervasive hostile environment harms Jewish and Israeli students.  In fact, Columbia has been aware of its antisemitism problem for years, but its response has been, to say the least, utterly ineffective and clearly unreasonable in not just tolerating, but enabling, antisemitism. Columbia has abjectly failed to enforce its policies and discipline those responsible for turning Columbia's campus into a severely hostile environment for its Jewish and Israeli students, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members.  When, in December 2023, in clear violation of Columbia's policies, a mob of students took over the School of Social Work to further their antisemitic agenda, Columbia's response was not to remove and discipline them, but to enable them to conceal their identities by supplying them with umbrellas and asking bystanders not to film them.

4.     Columbia's longtime practice when it comes to antisemitism—refusing to enforce its own policies against discrimination and harassment—ensured that Hamas's October 7 terrorist attack would enormously intensify the anti-Jewish abuse on campus.  Shockingly, numerous students and faculty at Columbia have openly endorsed Hamas and the horrific October 7 massacre it perpetrated even though: Hamas, since its founding in 1987, has perpetrated numerous suicide bombings and other terrorist attacks against civilians; Hamas vows to kill and destroy Jews and Israel; the U.S. State Department has designated Hamas as a Foreign Terrorist Organization; and Hamas repeatedly proclaims its determination to repeat the October 7 atrocities until its genocidal aims are achieved.  Many of Columbia's students and faculty support Hamas and condemn Israel for defending itself against Hamas's attacks—but they are never heard to condemn, let alone rally against, Syria and Yemen, which have killed hundreds of

thousands of Arab civilians; Pakistan, which is currently expelling almost two million Afghan Muslims; China, which has imprisoned its Muslims in reeducation camps; or countries like Somalia and Nigeria, where Christians are regularly murdered.  On May 29, 2024, Iran's Supreme Leader Ayatollah Ali Khamenei, one of the most oppressive and murderous leaders in the world, who regularly calls for the destruction of Israel, publicly thanked the anti-Israel agitators on U.S. college campuses, telling them that they are "on the right side of history."

5. In April 2024, the very same day Columbia University's President Minouche Shafik testified before Congress that "safety is paramount" and that "antisemitism has no place on [Columbia's] campus," Columbia permitted hundreds of students, faculty, and others to occupy Columbia University's South Lawn on campus for weeks, erecting an encampment to further their antisemitic agenda.  The encampment was replete with calls for a global Intifada and other antisemitic slogans, chants, and banners.  One night, an occupier with her face covered by a keffiyeh displayed in front of a group of Jewish students, a sign stating "Al-Qas[s]am's next targets," with an arrow pointing to them.  Al-Qassam is Hamas's military wing.  The encampment upended Jewish and Israeli students' lives, preventing them from learning in class or studying at the libraries, disturbing those living in nearby dormitories and residence halls with chants at all hours of the night, and harassing, threatening, and intimidating Jewish and Israeli students attempting to traverse the campus.  At multiple points, the occupiers, including students and faculty, locked arms and formed human chains to physically block Jewish students from entering portions of the campus.  Columbia did nothing to stop this and instead negotiated with the encampment's student leaders, including a student who, a few months earlier, told administrators that "Zionists don't deserve to live," and that Columbia should "be grateful that [he's] not just going out and murdering Zionists."  A Columbia Hillel rabbi told Jewish students

to return home because Columbia could not protect them.  After nearly two weeks of occupation, and only after students took over one of Columbia's academic buildings for nearly twenty-four hours, triggering a shelter-in-place order for the entire community, President Shafik allowed the New York City Police Department ("NYPD") to finally intervene to clear the building as well as the encampment.  A few weeks later during alumni weekend, a group of students set up a third encampment.

6.      As over 500 Columbia Jewish students stated in an impassioned May 2024 open letter entitled "In Our Name: A Message from Jewish Students at Columbia University," Jewish students "have been calling out the antisemitism [they've] been experiencing for months [yet their] concerns have been brushed off and invalidated."  Nonetheless, and even though President Shafik admitted in an April 29 statement to the Columbia community that Columbia had "a hostile environment in violation of Title VI," Columbia continued to refuse to take the steps necessary to remedy that environment and prevent it from recurring.

7.      In short, Columbia has permitted intense anti-Jewish vitriol and endemic and egregious antisemitism, including from its own faculty and administrators, to exclude Jewish and Israeli students, including Plaintiffs, from full and equal participation in, and to deprive them of the full and equal benefits of, their educational experience at Columbia, and has invidiously discriminated against them by, among other things, failing to protect them in the same way Columbia has protected other groups—all based on their race, ethnicity, religion, citizenship, and/or national origin.  That Columbia has done so for many years and continues to do so to this day further confirms that it has responded to antisemitism with at best deliberate indifference, that Columbia cannot be left to its own devices, and that its response has been clearly ineffective and clearly unreasonable.

8.      As alleged herein, Columbia's actions, including its deliberate indifference to, and indeed enabling of, antisemitism on its campus, constitute an egregious violation of Title VI of the Civil Rights Act of 1964 and similar civil rights laws.  Columbia must now be compelled to implement institutional, far-reaching, and concrete remedial measures.  Columbia must also pay damages to the Individual Plaintiffs—who have been robbed of their college and graduate school experience—to compensate them for the hostility they have been forced to endure as a consequence of Columbia's unlawful conduct.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq.*) and 42 U.S.C. § 1986.  This Court has supplemental jurisdiction over plaintiffs' related state-law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as plaintiffs' federal claims.

10.     This Court has personal jurisdiction over Columbia University because it is based and operates in New York.

11.     This Court has personal jurisdiction over Barnard because it is based and operates in New York.

12.     Venue in the Southern District of New York is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to plaintiffs' claims occurred and where Columbia University and Barnard are located.

## PARTIES

13.     Plaintiff Students Against Antisemitism, Inc. is a not-for-profit corporation and 501(c)(3) tax-exempt charity organized under the laws of the State of Delaware, formed to defend human and civil rights, including the right of individuals to equal protection and to be

free from antisemitism in higher education.  SAA is composed of voluntary members, including students at higher education institutions, who support SAA's mission and who have been personally aggrieved or otherwise impacted by antisemitism and discrimination in higher education.  SAA's members include current Jewish and Israeli Columbia students experiencing a severe and pervasive hostile educational environment, which causes them to lose the full benefits of Columbia's educational and extracurricular opportunities.

14.     Plaintiff StandWithUs Center for Legal Justice is a tax-exempt membership organization organized under the laws of California, and that partners with StandWithUs, a nonprofit education organization dedicated to supporting Israel and combating antisemitism. Composed of students, professors, and community members, SCLJ enhances StandWithUs's mission through impact litigation and other legal actions.  SCLJ's Jewish and/or Israeli Columbia student members include current Jewish and Israeli Columbia students, who are experiencing a pervasively hostile campus climate and loss of attendant educational and extracurricular opportunities.  SCLJ members also include Columbia alumni.

15.     Plaintiff Miles Rubin was a Jewish student who graduated from Columbia University in February 2024 and first enrolled in Columbia University's School of General Studies in fall 2019.  Rubin holds American and Israeli citizenship.  He is also a member of SAA and SCLJ.

16.     Plaintiff Daniella Symonds is a Jewish student at Columbia University and has attended Columbia University's School of General Studies since fall 2023.  She is also a member of SAA and SCLJ.

17.     Plaintiff Erin McNulty is a Jewish student at Columbia University and has attended Columbia University's School of General Studies since fall 2021.  She is also a member of SAA and SCLJ.

18.     Plaintiff Noah Miller is a Jewish student in his second year at Columbia University's Graduate School of Architecture, Planning and Preservation.  He is also a member of SAA and SCLJ.

19.     Plaintiff Valerie Gerstein was a Jewish Masters student who graduated from Columbia University in spring 2024.  Gerstein first enrolled in Columbia University's School of Professional Studies in fall 2022.  She is also a member of SAA and SCLJ.

20.     Plaintiff Katiana Aryeh was a Jewish student who graduated from Barnard in spring 2024.  Aryeh first enrolled in Barnard in fall 2020.  She is also a member of SAA and SCLJ.

21.     Plaintiff Laura Bellows is a Jewish student at Barnard and has attended the joint program between Barnard and The Jewish Theological Seminary since fall 2023.  She is also a member of SAA and SCLJ.

22.     Plaintiff Lemony David is a Jewish student at Columbia University and has attended the dual degree program between Columbia University's School of General Studies and Tel Aviv University since fall 2020.  David holds American and Israeli citizenship.  She is also a member of SAA and SCLJ.

23.     Plaintiff John Doe is a Jewish student at Columbia University and has attended Columbia College since fall 2023.  He is also a member of SAA and SCLJ.

24.     Plaintiff Chaya Droznik is a Jewish student at Columbia University and has attended Columbia University's School of General Studies since fall 2022.  She is also a member of SAA and SCLJ.

25.     Plaintiff Leo Elkins is a Jewish student at Columbia University and has attended the dual degree program between Columbia University's School of General Studies and Tel Aviv University since fall 2021.  He is also a member of SAA and SCLJ.

26.     Plaintiff Samuel Friedman was a Jewish Masters student who graduated from Columbia University in spring 2024.  Friedman first enrolled in Columbia's School of Engineering and Applied Science in May 2022.  He is also a member of SAA and SCLJ.

27.     Plaintiff Maya Gal is a Jewish Israeli student at Columbia University and has attended the dual degree program between Columbia University's School of General Studies and Tel Aviv University since May 2020.  She is also a member of SAA and SCLJ.

28.     Plaintiff Ayelet Glaser was a Jewish student who graduated from Barnard in spring 2024.  Glaser first enrolled in Barnard in fall 2021.  She is also a member of SAA and SCLJ.

29.     Plaintiff Michael Gross is a Jewish Doctor of Nursing Practice candidate at Columbia University and has attended Columbia University's School of Nursing since June 2022.  He is also a member of SAA and SCLJ.

30.     Plaintiff Jared Harnick is a Jewish student at Columbia University and has attended Columbia's School of Engineering since fall 2023.  He is also a member of SAA and SCLJ.

31.     Plaintiff Gabriel Kahane is a Jewish student at Columbia University and has attended Columbia University's School of General Studies since spring 2023.  Kahane holds American and Israeli citizenship.  He is also a member of SAA and SCLJ.

32.     Plaintiff Talia Kesselman was a Jewish student who graduated from Columbia University in spring 2024.  Kesselman first enrolled in Columbia's School of Social Work in fall 2022.  Kesselman holds American and Israeli citizenship.  She is also a member of SAA and SCLJ.

33.     Plaintiff Eli Mizrahi-Aks is a Jewish Israeli student at Columbia University and has attended the joint program between Columbia University's School of General Studies and The Jewish Theological Seminary since fall 2022.  He is also a member of SAA and SCLJ.

34.     Plaintiff Omer Nauer was a Jewish student who graduated from Columbia University in spring 2024.  Nauer first enrolled in Columbia's School of General Studies in fall 2020.  Nauer holds American and Israeli citizenship.  He is also a member of SAA and SCLJ.

35.     Plaintiff Amiel Nelson is a Jewish student at Columbia University and has attended Columbia University's School of General Studies since spring 2024.  He is also a member of SAA and SCLJ.

36.     Plaintiff Gabriel Nelson is a Jewish student at Columbia University and has attended Columbia College since fall 2023.  He is also a member of SAA and SCLJ.

37.     Plaintiff Molly Nelson was a Jewish student who graduated from Barnard in spring 2024.  Molly first enrolled in Barnard in fall 2020.  She is also a member of SAA and SCLJ.

38.     Plaintiff Marc Nock is a Jewish Masters of Public Health candidate at Columbia University and has attended Columbia University's Mailman School of Public Health since fall 2023.  He is also a member of SAA and SCLJ.

39.     Plaintiff Ava Quinn is a Jewish student at Columbia University and has attended the joint program between Columbia University's School of General Studies and The Jewish Theological Seminary since fall 2021.  She is also a member of SAA and SCLJ.

40.     Plaintiff Talia Rabban is a Jewish student at Barnard and has attended Barnard since fall 2021.  She is also a member of SAA and SCLJ.

41.     Plaintiff Jane Roe was a Jewish student who graduated from Barnard in spring 2024.  Roe first enrolled in Barnard in fall 2022.  She is also a member of SAA and SCLJ.

42.     Plaintiff Sophie Rukeyser was a Jewish student who graduated from Barnard in spring 2024.  Rukeyser first enrolled in Barnard in fall 2020.  She is also a member of SAA and SCLJ.

43.     Plaintiff Aliza Ruttenberg is a Jewish student who is transferring from Barnard.  Ruttenberg first enrolled in Barnard in fall 2023.  She is also a member of SAA and SCLJ.

44.     Plaintiff Emily Sandler was a Jewish student who graduated from Columbia University in spring 2024.  Sandler first enrolled in Columbia's School of Engineering in fall 2020.  She is also a member of SAA and SCLJ.

45.     Plaintiff Andrew Stein is a Jewish student at Columbia University and has attended Columbia University's School of General Studies since fall 2022.  He is also a member of SAA and SCLJ.

46.     Plaintiff Jonathan Swill was a Jewish student who graduated from Columbia University in spring 2024.  Swill first enrolled in Columbia's Graduate School of Engineering

and Applied Science in August 2023.  Swill holds American and Israeli citizenship.  He is also a member of SAA and SCLJ.

47.     Plaintiff Rafael Vanuno is a Jewish student at Columbia University and has attended the joint program between Columbia University's School of General Studies and The Jewish Theological Seminary since fall 2023.  He is also a member of SAA and SCLJ.

48.     Plaintiff Xavier Westergaard is a Jewish Ph.D. candidate at Columbia University and has attended Columbia University's Graduate School of Arts and Sciences since fall 2019. He is also a member of SAA and SCLJ.

49.     Plaintiff Eden Yadegar is a Jewish student at Columbia University and has attended the joint program between Columbia University's School of General Studies and The Jewish Theological Seminary since fall 2021.  She is also a member of SAA and SCLJ.

50.     Plaintiff Lily Zuckerman is a Jewish student at Barnard and has attended Barnard since fall 2022.  She is also a member of SAA and SCLJ.

51.     SAA Member #1 is a Jewish student enrolled at Barnard.

52.     SAA Member #2 is a Jewish student at Columbia University, enrolled at Columbia University's School of General Studies.

53.     SAA Member #3 is a Jewish student enrolled at Barnard.

54.     SAA Member #4 is a Jewish student enrolled at Barnard.

55.     SCLJ Member #1 was a Jewish student who graduated from Columbia University's School of Social Work in spring 2024.

56.     SCLJ Member #2 is a Jewish student at Columbia University, enrolled at Columbia University's School of Social Work.

57.     SCLJ Member #3 is a Jewish student at Columbia University, enrolled at Columbia University's School of Social Work.

58.     SCLJ Member #4 is a Jewish Israeli Ph.D. candidate at Columbia University.

59.     SCLJ Member #5 is a Jewish Israeli Ph.D. candidate enrolled at Columbia University's Irving Medical Center ("CUIMC").

60.     SCLJ Member #6 is a Jewish student at Columbia University, enrolled at Columbia University's School of the Arts.

61.     SCLJ Member #7 is a Jewish student at Barnard and holds American and Israeli citizenship.

62.     Defendant The Trustees of Columbia University in the City of New York is the legal name of Columbia University, a private not-for-profit university based in New York, New York.  Columbia University is composed of various graduate and undergraduate constituent schools, including Columbia College, the School of General Studies ("GS"), the School of Social Work ("CSSW"), the Graduate School of Architecture, Planning and Preservation ("GSAPP"), the School of Nursing, the School of Professional Studies ("SPS"), the School of Engineering and Applied Science, the School of the Arts, the Graduate School of Arts and Sciences, and the Mailman School of Public Health.

63.     As of October 2023, Columbia University's endowment fund was valued at $13.6 billion.  Columbia University accepts substantial direct financial assistance from the federal government through, among other things, grants and contracts; it received at least $1.2 billion in fiscal year 2023 and will receive substantial direct federal financial assistance in fiscal year 2024.  Columbia University also receives substantial indirect federal financial assistance through, among other things, tuition paid with federal financial aid.  At all times relevant to this

complaint, Columbia University was and continues to be subject to Title VI.  Columbia
University is also an "educational institution" and place of "public accommodation" under the
New York State Human Rights Law and the New York City Human Rights Law.

64.     Defendant Barnard College is a private not-for-profit women's liberal arts college
in New York, New York.  Barnard is an official undergraduate college of Columbia University.

65.     While Columbia University and Barnard are separate institutions, Barnard
students are deeply integrated in the Columbia University campus and community and vice
versa.  Barnard and Columbia University students can cross-register for courses, and Barnard
students receive a diploma with seals from both schools and signatures by the presidents of both.
Barnard students can also join student clubs at both Barnard and Columbia University.  Barnard
has about eighty student clubs, and Barnard students may also join any of the five hundred clubs
at Columbia University.  Barnard students compete in Columbia University's NCAA Division I
athletic programs and have "full access to Columbia[] [University's] libraries and library
resources."  Columbia University students can access the Barnard Library, and students at each
school can access each other's dining halls.  The only kosher dining hall at Columbia is located
on Barnard's campus.

66.     As of January 2023, Barnard's endowment fund was valued at $459.8 million.
Barnard, like Columbia University, accepts financial assistance from the federal government
through grants and contracts, including $7,537,000 in fiscal year 2023.  Barnard also receives
indirect federal financial assistance through federal financial aid.  At all times relevant to this
complaint, Barnard was and continues to be subject to Title VI.  Barnard is an "educational
institution" and place of "public accommodation" under the New York State Human Rights Law
and the New York City Human Rights Law.

## FACTS

### A.  Title VI Protects Jewish Students Against Antisemitism

67.  Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives federal funding or other federal financial assistance, and protects all students, including Jewish and Israeli students, in such programs or activities.

68.  Since at least September 2004, it has been the policy of the Office of Civil Rights ("OCR") of the U.S. Department of Education to investigate Title VI complaints against universities related to antisemitism.  In an October 26, 2010 letter to federally funded schools, OCR confirmed that such schools are "responsible for addressing harassment incidents about which [they] know[] or reasonably should have known," and must address "anti-Semitic harassment," stating that such harassment violates Title VI when it creates a "hostile environment" based on "actual or perceived shared ancestry or ethnic identity as Jews," in which "the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school," or when the "harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees."

69.  The Obama, Trump, and Biden administrations have confirmed the urgent need to combat antisemitism in educational institutions.  In June 2010, President Barack Obama's State Department adopted a working definition of antisemitism developed by the European Monitoring Center on Racism and Xenophobia.  The State Department also adopted contemporary examples of antisemitism, which include ways that antisemitism manifests itself with regard to the State of Israel:

- "Using the symbols and imagines associated with classic anti-Semitism to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis";

- "Blaming Israel for all inter-religious or political tensions";

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation"; and

- "Denying the Jewish people their right to self-determination, and denying Israel the right to exist."

70.     In December 2019, President Donald Trump issued Executive Order 13899 on "Combating Anti-Semitism," directing the executive branch to enforce Title VI against discrimination "rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI," and in doing so, to consider the definition of antisemitism promulgated by the International Holocaust Remembrance Alliance ("IHRA"), an intergovernmental organization comprised of thirty-five member countries.

71.     The IHRA definition of antisemitism provides, among other things, the following "contemporary examples of antisemitism":

- "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion";

- "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor";

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation";

- "Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis"; and

- "Holding Jews collectively responsible for actions of the state of Israel."

72.     On January 4, 2023, the Department of Education, citing the "rise in reports of anti-Semitic incidents," released a fact sheet, "Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics," which reiterated that Title VI protects "students who

17

experience discrimination, including harassment, based on their . . . (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity."

73.     In May 2023, President Joseph Biden released the U.S. National Strategy to Counter Antisemitism, described as the "most ambitious and comprehensive U.S. government-led effort to fight antisemitism in American history," and the Department of Education launched its Antisemitism Awareness Campaign.

74.     On May 7, 2024, OCR released a letter promulgating Title VI guidance, making clear, among other things, that the "fact that harassment may involve conduct that includes speech in a public setting or speech that is also motivated by political or religious beliefs . . . does not relieve a school of its obligations to respond under Title VI . . . if the harassment creates a hostile environment in school for a student or students," "harassing conduct that otherwise appears to be based on views about a country's policy or practices [that] is targeted or infused with discriminatory comments about persons from or associated with a particular country" may implicate Title VI, and that "[h]arassing conduct need not always be targeted at a particular person in order to create a hostile environment for a student or group of students," but "may be directed at anyone."  The letter also provided examples of the kinds of conduct with respect to which a university's failure to take effective preventive action could give rise to a Title VI violation—namely, the very kind of harassment and intimidation that has been regularly occurring at Columbia.

75.     As the historical birthplace of the Jewish people, the land of Israel is at the core of Jewish identity, ancestral tradition, religion, and culture.  The movement for the reestablishment, development, and protection of the Jewish nation in the land of Israel, known as Zionism, arises

from Jews' ethnic and historic roots in that land and their right to self-determination. Zionism is central to the Individual Plaintiffs', SAA's and SCLJ's members' Jewish identities, and many are descendants of survivors of the Nazis, with family and friends in Israel.

76.   Anti-Zionism is not merely a political movement—although many try to disguise it as such—but is a direct attack against Israel as a Jewish collectivity. Nearly half of the Jews in the world live in Israel. Anti-Zionism is discriminatory and antisemitic when expressed in terms of, for example: applying double standards not applicable to other countries or peoples in assessing Israel's legitimacy and conduct; denying the Jewish people's right to self-determination or the right of the State of Israel to exist; denying that Israel has the right to self-defense against terrorism, invasion, or the murder, rape, and kidnapping of its citizens; accusing Israel of being inherently racist or comparable to the Nazis; or invoking classic antisemitic canards against Israel and its people. "When people criticize Zionists," Dr. Martin Luther King, Jr. explained, "they mean Jews. You're talking anti-Semitism."

77.   The widespread anti-Jewish hate that has gripped Columbia and other universities since October 7, 2023 confirms that in nearly all instances, anti-Zionism is rarely anything more than thinly veiled antisemitism. At rallies and events across the country, and especially at Columbia, Jewish students have been maligned as "murderers," "colonizers," "racists," "genocidal," and "Zionists."

78.   On February 12, 2024, the Committee on Education and the Workforce of the U.S. House of Representatives ("House Education Committee") opened an investigation into Columbia University's "response to antisemitism and its failure to protect Jewish students," citing "grave concerns regarding the inadequacy of Columbia's response."

79.     On June 3, 2024, the U.S. House of Representatives announced it will not "countenance the use of federal funds to indoctrinate students into hateful, antisemitic, anti-American supporters of terrorism" and that six U.S. House committees could "conduct oversight" into Columbia's use of federal funds.

## B.     Columbia University and Barnard Fail to Enforce Their Own Policies to Protect Jewish Students

### i.     Columbia University's Policies

80.     Columbia University has issued at least eight applicable policies ostensibly to protect students from discrimination, harassment, and intimidation: (i) Equal Opportunity and Affirmative Action Policies & Procedures; (ii) Rules of University Conduct; (iii) Non-Discrimination Statement and Policy; (iv) Standards & Discipline Policy; (v) University Events Policy; (vi) Interim University Policy for Safe Demonstrations; (vii) Student Group Event Policy and Procedure; and (viii) Faculty Handbook.  Columbia University's clearly unreasonable response to antisemitic discrimination and harassment, and its selective enforcement of its own rules, however, reflect a shameful double standard in its failure and refusal to apply these policies in a nondiscriminatory manner to protect Jewish and Israeli students and prevent antisemitism on campus, deeming Jewish and Israeli students unworthy of the protections Columbia University readily affords non-Jewish and non-Israeli students.

#### a.  Equal Opportunity and Affirmative Action Policies & Procedures

81.     Columbia University's Office of Equal Opportunity and Affirmative Action ("EOAA") is supposed "to prevent and respond to discrimination and harassment by developing and implementing policies and procedures [("EOAA Policies & Procedures")] that address discrimination [and] harassment."  The EOAA Policies & Procedures prohibit discrimination and

harassment on the basis of, among other protected characteristics, creed, national origin, race, or religion.

82.     Under the EOAA Policies & Procedures, proscribed discrimination includes "[t]reating members of a protected class less favorably because of their membership in that class."  Harassment, "which is a form of discrimination," involves "[s]ubjecting an individual to unwelcome conduct, whether verbal or physical, that creates an intimidating, hostile, or abusive working, learning or campus living environment; that alters the conditions of employment or education; or unreasonably interferes with an individual's work or academic performance on the basis of the individual's membership in a protected class."[1]

### b.  Rules of University Conduct

83.     Columbia University's Rules of University Conduct provide that "[t]he University has an obligation to assure members of its community that they can continue in their academic pursuits without fear for their personal security or other serious intrusions on their ability to teach and to study," and the "University may restrict expression that constitutes a genuine threat of harassment" at "any demonstration, including a rally or picketing, that takes place on or at a University facility or at any University sponsored activity."  Barnard students, "as members of the Columbia University community," are also required to comply with the Rules of University Conduct.

### c.  Non-Discrimination Statement and Policy

84.     Columbia University's Non-Discrimination Statement and Policy prohibits discrimination against any person on the basis of citizenship status, creed, national origin, race,

---

[1] Harassment can include: "verbal abuse; epithets or slurs; negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; insulting or obscene comments or gestures; and the display or circulation of written or graphic material (including in hard copy, by email or text, or through social media) that denigrates or shows hostility or aversion toward an individual or group members of a protected class."

religion, or "any other applicable, legally protected status" in the administration of Columbia University's educational policies, programs, and functions.

### d.  Standards and Discipline Policy

85.     Columbia University's Standards and Discipline Policy prohibits misconduct such as disruptive behavior, harassment, vandalism or damage to property, and violation of Columbia University policies and law.  It provides that students who interfere with "the ability of others to take advantage of the full complement of University life" will be subject to discipline and recognizes that "[c]alls, texts, e-mails, and social media usage by students can contribute to a hostile work, learning, or living environment, even if they occur away from the University premises."

### e.  University Events Policy

86.     Columbia University's Events Policy ("Events Policy"), which governs on- and off-campus events held by student groups and non-affiliated organizations sponsored by a recognized Columbia University group, organization, or student activities adviser, provides that, among other things:

> Consistent with the Rules of University Conduct, the University may regulate the time, place and manner of certain forms of public expression.  This includes restricting certain activities when the University believes there is a genuine threat of harassment and/or the potential for an unmanageable safety concern.

87.     On December 7, 2023—two days after the presidents of Harvard University, University of Pennsylvania, and Massachusetts Institute of Technology were widely criticized for refusing, in their testimony before the House Education Committee, to affirm that calling for the genocide of Jews violates their universities' policies—Columbia University revised its Events Policy and Campus Resources FAQ to include the question "what is Columbia's reaction to calls for genocide against Jews?"  Its response:

> The University has an obligation to assure members of its community that they can continue in their academic pursuits without fear for their personal security or other serious intrusions on their ability to teach and to study.  Columbia supports free speech and expression, but our rules of conduct do not allow or condone language that promotes or supports violence in any manner.  Calls for genocide against the Jewish community or any other group are abhorrent, inconsistent with our values and against our rules.  Incitement to violence against members of our community will not be tolerated.

### f.  Interim University Policy for Safe Demonstrations

88.    On February 19, 2024, Columbia University implemented the Interim University Policy for Safe Demonstrations, which provides for designated demonstration areas and times as well as a two-day notice requirement for event registration.  It also prohibits advertising demonstrations prior to approval.  This policy also set forth procedures for redressing violations by both student groups and individual students.

### g.  Student Group Event Policy and Procedure

89.    Columbia University's Student Group Event Policy and Procedure, which governs the process for recognized student groups to host events, is "intended to promote safe and responsible social events for Columbia University's recognized student organizations," and provides, among other things, that the "conduct of all guests is bound by University Rules and the student group may be held responsible for the behavior of their invited guests."

90.    On October 24, 2023, Columbia University amended its Student Group Event Policy and Procedure to permit sanctions for failure to obtain required event approval or abide by the terms of an approved event.

### h.  Faculty Handbook

91.    Columbia University's Faculty Handbook incorporates the EOAA Policies and Procedures and the Non-Discrimination Statement and Policy and, among other things, directs

that faculty should "confine their classes to the subject matter covered by their courses and not use them to advocate any political or social cause."

### ii.   Barnard's Policies

92.    Barnard has issued at least four policies ostensibly to protect students from harassment and intimidation, including: (i) Policy Against Discrimination and Harassment; (ii) Rules for Maintenance of Public Order; (iii) Student Code of Conduct; and (iv) Policy for Safe Campus Demonstrations.

### a.   Policy Against Discrimination and Harassment

93.    Barnard's Policy Against Discrimination and Harassment ("Barnard's Discrimination Policy") provides that Barnard "does not tolerate and specifically prohibits" discrimination and harassment "on the basis of race, color, religion, creed, national or ethnic origin . . . in the administration of any of its educational programs and activities," and that Barnard will take "prompt and appropriate action to address such misconduct, end a hostile environment if one has been created, and prevent the recurrence of a hostile environment."

94.    Barnard's Discrimination Policy defines "discriminatory harassment" as "harassment by any member or group of the community on the basis of actual or perceived membership in a class protected by policy or law," and a "hostile environment" as "one that unreasonably interferes with, limits, or effectively denies an individual's educational or employment access, benefits, or opportunities."  Barnard's Discrimination Policy proscribes "online manifestations of any of the behaviors prohibited [by Barnard's Discrimination Policy], when those behaviors occur in or have an effect on the College's education program and activities or use College networks, technology, or equipment."

### b. Rules for Maintenance of Public Order

95.     Barnard's Rules for Maintenance of Public Order, which state that "Barnard College is committed to defend the right of each member of the Barnard community to carry out his or her assigned duties and responsibilities without interference," including the ability of "students to attend classes," prohibit: "Use or threat of force or violence against any person, or the damaging of property"; "Prevention of the normal use or occupancy of any building owned or rented by the College or disruption of any normal College function through use of force or threat of force, physical obstruction, or noise"; and "Physical obstruction of or the use of threat of force or violence to interfere with the passage of any person about the College campus or through the entrance or exits of any College building or facility or the corridors thereof."

### c. Student Code of Conduct

96.     Barnard's Student Code of Conduct prohibits, among other things, "discrimination, harassment and retaliation," "[d]isorderly [c]onduct," "[d]isruptive [b]ehavior," "[v]andalism or [d]amage to [p]roperty," "[t]hreatening [b]ehavior," and violations of Barnard policy or federal, state, or local law.

### d. Policy for Safe Campus Demonstrations

97.     On February 20, 2024, Barnard implemented the Policy for Safe Campus Demonstrations, which "sets forth reasonable, content-neutral time, place, and manner restrictions for campus demonstrations," including designated demonstration areas and times, as well as a two-day registration notice requirement.  It also prohibits noise amplification and makes clear participants may not make "true threats, incite violence, use fighting words, or engage in unlawful harassment," and states that students who violate the policy "will be subject to Student Conduct proceedings," while staff or faculty who violate the policy "will be subject to policies governing employees."  Further, it provides that anyone who "refus[es] to cease their

25

activities and/or to provide identification to [Barnard] officials will be required to leave campus immediately."

### C.   Columbia's History of Antisemitism and Civil Rights Violations

#### i.   Columbia Has Permitted and Fostered Antisemitism for Years

98.   The antisemitism permeating Columbia's campus today has a long history, and antisemitism has long been promulgated in Columbia's classrooms.

99.   From 1963 to 2003, Columbia University Professor Edward Said was a pioneer in developing a purported academic theory—a doctrine invoked by Hamas in its founding charter— he called "Orientalism," which, as one scholar has put it, "posits that every interaction between the West and the East is influenced by racism, ignorance, and rapaciousness."  Under that doctrine and related doctrines concerning so-called "settler colonialism"—doctrines which have become enormously influential at Columbia and other universities—Jews and Israelis are assigned to the West and considered among the oppressor class.  In 2000, Said put his antisemitic doctrine into practice when he was photographed throwing stones across the Lebanon-Israel border at an Israeli guardhouse.  The current Edward Said Professor of Modern Arab Studies, Rashid Khalidi, is known for his work as a spokesperson for the Palestine Liberation Organization when it was a U.S.-designated terrorist organization.

#### ii.   Columbia's Antisemitism Is Exposed in *Columbia Unbecoming*

100.   In 2004, *Columbia Unbecoming*, a film exposing the rampant antisemitism among Columbia University's faculty, was released.  Through a series of interviews—including with students who took classes in Columbia University's Middle East and Asian Languages and Cultures Department (now known as the Middle Eastern, South Asian, and African Studies Department, or "MESAAS")—the film put Columbia on notice of professors who were

intimidating and harassing Jewish students.  Columbia, however, failed to take any meaningful

remedial or disciplinary actions.

101.    For example, in the film, one student recounted being belittled by longtime

Columbia University Professor George Saliba.  During a conversation about who has a claim to

the land of Israel—Arabs or the Jews (who had lived in Israel for thousands of years)—Saliba,

apparently of the view that only those he views as "pure-bred" Arabs have a claim to the land,

told her, "you have no voice in this debate . . . you have green eyes, you're not a Semite  . . . you

have no claim to the land of Israel."

102.    Another central figure in *Columbia Unbecoming* is Professor Joseph Massad, who

has taught at Columbia University since 1999.  For years, Massad has spewed antisemitic

rhetoric and intimidated students with impunity.  In 2002, for example, while lecturing at Oxford

University, Massad claimed, "the Jews are not a nation.  The Jewish state is a racist state that

does not have a right to exist."  In 2003, Massad wrote: "The ultimate achievement of Israel: the

transformation of the Jew into the anti-Semite and the Palestinian into the Jew."  At Columbia

University, upon learning that a Columbia student was Israeli and had served in the Israel

Defense Forces ("IDF"), Massad demanded to know how many Palestinians that student had

killed.  And when another student asked about Israel giving warnings before bombings to avoid

casualties, Massad shouted, "if you're going to deny the atrocities being committed against

Palestinians, then you can get out of my classroom!"

103.    The film also exposed Professor Hamid Dabashi, who, among other roles, is a

founding member of Columbia University's Center for Palestine Studies and Director of

Undergraduate Studies at MESAAS.

104.     Rather than remedying the anti-Jewish hatred on campus exposed in *Columbia Unbecoming*, Columbia did the opposite: In December 2004, to whitewash and denounce the film, it assembled an "Ad Hoc Grievance Committee," a group of five professors, including one who previously ignored student complaints about antisemitism.  After nine months of purported investigation, the committee issued a report which—despite corroborating several of the antisemitic incidents in the film perpetrated by Columbia University faculty—concluded that "further formal rules or regulations to codify behavior or sanction specific categories of action" were not necessary.  The Ad Hoc Grievance Committee recommended no disciplinary measures against any of the offending professors, including Professors Massad and Saliba.

105.     *Columbia Unbecoming*'s shocking revelations concerning campus antisemitism— and the leading roles played by faculty—helped prompt a November 2005 investigation into antisemitism on college campuses by the U.S. Commission on Civil Rights ("Commission"), a bipartisan, independent commission of the federal government created by the Civil Rights Act of 1957.

106.     In April 2006, the Commission issued a report cataloging its findings, which included that "anti-Israeli or anti-Zionist propaganda has been disseminated on many campuses that include traditional anti-Semitic elements, including age-old anti-Jewish stereotypes and defamation," and that "[a]nti-Semitic bigotry is no less morally deplorable when camouflaged as anti-Israelism or anti-Zionism."

107.     The Commission also made the following recommendations:

- "OCR should protect college students from anti-Semitic and other discriminatory harassment by vigorously enforcing Title VI against recipients that deny equal educational opportunities to all students";

- "University leadership should ensure that all academic departments, including departments of Middle East studies, maintain academic standards, respect

intellectual diversity, and ensure that the rights of all students are fully protected"; and

- "OCR should conduct a public education campaign to inform college students of the rights and protections afforded to them under federal civil rights laws, including the right of Jewish students to be free from anti-Semitic harassment."

108.    Neither *Columbia Unbecoming* nor the Commission's report led Columbia to address and ameliorate the antisemitism pervading its campus.  Three years after the Commission's report, despite his antisemitic conduct, Professor Massad was awarded tenure.

### iii.    *Columbia Unbecoming* Fails to Inspire Change

109.    Since the film, Columbia's hostile environment has only gotten worse for Jewish and Israeli students.  As alleged herein, swastikas—the Nazi symbol still used to threaten and intimidate Jews around the world—are drawn on campus; faculty relentlessly spew anti-Jewish rhetoric, inveigh against Zionists, and parrot terrorist propaganda; student groups routinely use the campus for antisemitic rallies and to threaten Jewish and Israeli students; and Columbia's administration consistently ignores the pleas of its Jewish and Israeli students for protection and support, while readily expressing outrage at, and zero tolerance for, abuse and harassment of other, non-Jewish and non-Israeli groups.

110.    Along with faculty, certain student groups have been central to perpetuating antisemitism at Columbia.  Students for Justice in Palestine ("SJP") is one of the most vitriolic antisemitic networks on college campuses, including at Columbia.  SJP was founded by the chair and co-founder of American Muslims for Palestine ("AMP"), Hatem Bazian, who, during a 2004 rally in San Francisco, stated: "Are you angry?  Well, we've been watching Intifada in Palestine. . . .  And the question is what are we doing?  How come we don't have an Intifada in this country? . . .  [I]t's about time that we have an Intifada in this country. . . . "  Intifada is a

word used to describe "periods of intense Palestinian protest against Israel, mainly in the form of violent terrorism."

111.    AMP's leadership overlaps with three organizations that have been shut down by federal authorities, whose assets were frozen by the U.S. Treasury Department, or that have been found civilly liable for providing material support to Hamas, including Holy Land Foundation for Relief and Development.  On October 9, 2023, a Hamas official, Ali Barakeh, declared that one of the goals of the October 7 terrorist attack was to demand the release of the directors of Holy Land Foundation for Relief and Development serving prison sentences in the U.S.  A recent study by the Network Contagious Research Institute found that the presence of SJP on campuses "significantly correlated with antisemitic activity."  And on October 31, 2023, Virginia Attorney General Jason Miyares announced an investigation into AMP for providing material support to Hamas.  National SJP receives funding and training from AMP.

112.    In 2016, Columbia's chapters of SJP and Jewish Voice for Peace ("JVP")—an anti-Zionist organization, which also receives funding from AMP, and whose members include both Jews and non-Jews—launched Columbia University Apartheid Divest ("CUAD"), a coalition of Columbia University and anti-Zionist student organizations, which is not a student organization recognized by Columbia.  Days before Hamas's October 7 atrocities began, SJP posted on their Instagram account an image depicting Israel and the text "We are back!!"  Although Columbia University nominally suspended SJP and JVP in November 2023, they continue to operate without consequence, including through CUAD.

113.    On April 7, 2016, SJP, JVP, and CUAD co-hosted an event titled "Intifada: The Palestinian Uprising" at Columbia University's Pupin Hall.  The student groups described the Intifada as "the self determined response of the Palestinian people to the daily horror and

atrocities committed by the state of Israel, [which] today is called an act of terrorism . . . a subjective rhetorical strategy used by the powerful to demonize legitimate acts of resistance and to maintain systems of oppression."  In fact, the Intifadas were carried out through a campaign of suicide bombs, many of which included nails dipped in rat poison, targeted at civilians.  During the Second Intifada, from around September 2000 through February 2005, Hamas claimed responsibility for over fifty suicide bombings, including: the August 9, 2001 bombing of a Jerusalem pizzeria, killing seven children; the December 1, 2001 double-suicide bombing in the crowded Ben Yehuda pedestrian mall in Jerusalem, killing eleven; and the March 27, 2002 suicide bombing at a Passover Seder at the Park Hotel in Netanya, killing thirty.  Indeed, two Columbia students were murdered in a 1996 Hamas bus bombing in Jerusalem.

114.    On January 17, 2017, during a Chicago radio interview, Professor Khalidi invoked Nazi-era dehumanization tropes analogizing Jews to vermin, stating that Israel supporters would "infest the Trump transition team, . . . [and] infest our government as of January 20."

115.    On February 13, 2017, CUAD, SJP, and JVP rallied against a speech in Lerner Hall by the Israeli Ambassador to the United Nations, Danny Danon, sponsored by the Columbia student group Students Supporting Israel ("SSI"), accusing Ambassador Danon of "virulent racis[m]."  Rallying outside of Lerner Hall, students chanted, "no peace on stolen land," as many attempted to get past security and into the event.  During the event, several attendees had to be removed by security personnel for disruptive outbursts.  Eventually, roughly one hundred students managed to break through the event's security, and marched through Lerner Hall, chanting, "from the River to the Sea, Palestine will be free" and "Israel is a terrorist state."

116.     In April 2017, a Columbia University library book was defaced with text that implied too few Jews were murdered during the Holocaust: "The ovens were too small!  Heil!" A few months later, a swastika was discovered in a Columbia University stairwell.

117.     On April 11, 2018, Holocaust Remembrance Day, SJP held a "Gaza Solidarity Rally" only a few hundred feet away from SSI's Holocaust commemoration booth.  Members of SJP chanted at mourning Jewish students, "from the River to the Sea, Palestine will be free" and "from Gaza to the [Low] plaza, globalize the Intifada!"

118.     On May 8, 2018, Professor Dabashi posted an antisemitic diatribe to Facebook, writing: "Every dirty treacherous ugly and pernicious act happening in the world just wait for a few days and the ugly name of 'Israel' will pup [sic] up as a key actor in the atrocities."  Less than ten days later he posted: "The Israeli flag, the very term 'Israel' are now and forever synonymous with mass murderers . . . with massacres, with land thieves, with incremental genocide, with war crimes, with crimes against humanity."

119.     On May 29, 2018, the Columbia University/Barnard chapter of Alums for Campus Fairness, a nonprofit organization dedicated to organizing alumni to combat campus antisemitism, sent an open letter to Columbia regarding Dabashi's antisemitic statements, requesting that Columbia:

> 1. Issue a formal, public statement unequivocally condemning Professor Hamid Dabashi's anti-Semitic postings as antithetical to Columbia University's liberal values;
>
> 2. State unequivocally that Jewish, Israeli and pro-Israel students, for whom Zionism and the right of Jewish self-determination are core values, are as welcomed at Columbia University as everybody else;
>
> 3. Meet with the representatives of alumni, parents, and selected signatories to discuss how the campus environment can be improved; [and]

> 4. Relieve Professor Dabashi of teaching responsibilities until he commits to recognizing and ending his anti-Semitic rhetoric. . . . Dabashi must be prevented from creating a hostile environment on campus for Jewish, Israeli and pro-Israel students who are entitled–like every student–to a safe and welcoming learning environment.

120.    Appended to the letter were comments from Columbia community members, including faculty, alumni, and students.  One student explained: "As an Israeli student I feel targeted in this University by professors such as Dabashi.  I expect the administration to AT LEAST help me by condemning him when needed."  In line with Columbia's reaction to *Columbia Unbecoming*, these statements were ignored.  Columbia's failure to act emboldened Dabashi, who one year later proclaimed on Facebook that the "only difference" between ISIS, one of the worst and most murderous terrorist groups in modern history, and Israel is that "ISIS does not have a platoon of clean shaven and well coiffured columnists at the New York Times propagating the cause of the terrorist outfit as the Zionists columnists do on a regular basis."

### iv.    Columbia's Failure to Act Against Antisemitism Emboldens Overt Antisemitism on Campus

121.    On November 29, 2018, two swastikas and an antisemitic slur were spray-painted on the walls of a Jewish professor's office at Columbia University's Teachers College.

122.    In April 2019, SJP, JVP, and CUAD circulated a flier for "Columbia University Israeli Apartheid Week," depicting an IDF soldier with a disproportionately large nose and horns protruding from his helmet—age-old antisemitic caricatures.  Columbia failed to discipline SJP, JVP, CUAD, or any of their members or faculty advisers.  Had student organizations or anyone else on campus distributed fliers with caricatures of other protected minority groups drawing on racial, ethnic, religious, gender, or sexual orientation stereotypes, or engaged in any of the other

conduct alleged herein against other protected groups, there is no question that Columbia would have acted to stop and deter it.

123.    In December 2019, two Columbia University students filed complaints with OCR alleging that Columbia University's educational environment was hostile to Jews and Israelis.  In one complaint, an alumna alleged that she received a master's degree from MESAAS but was deterred from pursuing another degree because of rampant antisemitism among faculty in the department including programming in Columbia University's Center for Palestinian Studies and Middle East Institute—the heart of intellectual antisemitism at Columbia—which "falsely depicts Jews as foreigners and 'congenital' outsiders in Israel and the Palestinian territories, equates Zionism with racism, demonizes Zionists as establishing an apartheid state in Israel, and advocates for the annihilation of the Jewish state and its replacement with a Palestinian [*sic*] in which Jews do not seek to rule."

124.    In the other complaint, a Jewish Israeli-American student alleged that during Professor Massad's keynote speech at the 2019 Palestine Center Annual Conference, Massad justified "the armed resistance of the Izz al-Din al-Qassam Brigades," the military wing of Hamas, which was responsible for the kidnapping and murder of the student's uncle.  The student further alleged that while he was standing at a table on campus advertising for SSI, "a Columbia professor of Arabic literature  . . .approached the table, interrupted the conversation, pointed at [him] and yelled, 'Don't believe a word he is saying.  He is Mossad [Israel's national intelligence agency].'"  The student also alleged that he was called a "Zionist pig," among other derogatory names, by student members of SJP.  On November 20, 2023, four years after the complaint was filed, the Department of Education announced an investigation into Columbia University based on these allegations.

125.    Between February and March 2020, there were three reports of swastikas on Columbia University's campus.

126.    In an interview with the *Columbia Spectator*, a Columbia University student stated that in 2022, when she told a professor that her family was Israeli, the professor responded, "so you must know a lot about settler colonialism.  How do you feel about that?"  When the student shared her Israeli background with another professor, the professor responded, "it's such a shame that your people survived just in order to perpetuate genocide."

127.    In October 2022, McNulty, while eating in a campus dining hall, heard students espousing antisemitic conspiracy theories promoted by Kanye West as they passed around an image of a swastika.  In or around the same time, McNulty crossed paths with three student athletes on campus on her way to class who were repeatedly using the phrase "Jew someone down" while laughing.  McNulty was taken aback by such open antisemitism on campus.

128.    In 2022, the watchdog group StopAntiSemitism graded twenty-five colleges and universities on whether their campus environments are hostile to Jews based on "surveys to the administration," "hundreds of first-person narratives by students," and other research.  Columbia received an F.  The report noted that Jewish students "overwhelmingly DO NOT believe the administration considers their safety as a priority."

129.    In spring 2023, Glaser, a staff writer for the *Columbia Spectator*, wanted to write an article reporting where students could celebrate Passover on campus.  Notwithstanding that the paper had published similar articles for Ramadan, her article was drastically modified, and a truncated version of it was published, with the editor-in-chief stating that her original version was not aligned with the paper's mission to be "all-inclusive."

130.     On the evening of September 16, 2023, five students ripped Doe's kippah off his head while he was in the lobby of his dormitory.  Doe reported the incident to his resident assistant, who chalked it up to the students being "drunk," but informed Doe that it would be difficult to do anything and referred Doe to mental health services.  Distressed from the antisemitism he was experiencing so early into his college experience, Doe began utilizing Columbia Psychological Services, and avoided spending time in his dormitory for several weeks.  One week later, Doe discovered that his mezuzah had been stolen from his dormitory room door.

### v.     Columbia Still Offers and Teaches an Antisemitic Curriculum

131.     During freshman orientation, Columbia University and Barnard require students to participate in Diversity, Equity, and Inclusion ("DEI") training focused on identifying and preventing discrimination and biases against a wide variety of groups.  Conspicuously omitted from the training is antisemitism.

132.     During first-year orientation, CSSW students are required to attend "Professional Development and Self Awareness Orientation," an orientation program run by multiple departments including the Office of Student Affairs.  CSSW teaches through a lens that focuses on power, race, oppression, and privilege, which ignores thousands of years of Jewish persecution and marginalization.  CSSW's orientation made SCLJ Member #1—whose Jewish heritage is integral to her identity—feel marginalized and excluded.

133.     To fulfill the requirements of his history major, with a focus on the Middle East, Rubin was required to enroll in a class taught either by Professors Khalidi or Massad.  In fall 2020, Rubin enrolled in History of the Modern Middle East with Khalidi.  During a class discussion on supposed national origin myths, a student asked Khalidi, "how intentional were the Jews in creating their national origin myth in creating Israel?"  Khalidi responded by stating that

Jews have "no claim to [Israel]," thereby delegitimizing a core aspect of Jewish identity and the Jewish people's historical, ethnic, and ancestral claim to the land of Israel.

134.    In November 2022, Gerstein joined SPS's Diversity Equity Inclusion, and Accessibility ("DEIA") Committee, made up of administrators, faculty, staff, alumni, and students, believing it to be a viable avenue to effect change to Columbia's institutional antisemitism, but Gerstein's efforts were rebuffed.  In January and February 2023, Gerstein proposed a Jewish Identity and Antisemitism workshop in consultation with the Academic Engagement Network, but after submitting the formal proposal, was told, with no valid explanation, that the workshop would be postponed.  When Gerstein contacted SPS Dean Troy J. Eggers to plan the workshop for spring 2024, he emailed: "We have our list of DEIA events set for the spring already and are focusing on those."

135.    In spring 2023, Miller was enrolled in a class with Professor Rosana Elkhatib. During a class field trip to the architecture firm where she works, Elkhatib referred to Israel as a "terrorist organization"—equating Israel to terrorists like Hamas—to Miller in front of his classmates.

136.    A few months earlier, during Miller's Architecture History course, Professor Felicity Scott referred to a map of Israel as a "military map of illegal conquest."  Scott has signed on to a public letter stating: "We recognise [sic] that architecture and urban planning are both the means and the ends of Israeli settler colonialism and state terror.  As architects and planners, it is our moral and ethical duty to acknowledge that the tools of our profession have been co-opted to violate the legal rights of the Palestinian people."  The letter's signatories also included GSAPP Dean Andrés Jaque.

137.     Antisemitism is so pervasive that it even permeated the curriculum in an Introduction to Judaism class Rubin enrolled in for fall 2023.  During a lecture about the Jewish holidays, Professor Beth A. Berkowitz, while laughing, asserted that Jews perform the "method act" of celebrating Passover, implying Jews are not oppressed or marginalized.  As a result, Rubin dropped the class after two weeks.

138.     In late September 2023, during a General Studies Student Council general body budget vote, a council member, with support from the vice president of finance, motioned to allocate the full funds for a GS Shabbat Dinner with Dean Lisa Rosen-Metsch.  The student council president asked the council member to withdraw the motion and told him he would veto it if he did not.  Ultimately, the student council voted to fund only half of the $3,000 request.

### D.     Hamas Terrorists Commit Horrific Atrocities Against Innocent Civilians in Israel

139.     On October 7, 2023, Hamas launched an unprovoked surprise attack on Israel, perpetrating depraved acts of murder, torture, rape, violence, and kidnapping against Israeli citizens.  Thousands of armed terrorists invaded southern Israel, while others launched a barrage of rockets toward populated cities.  Once inside Israel, the terrorists, acting as well-armed death squads, dispersed into towns shooting, raping, torturing, burning, and mutilating unarmed civilians, including infants, children, and the elderly, taking hundreds of hostages and engaging in mass murder and rape at a music festival near Gaza's border with Israel.

140.     The IDF eventually repelled the terrorists and regained control over the affected area.  By that time, Hamas had killed 1,200 people and abducted over 200 more.  October 7 was the single deadliest day for Jews since the Holocaust.

141.     Antisemitism is a core tenet of Hamas—an extreme Islamist terrorist group explicitly committed to the destruction of Israel and its Jewish inhabitants, the creation of an

Islamic state in Israel's place, and the annihilation of all Jews around the world.  Hamas's 1988 charter states: "The Day of Judgment will not come about until Muslims fight the Jews and kill them."  In October 1997, the U.S. State Department designated Hamas, which has controlled Gaza since 2007, a Foreign Terrorist Organization.

142.     In keeping with its charter and goals, since its inception, Hamas has carried out numerous indiscriminate terror attacks on Israeli civilians through bombings, rocket barrages, shootings, and stabbings, including during two Intifadas.  Since 2002, Hamas killed scores more through similar suicide bombings, public bus attacks, booby traps, shootings, and other acts of terror.  Since October 7, senior Hamas officials have hailed the slaughter and vowed that it was "just the first time, and there will be a second, a third, a fourth," promising another "October 7, October 10, October one-millionth" until the complete annihilation of Israel.

143.     Shockingly, many students and faculty at Columbia celebrate, justify, and excuse Hamas's mass rape, murder, and kidnapping.  Some have resorted to harassment and even violence against Jewish and Israeli students in support of Hamas's attack and in condemnation of Israel's defensive response.  Columbia's faculty and students falsely accuse Israel of: committing "genocide" and "ethnic cleansing" (even though the Arab population of Gaza has more than quadrupled since 1967); creating an "open-air prison" in Gaza (even though Israel completely removed itself in 2005 from Gaza, which also shares a border with Egypt); and "apartheid" (even though all citizens in Israel enjoy equal rights).

144.     Further evidencing the antisemitic nature of their activities, these students, and the faculty who support them, do not condemn, let alone rally against, such countries as Syria and Yemen, which have killed hundreds of thousands of Arab civilians; Pakistan, which is expelling

almost two million Afghan Muslims; China, which has imprisoned its Muslims in reeducation camps; or Somalia and Nigeria, where Christians are regularly murdered.

**E.    Columbia's Facially Inadequate Response to October 7 Fans the Flames of Campus Antisemitism**

145.    Columbia's decades of deliberate indifference to anti-Jewish and anti-Israeli harassment has created an environment in which antisemitic activity has flourished and which, following Hamas's October 7 massacre, has enabled yet another intolerable wave of antisemitic abuse on campus.

**i.    Columbia's Silence Creates a Vacuum Filled by Antisemitism**

146.    In the immediate aftermath of the October 7 massacre, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members waited for President Shafik to issue a statement condemning Hamas's mass murder and kidnapping, just as Columbia University presidents had done in the wake of other incidents and events, including Asian violence during the COVID-19 pandemic and George Floyd's murder.  As Columbia's students and faculty began celebrating Hamas's slaughter, President Shafik remained silent.  Two days later, rather than condemn Hamas or those who celebrated their attack, President Shafik urged faculty to bring "clarity and context" to the greatest loss of Jewish life since the Holocaust.

147.    On the evening of October 7 and in the days that followed, Jewish and Israeli students at Columbia gathered on campus to hold vigils to mourn Hamas's victims.  For those students, including Symonds, McNulty, Rubin, David, Westergaard, Swill, Rabban, Quinn, Glaser, Ruttenberg, and SAA Member #2, these silent moments were interrupted by classmates who yelled, "free Palestine" or "screw you guys" at them.

148.    On the evening of October 7, while Doe was wearing his kippah on campus, a group of four students said to him, "this is going to happen again, you terrorist.  This is

40

resistance."  Doe reported the incident at an October 11 meeting with his advising dean, who informed him that a bias report would be filed with the Multicultural Affairs office.  Doe went to the Multicultural Affairs office in November to check on the status of the report and was told that none had been filed.

149.    On October 8, Professor Massad published a piece celebrating Hamas's attack in *The Electronic Intifada* titled "Just another battle or the Palestinian war of liberation?" Expressing his enthusiastic support of Hamas, he labeled the massacre as "an innovative Palestinian resistance," "shocking success," and "stunning victory," and used words such as "astounding" and "awesome" to describe the terrorist attack on Jewish civilians.  Kahane emailed President Shafik's office twice to express his concerns about Massad's article, but only received one response informing him the president's "schedule" was "very full, and a meeting will not be possible."

150.    On October 13, a Columbia University student started a petition to remove Professor Massad, which within four days had garnered over 50,000 signatures.  On October 15, more than 300 Columbia affiliates, including faculty, signed an open letter expressing "unwavering solidarity" with Massad, defending his October 8 pro-terrorism piece.  MESAAS administrators and a Columbia University spokesperson declined the *Columbia Spectator*'s request for comment on the petition and open letter.

151.    On October 9, several Columbia student groups publicized a joint statement "regarding the recent events in Palestine Israel: Oppression Breeds Resistance," framing the terrorist attacks as a form of resistance, and "remind[ing] Columbia students that the Palestinian struggle for freedom is rooted in international law, under which occupied peoples have the right to resist the occupation of their land."

152.     The joint statement blamed Israel for Hamas's attack and concluded that "Israel does not have the right to defend its occupation, its apartheid state or its siege of Gaza."  In the days that followed, the joint statement was edited to include more antisemitic rhetoric and additional signatories.  Three weeks later, in defense of the joint statement, nearly 170 Columbia faculty members signed an open letter characterizing the October 7 terrorist attack as a "military response" that could be regarded as an exercise of the "right to resist."  Columbia spokespersons declined the *Columbia Spectator*'s request for comment on the joint statement, and a Columbia University spokesperson subsequently declined to comment on the open letter.

153.     On October 9, SJP and JVP also issued an open letter standing in "full solidarity with Palestinian resistance against over 75 years of Israeli settler-colonialism and apartheid" and characterized Hamas's October 7 attack as "an unprecedented historic moment for the Palestinians of Gaza. . . .  Despite the odds against them, Palestinians launched a counter-offensive against their settler-colonial oppressor."

154.     On the evening of October 9, President Shafik broke her silence by issuing a "Message of Concern for Our Community" in which she claimed to be "devastated by the horrific attack on Israel and the ensuing violence that is affecting so many people."

155.     Around this same time, SJP and JVP reactivated CUAD, which had been dormant since 2020, "in response to the overwhelming support for Palestinian freedom from students on Columbia's campus"—in other words, CUAD was brought back to amplify the surge in student support for Hamas's October 7 atrocities.

156.     On October 18, President Shafik emailed Columbia students about purportedly "Upholding Our Values," stating:

> Our day-to-day duty of care for the security and well-being of our
> students, faculty, and staff is paramount. . . .We know that the

> atmosphere on campus is extremely charged, and some of you have
> expressed concern about your personal security.  Let me reassure
> you that the University will take all available steps to help you.

Again, conspicuously omitted from President Shafik's message was any explicit condemnation

of Hamas's terrorism or Columbia faculty and student support for Hamas.

157.     Following Hamas's October 7 attack, the IDF released a 47-minute compilation of

footage captured via CCTV, body camera, and cell phone video of the brutal massacre, much of

which was recorded by Hamas terrorists.  On two separate occasions, President Shafik and

members of Columbia's administration were invited to a screening of the footage; they all

declined both invitations.

158.     Columbia's Jewish and Israeli students are still waiting for the help President

Shafik promised.  At a press conference held outside of Columbia's gates on October 30, Jewish

students pleaded for help and spoke of not feeling safe on campus.  One student stated, "now I

get it, I actually understand how the Holocaust happened," referring to the way antisemitism was

allowed to continue without any efforts to curtail it.  In a media interview two weeks later, a

Jewish Israeli Columbia student detailed frequent "antagonization for being Jewish and being

Israeli" since October 7, including being told to "go to hell" and that Israeli hostage posters are

"fake news," and described reporting the harassment to Columbia administrators, Columbia

Public Safety ("Public Safety"), and her resident assistant, none of whom addressed the issue.

159.     On November 2, 2023, the *Columbia Spectator* reported the results of its

interviews with over fifty Jewish and Israeli students at Columbia:

> Of those interviewed, 34 reported feeling unsafe on campus since
> Hamas' unexpected attack on Israel on Oct. 7.  Thirteen students
> said that they personally experienced incidents where they felt
> attacked or harassed, either in-person or online.  Ten students
> reported avoiding or fully staying off campus at some point since
> Oct. 7.  Twelve students said they tried to hide or veil their Jewish

identity when walking around campus.  Seventeen students said they have been negatively affected or offended by Columbia-affiliated online spaces.

160.     A December 2023 study published by Brandeis University, which surveyed students at fifty-one campuses after October 7, ranked Columbia in its worst category: "highest antisemitic hostility."

      **ii.     Columbia Fails to Prevent or Respond to the Student-Organized National Day of Resistance**

161.     On or about October 10 and 11, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members learned that SJP chapters across the country—including Columbia's SJP chapter—were holding a "National Day of Resistance" on October 12.

162.     Leading up to the National Day of Resistance, tensions on campus rose and antisemitic rhetoric and acts of violence and intimidation intensified.  For example, on October 10, Aryeh was on Columbia University's campus when she observed a group of individuals displaying anti-Israel propaganda signs.  When Aryeh sought to engage them in dialogue, two of the individuals screamed at her.  The commotion caused a group of students to begin gathering, which only caused the group to become more aggressive.  Aryeh attempted to report the aggressive group to Public Safety for harassing students.  Public Safety informed her that it knew the group was a recurring issue and that they were not supposed to be on campus, and asked the individuals to leave, but did nothing when the group refused.  Aryeh saw the group back on campus a few days later and reported them again.  The group continued to harass students on Columbia's campus without intervention, despite Aryeh's reports to Public Safety, Barnard Dean Leslie Grinage, and President Shafik's office.

163.    On the morning of October 11, a Jewish Israeli student was verbally assaulted outside of Butler Library by someone yelling, "fuck the Jews."  The assailant said that he was attacking the student "because you are a Jew," motioning to the student's Star of David necklace.

164.    That same day, McNulty witnessed an individual on campus screaming, "Jews are going to hell" into a microphone.  Instead of disciplining or instructing the individual to leave, a Public Safety officer merely told the individual to turn the microphone volume down.

165.    In the late afternoon, Dennis A. Mitchell, Columbia University Interim Provost, emailed students that they are "all guided by the University's Rules of Conduct," which he attached "[f]or those who choose to engage in demonstrations or protests."

166.    Shortly after Provost Mitchell's email, five Jewish Israeli Columbia students were assaulted in front of Butler Library.  While exiting the library, the students noticed a Columbia student tearing down hostage posters, which they had hung up earlier that day.  When the students asked for their posters back, the assailant attacked them with a stick, cursed at them, and punched one of the students, who suffered a sprained finger and lacerations to his head.  When the incident was reported to the NYPD, the attacker was arrested and charged with assault.  But when the incident was reported to Columbia University, the student-victim was advised by an academic adviser, who is also a Columbia University administrator, to stay off campus in light of the upcoming National Day of Resistance.

167.    When Rubin learned of the assault, he emailed GS Dean Rosen-Metsch:

> I heard a disturbing story that an Israeli GS student was assaulted on campus today, and there is a lot of fear within the community about the safety of Columbia's jewish community.  There is a rumor going around that jewish students should not come to school the next few days.  I was wondering if there are efforts to alleviate the worries of the community and to let us know we are safe.

Rubin never received a response from Dean Rosen-Metsch.

168.    That evening, David Greenberg, Executive Vice President of Columbia University Facilities and Operations, emailed students that access to campus the next day would be restricted to valid Columbia University ID ("CUID") holders to "help maintain safety and a sense of community through planned demonstration activities."  Barnard and Columbia University students' CUID cards give each the ability to access both campuses.

169.    Fearing that Columbia was intentionally ignoring the red flags and taking little to no steps to thwart the anticipated violence, other Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members also voiced their concerns to the administration. Symonds, for example, emailed President Shafik requesting immediate action, including by banning SJP from campus because of its support for terrorism and condemning any student participation in the National Day of Resistance, which Symonds predicted "will put Jewish and Israeli students on campus at high risk."  Symonds never received a response.  Aryeh also emailed President Shafik predicting that SJP "will glorify and openly support the actions of Hamas," "genocide, terrorism, and the end of the Jewish people," and requested President Shafik "stand with the Jewish and Israeli students of Columbia against these heinous acts of antisemitism."  Aryeh never received a response.

170.    On October 12, Provost Mitchell issued another statement in anticipation of the National Day of Resistance in which he acknowledged that the event "risk[ed] creating an unsafe environment" and promised that "anyone unwilling to identify themselves will be required to leave campus, and "[a]ll violations are subject to discipline under our rules."  But Columbia did not follow through.

171.    Later that afternoon, hundreds of Columbia students swarmed the lawns at the center of campus.  SJP's raucous rally took place on one side while SSI and other students,

including Kahane, David, Elkins, Quinn, Sandler, Swill, Westergaard, Aryeh, Yadegar, Gabe, Roe, and Bellows, quietly assembled on the other, with Public Safety standing between the two groups. SJP encouraged Columbia members to chant: "Jews will not defeat us"; "globalize the Intifada"; "resistance is justified"; "from the River to the Sea"; "Minouche Shafik, open your eyes, please divest from Israel's crimes"; and "Columbia, Columbia, open your eyes, stop defending apartheid." They also held "glory to the martyrs" signs, praising the October 7 terrorists. The cheering Kahane heard on SJP's side—in contrast to the pain and tears he witnessed on SSI's side—led him to believe it was a pro-Hamas rally. As explained by Columbia University Professor Shai Davidai in a piece published in November 2023, "the differences between the student organizations' chant of 'from the river to the sea' and the Nazi chant of 'Germany for Germans' are mere semantics. The antisemitic sentiment is the same." David was dismayed by the lack of empathy shown by those on SJP's side, while the pro-Israel side quietly tried to honor the victims of October 7, including by holding posters of the victims. David felt terrified and suffocated by just how many students were participating in SJP's genocidal chants, including several she recognized as classmates. Elkins was likewise in attendance and was disturbed that while he and other Jewish students were still grieving, his classmates were justifying the massacre as "resistance." Quinn was on campus and felt threatened when she heard "Palestine is almost free" chanted and saw signs honoring "martyrs." Bellows heard "globalize the Intifada" and "from the River to the Sea" chants while on campus. Sandler was also in attendance and felt uncomfortable by the chants.

172.   As SJP's rally grew, student leaders from SSI, who were informed that Public Safety could not keep them safe, encouraged the pro-Israel students to disperse. As one Jewish

student left the rally, he had an Israeli flag ripped off his back within direct view of a Public Safety guard booth.

173.    SJP and its supporters roamed campus and spread their hateful messages.  Despite the clear language of the Rules of University Conduct—which prohibits conduct that, among other things, "endangers property on a University facility," "causes a noise that substantially hinders others in their normal academic activities," "places another in danger of bodily harm," or disrupts university functions—Public Safety looked on as students climbed on the iconic Alma Mater statue and used megaphones to broadcast their threats.

174.    At around 6:00 p.m., the SJP crowd abandoned their supposed "designated area" and began marching around campus.  Aryeh was holding a sign with information about the October 7 terrorist attack.  As students marched by, they screamed at her that the terrorist attack was "fake news" and that it "never happened."  The mob then marched down Broadway toward the Kraft Center for Jewish Student Life, Columbia's Hillel building, which was forced to lock its doors as a security precaution and advise students to shelter inside.  At 7:20 p.m.—three hours after the event began—Public Safety alerted Hillel that students could leave the building.

175.    Earlier that day, Gabe encountered a rally on his way out of a class where he heard students chanting "from the River to the Sea."  Later that evening, Gabe and another Jewish student were forced to take a different, longer route home to avoid the rally on campus.

176.    The next day, Rubin emailed Dean Rosen-Metsch and GS Assistant Dean of Students Mitali Dave that he felt forced to leave campus after viewing the "distressing videos from campus" on the National Day of Resistance and expressed his hesitation to return.  Yet again, Rubin did not receive a response.

### iii. SSI Is Prohibited from Holding Events While Other Student Groups Openly Discriminate Against Jewish and Israeli Students With Impunity

177. On October 17, Yadegar and other members of SSI's Executive Board met with Columbia University administrators—including Aaron Gomes, Executive Director of Student Engagement, Noah Mullenix, SSI's assigned adviser and Assistant Director of Student Engagement, and Sean Trulby, Associate Dean of Student Life—to express their concern that Columbia had canceled an approved SSI event planned for October 16 due to supposed concerns that Columbia would be unable to ensure safety at the event. Ironically, the purpose of the event, in part, was to publicize a krav maga (Israeli martial arts) self-defense class in response to Jewish students feeling unsafe on campus.

178. During the same meeting, SSI was told by the administrators that no clubs on campus could hold events revolving around "buzzwords" like "Israel" or "Palestine." In a follow up email on October 18, Yadegar asked Mullenix, Gomes, and others why SJP and JVP were allowed to announce an event that day which violated this new "buzzword" protocol, while SSI's peaceful tabling event was prohibited. Yadegar pointed out that during the October 12 rally, SJP and JVP violated Columbia University's amplified sound and masking policies, departed their designated areas, and caused the Kraft Center to go on lockdown.

179. Two days later, on October 20, Mullenix asked to schedule another meeting. At the next meeting, Mullenix failed to provide substantive responses as to why SJP and JVP were allowed to announce an event and instead explained the protocol for scheduling events. Mullenix followed up with an email providing "shareable resources," including a self-defense class and counseling and psychological services.

180. Meanwhile, anti-Jewish rhetoric and incidents continued to increase across Columbia. On October 17, for example, a Jewish student on campus had his kippah ripped off

his head.  Two days later, on October 19, a student yelled, "fuck the Jews" at a Jewish student

wearing a kippah inside a Columbia building.

181.    On October 20, 2023, Lizzy George-Griffin, president of the LionLez student

club—an "event-based, social club designed for queer and non-binary people"—emailed its

members inviting them to movie screenings.  At the bottom of the email, George-Griffin wrote:

"It's FREE PALESTINE over here.  Zionists aren't invited."

182.    In response to a student's reply expressing her concerns and disappointment,

George-Griffin launched into a vile and ignorant antisemitic tirade:

> [W]hite Jewish people are today and always have been the
> oppressors of all brown people . . . . I'm gonna touch your hand
> when I say this, WHEN I SAY THE HOLOCAUST WASN'T
> SPECIAL, I MEAN THAT. . . . Did you know that only white Jews
> are allowed to live in "Israel"? . . .  LionLez is run by people of
> color.  For it to be a safe space for people of color, Zionists (all of
> whom are white supremacists) are not invited.  Ever.
>
> Hamas only exists because of Zionists' cruelty.  Zionists have taken
> Palestinians hostages for 75 years, so Hamas took hostages for a
> prisoner exchange to get their family members back.  They fought
> back and killed a handful of people after a 75-year ongoing genocide
> that's killed hundreds of thousands.  This is not a war.  "Israel" is
> the sole aggressor.  Israelites are the Nazis.

183.    George-Griffin ended the email, "You and your white supremacy are also not

invited" and, with bold capital letters, "**STOP THE GENOCIDE!  FREE PALESTINE!**

**FUCK ISRAEL[.]**"

184.    SAA Member #4 felt particularly isolated by this email as a member of the Jewish

queer community.  She could not understand her place being told that she was not wanted as a

Zionist and would have to leave her identity behind to be welcomed and accepted.

185.    When another concerned Jewish student messaged LionLez, the club responded with no remorse: "discrimination is against oppressed people.  Zionists are the oppressors.  So nothing is gonna happen to our club."

186.    LionLez was right about one thing—nothing happened to the club, even though in May 2024, former Columbia Law School Dean and current Co-Chair of Columbia's Task Force on Antisemitism ("Task Force") Professor David Schizer admitted that excluding Jewish students from student groups because they care about Israel is "completely unacceptable" and "clearly a violation of the university's legal obligations."  Columbia learned of George-Griffin's and LionLez's antisemitic discrimination and harassment and did nothing.  On October 24, a student emailed the Student Governing Board, composed of student groups and formed to protect the rights of students, about LionLez.  On October 25, Symonds also emailed the Student Governing Board to express her concern.  A few days later, Symonds filed an OCR complaint. McNulty also filed an OCR complaint but was told that the incident had been reported and her complaint would be closed.

187.    Columbia graduated George-Griffin in December 2023 with a "Multicultural Graduation Cord"—an honor bestowed by the Multicultural Affairs group of the Undergraduate Student Life Office on graduates who demonstrate "an outstanding commitment to diversity, social justice, and multiculturalism through Multicultural Affairs, campus leadership, community involvement, academic endeavors, and/or personal dedication."

188.    On October 24, Columbia facilities employees tore down posters depicting Israeli hostages.  When a Jewish student questioned why the employees were tearing them down, one responded, "fuck you."  Mizrahi-Aks, who has two family members who were kidnapped and

held hostage by Hamas, also witnessed the employees tear down the posters, who told him that they were "propaganda."

189.    On October 25, SJP and other student groups participated in a national walkout, where they walked out of class and marched around campus.  The day before, Rubin asked various deans and professors to be allowed to attend class via Zoom because he did not feel safe on campus: "Tomorrow there is a large Pro-Palestinian rally on campus, and I cannot take much more of this.  Please help me, I cannot continue to bear witness to all of this."  After Rubin's accommodation request was denied, he was forced to drop the course or risk falling further behind.  Notwithstanding the antisemitism that occurred at SJP's October 12 rally, Columbia permitted the walkout and merely restricted campus access to CUID holders.

190.    During the walkout, Columbia community members chanted, "from the River to the Sea," while holding signs saying, "resistance is not terrorism!"  Rubin was shoved by a student wearing a keffiyeh, whom Rubin recognized as a Columbia University School of International and Public Affairs ("SIPA") student.  Rubin reported the student and his concerns for other nearby Jewish students to Public Safety officers at the rally but was told he had to report any concerns to the Public Safety office.  Yet when Rubin filed a formal report, he was told that Public Safety could not do anything in response.

191.    At another point during the rally, Rubin observed a student holding a Palestinian flag aggressively waving it in the faces of three Jewish students, one of whom was only spared from being hit because she ducked out of the way.  Rubin tried to non-violently deescalate the situation but was swarmed by students who falsely accused him of being the aggressor.  Rubin later went to the Public Safety office to report the incident, but found about ten officers standing around ignoring the chaos outside.

192.     That day, for the first time, Dean Rosen-Metsch offered to meet with Rubin later that afternoon.  During their meeting, Rubin reiterated his concerns.  Dean Rosen-Metsch—who herself is Jewish and is now a member of Columbia's Task Force—told Rubin that Columbia is a "historic antisemitic institution, and it has been the whole time I've been here, and there's really nothing I can do about it."

193.     On October 27, a swastika was discovered in a Columbia University building. Yet President Shafik failed to disclose the vandalism to the Columbia community.

194.     On October 31, Yadegar emailed Mullenix, Trulby, Senior Vice President for Student Affairs Joseph Defraine Greenwell, and Public Safety to inform them of a silent, on-campus event SSI scheduled the next day and to request Public Safety's presence in the general area.  Yadegar noted that in the past, SSI had "gone through all the proper channels with the university to register [its] events," and sought an exception for this peaceful demonstration. Mullenix replied that Columbia needed a "MINIMUM of 10 business days" for student group events, and should SSI move forward, "there likely will be individual and student group accountability."  By contrast, after SJP and JVP were conditionally suspended ten days later, Columbia advertised that no individuals were disciplined in connection with the suspension. When Yadegar asked for an explanation of the disparate treatment of SSI compared to SJP— which organized the October 25 walkout that, by definition, was not pre-approved—Mullenix replied: "There has been, what we might consider, a period of transition with the University event and student group policies this fall.  There was further clarity provided to the rules based on need, including how rules are enforced—so there has been some degree of flexibility the past few weeks."

195.    Fearing discipline, SSI did not move forward with the event.  In the following months, SSI has continued to abide by Columbia's policies, including the lengthy notice requirement before it was amended, but its efforts to organize events were often stymied. Understanding from Columbia that their events were denied because of an issue coordinating security, SSI tried to register an event without selecting the option for security but was told that security was required at their events.  Conversely, groups, like CUAD and its member organizations, have ignored Columbia's policies and warnings, holding rallies and events near-daily with impunity.  Yadegar repeatedly filled out bias reports and emailed Mullenix about the groups' events to no avail and almost always with no response.

### iv.    Columbia's Suspension of SJP and JVP Only Emboldens the Groups to Continue to Act Without Consequence

196.    On November 9, continuing their disregard for Columbia's policies, SJP and JVP organized a "Shut it Down!" walkout, which again attracted hundreds of students.

197.    Earlier in the week, McNulty reported this event to Dean Rosen-Metsch, asking to cancel or postpone the event given its especially disturbing timing—the anniversary of Kristallnacht, an unsettling message.  Columbia refused.  Similar to the SJP and JVP events that preceded it, the "Shut it Down!" rally featured Columbia community members freely espousing antisemitic and threatening rhetoric, including student and administrative assistant Adrian Gonzalez, who aggressively yelled, "fuck the Jews," "death to Jews," and "fuck Israel," while trying to instigate fights.  Aryeh observed students screaming at a rabbi while he was praying with students.

198.    At the event, Mohsen Mahdawi, a student organizer, yelled, "back" and "shame" into a megaphone while instructing other students to physically push a small group of pro-Israel students back as the agitators conducted a "die-in" and shouted, "from the River to the Sea."

These incidents were reported to Public Safety both during and after the event.  Kahane also alerted the NYPD on campus standing around twenty feet away at the time that pro-Israel students were physically getting blocked by agitators, but the NYPD told Kahane that if they interfered it could only make the situation worse.  Gerald Rosberg, Senior Executive Vice President of Columbia University and Chair, Special Committee on Campus Safety, acknowledged after the rally that it was filled with "threatening rhetoric and intimidation."

199.    On November 10, Columbia temporarily suspended SJP and JVP—not for the groups' antisemitic rhetoric, harassment, and calls for violence, but for their violations of campus event policies.  President Shafik later confirmed this in a listening forum attended by SCLJ Member #4, stating that the suspension "had nothing to do with what [SJP and JVP] were saying."  President Shafik reconfirmed this when she was called to testify before the House Education Committee at the April 17, 2024 "Columbia in Crisis: Columbia University's Response to Antisemitism" hearing ("Columbia Hearing").  And while Columbia's suspension is conditional—lifting the suspension is contingent on demonstrating a commitment to complying with Columbia's policies and engaging with school officials—other institutions, in contrast, such as Fordham University, State University System of Florida, and Lafayette College, have refused to recognize, banned, or permanently suspended SJP from their campuses.  In fact, in an October 24 letter, Florida's State University System Chancellor instructed Florida's universities to deactivate their SJP chapters citing the group's support for Hamas.

200.    Columbia's SJP and JVP suspensions applied to the groups, not their members. In response to a frequently asked question about Columbia University's event policies, Columbia University published on its Event Policy and Campus Resources FAQ website page that "[n]o person involved in organizing, promoting, or speaking at the event SJP and JVP staged on

November 9, 2023, was subject to any sanction under the Rules of University Conduct or otherwise." This is despite the litany of Columbia University policies that were broken—including the EOAA Policies & Procedures, which prohibit "epithets or slurs; negative stereotyping; [and] threatening, intimidating or hostile acts"—by readily identifiable students such as Mahdawi and Gonzalez.

201.    To circumvent the suspension, SJP and JVP members began using CUAD as their alter ego. Predictably, because Columbia refused to take measures to effectively address the root problem—antisemitism, and the students and faculty who perpetrate it—its campus environment is no better following the suspension. The same students who organized and attended SJP and JVP's unauthorized hate-filled events continue facilitating the same on a near-daily basis.

202.    On November 15, Within Our Lifetime-United for Palestine ("WOL")—an extremist, antisemitic group that endorsed the October 7 terror attack on Israel and vocally supported Hamas—organized a rally to protest SJP and JVP's suspensions just outside of Columbia's gates where a Public Safety guard booth is located. SJP advertised the rally on its social media outlets. WOL's mission, much like its affiliates, is to "defend the Palestinian right to resist Zionist settler violence and support Palestinian resistance in all forms. By any means necessary. With no exceptions and no fine print." Hundreds of students marched past Gabe's dormitory, where many stopped to give Gabe and his roommate the middle finger upon noticing their Israeli flag in their window. On February 2, this happened again, as several hundred students marched past Gabe's dormitory chanting and holding signs such as "victory to the resistance." Gabe and his roommate had to take a different exit to get to Friday night services at Hillel to avoid the rally.

203.    A few days before, McNulty emailed GS Dean of Students Marlyn Delva the rally's flier, "voicing [her] heaviest concern for the safety for Jewish students once again that is put at risk with events that push harmful hate rhetoric."  In line with her response to McNulty's concerns—which proved to be well founded—about the November 9 rally, Dean Delva said that she would pass the information on to others in Columbia's administration.

204.    During the November 15 WOL rally at Columbia, agitators defaced hostage posters, chanted, "Israel bombs, USA pays, how many kids did you kill today," and held banners that said, "by any means necessary" and "resistance until return within our lifetime."  One Columbia Jewish student wearing a kippah was spit at by a WOL agitator, and mocked and harassed by others with threats like, "I hope you guys suffer" and "you guys think it's okay to kill innocent babies and bomb hospitals."  Rabban, Symonds, Rubin, Gabe, SCLJ Member #7, and other Jewish students were subjected to chants calling them "white supremacists," "genocide supporters," "baby killers," "terrorists," and "Nazis."  Since the rally was in front of Columbia's main gates, Rubin, an IDF veteran, had to walk through the crowd on his way to class as antisemites flashed signs describing the IDF as "savage."  This was not the first time Rubin felt discriminated against as an IDF veteran at Columbia.  For example, a graduate student, after finding out Rubin was in the IDF, asked him, "how many Palestinians have you killed?"

205.    During the hate-fest, Mahdawi addressed the crowd while standing next to WOL's co-founder and chairperson, Nerdeen Kiswani, who has called for Israel to be "wiped off the map."  During his speech, Mahdawi referred to IDF soldiers as terrorists, claimed Israel is an "apartheid state," led a chant of "from the River to the Sea," and thanked the "thousands" of agitators for rallying in support of SJP and JVP.

206.    At the same time as the WOL rally, Columbia faculty organized a walkout and demonstration on campus to likewise protest the suspension.

207.    Symonds, who found herself in the crosshairs of this faculty-led rally while walking through campus, was horrified by the rhetoric school employees were shouting to students using megaphones.  Rubin also observed the same crowd placing stickers around campus such as "Israel is committing genocide" and "Zionism is racism."

208.    On November 16, Symonds attended an event sponsored by a student group, SIPA Palestine Working Group, entitled "New Paradigm Shift in Palestine and Israel."  During the event, Professor Khalidi lectured for an hour to a room full of supporters, echoing his claims, such as Israel is merely using the war as a pretext to destroy Gaza.

209.    That same day, the student group Columbia Law Coalition for Free Palestine occupied Columbia Law School's lobby.  For nearly three hours, these students violated multiple policies, including by disrupting classes with a megaphone.  After students notified a Columbia University administrator, the students were eventually asked to leave the building but were not removed when they refused.

210.    On November 28, Yadegar met with President Shafik and reported that Jewish students were experiencing a hostile environment, in part because of SJP's and JVP's rallies.

211.    On November 30, SIPA hosted a panel discussion, "The War in Gaza: Constructive Campus Conversations," in Low Library.  CUAD disrupted the event by locking hands to form a "Hall of Shame" with two parallel rows of students lining the stairs to the building to heckle attendees while entering or exiting.  Using megaphones, CUAD student members shouted antisemitic chants like "from the River to the Sea."  Rather than disperse the

crowd, Columbia emailed SCLJ Member #5 and others that they should use a side door (which the mob later blocked as well).

212.    Once the panel started, the CUAD agitators further disrupted the event by loudly banging on the Low Library doors; Public Safety took no steps to stop them.  That day, Aryeh passed by the rally while she was on her way to a meeting with Dean Grinage.  During the meeting, she reported the rally to Grinage, and afterward, emailed Grinage a picture of the "Hall of Shame" and a social media post proving that SJP and JVP organized the rally.

213.    On December 5, JVP flouted its suspension by posting on the group's Instagram account, inviting the Columbia community to join JVP and SJP at on-campus events for each night of Hanukah.  A Columbia University spokesperson told *Jewish Insider* that the university had "communicated with JVP that this is an unsanctioned event by an unsanctioned student group"—yet JVP and SJP were still able to advertise and hold their event without intervention.

214.    That same day, the general body of the Student Governing Board voted "overwhelmingly to declare noncooperation with Columbia's Student Group Event and Procedure policy."

215.    On December 6, during a breakfast event with Barnard President Laura Rosenbury, Rabban voiced her concerns and frustration with the antisemitism Barnard permitted on its campus.  Rabban was particularly disappointed with Barnard's silence on Hamas's rape and sexual violence.  And despite Barnard being a staunch supporter of women's rights, it permitted students to chant and hold signs that read, "resistance by any means necessary." Rabban told President Rosenbury about how the violent and antisemitic chants were harmful and expressed they should not be allowed on campus and shared that she no longer felt safe on campus.

216.    Rabban also conveyed to President Rosenbury that her class options are limited because many of Barnard's professors assign antisemitic class materials.  President Rosenbury acknowledged that antisemitism was a "problem" on campus but dismissed Rabban's concerns, telling her she was sorry Rabban felt that way.  President Rosenbury did not speak of any concrete actions she planned to take in response.

**v.    Future Social Workers Stage Takeovers in Support of Hamas's Massacre**

217.    In the days after October 7, CSSW students flocked to group chats to justify "armed resistance," writing, "I don't believe at all that Hamas has committed any atrocities," and "[t]here is absolutely not a place to humanize the Zionist Jews slaughtering children."  In response, Jewish CSSW students turned to their DEI office for guidance and support.

218.    On October 10, SCLJ Member #3 met with Karma Lowe, CSSW Senior Associate Dean for DEI, Enrollment, and Community Engagement, to report the group chat messages.  SCLJ Member #3 spent the meeting in tears stressing the need for a Jewish affinity group at CSSW to provide safe spaces for Jewish students to grieve and process the trauma of October 7.  Instead, Dean Lowe told SCLJ Member #3 that CSSW would not recognize a Jewish affinity group without a Palestinian affinity group.  Because Lowe could not find a faculty member willing to serve as a facilitator for a Palestinian affinity group, CSSW never formed a Jewish affinity group.

219.    At the same time that Jewish students' pleas for help were being dismissed, CSSW permitted the formation of student groups, like Columbia Social Workers 4 Palestine ("CSSW4P"), which advocate violence.  Soon after its formation, for example, CSSW4P released a "Statement in Support of Palestinian Resistance," introducing its mission to

"[d]efend[] Palestinian resistance," and arguing that "[t]he word terrorism is misappropriated to classify anti-imperial efforts as immoral or barbaric."

220.    On November 1, CSSW Student Life emailed its rules for posting fliers, specifying that fliers need to be pre-approved.  CSSW4P and its members continue to flagrantly ignore those rules without punishment and plaster the school, including classroom chairs, bathroom stalls, balconies, and even the gaps in the benches, with propaganda, including the classic blood libel that Israel commits "murder, mutilation, [and] targeted attacks of civilians." As part of its campaign, CSSW4P members also wrote on classroom chalkboards "CU, stop funding genocide" and "divest from Israel's crimes."

221.    Because Columbia refuses to enforce its own policies, Jewish students, like SCLJ Members #1 and 2, have removed unauthorized posters and erased hateful messages on chalkboards.  SCLJ Members #1 and 2 have also turned such posters over to CSSW's security personnel so that security footage can be reviewed and responsible individuals identified.  SCLJ Members #1 and 2 have also reported ongoing poster campaigns to their deans and DEI office. Their complaints, however, continue to be dismissed.  When SCLJ Member #1 reported unauthorized posters to Lorenzo A. Shaw-Graham, CSSW Assistant Director of DEI, in November 2023, for example, he responded that removing posters or reminding students of the policy was "not [his] job."

222.    After it was formed, CSSW4P also began hosting a series of events framed as "sit-ins" and "teach-ins."  On November 8, for example, CSSW4P staged a sit-in to support "Palestinian resistance movements."  During the takeover, which disrupted classes for over nine hours, CSSW students passed out pamphlets praising the October 7 attack:

- "Al-Aqsa Flood [the October 7 terrorist attack] has proven to the world . . . you are not safe to enjoy your ill-gained comforts";

- "All people of an honest heart can relate to" October 7;

- The "capturing hundreds of Israeli settlers . . . sends a clear military message";

- "Israel has once again exposed itself before the world as a vicious dog" and "the question of putting such a dog down is painfully apparent";

- October 7 proved that "despite their facades, reactionaries bleed and die like anyone else";

- "It is harder, and requires more maturity and understanding to support [Hamas]";

- "[T]he Houthi resistance fighters in Yemen have launched long-range missiles at Israel"; and

- "Armed struggle is the sole path of conquering power for the people."

223.    Students also held "from the River to the Sea" signs while they chanted, "globalize the Intifada" and "by any means necessary," pounded drums, floors, and the walls, and blocked entrances and exits to the building.

224.    Rather than remove these disruptive, pro-terror students, CSSW offered to escort Jewish students to and from their classes.  SCLJ Member #1—whose request for a Zoom option that day because of safety concerns was denied—was terrified to walk through the takeover and had to be escorted to and from class.  Moira Curtain, CSSW Assistant Dean and Director of the Advising Department, also escorted students.

225.    SCLJ Member #2 was terrified when she arrived at CSSW for her afternoon class and witnessed the takeover.  She was reminded of the Nazi's "Final Solution" upon hearing her classmates chanting, "there is only one solution, Intifada revolution."  She also observed CSSW4P members following and chanting at Jewish students in an effort to intimidate and harass them.

226.     On November 29, CSSW4P hosted its first "teach-in," during which students falsely proclaimed that: Zionists "suppress[ed] Yiddish and Ashkenazi culture in the region . . . to replace this weak diaspora Jew with a new strong Israeli and Hebrew speaking Jew" because "they wanted to erase the language and history of Jews who had historically lived peacefully with Palestinians"; Israel treats Holocaust survivors poorly because Zionists believe if "violence is enacted upon you, then you're weak and you're a victim, and [Israel] cannot have that in this new culture"; the "founding ideology of Israel" is "necessary revenge" which "shifted from Germans to Arabs"; Jews kill babies that "might present future harm to Jews"; "Zionism is antisemitism"; Zionism is "fanatically racist in nature"; and Jews are "open to killing their own people to maintain power."

227.     On December 3, CSSW4P began advertising its second "teach-in" titled "Significance of the October 7th Palestinian Counteroffensive."  The event, according to CSSW4P, would feature a discussion on "the centrality of revolutionary violence to anti-imperialism."  The flier disseminated before the event depicted an assault rifle, which a CSSW4P member claimed "is associated with revolutionary struggle."  Immediately after seeing the flier, Kahane reported the event to the administration.

228.     The Individual Plaintiffs, SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and members of the public were shocked to learn about this event and its purpose.  Professor Davidai, for example, posted on X that "[v]ictims of rape should never have to worry that their social worker might view some victims as acceptable targets" and tagged Columbia and CSSW, writing: "THIS IS SCHOOL-FUNDED HATRED" and "IF YOU ALLOW THIS EVENT TO TAKE PLACE, YOU ARE COMPLACENT IN THE HATRED."  Dr. Mijal Bitton, a research fellow at the Shalom Hartman Institute of North America, also

shared the event flier, tweeting: "Imagine receiving services from a Columbia-educated social worker who believes burning families, killing babies, and gang-raping women is a 'counteroffensive' and 'revolutionary violence [central] to anti-imperialism.'"

229.    After learning of the planned event, SCLJ Member #3 emailed CSSW Deans Melissa Begg, Moira Curtain, and Karma Lowe, Senior Executive Vice President Rosberg, and CSSW Assistant Dean for Student Services Cheiku Camara, the event's flier and wrote: "CSSW4Palestine must be addressed as a hate group that has infiltrated our campus. . . . They have not formed a proper student group so that they can shirk responsibility for the damage they are causing to our community."  SCLJ Member #5 also emailed their deans, asking them to ensure the event would be shut down and its promoters reprimanded.  The deans assured SCLJ Member #5 that CSSW would not allow the event to proceed.

230.    On December 4, Dean Begg issued a statement about the event:

> We learned late last night of a flier and accompanying text being circulated about a December 6th event at the Columbia School of Social Work (CSSW).  This is not a CSSW-sponsored event.  The students who organized the event did not seek approval for the fliers and text as required by CSSW processes. . . . [L]anguage that promotes violence in any manner [] is antithetical to our values.  This event will not go forward at CSSW.

231.    On December 5, CSSW4P posted a flier for the event on its Instagram and stated: "Ain't nothing canceled y'all.  Stay tuned for updates tonight.  If you didn't hear it from us, disregard it."  That day, SCLJ Member #2 emailed several professors and deans, including Dean Begg, to alert them of this post and report her safety concerns.  None of the deans responded.  Contrary to Begg's assurances, the event did go forward.

232.    On December 6, starting around 12:00 p.m., Columbia University officials not only stood idly by as students and faculty took over the CSSW lobby, but aided them in their

efforts.  Before the event, Assistant Dean Camara ushered the event's organizers into the lobby

and then addressed the crowd to provide tips on how to shirk public backlash, including by

instructing the crowd not to record the takeover.  During the event, Camara directed a student-

employee to retrieve and distribute CSSW branded umbrellas so that students and faculty could

create a makeshift barrier to shield the speakers' identities.

233.    When SCLJ Member #1 first heard the commotion and realized it was the "teach-

in," she went to Dean Begg's office, but Begg's secretary did not let her into the office.  With no

one enforcing the supposed cancellation, one by one, student speakers espoused the kind of pro-

violence rhetoric previewed by the event's flier.  One student described Hamas's October 7

terrorist attack as "great feats":

> On October 7, the Palestinian Liberation fighters demonstrated their
> refusal to be dominated. . . . They showed us that through creativity,
> determination, and combined strength, the masses can accomplish
> great feats, a fact that we have seen in every heroic struggle for
> liberation, from Vietnam to Afghanistan.  As Mao says, "dare to
> struggle, dare to win."

234.    Another student speaker stated: "It is the blood of the pure martyrs and the heroes

. . . that will put an end to [this battle]" and then praised, "Hamas, the Popular Front for the

Liberation of Palestine, Islamic Jihad, the Democratic Front for the Liberation of Palestine . . .

[who] reached united armed struggle in Operation Al Aqsa Flood on October 7."

235.    During these speeches, students jabbed their open umbrellas at SCLJ Members #2

and 3, who were attempting to document the takeover.  On several occasions, when SCLJ

Member #2 attempted to reposition herself to see the speakers, the students would adjust their

umbrellas so her vision remained blocked.  SCLJ Member #2 was jabbed in the face with these

umbrellas throughout the takeover.  And when she attempted to move closer to listen to a group

of students huddled together, she was shoved by a larger student, who was holding a keffiyeh as a barrier to help shield speakers' identities.

236.    Columbia University officials who witnessed this conduct sought themselves not to be filmed.  At one point, an observer asked CSSW's director of security if the event was canceled.  The security officer, while asking not to be filmed, confirmed that the event as planned was canceled, but claimed the university could not prevent the event's attendees from gathering in the lobby.  At another point, a Columbia University official escorted a student out because he refused to stop recording the event, evidencing that Columbia can evict students when it wants.  Only after over roughly an hour of the "teach-in" did Assistant Dean Camara finally ask students and faculty to disperse from the lobby and ushered them into another area of the building.

237.    Shortly after the "teach-in," SCLJ Member #5 emailed President Shafik's office, asking what Jewish students should do to protect themselves, given that Columbia "cannot guarantee [their] safety"—"If you cannot shut down an event that was known in advance and had no authorization, what will you do when someone attacks?"  Twelve days later, President Shafik's office provided a generic response that Columbia is committed to ensuring the safety and well-being of its student and enforcing violations of its policies.

238.    On December 7, a student reported the event and Camara's behavior through Columbia's bias hotline.  SCLJ Member #2 detailed her experiences at the takeover to several of her professors during a meeting in January.  Yet Columbia has not disciplined the students who brazenly flouted Columbia's policies nor the administrators, like Camara, who aided them in doing so.

239.    Columbia's refusal to enforce its policies to protect Jewish CSSW students, despite their persistent pleas for help, is astounding.  Dean Lowe has been on "leave" since December, so Jewish CSSW students are stuck with Assistant Director Shaw-Graham, who continues to dismiss their concerns.  Jewish CSSW students have regularly met with Dean Curtain to detail concerns for their safety and well-being, but on February 2, Curtain began a three-week vacation.  Her automatic email reply referred students to Assistant Dean Camara, the same administrator who enabled incitement of violence and actual violence at the December 6 "teach-in."

240.    On February 8, 2024, CSSW's Jewish Caucus organized an "Emergency Antisemitism Roundtable."  The Jewish Caucus invited various CSSW administrators and faculty; Dean Begg, however, did not attend, nor did any representatives of CSSW Student Affairs.  Deans Curtain and Lowe both responded with out-of-office emails, even though they could have attended via Zoom.  One professor was unable to attend because she was purportedly "commuting home" during that time.  Assistant Director Shaw-Graham attended for a portion on behalf of the DEI office and actively dismissed student concerns.  Assistant Dean Camara attended but said nothing, let alone explain his conduct during the December 6 takeover.  During the event, multiple faculty admitted that CSSW is not safe for Jewish students.

241.    On March 28, CSSW's DEI office hosted a "Trans Day of Visibility" panel. During the panel, the panelist stated Zionists were "stealing her joy," equated Zionists to homophobes, and promoted "pinkwashing," an antisemitic conspiracy theory that Israel touts its inclusiveness of the LGBTQ+ community to distract from its supposed mistreatment of Palestinians.

242.     Jewish students at CSSW, like SCLJ Members #1, 2, and 3, maintain a list of professors classified as "not friends of the Jews," "complicated," "undecided," or "friends of the Jews."  The number of professors considered "friends of the Jews" is close to the number of those that are hostile toward Jews.  Jewish students are thus deprived of access to Columbia's full course catalog available to their non-Jewish classmates if they want to avoid antisemitic discrimination or harassment from professors.

> **vi.     SJP and JVP Continue to Organize and Stage Yet Another Rally Despite Their Suspensions**

243.     On December 8, in violation of the terms of its suspension, SJP commandeered a table reserved by another student group to distribute pamphlets saying, "from the river to the sea, Palestine will be free."

244.     On December 9, SJP and JVP announced a December 11 rally at Barnard to demand that President Rosenbury publicly call for a permanent ceasefire between Israel and Hamas.  In anticipation, Sarah Gillman, Senior Vice President Strategic Finance and Operations at Barnard, and Dean Grinage warned students: "We have been made aware of a protest planned on the Barnard campus for Monday afternoon.  This protest has not been authorized. . . . [T]his, and any unauthorized protest or event, is not permitted."

245.     Undeterred, on December 11, Columbia students gathered in the Barnard Quad and on the Milstein Center terrace, then marched to Futter Field on Barnard's campus where they were joined by more students who had been attending another rally on the Low Library steps.  Doe could hear chants from his dormitory room, including, "Zionism will fall" and "we don't want Zionists here."  Doe tried to travel to a library, but Columbia had blocked the nearest route.  Doe was surrounded by marching students, and while attempting to get past them, students commented "what is he doing here?"  Throughout the Barnard rally, over one hundred students

chanted, "Intifada, Intifada, long live the Intifada," "from the River to the Sea," and, in Arabic, "from water to water, Palestine is Arab." At least one Jewish student was physically assaulted at the rally.

246.     Zuckerman was studying in Milstein Library but the constant chants made it impossible to focus. She left shortly thereafter and found the rally overwhelming and unsettling, especially because she recognized several classmates in attendance. Rabban was so overwhelmed by the sheer number of people chanting anti-Jewish hate outside Milstein Library, that she immediately started crying and left. Before leaving, she saw Dean Grinage at the rally, and felt frustrated that Dean Grinage did not intervene to stop it. Sandler held her calculus office hours on Barnard's campus during the rally and was forced to walk through the bushes just to safely access the math help room.

247.     When Ruttenberg left class, she had no choice but to walk through the rally. Once there, she saw Jennifer Fondiller, Barnard's Vice President for Enrollment and Communications. Ruttenberg approached Fondiller and told her she was terrified by the rally. Fondiller shrugged and responded that it is easier to let it happen than to stop the rally.

248.     During the rally, SAA Member #4 looked for Jennifer Rosales, Barnard's Vice President for Inclusion and Engaged Learning and Chief Diversity Officer, with whom she had spoken previously about her experiences on campus, but she was not in her office. SAA Member #4 later learned Rosales was on campus supporting the student agitators. SAA Member #4 has seen her professors at numerous rallies throughout the year, which made her feel she had no support system with Barnard's faculty.

249.     SCLJ Member #7 first heard the chants from her Barnard residence hall. Although she felt unsafe leaving, she had to walk through the rally to attend a class. While

traversing campus, she was disturbed that faculty participated in genocidal chants.  She was relieved to identify Dean Grinage at the rally, and asked her if Public Safety would shut it down. Dean Grinage responded that Public Safety was instructed to permit the rally, and if SCLJ Member #7 was uncomfortable, she could return to her residence hall.  Fearing for her safety, SCLJ Member #7 returned to her residence hall, where she was unable to escape the terrifying sound of the rally.

250.     After the rally, SCLJ Member #7 emailed President Rosenbury's office to report it, provide her firsthand account, and express that Jewish students "feel incredibly unwelcome and unsafe on our own campus" and are "disappointed in the lack of responsiveness to a planned unauthorized rally on campus."  President Rosenbury's office replied: "We appreciate your reaching out to share your thoughts, experience, and feedback. . . . Please know we take your concerns seriously and want to ensure that you have access to Barnard's spaces, support, and resources."  The email incredulously lauded Barnard's efforts to "ensure students' safety" during the rally, even though Dean Grinage admitted that Public Safety could not intervene safely, failed to commit to holding accountable those responsible, and merely referred SCLJ Member #7 to online resources and community programs.

251.     Bellows was in class when the rally started at Barnard, and had trouble focusing because the mob outside was banging drums, banging on classroom windows, and chanting.  Her professor continued teaching but she could not hear her over the rally outside.  When class ended, Bellows had to walk through the rally to exit campus.  She, along with two other visibly Jewish students, noticed Dean Grinage and other administrators at the rally not taking any action to stop it.  When they asked her why she was not stopping the rally, Dean Grinage told them there was nothing she could do.

252.    Even though SJP and JVP were suspended and were advocating violence against and the destruction of Israel and its people, Columbia did not shut the rally down.  And despite several Barnard deans passing by and Dean Grinage attending, the rally continued unabated. Aryeh still saw classmates on campus who boasted about their participation on social media.

### vii.    Violent and Exclusionary Anti-Jewish and Anti-Israeli Rhetoric Escalates in the Spring 2024 Semester

253.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members allowed themselves to hope that when they returned from winter break, Columbia would finally remedy its antisemitic hostile campus environment.  They were disheartened that at one of the first major rallies of the new semester, Columbia, once again, refused to enforce its rules against "language that promotes or supports violence," including "[c]alls for genocide against the Jewish community," among other policies.  As Mahdawi told the *Columbia Spectator*: "The administration has been betting on us calming down and getting busy and forgetting about it. . . . [W]e come stronger every time after a break."

254.    On January 19, 2024, Barnard held a "Day of Dialogue," a town hall style event "designed to address [] challenges, promote respectful dialogue across [] differences, and affirm [Barnard's] commitment to being an inclusive community."  To encourage attendance, Barnard canceled classes and held a raffle.  Barnard's administrators invited as a speaker Hatem Bazian—who infamously has stated that "it's about time we had an Intifada in this country," called for the dismantling of Israel, co-founded SJP, and founded and chairs AMP, which is under government investigation for providing material support to Hamas.  In defending the invitation, a Barnard spokeswoman praised Bazian as a "renowned scholar" who could help students "examine all viewpoints."  During the town hall, CUAD, SJP, and JVP members marched through a Barnard building to disrupt the event.

255.     The day before, Ruttenberg emailed Dean Grinage reporting an emergency rally planned for the next day and stated she was scared of attending the Day of Dialogue.  Dean Grinage responded, "[w]e are also aware of a planned protest on the steps of Low . . . we will monitor the activities at Low so that we can respond accordingly as needed on our own campus."

256.     SAA Members #1 and #4 attended the Day of Dialogue.  During one event, the male speaker told the audience that there was not enough evidence to prove Hamas sexually assaulted Israeli women on October 7.  SAA Member #4 was in disbelief that at an event at a historically women's college with classmates constantly encouraging others to "believe women," not one administrator or moderator responded to or stopped the speaker or sent an email after the event.  After the speaker finished, SAA Member #4 told one of the organizers she was extremely disappointed and disgusted by the speaker's behavior and Barnard permitting him to continue speaking.  The organizer thanked her for her feedback and said she would send a feedback form.  SAA Member #4 never received a feedback form.

257.     Later that day, CUAD held a "Divestment Now" rally at Low Library which was promoted by the supposedly suspended SJP and JVP.  Around 1:00 p.m., hundreds of Columbia students gathered on the steps of Low Library, where they kicked and knocked over metal barriers surrounding the Alma Mater statue and chanted: "there is only one solution, Intifada revolution"; "we will honor all our martyrs"; "if we don't get no justice, then they don't get no peace"; and, in Arabic, "from water to water, Palestine will be Arab."  Students also proclaimed their support for the Houthis—whose slogan is "Death to America, Death to Israel, curse the Jews and victory to Islam" (and who recently executed people they accused of homosexuality)— just two days after the U.S. State Department designated them a global terrorist group, chanting and holding signs that said, "Yemen, Yemen, make us proud, turn another ship around."

Westergaard heard and saw these chants and signs from the entrance of the Chemistry building. Molly was attending a vigil at the steps in front of Low Library when Public Safety asked her and the other Jewish students to relocate from the steps. Yet shortly after they moved, a pro-Palestinian rally formed in the same spot in front of Low and was not asked to move.

258. Several students advanced on the pro-Israel and Jewish students in attendance, blocking them with Palestinian flags. A Public Safety officer had to intervene when Mahdawi— the same organizer who was previously reported for his intimidation of Jewish students on November 9—encroached on and shouted through a megaphone at Jews and other Israel supporters. Although a Columbia University official acknowledged to the *Columbia Spectator* that "this was an unsanctioned event held by an unrecognized student coalition and that is a violation of university policies and procedures," Columbia did nothing to prevent the rally from occurring, remove attendees, or discipline CUAD's members. In fact, not only did Columbia tolerate the unsanctioned event, but Columbia faculty actively participated in it, including members of the Faculty and Staff for Justice in Palestine ("FJP"), which was organized in support of SJP and JVP.

259. A few days later, on January 24, CUAD, SJP, and JVP organized a walkout titled "No Safety Without Divestment." In anticipation, Columbia restricted campus to CUID holders, despite this proving unsuccessful in maintaining order during the previous semester's rallies. Over one hundred students walked out of their classes and gathered at the center of campus to chant, among other things: "if we don't get no justice, then they don't get no peace"; "Intifada, Intifada, long live the Intifada"; "from New York to Gaza, globalize the Intifada"; and, in Arabic, "from water to water, Palestine will be Arab." Students also held signs that said, "Yemen, Yemen make us proud, turn another ship around." The students also chanted, "we

don't want no IOF here" and "IOF off campus now," in reference to Columbia's IDF veterans (IOF is an antisemitic term for IDF, meaning "Israel Occupation Forces"). Because of mandatory military service in Israel, this is the equivalent of calling for Israelis not to be permitted on campus. Rabban, whose father is Israeli and who has many family and friends in the IDF, was particularly impacted by the "IOF" chants, as everywhere she looked, her friends and family were called "terrorists," including by classmates that she thought were her friends.

260.    During the rally, Mahdawi once again espoused violence. Using a megaphone, he glorified martyrdom, claiming that "there is nothing-nothing more honorable than dying for a noble cause." Doe was traveling to his dormitory when he came upon this scene. While maneuvering through the mob around the Low Library steps, Maryam Iqbal, a prominent SJP and CUAD organizer, stopped Doe and asked him, "why are you here?" When Doe questioned what she meant, Iqbal responded, "are you here as a Jew?" Doe again asked Iqbal what she meant, to which Iqbal asked, "well do you support Israel?" When Doe answered in the affirmative, Iqbal said, "well we're fighting against you." When the mob marched past Butler Library, Gerstein was blocked from entering. When the rally ended, students promised to continue their efforts, chanting, "we'll be back."

261.    Jewish students and faculty were scared and frustrated by Columbia's continued refusal to protect them. Professor Davidai tweeted: "Columbia knows *exactly* who are the organizers of these pro-Hamas protests. Columbia knows *exactly* who are the organizers that repeatedly break the school's rules. It's not that Columbia can't do anything. Columbia is *choosing* not [sic] to do nothing."

262.    In a *Democracy Now!* interview the next day, Katherine Franke, James L. Dohr Professor of Law at Columbia Law School, suggested that the mere presence of Israeli students

on campus is cause for concern, stating: "Columbia has a program.  It's a graduate relationship with older students from other countries, including Israel.  And it's something that many of us were concerned about, because so many of those Israeli students, who then come to the Columbia campus, are coming right out of their military service."  Franke has previously refused to write reference letters for students seeking jobs or internships in Israel and has been supporting and advising SJP and JVP during their suspensions and CUAD.  Gal understood Franke's comments to apply to Israelis in general, since service in the IDF is mandatory.

263.    A Columbia University spokesperson acknowledged in a statement to *Haaretez* that Professor Franke's statements are "antithetical to Columbia's values and can lead to acts of harassment or violence."  In May 2024, Task Force Co-Chair Professor Schizer told the *Wall Street Journal* that Franke's comments were "problematic, not just morally but also legally." Despite these statements, Columbia University has not disciplined Professor Franke.

264.    On January 26, CUAD, SJP, and JVP shared a tweet on their Instagram pages: "can we now say that . . . we've matured past the point where we genuinely believe that pacifist and diplomatic efforts to save Palestine will actually work?  revolution and armed resistance is the only thing that'll save Palestine."  Although Columbia's "rules of conduct do not allow or condone language that promotes or supports violence in any manner," like the many before it, the groups' open call for "armed resistance" has gone unpunished.

265.    That same day, SCLJ Member #5 attended President Shafik's "Listening Forum." SCLJ Member #5 was eager for this opportunity, but much to their dismay, President Shafik misappropriated the Listening Forum to deflect Jewish students' concerns.  During the forum, SCLJ Member #5 told President Shafik that Jewish students feel unsafe on campus and, because of Columbia's inaction, are often forced to avoid class, certain buildings, and campus altogether.

President Shafik responded by pointing to Columbia sponsored events, like the November 30

SIPA panel discussion, yet failed to acknowledge that Columbia allowed the panel discussion to

be overrun by agitators, causing Jewish students, like SCLJ Member #5, even more distress.

Ultimately, President Shafik made the troubling suggestion that Columbia should prepare

incoming students to be "more resilient" to the campus environment.

266.     During the Listening Forum, President Shafik also falsely claimed that an alleged

incident involving a stink bomb at CUAD's January 19 rally was the only physical attack on

campus since October 7.  In reality, several Jewish and Israeli Columbia students have been

assaulted on or adjacent to campus at events organized by Columbia students.  Even though the

NYPD's investigation is still ongoing, President Shafik gratuitously referred to the alleged stink

bomb incident as a "chemical attack."  During a February 16 Listening Forum attended by SCLJ

Member #4, President Shafik again referred to this incident as a "chemical attack."  In fact,

President Shafik has known for months that the substance involved was an odorous spray and not

a chemical yet has failed to correct the record to the Columbia community.

267.     On January 31, posters resembling Nazi propaganda were plastered around

Columbia's campus.  The posters contained an image of a blue and white skunk with an Israeli

flag imprinted in its fur next to the words "Beware!  Skunk on Campus" and "brought to you in

collaboration by Columbia University and the IOF."

268.     Around this time, student and CUAD organizer Khymani James'—who would

later become one of the leaders of the April 2024 encampment—livestreamed a meeting with

Columbia's Center for Student Success and Intervention ("CSSI"), the purpose of which was to

discuss the possibility of disciplinary action for disturbing comments James had made regarding

"Zionists" on social media, including: "Zionists in my DM, wanting to meet up and fight.  I don't

fight to injure or for there to be a winner or loser, I fight to kill.  See y'all in New York January

2024."  James also posted a screenshot of direct messages with text overlaying it that suggest

James carries a gun: "Yeah I CARRY that tool[.]  Get a taste[.]  I'm moving like I'm in an

OPEN CARRY STATE[.]"  When asked by Columbia administrators during the meeting if

James could "see why that's problematic in any way," James replied, "no."  James then told the

administrators that "taking someone's life in certain case scenarios is necessary and better for the

overall world," and "there should not be Zionists anywhere.  Zionists are Nazis."  Turning to the

camera when the administrators were on a break, James proclaimed, before breaking out into

hysterical laughter, "the meeting's a joke.  They definitely were hoping that I was going to walk

back the 'I fight to kill.'"

269.    During the meeting James also expressed: "Zionists, along with white

supremacists, need to not exist"; "be grateful that I'm not just going out and murdering Zionists";

and "Zionists don't deserve to live."  Columbia did not remove James from campus—Columbia

administrators even recognized James as one of the leaders of the encampment and negotiated

with him—until April 26, exposing Jewish students to months of further harassment by James

and CUAD.

270.    On February 2, WOL returned to Columbia for an "All Out for Palestine at

Columbia University" event, which was also organized and promoted by CUAD, SJP, JVP, and

Samidoun.  Samidoun is designated by the Israeli Ministry of Defense as a terrorist organization

and was banned in Germany in October 2023 for "disseminat[ing] anti-Israel and anti-Jewish

propaganda" and "support[ing] and glorify[ing] various foreign terrorist organisations, including

HAMAS."  Samidoun has had its funding blocked by U.S. credit clearing companies for its

alleged terror-related activities.

271.    A few days earlier, SCLJ Member #5 reported the upcoming event in an email to President Shafik's office, the Task Force, and Public Safety wherein they detailed WOL's hateful and violent history and expressed concern for the safety of Jewish students.  SCLJ Member #5 received no substantive response.

272.    Starting around 3:00 p.m., hundreds of agitators, including students and faculty, gathered in front of Columbia's gates.  The mob chanted: "we will honor our martyrs"; "there is only one solution, Intifada revolution"; "globalize the Intifada"; "settlers, settlers, go back home, Palestine is ours alone"; and "from the River to the Sea."  Agitators held up signs that said: "expel IOF terrorists from Columbia"; "by any means necessary"; "Israel has managed to turn Jews into Nazis!"; and "victory to the Palestinian resistance."  There were also trucks with billboards claiming that "Israel is the new Nazi Germany," repeating the blood libel that "Israel steals Palestinian organs," and displaying images of Hitler next to President Biden.  That afternoon, Doe was forced to take an alternative route to get a meeting in Butler Library.  While traveling through the WOL rally, he heard chants of, "go back to the gas chambers."

273.    At one point, the mob began marching down Broadway in front of a Columbia building where a Jewish student wearing a shirt with an Israeli flag was confronted.  One agitator saw the student's shirt and told the group to spread out and block his path before pushing and pinning the student against the wall of the Columbia building while the rest of the crowd surrounded him.  After the student broke free, the group chased after him yelling, "keep fucking running."

274.    SJP shared to Instagram that FJP participated in the rally, and Mahdawi vowed to continue organizing these riots, remarking after the rally, "we are not backing down."  The NYPD arrested several individuals, including at least one Columbia student.

275.    On February 8, CUAD, SJP, and JVP organized yet another walkout.  Columbia again merely restricted campus to CUID holders, permitting approximately fifty students to gather in the center of campus, where they created antisemitic propaganda and obscenity laden signs disguised as "art," such as "Zionists get no bitches," while using amplified sound to chant: "globalize the Intifada"; "there is only one solution, Intifada revolution"; "resistance is justified when people are occupied"; "Israel is a racist state"; "Israel is a fascist state"; "Israel is a terrorist state"; "from the River to the Sea, Palestine will be free"; "Palestine is our demand, no peace on stolen land"; "Yemen, Yemen, make us proud, turn another ship around"; "it is right to rebel, Israel go to hell"; and, in Arabic, "from water to water, Palestine will be Arab" and "Palestine, free, free, Zionists go out."

276.    Columbia Professor Joseph Howley spoke into a megaphone purportedly on behalf of FJP, espousing antisemitic conspiracy theories that Israel is directly "destroying the culture and reputation" of Columbia; and that Israel destroys Palestinian libraries "because they want to destroy its memory and its past."  Professor Howley also encouraged students to continue ignoring Columbia's policies by "showing up" for the unsanctioned rallies.

277.    Following the Columbia rally, Columbia University Professor and Task Force member Gil Zussman posted on X: "Cat is out of the bag: dozens of Students for Justice in Palestine chant 'From the river to the sea Palestine will be Arab' & other horrible chants about the 'Yahood' (Jews)."

278.    Less than one week later, on February 13, CUAD and SJP led roughly one hundred students in another rally on campus unopposed by Columbia.  During the rally, students dyed red the snow-covered lawns in the center of campus to symbolize blood.  They also chanted, using megaphones: "there is no safe place, death to the Zionist state"; "we don't want

two states, we want all of it"; "if we don't get no justice, then they don't get no peace"; "no peace on stolen land"; "Israel is a terrorist state"; and, in Arabic, "Jews out."  Students also harassed and intimidated a student holding an Israeli flag, blocking him and blasting sirens in his direction.  The students eventually marched around campus, culminating in a blockade at the entrance of Butler Library, where they broke the glass of a library door and promised to continue their efforts, shouting, "the more you try to silence us, the louder we will be."

279.    In response to the rally, Professor Zussman posted on X: "Another day, another unapproved demonstration with hate speech."  Disturbingly, on an SJP Instagram post bragging about the rally, an individual commented, "Plant a bomb tbh."

280.    Even with advance knowledge of these rallies, which violate numerous provisions of Columbia's policies and are organized by suspended student groups, Columbia refuses to stop them and curtail the pervasively hostile environment for Jewish and Israeli students.

281.    On February 29, Barnard emailed students that vandalism "will not be tolerated" in response to a string of pro-Hamas graffiti—"student dissent does not require authorization," "Gaza will live," and "RESIST BY ANY MEANS NECESSARY" with an upside down red triangle—in Barnard bathrooms.  The inverted red triangle has been used in videos by Hamas to identify Israeli military targets.  The email did not reference antisemitism.  On March 5, a bathroom stall at Barnard was spray-painted "LONG LIVE THE INTIFADA."

282.    At a February 29 bipartisan roundtable on campus antisemitism commissioned by the House Education Committee, Yadegar shared that at Columbia, the same Jew hatred that drove her family out of Iran was normalized, and that antisemitism has corrupted and impacted Columbia's campus, classrooms, student groups, online spaces, and even Hillel (which was vandalized with "LONG LIVE the PALESTINIAN ARMED STRUGGLE").  For example,

Yadegar intended to complete her Middle East Studies major requirements in the spring 2024 semester by taking a course on Israel, but the only course available was taught by Professor Massad.  On June 3, Yadegar submitted an EOAA complaint about MESAAS' discriminatory curriculum.

283.    On March 6, students set up a table in Lerner Hall with a banner that said, "Zionism is treif [unkosher]," which Aryeh reported to Public Safety and President Shafik's office.  Students passed out pamphlets from a table in Lerner Hall later that day calling to "globalize the Intifada" and stickers that said, "Zionism is Terrorism."

284.    On March 21, while Yadegar was at a table on campus with a sign that said, "I'm a Zionist, ask me why," she was accosted by students who called her "disgusting," a "white colonizer," and screamed that she should be "ashamed" of herself.

> **viii.    Columbia Students Host Event Supporting Terrorism on Columbia's Campus**

285.    On March 24, CUAD and WOL co-hosted "Resistance 101," an unsanctioned campus event that featured speakers from organizations with confirmed ties to the U.S.-designated terrorist organization Popular Front for the Liberation of Palestine ("PFLP"), including Samidoun and Masar Badil.  Masar Badil, also known as the Palestinian Alternative Revolutionary Path Movement, has supported the invasion of Israel, labeled October 7 as an act of "heroic Palestinian resistance," and hosted events with Hamas leaders.

286.    According to the flier advertising Resistance 101, which was promoted on Instagram by various Columbia student and faculty groups including FJP, and featured an image of a Palestinian boy throwing stones at an Israeli tank during the Second Intifada, the event was scheduled to take place in-person (with an online stream) at the Barnard Center for Research on Women, which provided logistical support by agreeing to host the event.

287.    On April 17, President Shafik testified before Congress at the Columbia Hearing. When President Shafik was asked about Resistance 101, she testified "we did not allow that event to happen," and that after Columbia University and Barnard declined to approve the event, it was "decamped to a dorm room" where it was held online.  She testified the administration only learned of the event that day and "immediately" contacted the FBI.  Yet the event was promoted on March 22, several days before.  Despite being supposedly unsanctioned and unapproved, the terrorism recruiting event took place in a dormitory and streamed via Zoom.

288.    During the event, speakers expressed their explicit support of Hamas's use of violence and "armed resistance" against Israel, and repeated that the student protests on Columbia and other campuses should and do operate as direct support for Hamas in its activities. The speakers, including Charlotte Kates, a leading member of Samidoun; her husband, Khaled Barakat, a spokesperson for the PFLP who in November 2023 called for Israel to be replaced; Nerdeen Kiswani, co-founder and leader of WOL, who has expressed full, unabashed support for all forms of "resistance" against Israel, regardless of the brutality of the violence; and Sean Eren, a member of National SJP, spent nearly two hours proclaiming their support for terrorism.

289.    Kates began by describing how "October 7th changed the world [because] [o]n October 7th, we saw the potential of a future for Palestine liberated from Zionism by the force of the Resistance."  Kates praised the Iranian regime for doing its utmost to "free Palestine from Zionism" and told the students: "It is incumbent on us that when we do go out and speak at demonstrations, and we do go out and organize, to say that we stand with the Palestinian armed resistance.  And we support them.  And that this is a struggle that we want to be part of."  She also told students that the "Palestinian resistance's" actions on October 7 were "earth-shattering,"

"necessary," and that "there is nothing wrong with being a member of Hamas, being a leader of Hamas, being a fighter in Hamas."

290.    Barakat, a leader of Samidoun, who has said that he "wish[ed] ISIS would fight the Zionists" and is banned from entering Germany due to his support for terror, drew parallels to the October 7 attack and the PFLP's terrorist hijacking attacks in the 1960's and 1970's, which he praised as "heroic" and "one of the most important tactics that the Palestinian resistance have engaged in."  He emphasized that it was "really important to see how the Al-Aqsa Flood [the October 7 Hamas attack] operation ha[d] liberated the Palestinian inner strength" and inspired "new generations that today are getting involved in the struggle and it's so visible in the US, Canada, Europe and elsewhere. . .a new generation that is actually leading our struggle in the diaspora."  He also relayed to students that he spoke with his "friends and brothers" in Hamas, Islamic Jihad, and the PFLP, and that "when they see students organizing outside Palestine, they really feel that they are being backed as a resistance and they're being supported.  Every demonstration in New York matters for Gaza.  Your work is so important to the resistance in Gaza, more than ever."

291.    Kiswani, who as leader of WOL has led countless anti-Israel rallies at Columbia and across New York City, called on students to openly embrace the October 7 attack as "resistance."  She told students: "Don't acquiesce to the idea [of], well, 'Oh, [Hamas is] considered a terrorist organization, so we shouldn't talk about resistance. . . . We have the right to return home, and we will get that right by any means necessary."

292.    Four days after Resistance 101, Columbia Chief Operating Officer Cas Holloway issued a statement that Columbia was investigating the unsanctioned and unapproved event, that the outside speakers were banned from campus, and that Columbia would pursue discipline

against those who violated policies.  At the Columbia Hearing, President Shafik testified that

"all" of the students who organized Resistance 101 had been suspended.  Yet Columbia's own

reporting revealed that was inaccurate.  Congressman Wilson said at the Columbia Hearing, "the

documents Columbia produced to the committee shows the University only suspended three

students for antisemitic incidents between October 7th and March 24, with the Resistance 101

event," and that "[a]ll three of those were lifted or reduced to adjudication," including a student

who repeatedly harassed students, screaming "F the Jews."  Additionally, "of the ten suspensions

that came in response to the Resistance 101, five were lifted because Columbia determined they

were not involved."  Indeed, some of the students purportedly suspended were seen participating

in the campus encampment weeks later.

293.    On April 3, CUAD published an "emergency communication" for its supporters

advising them to "show up" at a protest the next day to "take back [Columbia]" "to show [their]

unconditional solidarity with Palestine."  CUAD also recommended students take measures to

conceal their identity, such as covering up tattoos and piercings, wearing nondescript clothing

and shoes, and not swiping CUIDs on campus to avoid identification by scanning records.

294.    On April 4, CUAD co-sponsored an unauthorized rally at Columbia, "All Out for

Al-Shifa," referring to a hospital in Gaza.  During the rally, CUAD distributed fliers outlining its

goals, including, "financial divestment from Israel, an academic boycott of Israel, stopping the

displacement of Palestinians, defunding policing on campus, and calling for an immediate and

permanent ceasefire."  Students held signs that said, "from the River to the Sea, Palestine will be

free," and chanted, "say it loud, say it clear, we don't want no Zionists here."  During the rally, a

Jewish student overheard a Public Safety officer on the phone say, "the Jews have been

oppressing Palestinians in Gaza for years."

295.   That day, a swastika was drawn in a bathroom in Havemeyer Hall—the exact bathroom next to McNulty's classroom she had been in a few hours earlier.

296.   In the days before the rally, President Shafik emailed all students threatening disciplinary action.  At least one student supposedly suspended and evicted from campus for her involvement with Resistance 101 was back on campus on April 4 as a speaker at the rally.

297.   On April 5, less than two weeks before the Columbia Hearing, President Shafik published a statement concerning Resistance 101 and the April 4 rally.  She confirmed that even though Resistance 101 was barred twice from occurring, it did indeed take place and "featured speakers who are known to support terrorism and promote violence."  The statement also confirmed that the April 4 rally was an "unapproved event near academic buildings in violations of [Columbia's] rules and policies," and that students who participated would be identified and disciplined.  This unapproved rally—and others—occurred after and despite the Task Force's recommendation that Columbia "do more to stop unauthorized protests as they occur."

### ix.   Columbia University Administrators Testify Before Congress and Admit to Antisemitism Problem on Campus

298.   On April 17, President Shafik, Columbia University Board of Trustees Co-Chairs Claire Shipman and David Greenwald ("Co-Chairs"), and Task Force Co-Chair Professor Schizer testified before the House Education Committee at the Columbia Hearing.

299.   All four gave opening statements unequivocally acknowledging that the antisemitism Jewish students have faced at Columbia is "unacceptable."  President Shafik claimed to be fully aware of the devastating effects that the events of October 7 would have on Columbia's campus, acknowledging that "on October 7th the world changed . . . Israel was brutally attacked by Hamas terrorists, and very soon it became clear that these horrific events would ignite fear and anguish across our campus."  Despite this forewarning, Shipman admitted

that Columbia's "systems clearly [were not] equipped to manage the unfolding situation." Professor Schizer described some of the antisemitism Jewish students have experienced, acknowledging that "being a Zionist should not disqualify anyone from a dance group, or a theater production," and describing this "signaling that Jews are accepted only if they reject a core part of their religion and identity" as "old-fashioned bigotry." He also agreed with what Jewish and Israeli students, such as the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, have complained of for months: Columbia "needs to avoid double standards. When Jewish students complain that speech makes them uncomfortable, they should get the same treatment as other groups."

300. President Shafik and the Co-Chairs were also asked about the rallies and demonstrations on campus. President Shafik was specifically asked whether the chants, "by any means necessary" and "Intifada revolution[]" violated Columbia's policies. President Shafik refused to recognize that this language violates Columbia's rules. Instead, she said she "hope[s]" that the Task Force would help "actually clarify where language crosses the line from protected speech to discriminatory or harassing speech." Yet Columbia's policies do prohibit discrimination and harassment and as Professor Schizer, a legal scholar, testified, "free speech doesn't extend to harassment and discrimination."

301. When asked whether mobs shouting "from the River to the Sea" or "long live the Intifada" qualify as antisemitic comments, President Shafik replied: "I hear them as such. Some people don't."

302. Throughout her testimony, President Shafik revealed her lack of understanding of the reality of antisemitism. According to her, antisemitism is defined as "any discrimination against people for their Jewish faith." But, as Professor Schizer testified, antisemitism is broader

than President Shafik's definition.  According to Schizer, antisemitism is "bias against Jewish people, which can manifest as ethnic slurs, stereotyping, Holocaust denial, double standards as applies to Israel and antisemitic tropes."

303.    When asked if there had been any "anti-Muslim" or "anti-Arab" demonstrations on campus, President Shafik evaded the question and instead responded that "there have been many pro-Israeli demonstrations."  When pressed, she reiterated that she had seen "pro-Israeli demonstrations on campus."  When asked if she had seen any protests "against Jewish people," President Shafik said, "no," directly contradicting the numerous antisemitic rallies discussed at that very hearing.  When Professor Schizer and the Co-Chairs were later asked if they agreed with President Shafik that there have been no "anti-Jewish protests," they disagreed, and testified that there have been many antisemitic protests at Columbia.  When asked to clarify her earlier answer, President Shafik backtracked, stating that no protests had been "labeled as an anti-Jewish protest," but that "anti-Jewish things were said at protests."

304.    President Shafik's testimony was riddled with many other inconsistencies when, for example, she was asked about disciplinary action taken against faculty who were the subjects of complaints of antisemitism.  Both Co-Chairs agreed that Professor Massad would not be approved for tenure if the decision were being made now.

305.    President Shafik's testimony shined a spotlight on the double standard at Columbia regarding the way antisemitism is addressed compared to other forms of discrimination.  Throughout the hearing, President Shafik refused to give direct answers and often evaded questions.  When asked, "would this be tolerated, this treatment of black Americans for one second on Columbia's campus," she did not hesitate to respond, "absolutely not."

F.     **Pro-Hamas, Antisemitic Demonstrators Occupy Columbia University's South Lawn**

306.    During the evening of April 14, Columbia emailed that beginning at 8:00 a.m. Monday, April 15, access to the main campus would be restricted to CUID holders, with only three of the entrance gates open, out of, "an abundance of caution based on information received about activities that may impact campus this week."

i.     **April 17**

307.    In the early morning hours of April 17, at the direction of CUAD, SJP, and JVP, hundreds of Columbia students descended on the South Lawn in front of Butler Library, and erected roughly sixty tents to establish what they labeled a "Gaza Solidarity Encampment."

308.    The encampment was plastered in signs such as "WHOEVER IS IN SOLIDARITY WITH OUR CORPSES BUT NOT OUR ROCKETS IS A HYPOCRITE AND NOT ONE OF US[.]  UNTIL VICTORY[.]"; and "A MESSAGE TO THE SCUM OF NATIONS AND PIGS OF THE EARTH: PARADISE LIES IN THE SHADOW OF SWORDS. GLORY TO HE WHO MAKES THE OCCUPIER TASTE BITTERNESS."  Students chanted, "say it loud, say it clear, we don't want no Zionists here."  Photos of the encampment inundated social media, including some with paragliders photoshopped landing on the South Lawn to mimic one of the methods Hamas terrorists used to invade Israel on October 7.

309.    As President Shafik was testifying before Congress that day, the encampment grew.  Several hours after establishing the encampment, CUAD posted an "URGENT" call to action on Instagram, requesting students "MOBILIZE" and "SHOW UP IN NUMBERS," asking individuals to "surround and protect the encampment," soliciting food donations and Venmo payments to cover "legal fees" and "supplies," and encouraging students to email their professors to advocate "hold[ing] class on the lawn in solidarity with the encampment."  CSSW4Palestine

and FJP shared the post.  CUAD and WOL also co-organized an "urgent" call to "Flood Columbia for Gaza," urging individuals to "COME SUPPORT & PROTECT THE ENCAMPMENT RALLY OUTSIDE OF THE GATES" by gathering at Columbia's two main gates.  In sharing the rally's flier on Instagram, SJP wrote: "non-columbia affiliates can show out for us here!!!!"  As a result, hundreds of agitators descended on Columbia's campus.

310.     From around 12:00 p.m. to 4:00 p.m., Aryeh stood with a small group of Jewish students observing the encampment after hearing the rallies during a meeting with a professor. She watched as students physically pushed through Public Safety officers to join the encampment.  At one point, Aryeh was standing next to a Jewish student holding an Israeli flag when hundreds of students surrounded and chanted "shame on you" at them, terrifying Aryeh. She repeatedly asked Public Safety to intervene to no avail.  Aryeh heard a handful of occupiers admit they were not students so she asked Public Safety officers to check CUIDs but they refused.

311.     That day, Professor Frederick Neuhouser canceled one of his classes in which Zuckerman was a student, because of the "huge police presence" on campus, Barnard subjecting its students to disciplinary hearings for their participation in "'unauthorized' demonstrations," and not wanting his students to subject themselves to the possibility of being "surveilled by Barnard's and Columbia's security apparatuses" or being beaten by police.  Neuhouser's email made Zuckerman extremely anxious because the professor expressed no concern about any students other than the occupiers.

312.     During the weeks-long encampment, Zuckerman either altered her routes or avoided campus whenever possible.  One day when Zuckerman was on campus, she was walking with a friend by the encampment when a professor who was guarding it began following them

and repeatedly asked if they would abide by the encampment's guidelines, which included "to remain grounded . . . as an act of solidarity with the Palestinian people" and "to not engage[] with Zionist counter-protestors." The occupiers then held up keffiyehs and quilts to push Zuckerman and her friend away from the encampment. When she was walking away, Zuckerman noticed that three individuals were following her. On or around that same day, Zuckerman noticed John Ma, Chair of Columbia University's Department of Classics—Zuckerman's major—wearing the same yellow vest that other faculty who guarded the encampment usually wore.

313.     Rabban was forced to pass the encampment on her way to class, which was regularly disrupted by the screams and chants coming from the South Lawn. Glaser was only able to access campus through the Earl Gate. As she passed security near the gate to enter campus, wearing her Star of David necklace, a student yelled, "fuck you" at her. A few hours later, in the same area, Glaser was walking with another Jewish student when another student yelled, "fuck you" at both of them. Glaser reported both incidents but did not receive a response from Columbia. Quinn recognized classmates and professors at the encampment, which made her feel threatened and uncomfortable. Later, after seeing videos of Jewish students being pushed out of the encampment and students cheering, "death to Israel" and "we don't want no Zionists here," Quinn decided she could not return to campus and missed classes as a result.

314.     Gal could hear the chants from the encampment from the stacks in Butler Library where she was hiding. After that first day, Gal only went to campus when attendance was required such as for exams. As a Jewish Israeli student, Gal felt unsafe because her classmates participated in various rallies throughout the year and at the encampment, where they chanted "we don't want no Zionists here" and called for an "Intifada."

315.    Later that morning, administrators entered the encampment to announce to the occupiers, "we're here to work with you," and asked to speak with them to avoid disciplinary measures.  Hundreds of students took turns guarding the encampment with the express purpose of disrupting campus and blocking Jewish and/or Israeli students from accessing campus facilities, including the lawn.

316.    Faculty actively participated in the unauthorized encampment.  Professor Mahmood Mamdani, Columbia University's Herbert Lehman Professor of Government, who baselessly alleged in 2015 that "Zionists in Israel have long drawn inspiration from how Americans cleansed the land of Indians," and signed the October 30 faculty open letter defending the student groups' October 9 joint statement justifying the October 7 terrorist attack, gave a speech in the encampment that first day and later participated in a human barricade to "protect" the occupiers from the NYPD.

317.    That afternoon, SAA Member #2 left their first class and immediately noticed signs and chants calling for campus to be rid of Zionists, "by any means necessary," "from the River to the Sea," and one sign with a Star of David crossed out.  They had successive classes in Hamilton Hall, which overlooked the encampment and could hear the encampment throughout both classes.  They spoke to a professor after one of their classes to explain their concerns and deep emotional impact of the signs and chants.  The professor dismissed their concerns, telling SAA Member #2 they should not let it get to them or in the way of their education, and that the occupiers are allowed to protest.

318.    Around 4:00 p.m., Public Safety announced it was closing the campus' main gates.  Around 7:00 p.m., encampment occupiers were provided notices that stated students had to leave by 9:00 p.m. and threatened repercussions, including suspension, for those who

remained.  The notices also stated suspended students would be unable to attend class or hand in assignments and would be unable to complete their courses.  Members of Barnard's senior staff provided participants with similar warnings, threatening students with interim suspensions if they did not leave by 9:00 p.m.  Around 8:30 p.m., students joined a picket around the encampment. One hour later, agitators linked hands to prevent the NYPD and Public Safety from entering the encampment.

319.    Vanuno passed the encampment on his way out of class and left campus immediately.  Vanuno had to return to campus a few hours later for a meeting with his fellowship program.  He ran into two of his classmates and a third Jewish student holding an Israeli and American flag who yelled "rape is not resistance!"  Soon after, Vanuno and his friends were surrounded by occupiers from the encampment, one of whom pushed one of Vanuno's classmates.  He reported the incident to Public Safety, but his concerns were ignored.

320.    On or around April 17, Roe was waiting in line to get into Lerner Hall when a student behind Roe noticed the Chai necklace she was wearing and intentionally rammed into the side of her body.  The student then mockingly said to her "aww, poor Zionist fucking baby." Roe reported the incident to Columba University but did not hear back.  Roe visited Barnard Health Care Center after the assault.  Roe stopped wearing all jewelry that identified her as Jewish after the assault, avoided campus unless absolutely necessary, and would not travel alone to campus, Chabad, Hillel, or the stores in the area surrounding campus.

321.    Throughout the first day of the encampment, Jewish students were harassed on campus and at its gates.  As Swill was attempting to leave campus, he was surrounded by classmates chanting antisemitic slogans, leaving Swill too uncomfortable to return to campus the following week.  That evening, Doe was walking by Lerner Hall while wearing his kippah, when

two individuals with covered faces accosted him, with one calling Doe a "fucking Jew." Because of this incident, Doe removed his kippah.

322.     Despite Columbia's threats of removal and arrest throughout the first day, the encampment continued unabated through the night of April 17.

       **ii.     April 18**

323.     On April 18, FJP advertised an "ALL OUT FOR THE ENCAMPMENT" rally at 12:00 p.m. at the center of campus, and solicited Venmo payments to Barnard-Columbia Student Abolition Collective, one of the student groups in CUAD.  The president of Columbia Law Students for Palestine felt "empowered" by the encampment's "resilience in the face of tremendous crackdown and repression" and the administration's concession to one of the encampment's demands: It would provide financial transparency for investments with the University Senate executive committee.

324.     That day, President Shafik wrote to Michael Gerber, Deputy Commissioner of the NYPD, to request the NYPD's help removing the occupiers because the "encampment and related disruptions pose[d] a clear and present danger to the substantial functioning of the University."  The NYPD was not empowered to enter Columbia University's campus until President Shafik requested their help.  According to President Shafik, the individuals occupying the South Lawn had been told "numerous times" that they were violating Columbia's rules and policies and that all students participating in the encampment had been informed they were suspended.  Around 1:00 p.m., the NYPD entered the encampment and arrested over one hundred Columbia University and Barnard students.  While the NYPD was arresting students, approximately five hundred other students walked out of class to berate the officers, referring to them as "KKK" and "baby killers" and telling them to "go kill [themselves]."  David witnessed students shouting "NYPD, KKK, IOF, all the same," while the encampment was being cleared

out.  David was standing with a group of visibly Jewish students when one student agitator screamed at one of the Jewish students holding an American flag that he was a "fascist." Simultaneously, outsiders entered campus to help reconstruct the encampment, and with the help of the students who were not arrested, they reassembled the encampment on the west side of the South Lawn.

325.    President Shafik released a statement defending her decision to authorize the NYPD to enter campus as an "extraordinary step" because of "extraordinary circumstances." President Shafik stated that the individuals who established the encampment had been given multiple notices that they violated a "long list of rules and policies," including a new protest policy which allowed demonstrations on "very short notice and in prime locations in the middle of campus."  She claimed that even though the students violated policies, Columbia still tried through a "number of channels to engage with the [encampment's] concerns and offered to continue discussions if they agreed to disperse."  President Shafik admitted the encampment "severely disrupt[ed] campus life, and create[d] a harassing an intimidating environment for many of [Columbia's] students."

326.    Even though campus was supposed to be restricted to CUID holders, outsiders such as Cornel West and Mohammed El-Kurd gained access to campus.  West is an outspoken supporter of Louis Farrakhan, who has called Hitler "a VERY great man," promoted the conspiracy theory that Israelis and Zionist Jews perpetrated the September 11 terrorist attacks, and has said, in furtherance of the antisemitic trope of Jewish control, that "[w]hen you want something in the world, a Jew holds the door." El-Kurd has publicly announced his fantasy of murdering Jews, including that we "must normalize massacres as the status quo," and claims that Israelis and Zionist Jews—whom he calls part of a "death cult"—"harvest organs of" dead

Palestinians to "feed their warriors," a vile antisemitic blood libel.  Rabban could hear the rallies during her class.

327.    Ami was with a group of Jewish students in front of Butler Library holding American and Israeli flags when they were approached by an agitator who held up the symbol of the Palestinian Islamic Jihad and told them he was a "member of them."  Two other agitators also approached the group, laughed at them, said, "fuck the West," "Zionists are perverted," "what the fuck is wrong with you people," and "fuck Zionists," and lunged at one of Ami's friends while screaming, "fuck you bitch."

328.    Stein and other visibly Jewish friends were near the encampment holding American flags when they were harassed and called "Nazis" and "baby killers."  Agitators tried to rip the flags from their hands and screamed, "shame, shame, shame" at them.  One agitator, fully masked, approached Stein, and while flashing the symbol of Hamas, told him, "we're coming for you."  Public Safety officers, who were standing within eyeshot and earshot, shrugged their shoulders and refused to intervene when Stein asked.

329.    Following the arrests, hundreds of agitators rallied outside Columbia's gates and marched up and down Broadway and Amsterdam Avenue.  Yoseph Haddad, an Arab-Israeli journalist, whom SSI invited to speak at an event that evening to discuss "peace and coexistence in Israel," was attacked outside the gates.  Haddad received death threats, including, "put a bullet in your head" and "kill yourself," and was flashed the red triangle symbol.  He was then shoved from behind and punched in the face.  Haddad missed the event, which was canceled because of the incident, to file a police report.

330.    Friedman attended his mandatory in-person lecture that afternoon.  Shortly after arriving on campus, Friedman heard chants such as "Zionists are not welcome here" and "from

the River to the Sea." Friedman did not return to campus after April 18. That day, Molly was in

her apartment—avoiding campus because of the encampment—but heard chants from the

encampment and agitators banging metal pots and pans all throughout the day and night, causing

her immense stress and to lose sleep. When the NYPD was arresting the occupiers, Molly heard

screams of "Intifada revolution," "IDF, NYPD, and KKK are the same," and "from the River to

the Sea" from her apartment.

331.    During Doe's Literature Humanities, a core class, Professor Rebecca Kastleman

asked the class to pause to appreciate that a historic moment was unfolding outside. All of Doe's

classmates went to the window of the classroom to watch the encampment while Doe alone

remained seated. Professor Kastleman reiterated the importance of the moment and informed the

class that anyone who felt safe was free to leave to participate in the encampment without any

harm to their participation grade, despite the fact that Professor Kastleman has a strict policy

allowing for only one unexcused absence per semester. Fourteen of the twenty-two students left.

332.    SAA Member #2 attended classes remotely that day except for a lab. While the

teaching assistant offered an alternative to attending that class in person, in which students would

attend the teaching assistant's office hours, that teaching assistant had previously commented

that the department supports the protestors. SAA Member #2 attended the lab. When a mob

marched passed the lab, the teaching assistant proclaimed disbelief that anyone could

characterize the rallies as anything but peaceful, even though a sign held by the mob was visible

that read "death to Zionists."

333.    On or around April 18, Droznik was near the Amsterdam gate with her friends

when the football they were playing with rolled into a crowd of agitators, causing them to yell at

Droznik and her friends, "we don't want no Zionists here." A student then pushed Droznik while

others shoved keffiyehs in her face and blocked her from entering Butler Library.  A student said to her, "you think you are so lucky that you can go into the campus well I can too, I am a student"—implying she would follow her in, which she then tried to do as Droznik escaped the crowd.  Droznik reported this incident to Columbia but never received a response.  After that, Droznik tried to get into Butler but agitators followed her.  A fully masked man said to her, "I'm going to do the same to you that they did to the Israelis on October 7," and "you should be happy you're not in Palestine."  Others said, "October 7 is about to be every day for you guys" and chanted, "Nazi bitches."  Droznik begged the NYPD to escort her, as she felt extremely unsafe.

334.    That evening, students shouted antisemitic comments at Doe, who was wearing his kippah, while he helped a friend move out of his dormitory, including, "we are so happy that you Zionists are finally leaving campus" and "fuck Zionists."

335.    Westergaard, wearing his kippah and tzitzit, and two visibly Jewish friends, including Symonds, were on campus near the encampment when they were confronted and surrounded by a hostile group of approximately ten to fifteen occupiers.  The occupiers initially asked them to sign an "anti-Zionist pledge," which they claimed was required for entry into the encampment.  An occupier filmed Symonds and followed her around.  When Symonds asked her to stop, the occupier responded she would not until Symonds left.  The occupier got physically close to Symonds and threatened her.  Symonds and Westergaard reported this to Public Safety who refused to take action to identify the agitator.  A student from the encampment then shouted out Westergaard's name and Columbia ID number, before yelling, "we know who you are, we know that you're a biology Ph.D. student and you're not welcome on this campus."  When Westergaard was near the encampment on April 25, a student-occupier again shouted out his

Columbia ID number.  The occupiers at the encampment maintained a central drive where information on Jewish and/or Israeli students was kept.

336.    Around that same time, just outside of Columbia's gates, an agitator told three Jewish students "Never forget the 7th of October.  That will happen not one more time, not five more times, not 10…100…1000…10,000…The 7th of October is going to be every day for you."

### iii.    April 19

337.    On the third day of the encampment, students who had been arrested the day before returned.  According to FJP, Public Safety told students they could spend the night on the South Lawn as long as there were no tents.  Despite arrests and President Shafik's requests that the students disperse, the encampment and demonstrations continued throughout Friday.

338.    That afternoon, FJP members joined the encampment to encourage an "academic boycott of all events," including classes and commencement, until its demands that Columbia "halt all disciplinary proceedings against students," comply with CUAD's divestment proposal, which includes cancelling Columbia's partnership with Tel Aviv University ("TAU"), and opening of the Tel Aviv Global Center, and reinstate SJP and JVP were met.

339.    That day, over one hundred Jewish students signed an open letter to President Shafik stating that they felt "categorically threatened" and requesting the option to attend classes remotely.  The letter also recited a litany of antisemitic harassment Jewish students had recently endured, including that a student on campus wore a "Hamas emblem" and tried to instigate a fight while calling students "pussies," and that two Barnard students, including Bellows, were screamed at while in their residence hall by a group of individuals giving them the middle finger and threatening, "we know where you live now," "you killed half our family," and "come out pussy," while chalking "intifada" on the sidewalk under their room.  After threatening Bellows

and her friends, the agitators walked toward Barnard's gates, where only students were allowed to enter.  She reported this incident to Public Safety, who said she would have to file a police report with the NYPD.

340.    That afternoon, Doe was wearing his kippah and entering an Uber just off campus on Amsterdam Avenue when an individual yelled, "kike" and told him to "keep on walking." The Public Safety officers who were in earshot did not react or intervene.  Doe called his friends and family crying and changed his Passover plans to avoid campus.

341.    Swill went to campus to pray at a makeshift wall where Israeli flags and hostage posters had been on display, though some had been torn down.  He was told by the self-proclaimed encampment security donning yellow vests that he was not allowed to enter because Zionists were not allowed.  Friedman emailed President Shafik and COO Holloway about the presence of non-CUID holders on campus over the first two days of the encampment, specifically letting them know that nonstudents were sneaking in through the gates and that he had personally seen people walk past scanners without anyone verifying that their CUIDs were valid.  Friedman never received a substantive response.  At the encampment, Swill saw posters which stated "long live Hamas," "resistance by any means necessary," and "long live the resistance groups."

**iv.    April 20**

342.    On April 20, the encampment entered its fourth day.  A speaker in the encampment declared: "We are here today because on October 7, the Palestinian resistance in Gaza broke through the walls of their open-air prison, shattering the illusion of the invincibility of their occupiers.  By setting up this encampment in the heart of the Zionist stronghold of Columbia University, we intend to do the same."  Students cheered during the speech.

343.     SCLJ Member #4 called Public Safety to report individuals sneaking into campus and passing supplies for the encampment into campus via a 120th street entrance.

344.     That morning, Stein saw occupiers display a banner with the message "SHABBAT SHALOM, MOTHERFUCKER."  The night before, occupiers shouted at Stein and his Jewish friends, "get off our fucking campus" and "we don't want no Zionists here" and chased them away.

345.     That night, after Shabbat ended, Bellows and ten to fifteen other Jewish students were at the sundial on campus waving American and Israeli flags and singing songs of peace. Almost immediately, occupiers from the encampment started surrounding them and giving them the middle finger.  Soon after, an individual from the encampment stood in front of the group of Jewish students holding a sign with an arrow pointing at them that read "Al-Qasam's [*sic*] next target," referencing Hamas's military wing.  Other students surrounding the Jewish group referred to their Israeli flags as "Nazi flags" and chanted, "go back to Europe" and "all you do is colonize."  Occupiers from the encampment screamed, "baby killers" at Stein and his friends as they continued singing songs of peace.

346.     At the same time, WOL was leading a large rally directly outside the gates.  These WOL agitators accessed Columbia's campus because Columbia failed to station security at one of its gates.  Stein noticed WOL's leader Kiswani on campus.  Students reported her to Public Safety and asked the officers to remove her and the other nonstudents, but the officers shrugged their shoulders and refused to do so, falsely claiming they could not ask individuals on campus to show their CUIDs.

347.     As Stein and his friends tried to leave campus, a group of masked agitators harassed them, screaming, "you guys are inbred," "you don't have a culture," "we don't want no

Zionists here," "Hamas is coming for you guys," and in Arabic, "Hamas, Hamas, our beloved, burn Tel Aviv to the ground." When Bellows tried to leave campus, agitators on the other side of the gate chanted, "we say justice, you say how, burn Tel Aviv to the ground," "Al-Qassam, make us proud, take another soldier out," and "go Hamas, we love you, we support your rockets too." Around the same time, Columbia students chanted in Arabic, "I wish that I was a martyr." Later, students chanted, "there is only one solution, Intifada revolution."

348.    Stein again told Public Safety he and his friends were being harassed, but they refused to step in. As Stein and his friends made their way to the one open gate, the masked agitators followed. Since the WOL riot was directly on the other side of that gate, Stein and his friends were terrified. The masked agitators caught up to Stein and his friends and screamed, "go back to Poland," "colonizers," and "baby killers," while throwing water in their faces. Amid the chaos, one of Stein's friends became separated from the group and was assaulted by agitators who threw hard objects at him. After this, Stein did not feel safe on campus and reported the incident to Hillel the next morning. Weeks later, Columbia closed their investigation into the incidents of that evening claiming it could not identify the agitators. This is unsurprising considering Columbia continues to allow agitators to conceal their faces, despite the Task Force's March 4 recommendation that Columbia do more to identify individuals during rallies.

349.    Bellows, who is visibly Jewish, was terrified and felt like there was no safe way off campus. She asked Public Safety for an escort but her request was ignored, forcing Bellows and her friends to walk through the violent rally to exit campus with no protection. Agitators tried to steal and burn Bellows's friend's Israeli flag.

350.    A Jewish student wearing a kippah was assaulted when he tried to recover an Israeli flag from the agitator who had stolen it and tried to burn it. Public Safety was nowhere to

be found.  As the group of Jewish students exited campus, they were heckled with chants "stop

killing children," "go back to Poland, go back to Belarus," "go back to the gas chambers," "bye

bye fuckers," "genocidal pieces of shit," and "Yehudim [Jews], Yehudi [Jew], fuck you."

### v.    April 21

351.    On the morning of April 21, as it became clear Columbia would continue to allow

the encampment to remain, Columbia Hillel Rabbi Elie Buechler advised members of

Columbia's Jewish community to return home because Columbia's campus was unsafe, writing:

> What we are witnessing in and around campus is terrible and tragic.
> The events of the last few days, especially last night, have made it
> clear that Columbia University's Public Safety and the NYPD
> cannot guarantee Jewish students' safety in the face of extreme
> antisemitism and anarchy.
>
> It deeply pains me to say that I would strongly recommend you
> return home as soon as possible and remain home until the reality in
> and around campus has dramatically improved.
>
> *It is not our job as Jews to ensure our own safety on campus.*  No
> one should have to endure this level of hatred, let alone at school.

352.    That same day, Congresswoman Virginia Foxx, Chairwoman of the House

Education Committee, wrote to President Shafik and the Co-Chairs ("Foxx April 21 Letter").

Chairwoman Foxx wrote she was "gravely concerned by the ongoing chaos . . . caused by the

radical, unlawful Gaza Solidarity Encampment," and that the encampment and its "related

activities" had created a "severe and pervasive hostile environment for Jewish students at

Columbia."  The Foxx April 21 Letter warned: "Columbia's continued failure to restore order

and safety promptly to campus constitutes a major breach of the University's Title VI

obligations, upon which federal financial assistance is contingent, and which must immediately

be rectified."  The Foxx April 21 Letter also noted that the Columbia students, faculty, and staff

responsible for the "mayhem," including members of SJP, JVP, CUAD, and FJP, "repeatedly and flagrantly have violated multiple University rules, and in many cases, federal law."

353. Included in the Foxx April 21 Letter were no fewer than twenty-two incidents of antisemitism from the preceding four days which demonstrated Jewish students' "well-founded fears regarding their physical safety and continuing to be subjected to what is clearly a hostile environment." It further stated that threatening and pro-terror slogans such as "We don't want no Zionists here"; "Intifada"; "From the river to the sea, Palestine is Arab"; "We don't want two states, we want all of it"; and "[r]esistance is justified when people are occupied" have been heard on Columbia's campus since Hamas's terrorist attack.

354. The Foxx April 21 Letter highlighted Columbia's failure to fulfill its promises. For example, numerous individuals, including ones explicitly banned from campus, were documented at the encampment. Pro-Hamas Columbia University Visiting Professor Mohamed Abdou was photographed at the encampment on April 19, despite President Shafik's testimony just four days earlier that "he has been terminated, and not just terminated, but his files will show he will never work for Columbia again." Chairwoman Foxx urged President Shafik, and the Co-Chairs to "restore order and safety without further delay" in line with the commitments they made during their testimony on April 17 and to meet their legal obligations through immediate and decisive action.

355. Doe emailed his advising dean and Dean Josef Sorett, reporting being called a "fucking Jew," heckled with antisemitic remarks such as "we are so happy you Zionists are finally leaving campus" when helping his friend move, and called a "kike" while walking past the Amsterdam Avenue gate. Doe attached documentation of various antisemitic incidents that had occurred on campus, explained that he had to leave campus because his safety was at risk,

and sought accommodations to attend class online that week.  Doe's advising dean responded

that she was sorry about Doe's experiences and was sure Dean Sorett would help him get his

accommodations, but Doe never received a reply from Sorett.  Doe also filed a form with the

EOAA office that day, reporting the three incidents from his email and that Professor Kastleman

encouraged students to join the encampment.  Doe received a generic email confirming receipt of

his report and has not received any updates.

356.     That evening, three Jewish students, including Droznik, walked through campus

when they were confronted by a mob of students and other occupiers in the encampment.

Student and CUAD organizer Khymani James announced: "Attention everyone.  Can I get

everyone to form a human chain right here please?  We have Zionists that have entered the

camp."  As occupiers began emerging from the tents, Droznik was surrounded.  James continued

a call and answer: "Repeat after me.  We have Zionists who have entered the camp.  We are

going to create a human chain.  Where I am standing.  So that.  They do not pass this point.  And

infringe upon our privacy.  And try to disrupt our community.  Please join me in this chain.  We

are going to slowly walk and take a step forward.  So that we can.  Start to push them.  Out of the

camp."  At James' instruction, the mob of roughly two hundred students and outside agitators

encroached on the Jewish students, physically pushing them back.  As Droznik left, occupiers

followed her, and one yelled, "yeah, go back to Brooklyn."  Two of Droznik's friends called

Public Safety, who refused to act.  The students later reported the incident to Public Safety, but

never received any follow up.  The act of the occupiers locking arms to physically block Jewish

and/or Israeli students from accessing parts of campus is reminiscent of Nazis locking hands to

block Jews from entering the University of Vienna in 1938.

### vi.   April 22

357.    On April 22, President Shafik announced that classes would be held virtually that day "[t]o deescalate the rancor and give us all a chance to consider next steps."  Despite President Shafik's acknowledgment that there had been "too many" examples of intimidating and harassing behavior on campus, she ensured administrators and faculty would "continu[e] discussions with the student protestors."  In her statement, President Shafik deflected blame to "individuals who are not affiliated with Columbia who have come to campus to pursue their own agendas," ignoring that the encampment leaders invited outside agitators time after time and continued endorsing their messages.  In a separate statement, Columbia University Provost Angela Olinto and COO Holloway announced that professors would be required to provide a remote option for the rest of the semester, effectively creating a separate and inferior educational experience for Jewish and Israeli students who felt unsafe on campus and allowing occupiers to continue attending class from the encampment.  By contrast, as Professor Schizer told the *Wall Street Journal*: "The law requires universities to provide equal access to educational opportunities to everyone[.] . . .  You can't limit the access of Jews or any other minority group—and that includes clubs, and it includes programs and classes and it includes physical spaces. . . . A university cannot fulfill its responsibility by saying, 'For you, this has to be online.'  We cannot have some people allowed to be there in person and others only able to participate online."

358.    Barnard's Executive Vice President for Strategy and Chief Administrative Officer Kelli Murray emailed Barnard students that classes would take place entirely on Zoom.  Even though Rabban had classes on Columbia University's campus, Barnard students do not receive Columbia University emails so Rabban had not received emails from President Shafik.  Later that evening, President Rosenbury emailed Barnard students to inform them that students serving

interim suspensions "may not physically be on campus, but Barnard professors may permit them to attend class via Zoom and otherwise complete work remotely."  The email also stated that Barnard sent notices to these students, "offering to lift the interim suspensions . . . if they agree to follow all Barnard rules during a probationary period."  If the students chose to do this, the suspensions would not show on their academic transcripts or become a part of their disciplinary records.

359.    That day, hundreds of faculty walked out of their classes to rally in support of the encampment.  SCLJ Member #4 was in line to scan their CUID to access Columbia University's campus when a group of approximately twenty professors walked over from Barnard's campus and joined the line to participate in the rally.  The professors wore sashes stating, "we support students."  SCLJ Member #4 asked the group whether they support Columbia's Jewish students.  Barnard Professor María Rivera Maulucci responded, "we support all our students," to which SCLJ Member #4 shared that they are afraid to walk on campus.  Maulucci responded that the police presence around campus was causing students fear, dismissing the concerns SCLJ Member #4 had just shared.  When SCLJ Member #4's friend asked about the frequent calls for genocide of the Jewish people, Maulucci incorrectly claimed there had been no such chants.  SCLJ Member #4 submitted a bias report detailing this incident.

360.    That day, Kahane saw a photograph on Instagram of Motaz Azaiza at the encampment, who posted videos on Instagram in real time on October 7 of Israelis being murdered and abducted by Hamas terrorists.  Azaiza preached to students from a microphone, telling them, "Gaza is seeing what you are doing for Gaza, so thank you so much for all what you do. . . . This is the first place that make me feel like my work on the ground is action. . . . You are on the right side in this war."  Kahane reported Azaiza's presence at the encampment to

Columbia University and explained his role in October 7, but received no response.  Nauer also called Public Safety and told them that someone who had participated in October 7 was on campus, but all they said was, "we made a note."

361.     That same day, while individuals banned from campus and unaffiliated with Columbia were occupying the South Lawn, Professor Davidai was denied access to campus because, according to COO Holloway, Columbia could not "guarantee [his] safety."  Later that day, CUAD posted on Instagram "THE TENTS ARE BACK UP. COLUMBIA ADMIN IS FULLY AWARE. WE WILL NOT BE MOVED UNTIL COLUMBIA DIVESTS!!!!"

### vii.     April 23

362.     On April 23, President Shafik issued another statement acknowledging that the encampment raised "serious safety concerns, disrupts campus life, and has created a tense and at times hostile environment for many members of our community," and that it was "essential" to "move forward with a plan to dismantle" the encampment.

363.     But rather than taking immediate action to eradicate the encampment and punish those responsible, President Shafik claimed that for several days, a small group of faculty, administrators, and Columbia University Senators had been negotiating ways to dismantle the encampment with student organizers.  Because President Shafik "very much hope[d]" that these discussions would succeed, she set a deadline of midnight that night to reach an agreement.  If they were unable to reach an agreement, President Shafik told students that they would have to consider "alternative options" to clear the South Lawn and restore "calm" to campus.

364.     That evening, SAA Member #2 was walking back to their dormitory from a Passover Seder with a Jewish female friend, both wearing Star of David necklaces, and asked Public Safety for an escort home.  Their request was denied.  Moments later, they encountered a woman near campus who followed them home while swinging a broom in the air and slapping it

on the ground.  SAA Member #2 was terrified the woman would physically assault them with the broom.

365.    As Westergaard was leaving campus that evening while wearing his kippah, a woman began following him, while filming and screaming, "we have a Zionist here" and accusing Westergaard of being an undercover "Mossad agent."

366.    As the midnight deadline approached, an instigator speaking to the cheering encampment announced: "We are entering a period of high alert for the next three days.  And that is why, I will urge all of you to talk to your friends as well and let them know that we may need people to turn up quickly en masse in front of the encampment to defend the encampment. Will you be ready to rally for your comrades?"  Despite these ominous calls to action, President Shafik's deadline soon proved another empty threat.

### viii.    April 24

367.    On April 24, President Shafik claimed that Columbia was "making important progress with representatives of the student encampment," and the deadline had been extended an additional forty-eight hours "[i]n light of this constructive dialogue."  She also claimed that "[s]tudent protesters have taken steps to make the encampment welcome to all and have prohibited discriminatory or harassing language."

368.    Early that afternoon, James—the student who led the assault on three Jewish students using a human chain a few days before and who had shared with administrators his fantasies of murdering Zionists earlier in the year—spoke on behalf of CUAD at a CUAD-organized press conference to provide an update on the status of negotiations with Columbia. According to James, Columbia acceded to CUAD's demand not to call law enforcement into the encampment for the next forty-eight hours.

### ix.　April 25

369.　On April 25, the encampment continued undisturbed for the ninth day.  Isra Hirsi, who had been arrested and suspended one week earlier, returned to the encampment with her mother, Congresswoman Ilhan Omar.  Around this time, the wife of Sami Al-Arian, who pleaded guilty in 2006 to providing assistance to Palestinian Islamic Jihad, was photographed in the encampment.

370.　During a press conference that evening, Ben Chang, Columbia's Vice President of Communications, stated, "we have our demands; they have theirs.  A formal process is underway and continues."

### x.　April 26-29

371.　On April 27, CUAD posted on Instagram that Columbia was considering evicting students and implementing a complete lockdown of campus.  In response, spokesperson Chang issued an update dispelling the rumor of an impending lockdown or evictions on campus and noted that discussions between university officials and student organizers were still ongoing, even though the deadline to evacuate had long passed.

372.　On April 29, Columbia began distributing notices to the occupiers warning they had until 2:00 p.m. to leave the encampment, identify themselves to a Columbia official, and commit to abiding by Columbia policies through the earlier of June 30, 2025 or conferral of their degree.  Columbia also threatened that any student remaining after 2:00 p.m. would be suspended.  That day, Droznik and a Jewish friend were blocked from entering the lawn by faculty and staff.

373.　In response, SJP posted to X "[w]e will not be moved," and posted photos of the notices defaced with "I AINT READING ALL THAT FREE PALESTINE" and "COLUMBIA WILL BURN."

374.    That morning, President Shafik released a statement acknowledging that "many of our Jewish students . . . have found the atmosphere intolerable in recent weeks. . . . Many have left campus, and that is a tragedy."  She announced that since April 24, "a small group of academic leaders has been in constructive dialogue with student organizers to find a path that would result in the dismantling of the encampment and adherence to University policies going forward," but they "were not able to come to an agreement."  President Shafik thanked the student harassers for their "robust and thoughtful offers" and "diligent work, long hours, and careful effort," and stated that Columbia had offered concessions to the antisemitic occupiers by "offer[ing] to develop an expedited timeline for review of new proposals from the students by the Advisory Committee for Socially Responsible Investing, the body that considers divestment matters," "publish[ing] a process for students to access a list of Columbia's direct investment holdings," and "increase[ing] the frequency of updates to that list of holdings."

375.    President Shafik admitted that the "encampment has created an unwelcoming environment for many of our Jewish students and faculty," and that Columbia was "a hostile environment in violation of Title VI."  Rather than taking effective steps to remedy the hostile environment, Shafik merely "urge[d] those in the encampment to voluntarily disperse."

376.    That night, Doe, wearing his kippah, was followed on campus to his dormitory by a group of students who said, "oh you Zionist pig, welcome back," and repeatedly called him a "Zionist pig" and "baby killer" and made oinking noises at him.

### xi.    Pro-Hamas Demonstrators Violently Occupy Hamilton Hall

377.    Just after midnight in the early morning hours of April 30, dozens of students and their supporters, many dressed head to toe in black, broke into Hamilton Hall, a Columbia University academic building.  They smashed windows and the glass-paneled door, placed a bike lock around the door handles, and barricaded themselves inside the building.  Once inside, the

students covered security cameras and draped massive banners, including one calling for an "INTIFADA" outside the building, leading to chants of "from the River to the Sea, Palestine will be free."

378.   The occupiers shoved Droznik and Westergaard as they broke into Hamilton Hall. Droznik's friend called the NYPD multiple times but was told that Columbia declined to allow the NYPD on campus.  Yet Public Safety watched the takeover and refused to act.

379.   Several employees were inside Hamilton Hall when students occupied the building.  The employees were forced to fight their way out of the building while being subjected to verbal abuse by aggressive and threatening students, and at least two custodians were physically detained against their will.  When the employees asked to leave, the occupiers refused, telling them that the moment was "bigger than you."  One of the employees who was trapped inside had discovered a girl hiding in a custodian's closet in Hamilton Hall five days before the occupation and reported her to Public Safety and his department head, but his concerns were ignored.  According to witnesses, there was only one security guard stationed at Hamilton Hall that night who fled before the occupiers locked all the doors.

380.   Outside Hamilton Hall, hundreds more students and other agitators formed a human chain to protect the occupied building, claiming they would not leave until Columbia met their demands.  Those outside also passed supplies to the occupiers inside using a makeshift pulley system.  Around 2:00 a.m., students inside hung another banner that said, "Free Palestine" in both English and Arabic.  The chants continued through the night.

381.   Zuckerman was terrified as she watched agitators throw picnic tables into the building to barricade the doors.

382.     At 8:00 a.m., Columbia University spokesperson Chang issued a statement that Columbia University had alerted its community members to avoid coming to campus if possible.

383.     Rather than immediately remove the occupiers, Columbia closed campus and held all classes remotely.  Around 1:00 p.m., Chang issued another statement that those who continued to violate Columbia University's rules would be met with "clear consequences" and threatened student-occupiers with expulsion.

384.     At 2:30 p.m., President Shafik sent an email which also stated, in part, that the "disruptions on campus ha[d] created a threatening environment for many of [Columbia's] Jewish students and faculty and a noisy distraction that interfere[d] with teaching, learning, and preparing for final exams, and contribute[d] to a hostile environment in violation of Title VI."

385.     Kahane, completely silent and wearing his Star of David necklace, was filming the event from behind where the press was corralled.  When Kahane was walking away from the event, he was standing next to a visibly Jewish individual when another individual started yelling at them, "go back to Europe you fucking colonizers."  Kahane recorded the interaction, reported it to Public Safety, and supplied them with his footage, urging them to find the individual since he was easily identifiable from the video because he provided his hometown.  Yet Kahane never received a response.

386.     SAA Member #2 was on their way to campus when they learned of the raucous mob on and just off campus and that they would likely have difficulty getting home because of the perimeter the NYPD had established.  Afraid to try to return home, they stayed with a family friend elsewhere in New York City.  This too caused fear for SAA Member #2 because their dormitory room is equipped with certain accommodations for their disability that alert them in

the event of an emergency such as a fire.  The following day, they took a particularly circuitous route to return home, leaving the subway two stops before the Columbia station.

387.    At 8:18 p.m., Columbia University's Emergency Management and Operations Team alerted community members to "shelter in place" for their safety.  Roughly twenty minutes later, Barnard's Community Accountability, Response, and Emergency Services sent a similar alert.  Shortly after 9:00 p.m., President Shafik finally authorized the NYPD to enter Hamilton Hall and arrest the violent occupiers.

388.    Once the building was finally cleared, the mess left behind revealed the extent of the violent occupation and the coordination and organization involved.  The occupiers had disabled an elevator, damaged hundreds of chairs which were thrown around the building and zip-tied together, and removed wooden tabletops and drilled them into windows.  There were also hand-drawn floor plans, supply lists that identified the locations of equipment that could be used to barricade the building, and a task list consisting of action items such as setting up the pulley system and establishing security shifts—all evidence of a well-thought out, coordinated, and organized plan.

389.    On May 2, Columbia attempted to disclaim responsibility by stating that a "significant portion of those who broke the law and occupied Hamilton Hall were outsiders." The composition of those arrested in fact shows that only thirty percent of those who took over Hamilton Hall were unaffiliated with Columbia.  The rest were undergraduate and graduate students, as well as two employees.  In any event, that antisemitic outside agitators were infiltrating Columbia's campus, at the invitation of Columbia student groups and their members, in no way absolves Columbia.  Indeed, Professor Schizer recognized "[i]t was not just outside agitators. . . . What's going on is that students have not believed that there would be meaningful

discipline for breaking rules.  And it's because the university was so ineffective initially.  And it's also because there are faculty members who are encouraging it."

390.    On May 4, Doe was followed on his way to campus after a media appearance approximately six miles from Rockefeller Center on the subway and all the way to the gates of campus.  Doe called Public Safety to report it.

391.    On May 10, hundreds of Columbia faculty and staff members initiated a strike. The faculty, who had been "all hands [] on deck to demand for our disciplined and arrested students full amnesty and their records expunged," mischaracterized the Hamilton Hall occupation as "nonviolent" and stated their intent not to return to campus because of the police presence on campus.

392.    On May 16, FJP published an op-ed in the *Columbia Spectator*, applauding agitators for their "moral courage in speaking up about the ongoing genocide in Gaza" and their "courage, creativity, and fortitude" at the encampment and occupation.  The op-ed concluded by reiterating FJP's demand that Columbia completely divest from Israel.

393.    On May 31, the eve of alumni weekend, agitators, including students from SJP, set up another encampment on the South Lawn.  SJP posted an image of a banner from the encampment reading "WE'RE BACK BITCHES," with the caption: "Y'all thought we were done?  Columbia's third encampment is now up and running."  Later that day, SJP posted a video encouraging occupiers to remain in the tents and shouted, "shame" and "Free Palestine" at Public Safety officers.  That night, the encampment moved to occupy one of the large tents erected for alumni weekend and posted on Instagram: "what's a Columbia alumni reunion without an encampment to remind everyone NO DONATIONS TIL DIVESTMENT[] Many thanks to Columbia for the conveniently placed reunion tents to use for our encampment."  On

June 2, SJP posted a series of photos including: "WE WILL BE BACK, INSTALLATION 1 COMPLETE"; "WE KNOW THAT OUR MOVEMENT IS NOT CONFINED TO ONE BUILDING OR ONE LAWN, BUT RATHER, WE KNOW THE PEOPLE OF GAZA ARE THE LIFEBLOOD OF OUR STRUGGLE AND THAT THEY HAVE SPARKED THE STUDENT INTIFADA"; "WE RECOMMIT TO CONTINUE STRATEGIC, TARGETED ATTACKS ON ALL ASPECTS OF UNIVERSITY LIFE"; "WE ASK THAT STUDENTS ACROSS THE GLOBE PLEDGE TO DISRUPT ALL ASPECTS OF UNIVERSITY LIFE"; "AS WE BEGIN OUR SUMMER OF DISRUPTION, WE ASK THAT EVERY STUDENT, AND OUR WIDER COMMUNITY, DOES THE SAME.  USE THIS TIME TO AGITATE, EDUCATE, AND ESCALATE."  The caption accompanying the post read, "Until victory, we will be back.  Agitate, educate, escalate for Gaza."

394.    During an alumni reunion panel on Jewish life, Columbia University administrators, including Columbia College Vice Dean and Chief Administrative Officer Susan Chang-Kim, Dean of Undergraduate Student Life Cristen Kromm, and Associate Dean for Student and Family Support Matthew Patashnick, exchanged offensive messages disparaging and dismissing the panelists and topic.  While the panelists, including a Jewish Columbia student and a Columbia religious leader, recounted experiences with endemic antisemitism on campus, Dean Pastashnick invoked antisemitic stereotypes by accusing them of exploiting the subject for "fundraising potential," and Chang-Kim doubted Columbia has "really ha[d] students being kicked out of clubs for being Jewish."  As a Jewish alumna shared a vulnerable moment, sobbing as she described her daughter's experiences with antisemitism at Columbia, Kromm messaged vomit emojis.  In another message, Chang-Kim wrote, "This panel is really making the administration look like jokers," to which Pastashnick responded, "Yep."

### G.    Columbia's Digital Spaces Are Infected by Antisemitism

395.    Following October 7, platforms like Instagram, X, Sidechat, and WhatsApp have been bombarded with antisemitic social media posts and messages by Columbia students and employees celebrating Hamas, denigrating Jews and Israelis, and even targeting and calling for violence against individual Jewish students and faculty.  Though these actions have been reported to Columbia, it has done nothing in response.

396.    In the days immediately following October 7, for example, a WhatsApp chat group moderated by Columbia GS students was co-opted by outsiders invited to join by GS students.  Messages from a phone number associated with Mohammad Wiese, Assistant Professor of Emergency Medicine at CUIMC, sought to instigate fights with students who supported Israel: "Send location"; "Be a man and back ur threats"; and "The lack of locations being sent just shows me that your forefathers were women just as you all are."  In response, a GS student and IDF veteran replied that he intended to report the individual to GS for incitement of violence, which elicited the response from the professor, "LMFAOOOO."

397.    Sidechat in particular has become an anti-Jewish echo chamber for Columbia students posting anonymously.  A valid Columbia University email address domain is required to sign up for an account on Sidechat.  While other universities have endeavored to identify posters of antisemitic threats to anonymous message boards, Columbia has not.

398.    Immediately after Hamas's attack, Glaser noticed Sidechat had been taken over by students who pushed antisemitic and anti-Zionist agendas.  If a pro-Israel or pro-Jewish post remained on the platform, it was downvoted by other students, meaning students were disliking the post.

399.    When a Jewish Israeli student was assaulted on Columbia's campus by a student on October 11, Columbia students took to Sidechat to defend the assailant.  In one Sidechat post,

a Columbia community member expressed their violent fantasies involving Columbia's IDF veterans, and even went as far as to name a Columbia University student, who took leave during his junior year to serve in the IDF: "I sincerely hope any IDF veterans here (and this includes [specific student], currently 'proudly' serving) die a slow death." This, and similar messages regarding IDF veterans, have a profoundly negative effect on Rubin and Symonds, both IDF veterans, who feel threatened, forced to share a campus with individuals who wish for their deaths. Their fear was compounded when Columbia did nothing despite receiving reports of this post.

400.  In a series of Sidechat posts, Columbia students also targeted and doxed a Jewish Barnard resident assistant because she removed propaganda from a residence hall bulletin board. The posts named the resident assistant's specific residence hall and floor, leaving no doubt as to her identity and location, and encouraged students to vandalize her room, which they eventually did.

401.  Aryeh reported the Sidechat posts to Dean Grinage when they met on October 24. Grinage falsely responded that it was a Columbia University issue; however, Barnard students can post to Columbia's Sidechat. Nonetheless, Grinage stated that she would pass the information on to the appropriate authorities if she determined it necessary. Following the meeting, Aryeh emailed Grinage screenshots of antisemitic messages on Sidechat. She has not heard of any action taken in connection with her report.

402.  Social media posts that promote violence and target particular Jewish students violate several of Columbia University's policies which prohibit "verbal abuse; epithets or slurs; negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; insulting or obscene comments or gestures; and the display or circulation of written or graphic material . . .

that denigrates or shows hostility or aversion toward an individual or group members of a protected class," whether disseminated through "hard copy, by email or text, or through social media." Columbia University's Standards and Discipline Policy recognizes that "[c]alls, texts, e-mails, and social media usage by students can contribute to a hostile work, learning, or living environment, even if they occur away from the University premises." Similarly, Barnard's Discrimination Policy states that Barnard "will engage in a variety of means to address and mitigate the effects" of discrimination and harassment over social media.

403.    At the Columbia Hearing, President Shafik recognized that "social media is part of the problem," and that she is "particularly uncomfortable with some of the anonymous channels" such as "Sidechat." She even called the platform "poisonous" and stated that she would "welcome any improvement in content moderation which would reduce" the "egregious cases . . . of antisemitism" on the application. But Columbia has done nothing.

404.    Columbia nonetheless has made no effort to combat the onslaught of antisemitic harassment and threats on social media by its students and faculty. With respect to posts made while the user is on campus, using Columbia's WiFi network, Columbia has refused to disable access to Sidechat on its network or to take any steps to enforce Columbia University's Acceptable Usage of Information Resources Policy—which prohibits using Columbia University's network to "[v]iolate any institutional policies or procedures" or "[i]ntimidate, harass, threaten or otherwise do harm to other Users or internal or external Information Resources including, but not limited to: Doxing / Doxxing [and] Cyberbullying." Barnard's Acceptable Use Policy, which similarly applies to "all individuals who access, use, or control College resources," states that Barnard "resources must be used in compliance with all Barnard policies and procedures and applicable local, state, federal, and international laws and

regulations," and that users are prohibited from using College resources to "[i]ntimidate, harass, threaten, or otherwise do harm to other users including, but not limited to, doxing/doxxing, cyberbullying, creating deep fakes, cyberstalking, and non-consensual image use or impersonation."

### H.      Columbia's Double Standard in Addressing Antisemitism

405.    Columbia has deliberately chosen to remain indifferent in response to antisemitism and anti-Jewish harassment—which stands in stark contrast to its swift and decisive actions to address bias-related incidents when the victims are not Jewish and/or Israeli. Columbia's invidious and egregious double standard is reflected in, among other things, its official statements and programs addressing bias or important social issues, disciplinary actions against faculty, and disciplinary actions against students when antisemitism is not involved, as well as its disparate treatment of SSI, students in the joint program with Tel Aviv University, and Professor Davidai.

#### i.      Columbia Issues Strong Statements to Address Hate, Violence, and Harassment Unless Jews and Israelis Are the Targets

406.    Columbia's double standard is readily apparent when comparing its response to attacks against other groups—even those off campus and outside of New York State—to attacks against Jews and Israelis on its very own campus.  As one Black Jewish Barnard student told the *Times of Israel*: "When I speak about Black and Native American issues, you have people's attention, no one questions what you're saying.  If you say it's racist, then it's racist.  Your word is law.  But now it seems my Jewishness cancels it out for them.  If I say something is antisemitic they don't listen."

407.    In 2020, then Columbia University President Lee C. Bollinger and Columbia University deans released no less than nine separate statements of solidarity in the wake of

George Floyd's murder.  Shortly thereafter, Columbia announced robust efforts to address on-campus racism.

408.    In August 2020, Columbia University renamed a CUIMC residence hall because its namesake was a slaveowner, issuing a statement: "We all understand how careful we need to be in shaping the environment, symbolic as well as physical, in which we ask our students to live and to call home."

409.    In 2021, prompted by a rise in anti-Asian incidents during the COVID-19 pandemic, and a shooting spree in Atlanta that targeted Asians, then Columbia University President Bollinger and several Columbia University deans released statements of solidarity. President Bollinger stated, in part: "I cannot adequately express my sense of shared injury and outrage at yet another display of evil and bigotry in this country. . . . To the many thousands in our Columbia University community who are Asian or Asian American, we want you to know that we, too, on your behalf and for all of us, feel the anguish and justifiable fear because of this latest episode of a deep-rooted strain of racism in America."  Then Barnard President Sian Leah Beilock similarly issued a statement unequivocally denouncing xenophobia, which recognized that the shooting in Atlanta came amid a rise of anti-Asian violence in New York City, and expressed that "[i]t can be hard to fathom the depth of grief, rage, fear and confusion we are feeling."

410.    In 2022, following the Colorado Springs night club shooting that targeted the LGBTQ+ community, Columbia University released a statement of solidarity: "The violence and harm that took place last night at Club Q must be named as an act of hatred and terror against the LGBTQ+ community, and against the values we aim to uphold at Columbia.  Informed by the

values of respect, dignity and the inherent value of every human, we at Columbia condemn this act, and stand in solidarity with the LGBTQ+ community."

411.    At the beginning of the past school year, on August 28, 2023, Columbia University released a statement of solidarity in response to a shooting in Jacksonville, Florida, which targeted the Black community.  The statement claimed that "[o]ne of Columbia's greatest assets is our diverse community [and that Columbia] denounces all forms of racism and bias and will continue working to fulfill its commitment to anti-racism."

412.    In each of the above examples, Columbia decisively issued statements of solidarity with affected students and unequivocally denounced violence.  Yet it took six months after the October 7 terrorist attack against Jews for President Shafik to issue a statement to its students condemning Hamas.

413.    Columbia's failure to publicly condemn Hamas is part of a deliberate, broader pattern of refusing to acknowledge Jew hatred.  In 2018, when an antisemitic domestic terrorist unleashed a hail of bullets in the Tree of Life Synagogue in Pittsburgh, killing eleven Jews and wounding six others, including Holocaust survivors, Columbia issued a statement conspicuously omitting any reference to "Jews" or "antisemitism," while also offering solidarity for those affected by the then recent rise in homophobic- and racist motivated incidents.

### ii.    Columbia Swiftly Provides Resources for Victims of Doxing

414.    On November 1, after campus antisemitism and discrimination reached a fever pitch, Presidents Shafik and Rosenbury announced the creation of the Task Force.  Less than three hours later, Presidents Shafik and Rosenbury announced a "Doxing Resource Group" to address "disturbing incidents" in which the "names and photos of Arab, Muslim, and Palestinian students" were publicized.  They added that Columbia was "grateful for the persistence and

perseverance of the students, and their families, in the face of this harassment.  We are assembling available resources to support them and the staff and faculty who are by their side."

415.    These two initiatives were meant to address concerns from students on both sides—Jewish students targeted by antisemitism on one side and students who were identified for their possible involvement in these antisemitic incidents.  But comparing these two emails— sent hours apart—highlights Columbia's antisemitic double standard.  For example, the email announcing the Task Force framed the incidents on campus as "report[s]," while the Doxing Resource Group email left no doubt that Columbia believed "attacks" had occurred.

416.    While the Doxing Resource Group email recounted specific "disturbing incidents," no specifics or details about the antisemitic incidents on Columbia's campus were provided in the Task Force email.  And while the Doxing Resource Group email detailed concrete measures, including that Columbia had already "retained experts in the field of digital threat investigation and privacy scrubbing," the Task Force made its first recommendations, a narrow set of policy recommendations specific to Columbia University, on March 4, and has not issued any other reports since.  Since the establishment of the Task Force, Jewish students' safety remains unaddressed at Columbia.  As Professor Schizer testified at the Columbia Hearing, the Task Force has a "critical responsibility" because the antisemitism on campus is "not an acceptable situation," and he acknowledged "the problem is there, and it is not yet fixed."

iii.    **Columbia Does Not Hesitate to Discipline Faculty Who Make Racist or Other Controversial Statements, Except When the Statements Are Antisemitic**

417.    While Columbia hires, promotes, and protects professors who espouse and teach antisemitic and anti-Israel vitriol, Columbia decisively disciplines professors in matters involving other minority groups or expressing unpopular ideas.  In 2005, Barnard fired an

American History professor because he taught an unconventional perspective on history that emphasized the role of debauchery.  In 2022, Columbia University suspended its psychiatry department chair for tweeting a photo of an African model with the caption: "Whether a work of art or freak of nature she's a beautiful sight to behold."  That year, Barnard canceled a course on Culture in America, because the professor had quoted rap lyrics including the N-word.

418.   But Columbia University does nothing to protect Jews in response to complaints about its faculty, including Professors Rashid Khalidi, Hamid Dabashi, Joseph Massad, and Katherine Franke, all of whom have been repeatedly exposed for their expression of antisemitic views, endorsement of violence against Jews, and/or calls for Israel's destruction.  Indeed, just as it ignored corroborated reports of Professor Massad's antisemitic harassment nearly two decades ago, Columbia has failed to answer renewed calls to discipline Massad for his abhorrent support of terrorism against Jews and Israel the day after the depraved terror attacks on October 7.  By ignoring these reports, Columbia has emboldened Massad.

419.   Columbia University Law Professor Franke—who bragged on X on November 26, 2023 that she helped shut down and trap people on the Manhattan Bridge to protest the "genocide in Gaza," and more recently called for Columbia to exclude Israeli students from campus—taught three courses in the spring 2024 semester, including Reading Group on Modern History of Palestine.  The Associate Director of Undergraduate Career Development at Columbia University, Lameess Mehanna, stated at a rally in New York City on December 31, 2023, "we can make sure that it is etched in the books of history that 2023 was the beginning of the end for the Zionist entity [Israel]."  None have faced discipline.

420.   Columbia University's persecution of Jewish Israeli Professor Shai Davidai is emblematic of its invidious double standard.  Since October 7, Professor Davidai has been the

most vocal faculty-advocate for Columbia's Jewish and Israeli community and has been critical of Columbia's failure to address antisemitism and pro-terrorism on its campus.  At a vigil organized by Jewish students on October 18, Professor Davidai delivered an impassioned speech warning parents that Columbia "cannot protect your children from pro-terror student organizations," who in the prior week "had thousands of students chant pro-terror songs that are sung right now in Iraq, in Libya, in Yemen, in Afghanistan" and caused "the Center for Jewish Life [] to go on lockdown."  A video recording of the speech went viral and was viewed millions of times.

421.    In the ensuing months, Professor Davidai repeatedly exposed antisemitic and pro-terror incidents at Columbia and across the world, calling on Columbia to act, and criticizing administrators, such as President Shafik, COO Holloway, and Senior Executive Vice President Rosberg, for their failures to protect Columbia's Jewish and Israeli community members.

422.    On March 8, 2024, Professor Davidai revealed publicly that Columbia's EOAA office had opened an investigation accusing him of posting harassing material on social media. But Professor Davidai's posts identified in the accusation were critical of antisemitic, anti-Israeli, pro-Hamas, and pro-terror activities on and around the Columbia campus and criticized no one based on any protected characteristic.  Indeed, Professor Davidai has often expressed his "support for the Palestinian people, [] objection to Islamophobia and anti-Arab sentiment, [and] hope for a two-state solution."

423.    Conversely, for decades Columbia has permitted faculty like Professors Massad, Dabashi, and Khalidi to discriminate against and harass Jewish and Israeli students without consequence.  In fact, when President Shafik was asked at the Columbia Hearing about

Professors Khalidi and Dabashi, whose antisemitism has been publicly exposed, she confirmed that they are not under investigation.

424.    Despite testifying that there "are consequences" for professors who behave in a discriminatory fashion, when asked if there were any consequences for Professor Massad's article praising October 7 as "awesome, astonishing, astounding, and incredible," President Shafik stated he had merely been "spoken to."  President Shafik could not answer what Professor Massad was told other than, "I think he was told that language was unacceptable."  She added that Professor Massad "has not repeated anything like that ever since."  But during a webinar on December 4, 2023, Massad promoted the debunked claim that the IDF was engaging in "indiscriminate strafing of people at the music festival" or those trying to flee the scene.  He also added that the "claims of mass murders of babies" and "mass rapes of women" were lies "dispensed to a white supremacist Western world."  On January 11, 2024, Massad stated in the *Middle East Eye* that "a majority of Israeli Jews" hold "genocidal views" and "support [] ethnic cleansing of the Palestinian people," and suggested that "Israeli Jews" should move to the U.S. and Europe.

425.    President Shafik also claimed that professors are removed from the classroom "if necessary," but could not confirm if Professor Massad was still in the classroom.  President Shafik also put the onus on the students, adding that they are allowed to leave the classes if they feel "uncomfortable."

426.    Professor Mohammad Abdou posted on October 11: "Yes.  I'm with Hamas and Hezbollah and Islamic Jihad."  He also claimed reports of sexual violence by Hamas on October 7 were false.  The hiring of Abdou post-October 7 sparked questions by members of Congress about Columbia University's hiring practices, as Abdou was hired after he made these comments

publicly.  Ultimately, it was revealed the only checks that Columbia University currently does on potential employees in this regard are asking whether they were found "guilty" in a discrimination investigation.  And when asked if Professor Abdou had written anything antisemitic, President Shafik answered, "he has written and said things which are in support of Hamas, which [she] find[s] very problematic."

427.    Similarly, President Shafik was asked about Professor Franke, who expressed concern with Israeli students who come to Columbia's campus after their compulsory military service.  Despite acknowledging that Franke's comments were "completely unacceptable and discriminatory," President Shafik said Franke did not "intend" it and confirmed that no formal disciplinary action has been taken against her and she was merely "spoken to by a very senior person in the administration."

428.    Despite hours of testimony and questioning on antisemitic faculty at the Columbia Hearing, when Professor Shafik was directly asked if there are antisemitic professors on her faculty, she responded, "I certainly hope not, and if I have any evidence that there are, there will be consequences."  When asked if that meant she had not seen any evidence of antisemitism among professors, President Shafik then claimed she has seen "some cases, and there have been consequences."

429.    Following the Columbia Hearing, Professor Massad denied that he had been reprimanded, instead asserting that his supervisors praised his article and that he had received no notice of any investigation into him.  Further, an April 16, 2024 letter from Columbia University to the House Education Committee suggested that the investigation of Professor Massad for his October 8 article had only recently been initiated and confirmed it had not yet then been noticed. The letter also stated that the complainant had only been interviewed earlier that month (after

Congress asked President Shafik to testify), even though a student petition calling for Professor

Massad's termination had garnered 47,000 signatures by October 17 and Kahane reported

Massad twice.  And on May 7, 2024, Professor Abdou posted a video from his office at

Columbia University explaining he was not terminated, and that he had taught his two classes the

last two weeks in the encampment.

430.    In contrast to President Shafik's vacillations about antisemitic professors, when

asked about Professor Davidai at the Columbia Hearing, she confidently answered without

hesitation or need for confirmation that he was under investigation because Columbia University

received at least fifty complaints that he had "attack[ed] [Columbia] students."  Professor

Davidai's social media posts are public and belie President Shafik's suggestion that he

"attack[ed]" any student, let alone based on any protected characteristic.  Nor has Columbia

provided to Professor Davidai the alleged "complaints" it claims it received; who sent or

authored the complaints; to whom at Columbia the complaints were directed, if anyone; what if

any organization the sender(s) are associated with; whether such alleged complaints are identical

to one another or unique; and what exactly was being complained about.

431.    On June 28, 2023, SIPA announced that Maria Ressa would be joining the SIPA

faculty in July 2024.  On November 6, 2023, Ressa published an editorial that compared Israel to

Nazi Germany and accused Israel of "targeting" news journalists.  On May 23, 2024, Ressa gave

a speech at Harvard University's commencement where she used a classic antisemitic trope:

"Because I accepted your invitation to be here today, I was attacked online and called antisemitic

by power and money, because they want power and money."  Ressa's offer has not been

rescinded.

  iv. **Columbia Punishes Students for Policy Violations That Do Not Involve Antisemitism**

432. Columbia's failure and refusal to discipline students who engage in antisemitic harassment also stands in stark contrast to the discipline Columbia metes out in response to bias-motivated incidents against other minority groups, or even the mere use of crude language or other misconduct.

433. In 2006, for example, Columbia University suspended its men's ice hockey team from preseason competition, placed it on probation for a year, and required its members to participate in trainings because the team's recruitment fliers said, "stop being a pussy."  In 2015, Columbia University terminated a teaching assistant, in part, because he used the word "fucked" in an email to students.

434. In 2016, Columbia University suspended its men's wrestling team for text messages containing racist, sexist, and homophobic language.  In 2018, Barnard banned a Columbia University student from its campus for harassing Black students.  In November 2020, Columbia University banned seventy MBA students from campus for traveling to Turks and Caicos, in violation of its COVID-19 travel policy.  In 2021, Barnard evicted a low-income student from Barnard housing because she accidentally started a fire.

  v. **Students in the Tel Aviv University Dual Degree Program are Second-Class Citizens at Columbia**

435. In 2019, Columbia University's School of General Studies and TAU launched a dual degree program which allows students to spend their first two years at TAU and final two years at GS ("TAU Program").

436. Columbia University has exhibited a pattern of indifference toward students in its TAU Program, like David, Elkins, and Gal, as compared to other similarly situated students. For example, in May 2021, when Hamas launched thousands of rockets at Israeli population

centers, David was shocked by Columbia's silence.  She received a single email from GS Associate Dean for International Programs Jessica Sarles-Dinsick and Senior Assistant Dean of Students Sara Ede with security directives, such as "remain aware of the location of the nearest air raid shelter," but no offer of solidarity or condemnation of Hamas, and Columbia did not send a university-wide message of support.  In contrast, in January 2017, when the Trump administration banned immigrants from seven predominantly Muslim nations, then President Bollinger sent a midnight Sunday email to the entire Columbia University community condemning the executive order and stating that Columbia University was advising community members from the designated countries.  And after Russia invaded Ukraine in February 2022, then President Bollinger condemned the "unspeakable acts of criminal violence, brutality, and violations of international law," and stated that Columbia University was "reaching out to everyone affected to offer whatever assistance [Columbia University] can."

437.   In August 26, 2022, David participated in her Columbia University orientation, which was held for students in all of Columbia University's international dual degree programs. During an orientation activity, students were asked various prompts and their answers formed a word cloud projected on a large screen, with the most popular answers appearing in the largest font size.  When the students were asked what their favorite hobby was, the biggest—meaning the most popular—phrase was "freepalestine."  When students were asked what habits they hoped to continue while living in New York City, the second most popular word was "antizionism."

438.   In March 2023, Columbia University announced a Global Center in Tel Aviv. Following this announcement, nearly one hundred faculty, including Professors Franke, Khalidi, and Dabashi signed an open letter to then President Bollinger and then President-Designate

Shafik condemning the planned center as discriminatory and stating that because a Global Center existed in Jordan, another one in the Middle East was unnecessary.  Yet around that same time, Human Rights Watch was documenting cases of Jordanian Security Forces "systematically target[ing] lesbian, gay, bisexual, and transgender (LGBT) rights activists and coordinat[ing] an unlawful crackdown on free expression and assembly around gender and sexuality," affirming that those faculty were holding Israel to a double standard.

439.    Since Hamas's October 7 terrorist attack, students in the TAU Program and the Global Center in Tel Aviv have often been targeted by Columbia students and faculty.

440.    On November 29, 2023, student group Columbia University SIPA Divest staged a six-hour occupation of the SIPA building, demanding an end to the TAU Program and the cancellation of the Global Center in Tel Aviv.

441.    On March 3, 2024, Columbia College Student Council approved a referendum with a specific proposal by CUAD that Columbia University cancel its Tel Aviv Global Center's opening and end the TAU Program.  Barnard's Student Government Association quickly followed suit, approving its own referendum with CUAD's proposal on March 4, 2024.  The Columbia College referendum passed a student body vote on April 22 and Barnard's on April 29.

442.    On April 8, 2024, eighty-five dual degree students, including Elkins, David, and Gal, signed a letter to Columbia that stated "[s]ince the October 7th terror attacks on Israel, our program specifically has faced heightened animosity and discrimination by students at Columbia."  Given Columbia's silence for months about the harassment targeting the TAU Program, the students demanded a statement of support from the administration debunking rumors that it was in danger of cancellation, and reiterating that students in the TAU Program are welcome at Columbia.

443.    On April 28, 2024, SJP posted a supposedly "LEAKED DOCUMENT from Columbia University admin," which purported to demonstrate discriminatory admissions policies, disproportionate financial aid, and bias from Dean Rosen-Metsch.  This post was rife with misinformation, inspiring comments like "[t]hey always find a way to steal" and "[w]e're paying for the terrorists to go to college."  For example, the post falsely claimed that the program's class of 2025 was nearly all if not entirely Jewish, even though a significant percentage are non-Jewish.

444.    On May 1, President Shafik released a statement on the Hamilton Hall occupation, discussing Columbia's negotiations with the encampment's representatives, including "offer[ing] to consider new proposals" relating to the TAU Program.

445.    In May 2024, TAU's Vice President, who oversees international academic collaboration, said that some students in the dual program are "fearful or not at ease," and that many are "shaken" because of the antisemitism at Columbia in the wake of October 7. Columbia's campus was so hostile that TAU gave dual degree students the option of finishing their degree in Tel Aviv, where a war against Hamas is raging, rather than attend Columbia.

**vi.    Antisemitism Task Force Confirms Columbia's Double Standard**

446.    On March 4, 2024, over four months after it was announced, the Task Force issued its first (and only) report ("March 4 Report"), which narrowly focused on Columbia's rules on demonstrations, and merely made recommendations, while promising to issue more reports, "examining various aspects of this difficult situation" "[i]n the coming months."  The March 4 Report focused on Columbia University because the Task Force's work on Barnard was still at an "early stage," even though Jewish and Israeli students at both schools have endured the same antisemitism and harassment.

447.    The March 4 Report evaluated and endorsed Columbia's new demonstration policies, which went into effect for Columbia University on February 19 and Barnard on February 20, and which "adopt[ed] [a] location-based approach, requiring demonstrations to be in 'Demonstration Areas' (East South Lawn, West South Lawn, and the sundial on Columbia's Morningside campus and Futter Field on Barnard's campus) at designated times," and a two-business day notice requirement.  Barnard's Policy for Safe Campus Demonstrations also adopted a prohibition on sound amplification.  Yet these measures proved no more effective than the existing policies, because, among other things, SJP, JVP, CUAD, FJP, and others continued to disregard them with no effective response from Columbia.

448.    The March 4 Report acknowledged that "[d]iscrimination and [h]arassment are [n]ot [p]rotected [s]peech," and confirmed that since October 7, Jewish and Israeli students at Columbia have "been the object of racist epithets and graffiti, antisemitic tropes, and confrontational and unwelcome questions, while others have found their participation in some student groups that have nothing to do with politics to be increasingly uncomfortable"; heard "chants at protests like 'Globalize the Intifada' and 'Death to the Zionist State' as calls for violence against them and their families"; and "been criticized and stereotyped for serving in the military, something most Israelis are required to do."

449.    The March 4 Report also confirmed that there have been "repeated violations of the rules on protests," and that Columbia "generally has not tried to stop violations as they have occurred."  For example, "[p]rotesters have disrupted classes and events, taken over spaces in academic buildings, held unauthorized demonstrations, and used ugly language to berate individuals who were filming these protests or just walking by," and "[t]here also have been

reports of physical harm to students, including Columbia affiliates who were protesting against Hamas."

450.     In fact, the Task Force recommended Columbia "do more to stop unauthorized protests as they occur," including "[i]dentifying [m]asked [d]emonstrators," and "be[ing] more effective at investigating and enforcing violations after the fact."

451.     The March 4 Report clarified that "epithets or slurs"—such as "F*** the Jews"— and "negative stereotyping"—such as when "Jewish students walk by a group that is protesting against policies of the Israeli government, . . . [and] the protesters heckle these students by attributing Israel's policies to them (e.g., 'you bomb hospitals')"—are types of harassment that contribute to a hostile educational environment.  The March 4 Report also acknowledged that Columbia needs to better define antisemitic harassment, and recognized that Columbia's gender-based misconduct policy includes "scenarios" to "illustrate what is permitted and what is not," which "all members of the community" are required to attend "period online training" on, unlike how antisemitic harassment is treated.

452.     The March 4 Report admitted that Columbia's nonenforcement of its policies reflects an invidious double standard adverse to Jews and Israelis, or, as the Task Force put it, a "different norm has applied to many Jewish and Israeli Columbia affiliates."  Whereas, in the past, Columbia has "defer[red] to protected classes in defining which statements are considered biased or hateful, prioritizing the concerns of the audience (i.e., the protected class) over the intentions of the speaker"—which "has been evident, for instance, in discussions of policing, affirmative action, sexual assault, transgender rights, and other important issues"—"when some Israeli and Jewish Columbia affiliates have complained about phrases or comments in recent

months, the response has been different, defending the intentions and free speech rights of the speakers."

453.    On May 16, 2024, the Task Force published an op-ed in the *Columbia Spectator* entitled "We hear you."  The op-ed detailed reports of antisemitic harassment and discrimination that have occurred on campus, noting that the distinction between Israel and Jews has been "blur[red]," as shown by "signs and chants, and in the emergence of 'Zionist' as a highly charged negative category among some protesters and other students and faculty," which "has become a less well-defined general-purpose accusation."  According to the Task Force, "[i]t is usually only Israelis and Jews who are asked to assure people, as the price of acceptance, that they are not 'Zionists,'" which is "about as clear-cut a case of discrimination as one can find."  The op-ed also described the "discomfort and fear" caused by the "increasingly violent and threatening rhetoric" at rallies and on social media platforms such as Sidechat.

454.    The Task Force's op-ed acknowledged faculty's role in creating a hostile environment by: singling out Jewish and Israeli students in class; "endors[ing] efforts to deny Israel's long-established right to exist as a Jewish state"; and encouraging students to participate in anti-Israel demonstrations or "conduct[ing] classes at protest sites."

455.    The op-ed also stated that students complained to the Task Force "about their complaints not being taken seriously by administrators"; it was "common" for students to be "assured that what [they] had experienced wasn't antisemitism"; "two students in the same program were each independently told that there is not an antisemitism problem, there is an anti-civility problem—or that nobody else had complained"; "[s]ome students reported that their complaints were treated as evidence that they had mental health problems"; and "[s]everal told

[the Task Force] they had tried to reach out to their school but were directed to counseling services before they could meet with the dean of student affairs."

## I.     Plaintiffs Are Being Denied Equal Access to Columbia's Educational Opportunities

456.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members know that, solely because of their Jewish and/or Israeli identities, Columbia views and treats them as second-class citizens, undeserving of the protections that Columbia affords non-Jewish and non-Israeli students.  The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have been deprived of the benefits that non-Jewish and non-Israeli students enjoy in both academic and student life—all while paying, in addition to tuition, mandatory costly "student life fees," which fund student groups, including SJP, JVP, and the coalition of student groups that constitute CUAD.

457.    Because of Columbia's persistent refusal to comply with its obligations to stop discrimination and harassment against Jewish and Israeli students, the Individual Plaintiffs, SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and other Jewish and/or Israeli students are deprived of the benefits that non-Jewish and non-Israeli students enjoy, including, but not limited to, physical protection; emotional support; a sense of inclusion and belonging; participation in educational, extracurricular, and Columbia-sanctioned social activities; the ability to freely express their Jewish and/or Israeli identity in class, written coursework, and on campus; and their right to express their support for and attachment to Israel, their ancestral homeland, where many, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, have friends and family.  And because of the hostile environment, plaintiffs have been, and continue to be, deprived of Columbia's full

educational opportunities and offerings, including use of Columbia's libraries, in-person instruction, and other educational resources.

458.    As a result of Columbia's actions and inactions alleged herein, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members are made to feel less important than, and are treated differently from, other non-Jewish and non-Israeli students.  Students, along with Columbia faculty, are able to taunt, demonize, assault, harass, intimidate, ostracize, and discriminate against the Individual Plaintiffs, SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and other Jews and/or Israelis with impunity.

459.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and other Jewish and/or Israeli students do not feel physically safe on Columbia's campus or in its classrooms and other facilities and avoid certain areas of campus, or sometimes campus entirely.

460.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members also justifiably fear the harassment, discrimination, and intimidation they face, on any given day, from professors and Columbia leadership—who are supposed to teach and guide them—and from their fellow students, all of whom are required to treat them with respect and dignity under Columbia's policies.  Columbia's antisemitic faculty and curriculum effectively limits the available courses for Jewish and Israeli students.  When registering for classes, the Individual Plaintiffs, SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and other Jewish and/or Israeli students at Columbia are forced to check whether the professors have a history of antisemitism.  Especially since October 7, Jewish students have had to cross-reference their preferred courses against the long list of faculty that have signed onto

statements defending Hamas's atrocities or participated in the pro-terror rallies. They have had to avoid courses taught by professors who have expressed antisemitic views.

461.     As a result of Columbia's deliberate indifference to this hostile educational environment, including its clearly unreasonable response—and in many instances, failure to respond at all—to reported incidents, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members are often unable to focus, study, or perform their course work to the best of their ability, thereby inhibiting their ability to maximize their Columbia education. These students have had to spend their time at Columbia fearing for their physical safety, enduring anti-Jewish abuse and harassment, and communicating with Columbia administrators in vain over antisemitism. They have been unable to focus on their coursework or otherwise enjoy their Columbia experience.

462.     Columbia's unreasonable actions and inactions described above not only deprive the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members of their right to the educational and extracurricular opportunities afforded to other students— which have led and will continue to lead to academic, social, and professional consequences— but also severely impact their health, mental well-being, and sense of security. Indeed, a Columbia degree is now synonymous with antisemitism and pro-terror such that employers, including some federal judges, will not consider hiring Columbia graduates—for Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, their once highly coveted, respected, and valuable Ivy League diploma has greatly diminished in value.

### i.     Rubin

463.     In the immediate aftermath of October 7, Rubin faced special challenges as an IDF veteran. He anticipated being called to join his unit and contacted various GS deans to inquire what options were available should he need to do so. On October 8, Rubin asked Dean

Rosen-Metsch, who has touted GS as the "premier destination for military veterans seeking an undergraduate degree," to schedule a town hall to clarify how GS would support the Israeli community and those who planned to deploy to the IDF.  No town hall was scheduled.

464.    In the days and weeks that followed, Jewish students, including Rubin, Symonds, and McNulty, continued to contact the administration, including Deans Rosen-Metsch and Dave. On October 16, Rubin sent an email stating that he felt "unsafe" on campus and that the "learning environment [was] truly toxic."  GS Associate Dean of Student Affairs and Wellbeing Amber Griffiths responded by suggesting he connect with Public Safety to get a "better sense" of its presence on campus.  The next day, Rubin emailed Case Manager Bridgette "Judy" Aboal— his assigned point of contact at Columbia Health—stating that he was going through "emotional turmoil" and that Columbia had turned into a "hostile learning environment."  He asked for "immediate assistance in any way" and included "*urgent*" in the subject line.  That afternoon, in response to a different email, Aboal acknowledged how "difficult" it was for Rubin to share his "intimate experiences with the current events," but that she could not consider his request for remote classes—news she could "imagine" was a "disappointment."

465.    On or about October 24, Rubin tried again to attend class.  On his walk to class, including inside an academic building, Rubin was bombarded by signs reading Israel is "committing genocide."  Overwhelmed and unable to concentrate in class, Rubin left and went to the Dean of Students office, where he was told to return later in the day.  In the meantime, Rubin emailed Dean Dave, Dean Griffiths, and his professor, pleading for help, but he received no substantive response.

466.    Faced with no more conventional options, and desperate to receive any meaningful response from the administration, Rubin—joined at times by Symonds, Droznik, and

other Jewish students—stood quietly on Columbia University's College Walk for about four hours holding up a sign that read "Columbia doesn't care about the safety and well-being of its Jewish students."  While McNulty was nearby, two students in keffiyehs walked by laughing. When Rubin asked why they were laughing, one replied, "you guys bomb hospitals"—referring to a false Hamas report that Israel had bombed the Al-Ahli Arab Hospital in Gaza City, when in reality it was a rocket aimed at Israel that misfired.  While Droznik was there, a woman yelled, "fuck Israel."  When the Jewish students responded that their sign had nothing to do with Israel, she said, "fuck you Jews too" and walked away.  The incident was reported to Public Safety, who responded months later.

467.    Rubin was also approached by several professors.  One MESAAS professor took photos of Rubin and laughed at him.  Another professor stopped to ask Rubin why he felt Columbia does not care about its Jewish students.  Moments later, a female student walked by and yelled at Rubin, "Fuck the Jews.  Fuck Israel."  Rubin looked at the professor and said, "that's why."  One of Rubin's friends who had witnessed the interaction reported it to Public Safety but never heard back.

468.    Rubin experienced antisemitism in classes, which affected his GPA and forced him to withdraw from a class.  Since October 7, Rubin found Columbia's campus to be unbearable, affecting his mental health and causing him to flee campus to the safety of his parents' house and miss countless classes and fall behind on coursework.  On October 25, Rubin heard amplified chants of "from the River to the Sea" during a midterm exam, and during a lecture on the Holocaust that day, he could hear similar chants.  Rubin persistently requested accommodations, such as remote learning, to no avail, causing him to withdraw from a course.

### ii.   Symonds

469.    In the immediate aftermath of October 7, Symonds also faced special challenges as an IDF veteran as she needed to be prepared to potentially join her unit.  Symonds has experienced immense stress, anxiety, and trauma because of the antisemitic events at Columbia since October 7, causing her to lose sleep and miss countless classes.  Symonds's stress has been exacerbated by the lack of support offered by Columbia.  Symonds has had to avoid taking courses that she otherwise would have taken with certain professors, like Massad and Khalidi, because of their well-documented histories of antisemitic discrimination and harassment.  She was also interested in attending graduate school at SIPA, but is dissuaded because of its rampant antisemitism following October 7, including its academic building being defaced with a swastika on October 27.  Symonds initially avoided wearing clothing on campus identifying her as a member of SSI out of fear for her emotional safety, or otherwise felt compelled to cover it up depending on her surroundings, fearing retaliation for her Jewish identity.  In order to graduate on time, Symonds has to take summer classes to make up for credits lost during the fall 2023 semester.  During the encampment, she was forced to miss her University Writing class because the professor did not allow remote attendance and she did not feel safe on campus.  Symonds has applied to transfer to TAU.

### iii.   McNulty

470.    McNulty dropped multiple classes because professors refused to arrange accommodations for exams or missed in-person classes because she could not physically get to class without risking her safety by walking through antisemitic rallies.  On October 12, in her Chinese class, McNulty's classmate wrote the following notes on an iPad tilted in her direction: "The jewish student who was attacked yesterday was a white student who's [*sic*] goal was to get a black Palestinian arrested"; "The jewish students on campus were trying to recruit 'zionists'

who we [*sic*] 'extremely dangerous' and who would make the campus unsafe"; and "The Jewish communities [*sic*] goal is to spread misinformation to gain support."  Distressed by these messages, McNulty immediately left class and sent an email reporting the incident to, among others, Dean Delva.  She did not receive a response.  The next week, McNulty tried returning to class only to find students discussing their participation in SJP rallies, which had no connection to the subject matter of the course.

471.    In January 2024, there was a display in celebration of Lunar New Year at Barnard with sticky notes for students to write and display their wishes for the new year.  Many of her classmates wrote "free Palestine," "end the siege on Gaza," and "Columbia divests from apartheid" as their wishes.  On April 4, 2024, while an antisemitic rally took place on campus, McNulty was in her Chinese class trying to focus over the chants from outside the classroom.  Her professor remarked that war was taking place in the Middle East because of "people and money" and that the students protesting that day were doing so to fight against Israel.  McNulty is no longer pursing a minor in East Asian Studies so she can avoid the department.  On April 19, McNulty was walking to a final exam when she encountered a student who had been arrested at Columbia for being violent during rallies who stared and yelled at her in Arabic.  Shaken by this, McNulty could not focus on her exam.

472.    During the encampment, one of McNulty's best friends, an Israeli student in GS, stayed in her apartment because she felt unsafe on campus.  Her friend, whose parents and siblings were hiding in a bomb shelter in Israel on October 7, had been told by agitators at the encampment, "you are a dirty Zionist" and "we don't care that you got kicked out of Europe" and her classmates had said, "October 7th gave hope, optimism, and relief" and that their "hearts go out to Hamas."

473.     Despite her previously stellar academic record, McNulty completed only one class in the fall 2023 semester because that professor accommodated her request for remote learning; even in that situation, however, she was deprived of the educational opportunities offered by in-person learning.  Her request to continue a class via Zoom in spring 2024 was denied.  McNulty's mental health has also been significantly impacted by Columbia's hostile environment, causing her to lose sleep and have nightmares.  She also withdrew from the summer 2024 semester.  As a result, McNulty's graduation date will likely be extended by a full year.

### iv.     Gerstein

474.     Gerstein's academic environment was severely impacted by antisemitism.  In the spring 2024 semester, she had to take an independent study as an accommodation to avoid a required course taught by Erwin de Leon, SPS Chief Diversity Officer and Lecturer, because of his previous alleged conduct toward Jews.  The independent study was mainly online, depriving Gerstein of the full benefits of the course.  She was prevented from accessing libraries and other resources she intended to use to complete her final exams.  Antisemitism also impacted other educational activities for Gerstein, including her ability to fully participate on SPS's DEIA Committee and the Nonprofit Student Management Student Association.

475.     Since October 7, Gerstein had several classes disrupted because of the antisemitic campus environment.  In the fall 2023 semester, her class on the first floor of the SIPA building was constantly disrupted due to a nearby class taught by former U.S. Secretary of State Hillary Clinton, against whom students led a relentless campaign, disrupting academic activities in the SIPA building, including on November 29, when students occupied its lobby chanting, "Hillary, Hillary, you can't hide, you're supporting genocide."  During the spring 2024 semester, students in one of Gerstein's classes attended class virtually from the encampment.  Gerstein often

avoided campus when antisemitic rallies were planned, including on February 2 when WOL and Columbia students led a riot adjacent to campus.  When she was forced to be on campus during rallies, Gerstein was, at times, physically prevented by the mobs of agitators from accessing Columbia's facilities.  These experiences led Gerstein to fear she would be targeted for wearing a necklace in support of the hostages in Gaza or a Star of David.  Gerstein's university-wide graduation was canceled.

> ### v.  Miller

476.  Since October 7, Miller has continued to experience antisemitism in classes.  For example, on October 30, Miller attended a "safe space" lecture—which was advertised as an opportunity to have an open discussion about the Middle East with Dean Jaque of GSAPP.  During the lecture, Jaque consistently referred to Israel as "Palestine."  Feeling unsafe, Miller felt compelled to leave.

477.  The next day, Miller was paired with a fellow GSAPP student to give a lecture for their Extreme Design class.  While discussing the assignment, Miller's classmate suggested they focus their lecture on October 7.  When Miller told his classmate that it was extremely painful to discuss October 7, the classmate responded by pretending to look for a book around his desk and jokingly told Miller he was trying to find his copy of Mein Kampf.

478.  In November 2023, GSAPP students hosted a series of "teach-ins" as part of an event, "What is Settler Colonialism?"  Hamas was praised during at least one of these "teach-ins."

479.  During a meeting with Dean Jaque in December 2023, Miller asked Jaque to condemn antisemitic bullying on campus.  Jaque refused to do so, claiming he was told to follow President Shafik's lead and would not make an independent statement.  When Miller raised his concerns about the "What is Settler Colonialism?" fliers and event with Jaque, Jaque claimed

GSAPP did not endorse the event.  To date, the event remains advertised on GSAPP's website and the poster advertises it as a GSAPP event.

480.    After returning to campus in January 2024, Miller was once again confronted with antisemitism in the classroom.  On his first day of Spirits and Matter:  Architecture and the Modernization of the Middle East, Miller saw that according to the syllabus, not every class would involve discussions of architecture.  For instance, according to the syllabus, the lecture planned for March 6 is called "Occupation and Genocide," and required reading includes "Israel's Genocide in Gaza Encapsulates the Entire History of European Colonialism"—and Miller, unwilling to sit through an anti-Israel course, dropped the class.

481.    Throughout the spring 2024 semester, the bulletin boards outside Miller's studio were frequently covered with signs, such as "the more you try to silence us the louder we will be," "from the river to the sea," and "if someone's liberation offends you, it probably means you were benefitting from the occupation."  Miller avoided campus during the encampment.

482.    Since October 7, Miller has dropped multiple classes and avoided going to campus on at least twenty days because of the hostile environment.  He has made reports to the administration but has merely received automated replies which include referrals to wellness resources.  As a GSAPP student, Miller must work in his assigned studio space in Avery Hall; indeed, Columbia only provides software licenses to on-campus computers, which Miller cannot access on his personal computer.  Because the studio space does not have air conditioning, the windows are often open, making it impossible to ignore the disruptive noise of the rallies.  Even with the windows closed, Miller found it impossible to concentrate and was frequently too distracted to stay in the studio—which he reported to the administration.  He also needed an

extension to complete his studio final because the outside evaluators could not access campus during the encampment.

### vi.   Aryeh

483.    Aryeh moved out of campus housing during the fall 2023 semester because her former roommate posted vile antisemitic statements on social media.  As she explained to Dean Grinage in a November 7 email, she "no longer fe[lt] safe living in the same room" as her former roommate.  At first, Aryeh sought to move into different campus housing, but ultimately moved off campus altogether and to the east side of Manhattan because of the hostile environment, forcing her to incur additional costs.  Aryeh stopped wearing a necklace that has her Hebrew name on it because of safety concerns.

484.    Aryeh avoided campus after October 7 except to attend her classes.  She did not go to the libraries alone or social events outside of those hosted by Hillel and Chabad.  She participated in multiple clubs before October 7, but withdrew from all but Hillel and Chabad, because of rampant antisemitism in student groups.  She particularly avoided campus when rallies were scheduled.  She was selective about picking classes since October 7 to try to avoid those with professors or students with histories of antisemitism.  Her classes were disrupted because of the antisemitic rallies on campus.  For instance, on October 25, Columbia students caused a campus-wide disruption by walking out of classes.

485.    Aryeh's last day on campus was April 18.  She did not return to campus the remainder of the spring 2024 semester except in connection with presenting her thesis and graduation.  On May 1, one day before Aryeh was to present her thesis, she received an email from a Barnard administrator informing her that guests were no longer permitted to attend the thesis presentations.  Several of her family members were scheduled to attend but could not.  On May 13, during Aryeh's graduation rehearsal on campus, she was so afraid of being harassed that

she wore sunglasses and a hat and sat in the very back of the room.  Aryeh's university-wide graduation was canceled.  Her Barnard graduation was disrupted by pro-Palestinian students and their guests.  Aryeh was so upset, she left two hours early.

### vii.  Bellows

486.    Bellows first year at Barnard has been severely impacted by antisemitism, both on campus and in the residence hall.  When she went to campus, she had to adjust her route so that she would avoid walking by mobs with antisemitic chants and signs—a task which proved incredibly difficult when Columbia limited access to specific gates.  She could hear chants from her classrooms which made it difficult to focus.  She was similarly unable to concentrate in the library because students were often handing out antisemitic fliers.  The same happened in her residence hall, where students would place fliers under her door and her neighbor had pro-Palestine signs on her door, despite Barnard's policy to remove such items.  This was particularly distressing because when Bellows hung hostage posters up on a bulletin board in her residence hall, they were ripped down the next day.  Bellows has avoided certain classes because she does not feel comfortable being visibly Jewish in them, has concealed her Star of David necklace since October 7, and has avoided speaking Hebrew on campus.  Because her room overlooked Broadway, Bellows could not sleep once the encampment started as she heard chants throughout the night.  After being accosted on campus during the encampment, she left New York for nearly ten days and once she returned to New York, never set foot on campus.  Because of the antisemitism she experienced throughout her freshman year, she is considering transferring.

### viii.  David

487.    David's educational opportunities are directly impacted by the TAU Program being targeted by students and faculty.  She is wary of sharing her participation in the program,

and has been accosted in the past when she has.  In particular, when students chanted "burn Tel Aviv to the ground," David felt unsafe because of her connection to Tel Aviv through the TAU Program.  While David was mourning the loss of a close friend, who was murdered at the Nova Music Festival, she endured her classmates celebrating the attacks and their intimidating tactics, as well as the lack of support from Columbia, which did not uniformly afford accommodations until the university switched to remote learning.

488.  David missed two classes following October 7 and struggled to go otherwise. There were disruptive rallies that she could often hear from her classrooms, walkouts in the spring 2024 semester that affected her classes, and inflammatory anti-Israel fliers plastered around campus.  Yet when she put up posters and balloons around the Butler Library lawn area to celebrate the ninth birthday of an Israeli taken hostage by Hamas, Public Safety took them down and threw them in the garbage within an hour.  David has, at times, concealed her Star of David necklace and hostage tags out of fear, including once when she had to be near the encampment and thought she would be harassed.  She has avoided campus spaces, like the libraries, at times, and stopped going altogether when the encampment began.  Rather than attend one of her labs via Zoom, David was given pre-recorded lab sessions, which is not an adequate substitute for what should have been a hands-on learning environment.

### ix.  Doe

489.  Almost immediately after stepping foot on Columbia's campus, Doe was made to feel unwelcome because he is Jewish.  Doe had his kippah ripped off his head and his mezuzah stolen from his dormitory room.

490.  Doe's experiences with antisemitism persisted in the spring 2024 semester.  On January 16, there was a rally on campus and he could hear chants of "there is only one solution, Intifada revolution" from his Literature Humanities class in Lerner Hall.  At first, Professor

Kastleman instructed the class to ignore the noise from the rally.  Two students then began

leaving the class.  When Professor Kastleman asked why they were leaving, they said to join the

rally, to which Professor Kastleman replied, "please be safe."  Those students did not face any

repercussions for leaving class that day, even though Professor Kastleman had a strict policy

surrounding absences.  Previously, when Doe needed to miss class, he was required to provide a

doctor's note.

491.    In the spring 2024 semester, Doe was enrolled in Race, Climate Change, and

Environmental Justice with Professor Hadeel Assali and teaching assistant Casey Brayton.

Assali signed the October 15 letter expressing "unwavering solidarity" with Professor Massad in

response to backlash for Massad's open celebration of Hamas's October 7 attack.  On March 22,

Assali and Brayton canceled class to accommodate participation in a citywide anti-Israel rally.

On April 15, Professor Assali cancelled class and encouraged students to attend a "shutdown for

Palestine" rally, writing, "If you can, try to join a protest."  On April 20, Brayton posted on

Canvas (a learning management software utilized by colleges and universities) that class

discussions would be moved off "CU internet resources" to Signal, an ephemeral messaging

application that SJP had encouraged students to use to evade surveillance by Columbia while

organizing unauthorized rallies.  In addition, the Canvas post stated that the next class would be

held at an alternative location, such as the encampment or Riverside Park or Morningside Park.

Once the Signal chat was created, it was used to circulate information about off-campus class

gatherings, organize support for the encampment, and collect signatures for a letter condemning

the NYPD's presence on campus.  Assali and Brayton were both participants in the Signal chat.

On April 21, Doe inquired about a Zoom option for class the following day to accommodate for

Passover.  Assali informed him that a virtual option might be unavailable, and she might cancel

class and have a small gathering instead.  The class did gather at Professor Assali's apartment on April 22 with no accommodation for Doe who could not participate because of his religious observance.  In the email providing the details for this gathering, Brayton reminded the class to join the Signal group as "[they] would prefer not to use campus resources."  On April 28, Assali canceled the remaining two classes of the semester.

492.    The encampment created unique challenges to Doe's ability to observe his religion.  Doe could not access the only kosher dining hall at Columbia, located on Barnard's campus, because he is not a Barnard student and had to get his meals from the Kraft Center or otherwise spend his own money to be able keep kosher.  Indeed, on April 26, Doe attempted to access the Barnard kosher dining hall but was not permitted inside.  Doe spent his own money on kosher food during the final two weeks of the spring 2024 semester and had many unused meal swipes.  On May 10, Doe was returning to his dormitory to prepare for Shabbat services when a Public Safety officer demanded Doe scan his CUID to access campus.  Doe asked the officer to scan it for him, explaining that he could not use the scanner on Shabbat.  When he returned later that evening, Doe had the same problem with a different Public Safety officer.  Doe repeatedly requested the Public Safety officer scan Doe's CUID for him, but the officer said that it was Doe's job and threatened Doe that he would not be able to get into campus if he did not scan his own CUID.  Fearful of the consequences, Doe scanned his CUID himself, breaking Shabbat.  On May 11, Doe emailed COO Holloway, cc'ing Dean of Religious Life Ian Rottenberg, and on May 17, Doe received a response from Dean Rottenberg merely thanking Doe for bringing the issue to Columbia's attention.

493.    In addition to these challenges, Doe was severely harassed at the time of the encampment.  He was stalked and called a "fucking Jew," "kike," and "Zionist pig," among

other things.  Doe frequently stayed at a friend's at The Jewish Theological Seminary rather than his own dormitory on the main campus, and after the Hamilton Hall takeover, he stayed with a friend for the remainder of the semester.  Since October 7, Doe would check social media posts and group chats to learn about rallies so he knew to take alternative routes to avoid them.  Doe was afraid of his dormitory, the libraries, and the dining halls.  The only places Doe felt relatively safe at Columbia were Chabad, the Kraft Center, and The Jewish Theological Seminary.

494.    Following the fall 2023 semester, Doe was unsure if he would return to campus for the spring semester.  He spoke with his academic dean about the possibility of transferring, but felt optimistic that there would be meaningful change after Columbia's deans released a statement on December 20.  Unfortunately, Doe's optimism was short-lived, as Doe's spring semester was clouded by yet more antisemitism, including being stalked and called antisemitic slurs.  He has applied to transfer into the TAU and GS dual degree program.  If his application is not accepted, Doe will likely seek to transfer to be a full-time student at TAU.

### x.    Droznik

495.    Because of the harassment on campus, Droznik has avoided the gym, the library, and the dining hall—as a low-income student, she relied on her meal plan to eat.  She has been unable to complete assignments on time and has needed extensions for nearly all of her assignments.  She has been generally fearful of walking on campus, and is uncomfortable with a Zoom alternative since it would reveal her Jewish identity.  She also remains traumatized by the incident on the evening of April 21 when she was surrounded by students and other occupiers and pushed away from the encampment, thinking about it near-daily since it happened.

### xi.  Elkins

496.    Elkins' educational opportunities are directly impacted by the TAU Program being targeted by students and faculty.  The vitriol directed at and frequent calls to end his program has upended his educational experience.  Chants calling for Tel Aviv to burn to the ground have particularly concerned Elkins because such an action would result in the death of scores of civilians, including those in his program at TAU.  Elkins has sometimes avoided campus because of the discrimination he faced during the October 12 rally.  Rather than study on campus, Elkins would typically go home to his apartment instead.  Since the encampment began, these rallies have also been disruptive.  Elkins had a class in Hamilton Hall in the spring 2024 semester which was often disrupted by chants from the encampment.

### xii.  Friedman

497.    In the wake of October 7, three hostage posters were hung up on the bulletin board in the entrance of the Mudd Building.  On October 11, Friedman was exiting the building when he saw a woman walk in, scoff, tear a row of fliers of these posters off the wall, and crumple them up.  Following this incident, Friedman no longer felt safe wearing a kippah and for months, wore a hat on top to cover it while on campus.  That same day, October 11, Friedman went to study in Butler Library.  He saw students hanging hostage posters when he walked in, but noticed that the posters had been torn down when he left the library two hours later.  That evening, he learned that an Israeli student was beaten with a stick by another student while hanging hostage posters by the library that evening.  Friedman did not return to study in the library for the rest of the semester as he no longer felt safe there.

498.    Time-sensitive changes to Friedman's coursework were announced during Passover, while he was unable to access the internet.  Friedman was scheduled to take his Operating Systems final on May 7 in-person.  When Columbia switched to remote finals, the

professor canceled it altogether as he felt it would be too difficult to monitor cheating.  As a result, the weight of the other assignments for the class was redistributed.  Friedman hoped to use the final as an opportunity to improve his grade, and he had been working hard to prepare. Friedman lost that opportunity, and his grade suffered.

### xiii.    Gal

499.    Prior to October 7, Gal regularly utilized campus facilities, including libraries, dining halls, and medical services.  However, after October 7, Gal ceased using Columbia's medical services because she no longer felt safe on campus.  She also avoided attending classes and accessing other campus facilities.  Many of Gal's classes have been disrupted by rallies, with chants making it impossible for her to concentrate or focus on exams.  Gal could not enroll in certain literature or humanities courses because the professors or classroom environment made those classes hostile for Jewish and Israeli students.  Since enrolling at GS, Gal has felt isolated from her classmates, a feeling exacerbated by Hamas's terrorist attack.  She avoided Butler Library and concealed her Israeli identity on campus out of fear that speaking Hebrew with friends or family would make her a target.  As a veteran of the IDF, Gal was particularly distressed when students and faculty called for the removal of the "IOF" from campus.  With most of her family and friends still residing in Israel, including her sister and several cousins who are currently serving in the IDF, Gal felt especially threatened by rhetoric such as "Brick by Brick Israel will fall" and "Kill another soldier now," as these statements applied to her own family members.

### xiv.    Glaser

500.    During the fall 2023 semester, Glaser took a class concerning civil rights and civil liberties with a professor who had a connection to TAU's Law School.  During one class, the professor made a statement about the atrocities Hamas committed on October 7, calling Hamas

terrorists and the acts they committed "abhorrent."  Glaser immediately found herself surrounded by classmates laughing and whispering in response to their professor's statement.

501.    During fall 2023, Glaser spent most days in her apartment, terrified to leave.  For example, one rally fell on a Friday right before Shabbat began and before she left her apartment.  Since she does not use electronics like her cell phone on Shabbat, she found it particularly difficult to walk around without being able to pick up the phone and call for help.

502.    When Glaser registered for classes for the spring 2024 semester, as she had done in other semesters, she was forced to confirm that certain professors and classes would be safe for her as a Jewish student.  For example, Glaser wanted to take a class, but when she noticed the class description referred to Israel as "the occupied territories," she did not enroll.

503.    Throughout fall 2023 and spring 2024 semesters, Glaser's time studying in the library and her classes were interrupted by agitators chanting on Columbia's campus.  She also struggled to sleep at night, which made studying and going to class even more exhausting and unbearable.  She was often forced to adjust her routes to, from, and on campus to avoid rallies.  But avoiding the agitators off campus was no easier as outside agitators had also taken over the sidewalks surrounding campus.  After the encampment was erected, she avoided campus.  For the first time in her life, Glaser concealed her Jewish identity, often covering up clothing identifying her as Jewish and hiding her Star of David necklace.

### xv.    Gross

504.    In the days following October 7, the CUIMC campus became increasingly hostile for Jews.  Gross, whose friends were murdered in Hamas's attack, helped organize a small vigil at CUIMC.  After a photo of Gross crying and holding an Israeli flag was posted to social media,

he received hateful, antisemitic messages, calling him a "murderer," "filthy Jew," and "Nazi," as well as death threats.

505.    On October 12, Gross wrote an email to the School of Nursing deans and other administrators, explaining that he did not feel safe at CUIMC, and found the antisemitism on his campus deeply distressing.  Gross asked how Columbia planned to keep its Jewish students safe, but never received a response.  He separately heard from his program director that she would pass his concerns along to the deans of the nursing school.  As antisemitism escalated at CUIMC, he continued emailing his program director, who repeatedly told him she would pass his concerns along.

506.    Gross did not feel safe going to class because of the hostile environment on campus and the lack of a response from the administration.  CUIMC became so unbearable that he left New York during November and December 2023, but was forced to return in January 2024, when Columbia removed the remote option for all medical programs.  When he told his program director he left the state, she merely put him in contact with the school's social worker. When Gross met with the social worker, she dismissed his concerns by claiming that he was "the only Jewish student who has complained."  Yet Gross knows that several of his Jewish classmates have also complained to the administration about antisemitism on campus.  In fact, multiple Jewish students have been told by various members of Columbia's administration that they are the only ones feeling unsafe, a fact admitted by Columbia's Task Force in a May 16, 2024 op-ed in the *Columbia Spectator* entitled "We hear you":  "[T]wo students in the same program were each independently told that . . . nobody else had complained" about antisemitism. When Gross reiterated his concerns, the social worker replied, "I'm sorry that's your perception of things, but we have to support all of our students."  The social worker Columbia referred

Gross to dismissed his experiences with antisemitism yet emphasized she would never tolerate people saying they wanted to lynch African Americans or yelling homophobic slurs.

507. After October 7, Gross repeatedly emailed Judy Wolfe, School of Nursing Senior Associate Dean of Student Affairs, expressing his concerns with the campus environment, but never received a response. On November 28, Gross finally met with Dean Wolfe but left the meeting disappointed and discouraged. When he reiterated his concerns, Wolfe said, "I'm sorry this is your experience." Wolfe told him that she does not handle disciplinary procedures, and referred him to the bias reporting procedures, which at that time, weeks after announcing the Task Force, still did not include antisemitism as grounds for making a report. Indeed, antisemitism did not become a reportable basis for bias reports until the beginning of the spring 2024 semester.

508. Gross's experiences did not improve in the spring 2024 semester. There was an influx of fliers in residential buildings and the main lecture building and continuous rallies. Gross has continued to document and report incidents. On February 20, 2024, Gross met with Dean Judy Honig and another administrator to discuss incorporating Jewish history and education on antisemitism into the curriculum at the School of Nursing. Gross suggested consulting with Jewish professors and organizations and recommended resources, but the administrators failed to take these steps.

509. On March 27, Gross and another Jewish student, met with Dean Honig and another administrator, to continue the discussion from the February 20 meeting. But Honig was again dismissive of Gross's concerns. For example, when Honig questioned why Jewish students did not organize more Jewish events at CUIMC, Gross and his peer responded that Jewish Columbia students feared harassment. Honig expressed disbelief of the legitimacy of

their concerns, even after they detailed antisemitic incidents, claimed the issue is not antisemitism, but a "lack of civility," denied policies had been violated, invoked the pretextual excuse of free speech, disclaimed Columbia's ability to address antisemitism, and demanded Gross and the other Jewish student provide proof of antisemitic incidents.

510.    In response, on April 1, Gross emailed the administrators documentation of antisemitic incidents, including a recording of a "teach-in" the night after their March 27 meeting, during which a student claimed terrorism isn't a crime. Gross also attached a document with evidence of several other incidents, including the December 6 "teach-in" at CSSW and the January 24 "No Safety Without Divestment Rally." Over one week later, on April 9, Dean Honig responded copying Academic Affairs Coordinator Tina Holder who Honig said would "coordinate a meeting to discuss possible next steps." Gross, two other Jewish students, and Holder then exchanged emails discussing availability for the meeting, but when Gross's classmates asked if they could bring a member of the Task Force, Holder never responded. The meeting was never scheduled. On a separate email thread on April 19, Honig emailed Gross and the other two Jewish students requesting they "redirect" their meeting back to its "original purpose," the "nursing curriculum."

511.    On April 20, Gross was on his way to CUIMC while wearing a Star of David necklace. After October 7, Gross did not wear a Star of David publicly due to safety concerns, yet he made an exception this day to connect with an Orthodox Jewish patient who was hospitalized during Passover. Gross came across a rally by CUIMC, where students, including his classmates, were chanting "long live the Intifada," "there is only one solution, Intifada revolution," "from the River to the Sea," "we don't want no two states, we want all of it," "down with the Zionist state," "we don't want no Zionists here," "Zionists off campus now," and, in

Arabic, "from the River to the Sea, Palestine will be Arab."  Fearful, Gross returned home, took off the necklace, and then took an alternative route to campus.

512.    On April 22, Gross emailed School of Nursing deans, faculty, and other administrators, including Deans Wolfe and Honig, reporting this incident and expressing concerns that there had been "many instances of violence and intimidation against Jewish students since the encampment on the Morningside campus started, and it truthfully feels as though no one cares."  Gross explained that the "impact of these incidents on the Jewish community on campus is profound and terrifying," as "Jewish students are too afraid to show up on campus" or "contact their professors out of fear."  Gross again reported that he did "not feel safe on any Columbia University campus or in any Columbia University classroom" and could not "concentrate on any of [his] work or upcoming exams."  Gross also communicated disbelief that campus conditions could worsen from the previous semester when he "had to complete last semester remotely over 1,000 miles away," and "the complete lack of acknowledgment of what is occurring by administrators, deans, and professors."  Gross attached documentation of various antisemitic incidents in the days before.  Wolfe emailed Gross the next day offering a meeting. When Gross responded on April 24 asking how this meeting would be different than his prior meetings with administrators that had not led to any meaningful change, Wolfe did not respond.

513.    Gross attended an April 30 "Glory to Our Martyrs" rally at CUIMC (advertised as a "vigil"), risking his safety, because at the March 27 meeting, Dean Honig demanded Jewish students prove they have been experiencing antisemitism.  During the "vigil," Gross observed Professor Abdul Kayum Ahmed inciting disruption as he lamented that CUIMC was operational while the main campus was shut down because of the Hamilton Hall takeover.

514.     On May 8, Gross's professor asked in a remote clinical psychotherapy course if anger can be helpful and stated the anti-Israel rallies as an example of how can anger can be used constructively and rejected the notion that the rallies need to be peaceful.  Disturbed by this, Gross, the only Jewish Zionist in a class of just nine students, turned his camera off and was unable to focus and learn the rest of the class.

### xvi.     Harnick

515.     Harnick was frequently late to class because of the rallies.  On April 17, he noticed a large group of students marching around campus screaming for an "Intifada revolution."  On April 18, he left campus early and missed class after he saw occupiers screaming at visibly Jewish students that they supported genocide.  Harnick became uncomfortable in his classes as he feared confrontation.  Later that day, Harnick and other Jewish students were holding American and Israeli flags on campus when occupiers from the encampment accosted them, yelling that they were "terrorists" and "supported genocide."  One of Harnick's friends was called a "Nazi."  While they were standing with the flags, an agitator, with his face completely covered, stood in the faces of Harnick and his friends holding up a Hamas flag.  Harnick was frightened.

516.     Harnick's last day on campus was April 18.  Once his classes were moved online, office hours were canceled and his classes were no longer productive learning environments.  He also could not access campus, including the dining halls and libraries, which forced him to change his typical study routine.  His Computer Science final, which Harnick was relying on to improve his grade, was canceled, along with two other finals.  The remaining two finals were made optional.  Because he no longer feels safe on Columbia's campus, he is considering transferring.

xvii.    **Kahane**

517.    Since October 7, Kahane has experienced antisemitism in classes.  On December

4, 2023, students in Kahane's poetry workshop class shared poems they had written for class.

For example, a poem by his classmate included such lines as "two men blurring the image of a

body's cracked skull," "the Gazans have been eaten it will become the fissure near her brow the

blood that seeps presenting here as the blood that continues to seep the poem must undo," "the

poem must use both fists to convince its reader that this is not a poem and when I say place what

I really mean is Palestine and the stanza is the blood," "do you feel it bleeding onto the cotton of

your white blouse you are now wearing the poem," and "Palestine, for the poem you must keep

breathing."

518.    After this poem was shared and another poem was read, Kahane's professor

stopped the class for a break.  After the break Kahane read his poem to the class, a short haiku

poem written from the perspective of a hostage whose poster was ripped off a lamppost.  The

poem ended with the line "I want to go home."  Kahane's poem, which was written from the

point of view of a hostage in Gaza—not about Zionism or Judaism—triggered a charged

conversation, ultimately making him realize that as long as he expressed distress and sadness by

Hamas's October 7 attack, he would be unable to learn in a classroom environment free of

discrimination or harassment.  As is standard for the class, his professor asked him how he felt

after about ten minutes of discussion.  Kahane responded that he felt incredibly hurt hearing the

chants "globalize the Intifada" or "fuck the Jews" as he walks around campus, or reading posters

that exclaim "Zionism is terrorism," particularly because many of Kahane's ancestors were

killed in the Holocaust, Kahane's mother is from Israel, and at least two people he knew

personally were killed on October 7.  A student interrupted him asking to speak as an anti-

Zionist and told Kahane his rhetoric is dangerous because it's a "white supremacy" issue.

519.    Kahane, emotionally distressed, left the classroom and immediately returned to his apartment where he sat depressed in darkness for hours before reaching out to a support group of other Jewish students.  Following this incident, he told his professor that he did not feel safe in the classroom and would not be attending the last class session.  Kahane met with his professor to express his pain and fear for his safety in the classroom.  A few days after this incident, Kahane made a formal complaint with Columbia, detailing the incident and identifying the students that harassed him, but did not hear back for at least ten days—after classes had ended for the semester—at which point he received an automatic reply merely listing resources available.  Indeed, this incident was so severe that it prompted Kahane to take a leave of absence from Columbia for the spring 2024 semester.

520.    Kahane has experienced immense stress, anxiety, and depression because of the antisemitic events at Columbia, causing him to lose sleep, have nightmares that he has been forced to hide in an attic, and miss class.  This has been compounded by the lack of support from the administration.  For example, Kahane has met with Dean Rosen-Metsch to express his concerns but saw no changes implemented as a result.  Kahane struggles to feel comfortable speaking about his Jewish or Israeli identity and feels that Columbia has become a Hamas public relations firm.  Kahane has had to confirm his professors have not signed on to antisemitic letters or openly supported antisemitic professors like Massad.  Kahane's grades have suffered since October 7 and he has considered transferring but because he came to GS as a transfer student, he cannot transfer again and is forced to stay at Columbia if he wants to obtain a college degree.  He ultimately took a leave of absence from Columbia and has not yet decided when he might return, and in the interim, he has not found employment.

### xviii.   Kesselman

521.    Kesselman's experiences with antisemitism at Columbia began a year before October 7.  In fall 2022, during Introduction to Power Race Oppression Privilege—a required class for CSSW students—Professor Margarita Carlson often ignored Kesselman.  For example, when other students in the class shared their personal stories of intergenerational trauma or experiences with racism, Carlson provided feedback and told the students they were "amazing" or offered similar praise.  Yet when Kesselman shared she was Jewish or told her own family history, Carlson would simply ignore her and move on.

522.    In spring 2023, Professor John Robertson played a video to Kesselman's class of a disability activist named Judith Heumann, whose family members had survived the Holocaust, and who compared the Americans with Disabilities Act to the Emancipation Proclamation.  On a message board in the class, one classmate wrote that this comparison was very offensive because a Jewish woman was appropriating the term Emancipation Proclamation, and he falsely claimed that the Holocaust did not involve the sale of human beings or mass rape and exploitation.  The next class, during an argument about the Holocaust, that same classmate claimed that Jewish people were instrumental and disproportionately impactful in the slave trade, had a massive influence on slavery due to their wealth, and should be considered oppressors.  When another classmate responded and shared a story about her grandmother being enslaved in the Holocaust, Robertson responded that it's hard to conceptualize antisemitism these days "because we don't see it anymore."  Kesselman noted her disagreement, explaining that antisemitism does still exist.

523.    In the aftermath of October 7, Kesselman, who had friends and family murdered in Hamas's attack and other loved ones taken hostage into Gaza, struggled to focus on school and requested extensions for nearly all of her assignments.  On or around October 10, Kesselman

returned to class.  During that week's class with Professor LaTasha Smith, Kesselman was still grieving.  This class typically began with "making space" for Kesselman and her classmates to process and reflect, yet that week Professor Smith was away and the Live Support Specialist Leah led the class.  Leah did not address October 7.  In a smaller breakout room, Kesselman explained the emotional impact of October 7 to her classmates.  When the breakout rooms joined the larger class discussion to share what they had discussed, one of Kesselman's classmates explained that they talked about the atrocities in Israel, and that she thought it was important for Kesselman to share what happened.  Leah responded in essence, "um okay, it's definitely important, but before we get to that all the groups have to go."  After the groups finished sharing, it was finally Kesselman's turn to talk about October 7.  However, before Leah let Kesselman speak, she told the class "there are equally horrible things that happen in this country, and they don't get the same air time as other issues," and there are "lots of things that happen around the world."  After that, Kesselman gave a trigger warning—as she was required to do when sharing about sensitive topics—that she would be discussing horrific events, and then explained that Hamas terrorists invaded Israel, slaughtered civilians in their beds, and slaughtered babies in their cribs.  Leah interrupted to the effect of: "woah, woah, woah, Talia you're using a lot of really triggering, graphic language, the goal of this is to be in community with the class, we don't need the details, we can go on the news."

524.    On October 11, Kesselman received an email from Professor Smith asking her to "touch base."  During their meeting the next day, Smith asked Kesselman how she was doing.  Kesselman explained she was struggling to focus on class while still grieving from Hamas's October 7 attack.  Smith responded "yeah, that was clear, I watched the class."  Smith, a Black woman, then told Kesselman that she "disrespected another Black woman" by interrupting Leah

when she was speaking.  When Kesselman asked Smith if she was as horrified about the 1,200

Israelis that were slaughtered on October 7, she looked away from the camera, crossed her arms,

and said in effect, "I am horrified and outraged and scared about a lot of things around the world,

there are a lot of things that scare me."  Kesselman followed up and asked why Smith did not say

the word "Jews."  Smith defensively responded, "why do you need me to say that? You can't

make me say a thing that I don't want to say," and told Kesselman she was behaving

inappropriately.  Because of Smith's comments in their meeting, she dropped the class.

525.    In the spring 2024 semester, Kesselman took a class with Professor Natacha

Jacques.  During the first day of class, students had to agree to various "Community

Agreements," which were guidelines about how to behave in the class.  These included, "open-

mindedness toward all," "be considerate and respectful towards each other," "being respectful,

kind, and aware within the space," and "respect different opinions."

526.    On February 26, Kesselman emailed Professor Jacques, "As someone who lost

friends and family in this conflict and has loved ones actively being held hostage in Gaza, the

constant reminders [Palestinian flags] of the conflict in our class are becoming increasingly

traumatic."

527.    On March 18, Jacques brought up the issue in class, but was immediately met

with extreme backlash.  Students replied with comments such as "social work is incompatible

with Zionism," and "I refuse to be in a class with people complicit in genocide."  However,

neither Jacques nor Kesselman received support from the class.  Unable to remain in class,

Kesselman walked away from her computer and hid in her closet shaking until class ended.

528.    On March 20, Kesselman emailed Ernst VanBergeijk, a student adviser, and Dean

Curtain about the incident.  She explained that, when Professor Jacques tried to address the issue,

"the class erupted and became extremely toxic and hostile, with students sharing that social work students who support genocide should not be in this course/program, among many other hostile Anti-Semitic comments and messages." Kesselman explained that the situation was extremely traumatizing, and that she was "shaking and crying for hours following the incident." Because of this incident, Kesselman requested to complete the course through independent study.

529.    On March 25, Kesselman met with VanBergeijk. In response to Kesselman's request to complete the course through independent study, VanBergeijk suggested that she just mute the class, not participate, and accept a lower grade to just "get through it."

530.    Kesselman's mental health has suffered because of her experience at CSSW. Throughout her two years, but particularly since October 7, she felt unsafe, targeted, and traumatized as a Jewish Israeli student at Columbia. Given Columbia's inability to take control of its student body and the public criticism it has received, she is ashamed of her degree and fears she will not be able to get a job with it. She considered transferring, but could not afford to go to a different university, while also supporting her children.

### xix.    Mizrahi-Aks

531.    In the days after October 7, Mizrahi-Aks learned that two of his cousins were taken hostage by Hamas into Gaza. He immediately left New York to be with his family and did not return until late October. He was disturbed by what he heard before he left New York, as he was forced to listen to students proclaim, "it was a justified resistance" and the "rapes women reported were fake" as he walked through campus to get to class.

532.    On or around the beginning of April 2024, Mizrahi-Aks was walking to class when he encountered a mob of students just outside the campus gates. As he needed to get to class, he continued walking through the mob. Three individuals yelled, "get out kike" at him. Mizrahi-Aks reported the incident to Public Safety, but did not receive a response. Mizrahi-Aks

was wearing his Star of David necklace that day, but from that point on, he hid his Star of David while walking around campus if there was a rally.  Frightened by the encounter, he continued to avoid coming to campus whenever possible, took longer routes to class to avoid the mob, and even missed classes because of the mob's presence.

533.    On April 18, 2024, Mizrahi-Aks encountered the encampment for the first time. He was shocked by what he saw: a student wearing a green headband resembling ones worn by Hamas terrorists and another holding a Hamas flag.  They were chanting, "burn Tel Aviv to the ground" and "Intifada."  On or around this time, he was pushed several times, and was told, "Zionist get out" and "get the fuck out of here" and some of his friends were told, "go back to Poland."

534.    Mizrahi-Aks has experienced a decline in his mental health as a result of his experience at Columbia since October 7, causing him to lose sleep and his ability to focus on daily activities.  He spent most of his sophomore year in his apartment avoiding campus.  He also stopped speaking Hebrew, as he would typically do with friends and family, while on campus.

535.    Mizrahi-Aks has had to confirm his professors have not signed on to antisemitic letters or openly supported antisemitic professors.  His grades have suffered since October 7, as he could not participate in mandatory labs for his physics class during the fall 2023 and spring 2024 semesters, and could not study in the library because of the presence of students dressed up as Hamas terrorists, fully covered except for their eyes.  He has considered transferring but has realized that to complete his degree on time he needs to remain at Columbia.

### xx.    Nauer

536.    For the week after October 7, Nauer avoided going to campus as he was still grieving the loss of friends who died during Hamas's attack at the Nova Music Festival.  A few

weeks before October 7, Nauer and his classmates introduced themselves at the beginning of their Public Speaking class.  One student, Mohsen Mahdawi, introduced himself and, while pointing at Nauer, told the class that his best friend was shot in the eye when they were five, that his uncle was assassinated by an Israeli solider when he was eleven, and that he was shot in the leg by an Israeli soldier when he was fifteen.  Nauer reported the incident but did not receive a response until months later.  Because of this and because Nauer saw Mahdawi leading antisemitic rallies on campus, Nauer stopped attending Public Speaking in person after October 7 and instead attended remotely.  At the end of the fall 2023 semester, Nauer and his classmates had to write a persuasive speech and debate with a partner in front of the class.  For his debate, Mahdawi and his partner spent forty-five minutes lecturing Nauer and his classmates on boycotting Israel, telling them to stop buying Israeli products, and to kick out all Israelis.

537.     Because of the antisemitism on campus, Nauer has had anxiety and trouble sleeping.  When in class, Nauer could sometimes hear chants calling for his death over his professors, making it challenging to focus.  He also felt like an outsider on his own campus when students chanted that no Zionists should be allowed.  His freshman year, Nauer started a group for Israeli students at Columbia, which now has over 400 students.  In the months following October 7, Nauer and the group collected details of antisemitic harassment and incidents on campus and helped students report it to the administration.  Nauer would identify specific students in his reports but still see them on campus weeks or months later.

           **xxi.     Ami**

538.     Ami's experience on campus has been severely impacted by the rampant antisemitism.  He has concealed his Jewish identity, removing his kippah when on campus. Ami, who is an IDF veteran, could not focus on classwork when he heard his classmates chanting, "death to Israel" and "we don't want no Zionists here."  When Columbia closed its

campus for the encampment, Ami, who lives off campus, could not access campus, including the gym, libraries, and the kosher dining hall.

### xxii.    Gabe

539.    As Gabe keeps kosher, he regularly ate in the only kosher dining hall at Columbia University, which is on Barnard's campus.  One day in February 2024, he encountered a group of people with bullhorns standing in a ring blocking access to the dining hall.

540.    Gabe's last day of the spring 2024 semester on campus was April 19.  While he initially planned to return to campus after Passover, he ultimately stayed at his parents' house for another week because he did not feel safe as long as Columbia permitted the occupiers in the encampment.  And while he normally studied regularly in the library, he studied for all of his finals at his parents' home.

541.    Gabe had thoughts of transferring during his first semester, but decided against it, as he was optimistic that conditions would improve on campus and placed value on the education he was receiving from Columbia.  However, he quickly realized upon returning to campus for his second semester that things had gotten increasingly hostile.  While he had been excited to join clubs such as intramural soccer during his second semester, the increased number of rallies around campus led Gabe to decide not to join any clubs out of concern for his safety.  The encampment exacerbated these concerns, and he is now strongly considering transferring.  He has put in transfer applications at other institutions.

### xxiii.    Molly

542.    Molly's academic environment has been impacted by the antisemitic events and posters calling for violence at Barnard since October 7.  She reported the posters to the administration, but they were never taken down.  In or around November 2023, Molly, who for

three years studied in Milstein Library, was no longer comfortable studying there because of the harassment Jewish students faced in the library.

543.    Molly avoided campus during the encampment until May 2, when she was required to present her thesis.  Traditionally, Barnard invites the students' families to these presentations but because of the encampment, Barnard did not allow any guests.  On May 14, Molly attended her Phi Beta Kappa induction at Barnard.  Senior Class Dean Rebecca Grabiner chose Barnard Professor Manu Karuka as the keynote speaker to speak about W.E.B. Du Bois. A few weeks earlier, Karuka was guarding an entrance to the encampment and was seen with agitators in front of Hamilton Hall the night it was occupied.  Rather than speaking about Du Bois, Karuka's speech focused on Gaza, with no mention of October 7, Hamas's violence, or the hostages.  Karuka received snaps of approval throughout his speech and a round of applause at the end from both students and faculty, including President Rosenbury.  After the ceremony, President Rosenbury sent the students an email that stated, in part, she was "sorry" the "room was obviously divided" during such a "special day," but that Barnard does not review speeches by faculty, and she respected Professor Karuka's right to express his own views and "especially his right to criticize Barnard and Columbia's actions."

### xxiv.    Nock

544.    Nock's courses have been contaminated by rampant antisemitism before and following October 7.  In fall 2023, his Foundation of Public Health required course was taught by Assistant Professor Abdul Kayum Ahmed, who, in 2019, told an auditorium full of high school students during a presentation that there is "fluidity between those who are victims becoming perpetrators" as shown by "Jews who suffered in the Holocaust and established the State of Israel . . . perpetuat[ing] violence against Palestinians that [is] unthinkable."  Ahmed also signed the October 30 letter defending the student groups' joint statement that justified the

October 7 terrorist attack, and this year, published "A is for Amandla: The ABC Guide for Young Revolutionaries [and their parents]," the cover of which depicts children holding signs that say "no justice no peace" and "decolonize this place" in front of a banner that reads "free Palestine." Ahmed exploited his position as a core curriculum professor to teach a false narrative that justifies violence against Jews and Israelis to approximately 420 first-year graduate students.

545.     In early September 2023, Professor Ahmed led the students in a call-and-response chant, which was filmed by the teaching assistants, during which he yelled, "What do we want?"; the students responded, "Justice!"; Professor Ahmed then yelled, "If we don't get it?"; and the students responded, "Shut it down!" The exercise made Nock feel uncomfortable and different and reminded him of Nazi Germany. During that semester, Ahmed taught that Israel was a colonial state and claimed that (i) the School of Public Health should not be named after Joseph L. Mailman (a Jewish philanthropist who helped Jews escape Nazi Germany), and (ii) the building that houses the school should not be named after Armand Hammer (a Jewish philanthropist and Nobel Peace Prize nominee), because all they have done is give Columbia "blood money."

546.     During an October 10 event hosted by Mailman School of Public Health Dean Linda P. Fried, Ahmed redirected a discussion around Indigenous Peoples' Day to broadcast his narrative of Israel as a colonizer. Nock walked out of the event. On December 10, Nock shared his concerns about Professor Ahmed's "many biased and unprofessional actions" in an email to Dean Fried, as well as to various other administrators.

547.     Nock's required General Public Health program in the fall 2023 semester was similarly co-opted by Professor Rachel T. Moresky as a platform to spread propaganda. For example, Moresky assigned a biased reading ahead of a lecture that falsely blamed Israel for the

Al-Ahli Hospital explosion well after it was proven that a misfired rocket from Gaza caused the explosion.  Nock reported his concerns about Moresky's lectures in his December 10 emails to Dean Fried and others.

548.     On March 8, 2024, the *Wall Street Journal* published an article entitled "Some Columbia Professors Accused of Pro-Palestinian Indoctrination" that featured concerns about Ahmed, including a quote from Nock that "[Ahmed] puts the idea into everyone's head that the Jews stole the land and it should belong to the indigenous people."  Ahmed was quoted in the article responding to students, like Nock, who criticize him, stating, "a handful of privileged, white students, who have probably never been confronted by a framework that challenges them to think critically about the benefits they derived from the system of white supremacy, patriarchy, and capitalism."  After seeing the published article, Nock felt personally attacked by Ahmed since his father survived the Holocaust and engrained in Nock how dangerous justifications—such as that Jews are privileged, white supremacists—perpetuate hate for Jews solely because they are Jewish and lead to horrific attacks on Jewish people such as October 7.

549.     Since October 7, Nock only uses a back entrance to CUIMC because of frequent rallies held near the main entrance that make him feel unsafe.  Nock has avoided campus and missed classes due to safety concerns.  He also avoids certain courses and has withdrawn from others because he no longer feels safe at the main campus.  In the spring 2024 semester, Nock wanted to take French and coding classes, but dropped them after registering because they were located on Columbia's main campus.  Instead, he chose different classes, including a math class, even though he did not have background on the subjects.  Yet Nock was still unable to focus on his coursework because of the increasingly hostile environment at Columbia and fell dramatically behind on his schoolwork, ultimately forcing him to take an incomplete in at least

one class.  Because he has been unable to take classes in his program, Nock's graduation date has been delayed by at least one full semester.

550.    On May 7, Nock emailed Director of Student Support at the Mailman School of Public Health Meurcie K. Zignoli summarizing his experiences at Columbia, including the antisemitism in his fall 2023 classes.  He recounted how he "told [his] classmates, [his] professors, [his] advisors, [his] deans, [his] medical center administration and [his] University Administration about the hate that was being perpetrated in our classrooms.  AND NOTHING HAPPENED!"  Nock also explained that because he had not received responses from the administration to previous reports he made, he understood their silence as a refusal to take action and internally make substantive changes.  In the email, Nock reported that he intends to take a leave of absence and plans to take his remaining credits "at a time and place in which [he] feel[s] safe."  He also told Zignoli how he "let advisors and deans know that [he] was not doing ok for months," and wrote:  "So let me be clear: I need help.  The racist environment created at Columbia is deleterious to my emotional, mental, and likely physical health."

### xxv.    Quinn

551.    Quinn is a member of Sigma Delta Tau and on the sorority's Standards Board, which evaluates discipline or action taken against other sorority sisters.  In or around the first week of April 2024, one sorority sister had posted to her Instagram a screenshot of another sorority sister's pro-Israel story and wrote, "u fucking IDIOT USE UR HEAAAD."  Three members of the Standards Board, which constituted a majority, voted that the Instagram post was not antisemitic and not a personal attack on the pro-Israel student.

552.    Quinn's academic experience has been impacted by antisemitism since her freshman year.  When she was registering for classes, Quinn had to adjust her schedule to avoid classes with antisemitic professors or syllabi—even classes that were part of her sociology

major.  During her sophomore year, she mentioned Israel in class but was met with silence from her classmates and her professor changed the topic.  After October 7, Quinn became more apprehensive when she registered for classes as she worried professors and classmates would discriminate against her for being Jewish.  By November 2023, Quinn did not feel safe studying in the library and avoided campus when possible.  When she was on campus for class, she adjusted her route to avoid rallies but because she could hear the rallies from some of her classrooms, it was often difficult to focus.  Her classes were also disrupted by her classmates who would leave class to attend rallies.  For example, during one rally, approximately half of Quinn's class left class to participate in a pro-Palestine walkout.

553.    Because Quinn found her academic environment incredibly hostile, she added additional classes to her spring 2024 schedule to take enough credits to graduate and leave Columbia's campus early.  In her Global Activism course, Quinn was one out of only fourteen students in the class.  Students in the class often shared their support of Palestine, called Israel an "apartheid state," and the professor distributed readings that used Israel as an example of colonialism.  During one class, Quinn expressed that in her view, Israel cannot agree to a ceasefire without Hamas's commitment to do the same and that the lives of both those in Israel and Gaza should be valued equally.  Her classmates were initially quiet but then started laughing at her.  Her professor, who was silent when classmates shared support for Palestine, immediately changed the topic.  Quinn was particularly distraught by this experience because at the beginning of the semester the class was required to sign a "community agreement" which, in part, stated classmates would demonstrate kindness, consideration, and respect in the classroom.  Because of her classmates' and professor's reaction, Quinn felt even more uncomfortable being Jewish in the classroom and removed the dog tag necklace she wore in honor of the hostages held in Gaza.

554.     On April 23, the same professor emailed the class: "I condemn the recent actions of the Barnard and Columbia administrations, including the arrests, suspensions, and evictions of students, and I offer my unwavering support and solidarity to each and every one of you, especially those of you engaged in acts of protest."  He also changed the remaining assignments, allowing students to give presentations on recent campus events instead of their final paper topics and shortened the minimum final paper length since current events were "scrambling" students' work schedules.  While he was open to extensions, he "really [did] not recommend asking for more time."

### xxvi.     Rabban

555.     In the weeks after October 7, Rabban reached out to Barnard's Rosemary F. Furman Counseling Center, yet did not receive support because therapists were "backed up." Prior to October 7, Rabban felt connected to and accepted by her sorority sisters in Sigma Delta Tau.  But following Hamas's terrorist attack, a member of the board blocked all Jewish members on Instagram, one Jewish member was called a "fucking IDIOT" on Instagram, and others have consistently posted antisemitic content and promoted SJP's posts.  The sorority's DEI chair organized a "safe space" event in October with separate designated times for Jewish and non-Jewish members, further isolating Rabban and her Jewish sorority members.  Her sorority holds monthly DEI events for minority groups other than Jews.

556.     Despite her stellar academic record, Rabban has missed many classes because she was forced to avoid campus during the near-daily rallies.  Her grades have also suffered, receiving the lowest grades in her entire academic career because she could not concentrate in class, where she could hear her classmates protesting, or study on campus in the libraries.  In fact, in December 2023, Rabban elected to defer a physics exam until January so she could study

during winter break.  Because of the encampment, Rabban took an incomplete in her research class for spring 2024.

557.    Rabban has been forced to hide her Jewish identity, concealing her Star of David necklace during rallies on campus, and no longer discloses that her father is Israeli.  She has had to avoid taking classes in departments such as Sociology, Anthropology, and the Women's, Gender, and Sexuality Studies department, despite Barnard's reputation for being a women's college.  For example, Rabban wanted to take a class called Intersectional Feminisms but chose not to after the professor spoke of genocide in Palestine.  Rabban was also confused to see the syllabus focused on colonialism, not feminism.  When Rabban's friend met with this professor to express frustration that there were no other viewpoints on the syllabus, the professor told her friend, "there was one piece written by a Jew."

>        xxvii.    Roe

558.    Even though Roe lived off campus, she was close enough that she could hear the rallies on campus, particularly during the encampment, which made it impossible to sleep or focus.  On campus, she had to constantly walk by violent, hostile, and aggressive antisemitic protests where agitators chanted antisemitic rhetoric.  Because of the environment, she was incredibly anxious and would often arrive late or miss class and avoid campus.  When she was on campus, she regularly experienced panic attacks.  She also sustained an injury to her knee when she was assaulted by a student during the encampment.  The leg was unable to support her weight for weeks and caused immense pain.

559.    Roe is an observant Jew who has been asked by faculty multiple times to compromise her religious practices.  In the spring 2024 semester, Roe's class took her and her classmates to Berlin, Germany for research on their senior thesis project.  Roe told the department in advance that she would be unable to travel on Saturday as she observes Shabbat.

But a few weeks before the trip, Roe's department announced that it had put the class on a Saturday flight. Roe reiterated she was unable to travel with the group on Saturday. Roe was forced to change her flight to Friday and pay the change fee and for her hotel on Friday night.

560. That same semester, Roe's teaching assistant scheduled her final presentation on Passover. When Roe told her teaching assistant she would be unable to attend, her teaching assistant threatened to give Roe a failing grade for the class. After notifying the professor, Roe was ultimately able to move her presentation, but was required to present on Zoom. Around the same time, Roe was told she would have to install her final art project on a Saturday. Since the installation required using power tools, Roe explained she would be unable to participate. Despite her protest, Roe was forced to attend or face severe academic consequences. Roe ultimately attended on Saturday as it was the only time the curator—a mandatory aspect of the final—was scheduled to come in.

### xxviii. Rukeyser

561. The week after October 7, Rukeyser met with her Cultural Psychology professor, Karen Seeley, regarding her senior thesis. Professor Seely had asked the students in the class to select an aspect of their culture and write about it. Rukeyser went into the meeting eager to share that she wanted to write about Judaism, but the professor shut her down and said, "Judaism is a religion, not really a culture." On October 30, Seeley signed the "Open Letter from Columbia University and Barnard College Faculty in Defense of Robust Debate About the History of the War in Israel/Gaza."

562. In November, Rukeyser was in her Shakespeare and Performance class when the other students in the class arranged a walkout. Ten students stood up and left the class, and only Rukeyser, the professor, and one other student remained.

563.    Post-October 7, Rukeyser encountered rallies nearly every day while walking on campus.  She would regularly hear chants of "resistance by any means necessary," "from the River to the Sea," and "globalize the Intifada."  She also saw posters all over campus, saying things such as "resistance is justified when people are occupied" and "intifada."

564.    Feeling the stress and unease of everything that was happening around her on campus, Rukeyser hoped that she could seek refuge in the quiet of her own residence hall.  Unfortunately, that was not the case.  The elevator in Rukeyser's residence hall had posters for several days after October 7 saying things such as "Israel bombs, Columbia pays."

565.    Rukeyser had three roommates in her residence hall this year, with each of them having their own, separate bedroom and a shared common space.  She had been friends with these students previously, and they all knew she was Jewish and a Zionist.  Things became tense between Rukeyser and two of her roommates in the wake of October 7, as they would regularly attend rallies, openly supported SJP, and were hostile to Rukeyser.  When Rukeyser sought to initiate a conversation with one of her roommates about how these things were affecting her, the roommate blocked her on social media and told Rukeyser that she "wasn't antisemitic," she was "anti-Zionist."  In total, Rukeyser slept in her residence hall for only ten nights the entire year after October 7, often staying at her boyfriend's apartment or her parents' home instead.

566.    On May 1, at about 5:00 p.m., one of her roommates was loudly discussing the war in Israel and Gaza and said that "Israel was supporting a genocide" in their shared kitchen space, despite Rukeyser's repeated requests throughout the year not to discuss the topic in their shared spaces.  Rukeyser went into the kitchen to fill up her water bottle, and calmly stated that "Hamas is wrong for murdering, raping, and abducting 1,200 Jews."  The roommate immediately became aggressive, screamed at her that she was a "genocide supporter," and then lunged at her.

Rukeyser ran and closed the door to her bedroom, and the roommate continued to scream things like, "do not fuck with me," and banged on her bedroom door. Rukeyser called Community Accountability, Response, and Emergency Services to report the incident, and they offered to move her to another suite that evening. She also called the Title IX emergency line, and emailed the dean and the Title IX office about the incident.

567.    Rukeyser ended up filing a complaint against her roommate on May 2, and she followed up on May 6 as she had not received an update as to the status of her complaint. Once again, she was offered a room change and was provided information on counseling services, but was not given an update on the status of her investigation nor was any immediate action taken against the roommate. Given that she was dealing with the stress of finals, Rukeyser elected not to move and instead slept in her boyfriend's apartment during that time. She ultimately met with the Title IX office on May 17, two days after graduation. They informed her that since she had graduated, a no-contact order was not a viable option. Nothing happened to either of her roommates, and they graduated with clean records.

### xxix.    Ruttenberg

568.    Shortly after October 7, the doors in Ruttenberg's residence hall were covered with fliers and stickers including "never give up until Palestine is free," "glory to our martyrs!!," "long live the resistance!," "we are all Palestinian," "intifada intifada intifada intifada," "Zionism is terrorism," "Fuck the occupation," "anti-zionism is not anti-semitism," "every time media lies a neighborhood in Gaza dies," and "Zionism is terrorism."

569.    On February 1, 2024, Ruttenberg met with Dean Grinage, and told her the posters plastered on Barnard residence hall doors, including a poster of a blue and white skunk with an Israeli flag imprinted on it, made her feel unsafe as a Jewish student at Barnard. Dean Grinage said she would "look into it." On February 13, Ruttenberg met with her resident assistant about

fliers on doors in her hallway and her resident assistant submitted a report on her behalf.  After receiving an email from her on February 14, Ruttenberg met with Elizabeth Scott Francis, Barnard's Executive Director for Outreach and Response & Title IX Coordinator, on February 19, and four days later, on February 23, Barnard published a door policy stating, "we are asking everyone to remove any items affixed to your room and/or suite doors (e.g. dry-erase boards, decorations, messaging) by Wednesday, February 28 at noon."  Yet this policy was ineffective; decorations would be removed and placed in a bag on the door handle but the decorations would return on the door by the next day.

570.     On April 19, Ruttenberg returned to her residence hall to find a poster that read "ceasefire now" on her roommate's wall and a list of chants being used at the encampment, including "brick by brick wall by wall / apartheid states will have to fall," "we demand liberation / end the zionist occupation," and "fight the power, turn the tide / end israeli apartheid."  No longer feeling safe, Ruttenberg asked the Office of Residence Life to switch residence halls.  But Ruttenberg was unable to sleep in her new room which faced Broadway because she could hear chants from the encampment at all hours of the night.

571.     On April 22, Ruttenberg's professor canceled the class's final presentations, which were supposed to be held via Zoom, and offered to meet with students in a park on Riverside Drive instead.  Her professor wrote that class was canceled because campus was experiencing a moment of "historic turmoil" and that some were "close to the conflict in Palestine" and some close to the "conflicts on campus."  Ruttenberg met with Danielle-Hope Hayden, Barnard's Senior Associate Director of Nondiscrimination and Title IX, a few days later about this email and Barnard's failure to respond to antisemitism on its campus.  At the meeting, Hayden did not offer any actions Barnard would take to make campus safe other than offering

accommodations—after the semester was essentially over—and that Hayden would "keep [the situation] in mind."

572.    Because of the harassment and intimidation on campus, Ruttenberg started seeing a therapist.  However, Ruttenberg did not feel comfortable meeting with a Barnard affiliated therapist because on March 7, Barnard shared on its Instagram a post from the Barnard Health Center which read, in part, "if you were impacted by the January 19th spray incident on campus (for example, incurring costs for clothing, cleaning supplies, health follow up, etc.), please come to one of the open-hours care packages of health and wellness items and support from Health & Wellness Staff."  This was in reference to the purported "chemical attack" on January 19.  After seeing this, Ruttenberg did not feel safe talking to Barnard counselors about her safety on campus as a Jewish student, as Jewish students were not offered care packages in the aftermath of October 7 or any other day.

### xxx.    Sandler

573.    In the days following October 7, Sandler's classmates justified Hamas's October 7 attack on social media.  Because of the rallies on campus, with signs reading "by any means necessary" and chants such as "we don't want two states, we want all of it" and "death to Zionists," Sandler tried to avoid them.  She was particularly uncomfortable knowing professors participated in such rallies.  Sandler sometimes avoided the libraries, where she had frequently studied before October 7, because the rallies made it difficult to concentrate.  On November 18, 2023, Sandler emailed President Shafik and Columbia University's Board of Trustees "to express [her] deep concerns about the recent incidents on campus that have significantly impacted [her] experience both inside and outside of the classroom as a Jewish student."  Sandler further shared that she "no longer feel[s] that Columbia is a place that celebrates inclusion and diversity," and "[t]he current situation has significantly affected [her] mental well-being, making

it challenging to sleep, focus on [her] studies, and engage in campus life."  In particular, Sandler emphasized that she was "scared to tell [her] classmates and professors that [she] is Jewish." Sandler did not receive a response.  On December 11, 2023, Sandler was forced to walk through bushes on Barnard's campus to get to her office hours as a teaching assistant because of a rally. The following day, Sandler met with an administrator and shared her concerns about and experiences with antisemitism at Columbia.

574.    For the spring 2024 semester, Sandler cross-referenced the October 30 faculty open letter defending student groups for justifying Hamas's October 7 terrorist attack before registering for classes.  That semester, Sandler shifted her teaching assistant office hours to an earlier time of day when it would be less likely for there to be protest activity.  On April 19, Sandler's advising dean emailed her because she learned that Sandler intended to return home because of the encampment.  The advising dean apologized Sandler was "going through a tough time" and explained that if Sandler missed classes that had mandatory attendance, she would have to inform her professors she was "dealing with an urgent matter," request to attend classes via Zoom, and if completing her finals on time "seem[ed] challenging," Sandler would have to "petition for an incomplete in the relevant classes," which might affect her graduation date. Sandler was incredulous that her advising dean failed to recognize the antisemitism and hostile environment that made being on campus unsafe for Jewish students, instead framing it as Sandler's "urgent matter" and "tough time," and that she suggested Sandler might have to take incompletes in her classes because Columbia could not protect its Jewish students.  Since Sandler was expected to graduate in a few weeks, she did not want to take incompletes and be forced to finish class work over the summer after graduation.

575.     Sandler ultimately returned home on April 20 and did not return to campus until May 2 because she was uncomfortable by the encampment, as the noise made it difficult to focus, and it created an unsafe and unsettling environment, including as a result of nonstudents who were in the encampment even though they were not supposed to be permitted on campus. Sandler was especially frustrated when she was in a dining hall and witnessed a student brazenly filling a cardboard box with food to take to the encampment.  During finals in the spring 2024 semester, Sandler could hear rallies from her dormitory targeting President Shafik's residence, which caused her to lose sleep.  Sandler's commencement was canceled.

### xxxi.     Stein

576.     In the days following October 7, Stein, who wears a kippah, avoided campus. Stein could hear rallies from his classroom throughout the year.  During one final exam, Stein struggled to focus over the "Intifada, Intifada" chants directly outside.  Once the encampment occupied the South Lawn, the antisemitic chants were near constant, so when in class, Stein would close the classroom windows to minimize the noise.

### xxxii.     Swill

577.     In or around the first week of November 2023, Swill was physically assaulted near the Alma Mater statue in the center of Columbia's campus.  Swill was wearing his backpack with a pin stating "Israel Always and Forever" when a man wearing a keffiyeh over his face grabbed the pin, pulled Swill to the ground by his backpack, and said, standing over him, "fuck you Zionist."  When he got home, Swill immediately removed the pin from his backpack and never wore it on campus again.

578.     Swill applied to Columbia University specifically intending to join the Bio-Mechanics graduate program as Columbia University is one of the few universities offering the program.  When he arrived, he was told that the professor who taught the program was on

sabbatical for an entire year.  Swill switched to an entrepreneurship program rather than drop

out.  In or around mid-October 2023, Swill was offered a Ph.D. position with a basis in Bio-

Mechanics, which would allow him to pursue his desired degree.  He initially accepted the

position and began working on the degree.  Yet Swill ultimately forewent the opportunity

because he could not stay at Columbia another six years due to the antisemitism he has

experienced.

579.    During the encampment at the end of the semester, Swill still had final projects to

complete, including one in the Biomedical Engineering lab.  But because the encampment forced

the closure of the entire campus, Swill was denied access to his lab.  Swill went to the gate for

four days straight and each day he was told he could not enter, all while other students were

allowed entry.  Swill was told to email Public Safety for access to campus.  On May 1 and 2,

2024, Swill emailed and called Public Safety, who told him to go to the gates and that he would

be allowed on campus.  Yet when he went to the gates, he was still denied entry.  He continued

to call Public Safety and received inconsistent responses about his access to campus, with some

officers telling him there was nothing they could do and that even if he were allowed on campus,

no one was on campus who could open the lab.  On May 3, Swill emailed the chair of the

Biomedical Engineering Department requesting access to campus.  The chair forwarded Swill's

email to the dean of the Engineering School, who eventually granted Swill access to campus on

May 4, 2024.  Swill was denied access to campus from May 1 to May 4.

580.    Swill is traumatized by the intimidation and harassment he has experienced at

Columbia, including being physically assaulted.  In the days following October 7, Swill attended

a pro-Israel vigil when a professor walked through the group waving a Palestinian flag and

others around the group shouted, "free Palestine."  After this and hearing chants such as "we

don't want Zionists here" and "Intifada revolution" at the large October 12 rally on campus, Swill felt too uncomfortable and opted to stay home the next week.  Swill often avoided campus during rallies and missed many classes, including some with critical in-person lab components. On days when Swill had to go to campus, he would often see Columbia community members ripping down hostage posters.  Swill, whose two friends were murdered on October 7, and knows the family members of others taken hostage, was particularly impacted by this.

581.    One day on his way to class, Swill noticed a memorial for a ten-month-old baby held hostage in Gaza.  By the time Swill's class was over, the memorial had been ripped to shreds with devil horns and "satan" drawn on the baby's face.  For Swill, knowing he had classmates who were capable of destroying a memorial for a ten-month old was incredibly traumatizing and he left campus hysterically crying.  Swill felt similarly destroyed when he saw posters in honor of a hostage's ninth birthday also ripped down and torn to shreds.  During the rallies in the spring 2024 semester calling for all IOF off campus, Swill, who has worked with IDF soldiers for years and has dozens of cousins who have served or are serving in the IDF, found himself again avoiding campus because the chants during these rallies, calling Swill's family "terrorists," were particularly traumatic.

582.    Since October 7, Swill has experienced a decline in his mental health, doubled the dose of his anxiety medication, suffered from depression, lost sleep and missed countless classes. He also stopped wearing a kippah, began to conceal his Star of David, map of Israel, and "bring them home" dog tag necklaces, and stopped speaking Hebrew when on campus.  Swill's daily routines, such as going to the gym, became unthinkable as he was afraid to leave his apartment. Even though Swill lived off campus, he could still hear the agitators at Columbia's gates from his apartment.  He would also encounter agitators on his way to campus.  For example, one day

he encountered an individual standing at the entrance to Earl Hall in front of a Public Safety

booth asking students to sign a thank you letter to Hamas. When Swill asked the individual to

clarify what they were thanking Hamas for, he replied their October 7 operation.

### xxxiii. Vanuno

583.    Soon after October 7, Vanuno started seeing a therapist to help manage the

anxiety and stress he was experiencing. He joined a "first response" group chat on WhatsApp,

where he and fellow Jewish students could communicate to warn others of antisemitic activity on

campus. He concealed his Star of David necklace and avoided campus and the libraries. During

the encampment, Vanuno tried to avoid campus but was forced to go to access certain dining

halls where his meal plan was covered, as the only dining hall not on main campus was shut

down. One of the occasions he was on campus, he saw a large banner that said, "SHABBAT

SHALOM, MOTHERFUCKER." When he walked on campus, he felt intimidated and terrified

by chants such as "from the River to the Sea," and "globalize the Intifada" and tried to leave as

quickly as he could. Vanuno's girlfriend was accosted and called a "Zionist pig" by an occupier

at the encampment. Before classes were moved online, Vanuno missed an entire week of class

because he avoided campus. Once his classes became virtual, he effectively missed his

philosophy class because the audio was unintelligible, which ultimately impacted his

performance on the final exam.

### xxxiv. Westergaard

584.    Westergaard has been targeted by students and faculty at Columbia because he is

a visibly Jewish student. Since October 7, he has felt unsafe on campus, particularly because

individuals have shouted his CUID number and other personal information. Westergaard was

often forced to pass the hostile rallies, with chants against the "Zionist entity" and "Israeli

monster," on the way to his lab. In Lerner Hall, students have handed him pamphlets that depict

a "power map" of Columbia that purports to show that "Zionist cultural orgs" have disproportionate power over Columbia, that call to "Globalize the Intifada," and that claim "Zionism is terrorism." He has taken alternative routes to avoid rallies. Westergaard largely avoided campus in April 2024 because of the encampment, and when he had to go to campus, he wore a baseball hat and traveled quickly.

### xxxv. Yadegar

585. As a vocal leader and advocate for Columbia's Jewish and Israeli students, Yadegar has been targeted and harassed on social media, including by Columbia students. Yadegar has been called "Israel's number one d*ckrider [skull emoji] . . . [who] cries about dumb shit," and who "just can't stop reiterating debunked claims of baked and beheaded babies," been told, "burn in hell you Zionist bitch" and "[f]uck her," and has been accused of "misrepresentation and fear mongering" for sharing Jewish students' safety concerns. She has been referenced in Instagram posts such as "@edenyadegar continue crying about 'from the river to the sea' as the rest of the world watches the Zionists' genocide unfold in real time," and one from a student who called Yadegar a "coward" who speaks "out of her ass" and asked Yadegar to respond to certain questions and based on those she threatened, "I might smack a bitch." Because students were posting her photo and name, Yadegar is afraid she will be recognized and attacked on campus.

586. Since October 7, Yadegar has missed classes and taken alternative routes to avoid rallies when she can, has tried not to walk on or around campus alone, and has utilized Columbia's libraries much less often than she did before. When she was on campus, her classes were often disrupted with chants of "from the River to the Sea" and "Zionists off campus." Her grades have been impacted, particularly in the spring 2024 semester when she had to switch two classes to pass/fail and take an incomplete in two others.

### xxxvi.  Zuckerman

587.  Zuckerman has been effectively denied access to Columbia's campus and buildings like the gym, library, and dining hall, which has limited her ability to be with her support system, including friends at Columbia.  Since Zuckerman's apartment was directly across the street from Columbia, it was unbearable when rallies escalated during the spring 2024 semester as she could hear the agitators chanting on campus and outside the gates.  She has considered transferring or taking a leave of absence because of the discrimination she endured from the Barnard community.

### xxxvii.  SAA Member #1

588.  SAA Member #1 is a dual Mexican-American citizen who has experienced discrimination related to her Jewish identity that she knows would not be tolerated if directed toward her Mexican and Latin identity.  SAA Member #1 has avoided taking certain classes that she knows would subject her to indoctrination.  Because of the near-daily rallies on campus, SAA Member #1 has been unable to focus in the classroom and her grades have suffered.  It has also been difficult to sleep as she could hear chants from the encampment in her residence hall off campus late into the night.

589.  On February 23, Barnard mandated that students remove any items affixed to room or suite doors by February 28.  SAA Member #1 works as a resident assistant at Barnard and is responsible for mandatory reporting of actual or suspected incidents related to violations of Barnard's Discrimination Policy.  SAA Member #1 reported at least one complaint on behalf of a freshman student at Barnard who expressed fear and discomfort due in part to the numerous antisemitic banners affixed to the walls in her residence hall.  But in Barnard residence halls, the policy had the opposite effect, and, in response, students began displaying banners and flags in even greater numbers.

186

### xxxviii.    SAA Member #2

590.    In the fall 2023 semester, SAA Member #2 often took alternative routes around campus to circumvent rallies that they learned of in advance.  Although they would have preferred to avoid campus altogether, they risked falling behind substantially if they did not attend their classes regularly—some of which had crucial in-person lab components—and complete their coursework on time.  For that reason, when they could not physically avoid campus or a rally to get to their classes, they would travel through them, suppressing their safety concerns.  They hid their Star of David necklace when they knew there were rallies on campus, as they had friends whose necklaces had been ripped off their necks.  In both the fall 2023 and spring 2024 semesters, they had classes in Hamilton Hall.  Due to its proximity to the centrally located lawns on campus, their classes in that building were regularly disrupted by the rallies.

591.    When registering for classes for spring 2024, SAA Member #2 confirmed with Jewish classmates that the classes and professors they planned to take would be safe for a Jewish student.  Although they were optimistic that Columbia's environment would be calmer after winter break, they were in disbelief and dejected that it was just the opposite.  During the first week of the encampment, SAA Member #2 was meeting with a group of friends around campus when they learned that their Jewish friends had been spit on just outside of Columbia's gates.  They immediately changed their plans and avoided campus that day.

592.    On the first day of the encampment, SAA Member #2's professor dismissed their concerns about the encampment.  Because of the encampment and their safety concerns, SAA Member #2's last day on campus in the spring 2024 semester was April 19.  Even though SAA Member #2 attended their remaining classes via Zoom, they were severely disadvantaged because of a disability and are able to learn more effectively in person.

187

593.    Given their professor's dismissive remarks about the encampment, and that their teaching assistant called the mobs of students peaceful—despite them calling for "death to Zionists"—SAA Member #2 was shocked when, on April 18, their teaching assistant in another class remarked in class that the Environmental Biology Department supports the students who were arrested and that "[t]hey won't have academic repercussions," which the teaching assistant learned from a departmental faculty meeting earlier that day.  SAA Member #2 reported this incident to the Task Force.

594.    On April 18, SAA Member #2 received an email from their Student Affairs Committee chairs, students that were supposed to represent their interests, condemning Columbia for having the encampment cleared out rather than negotiating with the student harassers.  The following day, on April 19, SAA Member #2 received an email from their teaching assistant from a class they took in the fall 2023 semester with the subject "Just checking in," in which the teaching assistant expressed she was "thinking about y'all right now," and condemned "Columbia's actions in the past few days, namely its decisions to bring NYPD on campus and to arrest/suspend students."  The teaching assistant further explained that "us grad students are in your corner."  SAA Member #2 reported both emails to the Task Force.  On April 22, SAA Member #2 received an email from Javier Alvarez-Oviedo, Interim Hearing Officer, CSSI, who stated their April 18 report was forwarded to his office and was being investigated. SAA Member #2 met with Alvarez-Oviedo on April 24, and a mere two weeks later, on May 7, Alvarez-Oviedo emailed SAA Member #2 that Columbia would not be pursuing policy charges based on the emails.  SAA Member #2 is concerned that other students in positions of power are permitted to openly encourage policy violations and express indifference toward Jewish students who are suffering as a result of those violations.

595. On April 23, SAA Member #2 was denied an escort to their dormitory by Public Safety, resulting in being followed and intimidated by a woman just off campus, and SAA Member #2 did not return home on April 30 because of the Hamilton Hall takeover. As a result of being driven off campus, and because the kosher dining hall is located on Barnard's campus and was restricted to only Barnard students during part of the encampment, they were often forced to pay out of pocket for kosher meals or not eat at all, and finished the semester with approximately one third of their entire meal plan unspent.

### xxxix.   SAA Member #3

596. SAA Member #3's experience at Barnard has been impacted by antisemitism they have experienced on campus and in their residence hall. During the fall 2023 semester, their room faced Broadway and they often could not focus or concentrate on their schoolwork because they could hear chants from rallies on campus and in front of the gates for hours. In or around November 2023, SAA Member #3's suitemate displayed antisemitic stickers in her room such as "Zionist donors and trustees, hands off our university." They were also frequently unable to get to the library without passing a rally. During a class in the fall semester, SAA Member #3's professor was interrupted by the rally outside where agitators displayed a large "by any means necessary" banner. Shortly after October 7, SAA Member #3 began seeing a therapist to manage the emotional magnitude of the antisemitism at Barnard.

597. SAA Member #3 asked the administration if they could graduate early or be a part-time student and pay by credit because they felt uncomfortable, unsafe, and unwanted on campus. Their request was denied and they were told they must petition for an exception to Barnard's policies, that an individual exception "may be unlikely," and that any petition could not be submitted until the fall. Once the occupiers established the encampment, SAA Member #3's suitemate spent the days there and came home at night. Around this same time, SAA

Member #3 moved out of Barnard housing because they could not escape the sounds of the rallies and the antisemitic comments from their suitemate. When they returned to their residence hall to collect their belongings, their suitemate had taken over their room.

### xl.    SAA Member #4

598.    SAA Member #4's first year at Barnard has been plagued by the antisemitism she experienced on campus and in her residence hall. As someone who not only has friends and family in Israel but whose family friend was murdered on October 7 and whose family is close with the family of another taken hostage in Gaza, SAA Member #4 was distraught watching classmates rip down hostage posters. When she was on campus commemorating a hostage's first birthday with posters and balloons, she was yelled at, "it's just one kid, you murdered thousands of people."

599.    Throughout the year, on the days she could not avoid campus, SAA Member #4 found it impossible to avoid rallies on campus on her way to class. Seeing signs and hearing chants such as "we don't want no two states, we want all of it," "Intifada revolution," "skunks get off our campus," and "Zionists off our campus" was overwhelming and she would often struggle getting to class and focusing once there. Once in her classrooms, she could still hear the chants coming from the rallies, particularly during the encampment. Because of the noise, she tried to study in the library but often felt uncomfortable and anxious when there. But studying in her room was not a viable option because it overlooked Broadway, and she was unable to focus hearing chants from rallies on campus and outside the gates. The constant chants also impacted her sleep and eventually she spent nights at a family member's apartment far from campus. She has felt on edge eating at the kosher dining hall because she once heard two students, before they entered, say, "I don't want to go to Hewitt [the kosher dining hall] because that is where all the dirty Zionists go."

### xli.   SCLJ Member #1

600.    SCLJ Member #1 is traumatized by the intimidation and harassment she endured at CSSW, including at the November 8 takeover where she was forced to be escorted to and from class by a professor for her own safety.  SCLJ Member #1 had a final scheduled at the same time as the December 6 takeover.  SCLJ Member #1, driven to tears by the hostile environment created by the takeover, requested an accommodation.  Her request was denied, and she was required to take the final, a group project, with one of the organizers of the pro-terror event.  The next day, SCLJ Member #1 emailed several universities to ask about transferring but determined that transferring was not a viable option because it would require her graduation date to be extended.

601.    SCLJ Member #1 had to drop or avoid taking classes because of antisemitic students or professors.  SCLJ Member #1's classes were often derailed by student-led antisemitic diatribes.  In multiple classes, SCLJ Member #1's classmates made offensive comments about Jews, Zionists, and Israel—which none of her professors addressed.  She made reports to Dean Curtain. SCLJ Member #1 also made a formal conduct complaint to CSSI on January 30, 2024 about a threatening antisemitic social media post by a CSSW student.  Katie Goodwin, CSSI Senior Associate Director for Case Management and Student Support emailed SCLJ Member #1 on February 22, 2024 to arrange a meeting, but refused SCLJ Member # 1's request to have an adviser present.  Following the meeting, on April 9, 2024, CSSI Interim Hearing Officer Amela Bajramovic emailed SCLJ Member #1 to "further discuss this matter."  SCLJ Member #1 responded on April 19 that she had already provided the information, and Columbia's "lack of action since January has emboldened the student to harass [her] on social media."  Bajramovic replied that day to explain the meeting would be for "gathering more facts," and on April 21, SCLJ Member #1 offered to schedule a follow up but has not received a response.  The CSSW

student who posted the threat on social media and harassed SCLJ Member #1 graduated.  On June 7, 2024, CSSI emailed that the case had been closed.  SCLJ Member #1 dropped a course in the spring 2024 semester about a subject she was particularly interested in because of this student.

602.    Before October 7, SCLJ Member #1 took full advantage of CSSW.  She participated in several clubs; following October 7, she was only comfortable participating in events hosted by the Jewish Caucus because other clubs either published or endorsed antisemitic statements, or their leaders organized antisemitic rallies or made antisemitic posts or messages on social media.  She remained on campus only as long as necessary to attend her classes and often fled campus to stay with family outside of New York City.  SCLJ Member #1 did not step foot on campus from the time the encampment was first erected to the end of the spring 2024 semester.  She was dismayed that two of her professors signed a letter on behalf of CSSW faculty in support of Aidan Parisi and another CSSW student who were suspended for their role in organizing the Resistance 101 pro-terror event.  SAA Member #1 was a top student until spring 2024, when she received a C- in a class she found especially difficult to concentrate in because of antisemitic remarks made in class. SCLJ Member #1 was shocked to learn that her graduation ceremony this year was planned for a Friday and to end at 6:30 p.m., shortly before the Jewish Sabbath begins.  She and other Jewish CSSW students requested a date or time change to accommodate their Sabbath observance, which was denied.

### xlii.    SCLJ Member #2

603.    When on campus, SCLJ Member #2 lives in a constant state of fear.  Because of pro-terror rallies in the fall 2023 semester, her classes were moved to Zoom twice.  Another class, on November 9, was effectively canceled when she was the only student who did not participate in a walkout.  SCLJ Member #2 has had to avoid registering for courses she otherwise

would have taken because of antisemitic professors.  During the spring 2024 semester, she dropped a course that she planned her entire schedule around when on the second day, a group of roughly half the class came in late after participating in a rally.  SCLJ Member #2 recognized several of these students as having organized and participated in the December 6 takeover where she was shoved and jabbed with umbrellas.  During a meeting with her professors and a follow-up email dropping the class, SCLJ Member #2 reported that she did not feel safe being in a class with these students.

604.    SCLJ Member #2 struggles to concentrate in class as there are often distracting posters covering her classrooms, which her professors largely ignore.  Her professors and classmates often make offhand comments about Israel, regardless of whether it is relevant to the discussion.  SCLJ Member #2 avoids campus and common areas in CSSW because of the antisemitic environment.

### xliii.    SCLJ Member #3

605.    SCLJ Member #3 has been denied access to Columbia's full academic and extracurricular offerings because of antisemitism.  His request to form a Jewish affinity group at CSSW was denied, even though there are affinity groups for other protected groups.  SCLJ Member #3 has also been prevented from joining CSSW student caucuses that he is interested in because they have posted statements calling for violent means of resistance.  SCLJ Member #3's academics have also been disrupted because of campus antisemitism.

606.    SCLJ Member #3 foregoes registering for courses taught by antisemitic professors.  Multiple hostile takeovers at CSSW forced his classes during fall 2023 to be held remotely or canceled.  During the November 8 takeover, the professor of his afternoon course facilitated an informal discussion about the takeover and related current events, even though the topic of that class was supposed to be "toddlerhood, early childhood, and infancy," and his

evening class that day was canceled because of the takeover.  SCLJ Member #3 has avoided campus when there are rallies because they make him feel unsafe.

### xliv.    SCLJ Member #4

607.    In the two weeks following October 7, SCLJ Member #4 was deeply disturbed by the antisemitic rallies as they were forced to traverse through mobs of students with signs on campus stating "by any means necessary" and "resistance is justified" to get to their lab, which often requires them to be onsite.  While worrying about their family in Israel, SCLJ Member #4 was bombarded by signs and chants reminding them of stories they were told by members of their family who witnessed the Nazis rise to power and fled Europe before the Holocaust. Distraught and unable to focus while on campus, SCLJ Member #4 felt they had no choice but to work remotely until mid-January 2024, causing them to forgo onsite research.  Consequently, SCLJ Member #4's research was significantly adversely affected.

608.    SCLJ Member #4 returned to campus in mid-January but stays home on particularly chaotic and violent days.  Since returning in January, students and faculty have called for the exclusion of Israelis from campus.  SCLJ Member #4 now takes a circuitous route to their lab to avoid the rallies and also plans their research around when the rallies occur. Although they would like to continue their education and pursue their research in person, there are days where they cannot go to campus out of concern for their safety.  In one such instance, on February 2, WOL and student groups rioted around Columbia's perimeter, preventing SCLJ Member #4 from walking to their lab without confronting their fellow students' calls for their removal from the Columbia community.  SCLJ Member #4 has sent at least nine emails to President Shafik and the Task Force to report incidents that have created a hostile environment and impacted their access to the full educational benefits at Columbia.  SCLJ Member #4 has only received generic, ineffective responses.

609.    SCLJ Member #4 avoided campus as much as possible the first week of the encampment.  On April 18, SCLJ Member #4 emailed President Shafik, Columbia University's Board of Trustees, the Task Force, COO Holloway, and various administrators to express frustration over the encampment and Columbia's lack of response, writing "You are failing me," and "I have been sending emails to you since October 12th, and the situation has only gotten worse and worse.  I am nearing the end of my capacity to handle this and am seriously considering other places to take my research."  SCLJ Member #4 did not receive a response.  On April 23, SCLJ Member #4 responded to their own unanswered email to criticize Columbia's "solution" to go hybrid, rather than addressing the encampment and antisemitism directly.  SCLJ Member #4 reported students in the encampment for "chanting death threats" and "inviting non-Columbia affiliates onto campus, making it unsafe for me to come onto campus."  SCLJ Member #4 explained that they could not work remotely without sacrificing months of lab work.  SCLJ Member #4 received a response from an administrator, and they scheduled a call for April 23. During the call, SCLJ Member #4 reported that they could not go to campus because of the encampment.  The administrator offered no concrete response, instead expressing platitudes like, there are a lot of "charged sentiments," there is "a lot of hurt everywhere," there needs to be "conversations" and "perspectives shared," and she knows it's "not comforting that you and I can't solve things."  The administrator advised SCLJ Member #4 to "exercise caution" around campus and do "whatever [work] you can do at home."  SCLJ Member #4 responded that this was unacceptable.  The administrator agreed but asked to redirect the discussion to focus on SCLJ Member #4 and how SCLJ Member #4 can get their work done.

610.    During the second week of the encampment, SCLJ Member #4 reluctantly returned to campus more often to prevent losing months' worth of lab work.  SCLJ Member #4

was forced to access their lab through the main entrance after the direct entrance to their lab, which was four blocks north, was closed, which forced them to pass through mobs of individuals who openly supported terrorism against Jews.  After SCLJ Member #4 returned to their lab, they could hear rally goers marching around campus on Broadway.  They could also observe nonstudents entering campus, causing them to fear violence by outside agitators.  On April 28, SCLJ Member #4 emailed President Shafik, Columbia's Board of Trustees, the Task Force, COO Holloway, and various administrators admonishing Columbia for "continuing to negotiate with students who are calling for my death and the destruction of my country."  Two days later, on April 30, SCLJ Member #4 responded to the email: "You have let a violent antisemitic mob take over our campus.  You are forcing me to stay home for my safety and abandon my research."

611.    SCLJ Member #4 has had issues with groups that are supposed to represent their interests, but instead espouse antisemitism.  They withdrew their membership from their graduate student union because of its rampant antisemitism, including its statement blaming Israel for October 7, dissemination of weekly emails encouraging attendance at rallies, and vote to divert funding to SJP and JVP, which they were not supposed to receive during their suspension.  Columbia's hostile environment—in which they are constantly confronted by stickers such as "Zionist donors get your hands off our institution" or posters hung near their lab with pictures of Israeli tanks with phrases such as "is your research fueling the war machine?"— has severely impacted SCLJ Member #4's mental health.  In response, SCLJ Member #4 is in a constant state of distress and hypervigilance whenever stepping foot on campus.

### xlv.    SCLJ Member #5

612.    Since October 7, SCLJ Member #5 is forced to often work remotely rather than in their shared Columbia lab, which for months was overtaken by individuals who used the space to espouse antisemitic conspiracy theories and blood libels.  Columbia students have organized

multiple rallies at or next to CUIMC's campus, including on November 29 in which they blockaded the entrance to the Hammer Health Sciences Building. SCLJ Member #5 now feels unsafe working on campus and often stays home instead.

613.    SCLJ Member #5 is also afraid for their safety on campus because of the violent and exclusionary rhetoric espoused freely by students targeting them as an Israeli and Jew. SCLJ Member #5 is deterred from wearing garb that identifies them as Jewish because of these safety concerns. SCLJ Member #5 returned to Israel over winter break because they did not feel safe on campus and were disheartened that their concerns proved even more well founded upon returning. Before returning, they emailed their deans to ask if the campus environment was likely to be safer when they returned. One of their deans responded that it was unclear. SCLJ Member #5 visited Israel in early April, and extended the trip because their friends experienced direct instances of antisemitism during the encampment, which they submitted to Columbia through a bias report.

614.    SCLJ Member #5 is significantly less productive at home, and has sacrificed in-person collaboration, networking, and other benefits afforded to their non-Jewish, non-Israeli colleagues. When SCLJ Member #5 is on campus, they struggle to concentrate. In the fall 2023 semester, for example, there were constant antisemitic poster campaigns at the Hammer Health Sciences Building, which included placing posters containing blood libels on every seat. There has also been phone banking weekly at the Vagelos Education Center.

615.    SCLJ Member #5, exhausted by all of the energy they expend documenting and reporting antisemitism at Columbia, including their considerable efforts to be heard by Columbia's administration, considered transferring. At the very least, their graduation date will likely be extended because of their diminished productivity.

### xlvi.    SCLJ Member #6

616.    SCLJ Member #6's experience as a film student at Columbia hinges on their ability to access equipment on campus and work collaboratively with classmates.  Following October 7, this has been nearly impossible, significantly affecting their productivity, and they have considered transferring to a different school or taking a leave of absence.  Immediately after October 7, SCLJ Member #6 was attacked by classmates in a group chat for sympathizing with another Jewish student.  Since then, SCLJ Member #6 is a social pariah in their department due to their Jewish identity, and they have been forced to forgo numerous social events.

617.    On November 2, SCLJ Member #6 met with an administrator in Columbia's film department and expressed concern about certain classmates posting violent rhetoric on social media.  SCLJ Member #6 also expressed concern about professors in the department who had signed onto a letter defending the students who signed the pro-terror joint statement and referring to the October 7 terrorist attack as a "military action" that can be reasonably "recontextualize[d]."  SCLJ Member #6 will now not take classes with these professors even though they likely would have otherwise.  The chair of their department said there is nothing they can do to address the issue, and that SCLJ Member #6 needs to be comfortable working with people they disagree with.  Lechner also told them that the Jewish people "have been through a lot and can get through [this]."

618.    On January 22, SCLJ Member #6 met with School of Arts Assistant Dean of Student Support Herbert Hugh "to highlight the occurrences on campus that have made Columbia a hostile and unsafe environment since Hamas' attack," including frequent calls for violence against Jews.  During this meeting, Hugh told them that he would send multiple resources to "foster [their] wellness as a Jew on [Columbia's] campus"—a common response to Jewish students who have expressed similar concerns rather than addressing the root cause or

disciplining harassers.  Three days later, SCLJ Member #6 emailed Hugh because they had not received any resources.  In response, Hugh claimed he was delayed sending resources—despite promising them within one day—because he wanted to consult School of the Arts Dean Leila Maher.  In a February 2 meeting, Dean Maher echoed the department chair's response, telling SCLJ Member #6 there was nothing she could do about the antisemitism on campus.

619.   SCLJ Member #6's classes have been disrupted by antisemitic rallies on roughly five occasions.  The School of Arts is near the center of campus, and rallies can be heard from within the building.  On February 2, the rally was so disruptive, SCLJ Member #6 was forced to leave class.  There are also days where rallies are scheduled and SCLJ Member #6 avoids campus altogether.  When they must go to campus, SCLJ Member #6 takes alternative routes to and from campus to avoid rallies.  When campus access is restricted and certain gates are closed because of rallies, however, SCLJ Member #6 is sometimes forced to traverse threatening rallies to get to the School of Arts.  SCLJ Member #6 recently received an email from a professor inquiring as to why they were absent from a lecture class.  They responded they did not want to come to campus given the previous day's rally where SJP students broke a library door and chanted, "there is no safe place."  The professor responded this was not a valid excused absence.

### xlvii.    SCLJ Member #7

620.   SCLJ Member #7's classes, particularly those on Barnard's campus, have been regularly disrupted by the antisemitic rallies.  For example, a rally on November 15 could be heard during SCLJ Member #7's lab.  SCLJ Member #7's classmates congregated at the classroom's windows to watch the rally.  Rather than address the disruption, SCLJ Member #7's professor remarked, "wish we could be there."  Due to incidents like this, SCLJ Member #7 is afraid to share her Jewish identity in her classes.

621.     SCLJ Member #7's campus experience has also been deeply impacted by Columbia's hostile environment since October 7.  SCLJ Member #7 is disturbed by antisemitic propaganda ubiquitous on Columbia's campus.  Due to Columbia's inaction, she reports these posters herself.  In SCLJ Member #7's formerly preferred study location in the Milstein Center, there is an unauthorized poster that she cannot remove herself and Barnard has not taken down despite her reports.  Consequently, SCLJ Member #7 stopped studying in this location.

## COUNT I
### (Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*)
### On Behalf of All Plaintiffs Against All Defendants

622.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

623.     Columbia University and Barnard receive financial assistance from the United States Department of Education and are therefore subject to suit under Title VI of the Civil Rights Act of 1964.

624.     Discrimination against Jews and/or Israelis—including based on actual or perceived shared ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI.

625.     The Individual Plaintiffs are and identify as Jewish and/or Israeli, and their status and identification as Jews brings them within the scope of Title VI's protections.  The Individual Plaintiffs include students currently enrolled in Columbia and recent graduates.  SAA's members include Jewish and/or Israeli students at Columbia, who are also within the scope of Title VI's protections.  SCLJ's members include Jewish and/or Israeli students currently enrolled in Columbia and recent graduates, who are also within the scope of Title VI's protections.

626.    Title VI prohibits a recipient of federal funds from intentionally treating any individual worse, even in part because of his or her ancestry, race, ethnic characteristics, or national origin.

627.    The acts and omissions of Columbia and its administrators have subjected the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and continues to subject, the Individual Plaintiffs currently enrolled in Columbia and SAA's and SCLJ's Jewish and/or Israeli Columbia student members to discrimination and harassment on the basis of their actual and/or perceived shared Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin.

628.    Columbia and its administrators had and have actual notice that such discrimination and harassment, over which Columbia had and has substantial control and the authority to remedy, was, and continues to be, so severe, pervasive, and objectively offensive that it created, and continues to create, a hostile environment based on shared Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin that deprives the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members of full access to Columbia's educational programs, activities, and opportunities.

629.    Columbia and its administrators intentionally discriminate against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members on the basis of their actual and/or perceived shared Jewish ancestry, race, ethnic characteristics, or national origin, as exhibited by Columbia and its administrators' deliberate indifference to the antisemitic abuse, harassment, and intimidation of the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members in violation of Title VI.  Specifically, Columbia and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise

adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members and the hostile environment that they and other Jewish and/or Israeli students are forced to endure at Columbia because of their ancestry, race, ethnic characteristics, or national origin. Additionally, Columbia continues to fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring. Such unlawful deliberate indifference caused and causes the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members to be subjected to a hostile educational environment.

630.    The environment at Columbia, which has been rendered hostile for the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members as a result of their Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it deprives the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members of equal access to the educational opportunities and benefits that Columbia provides to non-Jewish and/or non-Israeli students.

631.    Columbia and its administrators actively and intentionally engage in this pattern of severe and pervasive discrimination.

632.    Columbia and its administrators also directly and intentionally discriminate against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, with their actual or perceived shared Jewish and/or Israeli ancestry, race ethnic characteristics, or national origin a substantial or motivating factor in Columbia actions.

633.    Columbia continues to unreasonably fail to act, or to act inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference and/or unjustifiable delay, in applying its policies to known or reported incidents involving antisemitism or where the victim or complainant is a Jewish and/or Israeli student, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members.  As detailed above, Columbia's actions, inactions, and conduct were, and continue to be, intended to treat the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members differently as Jewish and Israeli students as compared to other similarly situated non-Jewish and/or non-Israeli students.

634.    Columbia's acts and omissions are the actual, direct, and proximate causes of the Individual Plaintiffs' and SAA's and SCLJ's Jewish and/or Israeli Columbia student members' injuries.

635.    As a result of the foregoing, the Individual Plaintiffs have suffered, and currently enrolled Individual Plaintiffs continue to suffer, substantial damages in amounts to be determined at trial.

636.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have been and will continue to be injured because Columbia has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and has and will continue to intentionally discriminate against them on the basis of Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin.

637.    Plaintiffs are entitled to injunctive relief under Title VI, because Columbia has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate remedy at law to prevent Columbia

from continuing to discriminate against its students on the basis of Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin in violation of Title VI; and the harm the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members currently enrolled will otherwise continue to suffer is irreparable.

638.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II
### (New York Executive Law (Human Rights Law) § 296 *et seq.*)
### On Behalf of All Plaintiffs Against All Defendants

639.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

640.    Educational institutions like Columbia are prohibited, under New York Executive Law § 296, from discriminating against or permitting the harassment of students, even in part because of their actual or perceived race, religion, national origin (defined to include "ancestry"), citizenship, or immigration status.

641.    The Individual Plaintiffs are and identify as Jewish and/or Israeli, and their status and identification as Jews and/or Israeli brings them within the scope of Executive Law § 296's protections.  The Individual Plaintiffs include students currently enrolled in Columbia and recent graduates.  SAA's members include Jewish and/or Israeli students at Columbia, who are also within the scope of Executive Law § 296's protections.  SCLJ's members include Jewish and/or Israeli students currently enrolled in Columbia and recent graduates, who are also within the scope of Executive Law § 296's protections.

642.    The acts and omissions of Columbia and its administrators have subjected the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and continues to subject, the Individual Plaintiffs currently enrolled in Columbia and SAA's and SCLJ's Jewish and/or Israeli Columbia student members to discrimination and harassment on the

basis of their actual and/or perceived Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status.

643.    Columbia and its administrators had and have actual notice that such discrimination and harassment, over which Columbia had and have substantial control and the authority to remedy, was and continues to be severe, pervasive, and objectively offensive that it created, and continues to create, a hostile environment based on shared Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status that deprives the Individual Plaintiffs and SAA's Jewish and SCLJ's and/or Israeli Columbia student members of full access to Columbia's educational programs, activities, and opportunities.

644.    Columbia and its administrators intentionally discriminate against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members on the basis of their actual and/or perceived shared Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status, as exhibited by Columbia and its administrators' deliberate indifference to the antisemitic abuse, harassment, and intimidation of the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, in violation of Executive Law § 296.  Specifically, Columbia and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members and the hostile environment that they and other Jewish and/or Israeli students are forced to endure at Columbia because of their race, religion, national origin, citizenship, or immigration status.  Additionally, Columbia continues to fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring.  Such unlawful deliberate

indifference causes the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members to be subjected to a hostile educational environment.

645.    The environment at Columbia, which has been rendered hostile for the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members as a result of their Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status is sufficiently severe, pervasive, persistent, and offensive such that it deprives the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members of equal access to the educational opportunities and benefits that Columbia provide to non-Jewish and/or non-Israeli students.

646.    Columbia and its administrators actively and intentionally engage in this pattern of severe and/or pervasive discrimination.

647.    Columbia and its administrators also directly and intentionally discriminate against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, with their actual or perceived shared Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status a substantial or motivating factor in Columbia's actions.

648.    Columbia's actions or conduct had, and continue to have, an unjustifiable differential or disparate impact upon the Individual Plaintiffs, SAA's and SCLJ's Jewish and/or Israeli Columbia student members, as Jewish and/or Israeli students.

649.    Columbia continues to unreasonably fail to act, or to act inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving antisemitism or where the victim or complainant is a Jewish and/or Israeli student, including the Individual Plaintiffs and

SAA's and SCLJ's Jewish and/or Israeli Columbia student members.  As detailed above,
Columbia's actions, inactions, and conduct were, and continue to be, intended to treat the
Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members
differently as Jewish and/or Israeli students as compared to other similarly situated non-Jewish
and/or non-Israeli students.

650.     Columbia's acts and omissions are the actual, direct, and proximate causes of the
Individual Plaintiffs', SAA's, and SCLJ's Jewish and/or Israeli Columbia student members'
injuries.

651.     As a result of the foregoing, the Individual Plaintiffs and SAA's and SCLJ's
Jewish and/or Israeli Columbia student members have suffered, and those currently enrolled
continue to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss
of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

652.     Columbia's actions and omissions toward the Individual Plaintiffs, SAA's and
SCLJ's Jewish and/or Israeli Columbia student members amount to willful or wanton
negligence, recklessness, and/or a conscious disregard of the rights of others.

653.     The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia
student members have been and will continue to be injured because Columbia has and will
continue to deny them equal access to the educational opportunities and benefits provided to
other students, and has and will continue to intentionally discriminate against them on the basis
of Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status.

654.     Plaintiffs are also entitled to injunctive relief under New York Executive Law
§ 296, because Columbia had and has knowledge of, and has been, and continues to be,
deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is

no adequate remedy at law to prevent Columbia from continuing to discriminate against its students on the basis of Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status in violation of Executive Law § 296; and the harm the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members currently enrolled will otherwise continue to suffer is irreparable.

655.     Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y. Exec. Law § 297(10).

### COUNT III
**(New York Civil Rights Law § 40-c)**
**On Behalf of All Plaintiffs Against All Defendants**

656.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

657.     New York Human Rights Law § 291 provides that the opportunity to obtain education and use places of public accommodation, such as Columbia, without discrimination because of race, creed, or national origin is a civil right.

658.     New York Civil Rights Law § 40-c ("NYCRL") prohibits Columbia from subjecting Jewish and/or Israeli students to discrimination or harassment—including based on their actual or perceived race, creed, or national origin.

659.     The Individual Plaintiffs are and identify as Jewish and/or Israeli, and their status and identification as Jews and/or Israelis brings them within the scope of NYCRL's protections. The Individual Plaintiffs include students currently enrolled in Columbia and recent graduates. SAA's members include Jewish and/or Israeli students at Columbia, who are also within the scope of NYCRL's protections.  SCLJ's members include Jewish and/or Israeli students currently enrolled in Columbia and recent graduates, who are also within the scope of NYCRL's protections.

660.    The acts and omissions of Columbia and its administrators have subjected, and continue to subject, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members to discrimination and harassment on the basis of their actual and/or perceived Jewish and/or Israeli race, creed, or national origin.

661.    Columbia and its administrators had and have actual notice that such discrimination and harassment, over which Columbia had and has substantial control and the authority to remedy, was and continues to be so severe, pervasive, and objectively offensive that they created and continue to create a hostile environment based on shared Jewish and/or Israeli race, creed, or national origin that deprives the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members of full access to Columbia's educational programs, activities, and opportunities.

662.    Columbia and its administrators intentionally discriminate against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members on the basis of their actual and/or perceived shared Jewish and/or Israeli race, creed, or national origin, as exhibited by Columbia and its administrators' deliberate indifference to the antisemitic abuse, harassment, and intimidation of the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, in violation of NYCRL.  Specifically, Columbia and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members and the hostile environment that they and other Jewish and Israeli students are forced to endure at Columbia because of their race, creed, or national origin.  Additionally, Columbia continues to fail to take prompt and effective steps reasonably calculated to end the harassment,

eliminate any hostile environment, and prevent the harassment from recurring.  Such unlawful deliberate indifference causes the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members to be subjected to a hostile educational environment.

663.    The environment at Columbia, which has been rendered hostile for the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members as a result of their Jewish and/or Israeli race, creed, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it deprives the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members of equal access to the educational opportunities and benefits that Columbia provides to non-Jewish and/or non-Israeli students.

664.    Columbia and its administrators actively and intentionally engage in this pattern of severe and/or pervasive discrimination.

665.    Columbia and its administrators also directly and intentionally discriminate against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, with their actual or perceived shared Jewish and/or Israeli race, creed, or national origin a substantial or motivating factor in Columbia's actions.

666.    Columbia's actions or conduct had, and continue to have, an unjustifiable differential or disparate impact upon the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, as Jewish and/or Israeli students.

667.    Columbia continues to unreasonably fail to act, or to act inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving antisemitism or where the victim or complainant is a Jewish and/or Israeli student, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members.  As detailed above,

Columbia's actions, inactions, and conduct were, and continue to be, intended to treat the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members differently as Jewish and Israeli students as compared to other similarly situated non-Jewish and/or non-Israeli students.

668.   Columbia's acts and omissions are the actual, direct, and proximate causes of the Individual Plaintiffs', SAA's, and SCLJ's Jewish and/or Israeli Columbia student members' injuries.

669.   As a result of the foregoing, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have suffered, and those currently enrolled continue to suffer, substantial damages and are entitled to statutory damages of $500 per violation pursuant to NYCRL § 40-d.

670.   The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have been and will continue to be injured because Columbia has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and has and will continue to intentionally discriminate against them on the basis of Jewish and/or Israeli race, creed, or national origin.

671.   Plaintiffs are also entitled to injunctive relief under NYCRL, because Columbia had and has knowledge of, and has been, and continues to be, deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate remedy at law to prevent Columbia from continuing to discriminate against its students on the basis of Jewish and/or Israeli race, creed, or national origin; and the harm the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members currently enrolled will otherwise continue to suffer is irreparable.

672.     By this action, plaintiffs seek to vindicate the public interest by enforcing fundamental civil rights protections for students, including students who face discrimination and harassment at school based on race, creed, or national origin.

673.     Plaintiffs have complied with the procedural requirements of NYCRL § 40-d by serving notice of this complaint upon the State Attorney General at or before the commencement of the action.

## COUNT IV
**(New York City Human Rights Law – N.Y.C. Admin. Code § 8-107(4), (17))**
**On Behalf of All Plaintiffs Against All Defendants**

674.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs above as though fully set forth herein.

675.     New York City Admin. Code § 8-107(4) prohibits Columbia from subjecting Jewish and/or Israeli students to discrimination or harassment—including based on actual or perceived race, creed, national origin, immigration or citizenship status.

676.     The acts and omissions of Columbia and its administrators and other employees have subjected, and continue to subject, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members to discrimination and harassment on the basis of their actual and/or perceived Jewish and/or Israeli race, creed, national origin, immigration or citizenship status that is severe and pervasive.  Columbia has refused, withheld from, and denied the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members the full and equal enjoyment, on equal terms and conditions, of Columbia's accommodations, advantages, services, facilities or privileges, in violation of N.Y.C. Admin. Code § 8-107(4), including by treating them less favorably than similarly situated non-Jewish and/or non-Israeli students based on their protected characteristics.

677.    Columbia's actions or conduct had, and continue to have, an unjustifiable differential or disparate impact upon the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, as Jewish and/or Israeli students, in violation of N.Y.C. Admin. Code § 8-107(17).

678.    Columbia's acts and omissions are the actual, direct, and proximate causes of the Individual Plaintiffs' and SAA's and SCLJ's Jewish and/or Israeli Columbia student members' injuries.

679.    As a result of the foregoing, the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have suffered, and those currently enrolled continue to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

680.    Columbia's actions and omissions toward the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members amount to willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others.

681.    The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members have been and will continue to be injured because Columbia has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and has and will continue to intentionally discriminate against them on the basis of Jewish and/or Israeli race, creed, national origin, immigration or citizenship status.

682.    Plaintiffs are also entitled to injunctive relief, because Columbia had and has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate remedy at law to prevent Columbia from continuing to discriminate against its students on the basis of Jewish and/or Israeli race,

creed, national origin, immigration or citizenship status; and the harm the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members currently enrolled will otherwise continue to suffer is irreparable.

683.    By this action, plaintiffs seek to vindicate the public interest by enforcing fundamental state civil rights protections for students, including students who face discrimination and harassment at school based on their actual or perceived race, creed, national origin, immigration or citizenship status.

684.    Plaintiffs have complied with the procedural requirements of N.Y.C. Admin. Code § 8-502 by serving notice of this complaint upon the City Commission on Human Rights and the Corporation Counsel.

685.    Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y.C. Admin. Code § 8-502(g).

**<u>COUNT V</u>**
**(Breach of Contract)**
**On Behalf of Individual Plaintiffs Against All Defendants**

686.    The Individual Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

687.    At all relevant times, an implied and/or express contractual relationship existed between Columbia University and David, Doe, Droznik, Elkins, Friedman, Gal, Gerstein, Gross, Harnick, Kahane, Kesselman, McNulty, Miller, Mizrahi-Aks, Nauer, Ami, Gabe, Nock, Quinn, Rubin, Sandler, Stein, Symonds, Swill, Vanuno, Westergaard, and Yadegar, by virtue of their enrollment at Columbia University and as defined by and through Columbia University codes, policies, and procedures governing student conduct, including, but not limited to, Columbia University's (i) EOAA Policies & Procedures; (ii) Rules of University Conduct; (iii) Standards & Discipline Policy; (iv) Non-Discrimination Statement and Policy; (v) University Events

Policy; (vi) Interim University Policy for Safe Demonstrations; (vii) Student Group Event Policy and Procedure; and (viii) Faculty Handbook.  Through the documents and materials it publishes and provides to students, Columbia University makes express and implied contractual commitments to its students concerning bias-related abuse, harassment, intimidation, and discrimination.

688.    At all relevant times, an implied or express contractual relationship existed between Barnard and Aryeh, Bellows, Glaser, Molly, Rabban, Roe, Rukeyser, Ruttenberg, and Zuckerman by virtue of their enrollment at Barnard and as defined by and through Barnard codes, policies, and procedures governing student conduct, including, but not limited to, Barnard's (i) Policy Against Discrimination and Harassment, (ii) Rules for Maintenance of Public Order, (iii) Student Code of Conduct, and (iv) Policy for Safe Campus Demonstrations. Through the documents and materials it publishes and provides to students, Barnard makes express and implied contractual commitments to its students concerning bias-related abuse, harassment, intimidation, and discrimination.

689.    New York law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of student handbooks, university bulletins, regulations, codes, policies, and procedures become part of that contract.

690.    The Individual Plaintiffs complied with their obligations under these contracts.

691.    Columbia University breached its agreements with David, Doe, Droznik, Elkins, Friedman, Gal, Gerstein, Gross, Harnick, Kahane, Kesselman, McNulty, Miller, Mizrahi-Aks, Nauer, Ami, Gabe, Nock, Quinn, Rubin, Sandler, Stein, Symonds, Swill, Vanuno, Westergaard, and Yadegar, and failed to comply with its obligations under these contracts, throughout the

course of their enrollment at Columbia University, including by, among other things, failing to comply with the following provisions, among others:

- "Columbia University is committed to providing a learning, living, and working environment free from prohibited discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members." (EOAA Policies & Procedures);

- "Harassment may include, but is not limited to: verbal abuse; epithets or slurs; negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; insulting or obscene comments or gestures; and the display or circulation of written or graphic material (including in hard copy, by email or text, or through social media) that denigrates or shows hostility or aversion toward an individual or group members of a protected class." (*Id.*);

- "All employees . . . have an obligation to immediately report harassment [and] discrimination." (*Id.*);

- Violations of the Rules of University Conduct include, among other things, threatening to or placing another in danger of bodily harm or causing or attempting to cause physical harm; incitement; property damage; interfering with an entrance or exit or physically preventing passage from a University facility; "causing noise that substantially hinders others in their normal academic activities"; "briefly interrupt[ing] a University function"; "disrupt[ing] a University function or render[ing] its continuation impossible"; "fail[ing] to self-identify when requested to do so by a properly identified [dean or appointed official]"; and "fail[ing] to disperse from an assembly upon order of a properly identified [dean or appointed official]." (Rules of University Conduct);

- "The University prohibits any form of discrimination against any person on the basis of . . . citizenship status; . . . creed; . . . national origin;. . . race; religion; . . . or any other applicable, legally protected status in the administration of its educational policies, admissions policies, employment, scholarship and loan programs, and athletic and other University-administered programs and functions." (Non-Discrimination Statement and Policy);

- "As members of the Columbia University community, all students are expected to uphold the highest standards of respect, integrity, and civility. . . . Students who violate standards of behavior related to academic or behavioral conduct interfere with their ability, and the ability of others, to take advantage of the full complement of University life, and will thus be subject to Dean's Discipline." (Standards and Discipline);

- "The University has an obligation to ensure that all members of our community can participate in their academic pursuits without fear for their safety." (University Event Policy);

- "Attendees at events held without approval as described in this Policy will be required to disperse." (*Id.*);

- "[R]ules of conduct do not allow or condone language that promotes or supports violence in any manner. Calls for genocide against the Jewish community or any other group are abhorrent, inconsistent with our values and against our rules. Incitement to violence against members of our community will not be tolerated." (Event Policy and Campus Resources FAQ);

- "The University will designate spaces ("Demonstration Areas") that will be available on each of its campuses for Demonstrations from 12:00 to 6:00 pm on Monday-Friday ('Regular Demonstration Times') when classes are in session (does not include reading days or exam periods) in a manner that does not disrupt University matters and subject to the Rules. Any such designation will take account of the importance of providing prominent and central locations for Demonstrations. On the Morningside campus, for example, the designated Demonstration Area will typically be South Field East, South Field West, or the Sundial area. Demonstrations may not be advertised before registration is confirmed." (Interim University Policy for Safe Demonstrations.);

- "In order to ensure safety and limit potential interference with normal University activities, Demonstrations will not be permitted in University areas outside of the Demonstration Areas, except as provided in the following paragraph." (*Id.*);

- "Two working days' advance registration is required for any Demonstration to ensure the safety of the University community." (*Id.*);

- "Demonstrations that are not registered or go beyond the registered Demonstration Area or reserved time will violate this policy. Advertising of Demonstrations prior to a confirmed registration is also a violation." (*Id.*);

- "The conduct of all guests is bound by University Rules and the student group may be held responsible for the behavior of their invited guests." (Student Group Event Policy and Procedure.); and

- "Faculty should confine their classes to the subject matter covered by their courses and not use them to advocate any political or social cause . . . Faculty should allow the free expression of opinions within the classroom that may be different from their own and should not permit any such differences to influence their evaluations of their students." (Faculty Handbook.)

692.    Barnard breached its agreements with Aryeh, Bellows, Glaser, Molly, Rabban, Roe, Rukeyser, Ruttenberg, and Zuckerman, and failed to comply with its obligations under

these contracts, throughout the course of their enrollment at Barnard, including by, among other

things, failing to comply with the following provisions, among others:

- "The College takes prompt and appropriate action to address misconduct, end a hostile environment if one has been created, and prevent the recurrence of a hostile environment." (Policy Against Discrimination and Harassment.);

- "Although Barnard may not control websites, social media, and other venues in which harassing communications are made, when such communications are reported to the College, it will engage in a variety of means to address and mitigate the effects." (*Id.*);

- "The following activities which infringe upon the rights of individuals shall not be permitted and shall be considered violations of College rules:" "Use or threat of force or violence against any person, or the damaging of property"; "Prevention of the normal use or occupancy of any building . . . or disruption of any normal College function"; "Physical obstruction of or the use of threat of force or violence to interfere with the passage of any person about the College campus or through the entrance or exists of any College building or facility." (Rules for Maintenance of Public Order.);

- Prohibited conduct includes, among other things, "discrimination, harassment and retaliation," "Disorderly Conduct," "Disruptive Behavior," "Failure to Comply," "Vandalism or Damage to Property," "Threatening Behavior," and violations of Barnard policy or federal, state, or local law. (Student Code of Conduct.);

- "This policy protects the right to engage in campus demonstrations as long as demonstrations are conducted safely and do not interfere with the rights of others to speak, study, teach, learn, work, and live on our four-acre campus." (Policy for Safe Campus Demonstrations.);

- "Demonstrations are not permitted inside College buildings or at locations other than the Designated Demonstration Area.  The Designated Demonstration Area is limited to the grassy area of Futter Field, and Demonstrations may not extend onto the walkways, patios, and terraces surrounding the field." (*Id.*);

- "The Designated Demonstration Area will be available to students, faculty, staff, and Barnard-recognized student groups for Demonstrations from 2:00 pm to 6:00 pm on Monday through Friday when classes are in session (excluding reading days, exam periods, and College holidays)." (*Id.*);

- "Demonstrations may take place in the Designated Demonstration Area within the available time window only upon advance notice and registration given Barnard's small campus size and limited staffing capabilities." (*Id.*);

- "[I]ndividuals participating in registered Demonstrations must follow all Rules for the Maintenance of Public Order." (*Id.*);

- "[T]hose participating in registered Demonstrations may not use noise amplification (e.g., megaphones, bull horns, etc.) or sound machines (e.g., pots, pans, instruments, etc.) during Demonstrations. (*Id.*);

- "[T]hose participating in registered Demonstrations may not make true threats, incite violence, use fighting words, or engage in unlawful harassment." (*Id.*);

- "Those refusing to cease their activities and/or to provide identification to College officials will be required to leave campus immediately." (*Id.*); and

- "Any student violating this policy, including by engaging in an unregistered Demonstration or in Demonstrations that go beyond the registered area or time, will be subject to Student Conduct proceedings.  Any staff or faculty member violating this policy will be subject to policies governing employees." (*Id.*)

693.    Columbia University has also breached the implied covenant of good faith and fair dealing implied in its contracts with students, including David, Doe, Droznik, Elkins, Friedman, Gal, Gerstein, Gross, Harnick, Kahane, Kesselman, McNulty, Miller, Mizrahi-Aks, Nauer, Ami, Gabe, Nock, Quinn, Rubin, Sandler, Stein, Symonds, Swill, Vanuno, Westergaard, and Yadegar.  Among other things, Columbia University selectively applies or enforces its student handbooks, university bulletins, regulations, codes, policies, and procedures in a bad faith and discriminatory way—improperly motivated by shared ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status bias—treating incidents of abuse, harassment, intimidation, or discrimination against Jewish and/or Israeli students, including David, Doe, Droznik, Elkins, Friedman, Gal, Gerstein, Gross, Harnick, Kahane, Kesselman, McNulty, Miller, Mizrahi-Aks, Nauer, Ami, Gabe, Nock, Quinn, Rubin, Sandler, Stein, Symonds, Swill, Vanuno, Westergaard, and Yadegar, in a more lenient, tolerant, forgiving, and nonchalant manner than it treats similar incidents against other minority groups.

694.    Barnard has also breached the implied covenant of good faith and fair dealing implied in its contracts with students, including Aryeh, Bellows, Glaser, Molly, Rabban, Roe,

Rukeyser, Ruttenberg, and Zuckerman.  Among other things, Barnard selectively applies or enforces its student handbooks, university bulletins, regulations, codes, policies, and procedures in a bad faith and discriminatory way—improperly motivated by shared ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status bias—treating incidents of abuse, harassment, intimidation, or discrimination against Jewish and/or Israeli students, including Aryeh, Bellows, Glaser, Molly, Rabban, Roe, Rukeyser, Ruttenberg, and Zuckerman, in a more lenient, tolerant, forgiving, and nonchalant manner than it treats similar incidents against other minority groups.

695.    As a direct, proximate, and foreseeable consequence of the foregoing breaches, the Individual Plaintiffs have been damaged, and continue to sustain substantial damages, in amounts to be determined at trial.

## COUNT VI
### (New York General Business Law §§ 349, 350)
### On Behalf of Individual Plaintiffs Against All Defendants

696.    The Individual Plaintiffs repeat and reallege the allegations of the preceding paragraphs above as though fully set forth herein.

697.    Section 349(a) of the General Business Law provides consumer protection by declaring as unlawful "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.  Section 350 similarly prohibits "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.

698.    Columbia University's conduct, statements, and representations described above, were consumer-oriented and were aimed at, and had a broad impact on, a large consumer group, namely, prospective and current students of Columbia University.  These statements include those reflected, embodied, and set forth in Columbia University's: (i) Equal Opportunity and

Affirmative Action Policies & Procedures; (ii) Rules of University Conduct; (iii) Standards &

Discipline Policy; (iv) Non-Discrimination Statement and Policy; (v) University Events Policy;

(vi) Interim University Policy for Safe Demonstrations; (vii) Student Group Event Policy and

Procedure; and (viii) Faculty Handbook.

699.   Columbia University has not acted in accordance with, and has not followed

through on, its statements against discrimination, abuse, and harassment, and has instead

knowingly engaged in the following false acts or practices that are deceptive or misleading in a

material way, that were aimed at the consumer public (namely, prospective and current students),

and that were likely to mislead a reasonable prospective or current student acting reasonably

under the circumstances:

- By falsely leading David, Doe, Droznik, Elkins, Friedman, Gal, Gerstein, Gross, Harnick, Kahane, Kesselman, McNulty, Miller, Mizrahi-Aks, Nauer, Ami, Gabe, Nock, Quinn, Rubin, Sandler, Stein, Symonds, Swill, Vanuno, Westergaard, and Yadegar to believe that Columbia University would apply, enforce, and follow the rules and policies, and the commitments contained therein, reflected, embodied and set forth in Columbia University's: (i) Equal Opportunity and Affirmative Action Policies & Procedures; (ii) Rules of University Conduct; (iii) Standards & Discipline Policy; (iv) Non-Discrimination Statement and Policy; (v) University Events Policy; (vi) Interim University Policy for Safe Demonstrations; (vii) Student Group Event Policy and Procedure; and (viii) Faculty Handbook; and

- By falsely causing David, Doe, Droznik, Elkins, Friedman, Gal, Gerstein, Gross, Harnick, Kahane, Kesselman, McNulty, Miller, Mizrahi-Aks, Nauer, Ami, Gabe, Nock, Quinn, Rubin, Sandler, Stein, Symonds, Swill, Vanuno, Westergaard, and Yadegar to believe that if they paid tuition and fees to Columbia University, then Columbia University would uphold, adhere to, abide by, and comply with its stated rules and policies, and the commitments contained therein, to foster, ensure, maintain, and create an environment free of discrimination, abuse, harassment, and intimidation, and provide an adequate and appropriate setting and environment in which all students, of whatever ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status could freely express their identity and ancestry, could learn and grow, and could participate fully and meaningfully in Columbia University's educational and other programs.

700.   David, Doe, Droznik, Elkins, Friedman, Gal, Gerstein, Gross, Harnick, Kahane,

Kesselman, McNulty, Miller, Mizrahi-Aks, Nauer, Ami, Gabe, Nock, Quinn, Rubin, Sandler,

Stein, Symonds, Swill, Vanuno, Westergaard, and Yadegar saw, heard, and were aware of Columbia University's false and misleading statements and representations described above before they enrolled at Columbia University, and after they were enrolled in Columbia University.

701.    Columbia University's false and misleading statements and practices described above caused David, Doe, Droznik, Elkins, Friedman, Gal, Gerstein, Gross, Harnick, Kahane, Kesselman, McNulty, Miller, Mizrahi-Aks, Nauer, Ami, Gabe, Nock, Quinn, Rubin, Sandler, Stein, Symonds, Swill, Vanuno, Westergaard, and Yadegar injury by causing them to enroll at Columbia University, and to pay tuition and fees to Columbia University, and to continue to maintain enrollment at Columbia University and continue to pay tuition and fees to Columbia University, based on the reasonable understanding that Columbia University would apply, enforce, and follow through on its codes and policies, and the commitments contained therein, concerning protecting students from harassment, abuse, intimidation and discrimination based on their ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status, would otherwise seek to protect students from such hateful and bigoted conduct, and would take actions and implement measures to adequately, appropriately, and sufficiently address such misconduct to foster, ensure, and maintain a safe educational and campus environment.  Columbia University did not take such actions.

702.    Columbia University's failure, refusal, lack of ability and intention, and lack of commitment to combating, addressing, and ameliorating these deplorable actions, and to making good on and complying with its aforementioned statements, constitute deceptive practices and/or false advertising, and have caused David, Doe, Droznik, Elkins, Friedman, Gal, Gerstein, Gross, Harnick, Kahane, Kesselman, McNulty, Miller, Mizrahi-Aks, Nauer, Ami, Gabe, Nock, Quinn,

Rubin, Sandler, Stein, Symonds, Swill, Vanuno, Westergaard, and Yadegar to sustain actual damages and not obtain the benefit of their bargain with Columbia University, including the loss of the value of the tuition and fees they have paid Columbia University, extreme emotional distress, loss of educational and extracurricular opportunities, economic injuries, and other direct and consequential damages.

703.    Accordingly, David, Doe, Droznik, Elkins, Friedman, Gal, Gerstein, Gross, Harnick, Kahane, Kesselman, McNulty, Miller, Mizrahi-Aks, Nauer, Ami, Gabe, Nock, Quinn, Rubin, Sandler, Stein, Symonds, Swill, Vanuno, Westergaard, and Yadegar are entitled to statutory and/or actual damages in amounts to be determined at trial and to treble damages pursuant to General Business Law § 349(h), based on Columbia University's willful or knowing violations.

704.    Barnard's conduct, statements, and representations described above, were consumer-oriented and were aimed at, and had a broad impact on, a large consumer group, namely, prospective and current students of Barnard.  These statements include those reflected, embodied, and set forth in Barnard's: (i) Policy Against Discrimination and Harassment, (ii) Rules for Maintenance of Public Order, (iii) Student Code of Conduct; and (iv) Policy for Safe Campus Demonstrations.

705.    Barnard has not acted in accordance with, and has not followed through on, its statements against discrimination, abuse, and harassment, and has instead knowingly engaged in the following false acts or practices that are deceptive or misleading in a material way, that were aimed at the consumer public (namely, prospective and current students), and that were likely to mislead a reasonable prospective or current student acting reasonably under the circumstances:

- By falsely leading Aryeh, Bellows, Glaser, Molly, Rabban, Roe, Rukeyser, Ruttenberg, and Zuckerman to believe that Barnard would apply, enforce, and

follow the rules and policies, and the commitments contained therein, reflected, embodied and set forth in Barnard's: (i) Policy Against Discrimination and Harassment, (ii) Rules for Maintenance of Public Order, (iii) Student Code of Conduct; and (iv) Policy for Safe Campus Demonstrations; and

- By falsely causing Aryeh, Bellows, Glaser, Molly, Rabban, Roe, Rukeyser, Ruttenberg, and Zuckerman to believe that if they paid tuition and fees to Barnard, then Barnard would uphold, adhere to, abide by, and comply with its stated rules and policies, and the commitments contained therein, to foster, ensure, maintain, and create an environment free of discrimination, abuse, harassment, and intimidation, and provide an adequate and appropriate setting and environment in which all students, of whatever ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status could freely express their identity and ancestry, could learn and grow, and could participate fully and meaningfully in Barnard's educational and other programs.

706.    Aryeh, Bellows, Glaser, Molly, Rabban, Roe, Rukeyser, Ruttenberg, and Zuckerman saw, heard, and were aware of Barnard's false and misleading statements and representations described above before they enrolled at Barnard, and after they were enrolled in Barnard.

707.    Barnard's false and misleading statements and practices described above caused Aryeh, Bellows, Glaser, Molly, Rabban, Roe, Rukeyser, Ruttenberg, and Zuckerman injury by causing them to enroll at Barnard, and to pay tuition and fees to Barnard, and to continue to maintain enrollment at Barnard and continue to pay tuition and fees to Barnard, based on the reasonable understanding that Barnard would apply, enforce, and follow through on its codes and policies, and the commitments contained therein, concerning protecting students from harassment, abuse, intimidation and discrimination based on their ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status, would otherwise seek to protect students from such hateful and bigoted conduct, and would take actions and implement measures to adequately, appropriately, and sufficiently address such misconduct to foster, ensure, and maintain a safe educational and campus environment.  Barnard did not take such actions.

708.    Barnard's failure, refusal, lack of ability and intention, and lack of commitment to combating, addressing, and ameliorating these deplorable actions, and to making good on and complying with its aforementioned statements, constitute deceptive practices and/or false advertising, and have caused Aryeh, Bellows, Glaser, Molly, Rabban, Roe, Rukeyser, Ruttenberg, and Zuckerman to sustain actual damages and not obtain the benefit of their bargain with Barnard, including the loss of the value of the tuition and fees they have paid Barnard, extreme emotional distress, loss of educational and extracurricular opportunities, economic injuries, and other direct and consequential damages.

709.    Accordingly, Aryeh, Bellows, Glaser, Molly, Rabban, Roe, Rukeyser, Ruttenberg, and Zuckerman are entitled to statutory and/or actual damages in amounts to be determined at trial and to treble damages pursuant to General Business Law § 349(h), based on Barnard's willful or knowing violations.

710.    Individual Plaintiffs are entitled to attorneys' fees and costs pursuant to General Business Law § 349(h).

**COUNT VII**
**(42 U.S.C. § 1986)**
**On Behalf of All Plaintiffs Against All Defendants**

711.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs above as though fully set forth herein.

712.    Jews and Israelis are a protected class for purposes of 42 U.S.C. § 1985.

713.    Certain Columbia students and faculty, including, but not limited to, those mentioned above; student organizations and coalitions, including, but not limited to, SJP, JVP, CUAD, and CSSW4P; faculty organizations, including, but not limited to, FJP (collectively, the "Co-Conspirators"), engaged in an anti-civil rights conspiracy within the meaning of 42 U.S.C. § 1985(3) which was antisemitic and threatening and which created a hostile and discriminatory

environment for the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members.

714.    The Co-Conspirators plotted, coordinated, and executed a common plan, with an agreement and understanding, to engage in, promote, and incite harassment, threats, violence, and intimidation against Jewish and Israeli members of the Columbia community, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members.

715.    This meeting of the minds is evidenced in the close collaboration among the groups, and their co-organization, co-sponsorship, and/or co-promotion of the rallies, demonstrations, and encampments, and the community guidelines described herein.  The Co-Conspirators posted their mission and demands online and reiterated them during negotiations with Columbia such that Columbia had knowledge.  The Co-Conspirators include individual student groups, as well as "collectives" and "coalitions" comprised of varying assortments of conspiring student groups.  Additional co-conspirators whose identities are not known committed numerous additional acts in furtherance of the conspiracy to violate plaintiffs' rights, including those alleged herein.

716.    In furtherance of a conspiracy to violate the rights of Jewish and Israeli Columbia students, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, as set forth in the paragraphs above, the Co-Conspirators committed numerous overt acts designed to create an environment of intimidation, physical and verbal harassment, and hostility against the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members for the purpose of depriving them of their constitutional rights to the equal protection of the laws and their equal enjoyment of the privileges and immunities of citizens of the United States guaranteed by the Constitution and laws, and to the full and equal

benefit of the laws and proceedings for the security of persons, including those under 42 U.S.C. §§ 1981 and 1982, the Thirteenth Amendment right to be free from racial violence, and the right to travel, because of their national origin, race, ethnicity, and/or religion.

717.    The Co-Conspirators, on behalf of themselves and/or the organizations for which they are members, leaders, agents, and/or officers, committed numerous express overt acts in furtherance of this unlawful conspiracy to engage in, promote, and incite racial, religious, and ethnicity-based harassment and physical violence, including, but not limited to, planning, coordinating, and promoting the rallies, demonstrations, and encampments detailed herein, encouraging and organizing followers to attend, coordinating logistical support to attendees, soliciting monetary and other aid, and encouraging attendees to make explicit violent and racially motivated threats, prepare for, and commit discriminatory and harassing acts while concealing their identities.  Those acts include physically removing and threatening to remove from the lawn Jewish and/or Israeli students, and holding demonstrations and occupations which, by express design, deprived Jewish and/or Israeli Columbia students access to their classrooms, dormitories and other Columbia facilities. The illegal activities described herein were undertaken pursuant to an unlawful conspiracy for the express purpose of depriving Jewish and/or Israeli Columbia students of their rights to the equal protection of the laws and their equal enjoyment of the privileges and immunities of citizens of the United States guaranteed by the Constitution, including the right to intrastate travel, because of their national origin, race, ethnicity, and/or religion.

718.    The Co-Conspirators repeatedly engaged in campaigns of intimidation, threats, and physical violence throughout Columbia's campus.  As a result of these conspiratorial acts, Jewish and Israeli Columbia students, including the Individual Plaintiffs, and SAA's and SCLJ's

Jewish and/or Israeli Columbia student members, have suffered injuries including deprivation of one or more of their rights or privileges guaranteed by the Constitution and laws, bodily injury, and severe emotional distress.

719.    Specifically, Jewish and Israeli Columbia students, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, among other things, have faced antisemitic verbal and physical harassment, have had classes and other educational opportunities disrupted, have been blocked from entering campus facilities, and have been prevented from moving about freely on campus.

720.    The actions of the Co-Conspirators violated 42 U.S.C. § 1985(3).

721.    Plaintiffs have not sued the Co-Conspirators but are setting forth the conspiracy and its particulars as the basis for the claim against Columbia brought pursuant to 42 U.S.C. § 1986, which requires an underlying violation of 42 U.S.C. § 1985.

722.    Columbia possessed actual knowledge of the Section 1985(3) anti-civil rights conspiracy described in this Complaint that was planned and undertaken against the class of Jews and Israelis on campus as described—including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members.

723.    This knowledge came through multiple reports by staff, faculty, and students, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, to Columbia's administration, including, but not limited to, those mentioned above, as well as news reports, correspondence with the House Education Committee, and other means. The Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members, and other Jewish and Israeli Columbia students, repeatedly begged and pleaded with Columbia, including, but not limited to, those individuals mentioned above, to take action, but

Columbia refused to help and instead placed the burden on Jewish and Israeli students to keep themselves safe.

724.    Moreover, the Co-Conspirators announced their plans for their antisemitic rallies, encampment, and related activity on social media and through other publicly available means, such that Columbia had advance knowledge that each antisemitic activity would and did occur. Columbia's administrators also directly observed this conspiratorial activity, including in person and through online media.  That Columbia had advance knowledge of the Section 1985 violations is further evidenced through the multiple emails to students and publicly released statements from Columbia about the Co-Conspirators' rallies, encampment, and related activities that routinely demonstrated awareness of the Co-Conspirators' antisemitic intentions.  Columbia had actual notice that students felt unsafe, that rallies had escalated to become more violent and/or threatening, and that action was needed to address it.

725.    Columbia has direct oversight and disciplinary power over the students, faculty, and groups of the same who committed the Section 1985 violations.  While Columbia conditionally suspended SJP and JVP in November 2023, it did not take any disciplinary action against any individuals in connection with the suspension, their members and leaders continued to engage in and take overt acts in furtherance of the conspiracy described herein, and SJP and JVP continued to organize, sponsor, and promote rallies, demonstrations, and the encampments, including through CUAD.  Columbia's actions were not reasonably diligent in preventing the acts in furtherance of the conspiracy.

726.    Columbia further has its own Public Safety department and had the ability to work with local law enforcement to either stop or at a minimum contain the rallies, encampment, and related activity, including by arresting or trespassing individuals who engage in unlawful

conduct, such as violence, threats, or harassment.  Indeed, that Columbia ultimately did call the NYPD twice to dismantle the encampment and Hamilton Hall occupation only serves as further proof that Columbia had both the ability and the authority to take reasonable actions much sooner than it did.

727.    Although Columbia had the power to intervene and prevent violations of its Jewish and Israeli students' civil rights, including the Individual Plaintiffs' and SAA's and SCLJ's Columbia student members' civil rights with reasonable diligence, Columbia neglected and/or refused to prevent or aid in preventing the commission of this conspiracy or any of the overt acts committed in furtherance of the conspiracy so as to stop the above-described injuries that occurred to Columbia's Jewish and Israeli students who were the target of the anti-civil rights conspiracy described above, including the Individual Plaintiffs and SAA's and SCLJ's Jewish and/or Israeli Columbia student members.

728.    Plaintiffs suffered their injuries as a result of Columbia's failure to stop the described conspiracy.

<u>**COUNT VIII**</u>
**(Premises Liability)**
**On Behalf of Individual Plaintiffs Against All Defendants**

729.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs above as though fully set forth herein.

730.    Columbia is obligated as owner of the premises to keep its campus, including its campus buildings, in a reasonably safe condition for all persons on the property, including the Individual Plaintiffs.

731.    Columbia owed, and owes, a duty of care to the Individual Plaintiffs in connection with their use of Columbia's campus, including its buildings, by owning,

maintaining, and exercising control over its premises and activities that are the subject of this lawsuit.

732.    Columbia breached its duty by its actions, inactions, negligence, and/or deliberate indifference and failure to control such dangerous and injurious conduct, despite notice and an opportunity to do so, by failing to take action to prevent or redress certain activity on Columbia's campus, including, but not limited to, the aforementioned activities on Columbia's campus on October 12, 2023, October 25, 2023, November 8, 2023, November 9, 2023, November 30, 2023, December 6, 2023, December 11, 2023, January 19, 2024, January 24, 2024, February 8, 2024, February 13, 2024, April 4, 2024, and during the encampment, including, but not limited to, Columbia's failure to take reasonable steps to prevent or restrain Columbia students, faculty, and others subject to Columbia's supervision and control as they (i) engaged in discrimination and/or verbal and/or physical harassment on the basis of actual and/or perceived shared Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status; and/or (ii) engaged in unlawful activity, including, but not limited to, trespassing, property damage, and/or assault.  Columbia thereby created an unsafe environment which threatened the safety and well-being of the Individual Plaintiffs, leading to their injuries.

733.    Columbia had actual and/or constructive knowledge that dangerous activity and injurious conduct was foreseeable and likely to occur during these activities on Columbia's campus.  The aforementioned activities were foreseeable through multiple reports made by students, including the Individual Plaintiffs, as well as through news reports, correspondence with the House Education Committee, and other means.  Moreover, the aforementioned activities were announced in advance on social media and through other publicly available means, such that Columbia had advance knowledge that each would and did occur.

734.    As a result of Columbia's breach of its duty, the Individual Plaintiffs have

suffered injury as well as financial and temporal losses in amounts to be determined at trial.  The

Individual Plaintiffs no longer feel safe on Columbia's campus; their safety was endangered by

Columbia, and they have, *inter alia*, missed and/or dropped classes, failed to perform on their

schoolwork, delayed graduation dates, taken leaves, and avoided campus and/or campus

buildings, as a result of Columbia's conduct.

735.    Columbia's breach of its duty is the actual, direct, and proximate cause of the

Individual Plaintiffs' injuries.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a jury trial for all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray and request that a judgment be entered in each of their

favor, and against Columbia University and Barnard awarding them:

A.    Injunctive relief enjoining Columbia University and Barnard and their agents

from establishing, implementing, instituting, maintaining, or executing policies,

practices, procedures, or protocols that discriminate against Jewish and Israeli

students on the basis of their Jewish or Israeli ancestry, race, ethnic

characteristics, or national origin, including the Individual Plaintiffs and SAA's,

and SCLJ's Jewish and/or Israeli Columbia student members, and ordering

Columbia University and Barnard to take all necessary and appropriate remedial

and preventive measures against antisemitic discrimination and harassment, such

as the following: (i) disciplinary measures, including termination, against deans,

administrators, professors, and other employees responsible for the antisemitic

discrimination and abuse permeating the schools that the Individual Plaintiffs and

SAA's, and SCLJ's Jewish and/or Israeli Columbia student members experience, whether because they engage in it or permit it; (ii) disciplinary measures, including suspension or expulsion, against students who engage in such conduct; (iii) declining and returning donations, whether from foreign countries or elsewhere, implicitly or explicitly conditioned on the hiring or promotion of professors who espouse antisemitism or the inclusion of antisemitic coursework or curricula; (iv) adding required antisemitism training for Columbia University and Barnard community members; (v) creating a Title VI office dedicated to combating antisemitism on campus; and (vi) appointing a neutral expert monitor to oversee compliance with this Court's order;

B.   Compensatory, consequential, and punitive damages in amounts to be determined at trial;

C.   Statutory penalties, including treble damages, for violations of General Business Law § 349(h) and N.Y. Civ. Rights Law § 40-c, pursuant to N.Y. Civ. Rights Law § 40-d;

D.   Reasonable attorneys' fees, the costs of suit, and expenses;

E.   Pre-judgment interest and post-judgment interest at the maximum rate allowable by the law; and

F.   Such other and further relief as the Court deems just and proper.

Dated:   June 17, 2024
       New York, New York

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By:   */s/ Marc E. Kasowitz*
     Marc E. Kasowitz
     Daniel R. Benson
     Mark P. Ressler
     Andrew L. Schwartz
     Joshua E. Roberts
     Jillian R. Roffer
     Brittany F. Alzfan
     Zachary N. Josephs
     1633 Broadway
     New York, New York 10019
     Tel:  (212) 506-1700

*Attorneys for Plaintiffs*