# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

STUDENTS AGAINST ANTISEMITISM, INC., STANDWITHUS CENTER FOR LEGAL JUSTICE, MILES RUBIN, DANIELLA SYMONDS, ERIN MCNULTY, NOAH MILLER, VALERIE GERSTEIN, KATIANA ARYEH, LAURA BELLOWS, LEMONY DAVID, JOHN DOE, CHAYA DROZNIK, LEO ELKINS, SAMUEL FRIEDMAN, MAYA GAL, AYELET GLASER, MICHAEL GROSS, JARED HARNICK, GABRIEL KAHANE, TALIA KESSELMAN, ELI MIZRAHI-AKS, OMER NAUER, AMIEL NELSON, GABRIEL NELSON, MOLLY NELSON, MARC NOCK, AVA QUINN, TALIA RABBAN, JANE ROE, SOPHIE RUKEYSER, ALIZA RUTTENBERG, EMILY SANDLER, ANDREW STEIN, JONATHAN SWILL, RAFAEL VANUNO, XAVIER WESTERGAARD, EDEN YADEGAR, and LILY ZUCKERMAN,

*Plaintiffs*,

v.

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, and TRUSTEES OF BARNARD COLLEGE,

*Defendants*.

No. 1:24-cv-01306

**ORAL ARGUMENT REQUESTED**

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Kaplan Martin LLP
156 West 56th Street, Suite 207
New York, NY 10019
(212) 316-9500

Hecker Fink LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883

July 22, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................... 3

    I.     Columbia Has Worked to Address Antisemitism on Campus ........................................... 3

    II.    The FAC .......................................................................................................................... 10

LEGAL STANDARD........................................................................................................... 12

ARGUMENT ....................................................................................................................... 13

    I.     Plaintiffs Fail to State a Claim Under Title VI (Count I) ................................................ 13

        A.     Plaintiffs Fail to Plead that Columbia Engaged in Discrimination........................ 14

        B.     Plaintiffs Cannot Plead that Columbia's Response Has Been Clearly
            Unreasonable Under the Known Circumstances ................................................... 14

    II.    Plaintiffs Fail to State a Claim Under 42 U.S.C. § 1986 (Count VII) .............................. 30

    III.   The Court Should Decline to Exercise Supplemental Jurisdiction Over Plaintiffs'
        State Law Claims, Which Fail in Any Event ..................................................................... 34

        A.     Plaintiffs Fail to State a Claim Under NYCHRL §§ 8-107(4) or (17) (Count
            IV) ....................................................................................................................... 34

        B.     Plaintiffs Fail to State a Claim Under the NYSHRL or NYCRL (Counts II-
            III) ...................................................................................................................... 35

        C.     Plaintiffs Fail to State a Contract Claim (Count V)............................................. 36

        D.     Plaintiffs Fail to State a Claim Under GBL §§ 349, 350 (Count VI) ................... 38

        E.     Plaintiffs Fail to State a Claim for Premises Liability (Count VIII)...................... 39

    IV.   Much of Plaintiffs' Suit Is Nonjusticiable and Their Request for Injunctive Relief Is
        Overbroad ........................................................................................................................ 41

        A.     SAA and SCLJ Lack Standing Entirely................................................................ 41

        B.     Plaintiffs Lack Standing to Seek Injunctive Relief.............................................. 42

        C.     Plaintiffs Cannot Properly Seek Such Sweeping Injunctive Relief ...................... 43

CONCLUSION..................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*,
    No. 12 Civ. 4828, 2018 WL 1273343 (S.D.N.Y. Mar. 5, 2018) ........................................... 3

*AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.*,
    361 F. Supp. 2d 312 (S.D.N.Y. 2005) ................................................................................. 18

*Abadi v. Am. Airlines, Inc.*,
    No. 23 Civ. 4033, 2024 WL 1346437 (S.D.N.Y. Mar. 29, 2024) ................................. 32, 33

*Alexander v. Yale Univ.*,
    631 F.2d 178 (2d Cir. 1980) ............................................................................................... 42

*Alexson v. Hudson Valley Cmty. Coll.*,
    125 F. Supp. 2d 27 (N.D.N.Y. 2000) ................................................................................. 38

*Amidax Trading Grp. v. S.W.I.F.T. SRCL*,
    671 F.3d 140 (2d Cir. 2011) ............................................................................................... 13

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. City of Albany*,
    250 F. Supp. 2d 48 (N.D.N.Y. 2003) ................................................................................. 42

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................................... 13

*Bano v. Union Carbide Corp.*,
    361 F.3d 696 (2d Cir. 2004) ......................................................................................... 41, 42

*Barker v. Bancorp, Inc.*,
    No. 21 Civ. 869, 2022 WL 595954 (S.D.N.Y. Feb. 25, 2022) ............................................. 3

*Barnett v. Johnson City Sch. Dist.*,
    No. 04 Civ. 0763, 2005 WL 8178066 (N.D.N.Y. Feb. 2, 2005) ........................................ 41

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................................... 12

*Blunt v. Lower Merion Sch. Dist.*,
    767 F.3d 247 (3d Cir. 2014) ............................................................................................... 41

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) ..................................................................................................... 32, 34

*Broidy Cap. Mgmt. LLC v. Benomar*,
  944 F.3d 436 (2d Cir. 2019)...................................................................................... 3, 13

*Burgos v. Aqueduct Realty Corp.*,
  92 N.Y.2d 544 (1998)................................................................................................. 40

*C.H. v. Pla-Fit Franchise, LLC*,
  83 N.E.3d 633 (Ill. Ct. App. 2017) ........................................................................... 40

*Calcano v. Swarovski N. Am. Ltd.*,
  36 F.4th 68 (2d Cir. 2022) ........................................................................................ 13

*Campisi v. City Univ. of N.Y.*,
  No. 15 Civ. 4859, 2016 WL 4203549 (S.D.N.Y. Aug. 9, 2016) ........................................ 19

*Carabello v. N.Y.C. Dep't of Educ.*,
  928 F. Supp. 2d 627 (E.D.N.Y. 2013) .................................................................. 16, 22

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)...................................................................................................... 42

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).............................................................................................. 42, 43

*Clissuras v. E.E.O.C.*,
  No. 89 Civ. 5869, 1990 WL 96754 (S.D.N.Y. July 5, 1990) ............................................. 33

*Colarossi v. Univ. of Rochester*,
  2 A.D.3d 1272 (4th Dep't 2003) ................................................................................ 41

*In re Columbia Tuition Refund Action*,
  523 F. Supp. 3d 414 (S.D.N.Y. 2021)................................................................... 36, 37

*Cooper v. Franklin Templeton Invs.*,
  No. 22-2763, 2023 WL 3882977 (2d Cir. June 8, 2023)................................................... 36

*Corsi v. Gestone*,
  No. 20 Civ. 4799, 2021 WL 5416623 (E.D.N.Y. Nov. 19, 2021) ...................................... 33

*Cotiviti, Inc. v. McDonald*,
  No. 19 Civ. 6559, 2021 WL 2784529 (S.D.N.Y. July 2, 2021) ........................................... 3

*Cruz v. FXDirectDealer, LLC*,
  720 F.3d 115 (2d Cir. 2013)....................................................................................... 38

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  596 U.S. 212 (2022).................................................................................................... 12

*Cuoco v. Moritsugu*,
    222 F.3d 99 (2d Cir. 2000)..................................................................................... 45

*D.S. ex rel. C.S. v. Rochester City Sch. Dist.*,
    No. 19 Civ. 6528, 2020 WL 7028523 (W.D.N.Y. Nov. 30, 2020).................................... 27

*D'Amico v. Christie*,
    71 N.Y.2d 76 (1987) ............................................................................................. 41

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999)....................................................................................... *passim*

*De Asis v. N.Y.C. Police Dep't*,
    No. 07 Civ. 3904, 2008 WL 3876075 (E.D.N.Y. Aug. 18, 2008) ...................................... 32

*Deen v. New Sch. Univ.*,
    No. 05 Civ. 7174, 2007 WL 1032295 (S.D.N.Y. Mar. 27, 2007) ..................................... 37

*Doe ex rel. Doe v. Brittonkill Cent. Sch. Dist. Bd. of Educ.*,
    No. 18 Civ. 0142, 2018 WL 6622191 (N.D.N.Y. Dec. 18, 2018) ............................... 17, 21

*Doe v. Columbia Univ.*,
    551 F. Supp. 3d 433 (S.D.N.Y. 2021)...................................................................... 14

*Doe v. Indyke*,
    457 F. Supp. 3d 278 (S.D.N.Y. 2020).................................................................. 13, 44

*Doe v. N.Y. Univ.*,
    438 F. Supp. 3d 172 (S.D.N.Y. 2020)...................................................................... 14

*Doe v. Sacks*,
    — F. Supp. 3d —, No. 23 Civ. 1307, 2024 WL 402945
    (S.D.N.Y. Feb. 2, 2024) .................................................................................. 17, 18

*Doe v. Syracuse Univ.*,
    No. 22-2674, 2023 WL 7391653 (2d Cir. Nov. 8, 2023) ........................................... 29, 45

*Doe v. Trs. of Columbia Univ. in City of N.Y.*,
    No. 21 Civ. 5839, 2022 WL 3666997 (S.D.N.Y. Aug. 25, 2022) .................... 19, 25, 34, 45

*Doe v. Trs. of Columbia Univ. in City of N.Y.*,
    No. 23-960, 2024 WL 2013717 (2d Cir. May 7, 2024)..................................................... 25

*Doe v. Yeshiva Univ.*,
    — F. Supp. 3d —, No. 22 Civ. 5405, 2023 WL 8236316 (S.D.N.Y. Nov. 28, 2023)......... 38

*Dorce v. City of New York*,
    2 F.4th 82 (2d Cir. 2021) ....................................................................................... 43

*Downing v. Life Time Fitness, Inc.*,
    No. 10 Civ. 11037, 2011 WL 2014771 (E.D. Mich. May 24, 2011) .................................. 40

*Dube v. State Univ. of N.Y.*,
    900 F.2d 598 (2d Cir. 1990) ..................................................................................... 28

*Eiseman v. State*,
    70 N.Y.2d 175 (1987) .............................................................................................. 40

*Espinoza v. N.Y.C. Dep't of Transp.*,
    304 F. Supp. 3d 374 (S.D.N.Y. 2018) ...................................................................... 34

*Faulkner v. Beer*,
    463 F.3d 130 (2d Cir. 2006) ..................................................................................... 13

*Feibleman v. Trs. of Columbia Univ. in City of N.Y.*,
    No. 19 Civ. 4327, 2020 WL 3871075 (S.D.N.Y. July 9, 2020) ................................ 25, 30

*Felber v. Yudof*,
    851 F. Supp. 2d 1182 (N.D. Cal. 2011) ......................................................... 18, 21, 22, 28

*Gally v. Columbia Univ.*,
    22 F. Supp. 2d 199 (S.D.N.Y. 1998) ....................................................................... 37

*Gebser v. Lago Vista Ind. Sch. Dist.*,
    524 U.S. 274 (1998) ................................................................................................ 15

*Gill v. Whitford*,
    585 U.S. 48 (2018) .................................................................................................. 43

*Gomez-Jimenez v. N.Y. L. Sch.*,
    103 A.D.3d 13 (1st Dep't 2012) .............................................................................. 38

*Grant v. County of Suffolk*,
    No. 15 Civ. 4781, 2018 WL 816242 (E.D.N.Y. Feb. 9, 2018) ............................... 32

*HB v. Monroe Woodbury Cent. Sch. Dist.*,
    No. 11 Civ. 5881, 2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012) ........................... 19

*Healy v. James*,
    408 U.S. 169 (1972) ................................................................................................ 27

*Heskiaoff v. Sling Media, Inc.*,
    719 F. App'x 28 (2d Cir. 2017) ............................................................................... 39

*Hesse v. Godiva Chocolatier, Inc.*,
    463 F. Supp. 3d 453 (S.D.N.Y. 2020) ................................................................... 3, 13

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*,
  37 N.Y.3d 169 (2021) ..................................................................................................... 39

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ........................................................................................................ 41

*Irish Lesbian & Gay Org. v. Giuliani*,
  143 F.3d 638 (2d Cir. 1998) ............................................................................................ 41

*JF v. Carmel Cent. Sch. Dist.*,
  168 F. Supp. 3d 609 (S.D.N.Y. 2016) ............................................................................. 14

*Johnson v. N.Y. Univ.*,
  800 F. App'x 18 (2d Cir. 2020) ....................................................................................... 14

*Jusino v. Fed'n of Cath. Tchrs., Inc.*,
  54 F.4th 95 (2d Cir. 2022) ............................................................................................... 34

*Kaye v. N.Y.C. Health & Hosps. Corp.*,
  No. 18 Civ. 12137, 2023 WL 2745556 (S.D.N.Y. Mar. 31, 2023) .................................. 35

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
  385 U.S. 589 (1967) ........................................................................................................ 27

*KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*,
  No. 12 Civ. 2200, 2013 WL 177911 (S.D.N.Y. Jan. 16, 2013) ...................... 18, 19, 20, 21

*KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*,
  531 F. App'x 134 (2d Cir. 2013) ................................................................................. 19, 45

*Langton v. Town of Chester Libr. Bd.*,
  No. 14 Civ. 9474, 2020 WL 2850898 (S.D.N.Y. June 1, 2020) ....................................... 31

*Lowell v. Lyft*,
  352 F. Supp. 3d 248 (S.D.N.Y. 2018) ............................................................................. 42

*Lugo v. Lesbian & Gay Cmtys. Serv. Ctr.*,
  No. 21 Civ. 7423, 2023 WL 6648913 (S.D.N.Y. Oct. 12, 2023) ...................................... 3

*Maas v. Cornell Univ.*,
  94 N.Y.2d 87 (1999) ....................................................................................................... 36

*Mandala v. NTT Data Inc.*,
  975 F.3d 202 (2d Cir. 2020) ............................................................................................ 35

*Mandel v. Bd. of Trs. of Cal. State Univ.*,
  No. 17 Civ. 03511, 2018 WL 5458739 (N.D. Cal. Oct. 29, 2018) ................... 18, 22, 23, 28

*Marcavage v. City of New York*,
    689 F.3d 98 (2d Cir. 2012).................................................................................... 42

*Martinetti v. Mangan*,
    No. 17 Civ. 5484, 2019 WL 1255955 (S.D.N.Y. Mar. 19, 2019) ...................................... 29

*Meisels v. Meisels*,
    No. 19 Civ. 4767, 2021 WL 1924186 (E.D.N.Y. May 13, 2021) ............................... 13, 44

*Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    7 F.3d 1085 (2d Cir. 1993)................................................................................. 33

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
    715 F.3d 102 (2d Cir. 2013)................................................................................. 34

*Minto v. Molloy Coll.*,
    No. 16 Civ. 276, 2019 WL 4696287 (E.D.N.Y. Sept. 26, 2019)...................................... 14

*Murillo-Roman v. Pension Bds. - United Church of Christ*,
    No. 22 Civ. 8365, 2024 WL 246018 (S.D.N.Y. Jan. 23, 2024)........................................ 35

*N.Y. State Nat'l Org. for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989)............................................................................... 31

*Nallan v. Helmsley-Spear, Inc.*,
    50 N.Y.2d 507 (1980) ....................................................................................... 39

*Newman v. Point Park Univ.*,
    No. 20 Civ. 204, 2022 WL 969601 (W.D. Pa. Mar. 31, 2022).......................................... 28

