# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STUDENTS AGAINST ANTISEMITISM, INC., STANDWITHUS CENTER FOR LEGAL JUSTICE, MILES RUBIN, DANIELLA SYMONDS, ERIN MCNULTY, NOAH MILLER, VALERIE GERSTEIN, KATIANA ARYEH, LAURA BELLOWS, LEMONY DAVID, JOHN DOE, CHAYA DROZNIK, LEO ELKINS, SAMUEL FRIEDMAN, MAYA GAL, AYELET GLASER, MICHAEL GROSS, JARED HARNICK, GABRIEL KAHANE, TALIA KESSELMAN, ELI MIZRAHI-AKS, OMER NAUER, AMIEL NELSON, GABRIEL NELSON, MOLLY NELSON, MARC NOCK, AVA QUINN, TALIA RABBAN, JANE ROE, SOPHIE RUKEYSER, ALIZA RUTTENBERG, EMILY SANDLER, ANDREW STEIN, JONATHAN SWILL, RAFAEL VANUNO, XAVIER WESTERGAARD, EDEN YADEGAR, and LILY ZUCKERMAN,<br><br>Plaintiffs,<br><br>-against-<br><br>TRUSTEES OF COLUMBIA, UNIVERSITY IN THE CITY OF NEW YORK, and BARNARD COLLEGE<br><br>Defendant. | Case No. 1:24-cv-01306<br><br>Hon. Vernon S. Broderick<br><br>**BARNARD'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(1), (6) AND TO STRIKE PURSUANT TO FED. R. CIV. P. 12(F)** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 3

     A.    Barnard's Robust and Unequivocal  Response to Antisemitism. ............. 3

     B.    Plaintiffs' Lawsuit. ................................................................................. 5

ARGUMENT ......................................................................................................... 10

I.    THE COURT SHOULD DISMISS UNDER RULE 12(b)(1) PLAINTIFFS' SWEEPING REQUESTS FOR INJUNCTIVE RELIEF. ................................. 11

II.    THE COURT SHOULD DISMISS UNDER RULE 12(b)(1) PLAINTIFFS SAA AND SCLJ FOR LACK OF STANDING. ...................................................... 14

     A.    SAA and SCLJ Lack Standing Because Their Claims and Requested Relief Require the Participation of Their Individual Members in this Lawsuit. .................................................................................................. 14

     B.    SAA and SCLJ Lack Standing To Proceed Against Barnard Because the Barnard Students They Represent are Anonymous. ......................... 15

III.    THE COURT SHOULD DISMISS THE FAC UNDER RULE 12(B)(1) AS UNRIPE……. ...................................................................................................... 16

IV.    THE COURT SHOULD DISMISS UNDER RULE 12(B)(6) PLAINTIFFS' TITLE VI CLAIM AGAINST BARNARD BECAUSE THE FAC ITSELF REFLECTS THE COLLEGE'S ROBUST RESPONSE TO ANTISEMITISM. ............ 18

     A.    Plaintiffs Fail to Plausibly Allege That Barnard Was Deliberately Indifferent to Harassment Directed at Them by Barnard Students or Faculty. ................................................................................................. 19

          1.    Barnard Lacks Substantial Control Over Most Alleged Events. ............................................................................................. 19

          2.    No Plaintiff Plausibly Pleads That Barnard Responded Unreasonably to Any Alleged Harassment in Light of Known Circumstances. .............................................................. 21

               a.    Barnard's Campuswide Response to Antisemitism Refutes Any Inference of Deliberate Indifference. .......... 22

               b.    Barnard Responded Reasonably To The Additional Incidents That Allegedly Impacted Individual Plaintiffs. ................................................................................. 28

     B.    Plaintiffs Fail to Plausibly Allege Direct Discrimination ....................... 33

V.    THE COURT SHOULD DISMISS PLAINTIFFS' REMAINING CLAIMS UNDER RULE 12(B)(6). ................................................................................. 34

     A.    Plaintiffs Fail to State a Claim Under NYHRL § 296 and NYCRL § 40-c. ................................................................................................. 34

**TABLE OF CONTENTS**
(continued)

**Page**

B.     Plaintiffs Fail to State a Claim Under NYCHRL §§ 8-107(4), (17). ....... 34

C.     Plaintiffs Fail to State a Breach of Contract Claim.................................. 35

D.     Plaintiffs Fail to State a Claim Under General Business Law §§ 349, 350......................................................................................................... 36

E.     Plaintiffs Fail to State a Claim Under 42 U.S.C. § 1986. ....................... 37

F.     Plaintiffs Fail to State a Claim for Premises Liability. ........................... 38

VI.    THE COURT SHOULD STRIKE PLAINTIFFS' UNAUTHORIZED REMEDIAL REQUESTS… ........................................................................................... 40

CONCLUSION................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**

*Access 123, Inc. v. Markey's Lobster Pool, Inc.*,
2001 WL 920051 (D.N.H. Aug. 14, 2001) ............................................................ 16

*Alexander v. Yale Univ.*,
631 F.2d 178 (2d Cir. 1980) ................................................................................ 12

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011) ................................................................................... 9

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ...................................................................... 1, 10, 25

*ASARCO Inc. v. Kadish*,
490 U.S. 605 (1989) ........................................................................................... 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................... 10

*Atuahene v. City of Hartford*,
10 F. App'x 33 (2d Cir. 2001) ................................................................ 18, 37, 38

*Bano v. Union Carbide Corp.*,
361 F.3d 696 (2d Cir. 2004) .......................................................................... 15, 16

*Barnes v. Gorman*,
536 U.S. 181 (2002) ........................................................................................... 40

*Barnett v. Johnson City Sch. Dist.*,
2005 WL 8178066 (N.D.N.Y. Feb. 2, 2005) ...................................................... 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................ 9, 18

*Bernheim v. N.Y. City of Dep't of Education*,
2020 WL 3865119 (S.D.N.Y. July 9, 2020) ...................................................... 35

*Black Lives Matter D.C. v. Trump*,
544 F. Supp. 3d 15 (D.D.C. 2021) ..................................................................... 38

*Blum v. Yaretsky*,
457 U.S. 991 (1982) ........................................................................................... 23

*Blunt v. Lower Merion Sch. Dist.*,
767 F.3d 247 (3d Cir. 2014) .......................................................................... 15, 16

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Brooks v. Cnty. of Nassau,*
    54 F. Supp. 3d 254 (E.D.N.Y. 2014) ..................................................... 38

*Carabello v. N.Y.C. Dep't of Educ.,*
    928 F. Supp. 2d 627 (E.D.N.Y. 2013) ............................................. 25, 28

*Chacko v. Dynair Servs. Inc.,*
    1998 WL 199866 (E.D.N.Y. Mar. 15, 1998) ......................................... 40

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) .............................................................. 11, 12, 13

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .................................................................. 11, 12

*Clark v. Martinez,*
    543 U.S. 371 (2005) ........................................................................ 23

*Colarossi v. Univ. of Rochester,*
    2 A.D.3d 1272 (2004) ..................................................................... 39

*Cook v. Colgate Univ.,*
    992 F.2d 17 (2d Cir. 1993) ............................................................. 11

*Cooper v. Franklin Templeton Invs,*
    2023 WL 3882977 (2d Cir. June 8, 2023) ......................................... 11

*Cotton v. Noeth,*
    96 F.4th 249 (2d Cir. 2024) ............................................................ 16

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
    596 U.S. 212 (2022) ........................................................................ 40

*Danielenko v. Kinney Rent A Car, Inc.,*
    441 N.E.2d 1073 (N.Y. 1982) ..................................................... 39, 40

*Davis v. Monroe Cty. Bd. of Educ.,*
    526 U.S. 629 (1999) ................................................................ *passim*

*Demoret v. Zegarelli,*
    451 F.3d 140 (2d Cir. 2006) ........................................................... 15

*Disabled in Action of Metro. N.Y. v. Trump Int'l Hotel & Tower,*
    2003 WL 1751785 (S.D.N.Y. Apr. 2, 2003) ....................................... 16

*Do No Harm v. Pfizer Inc.,*
    96 F.4th 106 (2d Cir. 2024) ............................................................ 16

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Doe v. Sacks,*
2024 WL 402945 (S.D.N.Y. Feb. 2, 2024) ............................................................. 21, 23, 26

*Doe v. Trs. of Columbia Univ.,*
2024 WL 2013717 (2d Cir. May 7, 2024) ............................................................. 27

*Doron Precision Sys., Inc. v. FAAC, Inc.,*
423 F. Supp. 2d 173 (S.D.N.Y. 2006) .......................................................... 1, 10, 22

*Draper v. Healey,*
827 F.3d 1 (1st Cir. 2016) ............................................................................... 16

*Eiseman v. State,*
70 N.Y.2d 175 (1987) .................................................................................... 39

*Felber v. Yudof,*
851 F. Supp. 2d 1182 (N.D. Cal. 2011) ......................................................... 23, 24

*Galindo v. Town of Clarkstown,*
2 N.Y.3d 633 (2004) ..................................................................................... 39

*Gally v. Columbia Univ.,*
22 F. Supp. 2d 199 (S.D.N.Y. 1998) .............................................................. 36

*Gebser v. Lago Vista Independent School District,*
524 U.S. 274 (1998) ...................................................................................... 25

*Gilbert v. St. John's Univ.,*
1998 WL 19971 (E.D.N.Y. Jan. 20, 1998) ..................................................... 39

*Gill v. Whitford,*
585 U.S. 48 (2018) ........................................................................................ 13

*Grandison v. U.S. Postal Serv.,*
696 F. Supp. 891 (S.D.N.Y. 1988) ................................................................ 40

*Guest v. Hansen,*
2007 WL 4561104 (N.D.N.Y. Dec. 18, 2007), *aff'd*, 603 F.3d 15 (2d Cir.
2010) .............................................................................................................. 39

*Guest v. Hansen,*
603 F.3d 15 (2d Cir. 2010) ............................................................................ 39

*Harary v. Allstate Ins. Co.,*
983 F. Supp. 95 (E.D.N.Y. 1997) .................................................................. 37

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977) ...................................................................................... 14

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*In re Merrill Lynch Auction Rate Secs. Litig.*,
  851 F. Supp. 2d 512 (S.D.N.Y. 2012).................................................................... 22

*Isbell v. City of New York*,
  316 F. Supp. 3d 571 (S.D.N.Y. 2018).................................................................... 10

*Johnson v. NYU*,
  2018 WL 3966703 (S.D.N.Y. Aug. 20, 2018)........................................................ 34

*Koumantaros v. City Univ. of New York*,
  2007 WL 840115 (S.D.N.Y. Mar. 19, 2007) .......................................................... 33

*L. L. v. Evesham Twp. Bd. of Educ.*,
  710 F. App'x 545 (3d Cir. 2017) ........................................................................... 15

*Liu v. U.S. Congress*,
  834 Fed. App'x 600 (2d Cir. 2020)........................................................................ 12

*Lulac Councils 4433 & 4436 v. City of Galveston*,
  942 F. Supp. 342 (S.D. Tex. 1996) ....................................................................... 15

*Makarova v. United States*,
  201 F.3d 110 (2d Cir. 2000).................................................................................... 9

*Mandel v. Board of Trs. of California State University*,
  2018 WL 1242067 (N.D. Cal. Mar. 9, 2018)......................................................... 23

*Minto v. Molloy College*,
  2019 WL 4696287 (E.D.N.Y. Sept. 26, 2019) ...................................................... 34

*Mogul Media, Inc. v. City of New York*,
  2017 WL 6594223 (S.D.N.Y. Dec. 22, 2017) ......................................................... 9

*Morrison v. Nat'l Aus. Bank. Ltd.*,
  547 F.3d 167 (2d Cir. 2008).................................................................................... 9

*Murillo-Roman v. Pension Bds. – United Church of Christ*,
  2024 WL 246018 (S.D.N.Y. Jan. 23, 2024) .......................................................... 35

*N.Y.C.L. Union v. Grandeau*,
  528 F.3d 122 (2d Cir. 2008)............................................................................. 16, 17

*Nesbeth v. N.Y.C. Mgmt. LLC*,
  2019 WL 110953 (S.D.N.Y. Jan. 4, 2019) ............................................................ 18

