# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

STUDENTS AGAINST ANTISEMITISM,
INC., STANDWITHUS CENTER FOR
LEGAL JUSTICE, MILES RUBIN,
DANIELLA SYMONDS, ERIN
MCNULTY, NOAH MILLER, VALERIE
GERSTEIN, KATIANA ARYEH, LAURA
BELLOWS, LEMONY DAVID, JOHN
DOE, CHAYA DROZNIK, LEO ELKINS,
SAMUEL FRIEDMAN, MAYA GAL,
AYELET GLASER, MICHAEL GROSS,
JARED HARNICK, GABRIEL KAHANE,
TALIA KESSELMAN, ELI MIZRAHI-AKS,
OMER NAUER, AMIEL NELSON,
GABRIEL NELSON, MOLLY NELSON,
MARC NOCK, AVA QUINN, TALIA
RABBAN, JANE ROE, SOPHIE
RUKEYSER, ALIZA RUTTENBERG,
EMILY SANDLER, ANDREW STEIN,
JONATHAN SWILL, RAFAEL VANUNO,
XAVIER WESTERGAARD, EDEN
YADEGAR, and LILY ZUCKERMAN,

                     Plaintiffs,

     v.

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW
YORK, and BARNARD COLLEGE,

                     Defendants.

------------------------------------------------------- X

Case No. 1:24-cv-01306-VSB-SN

**ORAL ARGUMENT REQUESTED**


# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
# DEFENDANTS' MOTIONS TO DISMISS AND TO STRIKE

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

SUMMARY OF FACTS ........................................................................................................... 9

ARGUMENT ........................................................................................................................... 13

I.    PLAINTIFFS STATE TITLE VI HOSTILE ENVIRONMENT CLAIMS ....................... 14

   A.    Plaintiffs Sufficiently Allege Actual Knowledge ............................................. 15

   B.    Plaintiffs Sufficiently Allege Columbia Harassment and Control .................... 17

   C.    Plaintiffs Sufficiently Allege Barnard Harassment and Substantial Control ................ 20

   D.    Plaintiffs Sufficiently Allege Deliberate Indifference ...................................... 22

     1.    Columbia Is Deliberately Indifferent ......................................................... 23

     2.    Barnard's Deliberate Indifference ............................................................... 28

     3.    Task Force Report Confirms Defendants Deliberate Indifference ............... 30

     4.    Columbia's Responses Were Clearly Unreasonable .................................... 32

     5.    Barnard's Responses Were Clearly Unreasonable ...................................... 35

     6.    Academic Freedom Does Not Protect Harassment ...................................... 35

II.   PLAINTIFFS STATE DIRECT DISCRIMINATION CLAIMS UNDER TITLE VI ......... 39

III.  PLAINTIFFS STATE A CLAIM UNDER 42 U.S.C. § 1986 AGAINST COLUMBIA ..... 41

   A.    Plaintiffs Sufficiently Allege a Conspiracy ..................................................... 42

   B.    Plaintiffs Sufficiently Allege That Columbia Failed to Prevent the Conspiracy ............. 47

IV.   PLAINTIFFS ADEQUATELY ALLEGE STATE AND LOCAL LAW CLAIMS ........... 48

   A.    Plaintiffs Sufficiently Plead City and State Discrimination Claims ................. 48

   B.    Plaintiffs Sufficiently Plead Contract Claims .................................................. 50

   C.    Plaintiffs Sufficiently Plead Claims for Consumer Fraud ................................ 52

   D.    Plaintiffs Sufficiently Plead Claims for Premises Liability .............................. 53

V.    THE COURT HAS SUBJECT MATTER JURISDICTION ................................................. 56

  A.    Plaintiffs Have Standing to Pursue Injunctive Relief and SAA Has Associational

  Standing ............................................................................................................................. 58

    1.    Plaintiffs Properly Allege Ongoing and Future Injury-in-Fact ..................................... 58

    2.    Plaintiffs Sufficiently Allege Defendants' Continuing Deliberate Indifference Will

    Cause Future Injury............................................................................................................ 62

    3.    A Favorable Decision Will Redress Plaintiffs' Injuries ................................................ 63

    4.    SAA and SCLJ Are Genuine Membership Organizations That Have Standing to Sue 66

      a)    Members Are Not Required to Be Parties to This Suit.............................................. 66

      b)    Members May Be Anonymous at This Stage ........................................................... 69

      c)    SAA and SCLJ Can Assert a Section 1986 Claim.................................................... 70

  B.    Plaintiffs' Claims Are Ripe.............................................................................................. 71

  VI.    DEFENDANTS' MOTION TO STRIKE SHOULD BE DENIED .................................... 73

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abadi v. American Airlines, Inc.*,
  2024 WL 1346437 (S.D.N.Y. Mar. 29, 2024) ........................................................43

*Access 123, Inc. v. Markey's Lobster Pool, Inc.*,
  2001 WL 920051 (D.N.H. Aug. 14, 2001) ...........................................................70

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. City of Albany*,
  250 F. Supp. 2d 48 (N.D.N.Y. 2003) .............................................................68, 69

*Ass'n of Car Wash Owners Inc. v. City of New York*,
  911 F.3d 74 (2d Cir. 2018)....................................................................................57

*Atuahene v. City of Hartford*,
  10 F. App'x 33 (2d Cir. 2001) ..............................................................................21

*Bailey v. N.Y. Law Sch.*,
  2017 WL 835190 (S.D.N.Y. Mar. 1, 2017) ..........................................................52

*Banks v. Gen. Motors, LLC*,
  81 F.4th 242 (2d Cir. 2023) ..................................................................................17

*Barnett v. Johnson City Sch. Dist.*,
  2005 WL 8178066 (N.D.N.Y. Feb. 2, 2005) ...................................................18, 67

*Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*,
  448 F.3d 138 (2d Cir. 2006)..................................................................................67

*Blunt v. Lower Merion School District*,
  767 F.3d 247 (3d Cir. 2014)............................................................................67, 70

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993)..............................................................................................45

*Brooklyn Branch of N.A.A.C.P. v. Kosinski*,
  657 F. Supp. 3d 504 (S.D.N.Y. 2023)...................................................................67

*Brown v. Univ. of Rochester*,
  216 A.D.3d 1328 (3d Dep't 2023) ........................................................................54

*D.S. ex rel. C.S. v. Rochester City Sch. Dist.*,
  2020 WL 7028523 (W.D.N.Y. Nov. 30, 2020) .....................................................38

*Campisi v. City University of New York*,
    2016 WL 4203549 (S.D.N.Y. Aug. 9, 2016) ........................................................28

*Carabello v. N.Y.C. Dep't of Educ.*,
    928 F. Supp. 2d 627 (E.D.N.Y. 2013) ........................................................16, 21, 32

*Carter v. HealthPort Techs., LLC*,
    822 F.3d 47 (2d Cir. 2016)........................................................................56, 61, 62

*In re Chantix (Varenicline) Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*,
    2024 WL 2784234 (S.D.N.Y. May 28, 2024) ..............................................13, 19

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983).........................................................................................59

*Clapper v. Amnesty International USA*,
    568 U.S. 398 (2013)....................................................................................59, 60

*Clissuras v. E.E.O.C.*,
    1990 WL 96754 (S.D.N.Y. July 5, 1990), Col. Mem. 33 ...................................48

*Colarossi v. University of Rochester*,
    2 A.D.3d 1272 (4th Dep't 2004)......................................................................55

*In re Columbia Tuition Refund Action*,
    523 F. Supp. 3d 414 (S.D.N.Y. 2021)................................................................50

*Corsi v. Gestone*,
    2021 WL 5416623 (E.D.N.Y. Nov. 19, 2021)....................................................45

*Cotton v. Noeth*,
    96 F.4th 249 (2d Cir. 2024) ......................................................................72, 73

*Crandell v. N.Y. Coll. of Osteopathic Med.*,
    87 F. Supp. 2d 304 (S.D.N.Y. 2000)...........................................................15, 17

*Cruz v. Coach Stores, Inc.*,
    202 F.3d 560 (2d Cir. 2000)...........................................................................17

*Cuoco v. Moritsugu*,
    222 F.3d 99 (2d Cir. 2000).............................................................................75

*Davis v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999).........................................................................................72

*De Asis v. New York City Police Dept.*,
    2008 WL 3876075 (E.D.N.Y. Aug. 18, 2008)...................................................43

*Democratic Cong. Campaign Comm. v. Kosinski*,
    614 F. Supp. 3d 20 (S.D.N.Y. 2022)................................................................60

*Disabled in Action of Metro. N.Y. v. Trump Int'l Hotel & Tower*,
    2003 WL 1751785 (S.D.N.Y. Apr. 2, 2003)..................................................70

*Do No Harm v. Pfizer Inc.*,
    96 F.4th 106 (2d Cir. 2024) ....................................................................69, 70

*Doe ex rel. Doe v. Brittonkill Cent. Sch. Dist. Bd. of Educ.*,
    2018 WL 6622191 (N.D.N.Y. Dec. 18, 2018)..........................................22, 33

*Doe v. Columbia Univ.*,
    551 F. Supp. 3d 433 (S.D.N.Y. 2021)......................................................39, 40

*Doe v. N.Y. Univ.*,
    438 F. Supp. 3d 172 (S.D.N.Y. 2020).............................................................40

*Doe v. Sacks*,
    2024 WL 402945 (S.D.N.Y. Feb. 2, 2024).....................................................20

*Doe v. Sarah Lawrence Coll.*,
    453 F. Supp. 3d 653 (S.D.N.Y. 2020).............................................................50

*Doe v. Trs. of Columbia Univ. in City of N.Y.*,
    2022 WL 3666997 (S.D.N.Y. Aug. 25, 2022)........................................22, 31, 65

*Doe v. Yeshiva Univ.*,
    703 F. Supp. 3d 473 (S.D.N.Y. 2023).............................................................50

*Dorce v. City of New York*,
    2 F.4th 82 (2d Cir. 2021) ..............................................................................60

*Draper v. Healey*,
    827 F.3d 1 (1st Cir. 2016)..............................................................................69

*Dube v. State University of New York*,
    900 F.2d 587 (2d Cir. 1990)..........................................................................37

*E.E.O.C. v. Lafond*,
    2009 WL 803150 (E.D.N.Y. Mar. 25, 2009)...................................................20

*East v. Roosevelt Union Free Sch. Dist.*,
    2020 WL 13753159 (E.D.N.Y. July 31, 2020)................................................47

*Eccleston v. Pine Bush Cent. Sch. Dist.*,
    2013 WL 12444443 (S.D.N.Y. Jan. 8, 2013) .................................................49

*AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.*,
  361 F. Supp. 2d 312 (S.D.N.Y. 2005)......................................................................18

*Emps. Committed for Just. v. Eastman Kodak Co.*,
  407 F. Supp. 2d 423 (W.D.N.Y. 2005) ....................................................................68

*Evans v. SSN Funding, L.P.*,
  2017 WL 3671180 (S.D.N.Y. Aug. 23, 2017)..........................................................57

*Feibleman v. Trs. of Columbia Univ. in City of N.Y.*,
  2020 WL 3871075 (S.D.N.Y. July 9, 2020) ......................................................22, 31

*Felber v. Yudof*,
  851 F. Supp. 2d 1182 (N.D. Cal. 2011) .......................................................... *passim*

*Feminist Majority Found. v. Hurley*,
  911 F.3d 674 (4th Cir. 2018) ............................................................................20, 36

*Found. v. Stenger*,
  2023 WL 3559619 (N.D.N.Y. May 19, 2023)....................................................70, 71

*Frankel v. Regents of the Univ. of California*,
  2024 WL 3811250 (C.D. Cal. Aug. 13, 2024)........................................2, 8, 47, 58

*Gally v. Columbia Univ.*,
  22 F. Supp. 2d 199 (S.D.N.Y. 1998)........................................................................51

*Girardi v. Ferrari Express, Inc.*,
  2023 WL 2744027 (S.D.N.Y. Mar. 31, 2023) ........................................................14

*Glob. Art Exhibitions, Inc. v. Kuhn & Bülow Italia Versicherungsmakler GmbH*,
  607 F. Supp. 3d 421 (S.D.N.Y. 2022)......................................................................56

*Goel v. Bunge, Ltd.*,
  820 F.3d 554 (2d Cir. 2016)....................................................................................14

*Grant v. County of Suffolk*,
  2018 WL 816242 (E.D.N.Y. Feb. 9, 2018)..............................................................44

*Green v. Jacob & Co. Watches, Inc.*,
  248 F. Supp. 3d 458 (S.D.N.Y. 2017)......................................................................49

*Gregory v. Daly*,
  243 F.3d 687 (2d Cir. 2001)....................................................................................14

*Hall v. Warren*,
  2022 WL 2356700 (W.D.N.Y. June 30, 2022) ........................................................70

*HB v. Monroe Woodbury Cent. Sch. Dist.*,
  2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012)....................................................................22

*Healy v. James*,
  408 U.S. 169 (1972)..........................................................................................................38

*Hesse v. Godiva Chocolatier, Inc.*,
  463 F. Supp. 3d 453 (S.D.N.Y. 2020)...............................................................................53

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*,
  37 N.Y.3d 169 (2021), Col. Mem. 39................................................................................52

*Hogan v. Rose*,
  2022 WL 675703 (N.D.N.Y. Mar. 7, 2022) ......................................................................53

*Howley v. Town of Stratford*,
  217 F.3d 141 (2d Cir. 2000)..............................................................................................18

*Hunt v. Washington State Apple Advertising Commission*,
  432 U.S. 333 (1977)..........................................................................................................67

*Irish Lesbian & Gay Org. v. Giuliani*,
  143 F.3d 638 (2d Cir. 1998)..............................................................................................67

*Janfeshan v. U.S. Customs & Border Prot.*,
  2017 WL 3972461 (E.D.N.Y. Aug. 21, 2017)...................................................................63

*Jews for Jesus, Inc. v. Jewish Cmty. Rls. Council of N.Y., Inc.*,
  968 F.2d 286 (2d Cir. 1992)..............................................................................................47

*JF v. Carmel Cent. Sch. Dist.*,
  168 F. Supp. 3d 609 (S.D.N.Y. 2016)...............................................................................40

*John v. Whole Foods Mkt. Grp.*,
  858 F.3d 732 (2d Cir. 2017)..............................................................................................56

*Johnson v. Bryson*,
  851 F. Supp. 2d 688 (S.D.N.Y. 2012)...............................................................................73

*Johnson v. New York University*,
  800 F. App'x 18 (2d Cir. 2020) .........................................................................................39

*Joseph S. v. Hogan*,
  561 F. Supp. 2d 280 (E.D.N.Y. 2008) ..............................................................................67

*Kamen v. AT&T Co.*,
  791 F.2d 1006 (2d Cir. 1986)............................................................................................72

*Kaperak v. N.Y.S. Dep't of Corr. & Cmty. Supervision*,
2022 WL 682633 (W.D.N.Y. Mar. 8, 2022) ..........................................................18

*Kellman v. 45 Tiemann Assoc*,
662 N.E.2d 255, 2255 (N.Y. 1995). .....................................................................53

*King v. New Rochelle Mun. Hous. Auth.*,
442 F.2d 646 (2d Cir. 1971) ................................................................................44

*Koch v. Greenberg*,
14 F. Supp. 3d 247 (S.D.N.Y. 2014) ....................................................................52

*Koumantaros v. City Univ. of N.Y.*,
2007 WL 840115 (S.D.N.Y. Mar. 19, 2007) ................................................ *passim*

*L.L. v. Evesham Twp. Bd. of Educ.*,
710 F. App'x 545 (3d Cir. 2017) .........................................................................66

*Langton v. Town of Chester Library Board*,
2020 WL 2850898 (S.D.N.Y. June 1, 2020) .......................................................43

*Laumann v. Nat'l Hockey League*,
105 F. Supp. 3d 384 (S.D.N.Y. 2015) ..................................................................60

*Leslie v. City of New York*,
2023 WL 2612688 (S.D.N.Y. Mar. 23, 2023) ......................................................63

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976) ................................................................................74

*Liu v. U.S. Cong.*,
834 F. App'x 600 (2d Cir. 2020) .........................................................................62

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .............................................................................................60

*Lulac Councils 4433 & 4436 v. City of Galveston*,
942 F. Supp. 342 (S.D. Tex. 1996) ......................................................................67

*Mandel v. Bd. of Trs. of Cal. State Univ.*,
2018 WL 5458739 (N.D. Cal. Oct. 29, 2018) ................................................18, 26

*Marcavage v. City of New York*,
689 F.3d 98 (2d Cir. 2012) ..................................................................................59

*Marsh & McLennan Agency LLC v. Williams*,
2023 WL 4534984 (S.D.N.Y. July 13, 2023) .......................................................72

*McGullam v. Cedar Graphics, Inc.*,
    609 F.3d 70 (2d Cir. 2010)..........................................................................61, 62

*Minto v. Molloy Coll.*,
    2019 WL 4696287 (E.D.N.Y. Sept. 26, 2019) ........................................................39

*Minto v. Molloy Coll.*,
    2021 WL 1394329 (E.D.N.Y. Jan. 21) ............................................................39, 49

*Moukengeschaie v. Eltman, Eltman & Cooper, P.C.*,
    2016 WL 1274541 (E.D.N.Y. Mar. 31, 2016)........................................................14

*N.A.A.C.P. v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)..................................................................................................37

*N.Y. State Nat'l. Org. for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989)..................................................................................41

*Nallan v. Helmsley-Spear, Inc.*,
    407 N.E.2d 451 (N.Y. 1980)....................................................................................54

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002)..................................................................................................61

*Nesbeth v. N.Y.C. Mgmt. LLC*,
    2019 WL 110953 (S.D.N.Y. Jan. 4, 2019) .............................................................21

*New York v. Pa. Higher Educ. Assistance Agency*,
    2020 WL 2097640 (S.D.N.Y. May 1, 2020) ..........................................................73

*Newman v. Point Park University*,
    2022 WL 969601 (W.D. Pa. Mar. 31, 2022) ..........................................................37

*Nick's Garage, Inc. v. Progressive Cas. Ins.*,
    875 F.3d 107 (2d Cir. 2017)....................................................................................52

*Novio v. N.Y. Acad. of Art*,
    286 F. Supp. 3d 566 (S.D.N.Y. 2017)......................................................................49

*Nungesser v. Columbia University*,
    244 F. Supp. 3d 345 (S.D.N.Y. 2017)..........................................................20, 21, 52

*NYCLU v. Grandeau*,
    528 F.3d 122 (2d Cir. 2008)..............................................................................71, 72

*Ochre LLC v. Rockwell Architecture Plan. & Design, P.C.*,
    2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012) ..........................................................21

*Oliveras v. Saranac Lake Cent. Sch. Dist.*,
　2014 WL 1311811 (N.D.N.Y. Mar. 31, 2014) .......................................................19

*Patterson v. City Univ. of N.Y.*,
　2014 WL 3511048 (E.D.N.Y. July 14, 2014) .......................................................41

*Pen Am. Ctr., Inc. v. Trump*,
　448 F. Supp. 3d 309 (S.D.N.Y. 2020).................................................................69

*Peters v. Molloy Coll. of Rockville Ctr.*,
　2008 WL 2704920 (E.D.N.Y. July 8, 2008) .......................................................51

*Plaintiffs #1-21 v. County of Suffolk*,
　2021 WL 11629176 (E.D.N.Y. Aug. 5, 2021).......................................................60

*Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*,
　2005 WL 1214281 (S.D.N.Y. May 20, 2005) .......................................................51

*Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*,
　10 F.4th 87 (2d Cir. 2021) ...................................................................................71

*Robinson v. Blank*,
　2013 WL 2156040 (S.D.N.Y. May 20, 2013) .......................................................62

*Roe v. St. John's Univ.*,
　91 F.4th 643 (2d Cir. 2024) .................................................................................40

*Ronzani v. Sanofi S.A.*,
　899 F.2d 195 (2d Cir. 1990).................................................................................75

*Rosas v. Balter Sales Co.*,
　2018 WL 3199253 (S.D.N.Y. June 29, 2018) .......................................................39

*Ross v. Bank of Am., N.A.(USA)*,
　524 F.3d 217 (2d Cir. 2008).................................................................................73

*Sabel v. Halsted Fin. Servs., LLC*,
　2020 WL 6274986 (S.D.N.Y. Oct. 26, 2020) .......................................................75

*Santiago v. ACACIA Network, Inc.*,
　634 F. Supp. 3d 143 (S.D.N.Y. 2022).................................................................49

*Schaeffer v. Vera Wang Bridal House, Ltd.*,
　64 F. Supp. 2d 286 (S.D.N.Y. 1999).............................................................54, 55

*Schwapp v. Town of Avon*,
　118 F.3d 106 (2d Cir. 1997).................................................................................17

*Shain v. Ellison*,
    356 F.3d 211 (2d Cir. 2004)................................................................................59

*Shipping Fin. Servs. Corp. v. Drakos*,
    140 F.3d 129 (2d Cir. 1998)...............................................................................56

*Silva v. Farrish*,
    47 F.4th 78 (2d Cir. 2022) ................................................................................58

*Sines v. Kessler*,
    324 F. Supp. 3d 765 (W.D. Va. 2018) .............................................................46

*Soule v. Conn. Ass'n of Schs., Inc.*,
    90 F.4th 34 (2d Cir. 2023) ........................................................................ *passim*

*Spencer v. Casavilla*,
    903 F.2d 171 (2d Cir. 1990)........................................................................44, 45

*StandWithUs Center For Legal Justice v. Massachusetts Institute of Technology*,
2024 WL 3596916 (D. Mass. July 30, 2024).......................................... *passim*

*Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)................................................................................ *passim*

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)................................................................................71, 73

*T.E. v. Pine Bush Cent. Sch. Dist.*,
    58 F. Supp. 3d 332 (S.D.N.Y. 2014)........................................................ *passim*

*TC v. Valley Cent. Sch. Dist.*,
    777 F. Supp. 2d 577 (S.D.N.Y. 2011)..................................................14, 16, 22

*Tesoriero v. Syosset Central School District*,
    382 F. Supp. 2d 387 (E.D.N.Y. 2005) ..............................................................28

*Thomas v. Roach*,
    165 F.3d 137 (2d Cir. 1999)..............................................................................43

*Tubbs v. Stony Brook Univ.*,
    343 F. Supp. 3d 292 (S.D.N.Y. 2018)..........................................................22, 31

*United States v. Apple Inc.*,
    992 F. Supp. 2d 263 (S.D.N.Y. 2014)..............................................................65

*United States v. Daley*,
    378 F. Supp. 3d 539 (W.D. Va. 2019) ..............................................................36

*United States v. N.Y.C. Dep't of Educ.*,
  407 F. Supp. 3d 365 (S.D.N.Y. 2018) ..................................................61

*Urbina v. City of New York*,
  2016 WL 79991 (S.D.N.Y. Jan. 6, 2016) ..............................................42

*Vega v. Hempstead Union Free Sch. Dist.*,
  801 F.3d 72 (2d Cir. 2015).....................................................................39

*Vega v. Miller*,
  273 F.3d 460 (2d Cir. 2001)....................................................................37

*Wai Chu v. Samsung Elecs. Am., Inc.*,
  2020 WL 1330662 (S.D.N.Y. Mar. 23, 2020) .......................................75

*Ware v. Univ. of Vt. & State Agric. Coll.*,
  2024 WL 989804 (D. Vt. Mar. 7, 2024) ................................................21

*Warth v. Seldin*,
  422 U.S. 490 (1975).................................................................................67

*Weiss v. City Univ. of N.Y.*,
  2019 WL 1244508 (S.D.N.Y. Mar. 18, 2019) .......................................14

*Welcome v. New York City Department of Education*,
  2018 WL 5817156 (E.D.N.Y. Nov. 6, 2018) .........................................31

*Williams v. City of New York*,
  2018 WL 4308552 (S.D.N.Y. Sept. 10, 2018) .......................................43

*Williams v. Pace Univ.*,
  192 F. Supp. 3d 415 (S.D.N.Y. 2016) ....................................................41

*Wolfer v. Getman*,
  221 A.D.2d 969 (4th Dep't 1995) ..........................................................54

*Zeno v. Pine Plains Cent. Sch. Dist.*,
  702 F.3d 655 (2d Cir. 2012)............................................................*passim*

*Zhang Jingrong v. Chinese Anti-Cult World All.*,
  287 F. Supp. 3d 290 (E.D.N.Y. 2018) ...................................................42

## Statutes

42 U.S.C. § 1983...........................................................................70, 72

42 U.S.C. § 1985...................................................................*passim*

42 U.S.C. § 1986...................................................................*passim*

42 U.S.C. § 2000d et seq...................................................................................... *passim*

New York Civ. Rights L. § 40-c ....................................................................48

New York City Hum. Rights L. § 8-107 .......................................................49

New York Exec. Law § 296 ...........................................................................48

New York Gen. Bus. L. § 349 .......................................................................52

New York Gen. Bus. L. § 350 .......................................................................53

Plaintiffs respectfully submit this omnibus memorandum of law in opposition to the motions of Defendants The Trustees of Columbia University in the City of New York ("Columbia") and Barnard College ("Barnard") to dismiss and to strike.[1]

## PRELIMINARY STATEMENT

By accepting federal funds, Defendants obligate themselves under Title VI of the Civil Rights Act of 1964 to protect their students from discrimination and harassment—including, no less than any others, Plaintiffs and Defendants' other Jewish and Israeli students. Defendants have long been a center of academic antisemitism, but the antisemitic discrimination and harassment on their campus became even more intolerably severe and pervasive after October 7, 2023, when students and faculty rallied to support Hamas, whose terrorists had invaded Israel to murder, torture, and rape 1,200 people and abduct hundreds of others. As Plaintiffs allege, by tolerating and enabling such antisemitic discrimination and harassment, Defendants are violating their obligations under Title VI, state and local civil rights laws, and their contracts with their students. Two district court decisions this month addressing antisemitism at Harvard and UCLA—decisions on all fours with this case—have rejected the very arguments Defendants advance here and confirm that their motions must be denied. In *Kestenbaum v. President & Fellows of Harvard College*, - F. Supp. 3d - , 2024 WL 3658793, at *6-7 (D. Mass. Aug. 6, 2024), Judge Stearns, in denying Harvard's motion to dismiss Title VI antisemitic hostile environment and breach of contract claims asserted by SAA and an individual student, held that plaintiffs' allegations showed that Harvard

---

[1] Submitted herewith in opposition to the motions is the Declaration of Joshua E. Roberts ("Roberts Decl."), dated August 21, 2024. "Ex. _" refers to exhibits to the Roberts Decl. Capitalized terms not defined herein have the meanings ascribed to them in the amended complaint (ECF No. 39) ("Complaint," or "¶_"). "Plaintiffs" refers to the individual plaintiffs and the members of Plaintiffs StandWithUs Center for Legal Justice ("SCLJ") and Students Against Antisemitism, Inc. ("SAA") referred to in the Complaint. "Col. Mem." and "Bar. Mem." refer to Defendants' respective memoranda of law in support of their motions. (ECF Nos. 61. and 65.) Unless otherwise noted, all emphasis is added.

