# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STUDENTS AGAINST ANTISEMITISM, INC., STANDWITHUS CENTER FOR LEGAL JUSTICE, MILES RUBIN, DANIELLA SYMONDS, ERIN MCNULTY, NOAH MILLER, VALERIE GERSTEIN, KATIANA ARYEH, LAURA BELLOWS, LEMONY DAVID, JOHN DOE, CHAYA DROZNIK, LEO ELKINS, SAMUEL FRIEDMAN, MAYA GAL, AYELET GLASER, MICHAEL GROSS, JARED HARNICK, GABRIEL KAHANE, TALIA KESSELMAN, ELI MIZRAHI-AKS, OMER NAUER, AMIEL NELSON, GABRIEL NELSON, MOLLY NELSON, MARC NOCK, AVA QUINN, TALIA RABBAN, JANE ROE, SOPHIE RUKEYSER, ALIZA RUTTENBERG, EMILY SANDLER, ANDREW STEIN, JONATHAN SWILL, RAFAEL VANUNO, XAVIER WESTERGAARD, EDEN YADEGAR, and LILY ZUCKERMAN, <br><br> Plaintiffs, <br><br> -against- <br><br> TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, and BARNARD COLLEGE <br><br> Defendants. | Case No. 1:24-cv-01306-VSB-SN <br><br> Hon. Vernon S. Broderick <br><br> **BARNARD'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(1), (6) AND TO STRIKE PURSUANT TO FED. R. CIV. P. 12(F)** |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 3

    I.    THE COURT SHOULD DISMISS THE FAC UNDER RULE 12(b)(6). ............ 3

        A.    Plaintiffs Fail to Plausibly Plead a Title VI Claim. ................................. 3

        B.    Plaintiffs Fail to Plausibly Plead Claims Under State or City Law. ........ 12

    II.    THE COURT SHOULD DISMISS UNDER RULE 12(b)(1)
        PLAINTIFFS' SWEEPING REQUESTS FOR INJUNCTIVE RELIEF
        AND ALL CLAIMS BY PLAINTIFFS SCLJ AND SAA FOR LACK OF
        STANDING. ....................................................................................... 14

        A.    Plaintiffs Do Not Have Standing to Seek Injunctive Relief. .................. 14

        B.    Plaintiffs SCLJ and SAA Do Not Have Associational Standing. ............ 15

    III.    THE COURT SHOULD DISMISS THE FAC UNDER RULE 12(b)(1)
        BECAUSE PLAINTIFFS' CLAIMS ARE UNRIPE. ......................................... 16

    IV.    THE COURT SHOULD STRIKE PLAINTIFFS' REMEDIAL
        REQUESTS. ....................................................................................... 18

CONCLUSION ................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Atuahene v. City of Hartford,*
10 F. App'x 33 (2d Cir. 2001) ............................................................. 3

*Aubrey v. New Sch.,*
624 F. Supp. 3d 403 (S.D.N.Y. 2022)................................................... 13

*Bano v. Union Carbide Corp.,*
361 F.3d 696 (2d Cir. 2004)............................................................ 15, 16

*Barnett v. Johnson City Sch. Dist.,*
2005 WL 8178066 (N.D.N.Y. Feb. 2, 2005) ........................................ 16

*Bernheim v. N.Y. City of Dep't of Education,*
2020 WL 3865119 (S.D.N.Y. July 9, 2020) ......................................... 12

*BMG Monroe I, LLC v. Vill. of Monroe,*
93 F.4th 595 (2d Cir. 2024) ................................................................ 16

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)............................................................................ 14

*Cotton v. Noeth,*
96 F.4th 249 (2d Cir. 2024) ........................................................... 16, 17

*Crandell v. N.Y. Coll. Of Osteopathic Med.,*
87 F. Supp. 2d 304 (S.D.N.Y. 2000)..................................................... 5

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.,*
526 U.S. 629 (1999)..................................................................... passim

*Disabled in Action of Metro. N.Y. v. Trump Int'l Hotel & Tower,*
2003 WL 1751785 (S.D.N.Y. Apr. 2, 2003).......................................... 16

*Do No Harm v. Pfizer Inc.,*
96 F.4th 106 (2d Cir. 2024) ................................................................ 16

*Doe v. Sacks,*
2024 WL 402945 (S.D.N.Y. Feb. 2, 2024)................................. 5, 10, 11

*Draper v. Healey,*
827 F.3d 1 (1st Cir. 2016)................................................................... 16

*Emps. Committed For Just. v. Eastman Kodak Co.,*
407 F. Supp. 2d 423 (W.D.N.Y. 2005)................................................. 16

*Harary v. Allstate Ins. Co.,*
983 F. Supp. 95 (E.D.N.Y. 1997) ....................................................... 13

*Johnson v. Bryson,*
851 F. Supp. 2d 688 (S.D.N.Y. 2012)................................................. 18

*Johnson v. New York Univ.,*
2018 WL 3966703 (S.D.N.Y. Aug. 20, 2018) ..................................... 11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Joseph S. v. Hogan*,
561 F. Supp. 2d 280 (E.D.N.Y. 2008) ................................................................................ 16

*Kestenbaum v. President & Fellows of Harvard Coll.*,
2024 WL 3658793 (D. Mass. Aug. 6, 2024) ............................................................... 8, 9, 12

*Koch v. Greenberg*,
14 F. Supp. 3d 247 (S.D.N.Y. 2014)...................................................................................... 13

*Koumantaros v. City Univ. of New York*,
2007 WL 840115 (S.D.N.Y. Mar. 19, 2007) ........................................................................ 11

*Leibovitz v. N.Y.C. Transit Auth.*,
252 F.3d 179 (2d Cir. 2001).................................................................................................. 15

*Moukengeschaie v. Eltman, Eltman & Cooper, P.C.*,
2016 WL 1274541 (E.D.N.Y. Mar. 31, 2016) ........................................................................ 4

