# KASOWITZ LLP

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

Marc E. Kasowitz
Direct Dial: (212) 506-1710
Direct Fax: (212) 835-5010
MKasowitz@kasowitz.com

ATLANTA
BOULDER
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
WASHINGTON DC

October 24, 2025

**VIA ECF**

The Honorable Vernon S. Broderick
United States District Court
Southern District of New York
40 Foley Square, Room 415
New York, New York 10007

    Re:    *Students Against Antisemitism, Inc., et al. v. Trustees of Columbia Univ., et al.*,
              No. 1:24-cv-01306-VSB-SN (S.D.N.Y.)

Dear Judge Broderick:

    We write on behalf of Plaintiffs in response to the October 23, 2025 letter filed by Defendant Trustees of Columbia University in the City of New York ("Columbia") (ECF 117), which attaches *StandWithUs Center for Legal Justice, et al., v. Massachusetts Institute of Technology*, 2025 WL 2962665 (1st Cir. Oct. 21, 2025), a First Circuit decision concerning Massachusetts Institute of Technology ("MIT").

    The First Circuit's decision was based largely on a finding that: "to the extent that plaintiffs allege isolated incidents that are plausibly antisemitic, the complaint's allegations are not sufficiently severe, pervasive, and offensive to constitute actionable harassment under Title VI" (*id*. at *6); plaintiffs in MIT failed to allege that MIT had "any knowledge" of the incidents (*id*. at *14); and most of the allegations consisted of speech protected by the First Amendment (*id.* at *6). None of those issues are present in the Complaint against Columbia.

    *First*, the facts and allegations regarding actionable harassment at issue here are not "isolated"—they were systemic. Indeed, in its Motion to Dismiss, Columbia did not (because it could not) contest the severity and pervasiveness of the harassment on campus. Columbia admitted that the allegations are "**deeply troubling**," (ECF 61 at 2), and that the Complaint "**contains many allegations reflecting speech or conduct that is abhorrent and antisemitic**," (*id*. at 27).

    Notably, Judge Stearns decided both the motions to dismiss brought by MIT (granted) and Harvard (denied). In denying Harvard's motion, the court held that plaintiffs' allegations showed that Harvard "failed its Jewish students" and that its response was "so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 310 (D. Mass 2024). Judge Stearns declined to "reward Harvard for virtuous public declarations" that "proved hollow when it came

to taking disciplinary measures against offending students and faculty." *Id*. The court distinguished its decisions for Harvard and MIT, because, in the court's view, MIT merely "fail[ed] to anticipate the bigoted behavior" and responded "with a perhaps overly measured but nonetheless consistent sense of purpose in returning civil order and discourse to its campus." *Id*.

Here, Columbia's response to an obviously hostile environment has been, if anything, worse than Harvard's (and MIT's). As alleged in the Complaint, for example, although it acknowledged that a rally "risk[ed] creating an unsafe environment," Columbia only restricted campus access and promised to impose discipline for rule violations (ECF 39 at ¶¶ 168-70), yet those measures proved ineffective (*id*. at ¶¶ 171-74). And despite evidence of a worsening environment, Columbia did not meaningfully adjust its response. *See, e.g., id*. at ¶¶ 257-61 (describing rallies rife with harassment, including calls for the genocide of Jews and exclusion of Israelis from campus, open support for terrorist organizations, and physical intimidation); ¶¶ 270-74 (describing rally during which a Jewish student was assaulted and there were chants of "go back to the gas chambers"); ¶ 278 (describing rally culminating in a blockade at the entrance of Butler Library, where agitators broke the glass of a library door); ¶¶ 285-91 (describing "Resistance 101," an unsanctioned event on Columbia's campus that featured speakers from organizations with confirmed ties to terrorists). Columbia's failure to respond ultimately culminated in an encampment replete with antisemitic slogans, chants, and banners, which were permitted to continue for weeks as Columbia tried to negotiate with agitators. *Id*. at ¶ 5. Despite then-President Shafik's admission that Columbia was "a hostile environment in violation of Title VI" (*id*. at ¶¶ 375, 384), at no time did Columbia take effective steps to remedy the situation.

*Second*, the Complaint details dozens of times Columbia was put on notice of antisemitic incidents. *See* ECF 72 at 15-16. As explained in Plaintiffs' Opposition to the Motion to Dismiss (ECF 72), and as noted above, Columbia cannot seriously dispute knowledge of its antisemitism problem while simultaneously touting its supposed efforts to combat it (ECF 61 at 16, 20).

*Third*, the First Amendment is mentioned only half-heartedly in a footnote in Columbia's Motion to Dismiss. *Id*. at 29 n.22. And for good reason. The First Amendment does not conflict with Columbia's Title VI obligations; if it did, the Civil Rights Act would be toothless. As Judge Stearns explained, it "is dubious that [a private university] can hide behind the First Amendment to justify avoidance of its Title VI obligations[.]" *Harvard*, 743 F. Supp. 3d at 309. Suggesting otherwise would also ignore decades of decisions by courts and the Department of Education holding both private and public institutions accountable for failing to stop verbal harassment, as well as Columbia's own Task Force. ECF 39 at ¶ 448. And Columbia cannot conveniently invoke the First Amendment as a shield here (for antisemitism) when it has notoriously used it as a sword in the past (for acts of hatred against other groups). *See, e.g., id.* at ¶¶ 417, 432-34.

The Court should deny Columbia's Motion to Dismiss.

Respectfully,

Marc E. Kasowitz