*Nnebe v. Daus*,
    644 F.3d 147 (2d Cir. 2011)................................................................................. 42

*Novio v. N.Y. Acad. of Art*,
    286 F. Supp. 3d 566 (S.D.N.Y. 2017)...................................................................... 34

*Nungesser v. Columbia Univ.*,
    169 F. Supp. 3d 353 (S.D.N.Y. 2016).................................................................... 38

*Nungesser v. Columbia Univ.*,
    244 F. Supp. 3d 345 (S.D.N.Y. 2017)......................................................... 17, 27, 37, 39

*Oden v. N. Marianas Coll.*,
    440 F.3d 1085 (9th Cir. 2006) ............................................................................. 25

*Oliveras v. Saranac Lake Cent. Sch. Dist.*,
    No. 11 Civ. 1110, 2014 WL 1311811 (N.D.N.Y. Mar. 31, 2014)...................................... 17

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*,
   85 N.Y.2d 20 (1995) ..................................................................... 38, 39

*Padmanabhan v. N.Y. Inst. of Tech. Campus*,
   No. 18 Civ. 5284, 2019 WL 4572194 (S.D.N.Y. Sept. 20, 2019) ...................... 36

*Papish v. Bd. of Curators of Univ. of Mo.*,
   410 U.S. 667 (1973)..................................................................... 27

*Pasquaretto v. Long Island Univ.*,
   106 A.D.3d 794 (2d Dep't 2013) ...................................................... 40

*People v. Trump Entrepreneur Initiative LLC*,
   137 A.D.3d 409 (1st Dep't 2016) ...................................................... 38

*Pratt v. Indian River Cent. Sch. Dist.*,
   No. 09 Civ. 0411, 2012 WL 13172930 (N.D.N.Y. Nov. 5, 2012)...................... 18

*Pratt v. Indian River Cent. Sch. Dist.*,
   No. 09 Civ. 0411, 2012 WL 13172929 (N.D.N.Y. Dec. 13, 2012) .................... 18

*Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*,
   No. 04 Civ. 704, 2005 WL 1214281 (S.D.N.Y. May 20, 2005)......................... 37

*Rodriguez v. Winski*,
   444 F. Supp. 3d 488 (S.D.N.Y. 2020).................................................. 41

*Roe v. St. John's Univ.*,
   91 F.4th 643 (2d Cir. 2024) .......................................................... 14

*Roskin-Frazee v. Columbia Univ.*,
   No. 17 Civ. 2032, 2018 WL 6523721 (S.D.N.Y. Nov. 26, 2018) ......... 19, 25, 29

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007)......................................................... 3, 13

*Rothbein v. City of New York*,
   No. 18 Civ. 5106, 2019 WL 977878 (S.D.N.Y. Feb. 28, 2019) ......................... 34

*Ruiz v. New Avon LLC*,
   No. 18 Civ. 9033, 2019 WL 4601847 (S.D.N.Y. Sept. 22, 2019) ...................... 23

*Rynasko v. N.Y. Univ.*,
   63 F.4th 186 (2d Cir. 2023) .......................................................... 37

*Sabel v. Halsted Fin. Servs., LLC*,
   No. 20 Civ. 1216, 2020 WL 6274986 (S.D.N.Y. Oct. 26, 2020) ....................... 45

*Schmidt v. Lessard,*
    414 U.S. 473 (1974) .................................................................................................. 44

*Scurry v. N.Y.C. Housing Auth.,*
    39 N.Y.3d 443 (2023) ............................................................................................... 40

*Shipping Fin. Servs. Corp. v. Drakos,*
    140 F.3d 129 (2d Cir. 1998) .................................................................................... 13

*Siino v. Reices,*
    216 A.D.2d 552 (1st Dep't 1995) ............................................................................ 40

*Sines v. Kessler,*
    324 F. Supp. 3d 765 (W.D. Va. 2018) .................................................................... 33

*Sirohi v. Lee,*
    222 A.D.2d 222 (1st Dep't 1995) ............................................................................ 36

*Soule v. Conn. Assoc. of Schs., Inc.,*
    90 F.4th 34 (2d Cir. 2023) ................................................................................. 43, 44

*Spencer v. Casavilla,*
    44 F.3d 74 (2d Cir. 1994) .................................................................................. 31, 32

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) .................................................................................................. 13

*Sunwoo v. JPMorgan Chase & Co.,*
    No. 20 Civ 5410, 2021 WL 2443814 (S.D.N.Y. June 15, 2021) .............................. 3

*Sutton v. Stony Brook Univ.,*
    No. 18 Civ 7434, 2021 WL 3667013 (E.D.N.Y. Aug. 18, 2021) ............................ 16

*Sutton v. Stony Brook Univ.,*
    No. 21-2055, 2022 WL 4479509 (2d Cir. Sept. 27, 2022) ..................................... 16

*Sweezy v. New Hampshire ex rel. Wyman,*
    354 U.S. 234 (1957) .................................................................................................. 28

*Tesoriero v. Syosset Cent. Sch. Dist.,*
    382 F. Supp. 2d 387 (E.D.N.Y. 2005) .................................................................... 20

*Thomas v. Roach,*
    165 F.3d 137 (2d Cir. 1999) .................................................................................... 31

*Tubbs v. Stony Brook Univ.,*
    343 F. Supp. 3d 292 (S.D.N.Y. 2018) ........................................................ 24, 25, 29

*Tyrrell v. Seaford Union Free Sch. Dist.*,
  792 F. Supp. 2d 601 (E.D.N.Y. 2011) ..................................................... 26

*United Bhd. of Carpenters & Joiners of Am., Loc. 610 v. Scott*,
  463 U.S. 825 (1983).................................................................................... 32

*United Prob. Officers Ass'n v. City of New York*,
  No. 21 Civ. 218, 2022 WL 875864 (S.D.N.Y. Mar. 24, 2022) .................. 34, 35

*Urbina v. City of New York*,
  No. 14 Civ. 9870, 2016 WL 79991 (S.D.N.Y. Jan. 6, 2016)....................... 31, 33

*Urbina v. City of New York*,
  672 F. App'x 52 (2d Cir. 2016) ................................................................. 31

*Valencia v. Lee*,
  316 F.3d 299 (2d Cir. 2003)....................................................................... 36

*Vega v. Miller*,
  273 F.3d 460 (2d Cir. 2001)....................................................................... 28

*Vengalattore v. Cornell Univ.*,
  36 F.4th 87 (2d Cir. 2022) ......................................................................... 15

*Wai Chu v. Samsung Electrs. Am., Inc.*,
  No. 18 Civ. 11742, 2020 WL 1330662 (S.D.N.Y. Mar. 23, 2020) ............ 45

*Walsh v. City of New York*,
  No. 19 Civ. 9238, 2021 WL 1226585 (S.D.N.Y. Mar. 31, 2021) .............. 31

*Walton v. Mercy Coll.*,
  93 A.D.3d 460 (1st Dep't 2012) ................................................................ 40

*Warth v. Seldin*,
  495 F.2d 1187 (2d Cir. 1974)..................................................................... 42

*Warth v. Seldin*,
  422 U.S. 490 (1975).................................................................................... 42

*Webb v. Goord*,
  340 F.3d 105 (2d Cir. 2003)....................................................................... 31

*Welcome v. N.Y.C. Dep't of Educ.*,
  No. 17 Civ. 5407, 2018 WL 5817156 (E.D.N.Y. Nov. 6, 2018)................ 25

*Wheeler v. Praxair Surface Techs., Inc.*,
  694 F. Supp. 3d 432 (S.D.N.Y. 2023)........................................................ 36

*Williams v. City of New York*,
    34 F. Supp. 3d 292 (S.D.N.Y. 2014) .................................................................. 43

*Williams v. City of New York*,
    No. 16 Civ. 8193, 2018 WL 4308552 (S.D.N.Y. Sept. 10, 2018) ....................... 31

*Williams v. Pace Univ.*,
    192 F. Supp. 3d 415 (S.D.N.Y. 2016) ................................................................. 14

*Wolfer v. Getman*,
    221 A.D.2d 969 (4th Dep't 1995) ........................................................................ 39

*Yu v. Vassar Coll.*,
    97 F. Supp. 3d 448 (S.D.N.Y. 2015) ................................................................... 36

*Zeno v. Pine Plains Cent. Sch. Dist.*,
    702 F.3d 655 (2d Cir. 2012) .......................................................... 15, 16, 25, 45

**Statutes**

20 U.S.C. § 1232g .................................................................................... 10, 24

28 U.S.C. § 1367 ............................................................................................ 34

42 U.S.C. § 1983 ............................................................................................ 42

42 U.S.C. § 1985 ....................................................................... 30, 31, 32, 34

42 U.S.C. § 1986 ...................................................................................... *passim*

42 U.S.C. § 2000d .......................................................................................... 11

N.Y. Civil Rights Law § 40-c .............................................................. 12, 35, 36

N.Y. Exec. Law § 296 ........................................................................ 12, 35, 36

N.Y. General Business Law § 349 ....................................................... 12, 38

N.Y. General Business Law § 350 ....................................................... 12, 38

N.Y.C. Admin. Code § 8-107 ................................................... 12, 34, 35

**Federal Rules**

Fed. R. Civ. P. 12 ......................................................... 3, 12, 13, 44

Fed. R. Civ. P. 65 ...................................................................... 44

**Other Authorities**

Harriet Engelke, *SEAS Updates Spring 2024 Pass/D/Fail Policies*, Bwog (Apr. 24, 2024),
    https://bwog.com/2024/04/seas-updates-spring-2024-pass-d-fail-policies/ .......................... 8

Off. for C.R., U.S. Dep't of Educ., Dear Colleague Letter: Protecting Students from
    Discrimination Such as Harassment, Based on Race, Color, or National Origin, Including
    Shared Ancestry or Ethnic Characteristics (May 7, 2024),
    https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202405-shared-
    ancestry.pdf .................................................................................................................... 29

Restatement (Second) of Torts § 344 ............................................................................................ 39

Ryan Quinn, *Columbia's President Denounced Her Before Congress. Firing Could Be Next*,
    Inside Higher Ed (July 12, 2024),
    https://www.insidehighered.com/news/faculty-issues/academic-
    freedom/2024/07/12/columbias-president-denounced-her-congress-firing ........................ 16

Sareen Habeshian, *Education Dept. Probes Columbia Over Alleged Anti-Palestinian
    Discrimination*, Axios (May 3, 2024),
    https://www.axios.com/2024/05/03/columbia-investigation-education-department ............. 7

Tatyana Monnay, *Columbia Law School Offers Pass/Fail Grading Amid Gaza Protests*,
    Bloomberg (May 1, 2024),
    https://news.bloomberglaw.com/business-and-practice/columbia-law-school-offers-pass-fail-
    grading-amid-gaza-protests ............................................................................................... 8

## PRELIMINARY STATEMENT

Although Columbia University has a unique and notable history of campus protest, the events on Columbia's campus over the past nine months have been unprecedented. Centuries of intellectual inquiry have led to the consensus that allowing sharp disagreement and dissent is vital to Columbia's academic mission and that of higher education more broadly. This mission is incomplete, however, without also ensuring the safety of all members of the Columbia community and maintaining an environment where every student can be treated with dignity and respect.

The terrorist attacks that Hamas launched against Israel on October 7, 2023, have stress-tested these principles like never before. Hamas's attacks and the ensuing war inflamed longstanding disagreements over a violent and intractable political conflict in the Middle East. In the wake of those attacks, some debates about these issues on Columbia's campus were marked by civility and empathy. Others, however, were not—and the campus, like New York City and the rest of the country, saw a spike in antisemitic conduct and speech.

These conditions created an environment for members of the Columbia community who are Jewish and Israeli that was painful and not what the University would want for any student, and which the University has been working tirelessly to address. As a matter of law, however, the United States Supreme Court has made it very clear that a university cannot be held liable in a private action for the independent, allegedly discriminatory actions of its students, even when those actions amount to harassment that materially impacts other students, unless the university's response was "clearly unreasonable" under the circumstances. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) (O'Connor, J.). In other words, because "a recipient of federal funds may be liable in damages . . . only for *its own* misconduct," a university is only liable if it has shown "deliberate indifference to known acts of harassment." *Id.* at 640, 643 (emphasis added). Under this standard, a university is not required to "remedy peer harassment,"

"engage in particular disciplinary action," or even "ensure that students conform their conduct to certain rules." *Id.* at 648 (cleaned up). Rather, a university like Columbia must "respond to known peer harassment in a manner that is not clearly unreasonable" "in light of the known circumstances." *Id.* at 648-49. As the Court explained, such a demanding standard is necessary to ensure that "[s]chool administrators . . . continue to enjoy the flexibility they require," "acknowledg[ing]" both the "substantial burdens" that "school administrators shoulder" and "the practical realities of responding to student behavior." *Id.* at 648-49, 653.

Despite the atmosphere on campus since October 7, Plaintiffs cannot satisfy this intentionally demanding standard. To be sure, the allegations in their First Amended Complaint ("FAC") are deeply troubling. Columbia sincerely regrets Plaintiffs' view that it has not sufficiently protected them, and Columbia is committed to continuing the work that is necessary to root out antisemitism, anti-Israeli bias, and other noxious forms of discrimination on campus. While Columbia's response to the turmoil following October 7, 2023 has not been perfect, it also has not been clearly unreasonable under the circumstances. To the contrary, the University's efforts have run the gamut from repeated and forceful condemnations of Hamas and antisemitism, to community engagements and dialogue sessions, to policy and process overhauls, to the establishment of a Task Force on Antisemitism and a commitment to establish a new, permanent antidiscrimination office, to educational and safety accommodations, to disciplinary proceedings and sanctions, to campus lockdowns, and even to requests for New York City Police Department ("NYPD") assistance when necessary.

In other words, like the situation in our country, the situation on Columbia's campus has been difficult and complex. In the months since October 7, Columbia administrators have had to make countless daily decisions about how best to protect the safety of Columbia's diverse

community, preserve educational opportunities for tens of thousands of students, maintain free academic inquiry, and comply with privacy and process requirements—all while taking criticism (and defending litigation) on all sides. That, of course, is the job of a university. With the benefit of hindsight, some of those decisions probably could have been different—and the University continues to learn from the lessons of this past year as it prepares for the coming academic year. But the fact that dilemmas like these are so inherently difficult, even in normal circumstances, is precisely why the *Davis* Court urged restraint and "flexibility," *id.* at 648—not direct supervision of personnel, operations, finances, and security of a large, private university by a federal court, as Plaintiffs demand.

To reiterate, Columbia does not and cannot deny that Plaintiffs' allegations are very serious and that Columbia's response to certain events on campus in the wake of October 7 has not been flawless. But Title VI does not allow for the second-guessing of a university's complicated but reasonable judgments, rendered under truly extraordinary circumstances. And Plaintiffs fail to state any other claims or establish standing to seek prospective relief, let alone the unprecedented injunction that they seek.

## BACKGROUND[1]

### I.    Columbia Has Worked to Address Antisemitism on Campus

On October 7, 2023, "Hamas launched an unprovoked surprise attack on Israel, perpetrating depraved acts of murder, torture, rape, violence, and kidnapping." ¶ 139.[2] "The attack

---

[1] The factual allegations in the FAC are accepted as true only for purposes of this motion to dismiss, but not to the extent that they are contradicted by documents integral to the pleading or incorporated by reference, or by documents of which this Court can take judicial notice. *See, e.g.*, *Lugo v. Lesbian & Gay Cmtys. Serv. Ctr.*, No. 21 Civ. 7423, 2023 WL 6648913, at *1 n.2 (S.D.N.Y. Oct. 12, 2023) (Broderick, J.); *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, No. 12 Civ. 4828, 2018 WL 1273343, at *8 n.4 (S.D.N.Y. Mar. 5, 2018).