*Novio v. N.Y. Academy of Art*,
  286 F. Supp. 3d 566 (S.D.N.Y. 2017).............................................................. 34, 35

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Nungesser v. Columbia Univ.*,
169 F. Supp. 3d 353 (S.D.N.Y. 2016) ............................................................. 36, 37

*Nungesser v. Columbia Univ.*,
244 F. Supp. 3d 345 (S.D.N.Y. 2017) .......................................................... 21, 28, 37

*Ochre LLC v. Rockwell Architecture Plan. & Design, P.C.*,
2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012) ...................................................... 18, 38

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*,
647 N.E.2d 741 (N.Y. 1995) .................................................................................... 37

*Padmanabhan v. N.Y. Inst. of Tech. Campus, N.Y.*,
2019 WL 4572194 (S.D.N.Y. Sept. 20, 2019) ........................................................ 34

*Papish v. Board of Curators*,
410 U.S. 667 (1973) ................................................................................................ 23

*Parker Madison Partners v. Airbnb, Inc.*,
283 F. Supp. 3d 174 (S.D.N.Y. 2017) ............................................................ 1, 9, 13

*Preddie v. Bartholomew Consol. Sch. Corp.*,
799 F.3d 806 (7th Cir. 2015) .................................................................................. 38

*Roe v. St. John's University*,
91 F.4th 643 (2d Cir. 2024) .............................................................................. 15, 28

*Roskin-Frazee v. Columbia Univ.*
2018 WL 6523721 (S.D.N.Y. Nov. 26, 2018) ......................................................... 22

*Roskin-Frazee v. Columbia Univ.*,
474 F. Supp. 3d 618 (2019) .................................................................................... 31

*Rothbein v. City of New York*,
2019 WL 977878 (S.D.N.Y. Feb. 28, 2019) ........................................................... 35

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001) .................................................................................... 23

*SFAA v. Harvard Coll.*,
600 U.S. 181 (2023) ................................................................................................ 14

*Shain v. Ellison*,
356 F.3d 211 (2d Cir. 2004) .................................................................................... 11

*Singer v. City of New York*,
417 F. Supp. 3d 297 (S.D.N.Y. 2019) ..................................................................... 38

**TABLE OF AUTHORITIES**

*(continued)*

**Page(s)**

*Soule v. Conn. Ass'n of Schs., Inc.*,
90 F.4th 34 (2d Cir. 2023) ............................................................. 13, 14

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .................................................................. 11, 12, 13

*United Prob. Officers Ass'n v. City of New York*,
2022 WL 875864 (S.D.N.Y. Mar. 24, 2022) ............................................ 35

*Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC*,
374 F. Supp. 3d 1124 (D. Utah 2019) .................................................. 14

*Valley Forge Christian College v. Am. United for Separation of Church & State*,
454 U.S. 464 (1982) .................................................................. 14

*Ward v. NYU*,
2000 WL 1448641 (S.D.N.Y. Sept. 28, 2000) ...................................... 35, 36

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
127 F. Supp. 3d 156 (S.D.N.Y. 2015) ................................................. 10

*Xiaolu Peter Yu v. Vassar Coll.*,
97 F. Supp. 3d 448 (S.D.N.Y. 2015) .................................................. 36

*Zeno v. Pine Plains Cent. Sch. Dist.*,
702 F.3d 655 (2d Cir. 2012) ..................................................... *passim*

**Rules**

Fed. R. Civ. P. 12(b)(1) .............................................................. 9

Fed. R. Civ. P. 12(b)(6) .............................................................. 9

Fed. R. Civ. P. 12(f) ............................................................... 40

## INTRODUCTION

Barnard unequivocally condemns antisemitism—an "ancient, but terribly resilient, form of hatred" that is antithetical to the College's values. Declaration of Jennifer B. Sokoler, Ex. A.[1] Barnard's leaders also recognize that "[c]ommunity and values don't stand on their own," and they are moving forcefully to "reaffirm and reinforce [the College's values] with action." *Id.*

Recent events have only underscored the urgency of those efforts. This case arises out of events in the wake of the October 7, 2023 terrorist attack on Israel, an unprecedented assault that resulted in "the single deadliest day for Jews since the Holocaust." FAC ¶ 140. While antisemitism was already on the "ris[e] in New York, across the country, and around the world in recent years," Ex. A, the October 7 attack inspired an appalling wave of antisemitic activity on college campuses nationwide—including at Barnard and Columbia University ("Columbia"), a school of which Barnard is a small affiliate and separate legal entity, FAC ¶¶ 4, 65. This lawsuit was brought against both schools, and while the focus is on Columbia, Plaintiffs include current and former Barnard students who are Jewish and have allegedly experienced incidents of antisemitism following the October 7 attack.

Barnard shares Plaintiffs' deep concern over antisemitism on campus, and it is partnering with Columbia to prevent and respond to such hate-based incidents. Following the October 7 attack, Barnard and Columbia launched a Task Force on Antisemitism to ensure that the entire

---

[1] In support of its Rule 12(b)(1) motion, Barnard relies on Exhibits A-O to the Sokoler Declaration and the Declaration of Leslie Grinage. *See Parker Madison Partners v. Airbnb, Inc.*, 283 F. Supp. 3d 174, 178 (S.D.N.Y. 2017) (Broderick, J.) In support of its Rule 12(b)(6) motion, Barnard relies on Exhibits A, C, D, G, H, M, P-R. As explained below, the Court may properly consider these exhibits because the Amended Complaint (FAC) "incorporate[s] [them] by reference" or fairly implicates them, *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 n.3 (2d Cir. 2022). In addition, all (except Exhibits P and R) were "publicly announced on [Barnard's] website," *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006). All exhibits are attached to the Sokoler Declaration.

University community is safe, welcoming, and inclusive for Jewish members.  FAC ¶¶ 414-16; Ex. A.  Barnard affirmed—early and unequivocally—that its non-discrimination policies prohibit antisemitism, and it has made changes to better enforce those policies.  Ex. B.  When policy violations occur, Barnard has moved swiftly, initiating disciplinary proceedings and imposing sanctions as appropriate.  *See* FAC ¶¶ 318, 358; Exs. M, N, O; Grinage Decl. ¶ 4.

In the FAC, Plaintiffs focus on a protest movement that recently swept many college campuses, including Columbia's.  FAC ¶¶ 306-388.  As the FAC reflects, however, Barnard took decisive steps to protect its students, including issuing interim suspensions to students who persisted in violating its rules.  *Id.* ¶¶ 318, 387.  Plaintiffs fault Barnard for not using more force, more quickly.  *See id.* ¶ 358.  But schools do not act unreasonably by attempting to "deescalate the rancor" and promote "calm" on campus before turning to discipline, *id.* ¶¶ 357, 363, particularly when they must respond in real-time to an unprecedented protest movement.

Barnard's campus has calmed with the close of the school year, and the College is dedicated to using this summer to continue revising its policies, procedures, and programs to promote an inclusive and welcoming environment for all students.  Grinage Decl. ¶¶ 3, 5.  The path forward—for the next academic year and beyond—will require effort and expertise.  Barnard will continue to respond decisively to antisemitism and any calls for violence on its campus, reaffirming that there is no place for hate on the Barnard campus.  But Barnard must also allow its students and faculty to voice political opinions—including those critical of Israel's policies—and have the humility to recognize the well-known limits of meeting protest with force.  Progress is not always easy, but Barnard is committed to meeting the challenge.

This lawsuit threatens to disrupt that process.  The FAC's focus on Barnard is relatively limited:  Just 3 of the 36 individual Plaintiffs are currently enrolled in Barnard; 5 graduated from

Barnard this spring and another plans to transfer.  As Columbia recently reaffirmed "a substantial (if not overwhelming) number" of the FAC's 735 paragraphs are focused on Columbia, not Barnard.  ECF No. 51.  "Columbia and its schools are mentioned no fewer than 1,197 times in the FAC, as compared to just 224 specific mentions of Barnard College."  *Id.*  Yet Plaintiffs nevertheless request that the Court indefinitely superintend nearly every aspect of Barnard's operations, overseeing broad policy and personnel changes.  *See* FAC, Prayer for Relief, (A).

This lawsuit demands just the type of "second-guessing" of schools that the Supreme Court has precluded, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999), and cannot proceed against Barnard.  The Court should dismiss Barnard from this action under Rule 12(b)(1) because (i) Plaintiffs lack standing to pursue injunctive relief; (ii) the associational plaintiffs lack standing to proceed at all; and (iii) it is not ripe.  Alternatively, the Court should dismiss Barnard under Rule 12(b)(6).  Far from plausibly alleging that Barnard has intentionally discriminated against any plaintiff, the FAC confirms—while understating—Barnard's proactive efforts to stamp out antisemitism on campus.  What Plaintiffs need to plead to prevail is Barnard's deliberate indifference to discrimination on campus, and the FAC itself shows the opposite.  At minimum, the Court should strike under Rule 12(f)(1) many of the FAC's remedial demands because they would impede Barnard's academic freedom and ability to protect all of its community.

## BACKGROUND

### A.      Barnard's Robust and Unequivocal  Response to Antisemitism.

Barnard has long condemned antisemitism of any kind, including through its policies that "specifically prohibit[]" discrimination or harassment "on the basis of race, color, religion, creed, national or ethnic origin," such as Jewish heritage.  FAC ¶¶ 92-97.

Barnard's commitment to combatting antisemitism became all the more important this past academic year.  On October 7, 2023, Hamas launched an unprecedented terrorist attack on Israel,

FAC ¶ 139, a tragic event that sparked a rise in antisemitism across universities nationwide, FAC ¶ 77. In response, Barnard quickly condemned Hamas's attack. On October 7, Dean Leslie Grinage sent a community-wide message offering support to the Barnard community, including outlining resources available for students affected by the attack. Ex. C. On October 10, Barnard President Laura Ann Rosenbury sent a message condemning the "horrific" attack and emphasizing Barnard's rejection of "antisemitism, Islamophobia, and other forms of hate." Ex. D.

Barnard's efforts did not stop there. In addition to condemning all "[h]ate speech and discrimination," Barnard acted swiftly to protect "[t]he safety and well-being of [its] students" in the weeks following October 7. Ex. B. Specifically, Barnard increased the number of safety officers on campus and began engaging in daily dialogues with the NYPD and safety personnel at Columbia. *Id.* Barnard also added more resources for students seeking support, including increased advising and wellness hours, as well as a dedicated email address to respond to "all questions and issues related to the crisis." *Id.* It has also sought to promote dialogue among its students, including through breakfasts hosted by President Rosenbury, *id.*, and by opening its spring semester with a campus-wide Day of Dialogue, FAC ¶ 254.

Since the wave of antisemitism unleashed by the October 7 attack, Barnard has also made structural changes to address student wellbeing. Barnard partnered with Columbia to launch a Task Force on Antisemitism, which will enhance support for Jewish students. FAC ¶ 414; Ex. A. Barnard and Columbia have established a Doxing Resource Group to streamline support for students who are the targets of doxing. FAC ¶¶ 414-416; Ex. E. And on February 20 2024, Barnard established a new Policy for Safe Campus Demonstration, which "sets forth reasonable, content-neutral time, place and manner restrictions for campus demonstrations." FAC ¶ 97; Ex. F. In this new policy, Barnard reiterated that the "right to speak on campus includes the right to

engage in demonstrations," but it also sought to ensure demonstrations "are conducted safely and do not interfere with the right of others to speak, study, teach, learn, work, and live." *Id.*

While Barnard's disciplinary proceedings are "private" and not always visible to students, Ex. G, when Barnard receives reports of potential policy violations, it has promptly investigated them and imposed appropriate disciplinary measures, up to and including suspensions, Grinage Decl. ¶ 4; Ex. M. But these proceedings take time and must follow Barnard's established policies. Consistent with those policies, Barnard affords every student accused of misconduct the opportunity to "respond to" charges against them, and the College will investigate any alleged incident that is contested. Ex. H. Likewise, the College considers on a case-by-case basis the appropriate sanctions for a violation, and Barnard's policies also promise that "[o]ne purpose of the student conduct system is that of an educational process, to guide students toward understanding the consequences of decisionmaking." *Id.* Consistent with that mission, the College will treat "[s]anctioning [a]s progressive during the time of being a student" and will account for a student's "prior conduct history" in imposing discipline. *Id.*; *see also* Ex. G (allowing consideration of "[p]revious disciplinary action" in "determining the appropriate sanction(s)").