"failed its Jewish students" and that its response to campus harassment was "so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." Judge Stearns declined to "reward Harvard for virtuous public declarations" by concluding that deliberate indifference was not plausibly alleged, where those declarations "for the most part, according to the allegations . . ., proved hollow when it came to taking disciplinary measures against offending students and faculty." *Id*. at *6. Here, as the Complaint alleges, Columbia's hostile environment and its response have been, if anything, worse than Harvard's, and its virtuous public declarations even more hollow.

In *Frankel v. Regents of the University of California*, 2024 WL 3811250 (C.D. Cal. Aug. 13, 2024), Judge Scarsi, in issuing a preliminary injunction barring UCLA from allowing pro-Hamas demonstrators to exclude Jewish students from its campus—much as Columbia's demonstrators did here, ¶¶ 7, 294, 259, 308, 313, 314, 333, 344, 511, 537, 538, 581, 586—rejected the argument Defendants advance here that they cannot be held responsible for the actions of third-party demonstrators on their campus. Citing constitutional principles barring discriminatory treatment equally applicable, *mutatis mutandis*, to the Title VI claims here, Judge Scarsci resoundingly made clear the repugnant nature of the discrimination and UCLA's response:

> In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith. This fact is so unimaginable and so abhorrent to our constitutional guarantee of religious freedom that it bears repeating, *Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith*. UCLA does not dispute this. Instead, UCLA claims that it has no responsibility to protect the religious freedom of its Jewish students because the exclusion was engineered by third-party protestors. But under constitutional principles, UCLA may not allow services to some students when UCLA knows that other students are excluded on religious grounds, regardless of who engineered the exclusion.

*UCLA*, 2024 WL 3811250, at *1 (emphasis in original).

Such "unimaginable" and "abhorrent" discrimination and harassment have proliferated at Columbia and Barnard—conduct, as former Columbia President Shafik acknowledged, Defendants would not tolerate "for one second" if directed at any other protected group. ¶¶ 305, 405-55. Columbia and Barnard's Jewish and Israeli students have been met with faculty and students openly lauding Hamas's October 7 atrocities as "astounding," "awesome," and "great feats." ¶¶ 1, 149, 424. Mobs of pro-Hamas students and faculty have marched by the hundreds through campus, shouting antisemitic slogans, including calls for genocide, such as "Jews will not defeat us," ¶ 171; "globalize the Intifada," ¶¶ 117, 171, 223, 259, 272, 275, 448, 518, 563, 583, 584; "there is only one solution, Intifada revolution," ¶¶ 225, 257, 272, 275, 347, 490, 511; "we will honor all our martyrs," ¶ 257; "resistance is justified," ¶¶ 171, 275, 563, 607; "by any means necessary," ¶¶ 204, 215, 272, 291, 317, 563; "burn Tel Aviv to the ground," ¶¶ 347, 487, 533; "death to the Zionist state," ¶¶ 278, 448; "we won't want two states, we want all of it," ¶¶ 353, 573; and, in Arabic, "from water to water, Palestine will be Arab," ¶¶ 245, 257, 259, 275; and "Jews out," ¶ 278. The mobs have occupied buildings, promoted violence against Jews, and harassed and assaulted Jews on campus. ¶¶ 306-94. Jewish and Israeli students have been spat at, physically assaulted, threatened, and targeted on campus and social media with epithets, such as "fuck the Jews," ¶¶ 163, 180, 197, 467, 518; "death to Jews," ¶ 197; "fucking Jew," ¶¶ 321, 355, 493; "kike," ¶¶ 340, 355, 493, 532; "go back to Europe," ¶¶ 345, 385; "go back to Poland," ¶¶ 348, 350, 533; "you guys are inbred," ¶ 347; "Zionist pig," ¶¶ 124, 376, 493, 583; and "baby killer," ¶¶ 204, 324, 328, 345, 348, 376. Columbia faculty have promulgated antisemitism in their courses and dismissed and intimidated students who object. ¶¶ 131-38. In April 2024, Columbia University Board of Trustees Co-Chair Claire Shipman testified before Congress, "we have a specific problem right now on our campus, so I can speak from what I know, and that is rampant antisemitism." ¶ 1.

What is most striking about all of this is Columbia's abject failure and deliberate refusal to do what is necessary to stop and deter this rampant antisemitism and discipline the students and faculty who perpetrate it.

Defendants' antisemitism manifests itself in a double standard invidious to Jews and Israelis. Defendants selectively enforces their policies to avoid protecting Jewish and Israeli students from harassment, hire professors who support anti-Jewish violence and spread antisemitic propaganda—who teach through a binary oppressor-oppressed lens, through which Jews, one of history's most persecuted peoples, are viewed as "oppressors" and therefore unworthy of support or sympathy—and ignore Jewish and Israeli students' pleas for protection. Defendants permit students and faculty to advocate, without consequence, the murder of Jews and the destruction of Israel, the only Jewish country in the world.

The arguments Columbia and Barnard advance on their motions are meritless—among other things, they say their statements against antisemitism and other utterly ineffective and insufficient responses to antisemitism exonerate them. Defendants assert that because they claim they are doing something, that is, anything, about antisemitism, they are not deliberately indifferent to their antisemitic hostile environment. Notwithstanding their hollow and irrelevant pieties, Columbia and Barnard, as Plaintiffs allege, are not merely deliberately indifferent to their antisemitic hostile environment, they treat antisemitic discrimination differently from and far more leniently than discrimination they do not tolerate against other protected groups. Plaintiffs' detailed allegations make this all but undeniable—at a minimum, there are questions of fact precluding the granting of Defendants' motions.[2] Those questions of fact include, among others, whether

---

[2] To be sure, because much of the discrimination and harassment has been taking place on Columbia's campus, Columbia is directly responsible to all the Plaintiffs, including the Plaintiffs who are Barnard students, but who, under Barnard's close relationship with Columbia, *see* ¶¶ 64-65, regularly must traverse the Columbia campus to attend classes and participate in other campus activities. But that in no way exonerates Barnard from its responsibility for its

Columbia's response was "inadequate—and deliberately indifferent," and in particular whether Columbia "dragged its feet," whether its purported remedial actions were "little more than half-hearted measures," and whether it "ignored the many signals that greater, more directed action was needed." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669-72 (2d Cir. 2012).

Here, the allegations make clear that Defendants and their remedial actions fell far short on all of these scores, and that, at a minimum Defendants knew that their efforts were "ineffective" but "continue[d] to use those same methods to no avail," rendering their response "clearly unreasonable" under Title VI. *Id*. at 666, 669 (citations omitted).

In fact, it could not be clearer that what Defendants are doing show no signs of working; their antisemitic hostile environment has only worsened. The occupation of Columbia's campus for two weeks, culminating in the takeover of an academic building, confirmed what was already clear: Columbia's response to antisemitism has been woefully insufficient. Rather than promptly end the encampment, Columbia negotiated with the perpetrators, permitting them to continue to harass Jewish students. During the encampment, for example, Columbia negotiated with a student who led a mob of two hundred students in surrounding and pushing back plaintiff Chaya Droznik and other Jewish students while chanting: "Attention everyone. Can I get everyone to form a human chain right here please? We have Zionists that have entered the camp. . . . We are going to create a human chain . . . So that. They do not pass this point . . . We are going to slowly walk and

---

own failure to protect its students. The week before the *Harvard* decision, Judge Stearns dismissed a Title VI action against M.I.T., *StandWithUs Center For Legal Justice v. Massachusetts Institute of Technology*, - F. Supp. 3d -, 2024 WL 3596916 (D. Mass. July 30, 2024), on the ground that, unlike Harvard, M.I.T. merely "fail[ed] to anticipate the bigoted behavior" the campus demonstrators exhibited, while responding "with a perhaps overly measured but nonetheless consistent sense of purpose in returning civil order and discourse to its campus." *Harvard*, 2024 WL 3658793, at *7. Here, while Columbia's response has been no better and arguably worse than Harvard's, Barnard's response has been far worse than M.I.T.'s mere failure to anticipate the demonstrators' conduct and it has exhibited no "sense of purpose" in doing what must be done to remedy the antisemitism on its campus.

take a step forward. So that we can. Start to push them. Out of the camp," ¶ 356[3]—the same student who weeks before said, "be grateful that I'm not just going out and murdering Zionists." ¶ 269. Columbia then proceeded to reverse or lessen disciplinary sanctions and offered the demonstrators concessions on their Israel-divestment demands. Columbia and Barnard allowed matters to get so out of control that on April 21, Columbia/Barnard Hillel Rabbi Elie Buechler advised Jewish students to return home, because, he said, Defendants could not guarantee their "safety in the face of extreme antisemitism and anarchy." ¶ 351. Nine days later, then Columbia President Shafik had no choice but to admit that the "disruptions on campus ha[d] created a threatening environment for many of [Columbia's] Jewish students and faculty . . . and contribute[d] to a hostile environment in violation of Title VI." ¶ 384.

Whether Columbia and Barnard have been deliberately indifferent thus cannot be resolved on this motion. Plaintiffs allege that the at best half-hearted and ineffective measures Columbia and Barnard disingenuously tout instead prove their deliberate indifference—they show that Defendants are aware of the problem but are deliberately indifferent to, or deliberately refuse to fulfill, their Title VI obligations to protect Jewish and Israeli students. Columbia and Barnard would have the Court infer from their supposed efforts that they are not deliberately indifferent. This is a quintessential issue of fact, and on this motion all inferences must be drawn in favor of Plaintiffs. And, contrary to Columbia and Barnard's misdirected arguments, Plaintiffs' allegations are plainly more than sufficient to state a claim for Columbia and Barnard's invidious direct discrimination against Jews and Israelis—their disparate treatment when it comes to remedying and preventing antisemitic discrimination. Columbia and Barnard's responses to antisemitism, including their failure and refusal to enforce their own conduct codes, unquestionably raise factual

---

[3] Video of that encampment episode can be accessed at https://x.com/luketress/status/1782257658331832579.

issues. Moreover, none of the cases Columbia and Barnard cite are apposite—among other things, none involved anything close to the kind of severe and pervasive onslaught of harassment and discrimination over many months Plaintiffs allege here.

Columbia mouths pieties about how Plaintiffs' allegations are "painful and not what the University would want for any student," Col. Mem. 1, and "very serious" *id*. at 3—but, it does so all in service to its argument that it should evade all accountability for having facilitated the very antisemitism that has robbed Plaintiffs and other Jewish students at Columbia and Barnard of much of their educational experience. To fully appreciate how specious Columbia's motion is and how empty its pieties are, one need only imagine (or review Columbia's history) to see what Columbia's response would have been (or has been) if even a fraction of the abuse Columbia's Jews have endured had been directed against any other protected group. Columbia would not have stood for it for one second. It is impossible to imagine Columbia arguing to the Court, "trust us; we're fixing" campus-wide, continuous, months' long onslaughts against any other protected group. It is impossible to imagine Columbia arguing in a case brought by members of any other group that the case should be dismissed because they were not personally present at enough of the onslaughts for the hostile campus-wide educational environment to have adversely affected them. Columbia's Jewish students do not have the luxury of continuing to trust Columbia or giving Columbia still more time to fix a problem it has permitted to fester and metastasize.

Defendants, apparently the only ones in the world expecting a different campus environment in the coming academic year, contend that Plaintiffs cannot show they will likely be harmed again and that, as a result, Plaintiffs lack standing to seek injunctive relief—the same argument rejected by Judge Stearns in *Harvard* and Judge Scarsi in *UCLA*. *See Harvard*, 2024 WL 3658793, at *4; (whether SAA has standing to seek perspective injunctive relief depends only

on "whether Harvard's actions to date have been adequate and whether they will likely be effective going forward" which is the "core merits dispute" and not resolvable at the motion to dismiss stage); *UCLA*, 2024 WL 3811250, at *4 (plaintiffs had standing because UCLA's "changes . . . do not minimize the risk that Plaintiffs will again be wronged").

And it is no excuse to say that the antisemitism at Columbia and Barnard is "political," Col. Mem. 27; Bar. Mem. 2, that is, say, mere disagreement with the policies of Israel. Plaintiffs do not seek to deny anyone the right to criticize Israeli policies. But campus mobs at Columbia and Barnard have targeted no other country, including those with far worse human rights records, and no other people with anything close to the kind of abuse they direct at Israel and Jews, going far beyond political disagreements to calling for Israel's destruction and denying its right to exist or defend itself, coupled, again, with egregious discrimination and harassment against Jews and Israelis. As the Obama, Trump, and Biden administrations have recognized, and as the widely adopted Intentional Holocaust Remembrance Alliance definition reflects, ¶¶ 69-71, what the mobs are doing is antisemitism, plain and simple. Even more outrageous is Defendants' abject failure, in violation of Title VI, to stop it.

Nor is so-called "academic freedom" an excuse, Bar. Mem. 30—as Plaintiffs also allege, when it comes to discrimination against other groups, Barnard, like Columbia, does not give a fig for academic freedom. If students or faculty need to be disciplined or dismissed to stop them from contributing to Defendants' antisemitic hostile educational environment, then that is what Title VI requires. Defendants' contention that the injunctive relief outlined in the Complaint is too broad because it is designed to ensure Defendants' compliance with Title VI is meritless and, in any event, premature. *Harvard*, 2024 WL 3658793, at *9 (denying motion to strike similar request for injunctive relief). If Defendants do not wish to comply with Title VI, if they want their faculty and

8

students to have the "academic freedom" to spew antisemitism and continue to harass Jewish students, their path is clear: forego federal taxpayer funds and return the funds they have received.

## SUMMARY OF FACTS

For many years, Columbia, one of America's leading universities, has known of, tolerated, and enabled antisemitism, paving the way for a metastasis of antisemitism since Hamas's October 7 massacre. ¶¶ 98-138, 145-305. Plaintiffs have been targets of repeated verbal and physical threats and harassment and forced to confront mobs extolling the massacre and calling for death to Jews and the annihilation of Israel. For instance, at a campus rally on October 12, pro-Hamas demonstrators chanted "from the River to the sea," "globalize the Intifada," and "Jews will not defeat us," and marched down Broadway toward Columbia/Barnard's Hillel forcing it to lock its doors as a security precaution. ¶¶ 171, 174. As early as October 12, when Columbia's Students for Justice in Palestine ("SJP"), a Columbia student group led and composed of Columbia and Barnard students, (and others nationally) held a "National Day of Resistance" rally on campus, it became clear that Defendants would not protect their Jewish and Israeli students.

In the following weeks and months, Columbia and Barnard did nothing effective to stop demonstrators from harassing Jews and Israelis on campus. *E.g.*, ¶¶ 161-76, 189-95, 196-98, 217-42, 243-52, 253-84, 285-97, 294, 306-94. While, on November 10, Columbia temporarily suspended SJP and Columbia-Barnard Jewish Voice for Peace ("JVP"), a Columbia student group led and composed of Columbia and Barnard students, for their violation of Columbia's campus event policies, ¶ 199, SJP and JVP members circumvented the suspension by instead using Columbia University Apartheid Divest ("CUAD"), a coalition of pro-Hamas Columbia and Barnard student organizations, and, as expected, the same Columbia and Barnard students who organized and attend SJP and JVP's unauthorized hate-filled events on Columbia and Barnard's campuses continued doing so on a near-daily basis. ¶ 201. Rather than preventing the rallies—of

which administrators had advance notice, *e.g.*, ¶¶ 169, 189, 197, 203, 228-31, 244, 259, 271, 296, 306—or suspending the student agitators, Columbia's decision to suspend SJP and JVP in name only—and Barnard's refusal to discipline its students, who led and participated in the clubs' antisemitic activity—enabled antisemitic rallies to continue unimpeded into the spring semester, ¶¶ 253-394. On October 20, the student president of a Barnard student club told members that "Zionists aren't invited" and "WHEN I SAY THE HOLOCAUST WASN'T SPECIAL, I MEAN THAT[.]" ¶¶ 181-82. On December 6, Columbia Social Workers 4 Palestine ("CSSW4P") held a "teach-in" titled "Significance of the October 7th Palestinian Counteroffensive" to extol Hamas's October 7 massacre, at which student speakers described the October 7 terrorist attack as "great feats" and praised Hamas, as the speakers' supporters jabbed Jewish students in the face with umbrellas. ¶¶ 227, 232-34. At a December 11 rally on Barnard's campus organized by SJP and JVP, Barnard's Dean Grinage told students that there was nothing she could do to stop the calls for genocide or intimidation against Jews. ¶ 249.

Hate-filled rallies escalated in the spring semester. ¶¶ 253-394. On January 24, CUAD, organized a walkout at which over one hundred students walked out of their classes, gathered at the center of campus, and chanted "Intifada, Intifada, long live the Intifada," "from New York to Gaza, globalize the Intifada" and in Arabic, "from water to water, Palestine will be Arab." ¶ 259. On January 26, President Shafik suggested that Columbia should prepare incoming students to be "more resilient" to the campus environment. ¶ 265. Five days later, posters resembling Nazi propaganda were plastered around both campuses containing an image of a blue and white skunk with an Israeli flag imprinted next to the words "Beware! Skunk on campus." ¶ 267. Around this same time, Khymani James—a Columbia student and CUAD organizer who would later become one of the leaders of the April 2024 campus encampment—livestreamed a meeting with

Columbia's Center for Student Success and Intervention after which he said publicly "be grateful that I'm not just going out and murdering Zionists" and "Zionists don't deserve to live." ¶ 269. Columbia did not remove James from campus, exposing Jewish students to months of further harassment by James and CUAD, including at the encampment at which he led a "human chain" to physically "push" Jewish students out of the encampment area. ¶¶ 269, 356.

Columbia and Barnard student and faculty groups regularly praised and hosted events with terrorist organizations, antisemites, and others who applauded Hamas's massacre. *E.g.*, ¶¶ 149, 150, 254, 270. On March 24, for example, CUAD and Within Our Lifetime ("WOL") co-hosted "Resistance 101," a campus event in a Columbia dormitory and streamed via Zoom, featuring speakers with ties to the terrorist group the Popular Front for the Liberation of Palestine ("PFLP") and Hamas, ¶¶ 285, 287, voicing support for "being a member of Hamas, being a leader of Hamas, being a fighter in Hamas," ¶ 289, and telling students how grateful Hamas, Islamic Jihad, and the PFLP, were for their support, ¶ 290. A few weeks after Resistance 101, the same day President Shafik testified before Congress that "safety is paramount" and that "antisemitism has no place on [Columbia's] campus," Columbia permitted hundreds of students, faculty, and others to erect an encampment on its South Lawn. ¶ 5, 307. At the direction of CUAD, SJP, and JVP, hundreds of Columbia and Barnard students encouraged others to "support," "protect," and "show out" for the encampment. ¶ 309. Four days later, Hillel Rabbi Elie Buechler advised members of Defendants' Jewish community to return home because their campuses were unsafe. ¶ 351.

Rather than disciplining and deterring those responsible for what President Shafik acknowledged as "too many" examples of intimidating and harassing behavior on campus, and forcing students, including Plaintiffs, off campus, Defendants moved classes online. ¶¶ 357-58. Over the next week, President Shafik continued to negotiate with the encampment's student

organizers, repeatedly extending the deadline to vacate. ¶¶ 363, 366-67, 371. On April 29, with

the encampment still in full force, President Shafik released a statement acknowledging that "many

of our Jewish students . . . have found the atmosphere intolerable in recent weeks. . . . Many have

left campus, and that is a tragedy." ¶ 374.

In the early morning hours of April 30, dozens of students and their supporters broke into

Hamilton Hall, a Columbia academic building. ¶ 377. The occupiers smashed windows and the

glass-paneled door and barricaded themselves inside the building. *Id*. Outside Hamilton Hall,

hundreds more students and other agitators formed a human chain to protect the occupied building

and passed supplies to the occupiers inside. ¶ 380. Massive banners were draped on the building,

including one calling for an "INTIFADA" and antisemitic rhetoric and chants continued

throughout the night. ¶¶ 377, 380. Instead of immediately removing the occupiers, Columbia made

empty threats of discipline. ¶ 383. Later that evening, Defendants each issued a shelter in place

order to their respective communities. ¶ 387. Shortly after 9:00 p.m., President Shafik finally

authorized the NYPD to enter Hamilton Hall and arrest the violent occupiers. *Id*. A third

encampment was erected by Columbia and Barnard students on Columbia's campus weeks later.

¶ 393. On June 2, SJP posted a series of photos promising they "WILL BE BACK" and asking

students "ACROSS THE GLOBE PLEDGE TO DISRUPT ALL ASPECTS OF UNIVERSITY

LIFE." *Id*. The caption accompanying the post read, "Until victory, we will be back. Agitate,

educate, escalate for Gaza." *Id*.

Most recently, in June 2024, the Dean of Columbia College and three other Columbia deans

were caught exchanging text messages mocking and dismissing Jewish panelists at an event on

campus concerning antisemitism at Columbia. ¶ 394; Ex. 1.[4] In one text, the Dean of Columbia College replied "LMAO" to a sarcastic text mocking Brian Cohen, the director of Columbia/Barnard Hillel. Other texts, echoing antisemitic tropes, stated that panelists were exploiting the situation for "fundraising potential," coming from "a place of privilege" with superior "resources and support," and "[l]aying the case to expand physical space" such that Jews "will have their own dorm soon." *Id.* In another text, a dean posted vomiting face emojis and another responded, "I'm going to throw up," while a Jewish alumna recounted her daughter's experience with antisemitism at Columbia. *Id.* Yet Columbia took no disciplinary action against the Dean of Columbia College, only suspending rather than terminating the other three (they have since resigned). *Id.*

Notwithstanding Plaintiffs' pleading with Defendants to enforce their policies to prevent the harassment they were enduring, *e.g.*, ¶¶ 6, 158, 339, and notwithstanding President Shafik's admission that Columbia was "a hostile environment in violation of Title VI[,]" ¶¶ 375, 384, at no time did Columbia take effective steps to remedy that hostile environment or that harassment. Student agitators have promised to continue "STRATEGIC, TARGETED ATTACKS" and encouraged others to use the summer to "AGITATE" and "ESCALATE," ¶ 393—leaving little, if any, doubt the hostile educational environment will worsen in the fall when students return.