*N.Y.C.L.U. v. Grandeau*,
528 F.3d 122 (2d Cir. 2008).................................................................................................. 17

*New York by James v. Pa. Higher Educ. Assistance Agency*,
2020 WL 2097640 (S.D.N.Y. May 1, 2020) ........................................................................ 18

*Novio v. N.Y. Acad. of Art*,
286 F. Supp. 3d 566 (S.D.N.Y. 2017)................................................................................... 12

*Nungesser v. Columbia Univ.*,
169 F. Supp. 3d 353 (S.D.N.Y. 2016)................................................................................... 13

*Ochre LLC v. Rockwell Architecture Plan. & Design, P.C.*,
2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012) .......................................................................... 3

*Rent Stabilization Ass'n v. Dinkins*,
5 F.3d 591 (2d Cir. 1993)...................................................................................................... 15

*Roe v. St. John's Univ.*,
91 F.4th 643 (2d Cir. 2024) .................................................................................................. 16

*Shain v. Ellison*,
356 F.3d 211 (2d Cir. 2004).................................................................................................. 15

*Simmonds v. INS*,
326 F.3d 351 (2d Cir. 2003).............................................................................................17, 18

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)............................................................................................................... 15

*StandWithUs Ctr. for Legal Just. v. MIT*,
2024 WL 3596916 (D. Mass. July 30, 2024)................................................................. passim

*Ward v. NYU*,
2000 WL 1448641 (S.D.N.Y. Sept. 28, 2000)...................................................................... 13

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Ware v. Univ. of Vt. & State Agric. Coll.*,
   2024 WL 989804 (D. Vt. Mar. 7, 2024) .................................................................. 4

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................................................... 16

*Xiaolu Peter Yu v. Vassar Coll.*,
   97 F. Supp. 3d 448 (S.D.N.Y. 2015) ..................................................................... 13

*Zeno v. Pine Plains Cent. Sch. Dist.*,
   702 F.3d 655 (2d Cir. 2012) .......................................................................... passim

**Statutes**

28 U.S.C. § 1367(c)(3) ................................................................................................ 14

## INTRODUCTION

Barnard College ("Barnard") strives to create a safe and welcoming community that is not just free from antisemitism and all forms of discrimination, but in which all students can thrive and learn from one another.  Over the past year, Barnard faced an unprecedented challenge in its pursuit of this mission.  Like colleges across the country, Barnard experienced deep rifts following the October 7, 2023 terrorist attack in Israel.  Barnard's leaders did not hesitate to respond.  They condemned speech and conduct that was inconsistent with Barnard's nondiscrimination values, sought to build bridges of knowledge and understanding, and, when warranted, initiated disciplinary proceedings that resulted in sanctions, including suspension, as appropriate.  Barnard does not contend that these efforts repaired fully the injury to its community, including its Jewish students.  To the contrary, Barnard is continuing to update its policies and to enhance its programmatic offerings based on lessons learned and ongoing engagement with campus stakeholders.  It is also continuing to conduct disciplinary proceedings related to the events of last spring.  Barnard's actions, however, cannot plausibly be characterized as deliberately indifferent to antisemitic harassment.  The First Amended Complaint ("FAC") should therefore be dismissed.

Barnard is a small affiliate of Columbia University ("Columbia") and a separate legal entity.  FAC ¶¶ 64, 65.  The discussion of Barnard in the FAC is relatively limited.  While "Columbia and its schools are mentioned no fewer than 1,197 times . . . , [there are] just 224 specific mentions of Barnard College."  ECF No. 51.  Of the thirty-six individual Plaintiffs, just three are currently enrolled in Barnard; five recently graduated from Barnard and another has transferred.  The Plaintiffs who attended Barnard allege that they witnessed or experienced instances of antisemitic harassment on the Barnard or Columbia campuses during the last academic year.  The FAC acknowledges, while understating, some of the actions that Barnard took to respond to these incidents, including disciplinary measures.  *See, e.g.*, FAC ¶¶ 97, 254, 358, 414-

1

15, 569.

Because Plaintiffs cannot plausibly allege that Barnard was "indifferent," *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999), they argue instead that its efforts were "ineffective," Opp. 19. But Plaintiffs never suggest what Barnard could have done except impose harsher disciplinary sanctions. That is not a basis for Title VI liability. When the Supreme Court first adopted the "deliberate indifference" standard, it emphasized the "flexibility [that schools] require" to function—flexibility that aids not only administrators, but also the students and faculty that they serve. *Davis*, 526 U.S. at 648. While the dissent would have gone even further, all justices agreed on the "obvious reason for the majority's expressed reluctance to allow courts and litigants to second-guess school disciplinary decisions." *Id.* at 678 (Kennedy, J., dissenting). "History shows," it explained, that "no matter what a school official chooses to do," some will view the response as "too strict," while others will see it as "too lax." *Id.* at 682 (quotation omitted); *see id.* 648-49 (recognizing, "[l]ike the dissent," the importance of flexibility).

The events of the past year demonstrate the wisdom of the Supreme Court's approach. Last April, Columbia and Barnard students established an encampment on Columbia's campus. Barnard issued interim suspensions to its students who participated, but lifted the interim suspensions for students who had not been disciplined previously and agreed to abide by Barnard's rules during a probationary period. Ex. M.[1] While Plaintiffs fault Barnard for not imposing more severe sanctions, others protested Barnard's approach as unduly punitive, leading to further unrest and additional allegations of antisemitic conduct. *See* FAC ¶¶ 329, 338-39. At bottom, Plaintiffs charge Barnard with a "failure of clairvoyance and a perhaps too measured response to an outburst of ugliness on its campus." *StandWithUs Ctr. for Legal Just. v. MIT*, 2024 WL 3596916, at *5 (D.

---

[1] "Ex." refers to the Exhibits to the Declaration of Jennifer B. Sokoler, ECF No. 67.