[2] Citations to "¶ __" refer to paragraphs of the FAC, ECF 39. Citations to "Ex. __" refer to exhibits to the Declaration of Gabrielle E. Tenzer. For its Rule 12(b)(6) motion, Columbia relies on Exhibits A-H, J, L, O, U-Y, AA-BB, DD-EE, and MM, which are incorporated by reference into or integral to the FAC. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). In addition, the Court may further consider Exhibits I, K, M-N, P-T, Z, CC, and FF-LL on

that Hamas perpetrated on innocent Israeli civilians . . . cannot be justified or rationalized in any way." Ex. P at 3. These horrifying events not only created a new reality on college campuses across the nation but precipitated a disturbing increase in antisemitic speech and conduct. *See* ¶ 145.

Columbia promptly condemned Hamas's "horrific attack on Israel," Ex. J at 1, and it spoke out against "the antisemitism and anti-Muslim and Arab hate that is far too pervasive today," Ex. T at 2, while trying to promote the civil exchange of views that is so vital to the academic enterprise. In doing so, it is hardly surprising that Columbia's administration has been barraged daily with innumerable, difficult choices about balancing safety, educational opportunity, and freedom of expression on its campus, located in the diverse, already contentious environment of the country's largest city. Throughout the 2023-24 academic year, Columbia undertook a wide variety of measures—outlined in greater detail below—to combat antisemitism on campus, all while striving to balance these complex and competing considerations.

Those choices became all the more challenging, and Columbia's climate on campus grew increasingly tense, in the second half of the spring semester of 2024, when protestors set up encampments and later occupied a University building. One day after the first encampment was erected, Columbia requested the assistance of the NYPD to clear the encampment (after repeatedly warning the protestors that they were in violation of University rules and that they were being interim suspended). *See* ¶ 324; Ex. X at 1.

---

Columbia's Rule 12(b)(6) motion because they are subject to judicial notice as publicly available sources on Columbia's website. *See, e.g.*, *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020); *Cotiviti, Inc. v. McDonald*, No. 19 Civ. 6559, 2021 WL 2784529, at *6 (S.D.N.Y. July 2, 2021) (Broderick, J.). Several of these exhibits, as described below, may be considered on the additional basis that they are "fairly implicated" but selectively ignored by the FAC. *Barker v. Bancorp, Inc.*, No. 21 Civ. 869, 2022 WL 595954, at *6 (S.D.N.Y. Feb. 25, 2022); *see also Sunwoo v. JPMorgan Chase & Co.*, No. 20 Civ. 5410, 2021 WL 2443814, at *6 (S.D.N.Y. June 15, 2021) (Broderick, J.) ("Where the language of a complaint is contradicted by a written document that plaintiff artfully conceals . . . , the court may consider such a document on a motion to dismiss." (cleaned up)). For its Rule 12(b)(1) motion, Columbia relies on Exhibits A-MM. *See Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 441 (2d Cir. 2019) ("The district court can refer to evidence outside the pleadings when resolving a motion to dismiss under [Rule] 12(b)(1)." (cleaned up)).

Despite taking these significant steps, the protests and encampments continued. *See* ¶ 324. Recognizing that a longer-term resolution was needed and in an effort to deescalate campus tensions, Columbia offered accommodations to community members adversely affected by the encampments (including a mandate that every Columbia instructor provide a "no-questions-asked" remote learning option to any student who wanted one), and made clear that antisemitic chants, signs, and taunts were "totally unacceptable" and "intolerable," while at the same time seeking to persuade the protestors to permanently disperse. Ex. CC at 2; *see also, e.g.*, ¶¶ 357, 362-63.

When efforts to end the encampments proved futile, Columbia acted to interim suspend all students who remained in the encampments. *See* ¶ 372. In the early morning hours of April 30, 2024, a group of protestors responded to this decision by occupying Hamilton Hall, vandalizing and damaging the building, and confronting and intimidating Columbia employees working in the building. *See* ¶¶ 377-88. That very day, the University requested that the NYPD return to campus to end the occupation, disperse the encampments, and remain visibly present until Commencement season concluded on May 17, 2024, which the NYPD did. *See* ¶ 387; Exs. DD, EE.

Of course, Columbia did not wait until this past spring's escalations to address antisemitism and anti-Israeli bias in the wake of Hamas's terror attacks. Throughout the academic year, Columbia deployed numerous measures to meet the moment. These measures included, but are not limited to, the following:

***Statements of values.*** To begin with, University leaders have repeatedly and plainly denounced the October 7 attacks, condemned antisemitism and other forms of bias, and announced responsive initiatives, starting as early as Monday, October 9, 2023. *See* ¶¶ 146, 154, 156, 297, 374-75, 382-83.[3] Columbia's website confirms that Columbia's President and its Deans promptly,

---

[3] Although the FAC quotes many of the President's and other University leaders' statements, it does so selectively. For example, the President's October 9, 2023 statement did more than invite faculty to bring "clarity and context" to

frequently, and consistently condemned Hamas's terror attacks, decried antisemitic incidents on campus, offered support to members of the Columbia community who are Jewish or Israeli, and urged community members to promptly report discrimination and harassment. *See, e.g.*, Exs. K, M, N, P, Q, S. In the face of incidents such as the unauthorized "Resistance 101" event, the encampments on Butler Lawn, and the occupation and vandalism of Hamilton Hall, the President and senior administrators condemned antisemitic speech and conduct over and over again, emphasized that Columbia would not tolerate such behavior, and made clear (to the extent they were able in accordance with federal law) that perpetrators had faced and would continue to face consequences. *See, e.g.*, Exs. V, CC, II. Columbia's President and Trustees also expressed these values and commitments in testimony before Congress. *See* ¶¶ 298-99; Ex. W.

*Task Force on Antisemitism.* On November 1, 2023, the University President established the Task Force on Antisemitism ("Task Force") and charged it with developing recommendations to ensure "that our campuses are safe, welcoming, and inclusive for Jewish students, faculty, and staff, and all of us." Ex. O at 1; *see also* ¶ 414. The Task Force has carried out research on community members' experiences and views and issued its initial report in March 2024 (with further reports to follow). *See* ¶ 446.

*Enhanced public safety protections.* In October 2023, the University immediately deployed additional public safety officers, contracted with outside security firms, expanded its public safety hotline and safety escort service, and coordinated with law enforcement to protect its Jewish and Israeli students. Ex. L at 1. Throughout the academic year, the University closed its campus completely to non-Columbia University identification ("CUID") holders on numerous

---

Hamas's violence. ¶ 146. Contrary to the FAC, the President specifically condemned the "horrific attack on Israel this weekend" and assured affected community members "that Columbia will provide any measure of care or comfort that we can." Ex. J at 1; *see* ¶¶ 154, 412.

occasions. *See* ¶¶ 168, 189, 259, 275, 306. In April 2024, after the encampments formed, the University went further. It more than doubled the number of safety personnel per shift, enhanced security checks around the Morningside campus perimeter, and provided additional security coverage at the Kraft Center for Jewish Student Life during Passover. Ex. Z at 1. During and after the occupation of Hamilton Hall, Columbia further restricted access to campus to residents and essential employees to avoid "further disruptions to our academic mission" and to mitigate "the risk that tensions and activities in the City and around the country could spill over onto our campus and threaten the safety of our community." Ex. GG at 1. And the University requested assistance from the NYPD on two occasions when it became necessary to do so, culminating in the NYPD's continuous, visible presence on campus from April 30 through May 17, 2024. *See supra* pp. 4-5.

**Policy changes.** Columbia has also updated its policies on an ongoing basis since October 7 to address new circumstances and ensure that events on campus, including protests, do not provide occasion for the spread of antisemitism, bigotry against Israelis, or other forms of hate. In October 2023, the University amended its event policies to more clearly authorize the sanctioning of student groups and individuals who engaged in unauthorized events. *See* ¶ 90; Ex. G at 4-5. Pursuant to this authority, on November 10, 2023, Columbia suspended two groups—Students for Justice in Palestine ("SJP") and Jewish Voice for Peace ("JVP")—for repeatedly sponsoring and advertising unauthorized events. *See* ¶ 199.[4] Subsequent policy updates have been built upon lessons learned.

---

[4] SJP and JVP have sued the University over these suspensions. *See Columbia Students for Just. in Palestine v. Trs. of Columbia Univ. in City of N.Y.*, Index No. 152220/2024 (N.Y. Sup. Ct.). Similarly, Palestine Legal filed a complaint on behalf of SJP with the Department of Education's Office for Civil Rights, triggering an investigation. *See* Sareen Habeshian, *Education Dept. Probes Columbia Over Alleged Anti-Palestinian Discrimination*, Axios (May 3, 2024), https://www.axios.com/2024/05/03/columbia-investigation-education-department.

***Accommodations and resources.*** Throughout the past academic year, Columbia has made a wide range of accommodations and resources available to affected students and other members of the campus community. *See, e.g.*, Ex. JJ. Shortly after October 7, the University directed academic advisors and deans of students to accommodate the special needs of students who were coping with fear and grief. *See* Ex. L at 1. The University President encouraged anyone concerned about their safety to utilize the University's expanded Public Safety hotline and safety escort program. *See id.* At the end of the fall semester, Columbia created an in-person help desk and helpline to assist community members in making reports of discrimination and harassment. *See* Ex. KK. It also announced a series of "Dialogue Across Difference" events to equip community members with the skills necessary to "engage with diverse perspectives and navigate challenging conversations with a shared commitment to mutual understanding and respect." Ex. LL at 1. The University also awarded grants to faculty who developed initiatives to promote constructive dialogue and mutual respect on campus. *See* Ex. HH.

After the encampments began in April 2024, Columbia offered accommodations to the entire student body. The University, for example, required every instructor to offer students the option to take classes and complete final assessments online, and the Center for Teaching and Learning offered guidance to assist faculty in meeting this requirement. *See* ¶ 357; Ex. BB at 1. Following the occupation of Hamilton Hall, Columbia shifted nearly all academic activities online, asking that faculty in the small number of programs that continued to be conducted in person "provide other accommodations generously." Ex. FF at 1. Several of the University's 17 schools changed their grading policies to enable more students to take more classes on a pass/fail basis.[5]

---

[5] *See* Tatyana Monnay, *Columbia Law School Offers Pass/Fail Grading Amid Gaza Protests*, Bloomberg (May 1, 2024), https://news.bloomberglaw.com/business-and-practice/columbia-law-school-offers-pass-fail-grading-amid-gaza-protests; Harriet Engelke, *SEAS Updates Spring 2024 Pass/D/Fail Policies*, Bwog (Apr. 24, 2024), https://bwog.com/2024/04/seas-updates-spring-2024-pass-d-fail-policies/.

*Enforcement and sanctions.* Columbia has also taken significant steps to investigate discrimination and harassment directed at Jewish and Israeli students and to discipline community members found responsible for such behavior. Since October 7, Columbia has investigated and is continuing to investigate scores of reports of antisemitism, including certain incidents alleged in the FAC. Ex. W at 4. Columbia has initiated proceedings involving students, faculty, and staff under several of its policies, including the Standards & Discipline (the "Standards"), which govern student conduct, Ex. B; the Rules of University Conduct (the "Rules"), which apply to demonstrations, Ex. A; the Equal Opportunity & Affirmative Action ("EOAA") Policies & Procedures, which prohibit discrimination, harassment, and retaliation by University employees, Ex. C; the Student Group Event Policy & Procedure, which governs events sponsored by student groups, Ex. G; and the Interim University Policy for Safe Demonstrations ("Interim Policy"), which establishes processes for safe demonstrations on campus, Ex. H.

As a result of these proceedings, consequences have been imposed. For instance, in March 2024, after students evaded the University's repeated attempts to prevent "Resistance 101"—a reprehensible event espousing violence, *see* ¶ 287—Columbia promptly "notified law enforcement[,] . . . hired an outside investigation firm to uncover all the facts," and interim suspended students who refused to cooperate with the investigation, Ex. V at 1; *see* ¶ 602. As noted above, Columbia also interim suspended students who refused to leave the encampments after repeated warnings, as well as those who vandalized and occupied Hamilton Hall. And Columbia recently removed administrators from their duties who exchanged text messages that touched on antisemitic tropes. *See* ¶ 394; Ex. II at 1-2.

Importantly, Columbia's enforcement efforts have gone far beyond these more egregious incidents. Many disciplinary proceedings remain ongoing, reflecting the University's commitment

to conducting thorough investigations and affording all individuals the process they are due. Others have concluded, with many resulting in sanctions which are generally not disclosed pursuant to Columbia policy and applicable law. *See* 20 U.S.C. § 1232g; Ex. C at 35; Ex. I.

Moreover, over the fall and winter, Columbia made it easier for its community members to report incidents of discrimination, trained administrators on antidiscrimination policies and law, deployed additional staff to investigate and process reports of discrimination, and integrated its data systems to provide more seamless reporting and responses. *See* Ex. KK at 1. To further accelerate disciplinary processes, the University supplemented the personnel in its student conduct and other investigative offices. *Id.*; *see also* Ex. W at 2. And the University is currently working to establish "an office with the sole purpose of investigating and responding to allegations of discrimination, including antisemitism, in our community." Ex. W at 2.

*Community engagement.* In addition, Columbia has created several channels for students to communicate directly with the University President and other senior administrators, including through its Values in Action initiative. Columbia's President has held numerous Listening Forums, *see* ¶ 265, and many deans, professors, and administrators have met with students affected by antisemitism, including certain Individual Plaintiffs and SAA/SCLJ Members, to understand their concerns and adapt Columbia's responses, *see* ¶¶ 177, 192, 238, 494, 507. Through Dialogue Across Difference events, Columbia has worked "to foster a community where debates and disagreements are rooted in academic rigor and civil discourse," Ex. T at 1, not anger, stereotypes, harassment, or hate. And the University has announced further programming to address antisemitism and other forms of discrimination, including training for faculty and students, which will commence in the fall. *See* Ex. II at 1-2.

## II.    The FAC

This action was commenced on February 21, 2024, and Plaintiffs filed the FAC on June

17, 2024. Plaintiffs include 20 Columbia students,[6] seven Columbia graduates[7] (collectively with the students, the "Individual Plaintiffs"), and two organizations—Students Against Antisemitism, Inc. ("SAA") and StandWithUs Center for Legal Justice ("SCLJ"). ¶¶ 13-19, 22-27, 29-36, 38-39, 44-49.[8] SAA and SCLJ seek to sue on behalf of all Individual Plaintiffs, six anonymous Columbia students (SAA Member #2 and SCLJ Members #2-6), and one anonymous Columbia alum (SCLJ Member #1) (the "SAA/SCLJ Members"). ¶¶ 52, 55-60.