**B.**    **Plaintiffs' Lawsuit.**

On February 24, 2024, Plaintiffs filed this lawsuit naming both Barnard and Columbia as defendants. Before Barnard responded, Plaintiffs filed the FAC on June 17, 2024, adding numerous new plaintiffs and claims against both Barnard and Columbia.

While Barnard is an "official undergraduate college" and affiliate of Columbia, Barnard and Columbia are entirely "separate institutions" as a legal matter, FAC ¶¶ 64-65, with distinct student bodies, campuses, leadership, governing boards, finances, and policies, *see* Ex. I; *see also* FAC ¶¶ 92-97 (describing Barnard policies). The individual Plaintiffs involved in this suit include three current students at Barnard: Laura Bellows (FAC ¶ 21), Talia Rabban (FAC ¶ 40), and Lily

Zuckerman (FAC ¶ 50).  There are also five Plaintiffs who graduated Barnard this spring: Katiana Aryeh (FAC ¶ 20); Ayelet Glaser (FAC ¶ 28), Molly Nelson (FAC ¶ 37); Jane Roe (FAC ¶ 41), and Sophie Rukeyser (FAC ¶ 42).  One plaintiff, Aliza Ruttenberg, plans to transfer from Barnard. FAC ¶ 43.  The FAC also includes two associational plaintiffs.  SAA is an association created in December 2023 with a stated mission of defending against "antisemitism in higher education." FAC ¶ 13.  SCLJ, created in January 2024, is composed of members who are "dedicated to supporting Israel and combating antisemitism."  *Id.* ¶ 14.  SAA pleads that its members include three anonymous Barnard students (SAA Members #1, 3, 4), *id.* ¶¶ 51, 53-54, and SCLJ pleads that its members include one anonymous Barnard student (SCLJ Member #7), *id.* ¶ 61.

Each of those Plaintiffs[2] allege that they experienced or witnessed antisemitic harassment following the October 7 attack.  As discussed in more detail below, several Plaintiffs allege that they were personally targeted by antisemitic incidents perpetrated by students or faculty.  *E.g.*, FAC ¶¶ 483-486, 500-503, 555-72; *see infra* Part IV.A.2.b.  In addition, they all allege a "pervasively hostile environment" for Jewish and Israeli students.  FAC ¶ 280.  Many of the incidents they cite occurred on Columbia's campus (or at unnamed locations) and involved Columbia students (or unnamed individuals), rather than Barnard students or employees.  *E.g.*, *id.* ¶¶ 129, 147, 162, 169, 171, 174, 204, 212, 257, 283.  Other allegations relate generally to the campus climate after October 7, *e.g.*, "antisemitic fliers" in the library or residence halls, *id.* ¶ 486, "antisemitic chants" or signs, *id.* ¶¶ 215, 599, and "protesting" and rallies, *id.* ¶¶ 556-57, including at an "unauthorized rally" at Barnard on December 11, *id.* ¶ 250; *see also* FAC ¶¶ 245-52.

The FAC focuses particularly on demonstrations on Columbia's campus in the final weeks of the academic year.  *See* FAC ¶¶ 307-389.  Beginning on April 17, "hundreds of Columbia

---

[2] Barnard uses "Plaintiffs" to refer to plaintiffs who are its current or former students.

students descended on the South Lawn" of Columbia's campus and established what they labeled a "Gaza Solidarity Encampment." *Id.* ¶ 307. The encampment's stated purpose was to show support "for Gaza," *id.* ¶ 309, but according to the FAC, some student demonstrators also chanted anti-Zionist phrases, *id.* ¶ 308. Barnard's administrators initially tried to encourage its students participating in the encampment to leave without resort to "disciplinary measures." *Id.* ¶ 315. Members of Barnard's senior staff went to the lawn to personally ask Barnard students to leave and to advise them that they would be subject to sanctions if they did not. Ex. J; *see* FAC ¶ 318. But the encampment expanded, including with "non-[C]olumbia affiliates" and outside individuals who were not members of the community. FAC ¶ 309. The next day, Columbia's President took the "extraordinary step" of requesting the NYPD's help to clear the demonstrators because the "encampment and related disruptions pose[d] a clear and present danger to the substantial functioning of the University." *Id.* ¶¶ 324-25. Barnard also issued interim suspensions to its students who were part of the April 17 encampment, prohibiting them from being "physically present on campus. *Id.* ¶ 358.

The decision to request assistance from NYPD—and to impose interim suspensions on students arrested—was met with backlash from students and faculty alike, as well as individuals who were not part of the community, all of whom continued to protest over the following week, ultimately rebuilding an encampment. "Following the arrests, hundreds of agitators rallied outside Columbia's gates and marched up and down Broadway and Amsterdam Avenue," public streets in New York City. FAC ¶ 329. These "agitators" allegedly made threatening and antisemitic remarks to Jewish students, including several Plaintiffs. *E.g.*, *id.* ¶ 339. Faculty, too, protested the University's response to the encampment. *Id.* ¶ 338. According to the FAC, "[Faculty for Justice in Palestine ("FJP")] members joined the encampment to encourage an 'academic boycott

of all events'…until…Columbia [had] 'halt[ed] all disciplinary proceedings against students.'" *Id.*

Rather than further enflame tensions, Barnard sought to "deescalate the rancor," while also protecting the safety and security of its community. FAC ¶ 357. To that end, Barnard increased campus security, offered safety escorts and transportation, and limited campus access to students with university identification cards. Ex. K. It also held classes virtually while the encampment at Columbia continued. FAC ¶ 358 (incorporating Ex. L). In addition, Barnard carefully evaluated its disciplinary response to students who participated in the encampment in violation of its policies, tailoring its decisions to whether students had "previously received notices of misconduct" and whether they "they agree[d] to follow all Barnard rules during a probationary period." Ex. M; *see also* FAC ¶ 358 (incorporating Ex. M). In a campus-wide message, President Rosenbury reaffirmed the College's "commitment to open inquiry and expression while also stressing that free expression for some should not mean that others feel unwelcome, unsafe, or threatened in the place we all share." Ex. M. Thus, while "many of [its] student protestors [were] using their voices in a peaceful manner," President Rosenbury denounced protests "on and surrounding the Columbia campus [that] have become intimidating." *Id.*

While the majority of protestors disbanded by April 30, a smaller subset of students and outside protestors broke into Hamilton Hall, a Columbia building, early that morning. FAC ¶ 377. That night, Barnard's Community Accountability, Response and Emergency Services (CARES) sent a shelter-in-place alert. *Id.* ¶ 387. Ultimately, Columbia President Shafik authorized NYPD to arrest the individuals inside Hamilton Hall. *Id.* In addition, the FAC alleges that on May 31, "agitators, including students from SJP," set up an additional "encampment" on Columbia's lawn during alumni weekend. FAC ¶ 393. Barnard has ongoing disciplinary proceedings related to these additional incidents. *See* Exs. M & N; Grinage Decl. ¶ 4.

Based on these allegations, Plaintiffs bring causes of action asserting violations of (i) Title VI of the Civil Rights Act of 1964 ("Title VI") (Count I); (ii) New York Executive Law ("NYHRL") § 296 (Count II); (iii) New York Civil Rights Law ("NYCRL") § 40-c (Count III); (iv) New York City Human Rights Law ("NYCHRL") §§ 8-107(4), (17) (Count IV); (v) Breach of Contract (Count V); (vi) New York General Business Law §§ 349, 350 (Count VI); (vii) 42 U.S.C. § 1986 (Count VII); and (viii) Premises Liability (Count VIII).  In addition to monetary relief, Plaintiffs request prospective relief in the form of an injunction that would, *inter alia*, require "(i) disciplinary measures, including termination, against deans, administrators, professors and other employees" who "engage in" or "permit" antisemitic discrimination; and (ii) disciplinary measures against any students who engage in such conduct.  FAC, Prayer for Relief.  They also request a Court-appointed "neutral expert monitor to oversee compliance." *Id.*

## STANDARD OF REVIEW

Under Rule 12(b)(1), a complaint must be dismissed "when the district court lacks the statutory or constitutional power to adjudicate it," *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)), such as where a plaintiff fails to "affirmatively and plausibly suggest that it has standing to sue," *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011), or where the suit is unripe, *Mogul Media, Inc. v. City of New York*, 2017 WL 6594223, at *3 (S.D.N.Y. Dec. 22, 2017).  In resolving a motion to dismiss under Rule 12(b)(1), "a district court may consider evidence outside the pleadings." *Parker Madison*, 283 F. Supp. 3d at 178 (quoting *Morrison v. Nat'l Aus. Bank. Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)).

Under Rule 12(b)(6), a complaint must be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  While the Court must accept all well-pleaded facts as true, it need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court "may permissibly consider documents other than the complaint for the truth of their contents if they are attached to the complaint or incorporated in it by reference," as well as documents that are "integral" to the pleading.  *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 352 n.3 (quotation omitted); *Isbell v. City of New York*, 316 F. Supp. 3d 571, 582 (S.D.N.Y. 2018).  Likewise, "[f]or purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination."  *Doron*, 423 F. Supp. 2d at 179 n.8 (quotation omitted); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015).

## ARGUMENT

This suit should not proceed at all and certainly cannot proceed against Barnard.  The FAC's allegations are deeply concerning, but few involved Barnard's students, occurred on its campus, or were subject to its control.  Indeed, the vast majority of the FAC's factual allegations and causes of action make no mention of Barnard.

This Court should dismiss Barnard for several reasons.  <u>First</u>, the Court should dismiss much of the FAC under Rule 12(b)(1) because Plaintiffs do not have standing to seek injunctive relief, and the associational plaintiffs do not have standing at all.  Plaintiffs also brought suit too soon:  Barnard is in the process of responding to the allegations at the center of this lawsuit, and this Court has no cause to intervene in that ongoing process, which is not ripe for adjudication.  <u>Second</u>, and more fundamentally, the FAC fails to state a claim under Rule 12(b)(6).  Title VI, similar to its state- and city-law counterparts, imposes a "high standard" to hold a college liable for the actions of its students or teachers.  *See Davis*, 526 U.S. at 643.  Title VI prohibits only *intentional* discrimination by the recipient of federal funding.  *Id.*  Accordingly, the College can be held liable for the conduct of third parties only if: (1) it has "substantial control" over those

parties—*i.e.*, they are Barnard student or faculty; (2) it has "actual knowledge" of the harassment alleged; and (3) it responds with deliberate indifference. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 (2d Cir. 2012). Plaintiffs cannot plausibly satisfy that demanding standard, because Barnard has responded—consistently and forcefully—to each alleged incident within its control.

## I.    THE COURT SHOULD DISMISS UNDER RULE 12(B)(1) PLAINTIFFS' SWEEPING REQUESTS FOR INJUNCTIVE RELIEF.

No Plaintiff has standing to pursue prospective relief against Barnard, much less the sweeping injunction they request. FAC, Prayer for Relief A. At the pleading stage, Plaintiffs must "clearly [] allege facts demonstrating" that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Even where a plaintiff has standing to pursue damages, "standing to seek injunctive relief is a different matter." *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004). To seek injunctive relief, a plaintiff cannot rely on "[p]ast exposure" to harm. *Id.* (quotation omitted). Nor can a plaintiff proceed based on "subjective" fears of injuries that she *might* face. *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983). Instead, Plaintiffs must face a risk of future injury that is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). No Plaintiff satisfies that standard.

_First_, none of the Plaintiffs who have graduated or transferred from Barnard have standing to pursue injunctive relief. Of the nine current or former Barnard students who request injunctive relief in the FAC, five (Aryeh, Glaser, Nelson, Roe, and Rukeyser) have now graduated and one (Ruttenberg) plans to transfer. FAC ¶¶ 20, 28, 37, 41-43. "None of the[se] plaintiffs" face an imminent risk of injury at Barnard, nor can they "benefit from an order requiring" the injunctive relief sought in the FAC. *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993). Accordingly, none can pursue injunctive relief. *See, e.g.*, *id.* (students' Title IX claims mooted by graduation or

imminent graduation); *Alexander v. Yale Univ.*, 631 F.2d 178, 184 (2d Cir. 1980) (same).