## ARGUMENT

On a motion to dismiss, courts "must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor," and deny the motion as long as the pleadings support "more than a sheer possibility that a defendant has acted

---

[4] The Court can take judicial notice of these documents as they are publicly available from the House Education Committee. *See In re Chantix (Varenicline) Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 2024 WL 2784234, at *5 (S.D.N.Y. May 28, 2024) (taking judicial notice of statements on the Food and Drug Administration's website).

unlawfully." *Weiss v. City Univ. of N.Y.*, 2019 WL 1244508, at *3 (S.D.N.Y. Mar. 18, 2019) (Broderick, J.). Courts are "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001).[5]

## I.    PLAINTIFFS STATE TITLE VI HOSTILE ENVIRONMENT CLAIMS

To assert a Title VI hostile educational environment claim, a plaintiff must plead that the "harassment was so severe, pervasive, and objectively offensive that it deprived the plaintiff of access to the educational opportunities or benefits provided by the school" and the school had "actual knowledge" of the harassment; was "deliberately indifferent" to the harassment and exercises "substantial control over both the harasser and the context in which the known harassment occurs." *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 595 (S.D.N.Y. 2011) (citations omitted), *on reconsideration sub nom. DC v. Valley Cent. Sch. Dist.*, 2011 WL 3480389 (S.D.N.Y. June 29, 2011). "[T]he hostile environment analysis is fact-specific and is best left for trial." *Koumantaros v. City Univ. of N.Y.*, 2007 WL 840115, at *15 (S.D.N.Y. Mar. 19, 2007) (cleaned up).

Defendants do not and cannot seriously contest that the harassment on their campuses as alleged in the Complaint has been severe, pervasive, and objectively offensive. Columbia admits that the allegations in the Complaint are "deeply troubling," Col. Mem. 2, and that the Complaint "contains many allegations reflecting speech or conduct that is abhorrent and antisemitic," *id.*

---

[5] Defendants rely on exhibits which may not be considered on a Rule 12(b)(6) motion. *See Girardi v. Ferrari Express, Inc.*, 2023 WL 2744027, at *3, *6 (S.D.N.Y. Mar. 31, 2023) (Broderick, J.) (declining to consider extrinsic evidence because "[c]redibility assessments and weighing of evidence is not appropriate on a motion to dismiss at this stage of the litigation"). Courts can consider documents "incorporated by reference" or "integral" to the complaint. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). Barnard Exhibits C and D are not referenced in the Complaint, let alone "integral." Columbia Exhibits I, K, M-N, P-T, Z, CC, and FF-LL are similarly not integral to Plaintiffs' claims. Defendants nonetheless argue that these exhibits should be considered because they are available from Defendants' own websites. Col. Mem. 3 n.2; Bar. Mem. 1 n.1. But such information may only be used "to establish the existence of the [statements], and not for the truth of the facts asserted therein." *Moukengeschaie v. Eltman, Eltman & Cooper, P.C.*, 2016 WL 1274541, at *13 n.13 (E.D.N.Y. Mar. 31, 2016).

at 27. Barnard admits that "the October 7 attack inspired an appalling wave of antisemitic activity . . . at Barnard," Bar. Mem. 1. In its March 4 Report, Defendants' own Task Force on Antisemitism confirmed that Defendants' Jewish and Israeli students face a hostile educational environment. ¶ 446-52; Ex. 2.[6] And President Shafik admitted that Columbia was a "hostile environment in violation of Title VI." ¶ 375. Instead, Defendants try to evade liability by disingenuously deflecting blame (sometimes to each other) and asserting that their responses were not unreasonable. But Second Circuit law is clear: where—as is plainly the case here—a school's purported remedial measures are "not reasonably calculated to end [the] harassment" and are "ineffective," the school is deliberately indifferent. *Zeno*, 702 F.3d at 669.

## A.    Plaintiffs Sufficiently Allege Actual Knowledge

Defendants absurdly dispute actual knowledge of their antisemitism problem, while at the same time touting their supposed efforts to combat it, by pointing to several incidents for which they claim the Complaint does not allege their actual knowledge. Col. Mem. 16; Bar. Mem. 21, 25, 31, 33. But the law is clear that the defendant need not have actual knowledge of every incident, just "enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff[s'] legal claim is based." *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F. Supp. 2d 304, 320 (S.D.N.Y. 2000); *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 361 (S.D.N.Y. 2014) ("[C]omplaints about the harassment of other students . . . provide actual knowledge to the [school] that [plaintiff] himself suffered

---

[6] The Task Force's report, ¶¶ 446-52, also confirmed the other key allegations in the Complaint, including the "isolation and pain many Jewish and Israeli Columbia affiliates have experienced," Ex. 2 at 2, *see generally* ¶¶ 456-621; the "reports of physical harm" to Jewish and Israeli students, Ex. 2 at 2-3, ¶ 449; the "racist epithets and graffiti" and "antisemitic tropes" to which they have been subjected, Ex. 2 at 2, ¶ 448; the "calls for violence against them and their families," Ex. 2 at 2, ¶ 448; the "calls to exclude Israeli veterans from campus [which] apply to nearly all Israeli Columbia affiliates," Ex. 2 at 21, ¶¶ 259, 272; the "repeated violations" of Columbia's codes of conduct by antisemitic demonstrators and the "serious concerns about [Columbia's] enforcement" (or lack thereof) of those codes, Ex. 2 at 2, 4, 10, ¶¶ 449, 452; and the "different norm"—in other words, the invidious double standard—applied at Columbia to Jewish and Israeli students and faculty, Ex. 2 at 23, ¶ 452.

harassment."). There is no question, and, again, Defendants have repeatedly admitted, that they had enough knowledge—extensive, detailed knowledge—of the harassment and hostile environment to which Plaintiffs were subjected.

The Complaint extensively details Plaintiffs' continual efforts to report to Defendants the antisemitism on campus, expressing their fears and anxieties and pleading for help.[7] *See Koumantaros*, 2007 WL 840115, at *14 (actual knowledge triable issue where plaintiff "repeatedly complained of harassment" to administrators). Plaintiffs allege that they, their peers, concerned community members, even the U.S. Congress, not to mention extensive media coverage, alerted Defendants to the egregious antisemitic environment permeating their campus, *e.g.*, ¶¶ 6, 158, 339, 352, and their administrators witnessed it firsthand, *e.g.*, ¶¶ 224, 232, 236, 246, 247, 248, 251, 252. *See Zeno*, 702 F.3d at 668 (jury finding of actual knowledge supported by faculty, staff, and third parties reporting harassment); *TC*, 777 F. Supp. 2d at 596 (administrators' reaction to one incident demonstrated actual knowledge of harassment sufficient to impose liability for subsequent incidents). Plaintiffs' allegations make clear that the antisemitism is "so ubiquitous throughout [Columbia and Barnard] that it would be impossible for . . . administrators to miss," unquestionably "support[ing] a finding that [Columbia and Barnard's] administrators were aware of the . . . anti-Semitic harassment in general." *Pine Bush*, 58 F. Supp. 3d at 361; *e.g.*, ¶¶ 171, 189, 197, 202-05, 222-23, 232, 245, 257, 272, 278, 294, 306-88.[8]

---

[7] *E.g.*, ¶¶ 148, 149, 167, 169, 176, 190, 192, 197, 212, 215-16, 221, 227, 229, 237, 238, 247, 249, 250, 251, 255, 265, 271, 283, 313, 320, 333, 341, 355, 359, 360, 401, 464, 465, 470, 492, 505, 506, 507, 508, 509, 510, 512, 519, 528, 546, 550, 566, 567, 569, 571, 573, 589, 593, 594, 601, 608, 609, 610, 617, 618.

[8] Defendants' cases are inapposite and far afield. Col. Mem. 16, citing *Sutton v. Stony Brook Univ.*, 2022 WL 4479509, at *3 (2d Cir. Sept. 27, 2022) (plaintiff's "allegations in their totality d[id] not give rise to any plausible inference other than that [her] complaints were about [her supervisor's] supervision of her in general," not sex discrimination); *Carabello v. N.Y.C. Dep't of Educ.*, 928 F. Supp. 2d 627, 639 (E.D.N.Y. 2013) (actual knowledge could not be established by student harasser's past behavior, as it was too dissimilar to the alleged harassment, and two other students' reports of harassment were made just one hour before plaintiff's report). Bar. Mem. 25, 31 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998) (no actual knowledge where allegations "consisted of a complaint from parents of other students charging only that [a teacher] had made inappropriate comments during class,

**B.    Plaintiffs Sufficiently Allege Columbia Harassment and Control**

The Complaint sets forth a litany of antisemitic verbal and physical harassment and intimidation that has interfered with Plaintiffs' rights to the full benefits of their educational experience. The "atmosphere of anti-Semitism" Plaintiffs have endured is "more than a collection of individual instances of bigotry," and more than enough to create an actionable hostile environment. *Pine Bush*, 58 F. Supp. 3d at 357, 366-67 (hostile environment triable issue where Jewish students "had anti-Semitic slurs repeatedly directed at them, witnessed swastika graffiti, and were subjected to anti-Semitic 'jokes,'" and two of the three plaintiffs were physically harassed); *see also Banks v. Gen. Motors, LLC*, 81 F.4th 242, 264-65 (2d Cir. 2023) (reversing dismissal where collection of racist and sexist incidents could "evince[] a culture of hostility towards Black and female employees").

Columbia contends that the harassment must have been personally experienced by Plaintiffs. Col. Mem. 18. That is not the law.[9] In "evaluating hostile environment claims, courts have adopted a 'totality of the circumstances' approach that rejects disaggregation of the allegations and requires only that the alleged incidents cumulatively have resulted in the creation of a hostile environment." *Crandell*, 87 F. Supp. 2d at 319. None of the cases Columbia cites

---

plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with" the plaintiff); *Roskin-Frazee v. Columbia Univ.*, 474 F. Supp. 3d 618, 624 (S.D.N.Y. 2019) (pre-assault actual knowledge inadequately pled where plaintiff's allegation that an administrator tweeted an article indicating distrust of sexual assault complaints did not demonstrate knowledge of a "heightened risk of sexual assault in a specific context" or of the plaintiff by her specific assailant)).

[9] Harassment need not be directed at a plaintiff or experienced by a plaintiff firsthand to contribute to a hostile environment. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570-71 (2d Cir. 2000) ("Because the crucial inquiry focuses on the nature of the [] environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim," and hostile environment claim appropriate based on discriminatory remarks "even if [plaintiff] herself were not present or were not the target"); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir. 1997) (past incidents "cannot be ignored").

involve anything close to the kind of campus-wide, months-long, incessant onslaught alleged here, which unquestionably has created an ongoing egregiously hostile environment at Columbia.[10]

Moreover, Plaintiffs allege many direct experiences with harassment on Columbia's campus.[11] The hostile educational environment at Columbia is at least as bad as, if not worse than, the environment in *Harvard*, where the court held that campus-wide protests at Harvard created a hostile environment because, as Plaintiffs allege here, they "were, at times, confrontational and physically violent, and plaintiffs legitimately fear their repetition," and "impacted plaintiffs' life experience at Harvard; they dreaded walking through the campus, missed classes, and stopped participating in extracurricular events." 2024 WL 3658793, at *5.[12]

---

[10] Columbia's two out-of-circuit cases offer it no support. Col. Mem. 18 n.17, citing *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011) (recognizing relevance of indirect incidents); *Mandel v. Bd. of Trs. of Cal. State Univ.*, 2018 WL 5458739, at *21 n.23 (N.D. Cal. Oct. 29, 2018) (noting that incidents that occurred prior to plaintiffs attending the university "could support a hostile environment claim"). In *Harvard*, where, as here, there were allegations of a "myriad of events" over many months, the court "easily distinguished" the cases Columbia relies on here: "In *Mandel*, plaintiffs adequately alleged only three 'isolated' events, and the remaining alleged events were 'vague and lack[ing] substantiating specifics,' such as dates, times, and identities of the students allegedly harassing Jewish students," and "in *Felber*, 'a broad swath of the conduct alleged occurred at times and in places where plaintiffs were not present,' and plaintiffs did not establish that they were denied access to educational services," *Harvard*, 2024 WL 3658793, at *5 n.10. Columbia also relies on a summary judgment decision, *AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.*, 361 F. Supp. 2d 312, 316 n.5 (S.D.N.Y. 2005), to argue that the Court should disregard past antisemitic incidents, but in that case, the plaintiff had already left the school and had omitted from her *testimony* that she was aware of the events or considered them harassing. Finally, Columbia relies on a discovery decision the court expressly limited to "this case." *Id.* (citing *Pratt v. Indian River Cent. Sch. Dist.*, 2012 WL 13172930, at *3 (N.D.N.Y. Nov. 5, 2012)).

[11] *E.g.*, ¶ 190 (shoved during a rally); ¶¶ 223-24 (forced to be escorted to and from class while mobs of students blocked entrances and exits, chanted for the genocide of the Jewish people, and pounded drums, floors, and the walls); ¶ 235 (jabbed with umbrellas and shoved by students shielding speakers expressly lauding Hamas); ¶ 320 (rammed into by a peer who exclaimed, "aww, poor Zionist fucking baby,") ¶ 356 (physically pushed by student members of the encampment, followed, and told to "go back to Brooklyn,"); ¶ 376 (called a "Zionist pig" and oinked at while being followed); ¶ 577 (pulled to ground by their backpack and told, "fuck you Zionist"); *see also supra* at Preliminary Statement. Courts in this Circuit regularly find that allegations of far less severe and pervasive verbal harassment state a claim for or present a triable issue of a hostile environment. *See, e.g.*, *Howley v. Town of Stratford*, 217 F.3d 141, 149-156 (2d Cir. 2000) (triable issue of harassment of a single firefighter based, in part, on an inferior "spreading untrue rumors"); *Kaperak v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, 2022 WL 682633, at *2, *3, *7 (W.D.N.Y. Mar. 8, 2022) (triable issue of severe or pervasive harassment of a single teacher based on cumulative effect of several instances of lewd graffiti and two instances of graphic language); *Barnett v. Johnson City Sch. Dist.*, 2005 WL 8178066, at *2, *6 (N.D.N.Y. Feb. 2, 2005) (racially hostile educational environment adequately pled in part, because a student was allegedly told by a school official to "act respectful, even if your parents aren't").

[12] *See* Ex. 3 (House Education Committee Chairwoman Virginia Foxx recognizing Columbia is "home to some of the most egregious displays of antisemitism on a college campus since October 7."). The Court can take judicial notice of

Columbia suggests that it does not have control over certain incidents alleged in the Complaint because they occurred off campus. Col. Mem. 16-17. Given the overwhelming number of incidents on campus, over which Columbia unquestionably has control, this suggestion has little, if any, relevance, but even if it did, whether it is true raises issues of fact. Columbia does exercise a degree of control over the area immediately outside of campus.[13]

And, as alleged in the Complaint, students and student groups over which Columbia exercises disciplinary authority openly invited outsiders to escalate, harass or otherwise cause chaos on campus and at the gates. *E.g.*, ¶¶ 202-07, 270-74, 285-91, 309, 346; *see also* ¶ 89 (per Columbia policy, "conduct of all guests is bound by University Rules and the student group may be held responsible for the behavior of their invited guests"); *Pine Bush*, 58 F. Supp. 3d at 356 ("substantial control" recognizes that a school's "authority to take remedial action lies in its longstanding disciplinary oversight over its students" (citation omitted)).[14]

Columbia also claims that it lacks control when its students and faculty post antisemitic content on social media and messaging applications, like Sidechat, even when the messages target students. Col. Mem. 17-18. Again, even if this were relevant, given the overwhelming amount of harassment over which Columbia does not and cannot claim it lacks control, Columbia itself expressly asserts "disciplinary oversight," *Pine Bush*, 58 F. Supp. 3d at 356, over social media,

---

this document as it is publicly available from the House Education Committee. *See Chantix*, 2024 WL 2784234, at *5.

[13] For instance, guard booths are located just outside the campus gates, *e.g.*, ¶¶ 172, 202, and it is within the "role and responsibility" of Public Safety to respond to complaints of incidents on sidewalks on the perimeter of Columbia's campus, even when those incidents involve nonaffiliates, *see* Ex. 4 (Columbia terminated a Public Safety officer because his failure to respond to incident involving nonaffiliates on the sidewalk outside of Columbia demonstrated his lack of understanding of the "role and responsibility" of Public Safety).

[14] Columbia's cases are inapposite. *See* Col. Mem. 17. *Oliveras v. Saranac Lake Cent. Sch. Dist.*, 2014 WL 1311811, at *16 (N.D.N.Y. Mar. 31, 2014) did not involve, as here, a school's failure to identify students who were repeatedly engaging in acts of harassment and openly conspiring to conceal their identities and detection. *E.g.*, ¶ 450 (Task Force acknowledges Defendants' inadequate efforts to identify demonstrators and investigate harassment)."

*e.g.*, ¶ 82 (Columbia EOAA Policies & Procedures proscribe harassment "by email or text, or through social media"); ¶ 85 (Columbia Standards and Discipline Policy recognizes that "[c]alls, texts, e-mails, and social media usage by students can contribute to a hostile work, learning, or living environment, even if they occur away from the University premises). To post content on Columbia's Sidechat, an individual must have an email with a Columbia domain. ¶ 397. Columbia's awareness, combined with their refusal to take any steps to identify the perpetrators, cut off access to Sidechat on their campus networks, or enforce their policies, ¶¶ *id.*, 403-04, typifies Columbia's "clearly unreasonable" response to antisemitism. *Zeno*, 702 F.3d at 666; *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 687-88 (4th Cir. 2018) (university had substantial control over harassment that took place on an anonymous social media application because some posts were made "using the University's wireless network," "the harassment concerned events occurring on campus and specifically targeted [] students," and university had the "technical capacity to control" the messages because it "could have disabled access to [application] campuswide" and "sought to identify those students using [university's] network to harass").[15]

### C.    Plaintiffs Sufficiently Allege Barnard Harassment and Substantial Control

Barnard also attempts to downplay and disaggregate antisemitic incidents as merely "discrete" or "episodic," Bar. Mem. 28, 29-33, but that impermissibly "robs the incidents of their cumulative effect," *E.E.O.C. v. Lafond*, 2009 WL 803150, at *4 (E.D.N.Y. Mar. 25, 2009), and

---

[15] Columbia cites *Nungesser v. Columbia University*, 244 F. Supp. 3d 345, 368 (S.D.N.Y. 2017), Col. Mem. 17, but there, unlike here, the plaintiff did not allege any concrete facts suggesting that messages posted on Facebook, Twitter, or Tumblr, were posted by members of the Columbia community, and nothing suggested that the threats in the messages ever escalated to actual physical danger. In *Doe v. Sacks*, 2024 WL 402945, at *7 (S.D.N.Y. Feb. 2, 2024), Col. Mem. 21, unlike here, there were no allegations that the anonymous post "was created using [university] resources, shared or administered by any [university] account or device, hosted on [university] servers, or was otherwise within [the university's] ability to edit or delete. *Cf.* ¶ *404*. As alleged here, Columbia itself asserts control over posts linked to students or created using school resources. ¶¶ 402-04.

should be rejected. Plaintiffs' direct experiences with harassment on Barnard's campus are manifestly different in nature and extent from the cases on which Barnard relies.[16] As in *Harvard*, Barnard's "[p]rotestors marched through campus, staged classroom walkouts, and rallied in campus common areas, at times staying overnight," and "chanted provocative slogans such as 'from the river to the sea,' 'free Palestine,' and 'globalize the intifada,'" *see Harvard*, 2024 WL 3658793, at *1, and rallied in common areas, chanted in Arabic, "from water to water, Palestine is Arab," and were occasionally violent. *E.g.*, ¶ 245.

Barnard asserts that it does not have substantial control over antisemitic incidents involving its students on Columbia's campus. Bar. Mem. 19-21.[17] But Barnard's disciplinary authority over its students extends beyond its physical campus. *E.g.*, ¶ 94 (Barnard Policy Against Discrimination and Harassment proscribes "online manifestations of any of the behaviors prohibited").[18] *See Ware v. Univ. of Vt. & State Agric. Coll.*, 2024 WL 989804, at *22 (D. Vt. Mar. 7, 2024) (university had "substantial control at least [for] the motion to dismiss stage" over off-campus basketball team

---

[16] *See* Bar. Mem. 28, citing *Roe v. St. John's Univ.*, 91 F.4th 643, 650, 661 (2d Cir. 2024) (single plaintiff alleged harassment in the form of a "single anonymous tweet accusing him of sexual assault" and threatening calls and texts from one student and being punched at a bar by another); *Nungesser*, 244 F. Supp. 3d at 362-67 (single plaintiff alleged harassment largely by one other student); *Carabello*, 928 F. Supp. 2d at 643 (single student suffered one incident of harassment that the court found insufficiently severe).

[17] Barnard argues that Plaintiffs' definition of Columbia as both Columbia University and Barnard College in its Complaint alone supports its dismissal. Bar. Mem. 18. Yet, the Complaint unquestionably puts Barnard on "fair notice" of the claims against it. This is sufficient at the motion to dismiss stage without the benefit of discovery. The cases Barnard relies on, Bar. Mem. 18, are inapposite. *See Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (complaint dismissed where plaintiff provided "no factual basis to distinguish" conduct between defendants); *Ochre LLC v. Rockwell Architecture Plan. & Design, P.C.*, 2012 WL 6082387, at *6-7 (S.D.N.Y. Dec. 3, 2012) (complaint dismissed where plaintiff failed to distinguish at all between an architect, a design firm, a hotel, and a procurement agent), *aff'd*, 530 F. App'x 19 (2d Cir. 2013); *Nesbeth v. N.Y.C. Mgmt. LLC*, 2019 WL 110953, at *3 (S.D.N.Y. Jan. 4, 2019) (complaint dismissed where it was impossible for twenty-one defendants—some of which did not even exist—to be responsible for all decisions).

[18] Barnard's claim that Plaintiffs cannot plausibly show that Barnard has control or knowledge of the harassment on Sidechat is meritless. Bar. Mem. 21. It is clear Barnard knew of the harassment on Sidechat. *E.g.*, ¶¶ 400-01. To post content on Columbia's Sidechat, the individual must have a valid email address—either Columbia or Barnard. ¶¶ 397, 401; Bar. Mem. 21 n.7. At a minimum, it is an issue of fact whether the harassment on Sidechat was perpetrated by Columbia or Barnard students. *See supra* § I.

house where university helped "contribut[e] to the image of the House as a place for official University activities" and had disciplinary authority over harasser). At a minimum, these raise issues of fact that cannot be decided at this stage.

### D.    Plaintiffs Sufficiently Allege Deliberate Indifference

Defendants' argument that Plaintiffs do not sufficiently allege deliberate indifference is revisionist history; their responses to the conflagration of antisemitism that has engulfed their campuses have been anything but "reasonably calculated to end harassment," *Zeno*, 702 F.3d at 669.[19] Where, as here, a school "has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such [school] has failed to act reasonably in light of the known circumstances." *Id.* Defendants' purported measures "could not have plausibly changed the culture of bias or stopped the harassment[.]" *Pine Bush*, 58 F. Supp. 3d at 365.[20]

---

[19] In *Zeno*, the Second Circuit affirmed the appropriateness of a deliberate indifference jury verdict under Title VI, holding that even though the school, like Defendants claim to have done here, had taken remedial measures, the jury was entitled to find it delayed its response, took measures that were "little more than half-hearted," or "ignored the many signals that greater, more directed action was needed." 702 F.3d at 670-71. And because "[d]eliberate indifference will often be a fact-based question," *TC*, 777 F. Supp. 2d at 596, as here, it is inappropriate for resolution on this motion. Given the Complaint's allegations, a jury could and would easily find that, as in *Zeno*, Defendants' responses were delayed, half-hearted, or ignored the need for much more. In fact, Defendants' responses have been all three and much worse.