Mass. July 30, 2024). That is no basis for Title VI liability, as the United States District Court for the District of Massachusetts recently held in dismissing substantially similar claims against the Massachusetts Institute of Technology ("MIT"). *Id.* There are no guaranteed solutions to the challenges that Barnard's leaders confronted, but it is certain that progress will require educational experience and expertise. Barnard will continue to respond to antisemitism, but it must also allow its students and faculty to voice political opinions—including those critical of Israel's policies— and de-escalate tensions where possible.

This Court should dismiss Plaintiffs' suit under Rule 12(b)(6) for failure to state a claim: Plaintiffs ask this Court to do what Title VI forbids—to "second-guess[] the disciplinary decisions made by school administrators," *Davis*, 526 U.S. at 648. Alternatively, the Court should dismiss the FAC under Rule 12(b)(1), as Plaintiffs lack standing to pursue injunctive relief, and Plaintiffs SAA and SCLJ lack standing to proceed at all. At the very least, this dispute is not ripe. For all these reasons, the FAC should be dismissed.

## ARGUMENT

### I.    THE COURT SHOULD DISMISS THE FAC UNDER RULE 12(B)(6).

The Court should dismiss the FAC under Rule 12(b)(6).[2]

#### A.    <u>Plaintiffs Fail to Plausibly Plead a Title VI Claim.</u>

Title VI prohibits "intentional discrimination," and courts therefore hold schools accountable for the "actions of a third party"—*i.e.*, "teacher or peer harassment of a student"— only in narrow circumstances. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664-65 (2d Cir.

---

[2] By "lump[ing]" Barnard and Columbia together in its recitation of the elements of Plaintiffs' Title VI claim, *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001), the FAC fails to give Barnard "adequate notice of the factual allegations it faces," which alone warrants dismissal. *Ochre LLC v. Rockwell Architecture Plan. & Design, P.C.*, 2012 WL 6082387, at *6-7 (S.D.N.Y. Dec. 3, 2012); *see* MTD 18. Plaintiffs assert Barnard has fair notice, Opp. 21 n.17, but they do not—and cannot—contest that the FAC recites the elements of a Title VI claim only as to "Columbia and its administrators," thus failing to specify the factual basis of Plaintiffs' Title VI claim against *Barnard*. MTD 18 (quoting FAC ¶¶ 627-32).

2012) (quotation omitted). To proceed, each Plaintiff must plausibly plead facts showing that she experienced "severe and discriminatory harassment," over which Barnard had "substantial control" and "actual knowledge," and to which it responded with "deliberate indifference." *Id.* at 665. The Court should dismiss each Plaintiff's Title VI claim under Rule 12(b)(6) because the FAC's conclusory allegations do not plausibly satisfy Title VI's "high standard," *Davis*, 526 U.S. at 643, and the documents the FAC incorporates confirm that dismissal is proper.[3]

### 1.    Barnard Lacked Substantial Control Over Most of the Alleged Incidents.

Plaintiffs recognize that to state a plausible Title VI claim against Barnard arising from third-party misconduct, they must plead that Barnard had "actual knowledge" of the harassment, as well as substantial control over "both" the "harasser" and the "context in which the known harassment occurs." Opp. 14 (quotation omitted).[4] Plaintiffs also acknowledge (as they must) that Barnard lacks control over Columbia's physical campus and has no disciplinary authority over Columbia students and faculty. Opp. 4-5 n.2; *id.* at 21. These concessions doom Plaintiffs' Title VI claim against Barnard because the FAC overwhelmingly concerns events on Columbia's campus involving Columbia students and/or unnamed individuals. *See* MTD 20 & n.6. Plaintiffs cannot state a Title VI claim against Barnard based on such incidents.

Plaintiffs respond that Barnard's disciplinary authority *over Barnard students* extends beyond Barnard's physical campus. Opp. 21. That is true, but beside the point because the FAC

---

[3] Plaintiffs accept that the Court may consider Exhibits A, G, H, M, and P-R in ruling on Barnard's Rule 12(b)(6) motion. *See* MTD 1 n.1. Plaintiffs argue that Exhibits C and D may not be considered for the truth of the facts asserted therein. Opp. 14 n.5. But, as Barnard explained, it relies on those Exhibits merely to "establish the existence of the [statements]," *Moukengeschaie v. Eltman, Eltman & Cooper, P.C.*, 2016 WL 1274541, at *13 n.13 (E.D.N.Y. Mar. 31, 2016)— *i.e.*, the fact that Barnard made multiple statements in the wake of October 7 offering support to affected students and condemning the attack and antisemitism. *See* MTD 22 & n.8; Exs. C, D.

[4] The case that Plaintiffs cite is not to the contrary. *See Ware v. Univ. of Vt. & State Agric. Coll.*, 2024 WL 989804, at *22 (D. Vt. Mar. 7, 2024) (plaintiff pleaded substantial control where defendant had disciplinary authority over alleged harasser and alleged harassment occurred at off-campus facility associated with school's Athletics Department).

is largely devoid of allegations that *Barnard* students or faculty were responsible for the alleged incidents of harassment that occurred at Columbia. *E.g.*, FAC ¶¶ 98-130, 131-61, 163-68, 170, 172-73, 175-83, 185-96, 198-203, 205-11, 213-14, 217-42, 253, 261-80, 282-84, 288-305.