The FAC describes several incidents that occurred years ago, before any of the Plaintiffs were enrolled at Columbia. *See, e.g.*, ¶¶ 98-107, 112-22, 316. It also alleges numerous incidents that Plaintiffs claim impacted the Individual Plaintiffs and SAA/SCLJ Members, primarily during the tumultuous eight months following the October 7 attacks. Many of these allegations refer to offensive incidents that either occurred in the presence of the Individual Plaintiffs or SAA/SCLJ Members or came to their attention (including social media posts, in-person comments, and speech or conduct at demonstrations or campus spaces).[9] Other allegations describe offensive comments

---

[6] Lemony David, John Doe, Chaya Droznik, Leo Elkins, Maya Gal, Michael Gross, Jared Harnick, Gabriel Kahane, Noah Miller, Eli Mizrahi-Aks, Erin McNulty, Amiel Nelson, Gabriel Nelson, Marc Nock, Ava Quinn, Andrew Stein, Daniella Symonds, Rafael Vanuno, Xavier Westergaard, and Eden Yadegar.

[7] Samuel Friedman, Valerie Gerstein, Talia Kesselman, Omer Nauer, Miles Rubin, Emily Sandler, and Jonathan Swill.

[8] The remaining Plaintiffs and SAA/SCLJ Members are Barnard College ("Barnard") students or alums—but Barnard and Columbia are "separate institutions" with different Boards, presidents, administrators, and sets of policies. ¶¶ 65, 80-97. As a result, Columbia does not exercise control over Barnard students or programs. Even assuming that a non-student could assert a Title VI claim against Columbia, the Barnard plaintiffs' allegations generally do not allege discriminatory treatment in, or deprivation of access to, any *Columbia* "program or activity." 42 U.S.C. § 2000d; *cf. Davis*, 526 U.S. at 650 ("funding recipients are properly held liable . . . only where" discriminatory treatment "deprive[s] the victims of access to the educational opportunities or benefits *provided by the [defendant] school*" (emphasis added)). References to "Individual Plaintiffs," "Plaintiffs," or "SAA/SCLJ Members" include the Barnard plaintiffs only to the limited extent that the Barnard plaintiffs allege such treatment in a Columbia program or activity, *see* ¶¶ 129, 184, 358, 485, 555, 587—and the grounds for dismissal discussed below apply with equal force.

[9] *See, e.g.*, ¶¶ 217-18, 399, 601 (social media posts); ¶¶ 149, 208, 262, 266, 282, 331-32, 355, 437, 471, 474, 476, 478-79, 490, 514, 517, 522, 526, 536, 544, 546, 548, 553-54, 593-94, 606, 611-12 (comments from other students or University employees or faculty); ¶¶ 171, 175-76, 198, 202, 204, 207, 211, 221, 225, 227, 229, 231, 233, 245, 257, 272, 313-14, 317, 324, 330, 332, 341, 344, 346, 360, 465, 468-69, 475, 481, 490, 499, 505, 511-13, 531, 533, 537-38, 573, 576, 580-81, 583, 586, 600, 604, 607-11, 614 (chants, signs, symbols, or conduct at demonstrations or campus spaces); ¶¶ 132, 164, 167, 177-78, 181-84, 191, 194-95, 198, 217-18, 221, 319, 348, 435-36, 438-45, 480, 487, 496-97, 547, 553, 581, 590-91, 602, 605 (other alleged incidents).

or conduct directed at Individual Plaintiffs or SAA/SCLJ Members, including social media posts, targeted comments from other students or University employees or faculty, actual or threatened physical contact, and disturbing remarks and gestures at demonstrations, including at the encampments.[10] The Individual Plaintiffs and SAA/SCLJ Members allege that these incidents have impacted their educational experiences, grades, and/or mental health. *See, e.g.*, ¶¶ 463-621.

Plaintiffs assert eight causes of action: (1) violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"); (2) violations of the New York State Human Rights Law, N.Y. Exec. L. § 296 *et seq.* ("NYSHRL"); (3) violations of New York Civil Rights Law § 40-c ("NYCRL"); (4) violations of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107(4), (17) ("NYCHRL"); (5) breach of contract; (6) violations of the New York General Business Law §§ 349, 350 ("GBL"); (7) violations of 42 U.S.C. § 1986; and (8) premises liability. *See* ¶¶ 622-735. In addition to compensatory, punitive, and treble damages (on some claims), Plaintiffs seek an expansive injunction requiring Columbia to, *inter alia*, terminate unspecified "deans, administrators, professors, and other employees"; suspend or expel unnamed students; decline or return donations; implement mandatory antisemitism training; create a new Title VI office; and appoint an "expert monitor to oversee compliance." FAC, Prayer for Relief at A.[11]

## LEGAL STANDARD

Under Rule 12(b)(6), a complaint must be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[10] *See, e.g.*, ¶¶ 504, 585, 616 (social media posts); ¶¶ 147-48, 188, 265, 284, 334, 466-67, 470-71, 477, 509-10, 518, 523-24, 526-27, 532, 536, 552-53, 584, 617, 619 (targeted comments from other students, employees, or faculty); ¶¶ 190-91, 235, 243, 245, 319, 321, 328, 333, 335, 344, 348, 356, 378, 533, 577, 584 (acts involving physical or threatened contact); ¶¶ 191, 202, 260, 327-28, 333, 335, 341, 344, 347-48, 356, 365, 376, 385, 515, 533 (remarks and gestures during demonstrations, including the encampments); ¶¶ 321, 340 (other alleged incidents).

[11] To the extent Plaintiffs seek to recover damages for emotional distress under Title VI, such relief is foreclosed by Supreme Court precedent. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 217-18, 230 (2022).

(2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court must take the well-pleaded factual allegations as true, "[c]onsideration of materials outside the complaint is not entirely foreclosed." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). The Court may, for instance, consider materials "integral to the complaint" or "incorporated in it by reference." *Roth*, 489 F.3d at 509. And the Court "may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination." *Hesse*, 463 F. Supp. 3d at 463 (cleaned up).

In order to "survive [a] Rule 12(b)(1) motion to dismiss" for lack of standing, a plaintiff "must allege facts that affirmatively and plausibly suggest that [he] has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SRCL*, 671 F.3d 140, 145 (2d Cir. 2011); *accord, e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[J]urisdiction must be shown affirmatively," not "by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998); *accord, e.g.*, *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022). The Court may also rely on evidence outside the pleadings in deciding a motion to dismiss under Rule 12(b)(1). *See Benomar*, 944 F.3d at 441.

Under Rule 12(f), a court may strike a request for relief that is unavailable as a matter of law. *See, e.g.*, *Doe v. Indyke*, 457 F. Supp. 3d 278, 284 (S.D.N.Y. 2020). Motions to strike, though generally disfavored, "should be granted where doing so will clarify the issues and streamline the case." *Meisels v. Meisels*, No. 19 Civ. 4767, 2021 WL 1924186, at *8 (E.D.N.Y. May 13, 2021).

## ARGUMENT

### I. Plaintiffs Fail to State a Claim Under Title VI (Count I)

While Columbia agrees that the events of this past fall and spring created a troubling environment on campus, the University's efforts to remedy that situation under unprecedented circumstances, as reflected in the FAC and other documents this Court may consider, make clear

that Columbia neither discriminated against the Individual Plaintiffs or SAA/SCLJ Members, nor exhibited deliberate indifference to any discrimination or harassment that they experienced.

### A.    Plaintiffs Fail to Plead that Columbia Engaged in Discrimination

Although Plaintiffs' precise theory of liability under Title VI is somewhat unclear, they plainly do not challenge any specific University policy, nor the outcome of any particular disciplinary proceeding. Instead, they allege an array of incidents spanning decades, often without identifying any connection to a particular Individual Plaintiff or SAA/SCLJ Member.

At times, Plaintiffs hint at a direct discrimination claim, *e.g.*, ¶¶ 80, 632, which may be cognizable in this Circuit under an "erroneous outcome" or "selective enforcement" theory. *See Roe v. St. John's Univ.*, 91 F.4th 643, 652 (2d Cir. 2024). But to state a claim under either theory, a plaintiff must have "suffered an adverse action in pursuit of [their] education by defendant," such as dismissal or suspension, which none of them have experienced. *Williams v. Pace Univ.*, 192 F. Supp. 3d 415, 422 (S.D.N.Y. 2016); *accord JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 623 (S.D.N.Y. 2016). In other words, a necessary element of both types of claims is that "the university initiated disciplinary proceedings *against the plaintiff* or *disciplined the plaintiff*." *Roe*, 91 F.4th at 652 (cleaned up) (emphasis added); *see also, e.g.*, *Doe v. N.Y. Univ.*, 438 F. Supp. 3d 172, 182 (S.D.N.Y. 2020). There are no such allegations anywhere in the FAC.[12]

### B.    Plaintiffs Cannot Plead that Columbia's Response Has Been Clearly Unreasonable Under the Known Circumstances

Given their inability to plead a cognizable erroneous outcome or selective enforcement claim, Plaintiffs are left with seeking to hold Columbia liable based on a theory of "deliberate

---

[12] Regardless, Plaintiffs' attempts to infer differential treatment from supposed comparators like the 2006 men's ice hockey team, the 2016 men's wrestling team, and violators of COVID-19 travel restrictions in 2020, *see* ¶¶ 432-34, are unavailing. While "comparators need not be identical, . . . there must be at least a reasonably close resemblance of the facts and circumstances," such that they are "similarly situated . . . in all material respects." *Johnson v. N.Y. Univ.*, 800 F. App'x 18, 21 (2d Cir. 2020) (cleaned up); *see also Doe v. Columbia Univ.*, 551 F. Supp. 3d 433, 471-72 (S.D.N.Y. 2021); *Minto v. Molloy Coll.*, No. 16 Civ. 276, 2019 WL 4696287, at *10 (E.D.N.Y. Sept. 26, 2019).

indifference." But the Supreme Court has imposed strict limitations on schools' liability for such claims. To properly allege such a claim, a plaintiff must plead that Columbia had "substantial control" over and "actual knowledge" of the discriminatory harassment, and that the University nevertheless responded with "deliberate indifference." *Davis*, 526 U.S. at 647-50; *see also Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290-92 (1998) (applying deliberate indifference framework to teacher-student harassment).[13] Columbia, however, has been anything but indifferent to antisemitism on campus. As the FAC itself makes clear, the University has taken extraordinary measures to respond to a surge of antisemitism on campus since the October 7 attacks. While not all the measures have been successful, and while Plaintiffs insist that Columbia should have taken different steps, Title VI does not give Plaintiffs the "right to make particular remedial demands" or insist on "particular disciplinary action." *Davis*, 526 U.S. at 648. Because the FAC's allegations fail to plausibly establish that Columbia's response was "clearly unreasonable in light of the known circumstances," *id.*, Count I should be dismissed.

### 1.    Many of Plaintiffs' Allegations Cannot Support Title VI Liability

As a threshold matter, the FAC is rife with allegations that cannot sustain Plaintiffs' Title VI claim no matter what. Plaintiffs cannot hold the University liable for third-party harassment or discrimination about which it lacked actual knowledge or substantial control, or that bears no direct connection to Plaintiffs' (or their members') individual educational experiences.

*First*, to state a deliberate indifference claim, it is axiomatic that the school "must know of the harassment." *Zeno*, 702 F.3d at 666. "Constructive knowledge is not enough; only actual knowledge is a predicate to liability." *Id.* Furthermore, "the plaintiff must establish that a school

---

[13] Although *Davis* was a Title IX case, the Second Circuit has adopted *Davis*'s framework for Title VI claims, *see Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664-66 & nn.9-10 (2d Cir. 2012), and stated more broadly that "cases brought under Title IX are generally to be analyzed in the same way as cases under Title VI," *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 103 (2d Cir. 2022).

official with authority to address the alleged discrimination had actual knowledge . . . of the discrimination," *Carabello v. N.Y.C. Dep't of Educ.*, 928 F. Supp. 2d 627, 638 (E.D.N.Y. 2013)—and the "complaint to school officials must be specific regarding the nature of the harassment," *Sutton v. Stony Brook Univ.*, No. 18 Civ. 7434, 2021 WL 3667013, at *8 (E.D.N.Y. Aug. 18, 2021), *aff'd*, No. 21-2055, 2022 WL 4479509 (2d Cir. Sept. 27, 2022).

Here, the FAC fails to allege Columbia's knowledge of many incidents described. For example, Rubin cites offensive comments made by professors, ¶¶ 133, 137, and by another student upon learning of Rubin's service in the IDF, ¶ 204.[14] Similarly, Ami, Stein, and Harnick say they were accosted by "agitators" while protesting. ¶¶ 327, 347, 515.[15] But nowhere does the FAC allege that any of these incidents were reported to the University or that the University otherwise had knowledge of them. The same is true for many other incidents, including those pertaining to the anonymous SAA/SCLJ Members. *See, e.g.*, ¶¶ 129, 132, 242, 364, 460, 602, 604, 606-07, 612, 616. In no way does Columbia condone these behaviors, but it cannot be liable under Title VI for not responding to incidents it is not alleged to have known about. *See, e.g.*, *Davis*, 526 U.S. at 650.

*Second*, the FAC includes many allegations pertaining to incidents over which Columbia lacked "substantial control over both the harasser and the context in which the . . . harassment occur[ed]." *Zeno*, 702 F.3d at 665 (cleaned up); *see, e.g.*, ¶ 329 ("hundreds of agitators" rallying "outside" campus on public streets); ¶ 336 (unidentified agitator taunting Jewish students

---

[14] In fact, when students have reported instances involving professors, they have been investigated and investigations of several professors are currently underway. *See, e.g.*, ¶¶ 422, 429; Ryan Quinn, *Columbia's President Denounced Her Before Congress. Firing Could Be Next*, Inside Higher Ed (July 12, 2024), https://www.insidehighered.com/news/faculty-issues/academic-freedom/2024/07/12/columbias-president-denounced-her-congress-firing.

[15] Other examples include: Symonds citing comments by a professor, ¶ 208; Quinn saying "she mentioned Israel in class but was met with silence," ¶ 552; Kahane citing an offensive poem by a classmate, ¶ 517; McNulty saying she observed students "espousing antisemitic conspiracy theories . . . as they passed around an image of a swastika," ¶ 127; Miller saying he overheard a comment made by a classmate about "trying to find his copy of Mein Kampf," ¶ 477; Friedman saying he observed posters of Israeli hostages being torn down, ¶ 497; Doe saying he was followed by students and called antisemitic epithets, ¶ 376; and Swill alleging an assault near the Alma Mater statue, ¶ 577.

"outside" campus); ¶ 365 (Westergaard followed by unidentified woman after leaving campus); ¶ 390 (Doe followed by unidentified individual at Rockefeller Center). In particular, there are myriad allegations that outside agitators unaffiliated with Columbia participated in unlawful incidents on campus. *E.g.*, ¶¶ 309, 356-57, 380-81, 389, 610. But obviously, a court "cannot find that [a school] had control over the harasser when the identity, and whether he is even a student, is unknown." *Oliveras v. Saranac Lake Cent. Sch. Dist.*, No. 11 Civ. 1110, 2014 WL 1311811, at *16 (N.D.N.Y. Mar. 31, 2014) (cleaned up); *see also, e.g.*, *Doe ex rel. Doe v. Brittonkill Cent. Sch. Dist. Bd. of Educ.*, No. 18 Civ. 0142, 2018 WL 6622191, at *17 (N.D.N.Y. Dec. 18, 2018) (schools "do[] not have the ability to take remedial action against [non-affiliates] as [they] do[] students").