*Second*, none of the three remaining Plaintiffs alleges facts demonstrating that she faces a "certainly impending" injury when she returns to campus in the fall. *Clapper*, 568 U.S. at 410. Largely, Plaintiffs raise concerns about the campus-wide atmosphere in the aftermath of an unprecedented terrorist attack in Israel, FAC ¶¶ 1, 5-6, 77, but as the global response to the horrific attack evolves, so too will Barnard's campus climate. Moreover, Barnard has taken extensive efforts to prevent and address antisemitism on campus, *supra* at 3-5, and its efforts are ongoing, including developing new training for students and redoubling efforts to impose consequences on those who engage in unauthorized campus protests, Exs M & N; Grinage Decl. ¶¶ 3-5. With these initiatives in place, Plaintiffs cannot be "certain[]" that the events of the spring will repeat in a new school year. *Clapper*, 568 U.S. at 410. Certainly, the FAC cannot plausibly plead that any of the three current Barnard students *personally* face an imminent risk of a cognizable future injury. "For an injury to be particularized," the Supreme Court has explained, "it must affect the plaintiff[s] in a personal and individual way." *Spokeo*, 578 U.S. at 339 (quotation omitted); *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989). Thus, to the extent isolated incidents recur on campus, no Plaintiff can plausibly allege that she will personally face injuries, particularly since none alleges a recurring pattern of activity targeted at her. Thus, "it is surely no more than speculation" to assert that any Plaintiff "[herself] will again be involved in one of those unfortunate instances," as is necessary to seek injunctive relief. *Lyons*, 461 U.S. at 108.

*Third*, Plaintiffs fail to allege facts clearly demonstrating a "causal relationship" between Barnard and any actionable harassment they might face in the future. *Liu v. U.S. Congress*, 834 Fed. App'x 600, 604 (2d Cir. 2020); *Spokeo*, 578 U.S. at 338. The FAC attributes Plaintiffs' injuries to "third part[ies]," *i.e.*, teachers, students, or other outside protestors, *Zeno*, 702 F.3d at

664, but even if those injuries recur, Plaintiffs fail to plausibly allege that *Barnard* will be responsible or will respond inadequately.  The FAC's allegations belie any inference that Barnard has tolerated antisemitism to date, *infra* Part IV, and to the extent the question turns on a disputed issue of fact, *Parker Madison Partners*, 283 F. Supp. 3d at 178, extrinsic materials confirm Barnard's robust response to antisemitism. They reflect that Barnard has emphasized that it will not tolerate hate.  *E.g.*, Exs. A, C, & D.  Barnard has increased the presence of safety officers on campus and launched a Task Force on Antisemitism.  Ex. A.  It has thoroughly investigated allegations of discrimination and imposed appropriate disciplinary measures.  Exs. B; M, N, O; Grinage Decl. ¶ 4.  For instance, the FAC devotes nearly 100 paragraphs to allegations involving encampments at Columbia.  FAC ¶¶ 306-394. But Barnard moved decisively in response, taking actions up to restricting campus access and, in appropriate cases, issuing suspensions. Exs. J, K, M, N; Grinage Decl. ¶ 4.  To the extent a Barnard member persists in misconduct notwithstanding the clear threat of disciplinary or even criminal repercussions, such conduct is unacceptable, but it is not fairly traceable to a College that has taken and will continue to take decisive steps to secure the safety of its community.  At minimum, the Court should decline to credit "speculation" from Plaintiffs as to *future* actions Barnard might take.  *Lyons*, 461 U.S. at 108.

*Finally*, Plaintiffs have not plausibly alleged that the relief they seek is "likely" to "redress[]" their injuries.  *Spokeo*, 578 U.S. at 338.  Given the extensive actions that Barnard has already taken, *supra* at 3-5, Plaintiffs cannot plausibly plead that the amorphous injunctive relief they request will do more to reduce the risk of injury.  At the very least, Plaintiffs cannot plausibly allege that the relief is "limited to the inadequacy that produced [their] injur[ies] in fact."  *Gill v. Whitford*, 585 U.S. 48, 66 (2018); *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 50 (2d Cir. 2023) (en banc).  The FAC's requested relief sweeps far beyond the policies or persons who have

13

injured the three Plaintiffs with standing to seek injunctive relief. The FAC instead asks this Court (or a "neutral expert monitor") to oversee the response to any allegations of antisemitism in the entire College, unmoored from the injuries of the actual Plaintiffs. To the extent Plaintiffs have standing to seek prospective relief at all, plainly it does not extend so far. *See id.*; *Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC*, 374 F. Supp. 3d 1124, 1136 (D. Utah 2019) (no standing to pursue "overbroad" relief).

## II.    THE COURT SHOULD DISMISS UNDER RULE 12(B)(1) PLAINTIFFS SAA AND SCLJ FOR LACK OF STANDING.

Associational standing is a narrow exception to the long-established principle that a plaintiff "generally must assert his own legal rights and interests." *Valley Forge Christian College v. Am. United for Separation of Church & State*, 454 U.S. 464, 474 (1982). The purpose of associational standing is to allow lawsuits brought by organizations that represent their members' "collective views," *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977), such as where a university-wide policy inflicts the same injury on a group of students, *see, e.g.*, *Soule*, 90 F.4th at 46; *SFAA v. Harvard Coll.*, 600 U.S. 181, 201 (2023). But associational standing is improper where, as here, the claims and requested relief "require[] the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. And SAA and SCLJ certainly cannot press such claims on behalf of anonymous students only.[3]

### A.    SAA and SCLJ Lack Standing Because Their Claims and Requested Relief Require the Participation of Their Individual Members in this Lawsuit.

SAA and SCLJ cannot establish associational standing because the claims they purport to bring on behalf of their members "would require individualized proof" and "the relief requested

---

[3] At minimum, an associational plaintiff cannot pursue damages on behalf of its members. *Bano*, 361 F.3d at 714 ("We know of no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members.").

would require the participation of individual members in the lawsuit." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) (alterations and citations omitted). Courts regularly decline to recognize associational standing where an entity fails to "explain[] how [its] claims of intentional discrimination could be prosecuted without the participation of the individual members." *Barnett v. Johnson City Sch. Dist.*, 2005 WL 8178066, at *5 n.6 (N.D.N.Y. Feb. 2, 2005); *see also, e.g.*, *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 289-90 (3d Cir. 2014) (no associational standing given "highly individualized" components of plaintiffs' claims); *Lulac Councils 4433 & 4436 v. City of Galveston*, 942 F. Supp. 342, 345 (S.D. Tex. 1996) (similar).

That is the case here. Title VI, for instance, targets discrimination that "[r]estrict[s] an individual" from enjoying educational benefits, *Zeno*, 702 F.3d at 666, and "permits a plaintiff to recover damages when *he or she* is subjected to a hostile environment," *Roe v. St. John's University*, 91 F.4th 643, 661 (2d Cir. 2024) (emphasis added). That analysis requires a particularized inquiry into each student's environment, which is why deliberate-indifference claims are ordinarily brought by a single plaintiff. *See, e.g.*, *id.*; *Davis*, 526 U.S. at 633; *Zeno*, 702 F.3d at 659. In a multi-plaintiff suit, the court must proceed plaintiff by plaintiff, asking whether *each plaintiff* experienced sufficiently severe harassment and whether the school was deliberately indifferent in response. *See, e.g.*, *Demoret v. Zegarelli*, 451 F.3d 140, 145-150 (2d Cir. 2006) (analyzing plaintiffs' claims separately); *L. L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 549 (3d Cir. 2017) (allowing one plaintiff's claim to proceed, while granting summary judgment as to others'). Each member's claim thus depends on highly individualized allegations, requiring inquiries into different discriminatory conduct that implicate different actors. *Infra* at 29-33.

### B.    SAA and SCLJ Lack Standing To Proceed Against Barnard Because the Barnard Students They Represent are Anonymous.

Standing is also improper because neither SAA nor SCLJ has identified by name at least

one member, other than the individual plaintiffs. They must do so no later than summary judgment.

*See Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 115-19 (2d Cir. 2024). While the Second Circuit

has left open whether identification is required at the motion-to-dismiss stage, *id.*, it approvingly

cited a First Circuit decision imposing that requirement, *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir.

2016) (Souter, J.). And that requirement applies with particular force given "the substantive nature

of [SAA's and SCLJ's] claim[s]." *Bano*, 361 F.3d at 715. Barnard must be able to respond to

allegations that it was deliberately indifferent to a particular student's injury, so that the Court can

evaluate whether that response was "clearly unreasonable." *Zeno*, 702 F.3d at 666. But Barnard

cannot do so where it cannot identify that student or must guess her identity. Necessarily, "each

[SAA or SCLJ member] would have to be involved in the proof of his or her claims," and be

identified—not anonymous—so that Barnard can respond. *Bano*, 361 F.3d at 714-15. SAA and

SCLJ therefore lack standing to press the claims of only anonymous Barnard students.[4]

## III. THE COURT SHOULD DISMISS THE FAC UNDER RULE 12(B)(1) AS UNRIPE.

The ripeness doctrine allows courts "to avoid becoming embroiled in adjudications that

may later turn out to be unnecessary" or "entangling themselves in abstract disagreements."

*N.Y.C.L. Union v. Grandeau*, 528 F.3d 122, 131 (2d Cir. 2008); *Cotton v. Noeth*, 96 F.4th 249,

256-57 (2d Cir. 2024). This is one such dispute. Plaintiffs have already amended their complaint

once—before Barnard even responded—which illustrates that their suit is a moving target. And

the FAC, filed just weeks or months after many of the events it cites, necessarily cannot state a

---

[4] SAA and SCLJ cannot rely on their members who are also individual plaintiffs to meet this requirement. An organization cannot "merely repeat[] the claims" of a plaintiff already named in the case to establish associational standing. *See Disabled in Action of Metro. N.Y. v. Trump Int'l Hotel & Tower*, 2003 WL 1751785, at \*10 (S.D.N.Y. Apr. 2, 2003); *see also Access 123, Inc. v. Markey's Lobster Pool, Inc.*, 2001 WL 920051, at \*4 (D.N.H. Aug. 14, 2001) (similar); *Blunt*, 767 F.3d at 290 (no associational standing "to litigate [a] case on behalf of its members, when those members are already parties to the lawsuit in their own right").

claim about Barnard's ongoing response.

Principally, Plaintiffs challenge Barnard's alleged failure to take "disciplinary actions" against certain faculty and students.  *See, e.g.*, FAC ¶¶ 250, 358, 417, 567, 692.  But even were such claims cognizable (and they are not), *infra* at 27-28, it takes time to complete the disciplinary process consistent with Barnard's policies, *see supra* at 5; Exs. G, H.  As Barnard's President announced in a statement on May 2, the College is "still gathering information about the students involved" in the April demonstrations and is "working through the necessary conduct procedures while providing needed support."  Ex. N; Grinage Decl. ¶ 4.  Until those proceedings have run their course, this Court cannot entertain a claim that is "contingent on future events."  *Grandeau*, 528 F.3d at 133.  The same is true of Barnard's "non-disciplinary remedial action[s]," a critical component to its response to antisemitism.  *Zeno*, 702 F.3d at 669; *see also infra* at 27-28.  In response to the April protests, President Rosenbury promised that the College would do "everything possible to ensure that Barnard remains a safe and welcoming place for all of our students," Ex. M.  The College has also committed to taking steps "throughout 2024" to strengthen its campus climate, Ex. O, Grinage Decl. ¶¶ 3, 5, and the Task Force on Antisemitism is actively working to recommend immediate and "[l]onger term" changes to combat antisemitism.  Ex. A.