[20] Tellingly, none of the cases on which Defendants rely come close to the widespread harassment and deliberate indifference here. Col. Mem. 14-26, 29, citing *Doe v. Syracuse Univ.*, 2023 WL 7391653, at *2-3 (2d Cir. Nov. 8, 2023) (no deliberate indifference where Title IX office promptly provided resources to single plaintiff, notified the police within a week of her assault, issued a no contact order, provided resources, and filed a formal complaint even after plaintiff declined to do so herself); *KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, 2013 WL 177911, at *6-7 (S.D.N.Y. Jan. 16, 2013) (no deliberate indifference to two incidents by separate harassers against a single victim where school responded with appropriate remedial measures), *aff'd*, 531 F. App'x 132 (2d Cir. 2013); *Doe v. Trs. of Columbia Univ. in City of N.Y.*, 2022 WL 3666997, at *15 (S.D.N.Y. Aug. 25, 2022) (university complied with its complaint policies and procedures rather than engaging in "speculation" or indulging plaintiff's "preference for a different or more expansive investigation"); *HB v. Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 4477552, at *15 (S.D.N.Y. Sept. 27, 2012) (no deliberate indifference where only one race-related incident alleged); *Doe ex rel. Doe v. Brittonkill Cent. Sch. Dist. Bd. of Educ.*, 2018 WL 6622191, at *17 (N.D.N.Y. Dec. 18, 2018) (no deliberate indifference where in response to only actionable incident, school summoned law enforcement, "attempted to press charges against the [nonstudent harasser], and the [harasser] was banned from coming on to school property"); *Tubbs v. Stony Brook Univ.*, 343 F. Supp. 3d 292, 317 (S.D.N.Y. 2018) (no deliberate indifference where delay in adjudicating harassment complaint alone was not "unreasonable enough to invite Title IX liability," especially given that the delay was caused by plaintiff herself); *Feibleman v. Trs. of Columbia Univ. in City of N.Y.*, 2020 WL 3871075,

### 1.    Columbia Is Deliberately Indifferent

Columbia has had months of unrelenting antisemitic harassment to develop its response, but has failed to take any effective measures.[21] In this Circuit, a "finding of deliberate indifference depends on the adequacy of a school['s] response," not the mere existence of condemnations and plans. *Pine Bush*, 58 F. Supp. 3d at 361. "Responses that are not reasonably calculated to end harassment are inadequate[,]" and "once a school is aware of its ineffective response, a delay before implementing further remedial action is no less problematic." *Zeno*, 702 F.3d at 669-70.

Columbia's argument that it has "prioritized its students' physical safety," Col. Mem. 20, and worked to "address Plaintiffs' concerns about protest activity," *id*. at 22, is belied by Plaintiffs' allegations. It could not be clearer that Columbia's response has been unreasonably inadequate. To take one example of many, in anticipation of SJP's National Day of Resistance on October 12, which Provost Mitchell acknowledged "risk[ed] creating an unsafe environment," Columbia restricted campus access to CUID holders and promised to impose discipline for rule violations, ¶¶ 168-70—but those measures proved ineffective, and failed to deter the agitators, *e.g.*, ¶¶ 171-74. Columbia's refusal to take effective measures for the rest of the academic year typifies deliberate indifference. *E.g*, ¶¶ 189-91, 259-61, 275-77, 306-389; *See Zeno*, 702 F.3d at 669. In fact, the very measures Columbia cites only make its deliberate indifference undeniable. For

---

at *6 (S.D.N.Y. July 9, 2020) (single plaintiff could not identify any action that Columbia "should have but failed to undertake" to prevent conduct against him which, in any event, fell "short of the severity and prevalence required to support a deliberate indifference claim")); Col. Mem. 17-19, 25; Bar. Mem. 21-33, (citing *Sacks*, 2024 WL 402945, at *6-7 (no deliberate indifference where school investigated and took what actions it could in response to plaintiff being allegedly harassed by anonymous fellow students who published a Google spreadsheet on "non-university accounts" accusing him of sexual misconduct); *Roskin-Frazee v. Columbia Univ.*, 2018 WL 6523721, at *9 (S.D.N.Y. Nov. 26, 2018) (single victim failed to adequately plead deliberate indifference post-assault where she did not allege the university acted in a "clearly unreasonable" manner once she gave them notice of the assault and they opened an investigation)).

[21] Even as far back as 2004, professors in Columbia's Middle East Studies department, including Joseph Massad, were exposed by the film *Columbia Unbecoming* for creating a culture of antisemitism and intimidating students who expressed contrary views on Israel. ¶¶ 100-08. Yet Columbia failed to act, reinforcing this culture. ¶ 108 (Massad granted tenure); *see also* ¶¶ 124, 149, 424, 429.

example, Columbia's decision to restrict access to campus establishes that it knew of rallies beforehand and was acutely aware of the safety risks that they posed, but still opted not to stop them. *See Harvard*, 2024 WL 3658793, at *6 (deliberate indifference adequately pled where demonstration in academic lounge that violated university policies occurred "without any pushback from [] school administrators," and university police officers "failed to react" to physical harassment at an encampment).

Columbia similarly touts its temporary suspension of SJP and JVP in November 2023. Col. Mem. 24. But those suspensions proved to be in name alone, *Harvard*, 2024 WL 3658793, at *6, and did not apply to the groups' leaders or members. As a result, the leaders and members of SJP and JVP continued to operate with impunity through another unauthorized group, CUAD. ¶¶ 199-201, 212. While CUAD organized many of the events at issue, including the encampment (with SJP and JVP), ¶ 307, Columbia has taken no action against it or its member organizations, nor has Columbia acted to stop new, unauthorized groups from forming, such as CSSW4P and Faculty for Justice in Palestine ("FJP"), ¶¶ 219, 258; *see Harvard*, 2024 WL 3658793, at *6 (suspension of student group proved to be "in name alone," when it subsequently organized an encampment).[22]

Columbia had no better handle on implementing effective and adequate measures in December. For example, despite the administration's promise that CSSW4P's "teach-in" titled "Significance of the October 7th Palestinian Counteroffensive" would "not go forward," ¶ 230, the event not only took place, but Columbia officials actively aided the organizers, *e.g.*, ¶¶ 232,

---

[22] Columbia asserts that it has "made clear that its employees are not immune from discipline," and that "when students have reported instances involving professors, they have been investigated." Col. Mem. 16 n.14, 24 (citing Complaint paragraphs that do not allege discipline). Yet the Complaint establishes that faculty harass Jews and Israelis with impunity. *E.g.*, ¶ 419 (Associate Director of Undergraduate Career Development calls for the destruction of "the Zionist entity" during a rally, but is not disciplined); ¶ 423 (President Shafik confirms Professors Khalidi and Dabashi are not under investigation); ¶ 427 (President Shafik confirms Professor Franke has not been formally disciplined but was merely "spoken to"); ¶ 429 (Professors Massad and Abdou deny that they had been disciplined for antisemitism); ¶ 431 (Columbia fails to rescind offer of employment to individual who published article comparing Israel to Nazi Germany and invoked antisemitic tropes during a speech).

236. During the event, one student described Hamas's horrific October 7 attack as "great feats," ¶ 233, another openly praised Hamas, ¶ 234, and Jewish students were shoved and jabbed with umbrellas, ¶ 235.

Despite evidence of a worsening environment for Jewish and Israeli students, Columbia did not meaningfully adjust its response to the antisemitism on campus as the spring semester began. And there was no reason to believe the hostile environment would improve on its own, as a prominent student-organizer told the *Columbia Spectator*: "The administration has been betting on us calming down and getting busy and forgetting about it . . . [W]e come stronger every time after a break." ¶ 253. Columbia's efforts, which consisted of repeating the same "clearly unreasonable" and ineffective measures, *Zeno*, 702 F.3d at 666, that had failed in the fall, were plainly insufficient, and antisemitism intensified in January 2024. *E.g.*, ¶¶ 257-61 (describing January 19 and 24 rallies rife with harassment, including calls for the genocide of Jews and exclusion of Israelis from campus, open support for terrorist organizations, and physical intimidation); ¶¶ 270-74 (describing February 2 "All Out for Palestine" rally organized and promoted by CUAD, SJP, JVP, and outside agitators from WOL and Samidoun during which a Jewish student was assaulted, and there were chants of "go back to the gas chambers").

As the harassment escalated, Columbia continued to do nothing effective to stop it. For example, during CUAD, SJP, and JVP's February 8, 2024 walkout, ¶¶ 275-77, Columbia again restricted campus access to CUID holders, which, unsurprisingly, failed to curtail antisemitic genocidal and murderous chants. ¶ 275. Five days later, CUAD and SJP led another rally, during which students marched around campus, culminating in a blockade at the entrance of Butler Library, where they broke the glass of a library door. ¶ 278.

Columbia's reliance on its statements, initiatives such as Listening Forums, and meetings with students, fares no better. Col. Mem. 22. Again, those efforts, such as they were, reflect that Columbia was acutely aware of its antisemitism problem, but rather than take effective action to protect its Jewish students, Columbia issued nothing but ineffective platitudes and made empty promises. *See Zeno*, 702 F.3d at 670 (jury was entitled to find deliberate indifference even though school implemented bias trainings and reorganized an extracurricular group meant to combat prejudice); *Pine Bush*, 58 F. Supp. 3d at 364-65 (reasonable jury could find school deliberately indifferent where its "seminar[s]" and "assemblies, even ones that specifically address[ed] the discrimination complained of" proved ineffective). Likewise, meetings with students proved hollow. ¶¶ 148, 177-79, 192, 218, 265-66, 401, 479, 507-09, 512-13, 601, 618. Columbia ignores the allegations that Plaintiffs were told by administrators there was nothing they could do, and that their concerns were ignored or dismissed.[23] *See Harvard*, 2024 WL 3658793, at *6 ("Indeed, in many instances, Harvard did not respond at all."). And courts in this Circuit routinely find meetings with the harassed students insufficient. *See, e.g.*, *Pine Bush*, 58 F. Supp. 3d at 364; *Koumantaros*, 2007 WL 840115, at *14-15.[24] Columbia argues that it has "spoken out repeatedly against antisemitism and harassment of Jewish and Israeli students." Col. Mem. 23. But to "conclude that the [Complaint] has not plausibly alleged deliberate indifference would reward [Columbia] for

---

[23] *E.g.*, ¶¶ 148-49, 167, 169, 176, 192, 215-16, 218, 221, 231, 233, 246-51, 256, 265, 313, 320, 333, 341, 355, 360, 465, 470, 505-10, 512, 519, 594, 601, 608-09, 613, 617-18.

[24] Columbia relies on two out-of-circuit cases involving public universities to argue that its inaction "does not rise to deliberate indifference" because administrators met with victims. Col. Mem. 17-23. In *Felber*, 851 F. Supp. 2d at 1188, the university met with the victims and harassers but also took other appropriate steps as necessary, including having campus police arrest protestors, to respond to disruptive protest activity—activity which pales in comparison to the widespread harassment alleged here. In *Mandel*, 2018 WL 5458739, at *23, the plaintiffs merely disagreed with the outcome of an investigation. Here, by contrast, Plaintiffs allege Columbia's willful failure to identify perpetrators, investigate their misconduct, and enforce policy violations. When Columbia finally did engage with the harassers, it was not in connection with investigating their misconduct, but capitulating to their demands once they had erected the encampment. *See supra* Summary of Facts.

virtuous public declarations that for the most part, according to the allegations of the [Complaint], proved hollow when it came to taking disciplinary measures against offending students and faculty." *Harvard*, 2024 WL 3658793, at *6.

Columbia also argues that Plaintiffs "cannot know with certainty whether [disciplinary] actions were taken," but information released by the House Education Committee on August 19, 2024 confirms just how hollow its threats of discipline were. Ex. 5. For example, of the 22 students arrested inside Hamilton Hall, 18 are in good standing, three are on interim suspensions, and one on probation—notwithstanding Columbia's statement that occupiers would face expulsion. And of 35 students placed on interim suspensions for refusing to leave the encampment, Columbia lifted and dismissed charges for 29 of the students; 31 are currently in good standing, two are on interim suspension from previous incidents, one who was previously on disciplinary probation is now suspended, and one is now on disciplinary probation.[25] Col. Mem. 24.

Documents Columbia produced to the House Education Committee show that between October 7 and March 24, Columbia had suspended only three students for antisemitic conduct—despite the Complaint's numerous allegations of antisemitic incidents that occurred during that time—and all three suspensions were lifted or reduced. ¶ 292. It was not until students held a terrorist recruitment event, ¶¶ 285-91, and then only in the face of a congressional hearing on Columbia's response to antisemitism, that Columbia finally suspended a handful of additional students, which were later lifted. ¶ 292. *See Pine Bush*, 58 F. Supp. 3d at 363 ("[A]ttempts at disciplining students for harassment did not appear to have had an effect on the slurs, 'white power chants,' Hitler salutes, and swastika graffiti that Plaintiffs allege to have endured on a regular

---

[25] Columbia asserts that the Complaint admits many students were suspended. Col. Mem. 24. Yet the paragraphs Columbia cites tell a different story—where suspended students remain on campus, *e.g.*, ¶¶ 296, 324, 369, or students who repeatedly harass others go unpunished, *e.g.*, ¶¶ 181-87, 198, 205, 253, 260, 274, 292, 358.

basis."); *see also Zeno*, 702 F.3d at 669 (jury was entitled to find deliberate indifference even though school promptly disciplined harassers, in part, because such discipline "had little effect, if any" on the harassment); *Harvard*, 2024 WL 3658793, at *6 (denying Harvard's motion to dismiss SAA and Jewish student's hostile educational environment claim, noting the insufficiency of "a handful of steps that Harvard took in response to antisemitic incidents").[26]

### 2.    Barnard's Deliberate Indifference

Barnard likewise claims its response has been "robust" and included "extensive institutional efforts to combat antisemitism," Bar. Mem. 18, 22, but as with Columbia, "the facts as pled show that [Barnard] failed [its] Jewish students." *Harvard*, 2024 WL 3658793, at *6. Barnard's utterly inadequate response to antisemitism after October 7 was not merely a "failure of clairvoyance" or "overly measured," nor did it reflect a "consistent sense of purpose in returning civil order and discourse to its campus." *Id*. at *7. Rather, Barnard's reaction "was, at best, indecisive, vacillating, and at times internally contradictory." *Id.* Barnard allowed prohibited events "without any pushback from [] administrators," even as administrators attended those events, Public Safety "failed to react" to physical and verbal harassment, "in many instances, [Barnard] did not respond at all," and Barnard's statements "proved hollow when it came to taking

---

[26] And although "an educational institution is entitled to deference in its disciplinary actions," Col. Mem. 30, as Plaintiffs' allegations make clear, Columbia's administrators have exercised that discretion in a manner invidiously discriminatory against Jews and Israelis compared with other groups. *Tesoriero v. Syosset Central School District*, 382 F. Supp. 2d 387, 398-99 (E.D.N.Y. 2005), Col. Mem. 20, is instructive on this issue. Though the court noted that a school has the discretion to respond to harassment so long as it, in "good faith," "takes timely and reasonable measures to end the harassment," it found the school's deliberate indifference to be a question of fact where administrators met with the harassing teacher, and asked staff members "to check up on" the victims but, "did nothing," like Columbia here, that would have "reasonably been expected to remedy the violation." Similarly, in *Campisi v. City University of New York*, 2016 WL 4203549, at *7 (S.D.N.Y. Aug. 9, 2016), Col. Mem. 19-20, the court's finding of deliberate indifference hinged on the fact that though the school responded to plaintiff's harassment claims, the "failure to officially document or investigate the issue, and the office relocation that left [the plaintiff] in continued contact with [her harasser]" proved "insufficient solutions that left her vulnerable to future harassment." That is exactly what Plaintiffs allege here—nearly one year after the explosion of antisemitism on campus, Plaintiffs enter a new semester more vulnerable as Jews and Israelis than ever before.

disciplinary measures against offending students and faculty"—all while Barnard "repeatedly publicly recognized [] an eruption of antisemitism on its campus." *Id.*

Barnard's argument, like Columbia's, that the Court disaggregate the incidents alleged in the Complaint, Bar. Mem. 23-33, should be rejected. The Court must consider the "totality of the circumstances," *Koumantaros*, 2007 WL 840115, at *14 (citation omitted). Barnard disingenuously contends it "took proactive steps to warn students" about a disruptive Barnard rally. Bar. Mem. 24. The December 11 rally cannot be viewed in isolation. *See supra* § I.C. Barnard's claim that, in part, by collaborating with Columbia, limiting access to campus, issuing a warning, and encouraging students to take "alternative routes" ahead of the December 11 rally, Bar. Mem. 24, it should be absolved of Title VI liability fails, as the response was not reasonably calculated to end harassment. In fact, Dean Grinage and other Barnard administrators attended the rally and advised Plaintiffs that Barnard would not act because it was easier to let it happen than to stop the rally. ¶¶ 247-49; *see also* ¶ 252 (Aryeh continued to see students on campus who bragged about their participation).

Barnard's contention that its community was simply "at a rally on campus demanding a ceasefire," Bar. Mem. 25, could not be further from the truth. Barnard's administrators watched as its Jewish and Israeli community was harassed with antisemitic and genocidal chants such as "Intifada, Intifada, long live the Intifada," and in Arabic, "from water to water, Palestine is Arab," and physical assault. ¶ 245. Barnard also selectively quotes its own statements to argue it has "condemned and disavowed antisemitism," Bar. Mem. 21, and features its initiatives to "promote respectful dialogue," such as its January 19 "Day of Dialogue," Bar. Mem. 23. But it omits that this "Day of Dialogue" prominently featured Hatem Bazian—who has promoted violence against

Jews and founded and chairs AMP—and that the event was disrupted by CUAD, SJP, and JVP. ¶¶ 254, 256.

### 3.    Task Force Report Confirms Defendants Deliberate Indifference

Defendants also cite the creation of the Task Force, which was announced on November 1, 2023, as if it negates liability. Col. Mem. 22; Bar. Mem. 22 ("More than words, Barnard partnered with Columbia to launch a task force entirely dedicated to protecting 'Jewish students targeted by antisemitism.'"). On March 4, the Task Force issued its first and only report to date, which confirmed the extent of antisemitism at Columbia and the inadequacy of Columbia's response. *See* ¶¶ 446-53; Ex. 2.[27] The Task Force, however, has no power to act, and Columbia has taken no effective *actions* in response to the Task Force or its sole report. Nearly all Plaintiffs' allegations involve events following the announcement of the Task Force's formation on November 1, and much of the most severe and pervasive antisemitic harassment occurred after its only report—in short, the formation of the Task Force, like everything else Defendants claim to have done, did not "deter further harassment." *Pine Bush*, 58 F. Supp. 3d at 363; *see Harvard*, 2024 WL 3658793, at *3, *6 (deliberate indifference adequately pled even though Harvard created both an Antisemitism Advisory Group and a Presidential Task Force on Combating Antisemitism). Defendants have failed to implement many of the Task Force's most basic recommendations, including that the location of a demonstration "must ensure that demonstrations do not interfere with classroom learning and other essential functions of the University," Ex. 2 at 8; "when an unauthorized demonstration is taking place, representatives of the University should intervene

---

[27] While the March 4 Report focuses on Columbia's Rules on Demonstrations, the findings concerning the harm Plaintiffs—and other Jewish and Israeli students have faced—are not limited to Columbia. The March 4 Report's conclusions as to harm refer to "Columbia affiliates" which are defined as "includ[ing] students, faculty, and staff of Columbia [], Barnard, and Teachers College." Ex. 2 at 2. For example, "[t]here have also been reports of physical harm to students, including Columbia affiliates who were protesting against Hamas" and that "a different norm has applied to many Jewish and Israeli Columbia affiliates." ¶¶ 449, 452.

more proactively 'in real time' . . . [t]hey should not be content just to 'wait out' a demonstration and prevent violence" *id.* at 11; and "to provide more guidance on the meaning of 'discriminatory harassment,' including antisemitic harassment," *id.* at 20.

Even after meetings, the creation of the Task Force, "virtuous public declarations," *Harvard*, 2024 WL 3658793, at *6, and repeated promises that antisemitism would not be tolerated and violators would be disciplined, on March 24, CUAD and WOL co-hosted "Resistance 101," an unsanctioned event on Columbia's campus that featured speakers from organizations with confirmed ties to terrorists. ¶¶ 285-91. The event was initially scheduled to take place in-person at the Barnard Center for Research on Women but Barnard—and then Columbia—declined to approve the event. ¶¶ 286-87. Shortly after Resistance 101, CUAD organized and co-sponsored another unauthorized rally on Columbia's campus, ¶¶ 294-97, notwithstanding the Task Force's recommendation that "more [needed to be done] to stop unauthorized protests as they occur[ed]." ¶ 450. In response, President Shafik confirmed that the rally was an "unapproved event . . . in violations of [Columbia's] rules and policies," and that students who participated would be identified and disciplined, ¶ 297—i.e., more of the same empty platitudes and hollow promises that had proven ineffective in deterring harassment, *e.g.*, ¶¶ 170, 213, 230-32.

Defendants argue that Plaintiffs cannot insist on "particular disciplinary action." Col. Mem. 25; Bar. Mem. 27. But Plaintiffs are not insisting on "particular disciplinary action"—they are seeking *effective* action.[28] Further, Defendants' claims that they have been investigating violations

---

[28] None of Columbia's cases, again, involved anything close to the facts alleged here – months and months of extensive harassment. In three of them, the plaintiff's entire case boiled down to a complaint that they were "in some way deprived of access to other, different procedures" in a school's handling of their particular sexual assault investigation, which resulted in an outcome each thought erroneous. *Doe*, 2022 WL 3666997, at *15; *Feibleman*, 2020 WL 3871075, at *6 ("[Plaintiff] does not identify a single witness interview or other investigative action that Columbia should have but failed to undertake."); *see also Tubbs*, 343 F. Supp. 3d at 316 ("[T]he undisputed evidence showed that [the school] met its notice requirements, conducted a pre-Hearing investigation, and arranged for a Hearing in which both sides were able to present witnesses, offer evidence, read opening and closing statements, and question one another before a body of fact-finders, who received specific training."). Similarly, in *Welcome v. New York City Department of*

and enforcing their policies, Col. Mem. 23-26; Bar. Mem. 27, fare no better. Defendants cannot—

and do not—contest the lack of enforcement for the vast majority of antisemitic incidents alleged

in the Complaint. Defendants' own Task Force admitted—long before the establishment of the

encampment—that there have been "repeated" policy violations, that Defendants "generally ha[ve]

not tried to stop violations as they have occurred," that they needed to do more to "[i]dentify[]

[m]asked [d]emonstrators," and that they needed to "be more effective at investigating and

enforcing violations after the fact." ¶¶ 449-50.

### 4.    Columbia's Responses Were Clearly Unreasonable

Columbia argues that its response to the encampment evolved as "safety concerns

escalated." Col. Mem. 21.[29] But the fact that antisemitism persisted and intensified following

Columbia's supposed efforts to combat antisemitism and led to a nearly two-week long takeover

negates Columbia's arguments. Columbia's inaction and failure caused Plaintiffs "to undergo

harassment [and] ma[de] them liable to or vulnerable to it," as the encampment resulted from

Columbia's "clearly unreasonable" response to the months of continued abuse that preceded it.

*Zeno*, 702 F.3d at 666. *E.g.*, ¶¶ 268-69, 356.

Columbia's responses to the encampment were also "clearly unreasonable." *Id*. Columbia

first issued "repeated warnings," Col. Mem. 21, but as detailed *supra* § I.D.1 Columbia knew from

---

*Education*, 2018 WL 5817156, at *7 (E.D.N.Y. Nov. 6, 2018), the defendant school "act[ed] expeditiously and reasonably" when it called the police and ambulance "within one day after" learning about the incident. Columbia also claims, citing *Tyrrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601, 628 (E.D.N.Y. 2011), that it can disregard a "plaintiff's advocacy of more aggressive investigation," Col. Mem. 26, but omits that the plaintiff there contended "defendants could only have acted reasonably" by instituting an action that under the circumstances was "unfeasible, unnecessary and unsound."

[29] Columbia cites *Carabello*, 928 F. Supp. 2d at 636, 641, Col. Mem. 22, but there the school's response was "expeditious and effective"; the school "consistently took appropriate disciplinary measures in response to" the harasser's conduct before plaintiff's assault, and in response to plaintiff and two other students being assaulted, that day, the school's public safety officer "put out an 'APB' radio call for school security to find [the harasser] and notified the New York City Police Department of the incident," at which point the harasser was placed on "superintendent's suspension," was banned from campus until his hearing, and was ultimately suspended for a full calendar year and never returned to the school.

prior experience that this would not deter misconduct. *See Zeno*, 702 F.3d at 669 ("Where a school [] has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such [school] has failed to act reasonably in light of the known circumstances." (citation omitted)). Columbia authorizing the NYPD to enter campus in connection with the encampment, *see* Col. Mem. 20-21,[30] at most establishes that Columbia could have, but refused to, authorize the NYPD to intervene during the previous six months. And even after the NYPD first intervened, the encampment was immediately reassembled. ¶ 324. But rather than meaningfully respond, Columbia relied on their same ineffective measures and ultimately forced Plaintiffs to tolerate two more weeks of escalating physical and verbal antisemitic harassment, until a group of occupiers broke into an academic building before Columbia authorized the NYPD to intervene. ¶¶ 324-89. Deliberate indifference (like insanity) is evidenced by doing the same thing over and over and expecting a different result.