Attempting to overcome this deficiency, Plaintiffs highlight that the FAC alleges that Barnard students participated in the April encampment that "subjected Plaintiffs and others to harassment." Opp. 35 (citing FAC ¶¶ 306-94). But while the 89 paragraphs of the FAC that Plaintiffs cite detail allegations of harassment by the protestors in the encampment, there is not a single allegation that Barnard students or faculty were responsible for these incidents. FAC ¶¶ 306-94.[5]

Indeed, even if the Court assumes that Barnard students or faculty participated in some of the alleged harassment on Columbia's campus, Plaintiffs have failed to plead that Barnard had sufficient knowledge of that misconduct to take action beyond the institutional initiatives that it undisputedly implemented. *See infra* at 7-8. Plaintiffs cite no case to the contrary. In *Crandell v. New York College of Osteopathic Medicine*, the Court simply held that a school "must have possessed enough knowledge of the harassment that it could have reasonably responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." 87 F. Supp. 2d 304, 320 (S.D.N.Y. 2000). By this logic, Barnard's general awareness that Barnard students experienced antisemitic harassment on the Columbia campus put Barnard on notice to take precisely the sort of steps that Barnard actually implemented—including condemning antisemitism, working closely with Columbia leadership to respond to instances of antisemitism, relaying information "to the appropriate authorities" at Columbia, and relying on campus safety

---

[5] At most, Plaintiffs allege that during the encampment, Barnard professors expressed concern for the protestors, FAC ¶ 311, expressed support for "all our students," *id.* ¶ 359, and claimed that there had not been genocidal chants, *id.*

and other public safety officials as necessary to protect students on campus.  That is precisely what Title VI required.  *See Doe v. Sacks*, 2024 WL 402945, at *6 (S.D.N.Y. Feb. 2, 2024) (Title VI requires schools to take "the steps it [can] to respond to Plaintiff's reports" of misconduct).

### 2.    No Plaintiff Plausibly Pleads that Barnard Responded to Incidents of Antisemitism with Deliberate Indifference.

As to the matters over which Barnard had control, Plaintiffs fail to plausibly plead that Barnard acted with "deliberate indifference"—that is, that Barnard's response was "clearly unreasonable in light of the known circumstances."  *Davis*, 526 U.S. at 648.  Rather than questioning the reasonableness of Barnard's response to any "individual instance[] of bigotry," Plaintiffs maintain that Barnard was deliberately indifferent to a general "atmosphere of anti-Semitism."  Opp. 17.  But Plaintiffs acknowledge—even as they downplay—Barnard's extensive institutional efforts to combat antisemitism, and they cannot plausibly plead that Barnard's response to any particular incident within its control and knowledge was clearly unreasonable.

#### a.    *Barnard's Institutional Response to Antisemitism Forecloses Plaintiffs from Plausibly Pleading Deliberate Indifference.*

In the eight months after a terrorist attack unleashed an appalling wave of antisemitism, Barnard implemented an array of strategies to prevent and redress antisemitic conduct affecting its community, including: (i) sending community-wide messages offering support for students affected by the October 7 attack and condemning antisemitism, Exs. C, D; (ii) holding a campus-wide Day of Dialogue, FAC ¶ 254; (iii) partnering with Columbia to launch a Task Force on Antisemitism and a Doxing Resource Group, *id.* ¶¶ 414-16; (iv) establishing new time, place, and manner restrictions for campus demonstrations, *id.* ¶ 97; (v) attempting to persuade Barnard students to leave the April encampment and advising them that they would otherwise be subject to disciplinary measures, *id.* ¶¶ 315, 318; and (vi) investigating potential policy violations involving antisemitism and imposing appropriate disciplinary sanctions, Ex. M.  Plaintiffs maintain that none

6

of these efforts suffice because they all "prove[d] ineffective in deterring harassment." Opp. 31. In other words, Plaintiffs contend that they plausibly pleaded that Barnard was deliberately indifferent because, despite Barnard's efforts, allegedly antisemitic harassment persisted. *Id.*

That is exactly the sort of hindsight bias the Supreme Court has warned against. Under Title VI, a school can be liable only if its response to a hostile environment was "*clearly* unreasonable." *Davis*, 526 U.S. at 648 (emphasis added). "This is not a mere 'reasonableness' standard, as [Plaintiffs] assume," but instead a test that affords schools "sufficient[] flexib[ility]" by preventing courts from "second-guess[ing]" the decisions of school administrators. *Id.* at 648-49. The Second Circuit's decision in *Zeno* only proves the point, as it affirmed that "eliminating harassment is not a prerequisite to an adequate response." 702 F.3d at 670. It faulted a school only for using the "same methods"—*i.e.*, disciplinary measures—to remedy racial discrimination that had been targeted at a student for *years*, even as the school "knew" that disciplining the harassers "did not deter others from engaging [] in serious and offensive racial conduct." *Id.* at 669. The school's actions were "clearly unreasonable" not because the court or plaintiffs *thought* greater action was required, but because the school "*knew*" it was, and nonetheless "dragged its feet" for "a year or more" before "implementing any non-disciplinary" remedies. *Id.* at 667-69 (emphasis added).

The FAC pleads nothing of the sort. Unlike *Zeno*, which involved a years-long pattern of racial harassment targeting a single student, the FAC concerns the fallout within the Columbia and Barnard communities from the October 7 terrorist attack, FAC ¶ 4, and an unprecedented protest movement that swept across college campuses nationwide, *see id.* ¶ 288. Plaintiffs acknowledge that Barnard adopted various approaches to these fast-evolving problems. *Supra* at 1-2. The FAC reflects some (but not all) of the many steps Barnard took. MTD 6-8. Plaintiffs cannot plausibly

allege that Barnard "knew" that a different course of action was required in these uncharted waters, nor can they state a Title VI violation based on the fact that Barnard's efforts failed to "purg[e] [Barnard] of actionable peer harassment," *Davis*, 526 U.S. at 648.