These principles are especially relevant to the numerous allegations about social media posts made by unidentified individuals (sometimes students, sometimes not) on platforms such as Instagram, X, Sidechat, and WhatsApp. *E.g.*, ¶¶ 279, 308, 395-99, 504, 555, 573, 585, 601-02, 617.[16] Courts in this District have held that "Columbia does not exercise control over postings made on Facebook, Twitter, or Tumblr." *Nungesser v. Columbia Univ.* ("*Nungesser II*"), 244 F. Supp. 3d 345, 368 (S.D.N.Y. 2017); *accord Doe v. Sacks*, — F. Supp. 3d —, No. 23 Civ. 1307, 2024 WL 402945, at *7-8 (S.D.N.Y. Feb. 2, 2024). And even if Columbia had control over these specific unnamed persons, it surely lacks control over the context of the harassment—*i.e.*, the social media platform. After all, "[t]he mere fact that" an online post "was created by [university] students and could be accessed . . . around campus does not confer substantial control over the [post] itself." *Sacks*, 2024 WL 402945, at *7. At a minimum, there must be "allegations that the [post] was created using [university] resources; shared or administered by any [university] account

---

[16] These paragraphs do identify a Columbia professor who allegedly was seeking "to instigate fights with students who supported Israel" via messages on WhatsApp, ¶ 396, but there is no allegation that this incident was reported to Columbia, or that any Plaintiff or SAA/SCLJ Member was aware of these messages.

or device; hosted on [university] servers; or was otherwise within [the university's] ability to edit or delete," *id.*, all of which are absent here.

*Third*, the facts underpinning a deliberate indifference claim must relate to the educational experiences of "the victims" (*i.e.*, Plaintiffs and their members). *Davis*, 526 U.S. at 650. Yet the FAC includes pages of assertions about events and statements that occurred many years ago. *See, e.g.*, ¶¶ 99, 100, 102, 104, 113-16, 316. Such "acts occurring years before [P]laintiffs ever enrolled" do "little to demonstrate that [they] suffered severe and pervasive harassment," *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011), because such incidents are "not part of [each Plaintiff's] 'environment'" and therefore cannot be relevant to "the harassment and discrimination" each Plaintiff experienced—particularly absent any allegation Plaintiffs were even aware of these events, *Pratt v. Indian River Cent. Sch. Dist.*, No. 09 Civ. 0411, 2012 WL 13172930, at *3 (N.D.N.Y. Nov. 5, 2012), *aff'd*, 2012 WL 13172929 (N.D.N.Y. Dec. 13, 2012); *see AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.*, 361 F. Supp. 2d 312, 316 n.5 (S.D.N.Y. 2005).[17]

### 2. Plaintiffs Cannot Show that Columbia's Response Was Clearly Unreasonable in Light of the Known Circumstances

Even when a university is on notice and exercises substantial control, it still can be deemed deliberately indifferent "only where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances"—a standard that does not require a college "to 'remedy' peer harassment" or "purg[e]" campus of it, and that demands far more than "a mere 'reasonableness'" standard. *Davis*, 526 U.S. at 648-49; *accord, e.g.*, *KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, No. 12 Civ. 2200, 2013 WL 177911, at *6 (S.D.N.Y. Jan. 16, 2013),

---

[17] The same is true for more recent incidents alleged to have been experienced by other people, but not by any Plaintiff or SAA/SCLJ Member. *See, e.g.*, ¶¶ 138, 158, 166, 172, 180, 185, 193, 209, 213, 243, 264, 267, 273, 275-76, 278, 285-94, 336, 396, 418-19. At most, these allegations may "have some extremely marginal relevance," but again, only to "the extent plaintiffs were actually aware of [them]." *Felber*, 851 F. Supp. 2d at 1188; *see also Mandel v. Bd. of Trs. of Cal. State Univ.*, No. 17 Civ. 03511, 2018 WL 5458739, at *21 n.33 (N.D. Cal. Oct. 29, 2018).

*aff'd*, 531 F. App'x 132 (2d Cir. 2013). In fact, a mere allegation of negligence on the part of a university clearly "falls short." *Roskin-Frazee v. Columbia Univ.*, No. 17 Civ. 2032, 2018 WL 6523721, at *9 (S.D.N.Y. Nov. 26, 2018). "[T]he measures taken must be so inadequate that a degree of discriminatory intent may be inferred," *Doe v. Trs. of Columbia Univ. in City of N.Y.*, No. 21 Civ. 5839, 2022 WL 3666997, at *12 (S.D.N.Y. Aug. 25, 2022), and the allegations must "plausibly indicat[e] that [the] Defendant['s] conduct effectively caused subsequent harassment," *HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11 Civ. 5881, 2012 WL 4477552, at *15 (S.D.N.Y. Sept. 27, 2012) (cleaned up); *accord Davis*, 526 U.S. at 642-43.

The demanding nature of this standard is no accident. When the *Davis* Court recognized deliberate indifference liability, it expressed grave concern about the "risk that [a school] would be liable . . . not for its own official decision but instead for its [affiliates'] independent actions." *Davis*, 526 U.S. at 643 (cleaned up). The Supreme Court therefore crafted a "high standard" that "cabin[ed] the range of [actionable] misconduct" and directed courts to "refrain from second-guessing . . . disciplinary decisions," "acknowledg[ing] that school administrators shoulder substantial burdens" and ensuring that they "continue to enjoy the flexibility they require." *Id.* at 643-44, 648-49. And the Court warned lower courts to take these "very real limitations on a funding recipient's liability" seriously, expressing concern that its opinion could "mislead courts to impose more sweeping liability than we read Title [VI] to require." *Id.* at 651-52.

Plaintiffs' theory stretches deliberate indifference liability past its breaking point. In the typical deliberate indifference case, consistent with *Davis*, a student alleges that they reported harassment to school administrators, yet the school responded with "grossly inadequate action or no action at all." *KF*, 2013 WL 177911, at *6; *see also, e.g.*, *Roskin-Frazee*, 2018 WL 6523721, at *3, 6 (alleging defendant failed to adequately investigate alleged sexual assaults); *Campisi v.*

*City Univ. of N.Y.*, No. 15 Civ. 4859, 2016 WL 4203549, at *7 (S.D.N.Y. Aug. 9, 2016) (alleging supervisors failed to properly report matter and plaintiff continued to be assigned to projects with harasser); *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 399 (E.D.N.Y. 2005) ("no indication" that principal "did *anything* to track" harassing teacher's "behavior toward" plaintiff students). That, of course, is not even close to what Plaintiffs argue here. Plaintiffs cannot dispute that Columbia took many steps, over many months, to address the situation for Jewish and Israeli students. *See supra* at 4-10. What Plaintiffs are really saying is that Columbia should have made different decisions in the moment. And that is exactly what the *Davis* Court was so concerned about in the first place: plaintiffs and courts, with the benefit of hindsight, "second-guessing" a school's decisions. *Davis*, 526 U.S. at 648.

### a. Columbia Has Taken Numerous Steps to Combat Antisemitism on Campus

Plaintiffs cannot meet the exacting "clearly unreasonable" standard here. To the contrary, the FAC illustrates the seriousness with which Columbia has approached allegations of antisemitic harassment and the many concrete steps it has taken in the face of unprecedented challenges. While not all of the actions taken have been entirely successful or gone as planned, that is not what Title VI demands or requires. *See, e.g.*, *Davis*, 526 U.S. at 648-49; *KF*, 2013 WL 177911, at *6.

***Student safety.*** First and foremost, Columbia has prioritized its students' physical safety. The University has repeatedly restricted campus access to CUID holders when necessary, ¶¶ 168, 189, 259, 275, 306—an extraordinary measure for a university rooted in New York City, and one which Columbia has rarely taken prior to October 7. Public safety officers have intervened to reduce tensions on campus. ¶¶ 164, 171, 258, 318. When violent incidents have occurred, such as the assailant who purportedly attacked Jewish students with a stick, the FAC admits that such incidents were reported to the NYPD and that the assailants were arrested. ¶ 166.

Moreover, in instances when safety concerns escalated, so did the University's response. On April 18, 2024, following the establishment of a protest encampment on campus, and the issuance of repeated warnings, Columbia determined that the continued presence of the encampment posed a danger to the substantial functioning of the University. As a result, it took the extraordinary step of interim suspending participating students and requesting the assistance of the NYPD to clear the encampment. ¶¶ 324-25; Exs. X at 1-2, Y at 1. Likewise, after the occupation of Hamilton Hall on April 30, 2024, the University again authorized the NYPD to enter campus to clear out protestors and requested a continued police presence through the remainder of the term. ¶ 387; Exs. DD at 1-2, EE at 1-2; *see also* ¶ 287 (alleging University contacted FBI following unsanctioned campus event promoting violence). These actions, without precedent at Columbia since 1968, cannot be characterized as clearly unreasonable. *See, e.g.*, *Brittonkill*, 2018 WL 6622191, at *17 (not clearly unreasonable where "[l]aw enforcement was summoned in response to" harassment); *Felber*, 851 F. Supp. 2d at 1188 (no deliberate indifference where "plaintiffs have alleged facts that campus police have made arrests of disruptive protestors").

Plaintiffs attempt to cast the University's efforts to engage in good-faith negotiations with student protestors as unreasonable, ¶¶ 5, 363, 610, and contend that the University's eventual requests for NYPD assistance "pro[ve] that Columbia had both the ability and the authority to take reasonable actions much sooner than it did," ¶ 726. But there is nothing unreasonable, let alone "clearly unreasonable," about "engag[ing] in an ongoing dialogue with the opposing parties in an attempt to ensure that the rights of all persons are respected." *Felber*, 851 F. Supp. 2d at 1188. Nor was it "clearly unreasonable" for Columbia to refrain from immediately calling on the NYPD at the first sign of protests. After all, schools "retain broad flexibility in devising a response" to third-party harassment, *KF*, 2013 WL 177911, at *7, which encompasses the discretion to adopt a

carefully calibrated approach in response to evolving, even volatile, circumstances, *see Carabello*, 928 F. Supp. 2d at 642 (school's response not clearly unreasonable where escalating "disciplinary measures over time" adopted in response to known incidents).

For these reasons, the few courts that have addressed analogous Title VI claims have found no deliberate indifference where "the administration has engaged in an ongoing dialogue with the opposing parties in an attempt to ensure that the rights of all persons are respected, and to minimize the potential for violence and unsafe conditions." *Felber*, 851 F. Supp. 2d at 1188; *accord Mandel*, 2018 WL 5458739, at *23-25 ("[P]laintiffs' own allegations show that [the university] is not ignoring the hostile environment alleged by plaintiffs, but at most assert that [the university's] responses were not sufficient" and "some of the processes are still ongoing.").

***Protests and campus climate.*** Columbia has also worked to address Plaintiffs' concerns about protest activity. For example, in October 2023, Columbia "amended its [event policies] to permit sanctions for failure to obtain required event approval or abide by the terms of an approved event," ¶ 90—just one of many measures the FAC describes or incorporates by reference. Other such measures include the promulgation of the Interim Policy, "which provides for designated demonstration areas and times as well as a two-day notice requirement for event registration" and new "procedures for redressing violations," ¶ 88; clarifications concerning the application of University policies to abhorrent calls for genocide, ¶ 87; establishment of the Task Force, ¶¶ 414-16, 446-51; and Listening Forums led by the University President, ¶¶ 199, 265-66. Indeed, Plaintiffs concede that they and others "have regularly met" with administrators "to detail their concerns for their safety and well-being." ¶ 239; *see also* ¶¶ 148, 177-79, 192, 210, 218, 238, 479, 506-09, 519-20, 529, 573, 594, 603, 609, 617-18. In view of these actions, "[t]hat the University may not have acted as plaintiffs would prefer does not rise to 'deliberate indifference.'" *Felber*,

851 F. Supp. 2d at 1188; *see also Mandel*, 2018 WL 5458739, at *23 (no deliberate indifference where plaintiffs "do not allege that the University has not met with the complaining students or student groups," only "that little has occurred to resolve [their] concerns").

Columbia has also spoken out repeatedly against antisemitism and harassment of Jewish and Israeli students. The FAC acknowledges a subset of the many University statements reiterating that antisemitism is unacceptable at Columbia and antithetical to the University's values, but at times inaccurately characterizes them. *See, e.g.*, ¶¶ 87, 146, 154, 156, 357, 414-16. For instance, although the FAC alleges that Columbia "fail[ed] to publicly condemn Hamas" or "acknowledge Jew hatred," ¶ 413, it nevertheless incorporates by reference several statements by the University that do just that,[18] while ignoring others.[19] In truth, Columbia has made clear (and reiterates again here) that antisemitism is repugnant and has no place on campus.

***Enforcement.*** At the same time, Columbia has also been enforcing its policies. The University has undertaken investigations and imposed real consequences, as Plaintiffs are forced

---

[18] *See, e.g.*, Ex. L at 1 ("Many of our students, faculty, staff, and colleagues are suffering great distress over the terror attacks on Israel and the humanitarian crisis in Gaza. . . . Unfortunately, some are using this moment to spread antisemitism, Islamophobia, bigotry against Palestinians and Israelis, and various other forms of hate. I have been disheartened that some of this abhorrent rhetoric is coming from members of our community, including members of our faculty and staff. Especially at a time of pain and anger, we must avoid language that vilifies, threatens, or stereotypes entire groups of people. It is antithetical to Columbia's values and can lead to acts of harassment or violence.") (cited at ¶ 156); Ex. AA at 2 ("Antisemitic language, like any other language that is used to hurt and frighten people, is unacceptable and appropriate action will be taken.") (cited at ¶ 357). This Court need not accept Plaintiffs' inaccurate characterizations of these incorporated documents. *See, e.g.*, *Ruiz v. New Avon LLC*, No. 18 Civ. 9033, 2019 WL 4601847, at *13 n.12 (S.D.N.Y. Sept. 22, 2019) (Broderick, J.).

[19] *See, e.g.*, Ex. M at 1 ("I have been shocked to hear of several antisemitic incidents in just the last couple of days. . . . [A]ntisemitism, like any form of bigotry, is an assault on everything we stand for at Columbia."); Ex. T at 2 ("We strive to be a community free of discrimination or prejudice and we condemn the antisemitism and anti-Muslim and Arab hate that is far too pervasive today."); Ex. S at 1 ("[W]e should still strive to acknowledge the genuine hurt felt by others: acknowledge that hearing chanted phrases such as 'by any means necessary,' 'from the river to the sea,' or calls for an 'intifada'—irrespective of intentions and provenance—is experienced by many Jewish, Israeli, and other members of our community as antisemitic and deeply hurtful . . . ."); Ex. P at 3 ("Hamas is a terrorist organization . . . . The attack that Hamas perpetrated on innocent Israeli civilians on October 7 cannot be justified or rationalized in any way."); Ex. CC at 2 ("The antisemitism being expressed by some individuals is intolerable . . . . Chants, signs, taunts, and social media posts from our own students that mock and threaten to 'kill' Jewish people are totally unacceptable, and Columbia students who are involved in such incidents will be held accountable."). Again, the Court may consider these documents as "fairly implicated" yet selectively omitted from the pleading, and they are judicially noticeable as well. *See supra* note 2.

to concede. Symonds, for example, alleges that the University failed to take "immediate action, including by banning SJP from campus" when she emailed the President voicing concerns about the group's positions. ¶ 169. Yet Plaintiffs concede that Columbia *did* suspend SJP (and JVP) on November 10, 2023, ¶ 199, triggering a lawsuit by these groups in state court, *see Columbia Students for Just. in Palestine*, No. 152220/2024 (N.Y. Sup. Ct.). Plaintiffs express dissatisfaction with the reason for these suspensions, *id.*, but there is no basis under Title VI for holding universities liable for such disagreements.[20] The FAC also admits that many students were suspended for policy violations throughout the academic year, citing some by name and identifying collateral consequences. ¶¶ 292, 296, 324, 369, 602. Moreover, Plaintiffs cherry-pick from University statements to omit additional instances in which Columbia has confirmed the existence of investigations. And the University has likewise made clear that its employees are not immune from discipline. *See* ¶ 394; Ex. II at 1-2.