All told, Barnard has and will continue to do far more than the law requires, *see infra* Parts IV & V, and the very fact that it is engaged in responding to these incidents means this Court should dismiss the FAC for failure to state a claim.  *See infra* Part IV.  But, at minimum, the Court cannot hold that Barnard's response to antisemitism is deficient at the same time that the College is implementing that response.  To do so would not only "embroil[]" the Court in an unnecessary adjudication, it would also impose an exceptional "hardship," *Grandeau*, 528 F.3d at 130-32, not only on Barnard but also the students, faculty, and community members who depend on the

school's "flexibility" to function, *Davis*, 526 U.S. at 648-49.  If the Court does not dismiss the FAC with prejudice for the reasons stated below, it should at the very least dismiss the FAC on ripeness grounds until Barnard's response has had a chance to play out.

## IV.    THE COURT SHOULD DISMISS UNDER RULE 12(B)(6) PLAINTIFFS' TITLE VI CLAIM AGAINST BARNARD BECAUSE THE FAC ITSELF REFLECTS THE COLLEGE'S ROBUST RESPONSE TO ANTISEMITISM.

The Court should dismiss the Title VI claim under Rule 12(b)(6) for failure to state a claim against Barnard.  Indeed, the FAC—even as amended—barely bothers with a "formulaic recitation of the elements" of this cause of action as to Barnard, *Twombly*, 550 U.S. at 555, instead reciting the elements of this Count against "Columbia and its administrators," FAC ¶¶ 627-632.  Plaintiffs cannot cheat that pleading burden by purporting to define "Columbia" as including both Barnard College and Columbia University.  FAC p. 2.  These institutions are entirely separate legal entities, and the FAC must give "each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests," rather than "lump[] all the defendants together in each claim."  *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (quotation omitted).  Plaintiffs' "failure to isolate the key allegations against each defendant" alone "supports dismissal."  *Ochre LLC v. Rockwell Architecture Plan. & Design, P.C.*, 2012 WL 6082387, at *6-7 (S.D.N.Y. Dec. 3, 2012), *aff'd*, 530 F. App'x 19 (2d Cir. 2013); *Nesbeth v. N.Y.C. Mgmt. LLC*, 2019 WL 110953, at *3 (S.D.N.Y. Jan. 4, 2019) ("That separate legal entities might share a corporate affiliation does not alter the requirement of [providing] fair notice to each defendant of the claims against it.").

In any event, the FAC does not—and could not—plausibly allege that Barnard has violated Plaintiffs' Title VI rights.  The College's efforts to combat antisemitism, though ongoing, *see supra* Part III, already exceed what the law requires.  Even limited to the FAC's allegations, Plaintiffs cannot plausibly satisfy Title VI's "high standard," and the documents it incorporates or

fairly implicates only confirm as much. *See Davis*, 526 U.S. at 643.[5]

### A.    Plaintiffs Fail to Plausibly Allege That Barnard Was Deliberately Indifferent to Harassment Directed at Them by Barnard Students or Faculty.

Plaintiffs principally seek to hold Barnard liable for the alleged misconduct of its students and faculty.  Title VI, however, prohibits only "intentional" discrimination, and courts will therefore only hold a school accountable for the "actions of a third party"—*i.e.*, "teacher or peer harassment of a student"—in "narrow" circumstances.  *Zeno*, 702 F.3d at 664-65 (quotation omitted) (applying *Davis* to Title VI).  In particular, Title VI liability lies only in those rare cases in which a school's "own deliberate indifference effectively caused the discrimination." *Davis*, 526 U.S. at 642-43 (quotation and alteration omitted).  To meet that standard, a plaintiff must plausibly plead that she experienced "severe, pervasive, and objectively offensive" harassment, over which the school had "substantial control" and "actual knowledge," and to which it responded with "deliberate indifference, i.e., in a manner that was "clearly unreasonable." *Id.* at 645, 650.

No Plaintiff satisfies that "high standard." *Id.* at 643.  The majority of the FAC relates to incidents over which Barnard did not have "substantial control," as the events involved actions taken by individuals who are not affiliated with Barnard and/or that occurred off Barnard's campus. *See Zeno*, 702 F.3d at 665.  And the FAC fails to plausibly plead that Barnard responded with deliberate indifference to any of the remaining allegations.

### 1.    Barnard Lacks Substantial Control Over Most Alleged Events.

Under Title VI, Barnard can be liable only when it "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* (quotation omitted).

---

[5] For purposes of responding to the FAC, Barnard focuses on the allegations that it can ascertain implicate Barnard's campus, students, and/or administrators.  To the extent the Court determines that any additional allegations are relevant, *but see supra* at 18, Barnard incorporates the arguments made in support of Columbia's Motion to Dismiss.

Barnard is a small affiliate of Columbia University, which means it has "substantial control" (*id.*) only over the policies and procedures of its own campus. It has no ability to control Columbia policies, nor Columbia's physical space, *cf.* FAC ¶¶ 92-97 (distinguishing Barnard's policies from Columbia's). When it comes to disciplinary measures, Barnard may institute disciplinary proceedings against a Barnard student or faculty member who (i) violates Barnard's policies while on its campus; or (ii) violates Columbia University rules on the Columbia campus. Ex. H; FAC ¶¶ 92-97 (incorporating Barnard policies by reference). Barnard, however, has no authority to impose disciplinary sanctions on Columbia students—even for infractions committed on Barnard's campus. Ex. H (Columbia student "alleged to be in violation of Barnard rules … will be subject to the disciplinary procedures of the accused student's own school"). The same is true for a "Columbia University employee (including faculty and staff)." Ex. G.

Plaintiffs fail to plausibly plead that Barnard exercised substantial control over most of the misconduct they allege. The vast majority of the FAC focuses on Columbia Plaintiffs citing events about Columbia students (or unnamed individuals) on Columbia's campus. *E.g.,* FAC ¶¶ 98-130, 131-61, 163-68, 170, 172-73, 175-83, 185-96, 198-203, 205-11, 213-14, 217-42, 253, 261-80, 282-84, 288-305. Indeed, many of the allegations that involve the Barnard Plaintiffs still implicate conduct on Columbia's campus (or an unspecified location) and fail to allege whether the individuals involved were Barnard students.[6] Because Barnard has no authority to discipline

---

[6] *See, e.g.*, FAC ¶ 129 (students at the "*Columbia Spectator*"); *id.* ¶ 147 ("students at Columbia gathered on campus"); *id.* ¶ 162 ("group of individuals" on "Columbia University's campus"); *id.* ¶ 171 ("Columbia students swarmed the lawns at the center of campus"); *id.*, ¶ 184 (email from Columbia student); *id.* ¶ 197 (unidentified students screamed at a rabbi at an unidentified location); *id.* ¶ 204 ("agitators" at a "rally at Columbia"); *id.* ¶ 212 ("agitators" disrupting panel at "Low Library"); *id.* ¶ 257 ("[Columbia University Apartheid Divest] (CUAD)" rally at "Low Library"); *id.* ¶ 259 (chants from "students" during a "walkout" at Columbia); *id.* ¶ 283 (banner at "Lerner Hall"); *id.* ¶ 320 (assault at "Lerner Hall" reported to "Columbia University"); *id.* ¶ 484 ("Columbia students caused a campus-wide disruption").

members of the Columbia community, *see supra* at 20, failure to plead basic details about who was involved or where those incidents occurred dooms Plaintiffs' claims against Barnard, as such allegations cannot plausibly show that Barnard had "substantial control" or "actual knowledge" of the alleged harassment, *Zeno*, 702 F.3d at 665.[7]

Of course, none of this is to say that Barnard stands idly by when its students report harassment—including where that alleged harassment on Columbia's campus. Even where Barnard cannot identify or hold perpetrators accountable, it has condemned and disavowed antisemitism. *See infra* at 22, 27. Barnard has also worked closely with Columbia leadership to respond to instances of antisemitism, relaying information "to the appropriate authorities" at Columbia as appropriate, FAC ¶ 401, partnering on broader initiatives, such as the Task Force on Antisemitism and the Doxing Resource Group, FAC ¶¶ 414-16, as well as relying on campus safety and other public safety officials as necessary to protect students on campus, *see infra* at 24. That is what Title VI requires—that Barnard take "the steps it [can] to respond to Plaintiff's reports" of misconduct. *Doe v. Sacks*, 2024 WL 402945, at *6 (S.D.N.Y. Feb. 2, 2024)*.

### 2. No Plaintiff Plausibly Pleads That Barnard Responded Unreasonably to Any Alleged Harassment in Light of Known Circumstances.

Even where Barnard exercised control over alleged harassment, it can be held liable under Title VI only if it "fail[ed] to respond," responded only "after a lengthy and unjustified delay," or responded with "deliberate indifference." *Zeno*, 702 F.3d at 666 (quotations omitted). "This is

---

[7] Plaintiffs' allegations related to Sidechat suffer similar flaws. *See* FAC ¶¶ 398-401. Sidechat is a privately owned social media platform that allows students with a valid university email address (including a Barnard College address) to post anonymously on school-specific fora. *See* FAC ¶ 401. Plaintiffs allege that "Columbia students" posted antisemitic messages on the account, *id.* ¶ 400, but Title VI liability will not lie where, as here, a plaintiff cites alarming social media posts "but [] does not allege any concrete facts suggesting that those messages were posted by members of the [Barnard] community," *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 367-368 (S.D.N.Y. 2017).

not a mere 'reasonableness' standard." *Davis*, 526 U.S. at 649; *Roskin-Frazee v. Columbia Univ.* 2018 WL 6523721, at \*9 (S.D.N.Y. Nov. 26, 2018).   Rather, Barnard's response—or lack thereof—must be "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.   Conclusory allegations aside, Plaintiffs fail to allege a single instance where Barnard's response was deliberately indifferent—that is, "clearly unreasonable." *Id.*

      *a.*    *Barnard's Campuswide Response to Antisemitism Refutes Any Inference of Deliberate Indifference.*

The FAC focuses on Barnard's campus climate, but it does not deny—even as it downplays—Barnard's extensive institutional efforts to combat antisemitism.   Barnard's leadership immediately offered support to its students following the "horrific" October 7 attack, Ex. C & D,[8] and it has continued to reaffirm that the College "will not tolerate" antisemitic incidents, *see* Ex. A; *see also* FAC ¶ 415 (incorporating email by reference).   Senior leaders have met repeatedly with Jewish groups and students, including the Plaintiffs here, *id.* ¶¶ 212, 215, 401, 569.   More than words, Barnard partnered with Columbia to launch a task force entirely dedicated to protecting "Jewish students targeted by antisemitism."   FAC ¶¶ 414-15.

Barnard has also responded to antisemitic rhetoric on its campus.   Like many schools, Barnard has grappled this academic year with a range of impassioned and critical student speech, including speech critical of Israel's policy or the war in Gaza.   On the one hand, Barnard's policies guarantee the "right to freedom of expression," regardless of its own position on the speech.   Ex. H.   Federal law does not—and could not—require the University to punish "unwelcome speech"

---

[8] The Court may properly consider these statements, as they are available from Barnard's "own website," *Doron*, 423 F. Supp. 2d at 178 & n.8, and Barnard relies on them only to "demonstrate[e] the existence of information," *i.e.*, that it has issued multiple statements condemning antisemitism or disavowing hateful rhetoric, *In re Merrill Lynch Auction Rate Secs. Litig.*, 851 F. Supp. 2d 512, 526 n.4 (S.D.N.Y. 2012).

in violation of those policies. *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 210 (3d Cir. 2001).[9]  On the other, Barnard agrees that anti-Zionism can cross the line to antisemitism, and Barnard has thus sought to curtail disparaging "fliers" or posters, FAC ¶¶ 486, 542, "chants" *id.* ¶ 215, and other disruptive "protesting" and rallies, *id.* ¶¶ 556-57, 562-63, regardless of whether such displays reflect antisemitic sentiment or are simply harmful to the community.  That includes responding with initiatives to, for instance, "promote respectful dialogue across [] differences, and affirm [Barnard's] commitment to being an inclusive community."  FAC ¶ 254.  Barnard also strengthened its "content-neutral time, place, and manner restrictions for campus demonstration," FAC ¶ 97, as well as implemented policies asking everyone to remove "items affixed to your [dorm] room and/or suite doors," FAC ¶ 569.  While the FAC suggests that these measures were not always *effective*, *see* FAC ¶¶ 254, 569, it offers no plausible basis to characterize Barnard's comprehensive responses as deliberately *indifferent* to antisemitism.  *Doe*, 2024 WL 402945, at *6;  *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011); *Mandel v. Board of Trs. of Cal. State University*, 2018 WL 1242067, at *19 (N.D. Cal. Mar. 9, 2018).