Columbia contends that its efforts to negotiate with the encampment organizers—primarily with a student who previously said publicly that they should be "grateful that [he's] not just going out and murdering Zionists," ¶ 269—was part of Columbia's purported efforts "to ensure that the rights of all persons are respected," Col. Mem. 21. But Columbia's refusal to act despite such virulent antisemitism—even as it repeatedly acknowledged that the encampment created a hostile environment for Jewish and Israeli students, *see supra* § I.B—ensured that Jewish and Israeli students' most basic rights—the rights to safe, in-person instruction and a learning environment

---

[30] The cases Columbia cites are inapposite. In *Brittonkill*, 2018 WL 6622191, at *17, the transgressor was a parent, and not only were police "summoned in response to th[e] incident," but "the District attempted to press charges against the parent, and the parent was banned from coming on to school property." While arrests may have been sufficient in *Felber*, 851 F. Supp. 2d at 1188, the harassment there was not nearly as severe and pervasive as it is here. *See Harvard*, 2024 WL 3658793, at *5 n.10 (noting that in *Felber*—unlike the antisemitic hostile environment alleged at Harvard in the aftermath of October 7—much of the misconduct "occurred at times and in places where plaintiffs were not present, and plaintiffs did not establish that they were denied access to educational services").

free from discrimination and harassment—were far less of a priority to Columbia than the supposed rights of their persecutors to continue to harass them.[31] *See Pine Bush*, 58 F. Supp. 3d at 358 ("Plaintiffs were deprived of a supportive, scholastic environment free of racism and harassment." (citation omitted)).[32] Columbia cannot rely on these one-sided negotiations to escape liability. *See Harvard*, 2024 WL 3658793, at *2, *6 (plaintiffs adequately pled Harvard's deliberate indifference in part because Harvard "negotiated with leaders of the encampment" and Harvard police witnessed physical harassment and failed to react).

Columbia asserts that moving classes online was a reasonable response. Col. Mem. 26-27. In doing so, however, rather than removing the perpetrators of antisemitic harassment from campus, Columbia removed Jewish and Israeli students who were being victimized. This "accommodation" rewarded the harassers by permitting them to take classes from the encampment when they otherwise would have been absent, or by allowing students to attend class when they otherwise would have been precluded from doing so by their suspensions. ¶¶ 357-58. And in the months prior, Columbia repeatedly denied requests by Jewish and Israeli students for the same accommodations, *e.g.*, ¶¶ 189, 470, 600, further confirming that Columbia's "reaction was, at best, indecisive, vacillating, and at times internally contradictory." *Harvard*, 2024 WL 3658793, at *6.

---

[31] Any discipline Columbia imposed because of the encampment, Col. Mem. 21 was already too little, too late. *See supra* § I.D.1. At the same time, any discipline resulting from the encampment was insufficient and Columbia did not take the appropriate measures to enforce any interim suspensions it issued from the encampment. *E.g.*, ¶ 354 (individuals supposedly banned from campus are seen in encampment). Columbia's argument that its lifting of certain suspensions "underscores why investigations and disciplinary proceedings ordinarily take time" is meritless. Col. Mem. 25. Between October 7 and March 23, only three students were given interim suspensions, despite months of vitriolic antisemitic conduct. ¶ 292. At the motion to dismiss stage, the Complaint sufficiently alleges that Columbia's "reaction was, at best, indecisive, vacillating, and at times internally contradictory." *Harvard*, 2024 WL 3658793, at *6.

[32] Columbia's reliance on *Felber*, 851 F. Supp. 2d at 1188, Col. Mem. 21-22, is unavailing as there, a public university engaged in "ongoing" dialogue with protestors in order to ensure that their First Amendment rights were respected and campus police arrested disruptive protestors. The First Amendment does not relieve Defendants of their obligation to protect Jewish and Israeli students. *See infra* § I.D.6. Moreover, *Felber* did not involve a situation, as here, where the university was capitulating to the demands of harassers who had created an admitted hostile environment that forced Jewish and Israeli students off campus.

### 5.    Barnard's Responses Were Clearly Unreasonable

Barnard's arguments concerning its responses to the encampment should likewise be rejected. Barnard is wrong that Plaintiffs fail to plead that Barnard students were involved for many of the incidents alleged. Bar. Mem. 26. As discussed *supra*, the encampment was organized by joint student groups, and run by hundreds of Columbia and Barnard students, who subjected Plaintiffs and others to harassment. *See* ¶¶ 306-94.

Any interim suspensions Barnard ultimately issued were woefully insufficient. For example, a Barnard student who was suspended (and arrested) returned to the encampment. ¶ 369. Barnard walked back interim suspensions for the "vast majority" of harassers (no matter how bad their conduct was) if they "agree[d] to follow all Barnard rules during a probationary period." Bar. Mem. 27. Barnard, like Columbia, points to its decision to move classes online during the encampment as if it allows them to evade Title VI liability. *See supra* § I.D.4. But this was only an accommodation for the agitators. In fact, Barnard allowed suspended students to attend class remotely. ¶ 358. Plaintiffs do not need to allege what specifically Barnard should have done, Bar. Mem. 27. Instead, Plaintiffs must allege—which the Complaint does—that Barnard failed to act reasonably. Barnard repeating many of the same measures taken in October 2023 in the months that followed through the encampment only reinforces its deliberate indifference. *Zeno*, 702 F.3d at 669 ("Where a school [] has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such [school] has failed to act reasonably in light of the known circumstances.").

### 6.    Academic Freedom Does Not Protect Harassment

Defendants' disingenuous arguments that their *inaction* is excused by their "commitment to academic inquiry and free speech," Col. Mem. 27, and the "right to freedom of expression," Bar. Mem. 22, are meritless. Chants for the murder of Jews, such as "globalize the Intifada" and

the other abusive antisemitic harassment to which Jewish and Israeli students have been subjected at Columbia and Barnard are not merely "political speech," Col. Mem. 28, or "unwelcome speech," Bar. Mem. 22, speech, *see Harvard*, 2024 WL 3658793, at *1, *5 (rejecting Harvard's argument that antisemitic harassment following October 7—including "chant[ing] provocative slogans such as 'from the river to the sea,' 'free Palestine,' and 'globalize the intifada'"—amounted to merely "offensive utterance[s]").

Defendants' suggestion that the First Amendment conflicts with their Title VI obligations to rein in harassment, or otherwise prevents them from stepping in or disciplining their students or professors is, wrong and at the very least, inappropriate on a motion to dismiss. *See id.* at *6 (noting it "is dubious that [a private university] can hide behind the First Amendment to justify avoidance of its Title VI obligations," and deciding that the issue is "best reserved for a later day").[33] It also ignores decades of decisions by courts and the Department of Education holding both private and public institutions accountable for failing to stop verbal harassment, as well as Defendants' own Task Force. *E.g.*, ¶ 448. As the Obama, Trump, and Biden administrations have all made clear, under Title VI, schools have a responsibility to curb antisemitism, verbal or otherwise. ¶¶ 69-74.

And the Court need not decide the precise relationship between Title VI and the First Amendment on this motion. *See Harvard*, 2024 WL 3658793, at *6 (deciding that the issue is "best reserved for a later day"). Principles of "academic inquiry," Col. Mem. 27, or "academic freedom," Bar. Mem. 30, do not protect incitement, threats, assault, vandalism, trespassing, or destruction of property, even if the conduct "occurs within the broader context of a political demonstration" that would otherwise consist of protected expression. *United States v. Daley*, 378 F. Supp. 3d 539, 559

---

[33] In *Feminist Majority Foundation*, 911 F.3d at 690-93, which involved online harassment at a public university, the Fourth Circuit rejected an argument much like the one Defendants make here, holding that where speech is unprotected, like "threats," or where a school has a variety of "remedial options," the school cannot hide behind the First Amendment in refusing to take effective action.

(W.D. Va. 2019), *aff'd sub nom. United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020), *and aff'd sub nom. United States v. Gillen*, 2022 WL 4395695, at *1 (4th Cir. Sept. 23, 2022), *cert. denied*, 143 S. Ct. 605 (2023); *see also N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 912, 916 (1982) (the mere "presence of protected activity" at a boycott does not prevent tort liability for losses "caused by violence and by threats of violence" that occurred within the "context of constitutionally protected activity").

And it is no excuse to say that antisemitism at Columbia and Barnard is merely disagreement with the policies of Israel, Col. Mem. 28; Bar. Mem. 22; the allegations belie such an argument. As the Obama, Trump, and Biden administrations have recognized, what the mobs are doing is antisemitism, plain and simple.[34] As Barnard acknowledges, "anti-Zionism can cross the line to antisemitism." Bar. Mem. 23; *see also* ¶ 453 (Task Force recognizing that the distinction between Israel and Jews has been "blur[red]" and "[i]t is usually only Israelis and Jews who are asked to assure people, as the price of acceptance, that they are not 'Zionists,'" which is "about as clear-cut a case of discrimination as one can find"). It is clear from many examples in the Complaint that at Columbia and Barnard, "anti-Zionism is rarely anything more than thinly veiled antisemitism." ¶ 77; *e.g.*, ¶¶ 181-82 (student responding to criticism for stating, "Zionists aren't

---

[34] Columbia cites *Dube v. State University of New York*, 900 F.2d 587, 588, 598 (2d Cir. 1990), Col. Mem. 28, an appeal from a summary judgment decision involving, in part, a First Amendment claim stemming from a public university's tenure decision based on a single course description. *Newman v. Point Park University*, 2022 WL 969601 (W.D. Pa. Mar. 31, 2022), Col. Mem. 28, is similarly unpersuasive. There, the court noted that academic debate about the BDS movement not "directly and specifically targeted at Plaintiff" could not alone support claim. *Id*. at *25 n.16. These cases are unrelated to Columbia's obligation to address the antisemitic harassment alleged here. *Vega v. Miller*, 273 F.3d 460 (2d Cir. 2001), Col. Mem. 28, provides a helpful contrast. There, the court noted that a discharged professor's "toleration of the students' shouted vulgarities was far removed" from the course description in *Dube*, much like the conduct alleged here. *Miller*, 273 F.3d at 467. *See* ¶¶ 70-71 (describing 2019 executive order directing Department of Education to consider the IHRA definition of antisemitism—under which "[d]rawing comparisons of contemporary Israeli policy to that of the Nazis" is antisemitic—when enforcing Title VI). It is telling that despite dedicating two pages of its brief to a free speech defense, Col. Mem. 27-28, Columbia cites (and mischaracterizes) a portion of a single paragraph in the over two hundred-page Complaint. Plaintiffs did not "demand[] Columbia rescind offer to faculty member who 'published an editorial that compared Israel to Nazi Germany.'" Col. Mem. 28 (citing ¶ 431). Rather, Plaintiffs alleged that Columbia failed to rescind its offer to a faculty member who published that antisemitic editorial and separately invoked an antisemitic trope of Jewish "power and money" during a speech. ¶ 431.

invited" to an event by claiming the "THE HOLOCAUST WASN'T SPECIAL"); ¶ 278 (mobs of students chanting "death to the Zionist state" in the same breath as "Jews out"); ¶ 599 (students claiming the kosher dining hall is "where all the dirty Zionists go"); *see also Koumantaros*, 2007 WL 840115, at *15 ("Few would be so naive as to believe that racists subjecting a member of a disfavored group to abuse or harassment would preface every rude action with a racial epithet; given some evidence of clearly racial hostility, a reasonable fact finder could conclude that other obnoxious behavior, which in another context could be ascribed simply to interpersonal friction, was similarly racially motivated.").

None of the cases Defendants cite, Col. Mem. 27-28; Bar. Mem. 22-23, support their arguments that they can ignore antisemitic harassment as "political."[35] In any event, Defendants *do* restrict speech they find objectionable, for example, "in discussions of policing, affirmative action, sexual assault, transgender rights, and other important issues," ¶ 452; they *choose not to do so* only when the harassment is antisemitic, ¶¶ 416-34. Indeed, Defendants' Task Force admitted that when Jewish and Israeli students complain of harassment, a "different norm" applies. ¶ 452. Whereas in the past, Defendants "defer[red] to protected classes in defining which statements are considered biased or hateful, prioritizing the concerns of the audience (i.e., the protected class) over the intentions of the speaker," Defendants now defer to the "intentions and free speech rights of the speakers" when Jewish and Israeli students complain. *Id.* Defendants' tolerance of

---

[35] *E.g.*, Col. Mem. 27, citing *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 669-70 (1973) (recognizing universities have an "undoubted prerogative to enforce reasonable rules governing student conduct") *D.S. ex rel. C.S. v. Rochester City Sch. Dist.*, 2020 WL 7028523, at *10 (W.D.N.Y. Nov. 30, 2020) (student at public school alleged harassment was motivated by "perceived beliefs about race and [] preferred presidential candidate" granted leave to replead Title VI claim); *Healy v. James*, 408 U.S. 169, 189 (1972) (noting decision not to recognize political student group should be affirmed if there was evidence group posed substantial threat of material disruption in violation of college's policies); Bar. Mem. 22-23, citing *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209-10, 216 (3d Cir. 2001) (in reviewing the constitutionality of a public school's policies, noting that "preventing discrimination . . . in []schools . . . [is] a compelling[] government interest," "speech may be more readily subject to restrictions when a school . . . audience is 'captive' and cannot avoid the objectionable speech," and there is an *exception* for speech that creates a "substantial disruption or interference with the work of the school or the rights of other students").

antisemitism, but not other forms of harassment, not only reflects Defendants' deliberate indifference, but also demonstrates their direct discriminatory animus. *See infra* § II.

## II.    PLAINTIFFS STATE DIRECT DISCRIMINATION CLAIMS UNDER TITLE VI

Plaintiffs allege that Columbia and Barnard intentionally discriminate through their invidious double standard in failing to enforce their policies against antisemitism as compared to other forms of hate. ¶¶ 177-95, 405-55. On a motion to dismiss, there is a "temporary 'presumption' of discriminatory motivation," and a plaintiff "need only give plausible support to a minimal inference of discriminatory motivation." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (citation omitted). Plaintiffs' allegations support a minimal inference of discriminatory intent which can be "inferred from the totality of the relevant facts." *Id.* at 88 (citation omitted); *see also Rosas v. Balter Sales Co.*, 2018 WL 3199253, at *4 (S.D.N.Y. June 29, 2018) (Broderick, J.) ("Because 'smoking gun' evidence of racial discrimination is rarely available, plaintiffs frequently must raise an inference of discrimination through circumstantial evidence.").

Plaintiffs allege far more than is required—the way Columbia and Barnard respond to reports of antisemitic or anti-Israeli harassment, like Plaintiffs', is *a fortiori* worse than its response to other forms of discrimination or disfavored speech.[36] Indeed, Defendants' Task Force confirmed

---

[36] Defendants' argument that this claim must be dismissed because Plaintiffs' comparators are insufficient, Col. Mem. 14 n.12; Bar. Mem. 33-34, is improper on a motion to dismiss and unsupported. For instance, the court in *Minto v. Molloy Coll.*, 2019 WL 4696287, at *10 (E.D.N.Y. Sept. 26, 2019) (*Minto I*) dismissed a case alleging plaintiffs were discriminated against in being disallowed from retaking certain classes where plaintiffs only alleged their direct race discrimination with a conclusory statement. After plaintiffs amended to add additional examples of students allowed to retake classes, the court found that the defendant's asserted "differences in particular circumstances" did not matter at all at the pleading stage and denied the motion to dismiss. *Minto v. Molloy Coll.*, 2021 WL 1394329, at *11 (E.D.N.Y. Jan. 21) (*Minto II*) (defendant's arguments about the veracity of a plaintiff's comparators "amounts to improper fact-finding at the pleading stage"), *R. & R. adopted*, 2021 WL 804386 (E.D.N.Y. Mar. 3, 2021). Similarly, in *Johnson v. New York University*, 800 F. App'x 18, 21 (2d Cir. 2020), plaintiff did not plead that comparators faced the same issue (being refused admission following expulsion and grand larceny conviction). *See id.* ("none of the comparators had sought (let alone been granted) readmission after being expelled"). *Doe v. Columbia Univ.*, 551 F. Supp. 3d 433, 471 (S.D.N.Y. 2021) differs because there, the plaintiff, who sued Columbia based on its handling of multiple sexual assault claims made against him used his own victims as comparators, against whom he brought

that a "different norm," i.e., an invidious double standard, is applied to Jewish and Israeli students when they complain of harassment as compared to members of other protected groups and "has been evident, for instance, in discussions of policing, affirmative action, sexual assault, transgender rights, and other important issues." ¶ 452. While Judge Stearns in *Harvard* found, on the record before him, that using a prospective student as a comparator to current students was not sufficient, Plaintiffs here plead reasonable comparators, including allegations of Columbia and Barnard's strict enforcement of their policies when current students engage in discriminatory behavior or otherwise violate school rules. *E.g.*, ¶¶ 433-34 (Columbia suspending wrestling team for racist, sexist, and homophobic texts and banning seventy MBA students from campus for violating COVID-19 protocols); ¶ 434 (Barnard banning a Columbia student for harassing Black students).

Columbia misstates the standard for alleging direct discrimination, claiming that Plaintiffs' claim may only be "cognizable in this Circuit under an 'erroneous outcome' or 'selective enforcement theory.'" Col. Mem. 14 (citing *Roe*, 91 F.4th at 652). But Columbia omits that *Roe* specifically addressed a direct discrimination claim regarding a disciplinary proceeding on grounds of gender bias—a far narrower claim than, and not relevant to, the claim alleged here. *See Roe*, 91 F.4th at 652.[37] Contrary to Columbia's arguments, it is not "a necessary element" of a direct

---

[36] misconduct and harassment complaints. *See id*. Here, by contrast, Plaintiffs allege that they, as Jewish and Israeli students were subjected to materially different treatment when complaining of harassment, as Columbia administrators themselves admitted.

[37] Indeed, not only did *Roe* discuss only discrete "alleg[ations] that a university discriminated against a plaintiff . . . when disciplining the plaintiff," the court made clear that even with regard to disciplinary proceedings, the two theories it analyzed are not necessarily the only theories on which a direct discrimination case can be brought. 91 F.4th at 653 n.9. Columbia's other cases involve the same narrow scenario of alleged discrimination with regard to particular disciplinary proceedings and are otherwise distinguishable. *See JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 623 (S.D.N.Y. 2016) (dismissing case where plaintiff failed to identify, at summary judgment stage, sufficient comparator with regard to his suspension from school); *Doe v. N.Y. Univ.*, 438 F. Supp. 3d 172, 182 (S.D.N.Y. 2020) (dismissing Title IX claim where male student investigated for sexual misconduct did not allege "single instance" where a comparator female student was subject to more favorable treatment).

discrimination claim that "the university initiated a disciplinary proceeding against the plaintiff or disciplined the plaintiff." Col. Mem. 14. Courts in this circuit have repeatedly held that in the Title VI context, failing grades or other actions impeding a plaintiff's ability to pursue their education can also constitute an "adverse action" sufficient to underlie a direct discrimination claim. *See, e.g.*, *Williams v. Pace Univ.*, 192 F. Supp. 3d 415, 422 (S.D.N.Y. 2016) (plaintiff satisfied adverse action element because she received a failing grade on an examination); *Patterson v. City Univ. of N.Y.*, 2014 WL 3511048, at *4 (E.D.N.Y. July 14, 2014) (same). Plaintiffs have alleged that they have been harmed in numerous ways based on Columbia and Barnard's double standard in enforcing their policies. *See* ¶¶ 456-621.

## III.    PLAINTIFFS STATE A CLAIM UNDER 42 U.S.C. § 1986 AGAINST COLUMBIA

Plaintiffs plausibly allege Columbia's liability under 42 U.S.C. § 1986 for neglecting or refusing to prevent or aid in prevention of a conspiracy under 42 U.S.C. § 1985.[38] The elements of a Section 1985 violation are: (1) "a conspiracy"; (2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or the equal privileges and immunities under the laws"; (3) an act in "furtherance of the conspiracy"; (4) whereby a "person or class of persons" is deprived of "the exercise of any right or privilege of a citizen of the United States." *N.Y. State Nat'l. Org. for Women v. Terry*, 886 F.2d 1339, 1358 (2d Cir. 1989). And, "a plaintiff must demonstrate some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id*. To then plead a separate claim under 42 U.S.C. § 1986, a plaintiff must allege the "(1) defendant had knowledge of the conspiracy and its object, (2) defendant had power to prevent or aid in preventing the commission of the

---

[38] Plaintiffs are only pursuing this claim against Columbia.

conspiratorial acts, and (3) defendant neglected or refused to exercise such power." *Urbina v. City of New York*, 2016 WL 79991, at \*4 (S.D.N.Y. Jan. 6, 2016), *aff'd*, 672 F. App'x 52 (2d Cir. 2016).

### A.        Plaintiffs Sufficiently Allege a Conspiracy

Columbia argues that the Complaint fails to adequately plead an underlying Section 1985 conspiracy by insufficiently alleging a "meeting of the minds." Col. Mem. 31. Columbia argues that the Complaint fails to allege conspiracy because it describes "a sprawling, amorphous group . . . only some of whom are specifically identified" and fails to "describe how or when" the conspiracy was entered into. *Id.* The Complaint's identification of the particular student groups and individuals involved is hardly amorphous, and Columbia points to no authority requiring that a plaintiff know the identity of every individual conspirator before discovery. The Complaint also alleges, as much as possible at this stage, "how" and "when"—over social media, and before and during the first days of the encampment—the conspiracy was entered into. ¶¶ 307-09.

Plaintiffs plausibly allege a meeting of the minds of the members of CUAD, including CSSW4Palestine, SJP and JVP, faculty group FJP, and off-campus group WOL to erect the encampment and "Flood Columbia for Gaza." *E.g.*, ¶¶ 307-09, 388, 393, 713-15. While conspiracy allegations must "have some factual basis supporting a meeting of the minds[,] . . . [t]he factual basis need not be direct evidence"—a plaintiff can allege "facts upon which it may be plausibly inferred that the defendants came to an agreement to violate his constitutional rights." *Zhang Jingrong v. Chinese Anti-Cult World All.*, 287 F. Supp. 3d 290, 298 (E.D.N.Y. 2018) (cleaned up). But here, Plaintiffs alleged direct evidence of the conspiracy. *See* ¶¶ 307-09 (organizations CUAD, SJP, CSSW4Palestine, FJP, JVP, and WOL, and their individual leaders and members coordinated publicly to organize and perpetuate the encampment, including through Instagram posts (re-posted by the other groups) during the encampment directing members and non-affiliates to descend upon Columbia's campus, "MOBILIZE" and "SHOW UP IN NUMBERS" to "surround and protect the

encampment," rally in support, and advocate for holding classes within the encampment—all of which happened as planned); *see also* ¶ 393.

Even putting aside the explicit coordination broadcast by these groups and the individuals behind them, Plaintiffs allege "specific facts suggesting that there was a mutual understanding among the conspirators." Col. Mem. 31-32.[39] *Abadi v. American Airlines, Inc.*, 2024 WL 1346437 (S.D.N.Y. Mar. 29, 2024), Col. Mem. 32, provides a helpful contrast. There, the court found it "implausible" that each of forty-six defendants (airlines) conspired with the others to deny the pro se plaintiff an exception to their COVID-19 mask mandates. 2024 WL 1346437, at *26. But here, Plaintiffs allege that hundreds of students, in coordination with and at the express direction of identified groups, descended in concert to erect the encampment and engage in antisemitic harassment; it was not serendipity which brought them to Columbia's South Lawn in the early morning hours of April 17 with camping gear and other supplies for all. ¶ 307.