Finally, Plaintiffs invoke a recent decision denying a motion to dismiss a Title VI claim against Harvard University and summarily assert that they have adequately pleaded deliberate indifference because Barnard's response to antisemitism was "indecisive, vacillating, and at times internally contradictory." Opp. 28 (quoting *Kestenbaum v. President & Fellows of Harvard Coll.*, 2024 WL 3658793, at *6 (D. Mass. Aug. 6, 2024) ("*Kestenbaum*")). Plaintiffs' actual allegations, however, belie their reliance on *Kestenbaum*. The FAC contains no allegations concerning Barnard comparable to those that the district court emphasized in *Kestenbaum*. For instance, in *Kestenbaum*, the plaintiffs pleaded that "Harvard required Chabbad, a campus Hasidic Jewish community center, to remove its Hanukkah menorah from campus each night to prevent it from being vandalized, but it provided 24/7 security to [the Palestinian Solidarity Committee's] 'Wall of Resistance.'" *Id.* at *3. Or to take another example, the *Kestenbaum* plaintiffs alleged that after students protested in a particular study lounge for weeks, Harvard sent an email to the student body warning against such activity only after a Jewish group sought permission to hold a demonstration there. *Id.* And even after that warning was disseminated, pro-Palestinian protests continued unaddressed in that space until the end of the semester. *Id.* And while Barnard and Columbia continue to support the work of a Task Force on Antisemitism, FAC ¶¶ 414-16, the *Kestenbaum* plaintiffs alleged that Harvard dissolved its Antisemitism Advisory Group before it could make formal recommendations, *Kestenbaum*, 2024 WL 3658793, at *3 & n.6.

The allegations against Barnard in the FAC are nothing like those in *Kestenbaum*, but share far more in common with those that were recently found *not* to state a plausible Title VI claim in

*MIT*.  There, the same court that decided *Kestenbaum* held that plaintiffs had failed to plead that MIT was deliberately indifferent to antisemitism after October 7.  2024 WL 3596916, at *5.  Like Plaintiffs here, the *MIT* plaintiffs alleged that MIT should have imposed harsher discipline on students who participated in allegedly antisemitic incidents on campus in the immediate aftermath of the October 7 attack.  *Id.* at *2 (noting that MIT initially chose to "suspend student violators from *only* non-academic campus activities") (emphasis added).  The *MIT* plaintiffs also claimed that MIT's response to an encampment on its campus last April was legally insufficient because: (i) the university had warned students participating in the encampment that they could face disciplinary sanctions rather than "forcibly remov[ing]" them immediately; and (ii) a new encampment formed shortly after an initial encampment disbanded.  *Id.*  The *MIT* court held that these allegations did not satisfy the "stringent" deliberate-indifference standard, because, "[f]ar from sitting on its hands, MIT took steps to contain the escalating on-campus protests."  *Id.* at *4-5.  Even if MIT's response was "perhaps overly measured," *Kestenbaum*, 2024 WL 3658793, at *7, the court explained, it had implemented a "progressively punitive response [that] largely tracked its increasing awareness of the hostility that demonstrators directed at Jewish and Israeli students."  *MIT*, 2024 WL 3596916, at *5.

Barnard's approach last year followed a similar course—beginning with a variety of non-coercive and educational measures, *see* MTD 26, and escalating to interim suspensions when Barnard students participated in an encampment at Columbia in April, *id.* at 26-28.  Even if imperfect, Barnard—like MIT—acted with a "consistent sense of purpose in returning civil order and discourse on its campus."  *Kestenbaum*, 2024 WL 3658793, at *7.  In these circumstances, "fault[ing] [Barnard] . . . for an outburst of ugliness on its campus would send the unhelpful message that anything less than a faultless response . . . would earn no positive recognition in the

eyes of the law." *MIT*, 2024 WL 3596916, at *5.

>   b.   *The FAC Does Not Plausibly Plead that Barnard's Response to Any Incident Was Clearly Unreasonable.*

Plaintiffs do not argue that any of the discrete incidents that allegedly affected some of the individual Barnard Plaintiffs would, on their own, rise to a hostile environment for purposes of Title VI. MTD 28. Rather, Plaintiffs focus on the December 11 rally on Barnard's campus calling for a ceasefire between Israel and Hamas, and the April encampment at Columbia. Plaintiffs fail, however, to plausibly plead that Barnard's response to either of these incidents was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.

*First*, Plaintiffs assert in conclusory fashion that the steps Barnard took before and during the December 11 rally—including warning students and reaffirming that the rally was "not permitted," FAC ¶ 244, encouraging students to take alternative routes, limiting access to Barnard's campus, and increasing the presence of Barnard's Community Safety team and other staff members, Ex. P—were "not reasonably calculated to end harassment." Opp. 29. But it is hard to imagine what else Barnard could have done, short of calling law enforcement to clear the protestors from its campus. Barnard's decision to respond in the first instance with warnings about its rules and consequences, increase security, and initiate dialogue across its community was reasonable given its commitment to "debate, dialogue, and discussion on critical issues." Ex. P.

*Second*, Plaintiffs argue that Barnard's response to the encampment on the Columbia campus was clearly unreasonable because: (i) Barnard lifted the interim suspensions of students who had no prior disciplinary record and agreed to abide by Barnard's rules during a probationary period; and (ii) a student who had been suspended subsequently returned to the encampment. Opp. 35. But a response to alleged harassment is not "clearly unreasonable" merely because it is not the harshest possible option. *Doe*, 2024 WL 402945, at *6 (response is not "clearly unreasonable"

merely because plaintiffs wish  university "had gone to greater lengths to identify and discipline"

students).  Nor is a response clearly unreasonable because it fails to deter subsequent misconduct.

*Zeno*, 702 F.3d at 670 ("[E]liminating harassment is not a prerequisite to an adequate response.").

*Finally*, Barnard cannot be held liable based on allegations that it failed to discipline

students for protected speech.  MTD 22-23.  Plaintiffs say that they do not "seek to deny anyone

the right to criticize Israeli policies," Opp. 8, but many of their allegations implicate criticism of

Israel and its military campaign in Gaza.  *See, e.g.*, FAC ¶ 471.  The stated purpose of the

December 11 rally, for instance, was to call for a "ceasefire between Israel and Hamas."  *Id.* ¶ 244.

And the stated purpose of the April encampment was to show support "for Gaza."  *Id.* ¶ 309.  To

be clear, Barnard condemns antisemitic speech and takes allegations of harassment at these events

very seriously, *see* Exs. A, D, but Barnard is not unreasonable—much less "clearly" so—for

managing its response to such events in a manner that is sensitive to "students' speech-protected

values" and the academic freedom of its faculty.  *Doe*, 2024 WL 402945, at *7.