The FAC speculates that the University has not taken any disciplinary action with respect to certain students. *See, e.g.*, ¶¶ 3, 186, 238, 258, 432, 601. But Plaintiffs cannot know with certainty whether such actions were taken, because student disciplinary proceedings and their outcomes are not disclosed, in accordance with federal law. *See* 20 U.S.C. § 1232g; Ex. A § 451; Ex. B at 26-27. Proceedings involving Columbia employees are also subject to privacy protections. Ex. C at 75. Furthermore, investigating and determining appropriate consequences, while respecting the rights of all parties involved, can take time, especially in the current environment. *See, e.g.*, *Tubbs v. Stony Brook Univ.*, 343 F. Supp. 3d 292, 317 (S.D.N.Y. 2018) ("[A]mple case law shows that" delays resulting in a final disposition of disciplinary proceedings 14 months after

---

[20] The FAC's allegation of "disparate treatment of SSI compared to SJP" because SSI was asked to comply with certain time, place, and manner restrictions, while SJP violated them, falls flat. ¶¶ 177-78, 194-95. SJP (and JVP) were suspended for repeated violations of these University policies; SSI, in contrast, "continued to abide by Columbia's policies" and was not suspended. ¶¶ 195, 199.

report "are not unreasonable enough to invite Title IX liability."); *Roskin-Frazee*, 2018 WL 6523721, at *9 (nine-month delay in convening a hearing on sexual harassment allegations was not clearly unreasonable (citing *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006))).

Although Plaintiffs may prefer additional or different remedial measures and disciplinary consequences, *see, e.g.*, ¶¶ 169, 463-64, 726; FAC, Prayer for Relief at A, such disagreements cannot give rise to a Title VI claim. *See, e.g.*, *Doe v. Columbia*, 2022 WL 3666997, at *15 ("[A] mere preference for different procedures or, indeed, dissatisfaction or disagreement with the procedures used is insufficient to state a claim for deliberate indifference."); *Welcome v. N.Y.C. Dep't of Educ.*, No. 17 Civ. 5407, 2018 WL 5817156, at *7 (E.D.N.Y. Nov. 6, 2018); *Tubbs*, 343 F. Supp. 3d at 316-17. Rather, under Title VI, "victims do not have a right to specific remedial measures." *Zeno*, 702 F.3d at 666; *accord Doe v. Trs. of Columbia Univ. in City of N.Y.*, No. 23-960, 2024 WL 2013717, at *2 (2d Cir. May 7, 2024). "[C]ourt[s] must accord sufficient deference to the decisions of school disciplinarians," *Zeno*, 702 F.3d at 666, and "are pointedly cautioned to refrain from second-guessing" them, *Doe v. Columbia*, 2022 WL 3666997, at *15; *see also Davis*, 526 U.S. at 648 ("stress[ing] that" the deliberate indifference standard "does not mean" that school "administrators must engage in particular disciplinary action"); *Feibleman v. Trs. of Columbia Univ. in City of N.Y.*, No. 19 Civ. 4327, 2020 WL 3871075, at *6 (S.D.N.Y. July 9, 2020).

And for good reason, as the FAC itself illustrates. Plaintiffs allege that "of the ten suspensions that came in response to the Resistance 101 [event], five were lifted because Columbia determined the[] [students] were not involved." ¶ 292. This underscores why investigations and disciplinary proceedings ordinarily take time, lest students be punished over policy violations for which they are not actually responsible. As in this instance, exigent circumstances can justify swift responses; at the same time, moving quickly can increase the risk of inadvertent error. All of this

must be considered by University administrators in doing their jobs. Similarly, a large and diverse university like Columbia must proceed with care, consulting with a variety of stakeholders when pursuing policy changes or institution-wide initiatives, so as to ensure that those measures will be effective in achieving their intended goals. *See, e.g.*, ¶ 589 (alleging that when Barnard mandated the removal of items affixed to dorm room doors, "the policy had the opposite effect," sparking a counter-reaction from students upset by the rule change); *Davis*, 526 U.S. at 649 (recognizing universities do not "exercise the same degree of control over [their] students that a grade school" does); *cf., e.g.*, *Tyrrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601, 628 (E.D.N.Y. 2011) (rejecting deliberate indifference claim notwithstanding plaintiff's advocacy of more aggressive investigation by school because "such conduct" would have backfired and "further disseminated" information plaintiff wanted kept private). Title VI's deliberate indifference standard leaves ample room for consideration of these "practical realities of responding to student behavior, realities that Congress could not have meant to be ignored." *Davis*, 526 U.S. at 653. The *Davis* Court's core teaching is that the responsibility for balancing these complex considerations—student safety, the risk of error, the possibility that an intervention might provoke further unrest, and more—properly lies with university administrators, not students, their lawyers, or the federal courts. *See id.* at 648.

*Educational accommodations.* As noted above, the University has also offered accommodations to its student body, including Jewish and Israeli students. Just days after October 7, the University President recognized that "[s]ome students may need special accommodations as they cope with fear and grief" and directed that "those arrangements can be made through advisors or deans of students." Ex. L at 1 (cited at ¶ 156). Indeed, the FAC concedes that such accommodations were extended. *E.g.*, ¶¶ 473-74. Moreover, after the onset of the encampments, Columbia began offering additional accommodations to any students who wished to use them. *See*

*supra* p. 8. The University started by requiring all instructors to offer remote options. *See* ¶ 357. It then began conducting all classes remotely to "deescalate the rancor." *Id.*; Ex. AA at 2. This Court may take judicial notice of statements on Columbia's website urging instructors to provide yet further accommodations. *See, e.g.*, Ex. BB at 1-2.[21]

### b. Columbia Must Also Account for Core Speech Values

Even as Columbia has taken, and continues to take, all of the foregoing measures in response to reports of discriminatory harassment, the University must also remain true to its commitment to academic inquiry and free speech. The Supreme Court has repeatedly emphasized that the "college classroom with its surrounding environs is peculiarly the marketplace of ideas." *Healy v. James*, 408 U.S. 169, 180-81 (1972); *see also, e.g.*, *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). The Rules of University Conduct underscore the University's deep allegiance to these principles, noting that "Columbia, in particular, has a long tradition of valuing dissent and controversy and in welcoming the clash of opinions onto the campus." Ex. A § 440.

The FAC contains many allegations reflecting speech or conduct that is abhorrent and antisemitic. Such incidents have no place at Columbia. To the extent, however, that Plaintiffs seek to hold Columbia liable for failing to silence political speech with which Plaintiffs disagree, they go too far. "Being treated differently as a result of one's political beliefs is not the equivalent of discrimination." *D.S. ex rel. C.S. v. Rochester City Sch. Dist.*, No. 19 Civ. 6528, 2020 WL 7028523, at *10 (W.D.N.Y. Nov. 30, 2020); *cf., e.g.*, *Nungesser II*, 244 F. Supp. 3d at 363-65 (no deliberate indifference where harassment based on plaintiff's "*conduct*" rather than "*status*").

---

[21] The FAC inconsistently argues that remote accommodations were improperly denied, but that Columbia's provision of no-questions-asked remote accommodations was somehow itself discriminatory. *Compare* ¶¶ 189, 339, 224, 464, 468-69, 473, 491, *with* ¶¶ 357, 495, 583, 592. Plainly, granting students a requested accommodation cannot be clearly unreasonable under the circumstances.

For this reason, the courts that have confronted claims grounded in criticisms of Israel and Israeli policy have rejected them because they would restrict "pure political speech and expressive conduct, in a public setting, regarding matters of public concern, which is entitled to special protection." *Felber*, 851 F. Supp. 2d at 1188; *cf., e.g.*, *Newman v. Point Park Univ.*, No. 20 Civ. 204, 2022 WL 969601, at *25 n.16 (W.D. Pa. Mar. 31, 2022) (rejecting position that "criticism of the actions of the Israeli government . . . is per se unlawful discrimination [and] generates an objectively hostile work environment"). Policing the line between legitimate criticisms of the policies of the Israeli government and antisemitism is no easy task—one made even more challenging in the particular context of a university environment. *See, e.g.*, *Mandel*, 2018 WL 5458739, at *22 ("[W]hether anti-Zionist statements are necessarily anti-Jewish or anti-Israeli is . . . hotly disputed."). In *Dube v. State University of New York*, for example, the Second Circuit—emphasizing that "[t]he essentiality of freedom in the community of American universities is almost self-evident"—reversed a grant of summary judgment for the university in a lawsuit brought by a professor challenging a denial of tenure after he taught a course with a description that equated "Nazism in Germany" with "Zionism in Israel." 900 F.2d 587, 589-90, 597-98 (2d Cir. 1990) (quoting *Sweezy v. New Hampshire ex rel. Wyman*, 354 U.S. 234, 250 (1957)); *see* ¶ 431 (demanding Columbia rescind offer to faculty member who "published an editorial that compared Israel to Nazi Germany"). The *Dube* court explained that in order to prevail, the university would have to show that it "denied tenure and promotion to [the professor] for permissible academic reasons, without regard to community pressure triggered by [his] teaching on Zionism and racism." *Dube*, 900 F.2d at 598; *see also Vega v. Miller*, 273 F.3d 460, 467 (2d Cir. 2001) (reiterating *Dube* serves as warning "not to discipline a college teacher for expressing controversial, even offensive,

views lest a pall of orthodoxy inhibit the free exchange of ideas in the classroom" (cleaned up)).[22]

\*    \*    \*

Columbia does not and cannot claim that its response to every incident of antisemitic harassment involving any of its roughly 36,000 students, 20,000 employees, and seventeen schools has been perfect. But perfection is not what Title VI requires. *See, e.g.*, *Davis*, 526 U.S. at 648. Courts have taken the well-established limits on judicial intervention seriously, declining to find responses to alleged harassment clearly unreasonable notwithstanding "several mistakes," *Doe v. Syracuse Univ.*, No. 22-2674, 2023 WL 7391653, at \*2 (2d Cir. Nov. 8, 2023); "flawed and imperfect" decision-making, *Tubbs*, 343 F. Supp. 3d at 316; "negligence," *Roskin-Frazee*, 2018 WL 6523721, at \*9; or failure to comply with internal policies, *see id.*; *Martinetti v. Mangan*, No. 17 Civ. 5484, 2019 WL 1255955, at \*5 (S.D.N.Y. Mar. 19, 2019).

Events on Columbia's campus have not occurred in a vacuum. Hamas's acts of terror have undoubtedly heralded a reawakening of pernicious antisemitism, which Columbia is actively working to combat. At the same time, events in the Middle East have exposed deeply felt and corrosive political fissures—fissures which, far from being unique to Columbia, are evident across college campuses and the nation as a whole. Columbia is home to many Jewish and Israeli students who have been uniquely and profoundly affected by the terrors of October 7 and subsequent events. Columbia's diverse community also includes students who have strong opinions about, and who have also been personally and deeply impacted by, the aftermath of Hamas's terror attacks and the circumstances in Gaza. Given the range of views and connections to these intractable conflicts,

---

[22] It is no answer to argue, as we expect Plaintiffs will, that Columbia is a private university not bound by the First Amendment. Title VI and its deliberate indifference standard do not require private institutions to act inconsistently with the First Amendment. *See, e.g.*, Off. for C.R., U.S. Dep't of Educ., Dear Colleague Letter: Protecting Students from Discrimination Such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics 2 (May 7, 2024), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202405-shared-ancestry.pdf ("Nothing in Title VI or regulations implementing it requires or authorizes a school to restrict any rights otherwise protected by the First Amendment to the U.S. Constitution.").

sharp divisions—inherently more personal and charged than typical policy disputes—are inevitable. But even in these uncharted waters, it remains essential to the University's mission both that students be safe from discrimination and harassment, and that they can be heard.

Under these circumstances, the wisdom of the Supreme Court's guidance that Title VI does not require funding recipients to "purg[e] their schools of actionable" harassment could hardly be clearer. *Davis*, 526 U.S. at 648. Columbia has worked diligently to achieve a range of difficult, often competing, goals in the wake of October 7. Yet Plaintiffs ask this Court to second-guess the University's efforts and assume control over core university functions, including by terminating employees, expelling students, and returning donations. *See* FAC, Prayer for Relief at A. Plaintiffs thus ask this Court to reject "the Supreme Court and the Second Circuit's instruction that an educational institution is entitled to deference in its disciplinary decisions," *Feibleman*, 2020 WL 3871075, at *6, an instruction rooted in the *Davis* Court's recognition that "school administrators shoulder substantial burdens as a result of legal constraints on their disciplinary authority" and its unequivocal rejection of the notion that "nothing short of expulsion of every student accused of misconduct" would satisfy the university's obligations under Title VI, *Davis*, 526 U.S. at 648-49. In light of these settled principles, the Court should dismiss the Title VI claim.

## II.     Plaintiffs Fail to State a Claim Under 42 U.S.C. § 1986 (Count VII)

Plaintiffs' only other federal claim, under 42 U.S.C. § 1986, is predicated upon a purported conspiracy under 42 U.S.C. § 1985(3) (both part of the "Ku Klux Klan Act" or "KKK Act"). *See* ¶ 713. To state a § 1985(3) claim, Plaintiffs must show (1) a conspiracy; (2) a specific, predominant "purpose of depriving . . . any person or class of persons the equal protection of the laws, or the equal privileges and immunities under the laws"; (3) an overt act "in furtherance of the conspiracy"; (4) that the conspiracy "deprived such person or class of persons the exercise of any right or privilege of a citizen of the United States"; and (5) invidious, discriminatory animus.

*N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1358 (2d Cir. 1989) (cleaned up); *see Spencer v. Casavilla*, 44 F.3d 74, 79 (2d Cir. 1994). To state a § 1986 claim premised on such a conspiracy, Plaintiffs must further show that "(1) defendant had knowledge of the conspiracy and its object, (2) defendant had power to prevent or aid in preventing the commission of the conspiratorial acts, and (3) defendant neglected or refused to exercise such power." *Urbina v. City of New York*, No. 14 Civ. 9870, 2016 WL 79991, at *4 (S.D.N.Y. Jan. 6, 2016), *aff'd*, 672 F. App'x 52 (2d Cir. 2016). Plaintiffs do not come close to pleading such a claim.

*First*, Plaintiffs' § 1986 claim is deficient because the FAC does not adequately allege the existence of a conspiracy. To do so, Plaintiffs "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). Moreover, claims for conspiracy under § 1985 are held to a "heightened pleading standard," *Williams v. City of New York*, No. 16 Civ. 8193, 2018 WL 4308552, at *9 (S.D.N.Y. Sept. 10, 2018) (Broderick, J.), which requires that Plaintiffs plead both the alleged meeting of the minds and overt acts "reasonably related to the promotion of the claimed conspiracy" "with at least some degree of particularity," *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999); *see also Langton v. Town of Chester Libr. Bd.*, No. 14 Civ. 9474, 2020 WL 2850898, at *4 (S.D.N.Y. June 1, 2020).