That becomes all the more clear when the Court zeroes in on the allegations at the heart of the FAC.  For many Barnard Plaintiffs, the most pronounced and distressing instances on campus occurred from witnessing (1) an unauthorized December 11 rally on Barnard's campus, FAC ¶¶ 246-252; and (2) encampments that arose on Columbia's campus at the end of April, *id.* ¶¶ 307-370.  Barnard does not question the sincere distress that these Plaintiffs experienced from each event, but the FAC cannot plausibly plead that Barnard responded with deliberate indifference:

---

[9] Consistent with the First Amendment, Title VI could not require public schools to punish political speech, *see Papish v. Board of Curators*, 410 U.S. 667, 667-71 (1973), and the same construction must apply to private schools, too, *Clark v. Martinez*, 543 U.S. 371, 378 (2005).  Indeed, it would raise similar constitutional questions if a federal law "exercised coercive power" by forcing private schools to punish student speech or face liability.  *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

***December 11* rally.**  Several Barnard students allege that they witnessed a December 11 rally at Barnard, which was organized by SJP and Jewish Voice for Peace (JVP) "to demand that President Rosenbury publicly call for a permanent ceasefire between Israel and Hamas."  FAC ¶¶ 244-252.  As the FAC reflects, this rally was not authorized, and Columbia had suspended both groups.  FAC ¶¶ 199, 244.  Thus, when Barnard learned about this event, it took proactive steps to warn students and reaffirm that it was unequivocally "not permitted," *id.* ¶ 244, as well as to encourage students "to take alternative routes" and "contact CARES as needed for support," Ex. P (December 16, 2024 email);[10] *see also* FAC ¶ 250 (incorporating this email by reference).  To ensure student safety, Barnard also: (1) "collaborated closely with [its] colleagues at Columbia [] and local agencies, including NYPD"; (2) "limited access to Barnard's campus to CUID cardholders"; (3) "increased the presence of Barnard's Community Safety team, who monitored the situation, ensured … passage across campus[] or access to campus buildings, and were prepared to respond as needed;" and (4) posted "staff members, including our Campus Life & Student Experience and Wellness teams, on site to escort them around campus if they felt unsafe and provide alternative places on campus to study."  Ex. P.  In addition, Barnard responded with the campus-wide initiatives and policy changes described above.  *See supra* at 22-23.

In light of that concerted effort, Plaintiffs cannot plausibly allege (FAC ¶¶ 246-249) that Barnard was deliberately indifferent by failing to immediately, physically restrain all protestors involved in the rally.  *See Felber*, 851 F. Supp. at 1188.  While Barnard will not tolerate discrimination, it also does not ask its "Public Safety" officers to "intervene" in every policy violation.  FAC ¶ 250.  Nor can Plaintiffs fault Barnard because some students remained "on campus" after the rally.  FAC ¶ 252.  Plaintiffs do not make specific allegations as to what, if any,

---

[10] Barnard has redacted the students' identities consistent with the Court's order, ECF No. 48.

discipline Barnard imposed, nor do they have any right to "particular disciplinary action," *Davis*, 526 U.S. at 648.  And under Barnard's policies, "[n]ot all policy violations are viewed equally." Ex. H.  When Barnard imposes disciplinary measures, it considers the "seriousness of the offense," *id.*, and must distinguish between discriminatory acts and other violations of its student conduct code.  *Compare id.*, *with* Ex. G.  Under its policies, the sanction for a student who violated time, place, and manner rules to call for a "ceasefire between Israel and Hamas," FAC ¶ 244, may understandably differ from that imposed on a person who "[c]alls for genocide against the Jewish community," FAC ¶ 253.  With no specifics, the FAC cannot plausibly plead that Barnard acted "clearly unreasonably" in its case-by-case approach to discipline after this rally.  *Davis*, 526 U.S. at 648; *Carabello v. N.Y.C. Dep't of Educ.*, 928 F. Supp. 2d 627, 642 (E.D.N.Y. 2013).

    The same is true of Plaintiffs' allegations that unnamed "faculty" participated in the December 11 rally or other campus protests.  FAC ¶ 248.  By policy, all Barnard instructors "are entitled to freedom in the classroom in discussing their subjects [and] freedom of expression and associations in their private or civic capacities."  Ex. Q.[11]  Barnard therefore has no basis to discipline faculty simply for their presence at a rally on campus demanding a ceasefire.  That freedom, of course, does not excuse faculty who engage in discriminatory harassment in violation of Barnard's policies, *supra* at 3, and Barnard would not tolerate "genocidal" calls by anyone, FAC ¶ 249.  But the FAC's cursory allegations do not identify any Barnard professor alleged to have engaged in such speech, nor that any Barnard administrator had "actual knowledge" of any such violation.  *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 289 (1998) (school must have "actual knowledge of the teacher's conduct" and "opportunity to take action").

---

[11] The FAC incorporates other Barnard conduct policies, FAC ¶¶ 92-97, so the Court may consider this policy as "integral" to the FAC.  *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 352 n.3.

*April Demonstrations.* Many Plaintiffs also raise allegations related to the April demonstrations at Columbia, FAC ¶¶ 310-13 (Aryeh, Glaser, Rabban, Zuckerman), 330 (Nelson), 339, 345-49 (Bellows), 359 (SAA Member #4), but these allegations suffer similar—and additional—flaws. For one thing, because the encampment was on Columbia's campus, Plaintiffs cannot plead that Barnard had any "substantial control" over the decisions whether and when to call for law enforcement to remove it. *Zeno*, 702 F.3d at 665. Likewise, Barnard has no control over the Columbia students or faculty who participated, nor the "outsiders" who were unaffiliated with either school. *See, e.g.*, FAC ¶¶ 324, 326, 356. For many allegations, Plaintiffs fail to plead that Barnard students were involved. Indeed, Plaintiffs do not specifically allege that *any* Barnard student or faculty member was responsible for the allegedly antisemitic rhetoric they cite.[12]

Barnard, meanwhile, took "the steps it could to respond" to what was within its control, *Doe*, 2024 WL 402945, at *6, attempting to deescalate tensions, while also protecting community safety. The FAC reflects some—but not all—of those measures, including that Barnard moved to accommodate students with virtual classes while the encampment continued. FAC ¶ 358. In a campus-wide message, President Rosenbury reaffirmed the College's "commitment to open inquiry and expression while also stressing that free expression for some should not mean that others feel unwelcome, unsafe, or threatened in the place we all share." Ex. M; *see also* FAC ¶ 358 (incorporating email by reference). Thus, while "many of [its] student protestors [were]

---

[12] *See, e.g.*, FAC ¶ 310 (unspecified "students" chanting); *id.* ¶ 312 (unspecified "occupiers [] held up keffiyehs and quilts to push Zuckerman and her friend away from the encampment" and followed Zuckerman); *id.* ¶ 313 (unspecified student yelled "fuck you" at Glaser); *id.* ¶ 330 ("agitators" screaming "Intifada revolution"); *id.* ¶ 339 (unspecified "student on campus wore a 'Hamas emblem' and tried to instigate a fight"); *id.* ("a group of individuals" and "agitators" screamed "threatening" and vile messages at Bellow); *id.* ¶ 345 ("an individual from the encampment" held a sign that read "Al-Qasam's [sic] next target" and unspecified "other students" chanted phrases like "go back to Europe" at Plaintiffs); *id.* ¶¶ 562-563 (chants and posters from unspecified sources during encampment).

using their voices in a peaceful manner," President Rosenbury denounced rhetoric and protests "on and surrounding the Columbia campus [that] have become intimidating." Ex. M.

The FAC never suggests what more Barnard could or should have done in response to any of these protests other than take additional disciplinary action. *Cf.* FAC ¶ 358. But the College, as explained, issued interim suspensions to students who were part of the April 17 encampment, prohibiting them from being "physically" present on campus. *Id.* Barnard also offered a path forward for the "vast majority" of its participating students who had "not previously engaged in misconduct under Barnard's rules," allowing students to return to campus "if they agree[d] to follow all Barnard rules during a probationary period." Ex. M. Barnard specified that students who had "previously received notices regarding misconduct" would remain on interim suspension while Barnard completed its disciplinary process. *Id.* That approach adhered to Barnard's longstanding policies, which promise that the College will take into account past disciplinary offenses when imposing sanctions for policy violations. *See supra* at 5.

In any event, Plaintiffs cannot insist that Barnard "engage in particular disciplinary action." *Zeno*, 702 F.3d at 671 n.15; *Doe v. Trs. of Columbia Univ.*, 2024 WL 2013717, at *2 (2d Cir. May 7, 2024). Nor will discipline solve every problem. *Id.* at 669. *Zeno* is a case in point. There, the Second Circuit faulted a school for using the "same methods"—*i.e.*, disciplinary measures—to remedy discrimination targeted at a student for years, even as the school "knew" that disciplining the harassers "did not deter others from engaging [] in serious and offensive racial conduct." *Id.* at 667-69. The Second Circuit encouraged schools to also "implement[] non-disciplinary" remedies, *id.*, and that is exactly the playbook Barnard followed. The College moved swiftly to issue interim suspensions to students involved in the first encampment, but that only prompted more students and faculty to flood Columbia's grounds in response. When the encampment was

27

rebuilt, Barnard acted reasonably in trying to calm tensions and reach a durable solution with the students rather than jumping to discipline and force—particularly where there are no specific allegations that any Barnard student was responsible for antisemitic rhetoric. While Plaintiffs might have made different decisions, Title VI is meant to afford schools "sufficient[] flexib[ility]" in these fast-moving situations and to avoid entangling courts in disputes that "second-guess[]" the decisions of school administrators. *Davis*, 526 U.S. at 648.

<blockquote>

b.      *Barnard Responded Reasonably To The Additional Incidents That Allegedly Impacted Individual Plaintiffs.*
</blockquote>

The FAC also alleges that discrete incidents affected some of the individual Plaintiffs. The FAC does not suggest that these incidents, standing alone, would rise to a hostile environment for purposes of Title VI. After all, "not all harassment is actionable" under Title VI. *Zeno*, 702 F.3d at 665. As a threshold matter, the harassment must be so "severe, pervasive, and objectively offensive" as to effectively deprive a student of an educational benefit. *Davis*, 526 U.S. at 650-51. The Second Circuit has therefore reaffirmed that "generally incidents of harassment must be more than episodic to justify a hostile environment claim." *Roe*, 91 F.3d at 662 (quotations, alterations omitted).[13] Thus, if this Court agrees that Barnard was not deliberately indifferent to the campus-wide events that Plaintiffs allege created a "hostile environment," the Court need not assess the sufficiency of Barnard's response to the other discrete incidents that they allege, none of which themselves amount to actionable harassment under Title VI.[14]

---

[13] *See also Nungesser*, 244 F. Supp. 3d at 351 (no hostile environment for plaintiff who alleged that he was the target of persistent and false allegations of sexual assault which "received widespread media attention"); *Carabello*, 928 F. Supp. 2d at 643 ("[S]ingle incident of sexual abuse that [plaintiff] suffered, although unfortunate, was not so severe . . . that it deprived her of access to educational opportunities.").

[14] Similarly, the associational plaintiffs do not allege that any Barnard member suffered a hostile environment separate from the general campus climate above. *See supra* at 22-28. And regardless, Barnard cannot fully respond to allegations from anonymous students. *See* Part I.A.

In any event, the Plaintiffs have failed to plead that Barnard was deliberately indifferent to any of these incidents either. Proceeding plaintiff by plaintiff:

**Aryeh**. Aryeh primarily cites her experiences on Columbia's campus, including during the April demonstration. *See, e.g.*, FAC ¶¶ 162, 169, 171, 174, 212, 283. As the FAC reflects, Barnard administrators—including Dean of Students Leslie Grinage—engaged personally and repeatedly with Aryeh to understand and address her concerns. *See, e.g.*, FAC ¶¶ 212, 401, 483. That includes efforts to help her find new housing after she raised concerns about a former roommate who allegedly "posted vile antisemitic statements on social media." FAC ¶ 483.