Moreover, throughout its duration, the encampment was a well-organized enterprise, reflecting clearly that its participants "had knowledge of the nature and scope" of the co-

---

[39] *De Asis v. New York City Police Department*, 2008 WL 3876075, at *1, *5 (E.D.N.Y. Aug. 18, 2008), which Columbia cites, Col. Mem. 31-32, is inapposite. There, a pro se plaintiff suing New York City defendants for "economic and psychological injuries" from the issuance of three (later dismissed) parking tickets was held not to have properly pled a Section 1985 conspiracy where he failed to plead more than "conclusory statements" about a conspiracy among the defendants, or that he was a member of a protected class. Nor are Columbia's other cases—each cited for the proposition that a Section 1985 conspiracy requires "heightened" allegations of a meeting of the minds "with some degree of particularity"—of any support. Col. Mem. 31. In *Williams v. City of New York*, 2018 WL 4308552, at *9 (S.D.N.Y. Sept. 10, 2018) (Broderick, J.), this Court entertained a Section 1985 claim for a conspiracy to discriminate, finding that while the plaintiff had stated a claim for hostile work environment, she had yet to provide any "specific factual allegations regarding a meeting of the minds" between the alleged individual conspirators, and granted plaintiff leave to amend to add such factual allegations. In *Thomas v. Roach*, 165 F.3d 137, 146-47 (2d Cir. 1999), an appeal from summary judgment, a plaintiff who was shot during an arrest made only "conclusory and vague" allegations that other officers present conspired not "to prevent [the shooting officer's] use of excessive force." In *Langton v. Town of Chester Library Board*, 2020 WL 2850898, at *4 (S.D.N.Y. June 1, 2020), the court upheld a magistrate's decision to deny a pro se plaintiff leave to amend to add a Section 1985 claim to her suit against a library board for removing her from her position, merely crediting the magistrate's finding that amendment would be futile because the plaintiff had not pled any "factual basis supporting the meeting of the minds." By contrast, Plaintiffs here allege such a factual basis—pleading a conspiracy publicly entered into, and actualized, among various organizations and individuals (with more likely to be found out in discovery) to deprive Plaintiffs and others in their protected class of their rights.

conspirators' mission. Col. Mem. 32.[40] The encampment featured coordinated fundraising efforts, ¶¶ 309, 323; internal rules, "guidelines" (including a rule excluding "Zionists" and requiring signature of an "anti-Zionist pledge"), a security apparatus, ¶¶ 312, 335; and a unified leadership, which conducted press conferences and negotiated with Columbia on behalf of its participants, ¶¶ 356, 363, 368, 374, 715; *see also* ¶ 388 (detailing aftermath of Hamilton Hall takeover in which co-conspirator occupiers left "hand-drawn floor plans, supply lists, and a task list consisting of action items such as setting up the pulley system and establishing security shifts—all evidence of a well-thought out, coordinated, and organized plan"). These facts more than plausibly allege a well-coordinated conspiracy.

Columbia argues that the Complaint does not allege that a "conscious objective" of the Section 1985 conspiracy was to deprive Jews of the right to be free from racial violence guaranteed by the Thirteenth Amendment, and to travel across campus. Col. Mem. 32. But Plaintiffs do allege that deprivation of Plaintiffs' protected right to travel intrastate[41] was a conscious objective of the co-conspirators. *E.g.*, ¶ 308 ("[S]ay it loud, say it clear, we don't want no Zionists here."); ¶ 332 (sign reading "death to Zionists"); ¶ 333 ("I'm going to do the same to you that they did to the Israelis on October 7," and "October 7 is about to be every day for you guys"); ¶ 344 ("get off our fucking campus" and "we don't want no Zionists here"); ¶ 347 ("we don't want no Zionists here"); ¶ 356 ("We have Zionists that have entered the camp. We are going to create a human chain . . . Start to push them. Out of the camp.").

---

[40] In *Grant v. County of Suffolk*, 2018 WL 816242, at *11 (E.D.N.Y. Feb. 9, 2018), Col. Mem. 32, a pro se plaintiff removed by the police from a diner was unable to survive summary judgment merely from the fact that police officers "had spoken to the Diner employees" and "regularly frequent[ed]" the diner.

[41] *See, e.g.*, *Spencer v. Casavilla*, 903 F.2d 171, 174 (2d Cir. 1990) (finding conspiracy to "violate the plaintiff's constitutional right to travel" intrastate sufficient to state a Section 1985 claim); *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971) (recognizing constitutional right to intrastate travel).

Columbia contends that the "predominant purpose" of the co-conspirators was merely "bringing about a ceasefire in Gaza or impacting Israeli or U.S. government policy."[42] Col. Mem. 32-33. That is not what the co-conspirators themselves said. The occupiers themselves trumpeted that their encampment was an outgrowth and extension of Hamas's "Palestinian resistance" on October 7, ¶ 342, set up "in the heart of the Zionist stronghold of Columbia University," with "inten[t] to do the same," *id*.; *see also, e.g.*, ¶ 5 (participant points sign at Jewish students reading "Al Qas[s]am's next targets"); ¶ 339 (student wears Hamas emblem harassing Jewish students); ¶ 341 (posters in encampment reading "long live Hamas," "resistance by any means necessary," and "long live the resistance groups"); ¶ 347 (encampment participants and rally-goers tell Jewish students "Hamas is coming for you guys," and chant "Al-Qassam, make us proud, take another soldier out," and "go Hamas, we love you, we support your rockets too."). Indeed, the co-conspirators repeatedly made clear that their "predominant purpose" was not to peacefully protest Israeli or U.S. government policy, but to sow disruption and fear as did the terrorists they support, primarily against Jews and Israelis on Columbia's campus, or, as they call them, "Zionists." *E.g.*, ¶¶ 342, 344, 347, 356. The co-conspirators carried out this express goal by harassing, threatening, assaulting, verbally abusing, and blocking from campus Jewish and Israeli students, including

---

[42] Columbia, citing *Spencer*, 44 F.3d at 79, appears to invent a standard by which Plaintiffs would need to plead that the deprivation of their rights was the *only* "predominant purpose" of the enterprise. Col. Mem. 32-33. This is not true—a conspiracy can have multiple goals. In affirming dismissal of a Section 1985 claim following a jury trial, for plaintiffs' failure to present evidence that the conspirators who attacked their son acted with an objective to deprive them of their familial relationship, *Spencer* relied on the Supreme Court's decision in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275-76 (1993), which made clear that the conscious objective requirement, like the discriminatory animus requirement, would be met where the conspiracy was "at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." (cleaned up). *Corsi v. Gestone*, 2021 WL 5416623 (E.D.N.Y. Nov. 19, 2021), Col. Mem. 33, is similarly distinguishable. There, the plaintiff brought a KKK Act claim after he was assaulted for being gay, but other than merely noting in his opposition brief that he was assaulted "as he was traveling [] in the State of New York," he did not "contend Defendants 'aimed at' the impairment of Plaintiff's right to inter- or intrastate travel." 2021 WL 5416623, at *3.

Plaintiffs. ¶¶ 312, 320, 328, 333, 335, 341, 345, 347-50, 356, 372. Even assuming the issue is relevant, what the predominant purpose was is at a minimum, a question of fact.

Columbia asserts that *Sines v. Kessler*, 324 F. Supp. 3d 765 (W.D. Va. 2018), is distinct from this case, because there, the "whole point" of the conspiracy "was to commit acts of violence . . . to start a race war." Col. Mem. 33. But just as here, the *Sines* co-conspirators organized themselves over social media, and made their intention to deprive minorities of their right to be free from racial violence clear through violent and inflammatory rhetoric before, during, and after the Unite the Right rally. 324 F. Supp. 3d at 783-94. The rhetoric and subsequent conduct of the white supremacists in *Sines* echoes that of the antisemitic protestors of the Columbia encampment who, rather than looking to "start a race war," sought to perpetuate one already begun by Hamas. *E.g.*, ¶ 308 ("WHOEVER IS IN SOLIDARITY WITH OUR CORPSES BUT NOT OUR ROCKETS IS A HYPOCRITE AND NOT ONE OF US"); ¶ 313 ("death to Israel"); ¶ 328 (masked participant flashes Hamas symbol and tells Stein, "we're coming for you"); ¶ 333 (participant follows Droznik and tells her, "I'm going to do the same to you that they did to the Israelis on October 7"); ¶ 336 ("The 7th of October is going to be every day for you."); ¶ 345 ("Al-Qasam's [*sic*] next target"); ¶ 347 ("Hamas is coming for you."); ¶ 373 ("COLUMBIA WILL BURN"); ¶ 393 ("WE RECOMMIT TO CONTINUE STRATEGIC, TARGETED ATTACKS ON ALL ASPECTS OF UNIVERSITY LIFE").

Nor can Columbia argue that Plaintiffs have not pled the requisite discriminatory animus by the co-conspirators. Col. Mem. 33. That the participants often aimed their vitriol at "Zionists" when not slipping into more openly racist rhetoric (including "kike," ¶¶ 340, 532; "fucking Jew," ¶ 321; and "go back to the gas chambers," ¶ 350), does not turn the lawless and antisemitic

encampment into a protected political demonstration for a "ceasefire in Gaza" and a change in Israeli or U.S. government policy.[43] Col. Mem. 32-33. *See supra* § II.[44]

### B.    Plaintiffs Sufficiently Allege That Columbia Failed to Prevent the Conspiracy

Plaintiffs also sufficiently plead the necessary elements for holding Columbia liable under Section 1986. Columbia's argument that Plaintiffs did not plausibly allege it "had knowledge of the conspiracy and its object," Col. Mem. 33, is remarkably disingenuous. Columbia, who received countless reports from students, faculty, and administrators, and had administrators in constant dialogue with the co-conspirators, understood the nature of the conspiracy as well as the extensive, disturbing harassment that was perpetrated by the conspirators. *E.g.*, ¶¶ 313, 315, 324-25, 333, 355, 357, 360-61, 374-75, 384.

Plaintiffs also sufficiently allege Columbia had the power to prevent, or aid in preventing, the conspiracy, as Columbia itself makes clear in their policies. Columbia policies include the authority for Columbia to: "prevent . . . discrimination and harassment," ¶¶ 81, 82; "restrict expression that constitutes a genuine threat of harassment," ¶ 83; discipline "students who interfere with the ability of others to take advantage of the full complement of University life," ¶ 85; discipline "[c]alls for genocide against the Jewish community . . . [and] [i]ncitement to violence

---

[43] "Zionist" is used often by Columbia and Barnard's antisemites, and the co-conspirators here, as a code word for "Jew." *See supra* § I.D.6.

[44] Even if the anti-Zionism at the encampment, and at Columbia and Barnard generally, were not clear-cut antisemitism (it is), the discriminatory animus prong of § 1985(3) would be met merely by a showing that the co-conspirators meant to deprive "Zionists"—not even Jews—of their protected rights. A 1985(3) conspiracy "must be motivated by some racial, *or perhaps otherwise class-based, invidiously discriminatory animus* behind the conspirator's action." *East v. Roosevelt Union Free Sch. Dist.*, 2020 WL 13753159, at *20–21 (E.D.N.Y. July 31, 2020) (citation omitted). The Second Circuit has made clear that religion is a protected class for purposes of discriminatory animus under this statute. *Jews for Jesus, Inc. v. Jewish Cmty. Rls. Council of N.Y., Inc.*, 968 F.2d 286, 291 (2d Cir. 1992). And Zionism is far more complex than a political position; it is an immutable aspect of Plaintiffs' identities as Jews, and has ethnic, historic, and religious origins. ¶¶ 75-76; *see also UCLA*, 2024 WL 3811250, at *8 (enjoining school from allowing exclusion of Jewish students on basis of their "sincerely held religious belief": "supporting the Jewish state of Israel").

against members of [the Columbia] community," ¶ 87; and sanction those who fail to obtain required event approval, ¶ 90.[45]

Finally, Plaintiffs sufficiently allege that Columbia neglected or refused to exercise its power to prevent or aid in the prevention of the co-conspirators' violations of Plaintiffs' rights, including, among numerous other things, by allowing the encampment to continue and by negotiating with, rather than disciplining, the antisemitic agitators. *E.g.*, ¶ 315 (on April 17, administrators telling encampment participants, "we're here to work with you"); ¶ 363 (on April 23, President Shafik acknowledging that Columbia was "negotiating" with encampment participants and expressing that she "very much hope[d]" negotiations would succeed); ¶ 367 (on April 24, President Shafik acknowledging "progress" and "constructive dialogue" with the encampment leaders and extending—even further—a deadline to vacate the encampment); ¶¶ 374-75 (on April 29, President Shafik thanking the encampment participants for their "robust and thoughtful offers" and "diligent work, long hours, and careful effort," and noting concessions Columbia made to the participants).

## IV.    PLAINTIFFS ADEQUATELY ALLEGE STATE AND LOCAL LAW CLAIMS

### A.    Plaintiffs Sufficiently Plead City and State Discrimination Claims

Under New York State Human Rights Law Section 296 and New York State Civil Rights Law Section 40-c, Defendants are prohibited from discriminating against Plaintiffs or subjecting

---

[45] Columbia's cases do not lend it support. In *Clissuras v. E.E.O.C.*, 1990 WL 96754, at *2-3, *11 (S.D.N.Y. July 5, 1990), Col. Mem. 33, the court found that a pro se faculty member who sued her school and other government defendants for conspiring to "comput[] her pension at a lower rate than that of her colleagues" on account of her sex and religion, and mishandling her subsequent E.E.O.C. complaint stated a claim under Section 1985 against some defendants, but not Section 1986, because "she fail[ed] to make any specific factual allegations that any other defendants knew or could have prevented this conspiracy." None of the other cases cited by Columbia on this point discuss the requirements of Section 1986 in any depth. *See* Col. Mem. 33 (citing *Urbina*, 2016 WL 79991, at *5 (finding no Section 1985 conspiracy because plaintiff failed to allege "underlying constitutional violation"); *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (affirming dismissal of Sections 1985 and 1986 claims with instructions to permit leave to amend where pro se plaintiff offered only "conclusory allegations that he was discriminated against because of his race")).

them to a hostile educational environment. These claims are evaluated under the same standard as analogous claims under federal discrimination laws. *See Minto II*, 2021 WL 1394329, at *10; *Eccleston v. Pine Bush Cent. Sch. Dist.*, 2013 WL 12444443, at *13 (S.D.N.Y. Jan. 8, 2013). Because Plaintiffs adequately plead a claim under Title VI, Defendants' motions must be denied as to these claims as well.

Plaintiffs also adequately allege a hostile environment claim under New York City Human Rights Law ("NYCHRL") Sections 8-107(4), (17), under which "[i]nterpretations of state and federal civil rights statutes can serve only as a floor below which the NYCHRL cannot fall" and the "NYCHRL should be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof." *Green v. Jacob & Co. Watches, Inc.*, 248 F. Supp. 3d 458, 470 (S.D.N.Y. 2017) (citation omitted). Accordingly, "[c]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing its provisions broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible." *Id.* (citation omitted).

Under the broader NYCHRL standard, Plaintiffs need only show that they are treated "less well" because of a protected characteristic. *Santiago v. ACACIA Network, Inc.*, 634 F. Supp. 3d 143, 155-56 (S.D.N.Y. 2022) (denying motion to dismiss hostile work environment claims under the NYCHRL); *see Novio v. N.Y. Acad. of Art*, 286 F. Supp. 3d 566, 583 (S.D.N.Y. 2017) ("Under the NYCHRL, a plaintiff need not demonstrate that the treatment was 'severe or pervasive' [] but need only show that she has been treated 'less well' than other [students] because of a protected characteristic."). For the same reason that Plaintiffs' allegations state a claim under Title VI, they also state a claim for discrimination under the broader standards of NYCHRL § 8-107(4) and (17).

49

*See Doe v. Yeshiva Univ.*, 703 F. Supp. 3d 473, 507-10 (S.D.N.Y. 2023).[46]

### B.    Plaintiffs Sufficiently Plead Contract Claims

"When a university accepts a student for enrollment, an implicit contract is formed if the student complies with terms contained in the university's bulletins, circulars and regulations made available to the student." *Doe v. Sarah Lawrence Coll.*, 453 F. Supp. 3d 653, 668 (S.D.N.Y. 2020) (citation omitted). "Implicit in the contract is the requirement that the institution 'act in good faith' in its dealing with its students." *Id*. (citation omitted).

Defendants argue that Plaintiffs fail to "identify any specifically designated and discrete promises that could form the basis of [a breach of contract] claim," Bar. Mem. 35-36, and "strain[] to plead any specific and material promises by Columbia," Col. Mem. 36-37. They suggest that because of this, the policies Plaintiffs do cite do not "guarantee certain specified services,"[47] Col. Mem. 37, and at most offer "general promises about ethical standards," Bar. Mem. 35-36. Yet Plaintiffs identify several specific and discrete policies of Columbia and Barnard that ostensibly protect students, including Jewish students from discrimination. *E.g.*, ¶ 83 (Columbia's Rules of University Conduct provides that "[t]he University has an obligation to assure members of its community that they can continue in their academic pursuits without fear for their personal security or other serious intrusions on their ability to teach and to study"); ¶ 84 (Columbia's Non-Discrimination Statement and Policy prohibits discrimination on the basis of citizenship status,

---

[46] Barnard inaccurately states that "Count IV does not mention Barnard at all." Bar Mem. 35. Count IV, and the allegations contained therein, are alleged "against all defendants." *See* ¶¶ 674-85.

[47] In *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 421-22, 426-28 (S.D.N.Y. 2021), *aff'd sub nom. Tapinekis v. Pace Univ.*, 2024 WL 2764146 (2d Cir. May 30, 2024) (Col. Mem. 35, 37), the court found that the plaintiffs plausibly alleged a breach of contract claim based on the universities' denial of access to campus facilities and activities in response to the COVID-19 pandemic, and found that one university, but not the other, could be liable for a breach of contract claim premised on denial of live, in-person instruction. In dismissing the claim based on remote learning as to one university, the court held that the plaintiffs did not identify or cite any promise to provide exclusively in-person instruction, basing their allegations instead on mere assumptions. *Id*. at 422-24. Here, however, Plaintiffs do not rely on their assumptions about what the contracts provide, but on several specific and express policies regulating conduct.

creed, national origin, race, religion, or "any other applicable, legally protected status"); ¶ 93 (Barnard's Policy Against Discrimination and Harassment states that it will "not tolerate and specifically prohibits" discrimination and harassment and will take "prompt and appropriate action to address such misconduct, end a hostile environment if one has been created, and prevent the recurrence of a hostile environment."); *see generally* ¶¶ 80-97, 687-88.

Columbia also argues that Plaintiffs' allegations fail to make clear "when and how the defendant breached those promises," Col. Mem. 36, but Plaintiffs allege numerous instances of Defendants disregarding their policies, *e.g.*, ¶¶ 148, 173, 196-98, 244-45, 263, 357, 424, 427, 486, 567. But even if they had not, a college or university's broad commitments not to discriminate can sustain a breach of contract claim. *See, e.g.*, *Peters v. Molloy Coll. of Rockville Ctr.*, 2008 WL 2704920, at *7-8 (E.D.N.Y. July 8, 2008) (denying motion to dismiss contract claim where plaintiff alleged breach based on college catalog promising plaintiff she "would not be treated in a discriminatory fashion on account of her race or ethnic background," and noting a "term of an implied contract between a University and a plaintiff is presumably the right to complete a degree without being subjected to discriminatory conduct" (cleaned up)).[48]

Plaintiffs also adequately allege breach of the implied covenant of good faith and fair dealing concerning Defendants' selective enforcement of their policies. *See Harvard*, 2024 WL 3658793, at *9. And contrary to Defendants' contention—that Plaintiffs implied covenant argument is "based upon the same facts as [their] breach-of-contract claim," Bar. Mem. 36; *see also* Col. Mem. 38 n.26—Plaintiffs allege several distinct instances where students were penalized

---

[48] The cases Defendants cite, Col. Mem. 37; Bar. Mem. 36, are distinguishable. In those cases, the plaintiffs' breach of contract claims failed because they were time-barred, amounted to educational malpractice, or the plaintiffs themselves ignored the policies and procedures of the universities. *See Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*, 2005 WL 1214281, at *10-11 (S.D.N.Y. May 20, 2005); *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206-09 (S.D.N.Y. 1998).

for violating various Columbia or Barnard policies, but the students who engaged in antisemitic conduct did not face any discipline. ¶¶ 299, 304-05, 405-13, 432-34. Accordingly, Plaintiffs "sketch a claim that [Defendants] breached the implied covenant by failing to evenhandedly administer [their] policies." *Harvard*, 2024 WL 3658793, at *9.

### C.  Plaintiffs Sufficiently Plead Claims for Consumer Fraud

To state a claim under New York General Business Law Section 349 or 350, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Nick's Garage, Inc. v. Progressive Cas. Ins.*, 875 F.3d 107, 124 (2d Cir. 2017) (citation omitted). When the "acts complained of 'potentially affect similarly situated consumers,' the consumer-oriented prong will be met." *Koch v. Greenberg*, 14 F. Supp. 3d 247, 261 (S.D.N.Y. 2014) (citation omitted), *aff'd*, 626 F. App'x 335 (2d Cir. 2015). While Columbia argues that its policies are not directed to either prospective students or to consumers at large, Col. Mem. 38, courts in this District have held that representations made by schools in their advertising and marketing constitute consumer-oriented conduct sufficient to support a Section 349 claim. *See, e.g.*, *Bailey v. N.Y. Law Sch.*, 2017 WL 835190, at *8 (S.D.N.Y. Mar. 1, 2017) (allegations that school "advertised and marketed the diversity of the School and reputation of its faculty to diverse and minority applicants like [plaintiff]" sufficient to state a Section 349 cause of action), *aff'd*, 2021 WL 5500078 (2d Cir. Nov. 24, 2021).[49] Plaintiffs adequately allege that Defendants engaged

---

[49] Columbia cites *Nungesser*, 244 F. Supp. 3d at 368, to support its argument that its alleged conduct does not have an "impact on consumers at large." Col. Mem. 39. Yet in *Nungesser*, the claim failed because the deceptive act was "limited to just the parties." 244 F. Supp. 3d at 377 (citation omitted). Here, however, the deceptive practice extends to consumers at large as Columbia's consumer marketing is targeted to prospective students across the country. Columbia argues that a disclaimer addressing the "alleged deceptive conduct precisely" is a defense to liability by citing to *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*, 37 N.Y.3d 169, 180 (2021), Col. Mem. 39, but the court there also found that "where the overall impression of the representations is misleading (notwithstanding the disclaimer), the disclaimer is not a defense as a matter of law." The "overall impression" of Columbia's policies is that they advertise an environment free from harassment and discrimination.

in consumer-oriented conduct by falsely advertising to students its commitment to prevent, investigate, and resolve discrimination, abuse, and harassment. *See* ¶¶ 80-97, 699-700. Whether those advertisements were materially misleading is generally a question of fact not suited for resolution at the motion to dismiss stage. *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 467 (S.D.N.Y. 2020).[50]

## D.    Plaintiffs Sufficiently Plead Claims for Premises Liability

Plaintiffs adequately plead premises liability against Columbia.[51] A "claim premised on premises liability is a species of negligence claim," *Hogan v. Rose*, 2022 WL 675703, at *6 (N.D.N.Y. Mar. 7, 2022), and generally, an "owner of land has a duty to maintain its premises in a reasonably safe condition, in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk," *Kellman v. 45 Tiemann Assoc.*, Inc., 662 N.E.2d 255, 2255 (N.Y. 1995) (citation omitted) (finding landowner's alleged compliance with the applicable statutes and regulations did not resolve whether it satisfied its duties under the common law). Columbia had a duty to protect students from the events alleged, as they were a foreseeable consequence of Columbia's ongoing refusal to enforce its policies and its continuing failure to respond to escalating rhetoric, harassment, and violence. Columbia breached this duty by not taking measures to address the ongoing rallies and thereby prevent the escalation. Its failure to address the antisemitism on its campus led to the encampment and caused harm to Plaintiffs.

---

Further, Columbia's supposed "disclaimers," Col. Mem. 37 n.25, relate to general principles of academic freedom; they have no a bearing on Columbia's representations about discrimination and harassment, let alone address them "precisely."

[50] Barnard claims that the Complaint does not "include any allegations specific to Barnard" and therefore dismissal is "required." Bar. Mem. 37. Barnard is incorrect, as this claim is alleged against all defendants, and cites to policies that Barnard has disregarded in violation of New York General Business Law §§ 349, 350. ¶¶ 704-09.

[51] Plaintiffs are only pursuing this claim against Columbia.