### 3.    Plaintiffs Fail to Plausibly Plead a Direct-Discrimination Claim.

Plaintiffs fail to plausibly allege a claim for direct discrimination.   As Plaintiffs

acknowledge, Opp. 41, to state such a claim, a plaintiff must plausibly allege that the school took

an "adverse action" against her, *Koumantaros v. City Univ. of New York*, 2007 WL 840115, at *8

(S.D.N.Y. Mar. 19, 2007); MTD 33-34.  Plaintiffs vaguely assert "that they have been harmed in

numerous ways," but identify no specific adverse action that Barnard took against them.  Opp. 41.

In any event, Plaintiffs offer little more than conclusory assertions to support their claim

that Barnard has a "double standard" in response to antisemitism compared to other forms of hate.

FAC ¶¶ 409, 417, 434; MTD 33-34.  Barnard has previously explained why none of Plaintiffs'

examples establish a double standard, MTD 33-34, and Plaintiffs do not even attempt to argue that

they are "similarly situated in all material respects" to the examples on which they rely, *Johnson*

*v. New York Univ.*, 2018 WL 3966703, at *7 (S.D.N.Y. Aug. 20, 2018).

Plaintiffs attempt to distinguish the dismissal of a virtually identical direct-discrimination claim in *Kestenbaum* on the ground that "using a prospective student as a comparator to current students was not sufficient." Opp. 40. But plaintiffs' proposed comparators in *Kestenbaum* were not so limited. *Kestenbaum*, 2024 WL 3658793, at *7 (D. Mass. Aug. 6, 2024) (dismissing direct discrimination claim based on allegations that the institution "allow[ed] guest speakers and students to espouse antisemitic views but cancel[ed] other 'controversial speakers' and discipline[d] mostly unnamed students" who engaged in other discriminatory conduct). Indeed, the court expressed skepticism that *any* plaintiff could *ever* state a direct-discrimination claim based on a school's failure to punish the conduct of others, as Plaintiffs attempt to do here. *See id.* (it is "not clear" that a plaintiff "can advance a comparator claim based on [a school's] failure to punish the conduct of others"); *MIT*, 2024 WL 3596916, at *4 n.8.

### B.    Plaintiffs Fail to Plausibly Plead Claims Under State or City Law.

As Barnard has explained, MTD 34-37, Plaintiffs fail to state a claim under state or city law. None of Plaintiffs' responses (Opp. 48-53) suggest otherwise.

*First*, Plaintiffs agree that claims under NYHRL § 296 and NYCRL § 40-c are subject to the same standard as analogous claims under federal discrimination law. Opp. 49. Those claims must be dismissed for the same reasons as Plaintiffs' Title VI claims. *See supra* at 3-12.

*Second*, Plaintiffs' claims under NYCHRL §§ 8-107(4) and 8-107(17) fail for much the same reason. Plaintiffs claim they "need only show that they are treated 'less well' because of a protected characteristic," Opp. 49, but Plaintiffs must also show either direct discrimination by Barnard, *Novio v. N.Y. Acad. of Art*, 286 F. Supp. 3d 566, 584 (S.D.N.Y. 2017), or "deliberate indifference," *Bernheim v. N.Y. City of Dep't of Education*, 2020 WL 3865119, at *5 (S.D.N.Y. July 9, 2020). Because Plaintiffs fail to plead either, *see supra* at 3-12, these claims cannot

proceed.  Plaintiffs' Section 8-107(17) claim also fails because Plaintiffs do not identify a specific facially-neutral "policy or practice," *id.*, that has allegedly injured Jewish or Israeli students, much less explain how that unknown policy caused a disparate impact, *see* Opp. 48-49.

*Third*, Plaintiffs do not allege any "specifically designated and discrete promises" that could form the basis of a breach of contract claim.  *See* MTD 35-36 (quoting *Ward v. NYU*, 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000)).  Plaintiffs point to language that Barnard will "not tolerate and specifically prohibits" discrimination and harassment and will take "prompt and appropriate action to address such misconduct."  Opp. 51.  But this provision does not identify any specific action Barnard must take, and New York courts have consistently held that "promise[s]" not to discriminate are "too vague to be enforced," as they lack "definitive language by which to objectively analyze performance."  *Aubrey v. New Sch.*, 624 F. Supp. 3d 403, 414 (S.D.N.Y. 2022).  Nor does this (or any other provision Plaintiffs cite) mandate "any specific outcome" for misconduct.  *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 371 (S.D.N.Y. 2016).

*Fourth*, Plaintiffs argue that Barnard breached the implied covenant through "selective enforcement" of its policies, citing *Kestenbaum*, which applied Massachusetts law.  Opp. 51.  But as Barnard has explained, under New York law, Plaintiffs cannot pursue an implied-covenant claim that is duplicative of a breach of contract claim.  *See, e.g.*, *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 482 (S.D.N.Y. 2015); *Nungesser*, 169 F. Supp. 3d at 372-73.  At bottom, Plaintiffs' claim rests on the same facts as their breach of contract claim—namely, that Barnard allegedly failed to enforce its policies as to Plaintiffs.  It must therefore be dismissed.

*Fifth*, Plaintiffs fail to state a claim for consumer fraud under G.B.L. §§ 349, 350 because they identify no actionable consumer-oriented conduct.  Such conduct must be "aimed at the public at large," *Koch v. Greenberg*, 14 F. Supp. 3d 247, 261 (S.D.N.Y. 2014), but Barnard's internal

policies are aimed at its students, faculty, and staff, not the public, *see* FAC ¶¶ 704-05. These are not "advertising and marketing" materials, Opp. 52, and do not "have an impact on consumers generally," *Harary v. Allstate Ins. Co.*, 983 F. Supp. 95, 98 (E.D.N.Y. 1997), so they cannot form the basis of Plaintiffs' claim. In any event, Plaintiffs' claim that Barnard failed to follow its internal policies is neither plausibly pled, *see supra* at 3-12, nor ripe, *see infra* at 16-18.[6]

## II. THE COURT SHOULD DISMISS UNDER RULE 12(B)(1) PLAINTIFFS' SWEEPING REQUESTS FOR INJUNCTIVE RELIEF AND ALL CLAIMS BY PLAINTIFFS SCLJ AND SAA FOR LACK OF STANDING.