The FAC describes a sprawling, amorphous group of "[c]ertain Columbia students and faculty," plus additional organizations and coalitions, only some of whom are specifically identified. ¶ 713. "But, the [FAC] does not describe how or when the" purported conspirators "entered into the agreement," *Walsh v. City of New York*, No. 19 Civ. 9238, 2021 WL 1226585, at *8 (S.D.N.Y. Mar. 31, 2021), falling far short of the requirement that Plaintiffs "allege specific facts suggesting that there was a mutual understanding among the conspirators to take actions

directed toward an unconstitutional end," *De Asis v. N.Y.C. Police Dep't*, No. 07 Civ. 3904, 2008 WL 3876075, at *5 (E.D.N.Y. Aug. 18, 2008), let alone that "each purported member had knowledge of the nature and scope" of the agreement, *Grant v. County of Suffolk*, No. 15 Civ. 4781, 2018 WL 816242, at *11 (E.D.N.Y. Feb. 9, 2018). Courts in this District routinely hold that such "freewheeling and speculative allegations . . . fail to raise a reasonable inference of a conspiracy." *Abadi v. Am. Airlines, Inc.*, No. 23 Civ. 4033, 2024 WL 1346437, at *26 (S.D.N.Y. Mar. 29, 2024); *see id.* at *26, 28 (finding "implausible" that 46 separate defendants each "conspired with the other" and dismissing §§ 1985(3) and 1986 claims).

*Second*, Plaintiffs do not plausibly allege that the object of any purported agreement was to deprive them of the rights specified. Because § 1985(3) "provides no substantial rights itself," "[t]he rights, privileges, and immunities that [it] vindicates must be found elsewhere." *United Bhd. of Carpenters & Joiners of Am., Loc. 610 v. Scott*, 463 U.S. 825, 833 (1983). The FAC here identifies "42 U.S.C. §§ 1981 and 1982, the Thirteenth Amendment right to be free from racial violence, and the right to travel," as the source of these rights. ¶ 716. But the Supreme Court has emphasized that in the context of a § 1985(3) conspiracy, "the right"—not just the targeted person or population—"must be *aimed at*," not merely affected; "its impairment must be a conscious objective of the enterprise." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993). In other words, a plaintiff "must show that the predominant purpose of the conspiracy was interference with, or punishment for, the exercise of that right," *Spencer*, 44 F.3d at 79.

Plaintiffs here describe painful instances of antisemitism on campus. But their pleading is devoid of nonconclusory allegations that the *predominant purpose* of any purported conspiracy was to consciously deprive Jewish or Israeli students of their rights to be free from racial violence or to travel. That omission is fatal to the § 1985 allegations underlying Plaintiffs' § 1986 claim,

even assuming that Plaintiffs have properly pleaded conspiratorial agreement with discriminatory animus (which they have not). *See, e.g.*, *Corsi v. Gestone*, No. 20 Civ. 4799, 2021 WL 5416623, at *4 (E.D.N.Y. Nov. 19, 2021). By comparison, a district court found a KKK Act conspiracy properly pleaded where the plaintiffs alleged that the whole point of the KKK Act conspiracy was to commit acts of violence at the Unite the Right rally in Charlottesville, Virginia to start a race war. *See Sines v. Kessler*, 324 F. Supp. 3d 765, 783-94 (W.D. Va. 2018). Here, by contrast, Plaintiffs have not plausibly alleged that the point of any alleged conspiracy among protestors was to commit violence against Jewish or Israeli students, as opposed to their expressed aims of bringing about a ceasefire in Gaza or impacting Israeli or U.S. government policy.

*Third*, Plaintiffs have not plausibly alleged that the University "had knowledge of the conspiracy and its object," *Urbina*, 2016 WL 79991, at *4, or that "any of the wrongs conspired to be done" were "about to be committed," and yet neglected to do anything to "prevent" them, *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (per curiam). These elements require "specific factual allegations that" the University "knew or could have prevented this conspiracy." *Clissuras v. E.E.O.C.*, No. 89 Civ. 5869, 1990 WL 96754, at *11 (S.D.N.Y. July 5, 1990). The FAC cites social media posts advertising protests, ¶ 724, but the Court cannot plausibly infer Columbia's knowledge of an unlawful conspiracy to deprive students of their right to travel or be free from racially motivated violence based on such allegations alone, *see, e.g.*, *Abadi*, 2024 WL 1346437, at *26. Nor does the FAC plausibly allege that the University failed to exercise its power to prevent any rights deprivations of which it was aware. *See supra* Section I.B. To the contrary, the FAC recounts several extraordinary steps the University took in response to the encampments and the occupation of Hamilton Hall. *See* ¶¶ 324-25, 357, 383, 387.

In short, Plaintiffs' § 1986 claim would contravene the Supreme Court's admonition not to

construe § 1985 (and, by extension, § 1986) as a "general federal tort law." *Bray*, 506 U.S. at 269.

## III.    The Court Should Decline to Exercise Supplemental Jurisdiction Over Plaintiffs' State Law Claims, Which Fail in Any Event

Where (as here) a federal court can dispose of all federal claims prior to trial, it should "decline to exercise supplemental jurisdiction" over any state-law claims that remain. 28 U.S.C. § 1367(c)(3); *see Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 107 (2d Cir. 2022); *Espinoza v. N.Y.C. Dep't of Transp.*, 304 F. Supp. 3d 374, 391 (S.D.N.Y. 2018) (Broderick, J.) (collecting cases). In any event, Plaintiffs' state-law claims fail on the merits, as discussed further below.

### A.    Plaintiffs Fail to State a Claim Under NYCHRL §§ 8-107(4) or (17) (Count IV)

Although the FAC invokes two provisions of the NYCHRL, it pleads a violation of neither. The first bars "treat[ing] [a person] 'less well' . . . because of a protected characteristic." *Novio v. N.Y. Acad. of Art*, 286 F. Supp. 3d 566, 583-84 (S.D.N.Y. 2017); N.Y.C. Admin. Code § 8-107(4). While this standard is in some ways less demanding than its federal counterpart, it still requires a showing of "discriminatory motive." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013); *Rothbein v. City of New York*, No. 18 Civ. 5106, 2019 WL 977878, at *9 (S.D.N.Y. Feb. 28, 2019). Here, Plaintiffs neither allege direct discrimination by Columbia, *see supra* Section I.A, nor plead deliberate indifference, such that the requisite degree of intent could be inferred, *see supra* Section I.B; *cf. Doe v. Columbia*, 2022 WL 3666997, at *12. In the absence of such allegations, Plaintiffs' claims under Section 8-107(4) fail.

Plaintiffs likewise fail to plead that "a policy or practice of a covered entity . . . results in a disparate impact." N.Y.C. Admin. Code § 8-107(17). In order to do so, Plaintiffs "must plausibly (1) identify a specific . . . policy or practice; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *United Prob. Officers Ass'n v. City of New York*, No. 21 Civ. 218, 2022 WL 875864, at *10 (S.D.N.Y. Mar. 24, 2022). But Plaintiffs have not

specified any Columbia policy that harms Jewish and Israeli students, much less disproportionately. *See Murillo-Roman v. Pension Bds. – United Church of Christ*, No. 22 Civ. 8365, 2024 WL 246018, *11 n.5 (S.D.N.Y. Jan. 23, 2024). Nor have they adequately alleged the "existence" of any "disparity in outcome" between appropriate comparator "groups." *Id.* (quoting *Mandala v. NTT Data Inc.*, 975 F.3d 202, 207 (2d Cir. 2020)); *see, e.g.*, ¶¶ 194-95, 406-55. Columbia's emphatic condemnations of antisemitism have been no different in kind than its condemnations of other forms of hate. ¶¶ 406-16; *see supra* pp. 14, 22-23. And while Plaintiffs point to unwelcome rhetoric by certain Columbia affiliates "target[ing]" the Columbia–Tel Aviv University ("TAU") dual-degree program, they fail to identify any University policy or practice that has disadvantaged program participants relative to other groups. ¶¶ 435-45.[23]

In essence, Plaintiffs' claim of disparity rests on scattershot examples of statements or discipline, imposed across decades, in widely varying circumstances and without crucial context such as disciplinary histories or tenure statuses. *See* ¶¶ 417-36; *supra* Section I.A. Not only are such apples-to-oranges comparisons inapt, but any attempt to compare disciplinary outcomes is speculative given Columbia's general obligation to keep such outcomes confidential. Plaintiffs thus fall far short of pleading that any particular Columbia policy has caused a disparate impact.

### B.    Plaintiffs Fail to State a Claim Under the NYSHRL or NYCRL (Counts II-III)

Discrimination claims under the NYSHRL are "treated as analytically identical" to federal claims (although, since 2019, the amended NYSHRL arguably imposes liability standards "closer" to those of the NYCHRL). *Kaye v. N.Y.C. Health & Hosps. Corp.*, No. 18 Civ. 12137, 2023 WL 2745556, at *17 (S.D.N.Y. Mar. 31, 2023). While courts have not yet resolved precisely where the

---

[23] The group comprised of "students in [the] TAU program," ¶ 436, is not a protected class, *see* ¶ 443, and thus cannot supply the basis for a disparate-impact claim, *see* N.Y.C. Admin. Code § 8-107(17). Separately, Plaintiffs' allegations as to SSI cannot sustain an inference that it was "systemically treated less well" than other student groups. *United Prob. Officers Ass'n*, 2022 WL 875864, at *10; *see supra* note 20.

current standards fall, the amended NYSHRL is certainly no more demanding of universities than the NYCHRL. *See Cooper v. Franklin Templeton Invs.*, No. 22-2763, 2023 WL 3882977, at *3 (2d Cir. June 8, 2023); *Wheeler v. Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 432, 451 (S.D.N.Y. 2023). Because Plaintiffs' allegations do not pass muster even under the NYCHRL, their NYSHRL claims necessarily fail as well. That, in turn, requires dismissal of the claims under NYCRL § 40-c, which are subject to the same (or a potentially even less demanding) analysis. *See Padmanabhan v. N.Y. Inst. of Tech. Campus*, No. 18 Civ. 5284, 2019 WL 4572194, at *5 (S.D.N.Y. Sept. 20, 2019). And the fact that Plaintiffs' NYSHRL claims may implicate unsettled questions concerning recent amendments, *see Cooper*, 2023 WL 3882977, at *3, is yet another reason why the Court should decline to exercise pendent jurisdiction here, since such issues are "best left to [state] courts," *Valencia v. Lee*, 316 F.3d 299, 308 (2d Cir. 2003).

## C.    Plaintiffs Fail to State a Contract Claim (Count V)

While the "relationship between a university and its students is contractual in nature," *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 481 (S.D.N.Y. 2015), New York has long respected the "restricted role" that courts play "in dealing with and reviewing controversies involving colleges and universities," *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 92 (1999). In educational matters, New York courts "refuse[] to substitute their judgment for that of university officials." *Sirohi v. Lee*, 222 A.D.2d 222, 222 (1st Dep't 1995). Thus, to state a claim for breach of contract against a university, a plaintiff must identify an enforceable promise of "certain specified services," not just a "general statement of policy" or a "statement[] of 'opinion.'" *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 421 (S.D.N.Y. 2021) (cleaned up).

Plaintiffs, straining to plead any specific and material promises by Columbia, cite eight

different policies. *See* ¶ 687.[24] One, the Faculty Handbook, is by its own terms "intended only to provide information for the guidance of . . . faculty and officers of research," so it cannot form the basis of an enforceable promise to students. Ex. E at 1. Meanwhile, Plaintiffs' quotations from student-facing policies, *see* ¶ 691, do not "guarantee certain specified services," *Tuition Refund*, 523 F. Supp. 3d at 421. At most, they offer "general promises about ethical standards" that are "far different from the types of specific promises which have led to valid breach of contract claims against universities." *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998). Even if the policies contained such promises (and they do not), Plaintiffs' allegations fail to make clear "when and how the defendant breached" those promises. *Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*, No. 04 Civ. 704, 2005 WL 1214281, at *10 (S.D.N.Y. May 20, 2005). And in all events, none of the policies promises "any specific outcome" to a student who reports misconduct, *Nungesser II*, 244 F. Supp. 3d at 373, foreclosing any contract claim.

Furthermore, even if Plaintiffs had plausibly alleged that Columbia breached any specific, material promise (and, again, they have not), the presence of "[a] 'specific disclaimer' . . . may excuse the university from a specific promise that would otherwise be a contractual obligation." *Deen v. New Sch. Univ.*, No. 05 Civ. 7174, 2007 WL 1032295, at *2 (S.D.N.Y. Mar. 27, 2007); *see also Rynasko v. N.Y. Univ.*, 63 F.4th 186, 199 (2d Cir. 2023). Every policy Plaintiffs cite contains express disclaimers with respect to matters of speech, expression, or academic freedom.[25]

---

[24] Plaintiffs quote a ninth document, *see* ¶ 691 (quoting "Event Policy and Campus Resources FAQ"), but this is merely a reference guide that provides "facts and information on our policies and available resources," Ex. MM at 1.

[25] For example, the EOAA Policies & Procedures and the Non-Discrimination Statement and Policy provide that they may not be interpreted "to abridge academic freedom" or "the University's educational mission." Ex. C at 3; Ex. D. The Standards twice state that Columbia "does not generally limit the discussion or expression of ideas solely because they might be thought of as offensive, immoral, [or] disrespectful." Ex. B at 6-7. The Rules declare that "the University cannot and will not rule any subject or form of expression out of order on the ground that it is objectionable, offensive, immoral, or untrue." Ex. A § 440. The University Event Policy is to be construed "[c]onsistent with the Rules," while the Student Group Event Policy & Procedure "supplements and supports" the University Event Policy. Exs. F at 3, G at 1. The Interim Policy refers to "[t]he right of students, faculty, and staff to express their views" as "the cornerstone

These specific disclaimers placed Plaintiffs on notice of the University's commitment to academic freedom and the corresponding limitations on policy enforcement when free speech is at issue.[26]

### D.    Plaintiffs Fail to State a Claim Under GBL §§ 349, 350 (Count VI)

To state a claim under GBL § 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Nungesser I*, 169 F. Supp. 3d at 377 (discussing § 349); *see Doe v. Yeshiva Univ.*, — F. Supp. 3d —, No. 22 Civ. 5405, 2023 WL 8236316, at *14 (S.D.N.Y. Nov. 28, 2023) ("the same elements" apply under §§ 349 and 350). Such claims have succeeded in the education context only where (unlike here) an entity purporting to be a college was a sham or acted fraudulently. *See, e.g.*, *People v. Trump Entrepreneur Initiative LLC*, 137 A.D.3d 409, 411-12 (1st Dep't 2016); *Alexson v. Hudson Valley Cmty. Coll.*, 125 F. Supp. 2d 27, 30-31 (N.D.N.Y. 2000). That is because for conduct to be "consumer-oriented," it must "have a broad[] impact on consumers at large," not just the parties. *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995). Separately, for an act or practice to be "deceptive," it must be objectively "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* at 26. Plaintiffs' GBL claim fails both tests.

Unlike, for instance, consumer-oriented disclosures a school might make to prospective students about employment prospects as part of its "efforts to sell its services," *see Gomez-Jimenez v. N.Y. L. Sch.*, 103 A.D.3d 13, 17 (1st Dep't 2012), the policies Plaintiffs specify, *see* ¶ 698, are inward-facing and oriented not towards prospective students but current ones (or, in the case of

---

of our academic community." Ex. H at 1. And the Faculty Handbook section that Plaintiffs quote affirms that Columbia "respects [faculty members'] right to express freely their views on the subjects they are teaching." Ex. E at 1.