**Bellows**. Bellows' allegations primarily relate to her distress over the campus climate, including the Columbia encampment. *Supra* at 26-28. Bellows does not allege that she reported her personal experiences to Barnard (or sought help beyond Columbia's "Public Safety" (FAC ¶ 349)), such that the College could provide her with more individualized counseling or resources.

**Glazer**. Like Bellows, Glazer's allegations primarily relate to her distress at the encampment, FAC ¶ 313, as well as other incidents outside Barnard's control, *id.* ¶¶ 129, 147, 398. The FAC does not allege that Glazer reported any of these concerns to Barnard, so Barnard had no opportunity to provide her individualized support or resources. The same is true of Glazer's allegation that classmates "laugh[ed] and whisper[ed]" in response to a professor's comments that the Hamas attack was "abhorrent." FAC ¶ 500. Glazer does not allege she reported this incident to Barnard administrators, nor that this incident violated any Barnard policy. Likewise, Glazer alleges she saw a "class description" that referred to Israel as "the occupied territories," *id.* ¶ 502, but she does not provide any specifics about the class or allege any report to Barnard.

**Nelson**. Nelson, too, primarily raises concerns about the encampment, FAC ¶¶ 330, 542-43, and campus climate, *id.* ¶ 542. *See supra* at 22-28. Nelson also raises the distress she felt

when a Barnard professor spoke at the Phi Beta Kappa induction in May 14 and delivered a speech "focused on Gaza, with no mention of October 7, Hamas's violence, or the hostages." *Id.* ¶ 543. As explained above, Barnard is committed to free expression and academic freedom, *see supra* at 25, and President Rosenbury therefore defended the professor's "right to express his own views and 'especially his right to criticize [the] Barnard'" administration, FAC ¶ 543. At the same time, Rosenbury countered his speech with her own in an email after the event, apologizing to students for the divisive topic, and making clear that the professor "spoke for himself and not on behalf of the College." Ex. R; FAC ¶ 543 (incorporating email).

**Rabban**. In addition to concerns about the campus climate and encampment, FAC ¶¶ 246, 313, 358, 556, 557, as well as a "walkout" at Columbia, *id.* ¶ 259, Rabban alleges that she personally experienced two incidents that added to a hostile environment at Barnard: *First*, Rabban raises concerns about her "sorority sisters in Sigma Delta Tau." *Id.* ¶ 555. But she does not allege that she reported any such concerns to Barnard; allege that Barnard was aware of any allegations related to the sorority; or allege what, if anything, Barnard might have done in response. *Second*, Rabban reports that she wanted to, but did not, enroll in a class called Intersectional Feminisms "after the professor spoke of genocide in Palestine." *Id.* ¶ 557. By policy, Barnard professors are "entitled to freedom in the classroom in discussing their subjects" or when speaking in their "private and civic capacities." Ex. Q. The FAC does not allege sufficient facts for Barnard to ascertain whether any of its policies were violated, nor does it allege that Rabban (or her "friend" in the class) reported the incident to Barnard. FAC ¶ 557.[15]

---

[15] Rabban alleges that in the weeks after October 7, she "reached out" to Barnard's counseling center but did not receive immediate support because therapists were "backed up." *Id.* ¶ 555. The FAC does not allege any pertinent facts, including how long any delay was, such that the Court could evaluate whether Barnard denied her an educational benefit or acted clearly unreasonably.

*Roe*.  Roe cites several incidents that she says added to a hostile environment at Barnard. First, she alleges that an unnamed "student" intentionally "rammed into the side of her body" after noticing her Chai necklace, and then called her a "poor Zionist fucking baby."  FAC ¶ 320.  Roe does not allege that the student involved was from Barnard, and while Roe "reported the incident to Columbia University," *id.*, she does not allege anything about Barnard's response, such that the Court could assess whether it was deliberately indifferent.  Separately, Roe claims that she was "asked by faculty multiple times to compromise her religious practice" during the Spring 2024 semester, including being asked to attend class on a Saturday or "face severe academic consequences."  *Id.* ¶¶ 559-60.  These are serious allegations, but Roe does not allege that these incidents involved Barnard (rather than Columbia) faculty or classes.  Moreover, while Barnard's policies provide that the "College will provide reasonable accommodations of religious practices and beliefs, unless doing so places an undue hardship on the College," they also dictate that the student should "take the matter to the Office of the Provost" to appeal if a course instructor and department chair do not provide a requested accommodation.  Ex. G.  Roe does not allege that she followed Barnard's process or reported the allegations to *any* Barnard administrator, such that the College had "actual knowledge" of the alleged violation or an opportunity to address it.  *Zeno*, 702 F.3d at 665; *Roskin-Frazee v. Columbia Univ.*, 474 F. Supp. 3d 618, 624 (2019).

*Rukeyser*.  Rukeyser alleges that several incidents contributed to a hostile environment at Barnard.  *First,* she alleges that a psychology professor suggested that "Judaism is a religion, not really a culture."  FAC ¶ 561.  Rukeyser, however, does not allege that she reported this exchange to Barnard or that Barnard otherwise had any actual knowledge of it.[16]  *Second,* Rukeyser alleges

---

[16] She also alleges that the professor signed an open letter with other faculty "in Defense of Robust Debate About the History of the War in Israel/Gaza," but does not allege that Title VI would prohibit professors from advocating for "[r]obust [d]ebate" on this topic.  *See id.*

that she shared a suite with roommates who were previously her "friends," but that their relationship deteriorated in the wake of October 7 as her roommates posted "anti-Zionist" remarks. *Id.* ¶¶ 565-66. Rukeyser alleges that tension peaked on May 2, when her the roommate allegedly "became aggressive," screamed that Rukeyser "was a 'genocide supporter,' and then lunged at her." *Id.* ¶ 566. This alleged incident is disturbing, but as the FAC reflects, the College responded immediately after Rukeyser reported it. *Id.* ¶¶ 566-67. Barnard promptly offered to move her to another suite, and she was also offered counseling services. *Id.* While Barnard was not able to complete an investigation before all students graduated on May 17—and thus were no longer subject to Barnard's jurisdiction for disciplinary procedures—the FAC reflects that Barnard communicated that decision and rationale to Rukeyser. *Id.* ¶ 567.

*Ruttenberg.* Ruttenberg cites several incidents that she alleges added to a hostile environment on campus. *First*, she alleges that she experienced problems with her roommate, including because her roommate posted on her wall signs calling for a "ceasefire now," or containing phrases like "end [I]sraeli apartheid." FAC ¶ 570. Barnard's policies, as explained, do not prohibit speech simply because it is critical of Israeli policy. *Supra* at 21-22; Ex. H. But as the FAC reflects, Barnard provided Ruttenberg with a "new room." FAC ¶ 570. *Second*, Ruttenberg alleges that she "did not feel comfortable meeting with a Barnard affiliated therapist" because of an Instagram post from the Barnard Health Center, which offered support, as well as health and wellness items, to students impacted by a "stink bomb" that was set off at a CUAD rally. *Id.* ¶¶ 266, 572. The FAC alleges that Barnard had not offered similar support to students following the October 7 attack, *id.*, ¶ 572, but the FAC and public records refute that claim, *see supra* at 22. Indeed, more than an "Instagram Post," Dean Grinage sent a message to all students on October 7, "encourag[ing]" them to reach out to offices like the Furman Counseling Center.

Ex. C.  In addition, Ruttenberg does not allege that she reported her concerns to Barnard, such that it had actual knowledge of or an opportunity to directly address them.

**Zuckerman**.  Zuckerman's allegations relate to events she witnessed during the December 11 rally and the "weeks-long encampment" discussed above.  *See* FAC ¶¶ 312, 587.  Zuckerman alleges she felt particular anxiety because one of her professors canceled a class during the encampment, expressing concerns about student welfare due to the "police presence" on campus and Barnard's disciplinary proceedings.  FAC ¶ 311.  Zuckerman does not allege that the professor violated any Barnard policy, nor that she reported her concerns to Barnard.  Thus, while Barnard is deeply saddened by Zuckerman's sincere distress on campus, it had no opportunity prior to the FAC to offer her individualized support or otherwise remediate her injuries beyond the campus-wide initiatives discussed above.  *See supra* at 22-28.

### B.    Plaintiffs Fail to Plausibly Allege Direct Discrimination

Finally, Plaintiffs do not expressly plead that Barnard "intentionally discriminat[ed]" against them, *cf.* FAC ¶ 629, and for good reason.  To proceed under such a theory, a plaintiff must plausibly allege that he or she was "treated differently from similarly situated students who are not members of the protected class."  *Koumantaros v. City Univ. of New York,* 2007 WL 840115, at *8 (S.D.N.Y. Mar. 19, 2007).  Yet no Plaintiff has alleged that the school took any "adverse action" against her, such as dismissal or a suspension—a fatal defect in itself.  *See id.*

Nor have Plaintiffs plausibly pled that Barnard adopted a double standard in its response to antisemitism.  Barnard regularly condemned antisemitism on its campus, *supra* at 22, consistent with the statement Plaintiffs cite for another hate-based incident, FAC ¶ 409.  Likewise, Barnard has treated like cases alike when issuing discipline.  Plaintiffs allege that Barnard fired a professor in 2005 for his "unconventional perspective on history that emphasized the role of debauchery," *id.* ¶ 417, but they do not explain the relevance of that decades-old incident or allege that any

particular Barnard professor warrants similar discipline.  So, too, for allegations that, in 2018, Barnard banned a Columbia student from its campus for "harassing Black students" and evicted a student for her apparent role in starting a fire.  *Id.* ¶ 434.  Plaintiffs do not identify any Barnard student who committed similar violations and received no discipline, let alone plead any of the facts necessary to show that any such individual was "similarly situated in all material respects" to the examples they cite.  *Johnson v. NYU*, 2018 WL 3966703, at *7 (S.D.N.Y. Aug. 20, 2018); *Minto v. Molloy College*, 2019 WL 4696287, at *9 (E.D.N.Y. Sept. 26, 2019).

* * *

In all, the FAC reflects Barnard's meaningful response to antisemitism and, when stripped of its conclusory allegations, fails to allege anything approaching a Title VI violation.  The Court should dismiss the Title VI claim against Barnard under Rule 12(b)(6).

## V.    THE COURT SHOULD DISMISS PLAINTIFFS' REMAINING CLAIMS UNDER RULE 12(B)(6).

### A.    Plaintiffs Fail to State a Claim Under NYHRL § 296 and NYCRL § 40-c.

Plaintiffs' claims under NYHRL § 296 and NYCRL § 40-c fail for similar reasons as their Title VI claims.  New York courts regularly dismiss these state discrimination claims where—as here—the plaintiff falls far short of plausibly alleging a violation of federal discrimination law. *See, e.g.*, *Padmanabhan v. N.Y. Inst. of Tech. Campus, N.Y.*, 2019 WL 4572194, at *5 (S.D.N.Y. Sept. 20, 2019); *Novio v. N.Y. Academy of Art*, 286 F. Supp. 3d 566, 580-81 (S.D.N.Y. 2017); *see also Cooper v. Franklin Templeton Invs.,* 2023 WL 3882977, at *3 (2d Cir. June 8, 2023) (noting claims traditionally treated as "coextensive" and, in any event, dismissing state law claims even if standard construed more "liberally" than Title VI).  This Court should do the same.

### B.    Plaintiffs Fail to State a Claim Under NYCHRL §§ 8-107(4), (17).

Plaintiffs' claims under NYCHRL fail for much the same reason.  Section 8-107(4)

prohibits public accommodations from "treat[ing]" any person "less well" than others "because of a protected characteristic." *Novio*, 286 F. Supp. 3d at 583-584. Though Section 8-107(4), unlike Title VI, prohibits differential treatment even if not severe or pervasive, *Rothbein v. City of New York*, 2019 WL 977878, *9 (S.D.N.Y. Feb. 28, 2019), it still requires either direct discrimination, *Novio*, 286 F. Supp. 3d at 584, or "deliberate indifference," *Bernheim v. N.Y. City of Dep't of Education*, 2020 WL 3865119, at *5 (S.D.N.Y. July 9, 2020). As explained, Barnard's robust response to all harassment—regardless of whether it was severe or pervasive—far exceeds the federal floor, *see supra* Part IV, which dooms Plaintiffs' Section 8-107(4) claim, too.