Columbia incorrectly argues that Plaintiffs rest their claim exclusively on "emotional harms and consequential effects." Col. Mem. 39-40. But here, Plaintiffs have not alleged purely emotional harm; they have alleged many incidents of physical harm. *E.g.*, ¶¶ 190, 235, 312, 320, 333, 335, 356, 378, 533, 577.[52] Columbia further argues that it does not have a legal duty to keep "students, employees, or invitees off its premises to protect other students" or to "take minimal precautions to protect tenants from foreseeable harm by others." Col. Mem. 40. But "[a]n owner or occupier of land has a legal duty to exercise reasonable care under the circumstances to maintain his or her premises in a reasonably safe condition. . . . That duty includes taking minimal precautions to protect members of the public from reasonably foreseeable criminal acts of third parties." *Schaeffer v. Vera Wang Bridal House, Ltd.*, 64 F. Supp. 2d 286, 292, 295 (S.D.N.Y. 1999) (genuine issue of material fact existed as to whether defendant "knew or had reason to know that there was a likelihood of conduct on the part of third persons that was likely to endanger the safety of its customers," triggering a duty to "protect its customers," which a jury could find was breached). A university has "a legal duty to take appropriate responsive action" where it "received credible reports of *ongoing and pervasive* criminal conduct against students, perpetrated on campus by other students within the university's control." *Brown v. Univ. of Rochester*, 216 A.D.3d 1328, 1332 (3d Dep't 2023) (emphasis in original) (affirming denial of motion to dismiss

---

[52] Columbia's reliance on *Nallan v. Helmsley-Spear, Inc.*, 407 N.E.2d 451 (N.Y. 1980), and *Wolfer v. Getman*, 221 A.D.2d 969 (4th Dep't 1995), does not advance its argument as both courts found that a property owner may be liable to a visitor for physical harm when the landowner knows or has reason to know from past experience there is a likelihood of conduct may endanger the visitor's safety. *See Nallan*, 407 N.E.2d at 458 (reversing order affirming judgment in favor of defendants after jury trial where "a rational jury could have found from the history of criminal activity in the other parts of the building that a criminal incident in the lobby was a significant, foreseeable possibility" and defendant "failed in their obligation to take reasonable precautionary measures to minimize the risk and make the premises safe for the visiting public."); *Wolfer*, 221 A.D.2d at 969-70 (reversing denial of motion to dismiss where defendant established she "neither knew nor had reason to know that there was a likelihood that [a third person] would injure plaintiff."). Here, the Complaint alleges multiple incidents of harm—including physical—such that Defendants had reason to know from past experience there was a likelihood of conduct that may—and did—endanger Plaintiffs.

premises liability claim against university where student was sexually assaulted at an on-campus fraternity house). Columbia was repeatedly made aware of both ongoing and anticipated harms, perpetrated by the same student groups and their leaders and members, including criminal activity, on its campus. *See supra* § I. A.

Notwithstanding its knowledge, Columbia breached its duty by failing to reasonably respond to antisemitic conduct and repeatedly failing to take reasonable steps to prevent or restrain Columbia students, faculty, and others subject to Columbia's supervision and control from engaging in discrimination, verbal and physical harassment, and unlawful activity. As such, Columbia's failure to maintain a safe environment for Plaintiffs proximately caused their injuries.[53] While Columbia argues that it need only "act in a reasonable manner to prevent harm to those on their property . . . when [it has] the opportunity to control [third parties] and [is] reasonably aware of the need for such control," Col. Mem. 40-41, Plaintiffs have sufficiently alleged both opportunity and awareness. *E.g.*, ¶ 305 (President Shafik testifying that "this treatment of Black Americans for one second on Columbia's campus" would "absolutely not" be tolerated); ¶ 325 (President Shafik defends decision to authorize the NYPD to enter campus because of "extraordinary circumstances"). Further, the "question of what safety precautions may reasonably be required of the possessor of realty is generally a question of fact to be determined by the jury." *Schaeffer*, 64 F. Supp. 2d at 293 (citation omitted).

---

[53] Columbia cites *Colarossi v. University of Rochester*, 2 A.D.3d 1272, 1273-74 (4th Dep't 2004), *aff'd*, 812 N.E.2d 1250 (N.Y.2004). Col. Mem. 41. There, the court found no proximate causation where a student was shot by a third party on campus. But the injury in *Colarossi* was a one-time incident, while here, Plaintiffs and other students were subject to repeated and escalating harassment and discrimination by groups and individuals subject to Columbia's control, and Columbia emboldened the harassers throughout the school year by its unwillingness to respond. *See supra* § I.D.

## V.    THE COURT HAS SUBJECT MATTER JURISDICTION

Through unverified, post-litigation statements—and, in Barnard's case, a vague and conclusory declaration—Defendants seek to manufacture Rule 12(b)(1) arguments. *See* Col. Mem. 41-45; Bar. Mem. 11-18. Earlier this month, Judge Stearns rejected the same Rule 12(b)(1) arguments against SAA and SCLJ that Defendants raise here. *See Harvard*, 2024 WL 3658793, at *3-4; *M.I.T.*, 2024 WL 3596916, at *3-4. Under Rule 12(b)(1), courts must take "all uncontroverted facts in the complaint as true, drawing reasonable inferences in favor of the plaintiff, but can look to evidence outside the pleadings, including affidavits, to resolve disputed jurisdictional facts." *Glob. Art Exhibitions, Inc. v. Kuhn & Bülow Italia Versicherungsmakler GmbH*, 607 F. Supp. 3d 421, 429 (S.D.N.Y. 2022) (citation omitted).[54] Plaintiffs may still "rely on the allegations in the [p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016).

Plaintiffs allege facts sufficient to show standing—they allege that they are subject to ongoing injury requiring injunctive relief. *See infra* § V.A.1. But in any event, where, as here, Defendants' arguments on subject matter jurisdiction are "so intertwined with the merits that its resolution depends on the resolution of the merits," courts may dismiss only if "*no triable issues*

---

[54] Columbia misleadingly claims that the Court cannot "draw[] from the pleadings inferences favorable to the party asserting [jurisdiction]." Col. Mem. 13 (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)). The Second Circuit has since clarified *Drakos*, explaining that when defendants assert a facial challenge to standing, as here, "it remains the case that courts should continue to draw from the pleadings all reasonable inferences in the plaintiff's favor and are to presume that general allegations embrace those specific facts that are necessary to support the claim." *John v. Whole Foods Mkt. Grp.*, 858 F.3d 732, 737 (2d Cir. 2017) (cleaned up) (reversing and remanding case dismissed for lack of standing because lower court did not draw all reasonable inferences in plaintiff's favor). One of Columbia's cited cases even acknowledges this distinction. *See* Col. Mem. 13, citing *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022) (Lohier, J., concurring) ("Because the defendants have advanced a facial challenge to the plaintiffs' standing, we accept as true all material facts alleged in the complaints and draw all reasonable inferences in the plaintiffs' favor." (citation omitted)).

*of fact* exist." *Evans v. SSN Funding, L.P.*, 2017 WL 3671180, at *5 (S.D.N.Y. Aug. 23, 2017) (emphasis in original) (cleaned up).

Defendants' Rule 12(b)(1) standing arguments, and Barnard's ripeness arguments, cannot be resolved without resolving the merits of Plaintiffs' hostile educational environment claims. *See Harvard*, 2024 WL 3658793, at *3-4 (finding Harvard's ripeness argument against SAA's injunctive claim in a case with similar claims and factual circumstances cuts at the "core merits dispute in this case," and is thus intertwined).[55] Those arguments are unavoidably based on the same arguments Defendants raise on their Rule 12(b)(6) merits motions—their supposed response to antisemitism. *Compare* Col. Mem. 20-27 (arguing that Columbia's "numerous steps" pertaining to student safety, protests and campus climate, policy enforcement, and educational accommodations defeats Plaintiffs' claims under Rule 12(b)(6)) *with id.* 42-43 (challenging Rule 12(b)(1) standing by highlighting the "measures" it has taken pertaining to student safety, protests and campus events, educational accommodations, policy enforcement, among others); *compare* Bar. Mem. 16-18 (arguing under Rule 12(b)(1) that Plaintiffs' claims are unripe because of "Barnard's ongoing response" to antisemitism), *with id.* 18-19 (arguing under Rule 12(b)(6), Plaintiffs cannot state a Title VI claim because the "efforts to combat antisemitism [are] ongoing, *see supra* Part III"). As "there are major factual contentions in dispute," and Plaintiffs have not had an "opportunit[y] for pretrial discovery" on these issues, dismissal or summary judgment is inappropriate at this stage. *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 83 (2d Cir. 2018) (citation omitted).

---

[55] Columbia relies on all exhibits for both 12(b)(1) and 12(b)(6), Col. Mem. 3 n.2, and Barnard relies on Exhibits A, C, D, G, H, and M for both 12(b)(1) and 12(b)(6) which further confirms that Defendants' 12(b)(1) and 12(b)(6) arguments are intertwined.

A.    **Plaintiffs Have Standing to Pursue Injunctive Relief and SAA Has Associational Standing**

Plaintiffs have standing when they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Silva v. Farrish*, 47 F.4th 78, 86 (2d Cir. 2022) (citation omitted). Plaintiffs have alleged facts to demonstrate that they face ongoing and future imminent harm stemming directly from Defendants' deliberate indifference. And SAA and SCLJ have properly established associational standing such that they can represent the interests of their members.

1.    **Plaintiffs Properly Allege Ongoing and Future Injury-in-Fact**

Just last week, Judge Scarsi granted a preliminary injunction, finding Jewish students at UCLA, whom pro-Hamas demonstrations had excluded from campus based on beliefs concerning the Jewish state of Israel demonstrated a likelihood of future injury for standing purposes, noting that despite UCLA having taken certain remedial actions, that did "not minimize the risk that Plaintiffs will again be wronged by their exclusion from UCLA's ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs below a sufficient likelihood." *UCLA*, 2024 WL 3811250, at *4 (citation omitted). The court also "perceive[d] an imminent risk that [plaintiffs'] exclusion will return in the fall with students, staff, faculty, and non-UCLA community members." *Id*. at *5.

In both the *Harvard* and *M.I.T.* decisions this month, Judge Stearns rejected defendants' arguments that plaintiffs have not sufficiently alleged standing for prospective relief based on their ongoing and future injuries. *Harvard*, 2024 WL 3658793, at *4 ("The court concludes that Kestenbaum has standing to seek damages . . . and SAA has standing to seek prospective injunctive relief."); *M.I.T.*, 2024 WL 3596916, at *3-4 (SCLJ and individual students had standing to seek prospective injunctive relief on similar claims in similar circumstances). The law is no

different in this Circuit. *See, e.g.*, *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 49-50 (2d Cir. 2023) (prospective injunctive relief appropriate when it "can . . . remedy the existing harms that flow from the past denial of equal opportunity" (citation omitted)).

Defendants are alone in claiming that the circumstances on campus do not constitute a "certainly impending risk of future injury," and that Plaintiffs' allegations of future harm rest on a "speculative chain of possibilities." Col. Mem. 42-43; Bar. Mem. 12. The Complaint makes clear that given the current students' ongoing enrollment and Defendants' continuing ineffective response to rampant antisemitism, they will remain subject to a hostile environment—as everyone other than Defendants recognize, including the pro-Hamas demonstrators themselves who promise more harassment and escalation. That is sufficient. Plaintiffs remain personally subject to antisemitic harassment, intimidation, and threats, in a regularly recurring pattern of activity targeted at them as Jews or Israelis.[56] *E.g.*, ¶¶ 5, 161-76, 243-97, 306-94, 456-621. They have been, and are being, deprived of educational opportunities because of, among other things: professors' hateful vitriol that causes Plaintiffs to avoid taking or attending certain classes, and near-daily unsanctioned (and unregulated) rallies and antisemitic incidents which continue to cause Plaintiffs to avoid and fear campus or face terrifying threats and harassment.[57] *E.g.*, ¶¶ 312, 320, 469, 475,

---

[56] Defendants' cases are inapposite. In *Clapper v. Amnesty International USA*, 568 U.S. 398, 401, 411 (2013), plaintiffs challenging a foreign surveillance statute lacked standing because they were "United States persons" not subject to the statute and were speculating on whether the government might target their communications in the future. In *City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 107 n.8 (1983), there was no showing plaintiff was imminently likely to be arrested and illegally choked by police again. In *Shain v. Ellison*, 356 F.3d 211, 214-16 (2d Cir. 2004), the plaintiff, who was subjected to an unconstitutional strip search upon being arrested, could not "show that *if* he is arrested in Nassau County and *if* the arrest is for a misdemeanor and *if* he is not released on bail and *if* he is remanded to NCCC and *if* there is no particularized reasonable suspicion that he is concealing contraband, he will again be strip searched." In *Marcavage v. City of New York*, 689 F.3d 98, 100-01, 103 (2d Cir. 2012) (citations omitted), plaintiffs did not show a "certainly impending future injury" because no other national conventions were scheduled to come to New York City, and therefore, plaintiffs could not be injured by the challenged NYPD policies on pedestrian traffic at such conventions.

[57] For this reason, and as demonstrated *infra*, Defendants' arguments that Plaintiffs cannot rely on their "past injury"— the "numerous disturbing incidents" to which they have been exposed—to establish standing, Col. Mem. 42-43; Bar.

481-82, 484, 486, 488, 495-96, 543, 549, 552, 573, 576, 580, 583-84, 588, 591, 606, 609, 734.

Defendants' assertions that Plaintiffs' many allegations of imminent future injury are merely "speculative," Col. Mem. 43; Bar. Mem. 12, could not be more disingenuous.[58] The Complaint details how Defendants' actions and inactions have created, and continue to sustain, a hostile environment subjecting Plaintiffs to imminent personal "continuing, present adverse effects." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) (citation omitted).[59] And, in light of Defendants' longstanding failures and Plaintiffs "repeated incidents" of documented harms, "[e]vidence of past injury becomes even more probative, and the threat of future injury less speculative[.]" *Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 39 (S.D.N.Y. 2022) (citation omitted); *Plaintiffs #1-21 v. County of Suffolk*, 2021 WL 11629176, at *1 (E.D.N.Y. Aug. 5, 2021) (plaintiffs appropriately sued under Title VI based on "systemic discrimination and unconstitutional policing policies, patterns, and practices").[60] Plaintiffs have more than adequately alleged that intentional discrimination through Defendants' pattern and practice of failing to enforce their policies when Jews and Israelis are victims is Defendants' "standard operating

---

Mem. 11, is ludicrous. *See Soule*, 90 F.4th at 49-50 (prospective injunctive relief appropriate when it "can . . . remedy the existing harms that flow from the past denial of equal opportunity").

[58] Contrary to Barnard's assertion, plaintiffs need not be "certain[]" that the events of the spring will repeat in the new school year. Bar. Mem. 12 (citing *Clapper*, 568 U.S. at 410). The law does not demand clairvoyant plaintiffs, nor does it demand that plaintiffs wait to see if the hostile environment persists in the new school year. *See, e.g., Clapper*, 568 U.S. at 431 (Breyer, J., dissenting) ("[A]s the majority appears to concede[], *certainty* is not . . . the touchstone of standing" (citation omitted)); *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 411 n. 111 (S.D.N.Y. 2015) (explaining that *Clapper*'s "certainly impending" standard does not require literal certainty and could be established, *e.g.,* where a defendant "threatened to return" and harm plaintiff again (citing cases)).

[59] Columbia seeks to side-step this rule by meritlessly asserting that there is a "speculative chain of possibilities" that must happen before plaintiffs arrive at injury. Col. Mem. 43 (citing *Clapper*, 568 U.S. at 414). But plaintiffs here have already been and continue to be injured by Defendants' own actions. In *Clapper*, plaintiffs had faced no injury and were not even potential targets under the challenged statute. 568 U.S. at 411. Similarly, in *Dorce v. City of New York*, 2 F.4th 82, 95 (2d Cir. 2021), Col. Mem. 43, none of plaintiffs' allegations showed how they themselves could be "harmed in the future" where they did "not allege any facts to show that they own, plan to purchase, or have been deterred from purchasing any additional property that is likely to be subject to the [challenged] program."

[60] Further demonstrating that Columbia's continued deliberate indifference will cause Plaintiffs future injuries, two of the faculty members on Columbia's "rules committee"—which is partly responsible for the rules governing the protests—were recently exposed for themselves participating in the unauthorized encampment. *See* Ex. 6.

procedure." *United States v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 365, 417-18 (S.D.N.Y. 2018) (citation omitted). Further belying the notion that future injury is speculative is that members of Columbia's own faculty believe that campus will be similarly intolerable next semester. Ex. 7.

Columbia argues that it has taken measures to "prevent these alleged harms from recurring." Col. Mem. 43. For instance, Columbia claims it has "updated its policies on an ongoing basis since October 7 . . . to ensure that events on campus, including protests, do not provide occasion for the spread of antisemitism, bigotry against Israelis, or other forms of hate." *Id.* at 7. Yet Defendants' policies already proscribed the conduct alleged, *e.g.*, ¶¶ 84, 93, and student and faculty groups, and their leaders and members, who had repeatedly disregarded Defendants' policies did not respect new time, place, manner restrictions and event notice requirements, nor that calls for genocide are not allowed, ¶ 447; *e.g.*, ¶¶ 245, 257, 259, 272, 275, 278, 294, 314, 330, 347, 353, 377 (genocidal chants following clarification); ¶¶ 293-94, 306-89, 393 (violations of new time, place, manner restrictions). Defendants' proffered extrinsic materials should be rejected as "immaterial because [they] do[] not contradict plausible allegations that are themselves sufficient to show standing." *Carter*, 822 F.3d at 57.[61]

Barnard also contends that Plaintiffs may allege injury only based on harassment directly targeted at Plaintiffs themselves. Bar. Mem. 12. That is not the law. As Barnard's own cases explain, Plaintiffs need only be "*affect[ed]* . . . in a personal and individual way," Bar. Mem. 12, and courts have upheld standing for plaintiffs who were not the direct targets of discrimination.[62]

---

[61] Barnard's cited material offers nothing of substance to contradict Plaintiffs' plausible allegations. To highlight how useless Barnard's proffered information is, consider its vague assertion that the school is "reviewing" its policies and procedures. Grinage Decl. ¶ 5. Perhaps this means that Barnard intends to change or update those policies—though the Declaration provides no insight into what those changes or updates might be. Yet Barnard justifies its use of its current policies and procedures in its Motion, Bar. Mem. 5, which suggests its belief that those policies are adequate.

[62] *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." (citation omitted)); *McGullam v. Cedar Graphics, Inc*., 609 F.3d 70, 80 (2d Cir. 2010) (Calabresi, J., concurring) (same, and explaining that liability is usually based on "'the cumulative effect of individual acts' that are not independently actionable" (citation omitted)). These

Thus, where, as here, the defendant's "policies and practices" have been alleged to cause plaintiffs' injuries, plaintiffs sufficiently plead standing for injunctive relief. *E.g.*, *Robinson v. Blank*, 2013 WL 2156040, at *1, *7, *14-15 (S.D.N.Y. May 20, 2013) (former employee had standing to seek to enjoin his former employer's continued use of "policies and practices regarding . . . employees who have been arrested"—the basis for plaintiff's termination—because plaintiff had sought to be rehired and thus was still subject to them); *e.g.*, ¶¶ 74, 413, 426, 436, 631, 646, 664; *see generally*, Compl. §§ E-G.

### 2.    Plaintiffs Sufficiently Allege Defendants' Continuing Deliberate Indifference Will Cause Future Injury

Barnard argues that Plaintiffs did not show a "'causal relationship' between Barnard and any actionable harassment they might face." Bar. Mem. 12. Establishing causation for standing purposes requires only that "the plaintiff's injury be fairly traceable to the challenged action of the defendant." *Carter*, 822 F.3d at 55 (cleaned up). As alleged throughout the Complaint, Barnard's longstanding deliberate indifference to and failure to stop antisemitic harassment is the direct cause of Plaintiffs' injuries. *See supra* § I.D.[63]

Barnard's attempt to blame "third parties" for Plaintiffs' injuries, Bar. Mem. 12-13, is based on the same meritless arguments they raise on their Rule 12(b)(6) merits motion and ignores that Barnard is liable for its deliberate indifference to peer-on-peer and teacher-on-student—i.e.,

---

cases further show the inapposite nature of Barnard's argument that "to the extent *isolated incidents* recur on campus, no Plaintiff can plausibly allege that she will personally face injuries," Bar. Mem. 12. A hostile environment is derived from the cumulative effect of acts, not a single incident. *McGullam*, 609 F.3d at 80.

[63] *Liu v. U.S. Cong.*, 834 F. App'x 600, 602, 605 (2d Cir. 2020), does not support Barnard's argument. *See* Bar. Mem. 12. In *Liu*, a voter and a voters' rights organization brought suit against Congress and its leaders, seeking to hold them in contempt if they failed to replace the allegedly unconstitutional apportionment acts. 834 F. App'x at 601. The court held that the individual plaintiff sufficiently alleged injury-in-fact (that his vote was diluted through the apportionment scheme), but "it [wa]s the actions of those actors responsible for the census and for redistricting—not those of the Congress or its current leaders—that have allegedly injured him, [so plaintiff] failed to demonstrate that his injury is fairly traceable to the defendants." *Id*. at 602, 605 (citations omitted).

third-party—harassment. *Zeno*, 702 F.3d at 664-66. And as explained, *supra* § I.D, Barnard's response to the antisemitism that has plagued its campus for almost a full year is anything but "robust," Bar. Mem. 13. That Barnard says it "will continue to take decisive steps," *id.*, shows its failure to grasp the magnitude of the issue and the response necessary to address the problem. Whatever steps it may have taken since October 7 were not reasonably designed to protect Plaintiffs or any of its other Jewish and Israeli students. *See supra* § I.D.

### 3.    A Favorable Decision Will Redress Plaintiffs' Injuries

Defendants argue that the injunctive relief set out in Plaintiffs' prayer is unlikely to redress Plaintiffs' injuries and is not "limited to the inadequacy that produced their injuries." Bar. Mem. 13-14; Col. Mem. 43. Yet at this stage of the litigation, Plaintiffs "must show that it is 'likely, as opposed to merely speculative, that the [alleged] injury will be redressed by a favorable decision,'" which is a "relatively modest" burden. *Soule*, 90 F.4th at 47; *Janfeshan v. U.S. Customs & Border Prot.*, 2017 WL 3972461, at *5-6 (E.D.N.Y. Aug. 21, 2017) ("relatively modest" burden "refers to 'a non-speculative likelihood that the injury can be remedied by the requested relief.'" (citations omitted)); *see also Leslie v. City of New York*, 2023 WL 2612688, at *6 (S.D.N.Y. Mar. 23, 2023) ("redressability . . . 'is not a demand for mathematical certainty'"). The injunctive relief Plaintiffs seek is designed precisely to "redress the alleged denial of equal . . . opportunity," *Soule*, 90 F.4th at 48—that Defendants be ordered to comply with their obligations to protect Jewish and Israeli students by taking the "necessary and appropriate remedial and preventive measures against antisemitic discrimination and harassment," Compl., Prayer for Relief.

Defendants' argument that Plaintiffs seek "sweeping" and "unmoored" relief is wrong. Col. Mem. 43-45; Bar. Mem. 11-14. Plaintiffs' request is tailored to redress their injuries by requiring Defendants to enforce their own policies equally and to treat antisemitism with the same severity and seriousness as it treats other forms of discrimination. Defendants' cases provide them no

support, as each involved a request for relief untethered to those plaintiffs. Col. Mem. 43; Bar.
Mem. 13 (citing *Gill v. Whitford*, 585 U.S. 48, 72-73 (2018) (finding gerrymandering claim was
"unsettled . . . the contours and justiciability of which are unresolved" and refusing to direct
dismissal of the case); *Soule*, 90 F.4th at 48-50 (finding plaintiffs had standing to seek alteration
of public records that impacted their athletic standing because that would "at least partially redress"
their injuries but no standing to challenge alteration of other records or policies that no longer
applied to plaintiffs); Bar. Mem. 14 (citing *Utah Physicians for a Healthy Env't v. Diesel Power
Gear LLC*, 374 F. Supp. 3d 1124, 1136 (D. Utah 2019) (denying a requested injunction ordering
a used car dealership to recall or fix all polluting cars as "overbroad because it [was] not tied to
the geographic area" in which plaintiffs suffered injury)). That Plaintiffs' injuries derive from
Defendants' policies and practices of ignoring escalating antisemitic conduct (and their own
disciplinary policies when Jews and Israelis are victims) is sufficient to show that Plaintiffs'
injuries are "likely redressable . . . by the []injunctive relief sought." *Soule*, 90 F.4th at 47.