Plaintiffs' claims for injunctive relief and the associational plaintiffs—SCLJ and SAA—should independently be dismissed for lack of standing.

### A. Plaintiffs Do Not Have Standing to Seek Injunctive Relief.

Barnard has explained why Plaintiffs lack standing to pursue injunctive relief: No Plaintiff plausibly pleads that *Barnard* will cause her a "certainly impending" injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *see* MTD 11-14. While Plaintiffs now argue that Barnard is the "direct cause" of their injuries, Opp. 62, the FAC alleges that third parties—teachers, students, or other protestors—have been directly responsible for their injuries to date, and they fear future harassment by such third parties, *see, e.g.*, FAC ¶ 143; Opp. 18. Plaintiffs attempt to close the gap by arguing that any future injury caused by third parties is traceable to shortcomings in Barnard's past response to antisemitism. Opp. 63. That assertion is incorrect, *see supra* at 3-12, but even if the proposition were viable, the question is not whether Plaintiffs' *past* harms are traceable to Barnard, but rather whether Plaintiffs can prove that they will be harmed by Barnard's actions in the future. Barnard's extensive and ongoing response precludes Plaintiffs' ability to make that showing. *See infra* 16-18; MTD 3-5. And in any event, Plaintiffs cannot establish that it is "likely"

---

[6] Because Plaintiffs' federal claims should be dismissed, *see supra* at 3-12, the Court should at minimum "decline to exercise supplemental jurisdiction" over any remaining state or city claims, 28 U.S.C. § 1367(c)(3).

that the relief they seek (*e.g.*, more discipline) would redress their injuries, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), when the FAC alleges that disciplinary measures can trigger an unintended backlash and *more* harassment, *see, e.g.*, FAC ¶¶ 329, 338-39 (alleging that following interim suspensions and arrests, agitators marched up and down the street and made threatening and antisemitic remarks).[7]

### B.    Plaintiffs SCLJ and SAA Do Not Have Associational Standing.

Plaintiffs SCLJ and SAA lack associational standing because the nature of their claims and requested relief require the "individual participation" of their members. *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993); MTD 14-15. Plaintiffs claim that the participation of SCLJ's and SAA's members is unnecessary because SAA and SCLJ seek only "prospective equitable relief," citing two out-of-circuit district court decisions. Opp. 66-67. But the Second Circuit has emphasized that an association does not "automatically" establish standing "simply by requesting equitable relief." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004). Instead, an "organization lacks standing to assert claims of injunctive relief on behalf of its members where 'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof'" or where relief would require individual participation. *Id.*

That is the case here. Plaintiffs argue that they "challenge[] a widespread practice of discrimination," Opp. 67, but that argument misstates their claims. As Barnard has explained, MTD 14-15, deliberate-indifference claims must proceed plaintiff-by-plaintiff, focusing on "*the target of discrimination*," *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001).

---

[7] Plaintiffs are wrong that standing is "so intertwined" with the merits that the resolution of one depends on the other. Opp. 56. The Title VI inquiry is limited to whether Barnard responded with "deliberate indifference" to *past* incidents of harassment alleged in the FAC. *Davis*, 526 U.S. at 648. Even if Plaintiffs suffered past harm, "standing to seek injunctive relief is a different matter." *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004). That inquiry focuses on whether Plaintiffs will suffer *future* injury attributable to Barnard that could be prevented by a court order. *Supra* at 14.

Each plaintiff "must show that he [or she] subjectively perceived the environment to be hostile" and that a reasonable person in her circumstances would agree. *Roe v. St. John's Univ.*, 91 F.4th 643, 661 (2d Cir. 2024). The nature of Plaintiffs' claims thus "make[s] the individual participation of each injured party indispensable." *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

That does not mean that associational standing is never appropriate in Title VI cases, however. Associational standing may be appropriate where a plaintiff challenges the validity of a formal university-wide policy, *see* MTD 14, where the claims turn on a question of law,[8] or where the claims rely on statistical evidence to establish discrimination that is equally harmful to all members.[9] But here, where Plaintiffs assert deliberate-indifference claims that require "individualized proof," associational standing is improper. *Bano*, 361 F.3d at 714; *Barnett v. Johnson City Sch. Dist.*, 2005 WL 8178066, at *5 n.6 (N.D.N.Y. Feb. 2, 2005); MTD 14-15.[10]

## III.   THE COURT SHOULD DISMISS THE FAC UNDER RULE 12(B)(1) BECAUSE PLAINTIFFS' CLAIMS ARE UNRIPE.

At minimum, the Court should dismiss Plaintiffs' lawsuit under Rule 12(b)(1) as a "case [that] will be *better* decided later." *Cotton v. Noeth*, 96 F.4th 249, 256-57 (2d Cir. 2024).[11]

---

[8] *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 308 (E.D.N.Y. 2008) (plaintiffs' claims could "be resolved by answering common questions of law without individualized proof").

[9] *Emps. Committed For Just. v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 433-34 (W.D.N.Y. 2005) (pattern-or-practice claim that relied primarily on statistical evidence to establish discrimination "that [was] equally harmful and applicable to all members of the protected class," instead of "subjective and 'individualized proof'").