[26] Plaintiffs' implied covenant claim, *see* ¶ 693, should be dismissed as redundant (and for all the same reasons). *See, e.g.*, *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013); *Nungesser v. Columbia Univ.* ("*Nungesser I*"), 169 F. Supp. 3d 353, 372-73 (S.D.N.Y. 2016).

the Faculty Handbook, employees). Moreover, Plaintiffs' assertions about how Columbia has enforced these policies, *see* ¶¶ 699-704, cannot "transform what is, at best, a claim that Columbia failed to live up to its obligation to [Plaintiffs] into a plausible claim of deceptive trade practices having a broad impact on consumers at large," *Nungesser II*, 244 F. Supp. 3d at 377.

Nor do Plaintiffs point to any specific "affirmative statement" by Columbia, *Heskiaoff v. Sling Media, Inc.*, 719 F. App'x 28, 32 (2d Cir. 2017), or show that any such statement was "likely to mislead a reasonable consumer acting reasonably under the circumstances," *Oswego*, 85 N.Y.2d at 26. Plaintiffs' preference for different disciplinary outcomes does not render any of Columbia's policies objectively or materially deceptive. And the policies' disclaimers about objectionable speech, academic freedom, and Columbia's educational mission, *see supra* note 25, "address the alleged deceptive conduct precisely," *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*, 37 N.Y.3d 169, 180 (2021), dooming any argument that reasonable readers could be materially misled.

### E.    Plaintiffs Fail to State a Claim for Premises Liability (Count VIII)

Although Plaintiffs argue that Columbia, as a landowner, is obligated "to keep its campus . . . in a reasonably safe condition," ¶ 730, the FAC does not allege that the University failed to maintain its physical premises. Instead, Plaintiffs argue that Columbia failed "to take reasonable steps to prevent or restrain" other community members from harassing them or "engag[ing] in unlawful activity," leading them to feel unsafe and experience adverse educational consequences. ¶¶ 732, 734. This theory would obliterate three key limits on premises liability in this State.

*First*, claims grounded in a landowner's failure to control third persons are limited to "physical harm." *Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 519 (1980) (quoting Restatement (Second) of Torts § 344); *see also Wolfer v. Getman*, 221 A.D.2d 969, 969 (4th Dep't 1995). But Plaintiffs do not rest their claim on such injuries. Instead, although they refer to Columbia affiliates

"trespassing" and committing "property damage[] and/or assault," ¶ 732, they themselves plead emotional harms and consequential effects, *see* ¶ 734. Columbia is committed to ensuring that all its students feel safe on campus, but such harms cannot serve as the basis for a premises liability claim. The few courts that have confronted similarly novel theories have rejected them. *See Downing v. Life Time Fitness, Inc.*, No. 10 Civ. 11037, 2011 WL 2014771, at *11-12 (E.D. Mich. May 24, 2011) ("conclud[ing] that reputational and emotional harm cannot support a premises liability claim"); *C.H. v. Pla-Fit Franchise, LLC*, 83 N.E.3d 633, 641 (Ill. Ct. App. 2017) (similar).

*Second*, landowners in New York have no "duty to protect a tenant from the conduct of another tenant," *Siino v. Reices*, 216 A.D.2d 552, 553 (1st Dep't 1995), as "even a fully secured entrance would not keep out another tenant," *Burgos v. Aqueduct Realty Corp.*, 92 N.Y.2d 544, 550 (1998). Thus, Columbia has no general duty in its capacity as a landowner, to keep students, employees, or invitees off its premises to protect other students. *See, e.g.*, *Eiseman v. State*, 70 N.Y.2d 175, 190 (1987) ("[C]olleges today in general have no legal duty to shield their students from the dangerous activity of other students."); *Pasquaretto v. Long Island Univ.*, 106 A.D.3d 794, 795-96 (2d Dep't 2013) (same); *Walton v. Mercy Coll.*, 93 A.D.3d 460, 461 (1st Dep't 2012) ("as a matter of law, defendants cannot be held liable" for assault against student by "signed-in invitees of another dormitory resident"). Plaintiffs base their premises liability claim on Columbia's alleged failure to "restrain" Columbia affiliates. *See* ¶ 732. Because the University has no such duty as a landowner, their theory independently fails.

*Third*, even in circumstances (not present here) where a landowner owes a duty "to take minimal precautions to protect tenants from foreseeable harm" by others, *Scurry v. N.Y.C. Housing Auth.*, 39 N.Y.3d 443, 452 (2023), it need only "act in a reasonable manner to prevent harm to those on their property . . . when [it has] the opportunity to control [third parties] and [is]

40

reasonably aware of the need for such control," *D'Amico v. Christie*, 71 N.Y.2d 76, 85 (1987). For the reasons explained in Section I.B, *supra*, many of the Individual Plaintiffs' allegations cannot give rise to such a duty because they occurred in contexts beyond Columbia's control or without Columbia's knowledge; as for the others, Columbia responded reasonably. And in all events, Plaintiffs cannot plausibly allege that Columbia's conduct proximately caused any harm. *See, e.g.*, *Colarossi v. Univ. of Rochester*, 2 A.D.3d 1272, 1273-74 (4th Dep't 2003).

## IV.    Much of Plaintiffs' Suit Is Nonjusticiable and Their Request for Injunctive Relief Is Overbroad

Plaintiffs also lack standing to pursue most of the claims and relief set out in the FAC. Indeed, SAA and SCLJ fail to establish their standing to sue at all. And all Plaintiffs fail to establish standing to seek injunctive relief—especially the inappropriate, unprecedented relief they request.

### A.    SAA and SCLJ Lack Standing Entirely

SAA and SCLJ cannot sue in their own right, as they plead no "distinct and palpable injury in fact." *Rodriguez v. Winski*, 444 F. Supp. 3d 488, 492 (S.D.N.Y. 2020). And they cannot sue on behalf of their members because "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004); *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). In other words, any injuries alleged by SAA/SCLJ Members are not "common to [the organizations'] entire membership and shared by all to an equal degree." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 650 n.5 (2d Cir. 1998) (cleaned up). Thus, full adjudication would be fact-intensive and demand individual participation. *See, e.g.*, *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 289 (3d Cir. 2014); *Barnett v. Johnson City Sch. Dist.*, No. 04 Civ. 0763, 2005 WL 8178066, at *5 n.6 (N.D.N.Y. Feb. 2, 2005).

SAA and SCLJ lack standing to assert a claim under § 1986 for an additional reason: an

organization does not have standing to assert the rights of its members under the statute. *See, e.g.*, *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (cleaned up) ("It is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983," enacted in the same statute as § 1986, "as we have interpreted the rights § 1983 secures to be personal to those purportedly injured." (cleaned up)); *Warth v. Seldin*, 495 F.2d 1187, 1194 (2d Cir. 1974), *aff'd*, 422 U.S. 490 (1975).

Nor do SAA and SCLJ have standing to obtain the relief they seek. *See Bano*, 361 F.3d at 714. They make wide-ranging demands, including discipline against administrators, professors, and students. *See infra* Section IV.C. But such "heterogenous relief" would require focus on each person's role in causing each member's "individual injuries," *Arbor Hill Concerned Citizens Neighborhood Ass'n v. City of Albany*, 250 F. Supp. 2d 48, 59 (N.D.N.Y. 2003), again requiring individual members' participation. And, of course, individual participation is required to recover damages. *See Bano*, 361 F.3d at 714; *Lowell v. Lyft*, 352 F. Supp. 3d 248, 257 (S.D.N.Y. 2018).

### B.    Plaintiffs Lack Standing to Seek Injunctive Relief

As the FAC concedes, *see* ¶¶ 637, 654, 671, 682, Plaintiffs who have graduated cannot seek prospective relief against the University, *see, e.g.*, *Alexander v. Yale Univ.*, 631 F.2d 178, 184 (2d Cir. 1980). But Plaintiffs who remain students lack standing to seek such relief as well: they impermissibly rest their case on past events, without satisfying their burden of showing that they face a "certainly impending" risk of *future* injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012); *see also, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (threat of injury must be "real and immediate").

Plaintiffs allege numerous disturbing incidents that affected their experiences at Columbia. However, it is well established that Plaintiffs "cannot rely on past injury" to establish standing to seek injunctive relief; they must instead "show a likelihood that they will be injured again in the

future." *Dorce v. City of New York*, 2 F.4th 82, 95 (2d Cir. 2021). And "[s]uch an allegation of future injury will be sufficient *only if* 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Id.* (emphasis added).

Plaintiffs have not met this heavy burden here—especially in light of the measures that the University has taken to prevent these alleged harms from recurring. *See supra* pp. 4-10. Rather, Plaintiffs' allegations of future injury rest solely on assumptions that third parties will commit similar instances of harassment in the future, that such incidents will affect the same Plaintiffs in similar ways, and that the University's response will be inadequate under governing law. Because that theory is grounded in a "speculative chain of possibilities," it does not suffice to establish that Plaintiffs face "certainly impending" injury. *Clapper*, 568 U.S. at 414.

### C.    Plaintiffs Cannot Properly Seek Such Sweeping Injunctive Relief

Finally, Plaintiffs ask the Court to enter a remarkable and unprecedented injunction commanding Columbia to (among other things) fire faculty and staff, suspend and expel students, and return gifts allegedly connected to antisemitic activity. *See* FAC, Prayer for Relief at A. Plaintiffs, in other words, would have this Court seize control of the University's governance and finances, reflecting Plaintiffs' fundamental misapprehension of the judicial role and the well-settled, carefully tailored limitations on the scope of Title VI. Even if Plaintiffs had standing to seek any prospective relief (which they do not), they surely would lack standing to seek *this* relief. Alternatively, and at minimum, the Court should strike Plaintiffs' unsupported requests.

*First*, Plaintiffs do not have Article III standing to seek this injunctive relief. "[A] plaintiff's standing depends on the form of relief requested." *Williams v. City of New York*, 34 F. Supp. 3d 292, 295 (S.D.N.Y. 2014). That relief "must be 'limited to the inadequacy that produced [their] injury in fact,'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018), and cannot extend to "generalized grievances," *Soule v. Conn. Assoc. of Schs., Inc.*, 90 F.4th 34, 50 (2d Cir. 2023) (en banc).

The injunction Plaintiffs seek blows past these well-settled boundaries, stretching far beyond any past or future injuries Plaintiffs allege. Plaintiffs ask this Court—or a "neutral expert monitor" appointed by it—to oversee not only the University's entire student and employee disciplinary systems and its fundraising apparatus, but also an unlimited and unspecified number of "policies, practices, procedures, [and] protocols." FAC, Prayer for Relief at A. In short, Plaintiffs would have this Court order Columbia to (among other things) terminate or expel employees and students across the University's seventeen different schools, many of whom had nothing to do with the alleged injuries any Plaintiff or SAA/SCLJ Member personally suffered, and even reject and return certain donations, even though such donations are mentioned nowhere in the FAC. Plaintiffs plainly lack standing to pursue such relief. *See Soule*, 90 F.4th at 50.[27]

*Second*, even if Plaintiffs had standing to request such relief, the excesses of their request would amply satisfy the Rule 12(f) standard, as their request is both insufficiently detailed and unavailable under Title VI. *See Meisels*, 2021 WL 1924186, at *8 (a motion to strike "should be granted where doing so will clarify the issues and streamline the case"); *Indyke*, 457 F. Supp. 3d at 284-85. The injunction Plaintiffs request cannot be reconciled with Rule 65(d), which requires that "[e]very order granting an injunction . . . must . . . state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1); *see Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Many of the measures Plaintiffs request depend upon individualized, fact-intensive inquiries. Affected individuals would be owed meaningful process. As those processes unfolded, any decisionmaker would have to balance a range of considerations,

---

[27] Plaintiffs' request for "a Title VI office dedicated to combating antisemitism on campus," FAC, Prayer for Relief at A, is already effectively moot. In April 2024, the University President announced that Columbia would establish "an office with the sole purpose of investigating and responding to allegations of discrimination, including antisemitism, in our community." Ex. W at 2. Columbia is also working on antidiscrimination initiatives that will include antisemitism training for its faculty, staff, and students in the fall. Ex. II at 1-2.

including protecting students from discrimination and harassment, promoting academic inquiry, and allowing free expression—precisely those same considerations that the University has been grappling with throughout its responses following the October 7 terror attacks.

Finally, Plaintiffs' requested injunctive relief would contravene established limits on deliberate indifference liability. Again, the Supreme Court has emphasized that "courts should refrain from second-guessing the disciplinary decisions made by school administrators" and that plaintiffs suing under Title VI have no "right to make particular remedial demands," as schools require "flexibility" to function. *Davis*, 526 U.S. at 648. Heeding these teachings, courts routinely deny requests for specific remedial measures. *See, e.g.*, *Syracuse Univ.*, 2023 WL 7391653, at *2 ("[d]isagreement with disciplinary decisions of the school" insufficient to justify relief, as "a court must accord sufficient deference to the decisions of school disciplinarians" (quoting *Zeno*, 702 F.3d at 666)); *KF*, 531 F. App'x at 134 (similar); *Doe v. Columbia*, 2022 WL 3666997, at *15 ("[C]ourts are pointedly cautioned to refrain from second-guessing the disciplinary decisions of school administrators."). Yet Plaintiffs here demand far more than that—expulsions, terminations, returning of donations, and indefinite judicial superintendence of the University. *See* FAC, Prayer for Relief at A. The Court should hold that Plaintiffs lack standing to request such extensive relief or, at minimum, strike their request because it is overbroad, general, and unmoored from the role that Congress contemplated for the federal courts under Title VI.

## CONCLUSION

For the foregoing reasons, the Court should grant Columbia's motion and dismiss the FAC with prejudice as against Columbia.[28]

---

[28] Because Plaintiffs are "unable to allege any fact sufficient to support [their] claim[s]," dismissal with prejudice is appropriate under the circumstances. *Wai Chu v. Samsung Electrs. Am., Inc.*, No. 18 Civ. 11742, 2020 WL 1330662, at *9 (S.D.N.Y. Mar. 23, 2020); *accord, e.g.*, *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *Sabel v. Halsted Fin. Servs., LLC*, No. 20 Civ. 1216, 2020 WL 6274986, at *7 (S.D.N.Y. Oct. 26, 2020).

Dated:   July 22, 2024
         New York, New York

By: _____

Roberta A. Kaplan
Timothy S. Martin
KAPLAN MARTIN LLP
156 West 56th Street, Suite 207
New York, NY 10019
(212) 316-9500
rkaplan@kaplanmartin.com
tmartin@kaplanmartin.com

Gabrielle E. Tenzer
Maximillian L. Feldman
Amit Jain
Zachary J. Piaker
Sabrina Alvarez-Correa
Rachel H. Simon
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
gtenzer@heckerfink.com
mfeldman@heckerfink.com
ajain@heckerfink.com
zpiaker@heckerfink.com
salvarezcorrea@heckerfink.com
rsimon@heckerfink.com

J. Patrick Hornbeck*
HECKER FINK LLP
1050 K Street, NW, Suite 1040
Washington, D.C. 20001
(212) 763-0883
phornbeck@heckerfink.com
* *application for admission
forthcoming*

*Counsel for Defendant Trustees of
Columbia University in the City of
New York*

46