To state a claim under Section 8-107(17), Plaintiffs must plausibly allege that "a policy or practice of a covered entity . . . results in a disparate impact to the detriment" of a "protected group." *Id.* Count IV, however, does not mention Barnard at all, *see* FAC ¶¶ 674-685, let alone identify a specific facially-neutral policy or practice that has allegedly injured Jewish or Israeli students or explain how that unknown policy caused a disparate impact, *see Murillo-Roman v. Pension Bds. – United Church of Christ*, 2024 WL 246018, at *11 n.5 (S.D.N.Y. Jan. 23, 2024); *United Prob. Officers Ass'n v. City of New York*, 2022 WL 875864, at *10 (S.D.N.Y. Mar. 24, 2022). Plaintiffs' Section 8-107(17) claim must be dismissed as a result.

### C.    Plaintiffs Fail to State a Breach of Contract Claim.

Plaintiffs have also failed to state a cognizable claim for breach of contract against the College, as they fail to identify any "specifically designated and discrete promises" that could form the basis of such a claim. *See Ward v. NYU*, 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000).

Largely, Plaintiffs rely on "broad and unspecified procedures and guidelines." *Id.* They cite, for instance, Barnard's nondiscrimination policy, which explains that "[t]he College takes prompt and appropriate action to address misconduct" and "will engage in a variety of means to address and mitigate the effects" of online harassment reported to the College, FAC ¶ 692, and the

35

College's student conduct policy, which prohibits conduct including the "[u]se or threat of force or violence against any person" and "discrimination, harassment and retaliation," *id.*  But these "general promises about ethical standards" cannot form the basis of a breach-of-contract claim against a university.  *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998); *see also, e.g.*, *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 370-71 (S.D.N.Y. 2016).

Similarly, Plaintiffs point to various provisions of the College's Policy for Safe Campus Demonstrations, including those that explain when and where students may hold demonstrations on Barnard's campus.  FAC ¶ 692.  Those parameters, however, set forth expectations for student conduct; they do not amount to a "specifically designated and discrete promise[]" to Plaintiffs. *See Ward*, 2000 WL 1448641, at *4.  Indeed, the policy does not mandate "any specific outcome" for misconduct.  *See Nungesser*, 169 F. Supp. 3d at 371.  On the contrary, Barnard's policies afford it discretion in determining how to approach discipline, *see Ward*, 2000 WL 1448641, at *5, and Barnard has fully abided by its policies, particularly as the FAC does not allege any demonstrations on Barnard's campus since the Demonstrations policy was put in place, *supra* at 4.

Likewise, Plaintiffs' claim for breach of the implied covenant of good faith "is duplicative of [their] breach of contract claim."  *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 482 (S.D.N.Y. 2015).  This claim is based upon the same facts as their breach-of-contract claim— namely, allegations that "Barnard selectively applies or enforces its [guidance], policies, and procedures in a bad faith and discriminatory way."  FAC ¶ 694.  Because "New York law 'does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing'" that is "based upon the same facts" as a plaintiff's breach-of-contract claim, this claim must be dismissed, too.  *See Nungesser*, 169 F. Supp. 3d at 372-73 (quotation omitted).

### D.  Plaintiffs Fail to State a Claim Under General Business Law §§ 349, 350.

The Court should also dismiss Plaintiffs' attempt to transform a discrimination claim into

consumer fraud.  To assert a claim under GBL § 349 or § 350, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Nungesser*, 169 F. Supp. 3d at 373.  The definition of deceptive is "objective," limited to those acts and practices that are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995); *see also Nungesser*, 169 F. Supp. 3d at 373 ("Practices courts have found to be deceptive include 'false advertising, pyramid schemes, deceptive preticketing' and the like).

Plaintiffs' allegations do not and cannot satisfy that standard.  Count VI does not include any allegations specific to Barnard, which alone requires dismissal of Plaintiffs' claim.  *See Atuahene*, 10 F. App'x at 34.  Nor could it, as Plaintiffs cannot plausibly allege that Barnard engaged in consumer-oriented conduct likely to mislead a reasonable consumer.  FAC ¶¶ 696-710; *see also Oswego*, 647 N.E.2d at 745.  For one thing, the FAC focuses on Plaintiffs' individual experiences, but consumer-oriented conduct must "have an impact on consumers generally" and does not include disputes that are "unique to the parties," *Harary v. Allstate Ins. Co.*, 983 F. Supp. 95, 98 (E.D.N.Y. 1997); *Nungesser*, 244 F. Supp. 3d at 373.  In addition, Plaintiffs do not cite any specific provision of Barnard's policies or procedures that is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego*, 647 N.E.2d at 745.  To the extent Plaintiffs mean to allege that they were misled because they "believe[d] that [Barnard] would apply, enforce, and follow" its student conduct rules, the claim is neither ripe, *see supra* Part III, nor plausibly pled, *see supra* Part IV.  The Court should reject it.

### E.  Plaintiffs Fail to State a Claim Under 42 U.S.C. § 1986.

Plaintiffs also fail to state a claim under 42 U.S.C. § 1986.  To start, Count VII lacks any allegations specific to Barnard.  *See* FAC ¶¶ 711-728.  Once again, Plaintiffs simply "lump[]" the

defendants together and provide "no factual basis to distinguish their conduct"—a defect that alone warrants dismissal. *Atuahene*, 10 F. App'x at 34; *see also supra* at 18.

Plaintiffs also fail to plausibly allege a claim for conspiracy in violation of Section 1985, which is likewise fatal to a conspiracy claim under Section 1986. *See, e.g.*, *Singer v. City of New York*, 417 F. Supp. 3d 297, 328 (S.D.N.Y. 2019). Plaintiffs allege that various unnamed students, and campus organizations engaged in an anti-civil rights conspiracy as evidenced by "close collaboration among the groups." FAC ¶¶ 713-715. But allegations of "proximity" and "parallel activities" are insufficient to infer a meeting of the minds under Section 1985. *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 40 (D.D.C. 2021); *see also Brooks v. Cnty. of Nassau*, 54 F. Supp. 3d 254, 259 (E.D.N.Y. 2014) (dismissing Section 1985 claim where plaintiff failed to allege "factual content suggesting a 'meeting of the minds'").

At the very least, their Section 1986 claim would fail for the same reasons as their Title VI claim. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 820 (7th Cir. 2015) (violation of Section 1986 "impossible" where defendant did not discriminate in violation of Title VII). Section 1986 imposes liability on individuals who have "knowledge of a conspiracy under [Section] 1985, but *fail to take action to prevent [it]*." *Singer*, 417 F. Supp. at 328 (emphasis added). Plaintiffs' cannot plausibly allege such a failure. *See supra* Part IV.

### F.    Plaintiffs Fail to State a Claim for Premises Liability.

The Court should dismiss Plaintiffs' attempt to shoehorn a discrimination claim into a claim for premises liability for multiple independent reasons.

*First*, Count VIII again lacks *any* allegations specific to Barnard. *See* FAC ¶¶ 729-735. Plaintiffs' failure to "provide a plausible factual basis to distinguish the conduct of each of the defendants" alone dooms their claim. *Ochre*, 2012 WL 6082387, at *6; *see supra* at 18.

*Second*, Plaintiffs fail to plausibly allege that Barnard owed the individual plaintiffs a legal

duty under New York law.  While Barnard strives to foster a safe and welcoming campus for all its community members, *see supra* at 22-28, "colleges today in general have no legal duty to shield their students from the dangerous activity of other students," *Guest v. Hansen*, 2007 WL 4561104, at *4 (N.D.N.Y. Dec. 18, 2007), *aff'd*, 603 F.3d 15 (2d Cir. 2010) (quoting *Eiseman v. State*, 70 N.Y.2d 175, 190 (1987)).  This is particularly so when the allegedly dangerous activity occurs off-campus, as is true of the majority of the FAC's allegations.  *See supra* at 20.  In such circumstances, the Second Circuit has squarely recognized that even if a "College had the ability to control off-campus social activities, it was under no obligation to do so."  *Guest v. Hansen*, 603 F.3d 15, 22 (2d Cir. 2010); *see also, e.g.*, *Galindo v. Town of Clarkstown*, 2 N.Y.3d 633, 636 (2004) ("[A] person who lacks ownership or control of property cannot fairly be held accountable for injuries resulting from a hazard on the property."); *Gilbert v. St. John's Univ.*, 1998 WL 19971, at *5 (E.D.N.Y. Jan. 20, 1998) (no liability even where school "knew" that students were engaged in off-campus activity "in violation of the university's orders").

*Third*, Plaintiffs do not and cannot plausibly allege that Barnard's actions proximately caused their injuries.  As explained, Barnard's response to antisemitic conduct on campus has been comprehensive.  *Supra* at 3-5, 22-28.  Even if it were "conceivable" that further efforts by Barnard could have mitigated Plaintiffs' alleged injuries, "conceivability is too slim a reed" to plead proximate causation.  *Colarossi v. Univ. of Rochester*, 2 A.D.3d 1272, 1273–74 (2004) (dismissing premises liability claim, even where "conceivable that a greater security presence may have prevented the incident"); *Danielenko v. Kinney Rent A Car, Inc.*, 441 N.E.2d 1073, 1075 (N.Y. 1982) ("Whether hindsight reveals that greater precautions could have been taken to avoid the harm that eventuated is irrelevant if the injury could not reasonably have been foreseen.").

*Fourth*, Plaintiffs fail to plausibly allege that Barnard breached any duty of care it may

have owed. In light of Barnard's swift and thorough response to antisemitic conduct on campus, Plaintiffs simply cannot plausibly allege that Barnard's conduct was unreasonable "in [] light of what [Barnard] could anticipate." *Danielenko*, 57 N.Y.2d at 204.

## VI.    THE COURT SHOULD STRIKE PLAINTIFFS' UNAUTHORIZED REMEDIAL REQUESTS.

At minimum, this Court should strike, under Rule 12(f), certain requests for relief. A "court may strike from a pleading" any matter that is, *inter alia*, "immaterial" or "impertinent," Fed. R. Civ. P. 12(f), including where the plaintiff requests a remedy that is not authorized by the statute, *see, e.g.*, *Chacko v. Dynair Servs. Inc.*, 1998 WL 199866, at *2 (E.D.N.Y. Mar. 15, 1998); *Grandison v. U.S. Postal Serv.*, 696 F. Supp. 891, 896 (S.D.N.Y. 1988).

*First*, the Court should strike Plaintiffs' request for an injunction requiring specific disciplinary measures, including the termination of Barnard employees and the suspension or expulsion of students, among other things. *See* FAC, Prayer for Relief at A. Plaintiffs, however, have no "right to make particular remedial demands." *Davis*, 526 U.S. at 648. Indeed, the Supreme Court has cautioned against "second-guessing the disciplinary decisions made by school administrators," *id.* at 648, and the Second Circuit has explained that courts "must accord sufficient deference to the decisions of school disciplinarians," *Zeno*, 702 F.3d at 666. Because Plaintiffs' have no "right to specific remedial measures," *id.*, the Court should strike such requests.

*Second*, the Court should strike any request for punitive damages under Title VI, *Barnes v. Gorman*, 536 U.S. 181, 189 (2002), or damages for emotional distress under that statute, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 217-18, 230 (2022).

## CONCLUSION

For the foregoing reasons, the Court should grant the Motion to Dismiss under Rules 12(b)(1) and 12(b)(6) or, alternatively, to Strike under Rule 12(f)(1).

Dated:  July 22, 2024                    Respectfully submitted,

                                         */s/ Anton Metlitsky*
                                         Anton Metlitsky
                                         Jennifer B. Sokoler
                                         O'MELVENY & MYERS LLP
                                         7 Times Square
                                         30th Floor
                                         New York, New York 10036
                                         Telephone: (212) 326-2000
                                         Facsimile: (212) 326-2061
                                         E-mail:
                                                 ametlitsky@omm.com
                                                 jsokoler@omm.com


                                         *Counsel for Defendant Barnard College*