Columbia also incorrectly argues that Plaintiffs improperly request "particular remedial"
measures, "demand[ing] . . . expulsions, terminations, returning of donations, and indefinite
judicial superintendence of the University." Col. Mem. 45. Plaintiffs make no such demands—
they suggest options "*such as*" disciplinary measures against members of Columbia's community
and establishing a "Title VI office,"[64] which are possibilities the Court may consider in enjoining
Columbia from "establishing, implementing, instituting, maintaining, or executing policies,

---

[64] Columbia asserts that this specific suggestion is "effectively moot" because it intends to "establish an office with
the sole purpose of investigating and responding to allegations of discrimination," and it is "working on
antidiscrimination initiatives that will include antisemitism training." Col. Mem. 44 n.27 (citing Col. Mem. Exs. W,
II). These vague assertions of future plans are irrelevant. Once again, Columbia asks this Court to "trust us." Yet
Columbia offers no timeline for establishing such an office and similarly fails to say what the "antisemitism training"
will include, why it thinks that will remedy its antisemitism problem, or whether such training will be mandatory. *See
generally* Col. Mem. Ex. II. Columbia has had decades to effectively combat antisemitism on its campus. As the
Complaint makes clear, Columbia cannot be trusted to carry out its purported plans to fight antisemitism.

practices, procedures, or protocols that discriminate against Jewish and Israeli students." Compl., Prayer for Relief. Columbia's cases, Col. Mem. 45, are inapposite as they were decided in the context of determining whether the school was *liable* for being deliberately indifferent, not whether the plaintiff had standing to assert their claims or to request remedies once liability had already been established (or whether the court had the power to order such remedies). *See, e.g.*, *Doe*, 2022 WL 3666997, at *12-13, *15 (no Title IX deliberate indifference liability where complaint "contain[ed] no references to [plaintiff's] education" and "d[id] not point to a single deficit in Columbia's approach to sexual misconduct beyond [plaintiff's] general complaint that its policies were inadequate").

Finally, Defendants argue that Plaintiffs cannot request that the Court eventually appoint a "neutral expert monitor." Col. Mem. 43-44; Bar. Mem. 13-14. But the Court's authority to appoint a monitor is well established under Rule 53, the inherent power of the Court, and numerous decisions. *See, e.g.*, Fed. R. Civ. P. 53 (court authority to appoint monitor); *United States v. Apple Inc.*, 992 F. Supp. 2d 263, 280-82 (S.D.N.Y. 2014) (court has both inherent authority and power under Rule 53 to appoint monitor "to assist in framing and enforcing complex decrees . . . particularly when a party has proved resistant or intransigent" (citing Fed. R. Civ. P. 53 advisory committee notes (2003 amendments))). Given Defendants' long history of failing to take genuine steps combat antisemitism, *e.g.*, ¶¶ 98-138, coupled with their refusal to prevent the myriad antisemitic events of which they had prior knowledge, *e.g.*, ¶¶ 3, 189, 202-03, 227-32, 237, 254-55, 280, 285-97, 379, a monitor will be necessary and appropriate.[65]

---

[65] Further evidencing this need is the House Committee on Education and the Workforce's August 1, 2024 letter to Columbia, in which it threatened to subpoena the school in light of its repeated failure to produce the information and documents Congress requested. *See* Ex. 8. In the Committee's press release on the letter, it noted that Columbia is "home to some of the most egregious displays of antisemitism on a college campus since October 7." Ex. 3.

### 4.    SAA and SCLJ Are Genuine Membership Organizations That Have Standing to Sue

SAA and SCLJ have properly established associational standing such that they can represent the interests of their members, and neither of Defendants' arguments—namely, that the claims require individualized participation, Col. Mem. 41-42; Bar. Mem. 14-15, and that members cannot be anonymous, Bar. Mem. 15-16—refute that fact. The same is true of Columbia's argument that SAA and SCLJ lack standing to assert the Section 1986 claim. Col. Mem. 41-42.

### a)    *Members Are Not Required to Be Parties to This Suit*

Defendants argue that SAA and SCLJ cannot sue on behalf of their members because evaluating the members' injuries might require "individualized proof." Col. Mem. 41; Bar. Mem. 14-15.[66] Defendants misunderstand the law, and this argument was recently rejected in two cases brought by the same organizational plaintiffs here on behalf of students at Harvard and M.I.T. *See Harvard*, 2024 WL 3658793, at *4 ("Harvard contends that SAA cannot seek injunctive relief because Title VI claims are 'necessarily individualized.' Even if true, this does not preclude associational standing because the requested relief will 'inure to the benefit of those members of the association actually injured.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975))); *M.I.T.*, 2024 WL 3596916, at *3 ("Nor is the court persuaded that SCLJ's members need to be joined as parties to the case. Even if SCLJ's claims require 'proof specific to individual members of the association,' this is no bar to associational standing for purposes of injunctive relief." (citation omitted)). The Supreme Court has held that "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party *indispensable* to proper

---

[66] The cases Barnard cites do not involve facts similar to the torrent of antisemitism that persisted at Columbia and Barnard for nearly an entire academic year. Bar. Mem. 15, citing *Demoret v. Zegarelli*, 451 F.3d 140, 145-50 (2d Cir. 2006) ("[i]solated incidents" of alleged gender discrimination); *L.L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 548-49 (3d Cir. 2017) (involving one severe incident of overt racism directed at one plaintiff).

resolution of the cause, the association may be an appropriate representative of its members entitled to invoke the court's jurisdiction." *Warth*, 422 U.S. at 511. The SAA and SCLJ members are not "indispensable" here—this action challenges a widespread practice of discrimination against Jewish and Israeli students in violation of Defendants' policies, Title VI, and similar statutes, and seeks injunctive relief that would remedy that discrimination.

It is appropriate for SAA and SCLJ to seek this prospective equitable relief, which "will inure to the benefit of those members of the association[s] actually injured." *Id.* at 515; *see also Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 150 (2d Cir. 2006) (when an organization seeks "civil penalties and injunctive relief only, not monetary damages, its claims do not require 'individualized proof'").[67] It does not matter that some member participation may later be useful to "demonstrate the general manner in which defendants fail[ed]" to protect Jewish and Israeli students because of Defendants' "discriminatory policies and practices," since the "focus of plaintiffs' proof will be on *defendants'* actions," making these members not indispensable. *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 308-09 (E.D.N.Y. 2008).[68]

---

[67] Columbia disingenuously relies on *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638 (2d Cir. 1998), in support of its argument that the members' injuries must be shared by all members "to an equal degree" for them to have standing to assert claims for injunctive relief. Col. Mem. 41. But there, the organization did not have standing to "request *damages* on behalf of its members." *Irish Lesbian*, 143 F.3d at 649-50, 650 n.5. Organizations do not have to demonstrate that each of their potentially thousands of members were all affected in the same way to assert injunctive standing. *See, e.g.*, *Brooklyn Branch of N.A.A.C.P. v. Kosinski*, 657 F. Supp. 3d 504, 516-18 (S.D.N.Y. 2023) (finding Brooklyn N.A.A.C.P. had associational standing where organization alleged how some members intended to violate the challenged statute). Defendants' reliance on *Bano*, Col. Mem. 41; Bar. Mem. 14-15, is also misplaced as there, the court held that the organizations "lacked standing to bring claims for *money damages* on behalf of their members," because they sought individualized relief including "reimbursement for the costs of medical monitoring" and "remediation" of members' "private properties." 361 F.3d at 702, 715. SAA and SCLJ do not seek damages on behalf of their members, but the individual plaintiffs do have standing to pursue their own damages—a fact neither defendant challenges.

[68] The cases Defendants cite are irrelevant. In *Blunt v. Lower Merion School District*, 767 F.3d 247, 289 (3d Cir. 2014), plaintiffs sought "monetary reimbursement" that would vary depending on each student's needs. In *Barnett*, 2005 WL 8178066, at *5, the organization alleged "conjectural [and] hypothetical injuries" to non-plaintiff students who were not alleged to be members of the organization. In *Lulac Councils 4433 & 4436 v. City of Galveston*, 942 F. Supp. 342, 345 (S.D. Tex. 1996), none of the plaintiffs were members of the organization as required for organizational standing. And to the extent that either party intends to rely on *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977), Col. Mem. 41; Bar. Mem. 14, for more than the basic three-part test for associational standing, just last year, the Supreme Court expressly confirmed that Hunt's additional inquiry into

Barnard further effectively argues that associational standing can never apply in Title VI cases because they depend on "highly individualized allegations," and because Plaintiffs allegedly do not challenge a "university-wide policy." Bar. Mem. 14-15. Barnard's proffered rules, for which it relies on cases that *do not* involve associational standing, *id.*, are contrary to the law—courts regularly find that organizational plaintiffs can bring discrimination claims on behalf of their members, and that such organizational plaintiffs can bring hostile environment claims based on patterns and practices, including just last month in a separate case brought by SCLJ. *See, e.g.*, *M.I.T.*, 2024 WL 3596916, at *3 ("Even if SCLJ's claims require 'proof specific to individual members of the association,' this is no bar to associational standing for purposes of injunctive relief." (citation omitted)); *Emps. Committed for Just. v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 434 (W.D.N.Y. 2005) (finding hostile environment claim would "not hinge" on proof from individuals, "but rather the existence of a pervasive system-wide pattern or practice or discrimination that is equally harmful and applicable to all members").

Columbia asserts that the "heterogenous relief" sought—namely, "wide-ranging demands, including discipline against administrators, professors, and students"—requires a focus on "each person's role in causing each member's 'individual injuries.'" Col. Mem. 42 (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. City of Albany*, 250 F. Supp. 2d 48, 59 (N.D.N.Y. 2003)). But unlike in *Arbor Hill*, Plaintiffs here do not make any "wide-ranging demands," which "focus[] more on individual injuries that may have been suffered by individual members." 250 F. Supp. 2d at 59. Plaintiffs ask the Court to enjoin Columbia from discriminating against Jewish and Israeli students and to order Columbia to take all necessary steps, "such as" disciplinary measures

---

whether an organization with no members is the functional equivalent to an organization that does have members has "no applicability" to true membership organizations like plaintiffs here. *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023).

and the like, which would "serve[] plaintiff[s'] members as a whole," and would not involve individual participation from SAA or SCLJ's members to implement. Compl., Prayer for Relief; *see Arbor Hill*, 250 F. Supp. 2d at 58-59 ("Had plaintiff stopped" at their request to "permanently enjoin defendants from directing, administering, and operating" the challenged program, "the [associational standing] inquiry would be at an end.").

> b)    *Members May Be Anonymous at This Stage*

Barnard further asserts that SAA and SCLJ do not have standing because neither has "identified by name at least one member, other than the individual plaintiffs." Bar. Mem. 15-16. But as Barnard readily acknowledges, organizations need to name only one member "no later than summary judgment." Bar. Mem. 16 (citing *Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 115-19 (2d Cir. 2024)); *see Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 320 (S.D.N.Y. 2020) ("Unless 'all the members of an organization are affected by the challenged activity' Plaintiff must name at least one of its 'affected members' to establish associational standing at the pleading stage." (citations omitted)). What Barnard fails to acknowledge is that a member must be named only "to the court." *Do No Harm*, 96 F.4th at 119. Barnard's argument that it cannot defend itself without knowing the names of *all* the student members (which *Do No Harm* does not require) is all the more disingenuous here, as it knows the identities of the anonymous SAA and SCLJ Barnard members identified in the Complaint—each has communicated directly with Barnard regarding antisemitic incidents. *E.g.*, ¶ 589 (SAA Member #1); ¶ 597 (SAA Member #3); ¶ 256 (SAA Member #4); ¶ 249 (SCLJ Member #7). In any event, both Barnard and the Court currently have the names of the Barnard plaintiffs who are also SAA and SCLJ members.[69] ¶¶ 20-21, 28, 37, 40-

---

[69] For that reason (among others), *Draper v. Healey*, 827 F.3d 1 (1st Cir. 2016), Bar. Mem. 16, is inapplicable. There, unlike here, the "complaint did not identify any member of the group" such that the court could not determine whether any individual member had standing. *Draper*, 827 F.3d at 3.

43, 50. SAA and SCLJ will, in accordance with *Do No Harm*, 96 F.4th at 118-19, meet any obligation to disclose names of anonymous members by summary judgment.[70]

c)    *SAA and SCLJ Can Assert a Section 1986 Claim*

Columbia argues that SAA and SCLJ do not have "standing to assert the rights of its members under" 42 U.S.C. § 1986. Col. Mem. 42. Yet there is no such bar to associational standing for Section 1986 claims. *E.g.*, *Hall v. Warren*, 2022 WL 2356700, at *3-4, *11 (W.D.N.Y. June 30, 2022) (associational standing sufficient basis for Sections 1983, 1985 and 1986 claims); *Young Am.'s Found. v. Stenger*, 2023 WL 3559619, at *21-24 (N.D.N.Y. May 19, 2023) (denying motion to dismiss Sections 1985(3) and 1986 claims where plaintiff organization established associational standing). Just last month, in a similar case brought against M.I.T., the court "perceive[d] no jurisdictional bar" to plaintiffs' § 1986 claim, which SCLJ asserted on behalf of its members. *M.I.T.*, 2024 WL 3596916, at *3. Further, Columbia fails to explain why this Court should consider *Nnebe*, a case brought pursuant to 42 U.S.C. § 1983, when courts in this Circuit have found associational standing appropriate for claims brought under 42 U.S.C. § 1986. *See, e.g.*, *Hall*, 2022 WL 2356700, at *3-4, *11 (denying motion to dismiss Section 1986 claim because the organization, NLG, "establishe[d] associational standing" by pleading that defendants "attacked [one of the plaintiffs], an NLG [member]"); *see also Stenger*, 2023 WL 3559619, at *24 (organization asserted §§ 1983, 1985(3), and 1986 claims, but court limited its *Nnebe* analysis to

---

[70] Though SAA and SCLJ will not rely on individual plaintiffs to meet *Do No Harm*'s requirement to identify to the court at least one member, Barnard's cases on this point are further distinguishable. *See Access 123, Inc. v. Markey's Lobster Pool, Inc.*, 2001 WL 920051, at *3-4 (D.N.H. Aug. 14, 2001) (at summary judgment, organization did not show that any member besides plaintiff had standing to bring claim, and there was "little evidence that any other members" had been or would be injured); *Disabled in Action of Metro. N.Y. v. Trump Int'l Hotel & Tower*, 2003 WL 1751785, at *1-2, *10 (S.D.N.Y. Apr. 2, 2003) (at summary judgment, the only allegation that went to whether the organization's plaintiff members had standing was that its unspecified members had entered, or had attempted to enter, defendant's non-ADA-compliant premises, and intended to do so in the future); *Blunt*, 767 F.3d at 289-90 (seeking "monetary reimbursement" that would vary depending on each student's needs). The Complaint here sets forth separate allegations for the anonymous members.

70

the § 1983 claim only).

### B.  Plaintiffs' Claims Are Ripe

Through unjustifiably self-congratulatory and unverified proclamations regarding its efforts to date in combating antisemitism, Barnard asserts that Plaintiffs' claims are not ripe because "their suit is a moving target." Bar. Mem. 16. According to Barnard, the Court should wait to adjudicate Plaintiffs' federal civil rights claims until "Barnard's response has had a chance to play out" and to do otherwise would impose an "exceptional 'hardship'" on Barnard. *Id*. at 17-18. Under Barnard's theory, so long as it or any other institution is "committed to taking steps" and "working to recommend immediate and '[l]onger term' changes[,]" the courts should avoid enforcing Title VI—which would eviscerate Title VI. *Id*. at 17.

Barnard's contention that Plaintiffs' claims implicate the prudential ripeness doctrine because they are "'contingent on future events'" and rely on an "ongoing response," Bar. Mem. 16-17, should be rejected, first, because the doctrine has been all but abandoned: the "continu[ed] vitality" of the prudential ripeness doctrine has been placed into serious doubt given the federal courts' "virtually unflagging" "obligation to hear and decide cases." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014); *see also Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 102 (2d Cir. 2021) (reversing finding that case was prudentially unripe). Even assuming ripeness were still viable in a case like this, and it is not, its application should be rejected here. There is no justification for dismissing Barnard from the Complaint based on Barnard's say-so; at a minimum, there are hotly contested issues of fact as to what Barnard is doing—and what it should be, but is not, doing. *See supra* § I; *Harvard*, 2024 WL 3658793, at *4 (declining to rule on whether SAA's Title VI claim against Harvard was ripe at the motion to dismiss stage because it involved "the core merits dispute in th[e] case").

Barnard's reliance on *NYCLU v. Grandeau*, 528 F.3d 122 (2d Cir. 2008), to argue that

unspecified disciplinary proceedings and statements from the administration warrant dismissal of Plaintiffs' claims is misplaced. Bar. Mem. 16-17; *see Grandeau*, 528 F.3d at 130 (holding claim challenging defendant-agency's policy under the First Amendment was not ripe because it was "at best unclear to what an extent an agency has actually adopted a policy or how stringently the agency will enforce it").[71] Here, unlike in *Grandeau*, Plaintiffs allege and seek relief from "past events that have fully unfolded," *M.I.T.*, 2024 WL 3596916, at *4, and their claims in no way depend on the outcome of Barnard "commit[ing] to tak[e] steps" or the Task Force's "recommend[ations]." Bar. Mem. 17.

Barnard's claim that "it is engaged in responding to" incidents of antisemitism through "conduct procedures" and "non-disciplinary remedial action[s]," *id.* (citing Grinage Decl.), should be disregarded. *See supra* § I.D.2.[72] While Barnard touts that it is "working through the necessary conduct procedures," it ignores Plaintiffs' allegations that antisemitic harassment is ongoing, and fails to state how it plans to address the conduct moving forward. Bar. Mem. 17. Barnard also states that it has committed to "taking steps 'throughout 2024' to strengthen its campus climate," and the Task Force is working to recommend changes to combat antisemitism. *Id.* (citing Exs. A, O; Grinage Decl. ¶¶ 3, 5). But neither the establishment of the Task Force on November 1, 2023

---

[71] Barnard's citation to *Cotton v. Noeth*, 96 F.4th 249, 256-57 (2d Cir. 2024) in no way supports its position. There, the Second Circuit found that plaintiff-prisoner's Section 1983 claim was "both constitutionally and prudentially ripe for adjudication" because it was a "live controversy affecting [plaintiff's] rights[,]" involved "no future contingencies[,]" and leaving the issue unresolved could impose a hardship on plaintiff while deciding the issue would not impose a hardship on the State. *Cotton*, 96 F.4th at 256-57. And *Zeno*, 702 F.3d at 669, which Barnard cites in support of its argument that its non-disciplinary remedial actions, such as its Task Force on Antisemitism, have been a "critical component to its response to antisemitism," is irrelevant to that argument. Bar. Mem. 17. Finally, *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648-49 (1999), Bar. Mem. 17-18, does not address ripeness.

[72] "In accord with principles of fundamental fairness," it would be "improper for the district court, in ruling on the 12(b)(1) motion, to have considered the conclusory and hearsay statements contained in the affidavits submitted by defendants, and to deny plaintiff limited discovery on the jurisdictional question." *Kamen v. AT&T Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986). Here, "discovery is necessary, as it appears that the evidence [is] solely in the possession of [Barnard]" and is "relevant to Plaintiff's ability to respond to [Barnard's] motion." *Marsh & McLennan Agency LLC v. Williams*, 2023 WL 4534984, at *1 (S.D.N.Y. July 13, 2023) ("[A] court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." (citation omitted)).

nor the issuance of its first report on March 4, 2024, curtailed antisemitism on Barnard's campus. *See supra* § I.D.3.

Barnard's argument that adjudicating the "appalling wave of antisemitic activity" will cause Barnard an unexplained "hardship," Bar. Mem. 1, 17, ignores that what is at issue is "what hardship the parties will suffer in the absence of review," *Johnson v. Bryson*, 851 F. Supp. 2d 688, 702 (S.D.N.Y. 2012) (citation omitted), not whether hearing the case will cause hardship to the defendant. Barnard cites no case supporting the proposition that a court can disregard its "virtually unflagging" obligation "to hear and decide cases" simply because a defendant claims it will be inconvenienced by the continuance of litigation. *Susan B. Anthony List*, 573 U.S. at 167.

Plaintiffs should not be barred from court to accommodate the harassers and their enablers. A case is ripe when the plaintiffs' injuries are not "conjectural or hypothetical," but are instead "present, ongoing harms." *Ross v. Bank of Am., N.A.(USA)*, 524 F.3d 217, 226 (2d Cir. 2008). This case is not one that "will be *better* decided later." *Cotton*, 96 F.4th at 256-57. As described above, absent court-ordered resolution, Plaintiffs have been and will continue to be harmed by Barnard's violations of Title VI. *See New York v. Pa. Higher Educ. Assistance Agency*, 2020 WL 2097640, at *12 (S.D.N.Y. May 1, 2020) (finding plaintiff "would suffer hardship by delaying a resolution of its contentions that PHEAA has already violated the laws it is tasked with enforcing"); *Johnson*, 851 F. Supp. 2d at 702 (finding case was ripe where the fact that "the challenged policies have been in place . . . and will likely again be applied" made it "distinguishable from cases in which courts have determined that pre-enforcement challenges to agency decisions are unripe").

## VI.    DEFENDANTS' MOTION TO STRIKE SHOULD BE DENIED

Defendants' request to strike Plaintiffs' request for injunctive relief should be rejected. As Judge Stearns held in *Harvard*, because at least "some injunctive relief is viable as a remedy" there is "no reason" to strike the prayer. *Harvard*, 2024 WL 3658793, at *9. In any event, Plaintiffs'

request does not come within any of the bases for striking pleadings—it is not "redundant, immaterial, impertinent or scandalous," Fed. R. Civ. P. 12(f), and Defendants do not, as they cannot, show otherwise, *see Harvard*, 2024 WL 3658793, at *9 (refusing to strike a similar prayer for relief at the motion to dismiss stage). And motions to strike are highly disfavored, and should be granted only if "there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (citations omitted).

Columbia's argument that Plaintiffs' request for relief is "insufficiently detailed," and as such "[t]he injunction Plaintiffs request cannot be reconciled with Rule 65(d)," Col. Mem. 44, is misleading as Plaintiffs' request does, in fact, provide such detail about the specific "acts restrained or required," *see* Compl., Prayer for Relief at A. Columbia argues that Plaintiffs lack "Article III standing to seek this injunctive relief" because such relief cannot extend to "generalized grievances" and "stretch[es] far beyond any past or future injuries Plaintiffs allege." Col. Mem. 43-44. The relief sought, such as a "neutral expert monitor," "policies, practices, procedures, [and] protocols," and the termination of employees and students, Col. Mem. 44, is not overbroad, as Columbia suggests. Given the scope of the antisemitism Plaintiffs have and will continue to endure on Columbia's campus without intervention, this relief is clearly "limited to the inadequacy that produced [their] injury in fact." Col. Mem. 43; *see supra* § V.A.3.

Defendants' argument that Plaintiffs' requested injunctive relief involves specific disciplinary measures against particular students or faculty, Col. Mem. 45; Bar. Mem. 40, should also be rejected. In fact, nowhere in Plaintiffs' 234-page Complaint, which contains hundreds of allegations of antisemitic conduct, do Plaintiffs request "specific remedial measures." *Id.* Rather, Plaintiffs seek to compel Columbia and Barnard, among other things, to discipline perpetrators of antisemitism with the same degree of enforcement as it does other forms of discrimination and

hatred. Defendants have not, and cannot, explain how enjoining them from applying their policies in a discriminatory manner would amount to "second-guessing the disciplinary decisions made by school administrators." *Id.*; *cf. supra* § V.A.3.

## CONCLUSION

The Court should deny Defendants' motions in their entirety.[73]

Dated:    New York, New York
          August 21, 2024

                                        Respectfully submitted,

                                        KASOWITZ BENSON TORRES LLP

                                        By: */s/ Marc E. Kasowitz*
                                            Marc E. Kasowitz
                                            Daniel R. Benson
                                            Mark P. Ressler
                                            Andrew L. Schwartz
                                            Joshua E. Roberts
                                            Jillian R. Roffer
                                            1633 Broadway
                                            New York, New York 10019
                                            Tel: (212) 506-1700
                                            mkasowitz@kasowitz.com
                                            dbenson@kasowitz.com
                                            mressler@kasowitz.com
                                            aschwartz@kasowitz.com
                                            jroberts@kasowitz.com
                                            jroffer@kasowitz.com

                                        *Attorneys for Plaintiffs*

---

[73] Should any portion of Defendants' motions be granted, Plaintiffs respectfully request leave to amend the Complaint. Leave to amend should be "freely give[n] . . .when justice so requires," Fed. R. Civ. P. 15; *see also Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) ("When a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.'"). Columbia points to no case supporting a divergence from "the usual practice" of granting leave in these circumstances. *Wai Chu v. Samsung Elecs. Am., Inc.*, 2020 WL 1330662, at *9 (S.D.N.Y. Mar. 23, 2020) does not state or even imply that a plaintiff who falls short on a motion to dismiss should not be given leave to amend; there, the plaintiffs there were "unable to" make their allegations on amendment because they were "time-barred by the applicable statute of limitations." *Id.*; *see Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (denying leave to amend where any reframing would in any event be "futile" on the law); *Sabel v. Halsted Fin. Servs., LLC*, 2020 WL 6274986, at *7 (S.D.N.Y. Oct. 26, 2020) (declining to grant leave to amend *sua sponte* where "[p]laintiff has not requested leave to amend or suggested that he is in possession of facts that would cure the deficiencies").