[10] SAA and SCLJ also lack standing because neither identified by name any member other than the individual plaintiffs. *See Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.); *Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 115-19 (2d Cir. 2024) (favorably citing *Draper*). Plaintiffs respond that the individual plaintiffs are members of SAA and SCLJ, Opp. 69, but SAA and SCLJ cannot "merely repeat[] the claims" of a plaintiff already in the litigation to establish standing, MTD 16 n.4 (quoting *Disabled in Action of Metro. N.Y. v. Trump Int'l Hotel & Tower*, 2003 WL 1751785, at *10 (S.D.N.Y. Apr. 2, 2003)). Apparently recognizing that rule, SAA and SCLJ claim they will not rely on individual plaintiffs to meet *Do No Harm*'s requirement, Opp. 70 n.70, yet fail to identify any other member by name—whether to the Court or the parties.

[11] Plaintiffs assert that the prudential-ripeness doctrine "has been all but abandoned," Opp. 71, but the Second Circuit recently reiterated that "[r]ipeness has both constitutional and prudential dimensions," *Cotton*, 96 F.4th at 256-57; *see also BMG Monroe I, LLC v. Vill. of Monroe*, 93 F.4th 595, 600-01 (2d Cir. 2024) (affirming dismissal on "prudential-ripeness grounds").

Plaintiffs claim that Barnard's position would require courts to "avoid enforcing Title VI" so long as an institution commits to taking steps to address discrimination and harassment. Opp. 71. That argument misunderstands what Title VI requires. As explained, Barnard can be liable under Title VI only if it fails to respond to antisemitism on its campus or "use[s] th[e] *same* methods to no avail" even after a "year or more" when it knows they are ineffective. *Zeno*, 702 F.3d at 669 (emphasis added). The FAC contains allegations about incidents that occurred even weeks before it was filed, *see, e.g.*, FAC ¶¶ 345, 347, 349, 358-59, 381, and Plaintiffs' briefing cites events that occurred afterwards, *see* Opp. 12-13. Moreover, the record has evolved further while this motion was briefed. Last week, Barnard suspended three students for conduct related to the allegations in the FAC and five additional disciplinary proceedings remain ongoing. Supp. Grinage Decl., ¶¶ 3-4. Thus, Plaintiffs' claims are not based on "past events that have fully unfolded," Opp. 72 (quoting *MIT*, 2024 WL 3596916, at *4), and judicial review "would certainly benefit from additional factual development," *N.Y.C.L.U. v. Grandeau*, 528 F.3d 122, 133 (2d Cir. 2008). Plaintiffs cannot plausibly allege anything about the adequacy of Barnard's response to such recent events, which alone requires dismissal under Rule 12(b)(6). *See supra* at 6-11. But even if this Court disagrees, it should at least wait until the facts develop before "becoming embroiled" in a dispute that "may later turn out to be unnecessary." *Grandeau*, 528 F.3d at 130-31.

That is particularly true here, where delay will not "undermine[]" any party's rights. *Cotton*, 96 F.4th at 256. The Second Circuit considers hardship to all "parties" under this prong, *Simmonds v. INS*, 326 F.3d 351, 359-60 (2d Cir. 2003), and as Barnard has explained (MTD 17-18), prematurely litigating Plaintiffs' claims would strip Barnard of the "flexibility [required] to function," including to respond fully to allegations of misconduct, *Davis*, 526 U.S. at 648. Barnard does not question the sincerity of Plaintiffs' concerns—and certainly does not "ignore[]" them, as

Plaintiffs suggest, Opp. 72—but the "mere possibility" of future injury, without more, "does not constitute hardship," *Simmonds*, 326 F.3d at 134. Given Barnard's robust and ongoing response to antisemitism on campus, *see supra* at 6-11, Plaintiffs will not face hardship if the Court waits until it is in a "better [position] to adjudicate the issues," *Simmonds*, 326 F.3d at 135.[12]

## IV.    THE COURT SHOULD STRIKE PLAINTIFFS' REMEDIAL REQUESTS.

If the Court permits Plaintiffs to proceed on any claim, it should strike under Rule 12(f) certain requests for relief. Plaintiffs appear to agree that the Court should strike any requests for punitive damages or emotional distress under Title VI. MTD 40; *see* Opp. 73-75. The Court should likewise strike Plaintiffs' request for an injunction requiring specific disciplinary measures. Plaintiffs apparently accept that they have no right to particular disciplinary action under Title VI and instead argue that "nowhere" in their Complaint do they request such "specific remedial measures." Opp. 74. Plaintiffs' prayer for relief, however, requests the "termination" of "deans, administrators, professors, and other employees" and the "suspension or expulsion" of students. These are "particular remedial demands" that require the court to "second-guess[] the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. As the cases Barnard cites illustrate, *see* MTD 40, courts in this Circuit regularly strike as "immaterial" or "impertinent" remedial requests that are not authorized by the statute. The Court should do so here.

## CONCLUSION

For the foregoing reasons, the Court should grant the Motion to Dismiss under Rules 12(b)(1) and 12(b)(6) or, alternatively, to Strike under Rule 12(f)(1).

---

[12] Plaintiffs' cases do not suggest otherwise. *Johnson v. Bryson*, 851 F. Supp. 2d 688 (S.D.N.Y. 2012), involved a challenge to longstanding policies, and plaintiffs would likely suffer hardship because of the short time period when the Census Bureau hires temporary workers, *id.* at 702. And the claims in *New York by James v. Pa. Higher Educ. Assistance Agency*, 2020 WL 2097640 (S.D.N.Y. May 1, 2020), unlike Plaintiffs', were not "contingent on future events," and the court would "not benefit from any further factual development," *id.* at *12.

Dated:  September 11, 2024                    Respectfully submitted,

                                              */s/ Anton Metlitsky*
                                              Anton Metlitsky
                                              Jennifer B. Sokoler
                                              O'MELVENY & MYERS LLP
                                              1301 Avenue of the Americas
                                              17th Floor
                                              New York, New York 10019
                                              Telephone: (212) 326-2000
                                              Facsimile: (212) 326-2061
                                              E-mail: ametlitsky@omm.com
                                                        jsokoler@omm.com

                                              *Counsel for Defendant Barnard College*